IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| SIERRA CLUB, HAWAIʻI CHAPTER; HAWAIʻIʼS THOUSAND FRIENDS; and OUR CHILDRENʼS EARTH FOUNDATION, <br><br> Plaintiffs, <br><br> v. <br><br><br> CITY AND COUNTY OF HONOLULU and FRANK DOYLE, DIRECTOR OF THE DEPARTMENT OF ENVIRONMENTAL SERVICES, in his official capacity, <br><br> Defendants. | Civil No. 04-00463 DAE/BMK <br><br> **MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** |

650780-2 / 7502-3

**MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs Sierra Club, Hawaiʻi Chapter, Hawaiʻi's Thousand Friends, and Our Children's Earth Foundation (collectively, "Plaintiffs") move this Court for partial summary judgment against Defendant City and County of Honolulu ("CCH") on Plaintiffs' Third, Fourth, and Eighth Claims (Second Amended Complaint) for violations of the federal Clean Water Act ("CWA") at the CCH's Sand Island Wastewater Treatment Plant ("Sand Island WWTP" or "Sand Island")in Honolulu, Hawaiʻi.

The purpose of this motion is to resolve the Third, Fourth, and Eighth Claims and then count the total number of CWA violations based on the methodology set forth in this Court's April 16, 2007 Order in this case.

## I.    INTRODUCTION

Plaintiffs' Third Claim alleges that CCH violated the CWA by continuously exceeding the effluent limitations set forth in the National Pollution Discharge Elimination System ("NPDES") Permit governing CCH's discharge from the Sand Island WWTP.

Plaintiffs' Fourth Claim alleges that CCH violated its Sand Island NPDES permit by failing to complete required capital improvement projects.

Plaintiffs' Eighth Claim alleges that CCH violated the September 30, 2002 U.S. Environmental Protection Agency ("EPA") Administrative Order requiring CCH to curtail CWA violations at the Sand Island WWTP.

On April 16, 2007, this Court granted partial summary judgment for Plaintiffs on their Third and Fourth Claims, namely that CCH violated the CWA from May 1999 through July 2004. Order Granting Plaintiffs' Motion for Reconsideration ("April 16, 2007 Order"). In that April 16, 2007 Order, the Court resolved the legal methodology for *counting* CWA violations, but deferred final determination of the total number of violations. The Court indicated it (a) wanted to resolve CCH's liability on the Eighth Claim (b) <u>before</u> counting the total number of CCH's CWA violations.

Accordingly, Plaintiffs bring this motion for partial summary judgment to determine the total number of CWA violations by resolving: (a) Plaintiffs' Third and Fourth Claims for CCH's CWA violations for the time period August 1, 2004 through March 31, 2007; and (b) the Eighth Claim through the date of this motion.

## II.  STANDARD OF REVIEW FOR SUMMARY JUDGMENT

The standard of review for summary judgment is set forth in Federal Rule of Civil Procedure 56(c). Summary judgment shall be entered when:

> . . . the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c) (2003).

"In its motion for summary judgment, the moving party has the initial burden of demonstrating for the court that there is no genuine issue of material fact and that the court may rule on the issues as a matter of law. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986);" *Western Sunview Properties, LLC v. Federman*, 338 F. Supp. 2d 1106 (D. Haw. 2004)(Ezra, J.).  Once the movant has met its initial burden, the opposing party has the affirmative burden of coming forward with specific facts evidencing a need for trial. *See* Fed. R. Civ. P. 56(e). The opposing party cannot stand on its pleadings, nor simply assert that it will be able to discredit the movant's evidence at trial. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987); Fed. R. Civ. P. 56(e). Moreover, there is no genuine issue of fact "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). "A material fact is one that may affect the decision, so that the finding of that fact is relevant and necessary to the proceedings. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). "In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law." *Id.* at 254.

## III. STATEMENT OF FACTS

### A.    THE SAND ISLAND WASTEWATER TREATMENT PLANT

CCH owns and operates several sewage collection systems and treatment plants on Oʻahu.  These municipal systems are categorized under the CWA as "Publicly Owned Treatment Works" ("POTWs").  The Sand Island WWTP is a POTW.  (Separate and Concise Statement of Facts ("SCSF") ¶1.[1]  Most POTWs nationwide treat and discharge sewage effluent to a secondary level (the second of three possible levels) of treatment.[2]  However, the Sand Island WWTP only treats and discharges effluent to the first or primary level of treatment.[3]  (SCSF ¶1).

The sewage effluent discharged from the Sand Island WWTP contains a variety of  pollutants:  conventional pollutants such as Biochemical Oxygen Demand ("BOD") and Total Suspended Solids ("TSS"); sewage-related pathogenic organisms including various bacteria, viruses and protozoa; and toxic organic

---

[1]  Publicly owned treatment works or POTWs are the treatment works and related collection systems which collect and treat human sewage and are owned by a State, municipality, or intermunicipal or interstate agency.  33 U.S.C. § 1292(2); 40 C.F.R. 125.58(u).

[2]  Secondary treatment removes about 85 percent of organic matter in sewage by making use of the bacteria in it and disinfecting the sewage.  *Id.*

[3]  Primary treatment involves the removal of solids from sewage by screens, and chambers in which solids sink to the bottom.  *See* "How Wastewater Treatment Works . . . The Basics," EPA 833-F-98-002 (May 1998), published at: http://www.epa.gov/npdes/pubs/bastre.pdf

chemicals such as the chlorinated organic pesticides chlordane, heptachlor, and dieldrin. (SCSF ¶2).

"Biochemical Oxygen Demand" measures the tendency of total pollutants in a waste stream to deplete oxygen from receiving waters.  High BOD depletes oxygen from waters needed to support aquatic life. (SCSF ¶3).

"Total Suspended Solids" is the total solid pollutant material present in effluent.  High TSS reduces water clarity and can lead to sedimentation that smothers coral reefs and other habitat on the ocean floor. (SCSF ¶3).

Sewage-borne pathogens cause a wide variety of illnesses.  69 Fed. Reg. 67218, 67220 (Nov. 16, 2004).

Toxic organic pollutants harm marine life and pose multiple health risks to humans.  The pesticides chlordane and dieldrin are highly toxic and persistent chemicals.  Both are banned because of their potential harm to human health. (SCSF ¶3).

Excessive chlordane exposure is very likely to (a) cause cancer; (b) harm the nervous, digestive, and endocrine system; and (d) induce behavioral disorders in children.  *Id.*

Excessive Dieldrin is carcinogenic, harmful to the immune system, and increases infant mortality.  *Id.*

B.   THE CLEAN WATER ACT AND THE "NATIONAL POLLUTION
     DISCHARGE ELIMINATION SYSTEM" PERMIT REGULATION OF
     CCH'S SAND ISLAND PUBLICLY OWNED TREATMENT WORKS.

     1.   THE CLEAN WATER ACT - STATUTORY BACKGROUND

     The purpose of the CWA is "to restore and maintain the
chemical, physical and biological integrity of the Nation's
waters." CWA § 101(a); 33 U.S.C. § 1251(a).   To this end, the
CWA prohibits any discharge of pollutants from point sources into
"waters of the United States" unless first authorized and
regulated by a NPDES permit.   CWA § 301(a), 402(b),(c); 33 U.S.C.
§§ 1311(a), 1342(b),(c).

     The CWA authorizes EPA (or states with permit programs
approved by EPA) to issue NPDES permits that allow the discharge
of a defined level of pollutants (subject to regulation) into
waters of the United States.   CWA § 402.   EPA delegated its
authority and approved the Hawai'i DOH to administer an NPDES
permit program in the state.   DOH issues most of the NPDES
permits in Hawai'i.   However, EPA retains sole authority to issue
NPDES permits to POTWs under CWA § 301(h), 33 U.S.C. § 1311(h).

     NPDES permits for municipal POTWs include effluent
limitations on the levels of BOD and TSS that are allowed in
wastewater discharges.   CWA §§ 301(b)(1)(B), 402(b)(1)(A); 40
C.F.R. § 133.102.   There is a limited waiver provision.   Under
CWA § 301(h), EPA may issue NPDES permits to certain qualifying
POTWS that waive secondary treatment requirements and impose less
stringent BOD and TSS limits that POTWs can meet with only

primary treatment ("§ 301(h) waivers").  As discussed below, EPA did issue a limited § 301(h) waiver for the Sand Island WWTP imposing BOD and TSS limits that CCH should be able to meet with only primary treatment.

All NPDES permits must also include effluent limitations ("WQBELs" or "effluent limitations") based on water quality standards whenever an effluent discharge has the "reasonable potential" to cause or contribute to a failure to attain a state's "Water Quality Standards" (WQS).[4]  CWA § 301(b)(1)(C); 40 C.F.R. 122.44(d)(1).  The Sand Island NPDES Permit includes WQBELs for enterococcus bacteria, chlordane, and dieldrin set to achieve the State's WQS for these pollutants.  *See* Haw. Admin. R. § 11-54-8(b)(1), (3); *see also Hawai'i's Thousand Friends*, 821 F. Supp. at 1387.

> **2.  THE SAND ISLAND NPDES PERMIT LIMITS AND REQUIREMENTS:  POLLUTANT LIMITS, CAPITAL IMPROVEMENTS AND ADMINISTRATIVE ORDERS**

On November 2, 1998, EPA issued an NPDES permit under CWA § 301(h) to the Sand Island WWTP ("Sand Island Permit").  (SCSF ¶4).

---

[4]  WQS consist of "the designated uses" of the state's water bodies and "water quality criteria," i.e., the level of water quality needed to ensure attainment of these designated uses.  CWA § 303(c)(2)(A), 33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. § 131.3(i); *see generally Pronsolino v. Nastri*, 291 F. 3d 1123, 1127 (9th Cir. 2002).

a.   POLLUTANT LIMITS

The Sand Island Permit includes BOD and TSS limits that
CCH should be able to meet with primary treatment set pursuant to
CWA § 301(h).  *Id*.  The Sand Island Permit also includes WQBELs
for enterococcus bacteria, chlordane and dieldrin designed to
meet Hawai'i WQS.  Specifically, the Sand Island Permit limits
include:

| Discharge Parameter | Average Annual Limitation | Daily Limitation |
|---|---|---|
| Enterococcus | | 18,000 Colony Forming Units per 100 milliliters (CFU/ml) daily maximum concentration |
| Chlordane | 0.0076 micrograms per liter (µg/l) concentration limit | 0.38 µg/l daily maximum concentration |
| Chlordane | 0.0052 pounds (lbs)/day mass discharge limit | 0.26 lbs/day daily maximum mass discharge |
| Dieldrin | 0.012 µg/l concentration limit | |
| Dieldrin | 0.0082 lbs/day mass discharge limit | |

*Id*.

The Sand Island Permit requires CCH to (a) monitor its
compliance with all pollutant discharge limits in the permit; and
(b) report the level of pollutant discharged in monthly Discharge
Monitoring Reports ("DMRs") submitted to DOH and EPA.  *Id*.

### b.    CAPITAL IMPROVEMENTS

The Sand Island Permit also includes "compliance schedule" provisions that require CCH to construct various capital improvements EPA has deemed necessary for the Sand Island WWTP to improve its CWA compliance.  For example, the Sand Island Permit requires CCH to build and operate an effluent disinfection system by July 21, 2002.  *Id.*  The Permit also requires CCH to upgrade the Hart Street Wastewater Pump Station and institute various other capital improvement projects to improve treatment reliability and permit limit compliance.  *Id.*

### 3.    NPDES PERMIT VIOLATIONS

### a.    POLLUTANT LIMITS

Plaintiffs' January 6, 2005 motion for summary judgment ("January 2005 Motion") documented CCH's violations of the Sand Island Permit due to CCH's discharging excessive pollutants from the Sand Island WWTP.  Since Plaintiffs filed that motion, CCH has continued to violate the Sand Island Permit's enterococcus bacteria and pesticide effluent limitations. (SCSF ¶¶14, 17-20).

As stated in CCH's DMRs, the enterococcus concentration in Sand Island WWTP effluent greatly exceeded CCH's permit limit until as recently as February 2007. (SCSF ¶14).  The Sand Island Permit requires CCH to build a disinfection facility by July 21, 2002 and then begin to operate this facility continuously for a period of one year. (SCSF ¶5).  CCH completed this facility on December 20, 2006 – four and a half years late. (SCSF ¶7).  Even

though CCH began to operate the facility in December 2006, CCH continued to exceed the permit limit for enterococcus for several months thereafter.  (SCSF ¶14).  According to an EPA consultant retained to evaluate the matter, the disinfection system CCH chose to build may not be adequate to bring the Sand Island WWTP into compliance with CCH's NPDES permit limitation for enterococcus.  (SCSF ¶9).

In addition, CCH's Sand Island WWTP discharges have continuously violated the Sand Island Permit's annual average concentration and annual average mass limits for chlordane and for dieldrin since August 2004.  (SCSF ¶¶17, 18, 19, 20).  CCH expressly acknowledged to EPA that CCH cannot meet its chlordane and dieldrin limits.  (SCSF ¶10).

### b.    CAPITAL IMPROVEMENTS SCHEDULE REQUIREMENTS

The Sand Island Permit "Compliance Schedule" provisions require CCH to implement various capital improvement projects designed to improve the performance and reliability of the Sand Island WWTP and to "reduce the risk of human exposure to pathogenic organisms in marine recreational waters of Mamala Bay by decreasing bacterial indicator loadings from the Sand Island ocean outfall."  (SCSF ¶11).  The Sand Island Permit specifies interim milestones and final deadlines for these projects.

### (1)   DISINFECTION FACILITY

The Sand Island Permit required CCH to install and operate a plant disinfection facility in accordance with the following schedule:

| | |
|---|---|
| Planning | June 30, 1999 |
| Design | June 30, 2000 |
| Advertise | August 29, 2000 |
| Bid Opening | August 29, 2000 |
| Award | September 28, 2000 |
| Construction | July 20, 2002 |
| Continuous Operation | July 21, 2002 |

(SCSF ¶5).  As noted above, CCH finally completed the Sand Island disinfection facility in December 2006, more than four years after the permit deadline.  (SCSF ¶7).

### (2)   HART STREET PUMP STATION

The Sand Island Permit required CCH to modify, upgrade, and rehabilitate the Hart Street Pump Station according to the following schedule:

| | |
|---|---|
| Planning | June 4, 2000 |
| Design | July 24, 2002 |
| Advertise | September 22, 2002 |
| Bid Opening | September 22, 2002 |
| Award | October 22, 2002 |
| Construction | February 18, 2005 |

(SCSF ¶6).  According to CCH's last report (dated March 1, 2007) to EPA, the project has not been completed and closed due to ongoing cavitation problems.  (SCSF ¶8).  As of May 30, 2007, EPA had not received any additional documentation from CCH confirming that the project has been completed or that the operational problems had been resolved. (SCSF ¶22).

c.  **ADMINISTRATIVE ORDERS**

In October 1999 EPA issued an administrative order to CCH requiring CCH to take specific measures to correct the effluent limit and compliance schedule NPDES permit violations discussed above. *In the Matter of City and County of Honolulu*, Docket No. 309-9-00-003 ("1999 EPA Order"). (SCSF ¶12). CCH failed to comply with this Order. CCH's effluent limit and compliance schedule violations continued.

In September 2002 EPA issued a second Administrative Order because CCH continued to violate the Sand Island NPDES permit and had not complied with the 1999 EPA Order. *In the Matter of City and County of Honolulu*, Docket No. 402-9-02-61 ("2002 EPA Order"). *Id.*

The 2002 EPA Order requires CCH to "initiate all necessary measures to prevent all further permit violations and to bring Sand Island WWTP into immediate and continuous compliance" with all provisions of the Sand Island Permit. (SCSF ¶13). To facilitate compliance, CCH was required to submit an Effluent Limits Action Plan to "ensure continuous compliance with all permit effluent limits." *Id.* The 2002 EPA Order also ordered CCH to prepare a Compliance Schedule Action Plan detailing the completion of the required compliance schedule projects and an Operation and Maintenance Action Plan specifying schedules for implementing maintenance procedures and projects. *Id.*

Since the 2002 EPA Order was issued:  (a) CCH has continued to violate the Sand Island WWTP effluent limitations for enterococcus, chlordane, and dieldrin (SCSF ¶¶14, 17-20); and (b) CCH has failed to complete all the capital improvement projects required by the Sand Island Permit.  (SCSF ¶¶7, 8).

## IV.  SUMMARY JUDGMENT IS PARTICULARLY APPROPRIATE IN CWA CASES

CWA cases are particularly appropriate for summary adjudication under Fed. R. Civ. P. 56.  The CWA was designed for speedy and simple enforcement.  The CWA imposes strict liability for violations of any limitations established under the Act, including all terms of NPDES permits.  *See* CWA §§ 301(a), 402(k); 33 U.S.C. §§ 1311(a), 1342(k); *see also Hawaii's Thousand Friends v. Honolulu*, 821 F. Supp. 1368, 1392 (D. Haw. 1993) ("Courts throughout the country have held that NPDES compliance is a matter of strict liability and a defendant's intent and good faith are irrelevant"); *Sierra Club v. Union Oil Co. of California,* 813 F.2d 1480, 1490-91 (9th Cir. 1987), *vac'd on other grounds*, 485 U.S. 931, (1988), *reinstated*, 853 F.2d 667 (9th Cir. 1988).

CCH cannot genuinely dispute the material facts relevant to its liability.  Those facts derive from CCH's own Discharge Monitoring Reports, the mandatory self-monitoring reports to EPA and DOH required by CCH's NPDES permit.  A CWA "self-monitoring report is to be considered. . . conclusive evidence of an exceedance of a permit limitation." *Union Oil,*

813 F.2d at 1492.  Allowing a defendant discharger to impeach its DMRs "would be sanctioning countless additional hours of NPDES litigation and creating new, complicated factual questions for district courts to resolve[.]"  *Id.*  As this Court pointed out: "Because these reports are submitted under penalty of perjury, they constitute admissions of noncompliance which bind the defendant."  *Save Our Bays & Beaches v. City and County of Honolulu*, 904 F. Supp. 1098, 1138 (D. Haw. 1994).  Thus, CCH's self-monitoring reports submitted to EPA provide unequivocal evidence supporting summary judgment in this CWA case.

## V.    CITIZEN PLAINTIFFS MAY ENFORCE CWA VIOLATIONS AGAINST CCH

When a municipality violates the CWA, and neither the EPA nor the State bring a judicial enforcement action, the CWA explicitly provides that "any citizen may commence a civil action on his own behalf" to enforce effluent standards or limitations OR any order issued by EPA or a State regarding such standard or limitation.[5]

---

[5]    The CWA provides:

Except as provided in subsection (b) of this section and section 309(g)(6),any citizen may commence a civil action on his own behalf -
(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of
(A)  an effluent standard or limitation under this Act [33 USCS §§ 1251 et  seq.] or
(B)  an order issued by the Administrator or a State with respect to such a standard or limitation, or

CWA effluent standards or limitations include CWA § 301(a)'s prohibition on unpermitted discharge of pollutants and all NPDES permit conditions.  CWA § 505(f)(1),(6); *accord* 40 C.F.R. § 122.41(a)(2).  Thus, citizens may sue any person (including a government entity) who violates the prohibition in CWA § 301(a) against unpermitted discharges, any NPDES permit term, or any EPA or state-issued administrative order that enforce the CWA.  *Union Oil Co.,* 813 F.2d at 1483.

The Citizens' right to enforce the CWA is well-established in case law.  It was

> Congress' clear intention . . . that citizen plaintiffs are not to be treated as "nuisances or troublemakers" but rather as "welcomed participants in the vindication of environmental interests."

*Proffitt v. Municipal Auth. of the Borough of Morrisville*, 716 F. Supp. 837, 844 (E.D. Pa. 1989) (*quoting Friends of the Earth v. Carey*, 535 F.2d 165, 172 (2d Cir. 1976); *see also Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1525 (9th Cir. 1987) (underscoring that citizen suits perform an important public function in the Ninth Circuit); *Atlantic States Legal Foundation,*

---

. . . .
The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 309(d) of this Act

CWA § 505(a), 33 U.S.C. § 1365(a).

*Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1136 (11th Cir. 1990)
("citizen suits are an important supplement to government
enforcement of the Clean Water Act, given that the government has
only limited resources to bring to its own enforcement
actions."); *Save Our Bays & Beaches*, 904 F. Supp. at 1125.
Prevailing citizens are entitled to injunctions, declaratory
relief and civil penalties, attorney fees and costs, as
appropriate.  CWA § 505(a) and (d).

## VI.  CCH REPEATEDLY VIOLATED THE SAND ISLAND NPDES PERMIT

### A.    CCH VIOLATED THE SAND ISLAND'S PERMIT LIMITS ON POLLUTANT DISCHARGE (THIRD CLAIM)

Plaintiffs' January 2005 Motion documented CCH's
numerous violations of the Sand Island Permit's pollutant
discharge limitations *from August 30, 1999 through July 31, 2004.*
In this second motion for partial summary judgment, Plaintiffs
present conclusive evidence that CCH continued to violate the
Sand Island Permit's effluent limitations for the next two and
one-half years *from August 1, 2004 through March 31, 200*7.  CCH's
own DMRs report these violations and conclusively establish that
CCH violated the CWA.  *Union Oil,* 813 F.2d at 1492; *Save Our Bays
& Beaches,* 904 F. Supp. at 1138.

#### 1.    CCH VIOLATED THE SAND ISLAND ENTEROCOCCUS PERMIT LIMIT.

The Sand Island Permit sets an average daily maximum
enterococcus limit of 18,000 CFU/100 ml (effective July 21,
2002). (SCSF ¶4).  Although CCH finally began to operate the long

overdue disinfection facility in December 2006, the Sand Island WWTP's discharges continued to exceed its enterococcus permit limit until at least February 2007. (SCSF ¶¶7, 14). This Court's April 16, 2007 Order found that CCH violated its enterococcus limit every day from July 21, 2002 (the date when the limit took effect) through July 31, 2004. Thus, CCH's ongoing violation of the daily maximum enterococcus limits from July 21, 2002 to July 31, 2004, constitute *742 CWA violations*.

Since *August 1, 2004*, CCH continued to violate the enterococcus limit every day through *February 28, 2007.* (SCSF ¶14). Plaintiffs are entitled to summary judgment as a matter of law that CCH violated its enterococcus limit every day *from August 1, 2004 through February 28, 2007.* Each day of a permit violation constitutes a separate CWA violation. A violation of any single NPDES permit effluent limitation constitutes a separate CWA violation. *United States v. Smithfield Foods*, 191 F.3d 516, 527 (4th Cir. 1999), *cert. denied*, 531 U.S. 813, 121 S. Ct. 46 (2000); *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 78 & n.28 (3d Cir. 1990); *Hawaiʻi's Thousand Friends*, 821 F. Supp. at 1394. Between August 1, 2004 and February 28, 2007, CCH's discharges exceeded the Sand Island Permit's enterococcus limit on *942 days* for a total of 942 additional CWA violations.

Therefore, the sum total of CCH's violations of the Sand Island Permit's enterococcus limit *from July 21, 2002 through March 31, 2007 equals 1,684.*

### 2. CCH VIOLATED THE SAND ISLAND PERMIT LIMITS ON PESTICIDES.

#### a. CCH VIOLATED ITS AVERAGE ANNUAL LIMITS ON PESTICIDES.

The Sand Island Permit contains limits on the average annual <u>mass</u> and the average annual <u>concentration</u> of the pesticides dieldrin and chlordane in Sand Island WWTP effluent. (SCSF ¶4). These limits set the maximum allowable average mass and the maximum allowable average concentration values of these two pesticides in Sand Island effluent over an entire year. In the April 16, 2007 Order, this Court held that a violation of an *average measurement* over a specified period should be counted as a *violation of every day during that period*.

Therefore, CCH's Sand Island WWTP discharges in excess of *either* the running average mass OR the running average concentration limitations for these pesticides represents 365 violations (as a violation of an average limit counts as a violation for every day in the averaging period). *See also*, *Hawai'i's Thousand Friends*, 821 F. Supp. at 1394.

#### b. CHLORDANE VIOLATIONS

This Court's April 16, 2007 Order held that CCH's Sand Island WWTP discharges violated the Sand Island Permit's annual mass and annual concentration limits for chlordane continuously

*from May 30, 1999 (*the beginning of the statute of limitations period) *through July 31, 2004* (a period of 1,890 days).  Thus, the April 16, 2007 Order established that CCH violated the Sand Island Permit's: (a) annual mass chlordane effluent limitation on 1,890 days; and (b) annual concentration chlordane limitation also on 1,890 days through July 31, 2004.  Thus, CCH violated the Sand Island Permit's chlordane effluent limitations a total of 3,780 times during the May 30, 1999 to July 31, 2004 time period.

Since the time period addressed by the Plaintiffs' January 2005 Motion and the April 16, 2007 Order, CCH continued to violate its chlordane annual mass and concentration limits every day from August 1, 2004 through March 31, 2007 (a time period of 973 days).  (SCSF¶¶ 17, 18).  Therefore, CCH violated its annual mass chlordane limit for 973 days and its annual concentration chlordane of violation for 973 days, for a total of 1,946 additional violations in the above period.  This brings CCH's sum total of violations of the Sand Island Permit's chlordane effluent limitations from May 30, 1999 through March 31, 2007 to 5,726.

### c.  DIELDRIN VIOLATIONS

The Court's April 16, 2007 Order held that CCH's Sand Island WWTP discharges violated the annual mass and concentration limits for dieldrin continuously from May 30, 1999 (from the beginning of the statute of limitations period) through July 31, 2004 (a time period of 1,890 days).  Thus, pursuant to this

Court's April 16, 2007 Order CCH violated the Sand Island Permit's: (a) annual mass dieldrin effluent limitation on 1,890 days; and (b) annual concentration dieldrin limitation also on 1,890 days through July 31, 2004.

In addition, the April 16, 2007 Order establishes that CCH violated the Sand Island Permit's: (a) daily maximum mass limit for dieldrin on 62 days; and (b) daily maximum concentration limit for dieldrin on 31 days.

In sum, the April 16, 2007 Order established that CCH committed a total of 3,873 CWA violations for excessive dieldrin discharge through July 31, 2004.

Since the time period addressed by the Plaintiffs' January 2005 Motion and the April 16, 2007 Order, CCH continued to violate its dieldrin annual mass and concentration limits every day between August 1, 2004 and March 31, 2007. (SCSF ¶¶19, 20). Therefore, CCH violated the Sand Island Permit's: (a) annual mass dieldrin limit on 973 days; and (b) annual concentration dieldrin limit on 973 days for a total of 1,946 additional violations for the above period (August 1, 2004 to March 31, 2007).

The sum total of CCH violations of the Sand Island Permit's dieldrin effluent limitations through March 31, 2007 equals 5,819.

## B. CCH VIOLATED THE SAND ISLAND PERMIT'S COMPLIANCE SCHEDULE PROVISIONS (FOURTH CLAIM).

The Sand Island Permit requires CCH to complete several capital improvement projects designed to improve the Sand Island WWTP's performance and reduce the risk of human exposure to pathogens from its discharges.  (SCSF ¶¶4, 11).

### 1. DISINFECTION UNIT

As discussed above, the Sand Island Permit required CCH to build and begin continuously operating a disinfection unit for the Sand Island WWTP by July 21, 2002.  (SCSF ¶5).  In compliance reports CCH submitted to EPA (pursuant to EPA's 2002 Order), CCH confirmed that the Sand Island disinfection unit was not operational until December 20, 2006.  (SCSF, ¶7).  The Court's April 16, 2007 Order held that CCH violated this permit condition every day after July 21, 2002 that CCH failed to complete the disinfection facility until the date of Plaintiffs' January 5, 2005 Motion, 900 days of violations.  After Plaintiffs' January 2005 Motion, CCH continued to violate the permit requirement to build the disinfection unit every day until December 19, 2006.  This corresponds to an additional 713 days of permit violations between January 6, 2005 and December 19, 2006 for the failure to build the Sand Island disinfection unit.  (SCSF ¶15).

The total of CCH violations of the Sand Island Permit's requirement to build a disinfection facility equals 1,613.

### 2.    HART STREET PUMP STATION

The Sand Island Permit required another capital improvement project, the Hart Street Pump Station (New/Alternative) project. (SCSF ¶6). The Sand Island Permit required CCH to complete construction of this project by February 18, 2005. *Id*. Although CCH continues to work on this project, as of May 30, 2007, CCH had not completed construction of the project. (SCSF ¶8)

The Court's April 16, 2007 Order held that CCH's failure to build a capital improvement project required by the Sand Island Permit constitutes one violation for every day that the project has remained incomplete past the due date established by the Permit. Accordingly, CCH violated the Sand Island Permit requirement to construct the Hart Street Pump Station (New/Alternative) project every day beginning February 18, 2005 until May 30, 2007 (an 832 day time period). (SCSF ¶8). This equals 832 days of permit violations for the failure to complete construction on the Hart Street Pump Station. (SCSF ¶16).

### C.    CCH VIOLATED EPA'S 2002 ADMINISTRATIVE ORDER (EIGHTH CLAIM)

The CWA expressly authorizes citizens to enforce EPA administrative orders issued under the CWA. CWA § 505(a)(1). As discussed above, EPA issued an Administrative Order on September 30, 2002 which (in paragraph I) required CCH to "initiate all necessary measures to prevent all further permit violations and to bring Sand Island WWTP into immediate and

continuous compliance with all provisions" of the Sand Island
Permit.  (SCSF ¶13).  The EPA 2002 Order (in paragraphs II and
III, respectively) further required CCH to submit to EPA:  (1) an
Effluent Limitations Action Plan setting forth actions "to ensure
immediate and continuous compliance with the effluent limits" in
the Sand Island Permit; and (2) a Compliance Schedule Action Plan
"to ensure immediate and continuous compliance with the
compliance schedules" for construction projects in the Sand
Island Permit.  *Id*.

Plaintiffs' Eighth Claim alleges that CCH violated the
EPA 2002 Administrative Order.[6]  First, this Court should grant
Plaintiffs' motion for summary judgment on their Eighth Claim
that CCH failed to comply with *Paragraph I* of the EPA 2002
Administrative Order based on CCH's DMRs submitted in Plaintiffs'
January 2005 Motion and this motion.  As set forth above, the
DMRs report on-going violations of the Sand Island Permit since
September 2002.  *A fortiora*, CCH failed to "initiate all
necessary measures to prevent all further permit violations and
to bring Sand Island WWTP into immediate and continuous
compliance with all provisions" of the Sand Island Permit in
violation of the EPA 2002 Administrative Order.

Specifically:

1.  CCH committed ongoing violations of the Sand
    Island Permit's daily maximum enterococcus and

---

[6]  Plaintiffs' Eighth Claim is currently reflected in
Plaintiffs' More Definite Statement on their Eighth Claim of the
Second Amended Complaint filed in November 2005.

pesticide limits since EPA issued the EPA 2002 Administrative Order.  (SCSF ¶¶14, 17-20).

2.    CCH failed to complete the Sand Island disinfection facility by July 21, 2002.  In fact, CCH did not complete this facility until December 20, 2006.  (SCSF ¶7).

3.    CCH failed to complete the Hart Street Pump Station project by the Sand Island Permit's February 18, 2005 deadline. As of May 30, 2007, this project was still not completed.  (SCSF ¶8).

Thus, CCH (a) violated *Paragraphs I and II* of the 2002 EPA Administrative Order every day between October 1, 2002 and March 31, 2007 by continuing to exceed the Sand Island Permit's effluent limits; and (b) violated *Paragraph III* of the EPA 2002 Administrative Order every day between October 1, 2002 and May 30, 2007 by failing to complete the required capital improvement projects required by the Sand Island Permit.

Second, the Court should grant Plaintiffs' motion for partial summary judgment on their Eighth Claim that CCH failed to comply with *Paragraph II* of the EPA 2002 Administrative Order based on these same DMRs.  CCH's continuing violation of the Sand Island Permit's effluent limitations (demonstrated by the DMRs) necessarily means that CCH failed to develop an Effluent Limitations Action Plan setting forth actions "to ensure immediate and continuous compliance with the effluent limits" in the Sand Island Permit.

Third, the Court should grant Plaintiffs' motion for summary judgment on their Eighth Claim that CCH failed to comply with *Paragraph III* of the EPA 2002 Administrative Order based on

the evidence submitted here that CCH did not complete the Hart Street Pump Station project by the deadline specified in the Sand Island Permit.  The Sand Island Permit's February 18, 2005 deadline for completing this project was substantially <u>after</u> EPA issued the EPA 2002 Administrative Order and yet CCH still failed to meet this deadline. CCH's failure in this respect establishes that CCH failed to develop a Compliance Schedule Action Plan "to ensure immediate and continuous compliance with the compliance schedules" for construction projects in the Sand Island Permit.

Plaintiffs are therefore entitled to summary judgment on their Eighth Claim that CCH violated the 2002 EPA Order on every day *from October 1, 2002 to May 30, 2007*, for a total of 1,703 violations under Plaintiffs Eighth Claim.

The Court is now able to determine the total number of CCH's CWA violations and proceed directly to address remedial actions without delay.

## VII. CONCLUSION

Plaintiffs are entitled to partial summary judgment as a matter of law on CCH's liability under Plaintiffs' Third, Fourth, and Eighth Claims.  Specifically, the Court should issue an order and enter summary judgment that CCH violated the CWA as follows:

> (1)    8,613 violations of the Sand Island Permit's enterococcus, chlordane, dieldrin, BOD and TSS limits between May 30, 1999 and July 31, 2004 as set forth in Plaintiffs' January 2005 Motion and this Court's April 16, 2007 Order;

(2)   4,834 violations of the Sand Island Permit's enterococcus, chlordane, and dieldrin limits between August 1, 2004 and March 31, 2007;

(3)   900 violations of the Sand Island Permit's compliance schedule provisions between July 21, 2002 and January 5, 2005 due to CCH's failure to complete the Sand Island disinfection facility as set forth in Plaintiffs' January 2005 Motion;

(4)   713 violations of the Sand Island Permit's compliance schedule requirement between January 6, 2005 and December 19, 2006 for failing to complete the Sand Island disinfection facility;

(5)   832 violations of the Sand Island Permit's compliance schedule requirement between February 19, 2005 and May 30, 2007 for failing to complete the Hart Street Pump Station (New / Alternative) project; and

(6)   1,703 violations of the 2002 EPA Order between October 1, 2002 and May 30, 2007.

The sum total of all CCH's violations under Plaintiff's Third, Fourth, and Eighth claims equals 17,595 violations of the Clean Water Act.[7]

Therefore, this Court should determine, order, and award Plaintiff partial summary judgment on Plaintiffs' Third,

/

/

/

/

/

/

---

[7]   The number of CWA violations for the Third and Fourth Claims alone (excluding Plaintiffs' Eighth Claim) equals 15,892 CWA violations.

Fourth, and Eighth that the City and County of Honolulu committed 17,595 violations of the Clean Water Act.

Dated:  Honolulu, Hawaii July 26, 2007.

/s/ William Tam
CHRISTOPHER SPROUL
ENVIRONMENTAL ADVOCATES

PAUL ALSTON
WILLIAM TAM
BLAKE OSHIRO
ALSTON HUNT FLOYD & ING

Attorneys for Plaintiffs SIERRA
CLUB, HAWAI'I CHAPTER, HAWAI'I
THOUSAND FRIENDS, and OUR
CHILDREN'S EARTH FOUNDATION