

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION IX
75 Hawthorne Street
San Francisco, CA 94105-3901

MAY 25 2000

Dr. Kenneth E. Sprague, Director
Department of Environmental Services
City and County of Honolulu
650 King St., 3rd Floor
Honolulu, HI 96813

Subject:   Disinfection at the Sand Island Wastewater Treatment Plant

Dear Dr. Sprague:

    This is in regard to the Sand Island Wastewater Treatment Plant Disinfection Study Final Report, January 2000 (Disinfection Study Final Report), as well as to two requests for modifications to the Sand Island WWTP NPDES permit that have been submitted by the City and County of Honolulu. NPDES Permit No. HI0020117 at Part A.2 includes "Schedules of Compliance for Sand Island WWTP Upgrade and Discharge Limitations for Enterococcus". Subpart A.2.g sets out requirements for effluent disinfection as well as effluent limitations for bacteriological concentrations and effluent bacteriological monitoring as follows:

    First, it provides this schedule for the design, construction and operation of an effluent disinfection facility:

| Activity Description | Start (no later than) | Finish |
|---|---|---|
| Planning | | June 30, 1999 |
| Design | | June 30, 2000 |
| Advertise | | August 29, 2000 |
| Bid Opening | | August 29, 2000 |
| Award | | September 28, 2000 |
| Construction | | July 20, 2002 |
| Continuous Operation | July 21, 2002 | |

    Second, it provides a maximum daily discharge limitation for Enterococci, effective July 21, 2002, of 18,000 CFU/100 ml, as determined by a single grab sample collected between 12 noon and 3:00 p.m.

**EXHIBIT 6**

Dr. Kenneth E. Sprague  
Re: Disinfection at the Sand Island Wastewater Treatment Plant

Page 2 of 4

CCH has made the two following requests for modifications to the NPDES permit with regard to disinfection. First, on July 19, 1999 CCH requested a change to the monitoring requirements at subpart A.2.g for determining compliance with the enterococcus effluent limit from a single grab sample caught between noon and 3 pm to a geometric mean of samples caught over the course of the day. Second, on March 24, 2000 CCH made a request to modify the requirements at paragraph A.2.g which specifies schedule milestones for the planning, design, construction, and operation of the Sand Island WWTP Disinfection Facility project. CCH requests that the schedule be modified to extend the date of award of the construction contract from September 28, 2000 to May 2, 2001 (approximately 7 months) and the date of the beginning of continuous operation from July 21, 2002 to August 2, 2003 (approximately 1 year).

With respect to the first of the indicated permit modification requests, we are willing to consider making this modification. However, we need additional data before we can complete our evaluation of the request[1]. Therefore, please provide the requested information.

In regard to the second modification request, I am concerned that this would result in, at most, three months of experience in, and data from, operation of the disinfection facility prior to the November 2, 2003 expiration of the permit. Although I understand that the scope and complexity of the project has evolved significantly since the time of permit issuance, and although I am sympathetic to CCH's dilemma in needing additional time to bring the project on-line, I am reluctant to modify the permit in such a way that would result in such a limited set of operational data being gathered before the permit expires. I therefore request that CCH withdraw this request and propose another schedule modification that would allow at least six months' operation prior to the permit's expiration.

Let us turn now to the Disinfection Study Final Report, which CCH originally submitted on August 12, 1999. This study report marked the end of the planning phase for the Sand Island WWTP Plant Disinfection Facility, and was submitted pursuant to the requirements of subpart A.2.g of the permit. We found the report to be deficient and, as pursuant to Item 14 of the October 27, 1999 Administrative Order for Compliance (Docket No. CWA-309-9-00-003), CCH was required to submit a revised report. On January 31, 2000 CCH submitted the revised Sand Island WWTP Disinfection Study, Final Report.

We continue to have grave concerns about the viability of CCH's plan for disinfecting Sand Island wastewater effluent using ultraviolet radiation, as we believe the primary and proposed chemically assisted primary treatment at the WWTP will not support effective

---

[1] - To the extent that CCH has collected additional Enterococcus data of the Sand Island WWTP primary effluent beyond that presented in the tables attached to Appendix A (the WRRC Study report) of the Disinfection Study Final Report, provide the analytical results (densities) of all grab samples, along with an indication of the location, date and time of collection of each individual sample.

24572

Dr. Kenneth E. Sprague  
Re: Disinfection at the Sand Island Wastewater Treatment Plant

Page 3 of 4

disinfection sufficient to achieve compliance with the permit's disinfection limits. As mentioned in the Disinfection Study Final Report, consistent levels of effective disinfection of treated sewage have been demonstrated across the U.S. only at treatment plants that employ at least a secondary level of treatment. In addition, we continue to note the high levels of oil and grease and chlorides in Sand Island WWTP influent. Although we are aware CCH hopes to reduce these constituents over time through its grease control and sewer rehabilitation programs, continued high levels of these constituents will diminish the effectiveness of the UV system to achieve the permit limits.

We have additional concerns about the viability of CCH's plans, as described in the enclosed memo from our consultant SAIC to EPA staff. In general, SAIC disagrees with the conclusion that it is possible to successfully disinfect Sand Island primary effluent using a UV disinfection system as recommended by the Disinfection Study Final Report. In so doing, SAIC questions several of the assumptions utilized in the Study, stating that the use of more realistic assumptions would greatly increase the construction, operation, and maintenance costs of the project. EPA agrees with these concerns[2].

In expressing our concerns, we are not recommending whether or not CCH should proceed with the project as presently envisioned, which is a decision only CCH can make. Rather, if CCH proceeds, our concerns should be considered to be specific technical issues that should be appropriately addressed to ensure the project's viability as well as CCH's ability to comply with the permit's requirement to achieve continuous effective effluent disinfection. Moreover, EPA fully expects CCH to comply with the Enterococcus limit before the permit next expires. CCH's plans thus far do not assure us that using a UV disinfection system with lower quality sewage effluent than is normally associated with such systems will work. We invite your reply to the concerns we've raised.

Finally, I note that the next scheduled milestone pursuant to Part A.2.g of the permit is for the completion of design of the Sand Island WWTP Plant Disinfection Facility by June 30, 2000. We assume that, along with a desire to commence construction at the later date, CCH also anticipates the need for additional time to complete its design of the facility. With your reply addressing the requested schedule modification, could you provide a status report including other significant milestones and estimated dates that CCH anticipates using for its own planning and tracking purposes?

---

[2] - SAIC's first specific concern is in regard to the study's use of a geometric mean of samples for estimating the ability to comply with the maximum daily discharge limitation for Enterococcus, vs. the existing permit requirement to determine compliance based upon a single grab sample. As discussed above, EPA will consider CCH's request for a modification to this requirement which, if granted, would make moot this particular concern.

24573

Dr. Kenneth E. Sprague  
Re: Disinfection at the Sand Island Wastewater Treatment Plant

Page 4 of 4

    If you have any questions please contact Mr. Jeremy Johnstone of our Office of Clean Water Act Compliance Office, at 415-744-1895.

Sincerely,

Alexis Strauss, Director  
Water Division

Enclosure

cc:    Gary Gill, HDOH  
       Denis R. Lau, HDOH

# MEMORANDUM

**To:**        Steve Fuller, EPA
             Jeremy Johnstone, EPA

**From:**     Bill Hahn, SAIC

**Subject:**  Analysis of Sand Island UV Study

**Date:**     March 17, 2000

As a requirement of the new NPDES permit, Sand Island WWTP must comply with a disinfection limit (defined as compliance with a maximum daily discharge limitation of 18,000 CFU/100 ml for enterococci) based on a single grab sample collected between 1200 and 1500 hours each day.

SAIC reviewed the studies contained in the Brown & Caldwell document entitled *Sand Island Wastewater Treatment Plant Disinfection Study* (January 2000). In this document, the City's consultant states that very little research has been performed on disinfection of primary effluent and there are no applications of full-scale primary effluent disinfection for facilities of the magnitude of Sand Island. However, the City believes that, based on the results of a University of Hawaii study that is also part of this document, it is possible to use ultraviolet light (UV) to disinfect Sand Island primary effluent to the level required by the NPDES permit. The consultant recommends that a UV pilot test facility be constructed at Sand Island.

For reasons explained below, SAIC disagrees with the City's conclusion that it is possible to successfully disinfect Sand Island primary effluent under the scenarios presented in the B&C study. Further, while it is reasonable to conclude that the differences in opinions that exist about this matter could eventually be resolved by a pilot test facility, if indeed the pilot test indicates that UV disinfection of the effluent to the permit requirement is not feasible (due to costs, performance, or other issues), months will have elapsed during the test, and the City will be no closer to compliance with NPDES permit requirements.

SAIC's concerns about the City's study are summarized as follows:

1. The City's study is predicated on an NPDES permit revision from the current limit, that requires compliance based on a single grab sample, to compliance based on a geometric mean of samples. An average value is likely to be lower than a single grab sample, and therefore more likely to meet a permit limit. Averaging results also reduces apparent sample variability. However, the permit as currently written does not allow for averaging of results to meet the limit. Therefore, the consultant's presentation of averaged data does not speak to whether single samples will meet the limit.

24575

5. The actual UV dose needed for Sand Island primary effluent may be higher than the design dose used to estimate system costs in the consultant's study. Appendix E to the B&C study states that the vendors selected for the pilot study will determine the appropriate dose. This is because equipment for low water quality application varies greatly, and manufacturers have their own methods of calculating dose. However, the B&C study is based on the City's selection of the design UV transmissivity of 20 percent and the design UV dose of 25 mW-s/cm$^2$. If the vendor determines that a dose higher than the City's design dose is needed, costs of a full-scale system will be correspondingly higher.

6. Maintenance costs are likely to be significantly understated. The report states that an automatic lamp cleaning system is necessary because manual removal and cleaning of the lamps would be very labor intensive. At the same time the report acknowledges that "rapid chemical fouling is expected at Sand Island due to the high concentrations of

Steve Fuller, EPA
Page 2
March 17, 2000

2. SAIC analysis of data presented by the City's consultant indicates that at least half the time, discrete effluent samples will not meet the City's stated design standard of 20 percent UVT during the critical period of the day for permit compliance. UVT is a measure of the clearness of effluent; lower water quality produces lower UVT. UVT values for existing applications of UV disinfection technology are much higher, typically ranging from 40 to 65 percent.

SAIC analyzed primary effluent data from the University of Hawaii disinfection appendix to the B&C study. Factors included in our analysis were day of week, time of day, conductivity, turbidity, TSS, and UVT. Unfortunately, most of the data consisted of averages for a given day of the week and time, rather than actual values. This data presentation technique hides effluent variability. The data presented by the City included only 41 discrete sampling results. Of these, nine samples were collected within the permit monitoring period of 1200 to 1500 hours. Five of these nine, or 55 percent, had a UVT of 20 percent or less.

To ensure continuous compliance, a design value for UV transmission of 15% might be more appropriate. Use of such a value would increase capital costs, operating costs, power requirements, and space requirements by 25% over the values presented in the report.

3. The City selected a design bacterial density of 5 million CFU/100 ml, but the City's consultant noted that this figure may be a low estimate of actually density. If the actual density is indeed higher, construction and O&M costs of the UV disinfection system will be correspondingly higher.

4. Many factors influence the UV transmissivity of an effluent. Any changes in effluent quality may affect disinfection efficacy. Therefore, if a UV system is ultimately built to meet the NPDES permit requirement, the City will need to ensure that no wastewater operational changes occur that would have a negative impact on disinfection. This could limit operational flexibility. For instance, ferric ions are strong absorbers of UV light. Therefore, addition of ferric to wastewater (for purposes of odor control or to enhance solids precipitation) might be precluded. Other constituents that adversely interfere with UV disinfection performance by either scattering and/or absorbing radiation are chromium, copper, cobalt, sulfites, and nitrites, all likely to be present in primary effluent. The EPA Guidance Manual states that care should be taken with chemical processes upstream of UV disinfection process to minimize increasing concentrations of these constituents since disinfection efficiency may be adversely affected.[1]

---

[1] EPA Guidance Manual. Alternative Disinfectants and Oxidants. April 1999.

24576

Steve Fuller, EPA
Page 3
March 17, 2000

5. The actual UV dose needed for Sand Island primary effluent may be higher than the design dose used to estimate system costs in the consultant's study. Appendix E to the B&C study states that the vendors selected for the pilot study will determine the appropriate dose. This is because equipment for low water quality application varies greatly, and manufacturers have their own methods of calculating dose. However, the B&C study is based on the City's selection of the design UV transmissivity of 20 percent and the design UV dose of 25 mW-s/cm$^2$. If the vendor determines that a dose higher than the City's design dose is needed, costs of a full-scale system will be correspondingly higher.

6. Maintenance costs are likely to be significantly understated. The report states that an automatic lamp cleaning system is necessary because manual removal and cleaning of the lamps would be very labor intensive. At the same time the report acknowledges that "rapid chemical fouling is expected at Sand Island due to the high concentrations of grease, oil, and organic materials that may coat lamp sleeves."

7. The City's study indicates that UV disinfection is more environmentally acceptable than chlorine based methods. This may be true, however, studies conducted by other researchers indicate that use of UV to disinfect waters with organic components may produce toxic byproducts. UV radiation was found to produce low levels of formaldehyde in the majority of surface waters studied. Formaldehyde concentrations ranging up to 14 mg/L were observed in UV treatment of raw surface water.[2] Sand Island primary effluent contains higher concentrations of organics than normal surface waters. Formaldehyde could increase effluent toxicity.

In summary, the City proposes to pilot test an unproven technology that has never been applied at this scale. Test data show the approach to be under designed, thus the full-scale cost estimates are probably significantly understated. The consultant's report comes close to conceding that lamp fouling problems are likely, and may be fatal to the successful operation of the system. Effluent toxicity may be increased by using disinfection technologies on primary effluent.

---

[2] Malley Jr., J.P, J.P. Shaw, and J.R. Ropp. 1995. Evaluations of Byproducts by Treatment of Groundwaters With Ultraviolet Irradiation. AWWARF and AWWA, Denver, CO.