# EXHIBIT H

ENVIRONMENTAL ADVOCATES
ATTORNEYS AT LAW

5135 ANZA STREET
SAN FRANCISCO, CALIFORNIA 94121
(510) 847-3467
FAX: (415) 358-5695
E-mail: jisaacs@enviroadvocates.com

June 13, 2007

Matthew J. McKeown
Acting Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611

Via Electronic Mail

    Re:    Comments on Proposed Stipulated Order *United States and State of Hawai'i v. City and County of Honolulu*, Civ. No. 07 00235 DAE KSC

Dear Mr. McKeown:

    Sierra Club, Hawai'i Chapter, Hawai'i's Thousand Friends, and Our Children's Earth Foundation (collectively, "the Citizens") are writing to comment upon the proposed Stipulated Order in the above-referenced case ("the Stipulated Order"). The Citizens urge the United States that the Stipulated Order has some serious shortcomings which the United States should promptly address in additional multi-party negotiations between the U.S. Environmental Protection Agency ("EPA"), the State of Hawai'i's Department of Health ("DOH"), the City and County of Honolulu ("CCH"), and the Citizens. The United States should request the Court to defer entry of the Stipulated Order pending the outcome of these additional negotiations.

    As EPA is well aware, CCH's sewage system is in dire condition. Due to numerous structural and operational problems with its sewage collection system, CCH has spilled millions of gallons of raw sewage in numerous spill incidents, repeatedly contaminating and closing streams and beaches all over O'ahu. In addition, CCH's sewage treatment plants are poorly run and lack needed upgrades, and CCH's discharges from these plants routinely violate CCH's NPDES permit effluent limits. The Stipulated Order falls far short of requiring the measures needed to curb these Clean Water Act (CWA) violations. Specifically, the Stipulated Order is flawed for failing: (1) to provide for citizen participation, (2) to adopt a comprehensive approach to addressing CCH's sewage collection system problems and (3) to address *all* CCH's force main problems.

**EXHIBIT H**

### I. *The Stipulated Order Lacks Needed Citizen Participation Provisions.*

The Stipulated Order's omission of provisions for the Citizens' participation is a serious error. The Citizens have long been active in addressing CCH's sewage problems--and in reaching out to other local environmental groups and community organizations to enlist their support and input. In the end, no solution will prove workable without broad community input and support. The United States cannot foster this community support by entering into an agreement that provides no role for the public's involvement and for the Citizens as the most active set of groups concerned with CCH's sewage problems.

In 1995, the United States entered into a similar sewage spill consent decree with CCH in the case *United States, et al. v. City and County of Honolulu*, Civ. No. 94-00765 DAE-KSC. *See Order for Entry of Consent Decree as Modified; Consent Decree as Modified by Stipulation, U.S. v. CCH* (May 15, 1995) (the "1995 Consent Decree"). Just like the Stipulated Order, the 1995 Consent Decree included no citizen involvement or oversight role. The 1995 Consent Decree has failed to meet its stated goals of abating CCH's sewage spills and bringing CCH into CWA compliance, and the Stipulated Order is likely to similarly fail.

### A. *The 1995 Consent Decree Failed To Curb CCH's Spills.*

The 1995 Consent Decree required CCH to set annual goals for reduction of sewage spills, but CCH has failed to meet these goals. In addition, the 1995 Consent Decree required CCH to prepare and implement a long-term comprehensive Spill Reduction Action Plan (SRAP) "that is specifically aimed at reducing the number and volume of [sewage s]pills from its Collection System to the maximum extent practicable." The 1995 Consent Decree at 16. More than twelve years into the 1995 Consent Decree, CCH's sewage spill rate has remained essentially constant--and excessively high (more than one every other day).

Before the 1995 Consent Decree, CCH routinely spilled raw sewage from its collection systems due to sewer line blockages (generally caused by root intrusion, build-up of grease, and accumulation of sediment and debris), pump station failures, collapsing sewer lines, and excessive "infiltration and inflow" ("I/I") into sewer lines (rising groundwater or storm water runoff flowing into leaky sewer lines during rainy weather). Twelve years later, CCH still routinely spills sewage due to the same causes.

Some of CCH's spills have been spectacularly large. About a year ago, CCH spilled about 48 million gallons of raw sewage into the Ala Wai Canal from March 26-30, 2006 when its Beachwalk force main sewer line ruptured. The spill forced the closure of Waikiki Beach for several days, as the foul plume of raw sewage spread from the Ala Wai Canal to Waikiki. During the massive Beach Walk spill, CCH was simultaneously spilling large volumes of raw sewage from its Sand Island Wastewater Treatment Plant ("WWTP") and several Windward locations, causing additional beach closures.

For additional example, on December 4-5, 2003, CCH spilled about 7.5 million gallons of raw sewage from the Hart Street pump station due to a short circuit that caused a power failure at the pump station. This spill flowed into Nuʻuanu Stream, Kapālama Canal, and Honolulu

M. McKeown  
June 13, 2007 <span style="float:right">Page 3 of 7</span>

Harbor. In early January 2004, CCH had a series of major spills that caused beach closures all over eastern and southern Oʻahu. In March 2004, the CCH force main line that transports sewage from Ala Moana Pump Station underneath Honolulu Harbor to Sand Island Waste Water Treatment Plants ("WWTP") ("Ala Moana force main") ruptured, spilling 2 million gallons of raw sewage into Honolulu Harbor and the Pacific Ocean and closing beaches from Point Panic to Keʻehi Lagoon. CCH's repeated spill problem remains frequent front page news in Hawaiʻi.

EPA's and DOH's recent actions further underscore that the 1995 Consent Decree has failed and that CCH *did not* prepare and *has not been* implementing a SRAP which reduces sewage spills "to the maximum extent practicable." Subsequent to the 1995 Consent Decree, one, EPA and DOH have both issued administrative orders imposing additional requirements on CCH designed to curb CCH's sewage spills. EPA issued an administrative order on June 30, 2003 requiring CCH to develop a new action plan for reducing sewage spills into Kalihi and Nuʻuanu streams. *In the Matter of the City and County of Honolulu*, Docket No. CWA-309-03-019 (June 30, 2003). DOH further issued a proposed administrative order on April 15, 2004 that would require CCH to implement various measures to reduce spills from CCH's force mains. *Department of Health, State of Hawaiʻi v. The City and County of Honolulu*, Docket Nos. 2004-CW-EO-01N and 04-WW-EO-2. Two, EPA and DOH have entered into the Stipulated Order which imposes yet additional sewage spill reduction requirements on CCH. EPA and DOH's election to issue these administrative orders and to enter into the Stipulated Order underscores that the SRAP has not reduced sewage spills "to the maximum extent practicable" and that the 1995 Consent Decree has not been an effective remedy for CCH's sewage spill woes.

As CCH's current Mayor admitted in his State of the City Address in February 2005, CCH for years failed to comply with the 1995 Consent Decree's mandates:

> [T]he previous administration failed to raise sewer fees since 1994 to underwrite the mandated improvements [required to comply with the 1995 Consent Decree]. . . . The prior administration's approach to the sewage system . . . put us no closer to fixing the sewers. . . . [W]e have not paid enough attention to our sewer system. There were shortcomings in the past administration's efforts to comply with the EPA's mandates. And no financial commitment was ever made to fund those needs.

In our view, CCH's failure to vigorously implement the 1995 Consent Decree chiefly due to the lack of local community involvement in its design and implementation. With no local constituency advocating and working for the Decree's success, CCH simply failed to abide by its letter and spirit--exemplified by CCH diverting sewage enterprise funds to non-sewage related projects for years. Without citizen watchdogs to bring these failures to EPA's attention, EPA overlooked these failures. EPA has limited resources and vast jurisdiction, and it is not unexpected that EPA will occasionally fail to discover and act on all the CWA noncompliance

M. McKeown  Page 4 of 7
June 13, 2007

within its jurisdiction.[1] It is precisely this reason that Congress provided for citizen suits, prompting one court to observe:

> [I]n environmental lawsuits, the intent of Congress is clearly that "citizen groups are not to be treated as nuisances or troublemakers but rather as welcomed participants in the vindication of environmental interests." *See Friends of the Earth v. Carey*, 535 F.2d 165, 172 (2d Cir. 1976).

*U.S. v. Hooker Chems. and Plastics*, 540 F. Supp. 1067, 1082 (W.D. New York 1982).

### B. *The United States Should Follow Its Own Examples of Past Citizen Cooperation.*

As the United States is aware, the Citizens were the first to return to court after it became abundantly clear that the 1995 Consent Decree had failed and that additional judicial relief was needed to remedy CCH's sewage spill problem. The Citizens filed a separate CWA citizen suit action in May 2004, long before the United States sought its own supplemental judicial relief. *Sierra Club, et al. v. City and County of Honolulu*, Civil No. 04-00463 DAE/BMK. In similar situations, when EPA has encountered citizens so motivated by CWA violation that they have filed their own citizen suit actions, EPA has often, wisely, sought to partner with the Citizens in joint consent decrees rather than to enter into decrees that exclude the citizens. *See, e.g., United States, State of Maryland, and Anacosta Watershed Society, et al. v. Washington Suburban Sanitary Commission*, Civ. No. PJM-04-3679, and *United States, People of the State of California, and Santa Monica Baykeeper v. City of Los Angeles*, Civ. No. 01-191-RSWL and 98-9039-RSWL; *Upper Chattahoochee Riverkeeper Fund, Inc., the United States, and the State of Georgia v. the City of Atlanta*, Civ. No 95-CV-2550 TNT. Such partnerships have increased the community support for and the successes achieved by these decrees.

The United States should follow the examples of these cases and decline now to ask the Court to enter the Stipulated Order to which the Citizens are not signatory and which provides for no citizen involvement.

### II. *The Stipulated Order Reflects an Inappropriate Piecemeal Approach.*

Another serious shortcoming of the Stipulated Order is that it addresses but one aspect of CCH's sewer system problems–CCH's failure to inspect, assess, and replace or rehabilitate its force main sewer lines. The Citizens agree that all available evidence suggests that CCH has

---

[1] The Citizens specifically note that the 1995 Consent Decree provides for stipulated penalties against CCH for violations of the decree. the 1995 Consent Decree at 47-50. Despite what is by now obvious CCH noncompliance with the 1995 Consent Decree (for example, CCH clearly has not met the water reclamation supplemental environmental project requirements of the decree as evidenced by numerous documents EPA has provided the citizens in response to our Freedom of Information Act requests), EPA has never sought recovery of these stipulated penalties. This underscores that EPA, for resource and other reasons, has not been able alone to ensure that CCH's noncompliance is addressed by appropriate judicial relief.

M. McKeown  
June 13, 2007  
Page 5 of 7

urgent problems with its force mains, and we generally laud the United States for attempting to address these problems with supplemental judicial relief. The Citizens disagree, however, with EPA's approach of addressing just the force main lines at this time while leaving CCH's many other sewage system issues unaddressed.

EPA, DOH, and the Citizens commenced joint negotiations with CCH over securing additional judicial relief to address CCH's sewage problems in March 2006. It has taken EPA fifteen months to reach an agreement with CCH which addresses only one of the many remaining problems confronting CCH's sewage system. At this pace, it will be a very long time before a complete supplemental package of judicial relief is secured.

The optimum approach would be to defer entry of the Stipulated Order while EPA, DOH and the Citizens jointly pursue with CCH a global settlement that resolves *all* CCH's sewage problems–with a firm court deadline for completion of these negotiations. Ultimately, a sewage collection system is a dynamic, interdependent system that must be looked at comprehensively to maximize its performance and to minimize its spill rate. By far the best management technique is to look at the system as a whole and to set priorities for actions based on the relative sewage spill risks posed by different aspects of the system and available resources. This can only be accomplished by a global collection system settlement.

**III.** *The Stipulated Order's Force Main Compliance Schedule Is Inadequate.*

**A.** *The Stipulated Order Does Not Address All CCH's Force Main Problems.*

The Stipulated Order imposes remedial action requirements on CCH with respect to only six force main lines: the Beachwalk, Ala Moana, Old Hart Street, Kailua/Kaneohe, Waimalu, and Kahala lines (collectively, "the Target Force Mains"). This is an inadequate remedial response as CCH's force main problems obviously extend beyond the Target Force Mains. This is made abundantly clear, for example, by DOH's April 15, 2004 administrative order, *Department of Health, State of Hawai'i v. The City and County of Honolulu,* Docket Nos. 2004-CW-EO-01N and 04-WW-EO-2 ("the DOH Administrative Order"). The DOH Administrative Order found that CCH had 27 sewage spills from various force main lines between November 1996 to April 2004, primarily due to breaks caused by corrosion, malfunctioning of air relief valves, and contractor-caused damage. At least some of these spills were from force mains not addressed by the Stipulated Order. The DOH Administrative Order required CCH to implement various remedial measures directed toward *all* of CCH's force mains. Specifically, this order required CCH (1) to assess the condition of "*each* force main in CCH's collection system," (2) develop a force main contingency plan for addressing force main sewage spills "which includes *all* force mains in CCH's collection system," and (3) develop plans for maintenance and repair measures "for *all* CCH force mains" including redundant force main lines where CCH's contingency plans showed a risk of uncontrollable discharge from a failed force main (emphasis added).

In addition, CCH's own consultant's report, Fukunaga & Associates, "Force Main Condition Assessment Program" (Oct. 2004) identified seven critical force main lines where

M. McKeown                                                                                    Page 6 of 7
June 13, 2007

CCH should have redundant backup lines given a combination of the risk and consequence of force main failure. The Stipulated Order fails to address three of these lines: Kamehameha, Kailua Heights and Lualualei Force Mains. Failure to address the Lualualei Force Main is particularly problematic; the line is old, has likely been subject to corrosion, and is located such that a major failure would likely lead to a large, uncontrollable spill.

The Citizens have acquired numerous documents from EPA, DOH and CCH via Freedom of Information Act requests, Uniform Information Practices Act requests, and discovery production. Based on our review of these documents, CCH has not complied with the DOH Administrative Order and has not (1) assessed the condition of each force main in CCH's collection system," (2) developed a force main contingency plan for addressing force main sewage spills from all force mains in CCH's collection system nor (3) developed plans for maintenance and repair measures for all CCH force mains including redundant force main lines where CCH's contingency plans show a risk of uncontrollable discharge from a failed force main. Indeed, if CCH had done so, the Stipulated Order would be superfluous. The Stipulated Order will provide little remedy to this CCH failure to comply with the DOH Administrative Order, as it addresses but a small subset of CCH's force mains.

The United States should forego requesting entry of the Stipulated Order and should instead renegotiate a comprehensive settlement that judicially mandates CCH's compliance with the same measures required by the DOH Administrative Order. CCH's lack of compliance with the DOH Administrative Order demonstrates that judicial compulsion is needed to secure CCH's compliance with these measures, and the United States has no evidence before it to suggest that DOH's Administrative Order was in any respect erroneous in imposing these requirements.

   **B.   *The Stipulated Order Has an Inappropriate Loophole with Respect to Redundancy at the Waimalu and Kahala Force Mains.***

The Stipulated Order laudably requires CCH to take the steps needed to have redundant force main lines for the Beachwalk, Ala Moana, Old Hart Street, and Kailua/Kaneohe force mains. CCH's past spill performance, including the disastrous Beachwalk force main spill in March 2006, demonstrates the need for redundant lines to serve as backup force mains should any of these lines fail. The Stipulated Order also requires CCH to have redundant force main lines for the Waimalu and Kahala Force Mains, *but only if* CCH's condition assessment shows that these lines are defective. If CCH's condition assessment does not show that these lines are defective, then the Stipulated Order would allow CCH indefinitely to avoid securing redundant lines to serve as backup force mains should these lines fail in the future. Eventually, these force mains will likely deteriorate to the point where they will be at risk for failure, and CCH should be required to have redundant lines for these force mains to guard against this long-term risk. These force mains are located such that major failures of these lines would likely lead to uncontrolled spills, making redundancy an appropriate precautionary measure regardless of their current condition.

The United States should renegotiate to secure a judicial order mandating that CCH eventually have redundant lines for the Waimalu and Kahala Force Mains.

M. McKeown                                                                                                                  Page 7 of 7
June 13, 2007

### C. *The Stipulated Order's Time Schedule Is Unduly Lenient.*

The Stipulated Order grants CCH until January 2009, more than a year and a half, to assess the Target Force Mains, and until December 2018 to implement remedial actions with respect to all these lines, more than eleven and a half years. The Stipulated Order's unduly lenient time schedule is most problematic with respect to the schedule for remedial action for the Kaneohe/Kailua Force Main (to be addressed in about seven and a half years) and Waimalu Force Main (to be addressed in about eleven and a half years). Both of these force mains are very old; the Kaneohe/Kailua Force Main is over thirty years old and the Waimalu Force Main is about forty-three years old). Given CCH's track record of recent force main failures and the likely similar condition of the Kaneohe/Kailua and Waimalu Force Mains compared to other CCH force mains that recently failed, a significant spill on one or the other of these lines before the Stipulated Order deadlines for remedial action would appear to be likely.

The United States should renegotiate to secure a judicial order providing for tighter deadlines for completion of CCH's force main remedial work.

Thank you for consideration of these comments. We look forward to receiving the United States' response.

Sincerely,

*Jodene Isaacs*

Jodene Isaacs
Environmental Advocates