CHRISTOPHER SPROUL
Environmental Advocates
5135 Anza Street
San Francisco, California 94121
Tel: (415) 553-3376
Fax: (415) 358-5695
E-mail: csproul@enviroadvocates.com

PAUL ALSTON         1259-0
WILLIAM TAM         1887-0
BLAKE K. OSHIRO     6746-0
Alston Hunt Floyd & Ing
Attorneys At Law
18th Floor, ASB Tower
1001 Bishop Street
Honolulu, Hawai'i 96813
Tel: (808) 524-1800
Fax: (808) 524-5976
Email: palston@ahfi.com
       wtam@ahfi.com
       boshiro@ahfi.com

Attorneys for Plaintiffs
SIERRA CLUB, HAWAI'I CHAPTER,
HAWAI'I'S THOUSAND FRIENDS and
OUR CHILDREN'S EARTH FOUNDATION

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| SIERRA CLUB, HAWAI'I CHAPTER;<br>HAWAI'I'S THOUSAND FRIENDS; and<br>OUR CHILDREN'S EARTH FOUNDATION,<br>　　　　　Plaintiffs,<br><br>　　　vs.<br><br>CITY AND COUNTY OF HONOLULU and<br>FRANK DOYLE, DIRECTOR OF THE<br>DEPARTMENT OF ENVIRONMENTAL<br>SERVICES, in his official<br>capacity,<br>　　　　　Defendants. | Civil No. 04-00463 DAE/BMK<br><br>**PLAINTIFFS' OPPOSITION TO<br>DEFENDANT CITY AND COUNTY OF<br>HONOLULU'S MOTION TO STAY;<br>DECLARATION OF CHRISTOPHER<br>SPROUL; EXHIBITS A-K;<br>CERTIFICATE OF WORD COUNT;<br>CERTIFICATE OF SERVICE**<br><br>Hearing: September 10, 2007<br>Time:　　11:15 a.m.<br>Judge:　　David Alan Ezra |

655882-11/ 7502-3

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . iii

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . 2

II.   FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . 3

      A.   BACKGROUND ON THE SAND ISLAND WASTEWATER
           TREATMENT PLANT . . . . . . . . . . . . . . . . . 3

      B.   ENVIRONMENTAL IMPACT OF THE SAND ISLAND DISCHARGE . . 5

      C.   CCH VIOLATES ITS SAND ISLAND NPDES PERMIT . . . . . 9

      D.   EPA SAND ISLAND ADMINISTRATIVE ORDERS . . . . . . . 10

      E.   PRIOR COURT PROCEEDINGS RELEVANT TO CCH'S
           STAY REQUEST . . . . . . . . . . . . . . . . . . . 11

           1.   Sierra Club Action . . . . . . . . . . . . . . 11

           2.   EPA I and EPA II . . . . . . . . . . . . . . . 14

           3.   Prior Settlement Discussions . . . . . . . . 16

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . 21

      A.   THE COURT SHOULD NOT STAY THIS ACTION. . . . . . . 21

           1.   The Requirements under Landis for a Stay
                to Issue Are not Present in this Action . . . 23

                a.   The Damage to the Citizens' Interests
                     Does Not Favor a Stay . . . . . . . . . 23

                b.   Merely Having To Defend Litigation Is
                     Not Cognizable CCH Hardship . . . . . . 26

                c.   There Is No Near-Term Certainty of
                     Alternative Resolution of the Issues
                     Raised by Citizens' Claims . . . . . . 28

           2.   CCH's Requested Stay Conflicts with
                Congress's Directives as to When Citizen
                Suits Are Barred . . . . . . . . . . . . . . 31

B.    ASSUMING <u>ARGUENDO</u> THAT A STAY IS APPROPRIATE, IT MUST BE FOR A FIXED TIME OF SHORT DURATION . . .   34

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . .   35

## TABLE OF AUTHORITIES

### FEDERAL CASES

*American Honda Motor Co. v. Coast Distribution System, Inc.*,
2007 U.S. Dist. LEXIS 19981 (N.D. Cal. 2007) ............ 24, 26

*Amoco Prod. Co. v. Village of Gambell*,
480 U.S. 531 (1987) ................................ 23, 24, 31

*CALPIRG v. Shell Oil Co.*,
840 F. Supp. 712 (N.D. Cal. 1993) ......................... 34

*California Sportfishing Protection Alliance v. City of West Sacramento*,
905 F. Supp. 792 (E.D. Cal. 1995) ......................... 33

*Coalition for a Liveable W. Side v. New York City Department of Environmental Protection*,
830 F. Supp. 194 (D.N.Y. 1993) ........................ 27, 28

*Colorado River Water Conservation District v. United States*,
424 U.S. 800 (1976) ................................... 21, 28

*Friends of Milwaukee's River v. Milwaukee Metropolitan Sewerage District*,
382 F.3d 743 (7th Cir. 2004) .............................. 32

*Hawaii's Thousand Friends v. City and County of Honolulu*,
806 F. Supp. 225 (D. Haw. 1992) ........................... 5

*Idaho Sporting Congress, Inc. v. Alexander*,
222 F.3d 562 (9th Cir. 2000) .......................... 24, 31

*Jaffe v. Morgan Stanley DW, Inc.*,
2007 U.S. Dist. LEXIS 8502 (N.D. Cal. 2007) ............... 34

*Knee Deep Cattle Company, Inc. v. Bindana Investment Co. Ltd.*,
94 F.3d 514 (9th Cir. 1996) .............................. 32

*Landis v. North American Co.*,
299 U.S. 248 (1936) ...................... 22, 23, 26, 28,
                                              29, 34, 36

*Lockyer v. Mirant Corp.*,
398 F.3d 1098 (9th Cir. 2005) ..................... 23, 25, 29,
31, 34, 36

*Molokai Chamber of Commerce v. Kukui, Inc.*,
891 F. Supp. 1389 (D. Haw. 1995) .......................... 33

*Natural Resources Defense Council, Inc. v.
Outboard Marine Corp.*,
692 F. Supp. 801 (D. Ill. 1988) ...................... 22, 24

*Public Interest Research Group v. Star Enterprise*,
771 F. Supp. 655 (D.N.J. 1991) .......................... 24

*Sierra Club v. Chevron*,
834 F.2d 1517 (9th Cir. 1987) .................... 12, 14, 17,
32, 33, 34

*Sierra Club v. Hyundai America*,
23 F. Supp. 2d 1177 (D. Or. 1997) ....................... 33

*Sierra Club v. Union Oil Co. of California*,
813 F.2d 1480, 1492 (9th Cir. 1987),
*vac'd on other grounds*, 485 U.S. 931, (1988),
*reinstated*, 853 F.2d 667 (9th Cir. 1988) ................... 36

*Southern Pines Associates v. United States*,
912 F.2d 713 (4th Cir. 1990) ........................... 33

*Student Public Interest Research Group of New Jersey, Inc.
v. Georgia-Pacific Corp.*,
615 F. Supp. 1419 (D.N.J. 1985) ......................... 32

*Washington Public Interest Research Group v.
Pendleton Woolen Mills*,
11 F.3d 883 (9th Cir. 1993) (CWA § 309(g)(6) .............. 33

## DOCKETED CASES

*United States, et al. v. City and County of Honolulu*,
Civ. No. 07-00235 ................................... 11, 12

*United States, et al. v. City and County of Honolulu*,
Civ. No. 94-00765 ....................................... 11

# FEDERAL STATUTES

40 C.F.R. § 122.41(m) ....................................... 4

33 U.S.C. § 1311(b)(1)(B) .................................. 3

33 U.S.C. § 1319(a) ........................................ 33

33 U.S.C. § 1365. .......................................... 16

33 U.S.C. § 1365(c) ........................................ 27

CWA § 301(b)(1)(B) ......................................... 3

CWA § 309(a) ............................................... 33

CWA § 309(g)(6) ............................................ 33

CWA § 505 .................................................. 16

CWA § 505(b)(1)(B) ..................................... 32, 33

CWA § 505(c)(1) ............................................ 27

Rule 16.2          ........................................ 27

## PLAINTIFFS' OPPOSITION TO CITY AND
## COUNTY OF HONOLULU'S MOTION TO STAY

On Tuesday, August 14, 2007, Defendant City and County of

Honolulu ("CCH" or "City") moved to stay this case on the grounds

that the City is engaged in good faith negotiations with State

and federal officials to quickly resolve long delayed repairs to

Honolulu's sewer system and that litigation in this case would

interfere with the City's ability to address the issues.  Nothing

could be further from the truth.  Nothing has or is stopping the

City from taking any remedial action right now--except its own

unwillingness to commit the funds and sign contracts.  CCH's

Motion to Stay is only the latest installment of its dilatory

tactics and obfuscation that so far have thwarted every effort by

citizens and government alike to bring the City into compliance

with the Clean Water Act.[1]

---

[1]   CCH accuses the Citizens of undue haste in seeking
judicial remedies, yet the docket in this case reflects CCH
repeated efforts to delay any decision on the merits in this
case.  Since 2004, the City has appropriated more than $3.6
million to fund its legal opposition to the Citizen's enforcement
in this case. City and County of Honolulu Council Resolution No.
07-016 (adopted January 24, 2007).  *See* http://www4.honolulu.gov/
docushare/dsweb/Get/Document-58011/RES07-016.htm  CCH has also
appropriated an additional $1.2 million to contest EPA's pending
CWA 301(h) waiver review that would impose permit limits on CCH's
sewage treatment plants in order to meet treatment standards
applied to essentially every other municipality in the United
States.  *See* Declaration of Christopher Sproul in Support of
Citizens' Opposition to Defendant City and County of Honolulu's
Motion to Stay Entry of Stipulated Order ("Sproul Decl."), Ex. I.

## I.    INTRODUCTION

Faced with years of government agency failure, Sierra Club, Hawai'i Chapter, Hawai'i's Thousand Friends, and Our Children's Earth Foundation (collectively, "Citizens") brought this Clean Water Act ("CWA") citizen suit in 2004 to abate on-going CWA violations by the City and County of Honolulu ("CCH")at CCH's Sand Island Wastewater Treatment Plant ("Sand Island WWTP").   Two years ago CCH asked this Court to indefinitely stay this case. Such a stay  would have effectively dismissed this case.   The Court declined CCH's request in keeping with clear Congressional directives allowing citizen suits to proceed.   CCH has again filed a second motion to stay this case indefinitely pending the final outcome of proposed negotiations between CCH, the U.S. Environmental Protection Agency ("EPA") and the State of Hawai'i's Department of Health("DOH") which CCH contends will address the Citizens' pending claims.   The Court should also reject this second CCH stay motion.   CCH's motion was filed, not coincidently, soon after Citizens filed their substantive motion for summary judgment to count the number of days of CCH's CWA liability.   CCH's pattern of delay and deflection repeats itself: when Citizens move on the merits, CCH seeks a stay for time to "negotiate;" then CCH shuts out the Citizens and talks to the EPA and DOH--for months and years.   This Court should not condone

2

such behavior by an important public agency on matters involving critical public health infrastructure.

## II.  FACTUAL BACKGROUND

### A.  BACKGROUND ON THE SAND ISLAND WASTEWATER TREATMENT PLANT

CCH owns and operates several sewage wastewater treatment plants ("WWTPs") and a related sewage collection system.  *See* Plaintiffs' Separate and Concise Statement of Facts in Support of Their Motion for Partial Summary Judgment on Plaintiffs' Third, Fourth, Eighth, and Twelfth claims ("SCSF"),[2] ¶ 1. CCH's largest treatment plant is the Sand Island WWTP.  The Sand Island WWTP discharges effluent treated to a primary level.[3]  SCSF, ¶ 1. Most WWTPs nationwide discharge effluent treated to a secondary level.[4]

The sewage effluent discharged from the Sand Island WWTP contains a variety of pollutants:  conventional pollutants such as biochemical oxygen demand ("BOD") and total suspended solids

_____

[2]  The Citizens files this SCSF along with their first Motion for Partial Summary Judgment on January 6, 2005.

[3]  Primary treatment involves the removal of solids from sewage by screens, and chambers in which solids sink to the bottom.  *See* "How Wastewater Treatment Works . . . The Basics," EPA 833-F-98-002 (May 1998), published at: http://www.epa.gov/npdes/pubs/bastre.pdf

[4]  *See id.* & CWA § 301(b)(1)(B), 33 U.S.C. § 1311(b)(1)(B). Secondary treatment removes about 85 percent of organic matter in sewage by making use of the bacteria in it and disinfecting the sewage.  *See* "How Wastewater Treatment Works . . . The Basics," EPA 833-F-98-002.

("TSS"), sewage-related pathogenic organisms including various bacteria, viruses and protozoa; and toxic chemicals including the chlorinated organic pesticides chlordane, heptachlor, and dieldrin.  SCSF, ¶ 2.

The Sand Island WWTP has consistently failed to meet minimal environmental standards.  A June 2002 EPA inspection report concluded that the Sand Island WWTP "effluent remains the lowest quality effluent in [EPA] Region 9" compared to any other primary-level POTW.  SCSF, ¶ 4.

Historically, the Sand Island WWTP has either violated or come close to violating its BOD and TSS limits.[5]  SCSF, ¶ 26.  In 2000, CCH resorted to trucking part of the Sand Island WWTP's effluent wastestream known as "centrate" for treatment at CCH's Kailua and Wai'anae WWTPs.  SCSF, ¶ 5.  This unorthodox and inefficient practice lowers BOD and TSS levels in the Sand Island WWTP's discharge and has allowed the Sand Island WWTP to barely meet its BOD and TSS limits most of the time. EPA complains that this practice constitutes "bypass" of the Sand Island treatment plant.[6]  *Id.*

---

[5]   BOD and TSS broadly indicates WWTP performance given that these parameters represent a suite of contaminants.

[6]   EPA regulations generally prohibit treatment plant bypass and require advance notice of such bypass.  40 C.F.R. § 122.41(m).

EPA and DOH have issued administrative orders and inspection reports finding many operation, maintenance, staffing, and design problems with the Sand Island WWTP. SCSF, ¶ 6. DOH gave the Sand Island Plant "a general rating of 'Unsatisfactory' due to numerous deficiencies." *Id.* EPA and DOH repeatedly directed CCH to address these problems. Yet CCH repeatedly missed EPA and DOH deadlines for remedial action. SCSF, ¶ 7. The Sand Island WWTP remains a seriously deficient facility. SCSF, ¶ 6,7.

**B. ENVIRONMENTAL IMPACT OF THE SAND ISLAND DISCHARGE**

Māmala Bay and the waters immediately adjoining the Sand Island outfall are heavily used for water recreation activities. SCSF, ¶ 8. These waters also provide habitat for numerous marine species, including four endangered or threatened species. *Id.* Environmental groups have long argued that the Sand Island discharge, when combined with the discharge from CCH's nearby Honouliuli WWTP (nine miles west), places both the health of people using Māmala Bay and the integrity of the Bay's ecosystem at risk. SCSF, ¶¶ 1, 9; *Hawaii's Thousand Friends v. City and County of Honolulu*, 806 F. Supp. 225 (D. Haw. 1992).

Under a 1991 Consent Decree entered by this Court, CCH agreed to create the Māmala Bay Study Commission (MBSC) to evaluate the impact of CCH's sewage discharges into Mamala Bay. SCSF, ¶ 10. MBSC's technical advisors noted that while the movement of sewage contamination from the Sand Island outfall to

near-shore waters of Māmala Bay was "previously . . . assumed to be highly unlikely," new modeling now suggests otherwise. *Id.* These advisors found "plausible physical oceanographic pathways for the transport of fecal contamination from the [Sand Island] outfall" to near-shore beaches, especially during Kona winds and when top to bottom water column temperatures are uniform. *Id.* They concluded that "the Sand Island Outfall plume is transported throughout [Māmala] Bay" and is "the dominant source" of several sewage-related indicator bacteria and pathogens on many Māmala Bay beaches, including heavily used Ala Moana, Waikiki and Queens Surf Beaches. *Id.* The advisors further noted that upgrading the Sand Island WWTP to provide chemically enhanced primary treatment and disinfection would substantially decrease bacteria levels in near-shore and offshore waters. *Id.* MBSC concluded that the Sand Island WWTP discharge, combined with the Honouliuli WWTP discharge contributed to bacteria measurements in violation of the state water quality standards in Māmala Bay indicating the presence of sewage contamination and related pathogens. *Id.* MBSC concluded that the Sand Island discharge posed some elevated risk of sewage exposure-related illness. *Id.* MBSC recommended upgrading treatment at both WWTPs to include chemically enhanced primary treatment, disinfection of Sand Island effluent, and further follow-up study. *Id.*

EPA also evaluated the environmental risks from the Sand Island discharge both when issuing the last Sand Island Permit and more recently. SCSF, ¶ 11. In 2002, EPA concluded:

> [T]here is some evidence of degradation of receiving water shown in the SIWWTP Annual Report [submitted by CCH to EPA]. It appears that the shoreline is not being monitored when heavy use is occurring. It appears that a plume from the [Sand Island] outfall pipe may move towards the shore during certain times, but there are not sufficient monitoring stations to verify this. Fish in the vicinity of the outfall do contain contaminants in amounts of concern. This area is heavily fished and many people depend on it for a primary source of protein.

*Id.*

An EPA consultant's companion report detailed environmental concerns with the Sand Island discharge. Reviewing data on the toxic pollutants discharged by the Sand Island WWTP, the report took issue with CCH's past representations that the Sand Island discharge is environmentally benign. "Significantly more concern is warranted than the City suggests." SCSF, ¶ 12. Fish taken from near the Sand Island outfall contained detectable levels of several toxic organic pollutants, including probable human carcinogens and compounds known to be toxic to aquatic life. By contrast fish taken from a control station were free of all but one of these pollutants. *Id.* "[T]he pesticides dieldrin and chlordane are consistently present" in the Sand Island effluent. "[I]t appears that several priority [toxic] pollutants are

entering Māmala Bay in Sand Island effluent at levels that may be toxic to marine life and/or may exceed human health standards for fish consumption." *Id.* The report also noted that the discharge is causing Māmala Bay receiving waters to violate state water quality standards for ammonia nitrogen. Amonia nitrogen is a nutrient that can promote phytoplankton and algal growth that reduces water clarity. Amonia nitrogen is also a potential toxicant. *Id.*

With respect to public health risks from exposure to pathogens in the Sand Island effluent, the report corroborated that the Sand Island plume appears to "move shorewards and eastward at least some times of the year." This "could result in the plume contacting [near-shore] recreational waters." *Id.* The consultant concluded that CCH had not adequately monitored the potential contribution of the Sand Island plume to high bacteria levels in near-shore waters. *Id.*

Furthermore, EPA agreed that "some sewage-borne pathogens are more stable in the marine environment than enterococcus" making it "possible that these pathogens [in Sand Island effluent] may reach the shoreline" even when enterococcus levels are not elevated. *Id.*, ¶ 13. EPA agrees that "because higher levels of these pathogens can be expected in areas closer to the outfall, people using these waters for recreation may be exposed

to unacceptable risks" unless the Sand Island effluent is
disinfected.  Id.

### C.  CCH VIOLATES ITS SAND ISLAND NPDES PERMIT

On November 2, 1998, EPA issued a CWA National Pollution
Discharge Elimination System ("NPDES") Permit to the Sand Island
WWTP ("Sand Island Permit").  *Id.*, ¶ 14; Sproul Decl., Ex. J.
This permit includes, *inter alia*, effluent limitations on the
levels of BOD, TSS, enterococcus bacteria, chlordane and dieldrin
that the Sand Island WWTP may discharge.  The Permit requires CCH
to monitor its compliance with all pollutant discharge limits in
the permit and report the level of pollutant discharged in
monthly Discharge Monitoring Reports ("DMRs") submitted to EPA
and DOH.  *Id.*  As documented by these DMRs, CCH's Sand Island
WWTP discharge repeatedly violated the Sand Island Permit's
effluent limitations for enterococcus bacteria, pesticides, BOD,
and TSS.  SCSF, ¶¶ 15, 19-25.

The Sand Island Permit also includes "compliance schedule"
provisions that require CCH to construct various capital
improvements EPA deemed necessary for the Sand Island WWTP to
improve  CWA compliance.  For example, the Permit requires CCH to
build and operate an effluent disinfection system by July 21,
2002.  *Id.*, ¶ 17. CCH failed to meet its NPDES permit deadline
for completion and successful operation of the Sand Island
disinfection facility by many years.  *Id.*

### D.  EPA SAND ISLAND ADMINISTRATIVE ORDERS

In October 1999, EPA issued an administrative order to CCH requiring CCH to take specific measures to correct the effluent limit and compliance schedule NPDES permit violations discussed above.  *In the Matter of City and County of Honolulu*, Docket No. 309-9-00-003 ("1999 EPA Order"), SCSF, ¶ 31.  CCH failed to comply with this Order.  CCH's effluent limit and compliance schedule violations continued.  In September 2002, EPA issued a second administrative order which, among other things, ordered CCH to comply with EPA's first order.  *In the Matter of City and County of Honolulu*, Docket No. 402-9-02-61 ("September 2002 EPA Order").  *Id.*

Beyond compliance with the 1999 EPA Order, the September 2002 EPA Order requires CCH to "initiate all necessary measures to prevent all further permit violations and to bring Sand Island WWTP into immediate and continuous compliance" with all provisions of the Sand Island Permit.  *Id.*, ¶ 32.  To facilitate compliance, CCH was required to submit an Effluent Limits Action Plan to "ensure continuous compliance with all permit effluent limits."  *Id.*  The September 2002 EPA Order also ordered CCH to prepare a Compliance Schedule Action Plan detailing the completion of the required compliance schedule projects and an Operation and Maintenance Action Plan specifying schedules for implementing maintenance procedures and projects.  *Id.*  The

September 2002 EPA Order requires EPA approval of all these plans. *Id.* Once EPA approves these plans, they must be implemented as requirements of the Order. *Id.*

CCH has submitted the required plans, but in August 2004, EPA wrote CCH a detailed letter explaining that the plans were deficient. *Id.*, ¶ 33. Since the 2002 EPA Order, CCH continues to violate the Sand Island WWTP effluent limitations for enterococcus, chlordane, dieldrin, BOD, and TSS. *Id.*, ¶ 34.

**E.    PRIOR COURT PROCEEDINGS RELEVANT TO CCH'S STAY REQUEST**

CCH's current Motion to Stay is the third in a series of contested stays sought by CCH, EPA and/or DOH in this case and in two related pending CWA enforcement actions against CCH: (1) *United States, et al. v. City and County of Honolulu*, Civ. No. 94-00765 DAE/KSC ("*EPA I*"); and (2) *United States, et al. v. City and County of Honolulu*, Civ. No. 07-00235 DAE/KSC ("*EPA II*"). This Court declined to impose any of previously requested stays.[7]

**1.    Sierra Club Action**

The Citizens filed this action on July 29, 2004, alleging, *inter alia*, several claims (collectively, "WWTP Claims") concerning CCH's CWA violations discussed above.

---

[7]    As discussed below, the only stay to date in these cases was made pursuant to the parties stipulation in *EPA I*.

The Citizens' Third Claim alleges that since May 1999 CCH has continuously violated its Sand Island Permit effluent limitations on the discharge of enterococcus, chlordane, dieldrin, BOD, and TSS.

Plaintiffs' Fourth Claim alleges that CCH violated its Sand Island NPDES Permit by failing to complete remedial projects required by the Permit.

Plaintiffs' Eighth Claim alleges CCH violated the 2002 EPA Administrative Order.

Originally, the Citizens also brought claims in this case related to CCH's sewage spills from its sewage collection system since May 1999. On September 30, 2005, the Court dismissed the Citizens' sewage spill claims in *Sierra Club on res judicata* grounds due to EPA's prosecution of CCH sewage spills in the earlier-filed *EPA I*. Sproul Decl., Ex. A.

In January 2005, CCH filed a Motion To Stay the Citizens' WWTP Claims, asserting that this would allow CCH to work with EPA to address its alleged CWA violations without simultaneously having to litigate with the Citizens. *See id.*, Ex. A at 8. On September 30, 2005, the Court denied CCH's Motion to Stay. *Id.*, Ex. A at 20.

On January 6, 2005, the Citizens moved for partial summary judgment seeking to establish CCH's liability on their WWTP Claims. On September 30, 2005, the Court denied this motion.

*Id.*, Ex. A at 21-22.  The Citizens moved to reconsider.  On April 16, 2007, the Court granted the Citizens partial summary judgment on their Third and Fourth Claims:  (1) from May 1999 through July 2004 CCH violated effluent limitations in the Sand Island NPDES Permit; and (2) CCH violated the Permit's compliance schedule provisions requiring CCH to construct and operate the Sand Island disinfection facility.  *Id.*, Ex. K.  The Court's Order granting the Citizens' Motion for Reconsideration resolved the legal methodology for counting CWA violations, but deferred final determination of the total number of violations.  The Court indicated it wanted to resolve CCH's liability on the Eighth Claim before counting the total number of CCH's CWA violations. *Id.*

On July 26, 2007, in response to the Court's April 2007 Reconsideration Order, the Citizens moved for supplemental partial summary judgment to provide the Court the basis for counting CCH's CWA violations.  CCH now seeks an expedited stay expressly to preclude this Court from hearing the Motion for Summary Judgment that will determine the final violations count. CCH's transparent attempt to avoid a decision should be denied. Defendant City and County of Honolulu Ex Parte Application to Expedite the Hearing on Defendant's Motion to Stay ("Ex Parte App.") at 1-2.

2.    **EPA I and EPA II**

EPA and DOH currently have two pending CWA enforcement actions against CCH in this court:  *EPA I* filed in 1994;  *EPA II* filed in May 2007.  *Id.*, ¶ 6.  In both cases, EPA and DOH assert CWA claims against CCH for sewage spills from CCH's sewage collection system.  However, the agencies do not assert claims against CCH for violation of CCH's NPDES permit effluent limitations applicable to discharges from the Sand Island WWTP. Thus *EPA I* and *EPA II* do <u>not</u> state claims that match Citizens' WWTP Claims in *Sierra Club*.  *Id.*

On January 25, 2006, the Citizens moved to intervene in *EPA I* to assert their CWA claims against CCH for post-1999 sewage spills that the Court dismissed from their *Sierra Club* action. *Id.*, ¶ 7.  On March 28, 2006, the Citizens and CCH stipulated to stay further proceedings on the Motion to Intervene until September 29, 2006 to explore settlement discussions.  The Court approved this stipulation by Order (entered April 12, 2006).  The stipulation provided the stay could be lifted upon thirty days notice by any party.  *Id.*, ¶ 8.  When subsequent settlement negotiations stalled, Citizens notified CCH on August 30, 2006 that the stay was terminated.  *Id.*  Citizens engaged in further negotiations.  Finally on March 6, 2007, Citizens re-filed their Motion to Intervene.  *Id.*

EPA and DOH's response to the Citizens Motion to Intervene
in *EPA I* by requesting that the Court issue an open-ended stay in
*EPA I* to facilitate settlement talks as a condition of granting
the Citizens' intervention.  The Citizens opposed an
unconditional stay, but indicated they would not object to a
limited four month stay .  *Id.*, ¶ 9.  On May 3, 2007,
Magistrate Chang issued Proposed Findings and Recommendations
recommending Citizens' Motion to Intervene be granted.  *Id.*,
Ex. B.  Magistrate Chang's Proposed Findings did not impose any
stay, but instead recommended only that "any party may file a
motion seeking to stay the litigation *for a reasonable period of
time* to allow the parties to further engage in good faith
settlement negotiations."  *Id.*, Ex. B at 18-20.  On May 24, 2007
the Court issued an Order adopting Magistrate Chang's Findings
and granting the Citizens intervention in *EPA I* without imposing
a stay.  *Id.*, Ex. C.

On May 24, 2007, the Citizens filed a Motion to Intervene in
*EPA II*.  In response, CCH, EPA and DOH all recommended that the
Court order (as an express condition of granting the Citizens
intervention) that any party could file a motion for a stay of
*EPA II* "for a reasonable period of time" to facilitate settlement
negotiations.  The Citizens urged that no conditions should be
imposed on their intervention.  *Id.*, ¶ 11.  On June 28, 2007,
Magistrate Chang issued Proposed Findings and Recommendations

recommending Citizens' Motion to Intervene be granted, initially without conditions, including any conditions relating to a stay. Magistrate Chang recommended that conditions if any, should be imposed on Citizens' intervention only after the Court resolved whether to enter a Stipulated Order lodged by EPA in *EPA II*. *Id.*, Ex. D.  On July 25, 2007 the Court adopted Magistrate Judge Chang's Findings and granted Citizens intervention in *EPA II*. *Id.*, Ex. E.

### 3.    Prior Settlement Discussions

On May 4, 2004, the Citizens first proposed settlement discussions to CCH in the notice of intent to file a CWA citizen suit (required by CWA section 505, 33 U.S.C. § 1365).  *Id.*, ¶ 13, Ex. F.  Later in May 2004, the Citizens sent CCH a written settlement proposal and outlined this proposal in a meeting with CCH.  *Id.*, ¶ 13.  CCH did not respond to the Citizens' settlement proposal during this meeting or before the end of the sixty day pre-filing notice period under CWA section 505.  The Citizens filed suit in July 2006.  *Id.*

Finally, on October 24, 2006, CCH responded by rejecting every aspect of the Citizen's proposal.  CCH indicated that the Citizens should not be provided any relief in their action.  In CCH's view, all the CWA violations at issue were being addressed by the *EPA I* 1995 Consent Decree or by the EPA  administrative orders.  *Id.*, ¶ 14.

After CCH's definitive rejection of any possible settlement, the Citizens proceeded to litigate their *Sierra Club* claims by serving discovery, opposing CCH's Motion to Dismiss, and briefing cross-motions for summary judgment. *Id.*, ¶ 15. In early fall 2006, EPA informed the Citizens that the EPA would soon be pursuing supplemental CWA judicial enforcement of CCH's continuing CWA violations, including CCH's sewage spills <u>and</u> its WWTP effluent limitation violations. On December 12, 2006, the Citizens entered into a confidentiality agreement with EPA which provided that EPA and the Citizens would consult with each other about CWA litigation and/or settlement against CCH and would protect the confidentiality of their related communications with each other. *Id.*, ¶ 13. Thereafter, the Citizens and EPA communicated about a common settlement position. *Id.*

After repeated delays, EPA was finally able to schedule a meeting with CCH at the end of March 2006 to present a comprehensive EPA settlement proposal to CCH regarding CCH's sewage spills and WWTP effluent limitation violations. EPA shared earlier drafts of this settlement proposal with the Citizens and modified it somewhat to reflect the Citizens' comments and concerns. *Id.*, ¶ 17. CCH initially opposed the Citizens' presence at the March 2006 settlement meeting. After repeated discussion and the Citizens' agreement to enter into a Stipulation staying *Sierra Club* and the Citizens' Motion to

Intervene in *EPA I*, CCH agreed Citizens could attend a later session of that meeting. *Id.*, ¶ 18. During the March 2006 meeting, the parties discussed supplemental judicial relief to address multiple problems with CCH's sewage collection and treatment system. *Id.*

While the parties were meeting in March 2006, CCH's Beachwalk force main sewer line ruptured and spilled more than 48 million gallons of raw sewage into the Ala Wai and onto Waikiki Beach. In April 2006, EPA informed Citizens and CCH that in light of the Beachwalk spill, EPA wanted to refocus negotiations (1) to work out a stipulated preliminary injunction order for CCH to implement specific projects on an immediate and emergency basis; and (2) then to discuss a global settlement of all other sewage spill and treatment plant issues. *Id.*, ¶ 19. The Citizens had reservations about this approach. However, they agreed to work with EPA in hopes of quickly fashioning an interim agreement and then discussing a comprehensive solution to address both sewage spills and WWTP effluent limitation violations. *Id.*

In the ensuing settlement discussions, CCH repeatedly sent their settlement communications to EPA and/or DOH, but not to the Citizens. EPA sent copies of these communications to the Citizens in an effort to keep discussions going. CCH repeatedly refused to respond to the Citizens' suggested settlement terms that supplemented EPA's proposals. *Id.*, ¶ 20. By August 2006,

however, it was clear to Citizens that CCH would not agree to a multi-party resolution that met the Citizens' core concerns. Several issues separated the Citizens and CCH.  Most fundamentally, CCH rejected outright any question whether the Citizens would be a party signatory to any supplemental judicial relief with rights afforded a party.  It was clear that continued settlement talks with CCH were meaningless without resolution of the Citizens' party status.  Accordingly, in August, 2006, Citizens terminated the stay and moved to reset a hearing on their Motion to Intervene.  *Id.*, ¶ 21.  Contrary to CCH's unfounded assertions, the Citizens never communicated that they were withdrawing from settlement discussions.  Instead, CCH on its own initiative, informed EPA and DOH that:  (a) CCH would only communicate about settlement with the agencies; and (b) only if the agencies did not disclose these communications to the Citizens.  EPA and DOH informed the Citizens that confidential talks were occurring, but both agencies acquiesced to CCH's demand and would not disclose the content of any settlement discussions with the Citizens.  *Id.*, ¶ 23.

On September 28, 2006, Magistrate Chang held a status conference during which he indicated he wanted all parties to pursue settlement discussions.  Thereafter, CCH agreed the Citizens' could attend settlement meetings and CCH would provide copies of CCH's settlement communications so long as the Citizens

did not pursue intervention in *EPA I.*  *Id.,* ¶ 22.  These

settlement meetings were equally unproductive.  CCH would not

agree that the Citizens could be parties to any Stipulated Order.

The Citizens again concluded that settlement would be impossible

until the Court ruled on their intervention.  The Citizens

re-noticed their Motion to Intervene in *EPA I.*  *Id.*  Again, the

Citizens did not withdraw from the settlement talks.  Instead,

CCH once again sought and obtained EPA agreement to continue

settlement discussions with the Citizens excluded.  *Id.,* ¶ 23.

The Citizens continued to make settlement proposals to CCH.  *Id.*

The Citizens urged EPA, DOH and CCH not to enter into a

settlement that excluded the Citizens while the question of the

Citizens' party status remained unresolved.  These requests were

unavailing.  CCH, EPA, and DOH entered into a proposed Stipulated

Order in *EPA II* now lodged with the Court.  The proposed

Stipulated Order is inadequate on the merits (see Citizens'

August 24, 2007 Opposition in EPA II) and it excludes the

Citizens.  *Id.,* ¶ 24, Ex. G.

This proposed Stipulated Order indicates that CCH, EPA, and

DOH contemplate more negotiations, more judicial relief, more

remedial work, and more funding to address "all compliance issues

associated with CCH's wastewater system."  *Id.,* Ex. G.  CCH has

not proposed that Citizens be included in these discussions

(scheduled to begin in October, 2007) without unacceptable

pre-conditions. *Id.*, ¶ 25. Instead, CCH's Motion to Stay indicates that CCH intends to pursue its recent approach of requesting and obtaining EPA and DOH agreement to negotiate without the Citizens . . . unless Citizens stay their litigation. Defendant City and County of Honolulu's Motion to Stay ("CCH Stay Mot'n") at 12, 16.[8] The process repeats itself.

## III. ARGUMENT

### A.   THE COURT SHOULD NOT STAY THIS ACTION.

In seeking an indefinite stay of this action until CCH, EPA and DOH conclude as yet unknown negotiations that CCH argues may secure relief mooting the Citizens' claims, CCH ignores basic principles of federal court jurisdiction. The federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colorado River Water Conservation*

---

[8]   Notably, CCH states that it "requests that the Court stay plaintiffs' action in its entirety *pending the negotiations between CCH, EPA and DOH* of a comprehensive remedy addressing the Global Issues . . . .," pointedly omitting the Citizens from its list of negotiators. CCH Stay Mot'n at 12 (emphasis added). CCH later indicates it "is willing to discuss terms under which plaintiffs may participate in these negotiations." *Id.* at 16. Based on past experience, CCH will only agree to the Citizens' participation in settlement discussions if the Citizens agree to a stay of all litigation. The Citizens, however, are not willing to agree to such a condition given their experience with the lack of progress in negotiations unsupervised by the Court while litigation is stayed. In the Citizens' view, CCH lacked any motivation to respond meaningfully to the Citizens' settlement proposals without court rulings resolving the issues on which the Citizens and CCH disagree. Sproul Decl., ¶ 26.

*Dist. v. United States*, 424 U.S. 800, 817(1976).  A party seeking

to stay federal court litigation faces a heavy burden:

> [T]he burden of making out the justice and wisdom
> of a departure from the beaten track [of hearing a
> case on its merits] lay heavily on the [party
> seeking a stay] . . . . [A party seeking] a stay
> must make out a clear case of hardship or inequity
> in being required to go forward, if there is even
> a fair possibility that the stay for which he
> prays will work damage to some one else.  Only in
> rare circumstances will a litigant in one cause be
> compelled to stand aside while a litigant in
> another settles the rule of law that will define
> the rights of both.

*Landis v. North American Co.*, 299 U.S. 248, 255-56 (1936);

see *Natural Resources Defense Council, Inc. v. Outboard Marine*

*Corp.*, 692 F. Supp. 801, 812 (D. Ill. 1988) (declining stay

because defendant "has not met the heavy burden imposed on a

party asking a court to decline the exercise of its

jurisdiction").  CCH has not met that heavy burden.

Moreover, a federal court may not properly issue

indeterminate stays that has the surrogate effect of dismissing

the case.  In the limited circumstances where stays are

appropriate, they must be of short duration and in anticipation

of reasonably certain and imminent developments that may

otherwise resolve the issues raised.  299 U.S. at 256

("discretion was abused if the stay was not kept within the

bounds of moderation").

1.   **The Requirements Under _Landis_ for a Stay to Issue Are Not Present in This Action**

Applying the Supreme Court's leading _Landis_ decision, the Ninth Circuit made clear that stays are only justified after balancing three factors:  (1) the possible damage which may result from the granting of a stay; (2) the hardship or inequity which a party may suffer in being required to go forward; and (3) the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay.  _Lockyer v. Mirant Corp._, 398 F.3d 1098, 1110 (9th Cir. 2005).  CCH's requested stay is not justified under any of these factors.

a.   **The Damage to the Citizens' Interests Does Not Favor a Stay**

The Citizens' interests will be clearly damaged by a stay. This factor strongly weighs against CCH's stay request.  The Citizens seek injunctive relief to abate environmental harm caused by CCH's unlawful discharge of pollutants from its Sand Island WWTP in violation of the CWA.  Injunctive relief by its nature addresses irreparable harm.  As the Supreme Court held in _Village of Gambell_, irreparable harm is presumed when environmental injury is established:

> Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i. e.,

> irreparable.   If such injury is sufficiently
> likely, therefore, the balance of harms will
> usually favor the issuance of an injunction to
> protect the environment.

*Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987);

*Idaho Sporting Congress, Inc. v. Alexander*, 222 F.3d 562, 569

(9th Cir. 2000) (same).   Staying a case in such circumstances,

denies Citizens the possibility of prompt injunctive relief to

stop CCH's water pollution and necessarily entails the risk of

irreparable harm to the Citizens' interests.   *Id.* at 1110 (When

injunctive relief is sought as opposed to money damages, this

weighs against granting a stay); *American Honda Motor Co. v.*

*Coast Distribution System, Inc.*, 2007 U.S. Dist. LEXIS 19981, at

*4 (N.D. Cal. 2007) (same).   Indeed, as one court properly

observed in denying a polluter's stay request, "[t]here is a

clear federal policy militating against a stay" in CWA citizen

suits given Congressional intent to abate water pollution and to

use citizen suits as one tool to that end. *Public Interest*

*Research Group v. Star Enter.*, 771 F. Supp. 655, 668 (D.N.J.

1991); *see also Natural Resources Defense Council, Inc. v.*

*Outboard Marine Corp.*, 692 F. Supp. 801, 810-11 (D. Ill. 1988).

  CCH contends that the Citizens' interests will not be

damaged by a stay because EPA and DOH will represent their

interests in forthcoming negotiations with CCH.   CCH Stay Mot'n

at 16-17.  In *Mirant*, however, the Ninth Circuit clearly stated
that it is inappropriate to issue a stay and only speculation
that a parallel case proceeding will secure relief vindicating a
plaintiff's rights.  398 F.3d at 1111-12.  Here, not only is the
outcome of CCH, EPA, DOH's negotiations and the date they will
conclude a matter pure conjecture, EPA and DOH are not even
pursuing a parallel proceeding.

Moreover, the Citizens have reasonable basis to be
pessimistic that their interests will be advanced with reasonable
speed by open-ended CCH, EPA and DOH negotiations--especially
when CCH and the agencies appear ready to exclude the citizens
again from these negotiations unless they abandon their right to
file motions and seek judicial enforcement of the law.  EPA and
DOH have been fully aware of CCH's WWTP effluent limitation
violations for years (certainly since 1994).  CCH sends both
agencies monthly DMRs documenting these violations.  These
agencies in turn have written numerous letters and reports, and
issued administrative orders identifying and complaining of the
poor operation and performance of the Sand Island WWTP.  *See*
SCSF, ¶¶ 4-7, 15, 19-25, 31-34.  Yet, to date neither EPA nor DOH
has brought judicial action requiring CCH to remedy these
problems.  Instead, EPA and DOH have fallen prey to CCH's
dilatory tactics.

### b.    Merely Having To Defend Litigation Is Not Cognizable CCH Hardship

CCH's primary contention of hardship is that without a stay, CCH will be required to defend against the Citizens' claims generally and the Citizens' October 19, 2007 Motion for Summary Judgment in particular. CCH Stay Mot'n at 5, 17; CCH Ex Parte App. at 1-2. The Ninth Circuit has counseled, however, that defending a lawsuit is not the basis for a *Landis* stay:

> To be sure, if the stay is vacated [the party granted the stay] must proceed toward trial in the suit in the district court, but being required to defend a suit, without more, does not constitute a "clear case of hardship or inequity" within the meaning of *Landis.*

398 F.2d at 1112; *American Honda Motor Co. v. Coast Distribution System, Inc.*, 2007 U.S. Dist. LEXIS 19981, at *5(N.D. Cal. 2007)("[T]he hardship attendant with being forced to defend a lawsuit is irrelevant when considering whether to grant a stay.").

CCH vaguely hints it "will be further prejudiced if subjected to different and inconsistent injunctive relief as a result of the present action." CCH Stay Mot'n at 17. CCH cannot tenably claim prejudice on this basis. *There is no pending EPA or DOH litigation* in which either agency is seeking injunctive relief against CCH for the claims pled by the Citizens in this action. There is no present possibility of inconsistent results in this case and another case. Moreover, even if EPA or DOH were

in the future to file such claims (in the unlikely event that they did not simply intervene in this case as expressly provided for by CWA section 505(c)(1)[9]) their newly filed claims would almost certainly be consolidated with the Citizens' case pursuant to Local Rule 16.2.  Accordingly, this Court would be in position to ensure against CCH suffering inconsistent litigation results.

CCH incongruously cites *Coalition for a Liveable W. Side v. New York City Dep't of Envtl. Protection*, 830 F. Supp. 194 (D.N.Y. 1993) to support its prejudice argument, but that case actually supports the Citizens.  In *Coalition*, the defendant requested the court to bar a CWA citizen suit due to a parallel agency judicial proceeding concluded in another court.  The court declined to do so, noting that Congress had made it plain that citizens could seek injunctive relief in a CWA citizen suit if they could show action was needed to curtail on-going violation *even when a state agency had secured injunctive relief in a parallel proceeding addressing the same violations* (i.e., so long as they could show that the state agency's relief had not abated the violations).  *Id*. at 198.  Rather than barring the citizen's action, the court in *Coalition* granted the citizens precisely the relief sought here by the Citizens' pending Motion for Summary Judgment (i.e. summary judgment establishing the defendant's CWA liability).  If a citizen suit can properly proceed in such

---

[9]    33 U.S.C. § 1365(c).

circumstances, a citizen suit is surely proper here, where neither EPA nor DOH presently have any filed parallel claims for injunctive relief related to CCH's WWTP effluent limitations violations, much less any actual relief.  The court in *Coalition* was duly mindful that any remedy ultimately awarded a citizen plaintiff should not contradict any remedy secured by the government.  But, in accord with Congress' dictates, the solution is proper judicial care in awarding the citizens' a remedy, not in barring the citizens from proceeding.[10]  *Id.* at 197-98.

In sum, CCH's vaguely asserted claims of possible prejudice by inconsistent litigation results if the Citizens' case is not stayed, are unavailing.  *See Colorado River*, 424 U.S. at 816 ("the mere potential for conflict in the results of adjudications" does not of itself block federal courts from proceeding to hear cases on their merits).

    **c.**    **There Is No Near-Term Certainty of Alternative Resolution of the Issues Raised by Citizens' Claims**

Even when the first two factors discussed above favor a stay, a *Landis* stay can only be issued when there is assurance that proceedings external to the stayed case will resolve or

---

[10]  In *dicta*, the Court noted that it might be appropriate to stay a citizen action *when* a state is diligently prosecuting a currently pending judicial action in state court.  *Id.* at 197. This observation has no application here as there is no pending EPA or DOH action for injunctive relief for the claims asserted by the Citizens in this case, much less a diligent prosecution.

simplify issues of fact or law posed in the stayed case *within a reasonable time.* 299 U.S. at 256; *Mirant*, 398 F.2d at 1111. Thus, the Ninth Circuit has allowed stays when parallel judicial or administrative litigation that will likely resolve or simplify issues in a stayed case is proceeding "with diligence and efficiency." *Id.* The Ninth Circuit has directed that "[a] stay should not be granted unless it appears likely the other proceedings will be concluded within a reasonable time in relation to the urgency of the claims presented to the court." *Id.*

CCH has indicated to the Court its intention to pursue further negotiations with EPA and DOH concerning supplemental judicial relief for CCH's CWA violations, including relief for the Sand Island WWTP violations at issue in this case. Yet, neither EPA nor DOH have pending judicial or administrative claims to be litigated against CCH that parallel the Citizens' WWTP claims. Accordingly, there are no court deadlines or any other reasonably certain basis for concluding whether or when CCH, EPA and DOH's negotiations will culminate in any resolution.

Ironically, EPA and CCH have candidly informed the Court that they do not expect to agree on additional remedial measures any time soon. When questioned by Magistrate Chang about future settlement prospects during an April 2007 hearing, EPA counsel admitted:

> I know that it's going to take more than four
> months to do a final agreement [supplementing the
> Stipulated Order in *EPA II* ]. I can assure
> everyone of that without any question. . . .[I]t's
> going to take a good long time, because they're
> complicated issues. And that is why we're asking
> for in essence a stand still here [an indefinite
> stay of litigation in *EPA I*].

Sproul Decl., Ex. H at 16-17.

At the same hearing, CCH's counsel admitted CCH's anticipated timeline, indicating that by agreeing to emergency, interim relief in the Stipulated Order in fifteen months, the parties had acted "quite quickly." *Id.*, Ex. H at 19. CCH counsel indicated that CCH envisioned a much more leisurely pace lasting years for any further relief coming out of a "long term settlement negotiation." *Id.*, Ex. H at 20-21 (if long-term negotiations fail, "then there may be a third litigation *within a few years that would be a significant time away*...") (emphasis added). That CCH is anticipating a prolonged legal battle eventually, though one it hopes to delay until years into the future, is underscored by the Mayor seeking and obtaining recent City Council approval for $1.2 million to fund future legal costs for CCH litigation to avoiding stringent effluent limitations for its Sand Island and Honouliuli WWTPs. *Id.*, ¶ 28, Ex. I.

Expeditious action to address CCH's Sand Island WWTP violations should not be deferred in favor of CCH and EPA's prospective talk-athon. The Citizens and the general public have

serious public health and economic welfare interests at stake in prompt abatement of these violations entitling them to prompt injunctive relief. *See Amoco Prod. Co.*, 480 U.S. at 545; *Idaho Sporting Congress*, 222 F.3d at 569. After several months of delay in starting multi-party negotiations, followed by fifteen months of negotiation pre-dating EPA and DOH's filing of *EPA II*, EPA and DOH were only able to secure a very modest increment of additional injunctive relief to address CCH's separate sewage spill problem. The Citizens would almost certainly be forced to endure even longer inaction in remedying CCH's Sand Island WWTP violations if this action were stayed.

Given no assurance of prompt resolution in CCH, EPA and DOH negotiations, the speculative outcome of any such negotiations, and the indications that such negotiations would certainly be protracted, no stay should be granted here pending the outcome of negotiations. *Mirant*, 398 F.2d at 1111.

> **2. CCH's Requested Stay Conflicts with Congress's Directives as to When Citizen Suits Are Barred**

Congress has given very specific direction when EPA or state agency enforcement of the CWA precludes prosecution of citizen suits. Granting CCH's requested indefinite stay pending the outcome of EPA and DOH negotiations with CCH would, as a practical matter, be tantamount to barring the Citizens' suit due to prospective agency enforcement in circumstances that Congress

deemed insufficient for barring CWA citizen suits.  Due respect
for Congressional intent as to when agency enforcement blocks
citizen suits requires CCH's requested stay be denied.

CWA § 505(b)(1)(B) precludes citizen suits only when,
(1) EPA or a State has filed suit *in court* for violations of the
same CWA requirements, (2) the EPA or State action is *currently*
being prosecuted, (3) EPA or the State is *diligently* prosecuting
the action, and (4) the action is designed to achieve *complete*
*compliance* with the CWA, not merely a decrease in the number or
magnitude of violations.  *See e.g., Knee Deep Cattle Company,*
*Inc. v. Bindana Investment Co. Ltd.,* 94 F.3d 514, 516 (9th Cir.
1996); *Sierra Club v. Chevron,* 834 F.2d 1517, 1525 (9th Cir.
1987); *Friends of Milwaukee's River v. Milwaukee Metropolitan*
*Sewerage District,* 382 F.3d 743, 764 (7th Cir. 2004); *Student*
*Public Interest Research Group of New Jersey, Inc. v. Georgia-*
*Pacific Corp.,* 615 F. Supp. 1419, 1427 (D.N.J. 1985).  EPA and
DOH's prospective out-of-court negotiations referred to by CCH
meet *none* of these requirements for barring citizen suits.  EPA
and DOH have not brought suit in court for CCH's WWTP effluent
limitation violations and these agencies are not currently and
diligently prosecuting claims in court designed to achieve
complete CWA compliance.

Furthermore, EPA's 1999 and 2002 Administrative Orders
cannot bar this action as they are not agency prosecutions *in*

*court* and did not seek or impose civil penalties. *See Sierra Club v. Chevron*, 834 F.2d at 1525 (CWA § 505(b)(1)(B) bars citizen suits only when agency prosecution is literally in "court," not before administrative tribunal) *Washington Public Interest Research Group v. Pendleton Woolen Mills,* 11 F.3d 883, 886 (9th Cir. 1993) (CWA § 309(g)(6) literally construed; agency administrative actions seeking compliance but not civil penalties do not bar citizen claims); *Molokai Chamber of Commerce v. Kukui, Inc.*, 891 F. Supp. 1389, 1403-05 (D. Haw. 1995) (same); *Sierra Club v. Hyundai Am.*, 23 F. Supp.2d 1177, 1179 (D. Or. 1997) (CWA § 309(g)(6) literally construed; agency administrative enforcement bars citizen suit claims for penalties, but not injunctive relief); *California Sportfishing Protection Alliance v. City of West Sacramento*, 905 F. Supp. 792, 803 (E.D. Cal. 1995) (same). Furthermore, EPA's administrative orders are not in any sense on-going agency proceedings, as EPA issues such orders under CWA section 309(a) unilaterally and with immediate finality, without any further hearings or procedures. 33 U.S.C. § 1319(a); *see, e.g., Southern Pines Assocs. v. United States*, 912 F.2d 713, 715-16 (4th Cir. 1990).

It is important to note, the Ninth Circuit has repeatedly construed the CWA's citizen suit preclusion provisions narrowly and literally, instructing that citizen suits "should be handled liberally, because they perform an important public function."

*E.g., Sierra Club v. Chevron*, 834 F.2d at 1525. It follows that out-of-court agency negotiations cannot serve to bar citizen suits.

In a setting such as this, where EPA and DOH have for years been well aware of CCH's effluent limitation violations yet declined to bring judicial enforcement action to abate these violations, Congress intended citizens to be able to prosecute claims such as those presented by the Citizens here. *E.g., CALPIRG v. Shell Oil Co.*, 840 F. Supp. 712, 715 n.7 (N.D. Cal. 1993) ("Indeed, the citizens' suit provision of the Clean Water Act specifically contemplates that citizens will enforce NPDES violations where agencies decline to do so.").

**B.    ASSUMING __ARGUENDO__ THAT A STAY IS APPROPRIATE, IT MUST BE FOR A FIXED TIME OF SHORT DURATION**

Even if a stay somehow were appropriate in this case, it would be an abuse of discretion to impose CCH's requested indeterminate stay. In the limited circumstances where stays are appropriate, they must be set for a fixed, short duration. *Landis*, 299 U.S. at 256 ("discretion was abused if the stay was not kept within the bounds of moderation"); *Mirant*, 398 F.2d at 1111; *Jaffe v. Morgan Stanley DW, Inc.*, 2007 US Dist. LEXIS 8502 (N.D. Cal. 2007) (approving two month stay to allow time for result in parallel proceeding, noting that an indefinite stay to await the outcome of a parallel proceeding would be "extreme

relief" that the court would be reluctant to impose, and further
noting that defendant would bear a "very high burden" if it
sought to extend the stay).  Indeed Magistrate Chang recognized
this in denying EPA's requested open-ended stay in *EPA I* as a
condition of the Citizens' intervention in that case:

> I'm somewhat reluctant to have an indefinite stay
> basically of the litigation without knowing, for
> example, where the status of the interim agreement
> may be or whether it's forthcoming, because one
> seems to lead to the next.  And without some
> degree of certainty or probability with regards to
> the interim agreement, the final agreement may be
> as indefinite as the stay.

Sproul Decl., Ex. H at 17.  Accordingly, Magistrate Chang's
Proposed Findings and Conclusions concerning the Citizens'
intervention in *EPA I* declined to recommend the open-ended stay
proposed by EPA, but instead only recommended that "any party may
file a motion seeking to stay the litigation *for a reasonable
period of time* to allow the parties to further engage in good
faith settlement negotiations." *Id.*, Ex. B at 18-20.  The Court
by Order adopted Magistrate Chang's Proposed Findings. *Id.*,
Ex. C.

IV.  **CONCLUSION**

CCH inappropriately seeks to stay further proceedings to
avoid a ruling on the Citizens' October 9, 2007 Motion for
Summary Judgment.  This pending summary judgment motion is based
on CCH's own DMRs which conclusively establish CCH's CWA

violations. *See, e.g., Sierra Club v. Union Oil Co. of California,* 813 F.2d 1480, 1492 (9th Cir. 1987), *vac'd on other grounds,* 485 U.S. 931, (1988), *reinstated,* 853 F.2d 667 (9th Cir. 1988).

The Supreme Court *Landis* decision and the Ninth Circuit's *Mirant* decision instruct that "only in rare circumstances" will stays issue that bar litigants from their day in court because third parties may otherwise address the issues litigants raise. For such rare circumstances to exist, (1) a stay must not damage the litigants' interests, (2) there must be hardship to the party seeking the stay (other than the burden of litigation itself), and (3) the actions of third parties must be likely to bring prompt resolution of the issues raised by the litigants. CCH, EPA and DOH's as yet vague negotiations do not constitute the requisite rare circumstances. Granting CCH's requested stay pending negotiations that are almost certain to be protracted and which are likely to exclude the Citizens will injure the Citizens by denying them opportunity for prompt injunctive relief redressing their irreparable environmental harm. CCH's only hardship to be avoided by its requested stay is the burden of having to litigate this case. Finally, there can be no certainty that these negotiations will promptly resolve any of the issues presented by the Citizens' WWTP claims.

For these reasons, the Court should deny CCH's Motion to Stay.

DATED:   Honolulu, Hawai'i, August 31, 2007.

_/s/ William M. Tam_____
CHRISTOPHER SPROUL
ENVIRONMENTAL ADVOCATES

PAUL ALSTON
WILLIAM M. TAM
BLAKE K. OSHIRO
ALSTON HUNT FLOYD & ING

Attorneys for Plaintiffs
SIERRA CLUB, HAWAI'I CHAPTER,
HAWAI'I'S THOUSAND FRIENDS, and
OUR CHILDREN'S EARTH FOUNDATION