IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| SIERRA CLUB, HAWAI'I CHAPTER; HAWAI'I'S THOUSAND FRIENDS; and OUR CHILDREN'S EARTH FOUNDATION,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY AND COUNTY OF HONOLULU and FRANK DOYLE, DIRECTOR OF THE DEPARTMENT OF ENVIRONMENTAL SERVICES, in his official capacity,<br><br>Defendants. | Civil No. 04-00463 DAE-BMK<br><br>**DECLARATION OF CHRISTOPHER SPROUL** |

**DECLARATION OF CHRISTOPHER SPROUL**

I, Christopher Sproul, hereby declare and state under penalty of law that the following facts are true and correct:

1. I am an attorney admitted to the bar of this Court. I am a partner in Environmental Advocates, a law partnership, and counsel for SIERRA CLUB, HAWAI'I CHAPTER, HAWAI'I'S THOUSAND FRIENDS and OUR CHILDREN'S EARTH FOUNDATION (collectively, "Citizens") in this matter. I make this Declaration based on my personal knowledge and am competent to testify to the matters set forth herein.

2. I am counsel of record for Citizens in this case *Sierra Club, et al. v. City and County of Honolulu*, Civil No. 04-00463 DAE/BMK ("*Sierra Club*") and in two other cases currently pending in the Court that address CCH's sewage spills, *United States, et al. v. City and County of Honolulu*, Civ. No. 94-00765 DAE/KSC

655852-2 / 7502-3

("*EPA I*") and *United States, et al.* v. *City and County of Honolulu*, Civ. No. 07-00235 DAE/KSC ("*EPA II*").

## Prior Court Proceedings

3.  Citizens filed *Sierra Club* on July 29, 2004 alleging, *inter alia*, several claims (collectively, the "WWTP Claims") concerning CCH's effluent discharges from its Sand Island Wastewater Treatment Plant ("Sand Island WWTP").

The Citizens' **Third** Claim alleges that CCH has since May 1999 continuously violated its Sand Island NPDES Permit effluent limitations on the discharge of enterococcus, chlordane, dieldrin, biochemical oxygen demand ("BOD"), and total suspended solids ("TSS").

Plaintiffs' **Fourth** Claim alleges that CCH violated its Sand Island NPDES Permit by failing to complete remedial projects required by the Permit.

Plaintiffs' **Eighth** Claim alleges CCH violated an EPA administrative order issued in 2002.

4.  Originally, the Citizens also brought claims in this case related to CCH's sewage spills from its sewage collection system post May 1999. On September 30, 2005, however, the Court dismissed the Citizens' sewage spill claims in *Sierra Club* on *res judicata* grounds due to EPA's prosecution of CCH sewage spills in an earlier-filed action *EPA I*. A true and correct copy of the Court's Order Granting Defendants' Motion to Dismiss

Plaintiffs' First, Second, Ninth, Eleventh and Twelfth Claims for Relief is attached as **Exhibit A**.

5.   In January 2005, CCH filed a Motion To Stay the Citizens' WWTP Claims.  On September 30, 2005, the Court denied CCH's Motion to Stay.  *See Exhibit A*.

6.   EPA and DOH currently have two pending CWA enforcement actions against CCH in this court:  EPA I filed in 1994 and EPA II filed in May 2007.  In both cases, EPA and DOH assert CWA claims against CCH for sewage spills from CCH's sewage collection system, but the agencies do <u>not</u> assert claims against CCH for violation of CCH's NPDES permit effluent limitations applicable to discharges from the Sand Island WWTP.  Thus, *EPA I* and *EPA II* do not include claims comparable to the Citizens' WWTP Claims in *Sierra Club*.

7.   The Citizens moved to intervene in *EPA I* on January 25, 2006 to assert their CWA claims against CCH for <u>sewage spills</u> post-1999 that the Court previously dismissed from their *Sierra Club* action.

8.   On March 28, 2006, the Citizens and CCH entered into a stipulation to stay further proceedings on this Motion to Intervene in *EPA I* until September 29, 2006 to explore settlement discussions.  The Court approved this stipulation by Order entered April 12, 2006.  The stipulation provided the stay could be lifted upon thirty days notice by any party.  When subsequent settlement negotiations appeared stalled, the Citizens by letter

dated August 30, 2006 provided notice terminating the stay. The Citizens re-filed their Motion to Intervene on March 6, 2007.

9. EPA and DOH's responses to the Citizens' Motion to Intervene in *EPA I* both requested the Court issue an open-ended stay of any further litigation in *EPA I* to facilitate settlement talks as a condition of granting the Citizens' intervention. The Citizens opposed an unconditional stay, but indicated they would not object to a stay of fixed four months duration.

10. On May 3, 2007, Magistrate Judge Kevin Chang issued Proposed Findings and Recommendations recommending Citizens' motion to intervene be granted. A true and correct copy of Magistrate Judge Chang's May 3, 2007 Proposed Findings and Recommendations is attached as **Exhibit B**. On May 24, 2007, the Court issued an Order adopting Magistrate Judge Chang's Findings and granting the Citizens intervention in *EPA I.* A true and correct copy of the Court's Order adopting Magistrate Judge Chang's Findings and granting the Citizens intervention in *EPA I* is attached as **Exhibit C.**

11. On May 24, 2007, the Citizens filed a Motion to Intervene in *EPA II.* In their responses to this Motion, CCH, EPA and DOH all recommended that the Court order as an express condition of granting the Citizens intervention that any party could file a motion for a stay of EPA II "for a reasonable period of time" to facilitate settlement negotiations. The Citizens on

reply urged that no conditions should be imposed on their intervention.

12. On June 28, 2007, Magistrate Judge Chang issued Proposed Findings and Recommendations recommending Citizens' Motion to Intervene in *EPA II* be granted. A true and correct copy of Magistrate Chang's June 28, 2007 Proposed Findings and Recommendations is attached as **Exhibit D**. On July 25, 2007, the Court issued an order adopting Magistrate Judge Chang's Findings and granting Citizens intervention in *EPA II*. A true and correct copy of the Court's Order adopting Magistrate Judge Chang's Findings and granting the Citizens intervention in *EPA II* is attached as **Exhibit E**.

<u>Prior Settlement Discussions</u>

13. The Citizens first proposed settlement discussions to CCH in their May 4, 2004 notice of intent to file a CWA citizen suit sent to CCH as required by CWA section 505, 33 U.S.C. § 1365. A true and correct copy of this citizen suit notice letter is attached as **Exhibit F**.

The Citizens subsequently sent CCH a written settlement proposal and outlined this proposal in a meeting with CCH in May 2004. CCH declined to respond to the Citizens' settlement proposal during this meeting or before the end of the sixty day pre-filing notice period specified by CWA section 505. The Citizens filed suit in July 2006.

14. After delaying until October 24, 2006, CCH finally responded and rejected every aspect of the Citizen's proposal. CCH claimed the Citizens should not be provided any relief in their action. In CCH's view, all the CWA violations at issue were being addressed by the *EPA I* 1995 Consent Decree or by the EPA administrative orders.

15. Given CCH's definitive rejection of any affirmative relief through settlement, the Citizens proceeded to litigate their *Sierra Club* claims. Citizens served discovery, opposed CCH's Motion to Dismiss, and briefed cross-motions for summary judgment.

16. In early fall 2006, EPA advised the Citizens that EPA would pursue supplement CWA judicial enforcement to address CCH's continuing CWA violations of CCH's collection system sewage spills <u>and</u> its WWTP effluent limitation violations. On December 12, 2006, the Citizens entered into a confidentiality agreement with EPA which provided that EPA and the Citizens would consult with each other regarding CWA litigation and/or settlement against CCH and would protect the confidentiality of their related communications with each other. Thereafter, the Citizens and EPA communicated with each other to develop a common settlement position.

17. After repeated delays, EPA was finally able to schedule a meeting with CCH at the end of March 2006 to present a comprehensive EPA settlement proposal addressing CCH's sewage

spills and WWTP effluent limitation violations. EPA had shared early drafts of this settlement proposal with the Citizens and modified it somewhat to reflect the Citizens' comments and concerns.

18.  CCH initially opposed the Citizens' presence at the March 2006 settlement meeting. After repeated discussion and the Citizens' agreement to enter into a Stipulation staying *Sierra Club* and the Citizens' Motion to Intervene in *EPA I*, CCH agreed to have the Citizens join a later session of that meeting. During the March 2006 meeting, the parties discussed supplemental judicial relief to address multiple problems with CCH's sewage collection and treatment system.

19.  While the parties met in March 2006, CCH's Beachwalk force main sewer line ruptured and spilled 48 million gallons of raw sewage into the Ala Wai Canal and on to Waikiki Beach. In April 2006, EPA communicated to the Citizens and CCH that in light of this event, EPA wanted to shift the focus of the negotiations: (a) first, to work out a stipulated preliminary injunction order in which CCH would implement specific projects EPA believed were required on an immediate and emergency basis; and (b) second, to discuss a global settlement covering all sewage spill and treatment plant issues. The Citizens had reservations about this approach, but agreed to work with EPA in hopes of quickly fashioning an interim agreement and then moving to a comprehensive solution soon thereafter.

20. In the subsequent settlement discussions, CCH repeatedly sent their settlement communications to EPA and/or DOH, but <u>not</u> the Citizens. EPA graciously sent copies to the Citizens. CCH repeatedly declined to respond to the Citizens' suggested settlement terms supplementing EPA's proposals.

21. By August 2006, CCH made it clear that Citizens would not be admitted as a party and that the Citizens' core concerns would not be met. CCH was adamant, among other things, that the Citizens would not be a party signatory to any supplemental judicial relief with rights afforded a party. Continued settlement talks with CCH would be fruitless without resolution of the Citizens' party status. In August 2006, the Citizens acted to terminate the stay with CCH and obtain gain a hearing on their Motion to Intervene.

22. On September 28, 2006, Magistrate Judge Chang held a status conference and indicated he wanted all the parties to pursue settlement discussions. Thereafter, CCH agreed to the Citizens' attendance at settlement meetings and to provide copies of CCH's settlement communications. The Citizens held in abeyance its motion to intervene in *EPA I*. These settlement meetings proved equally unproductive. CCH refused to agree that the Citizens could be parties to any supplemental judicial relief. The Citizens concluded (again) that settlement would be impossible until the Court ruled on their intervention. The Citizens re-noticed their Motion to Intervene in *EPA I*.

23. Maile Chun has repeated her past declaration to the Court that the Citizens unilaterally withdrew from the multi-party settlement negotiations in August 2006 and again in February 2007. Declaration of Maile R. Chun in Support of Defendant City and County of Honolulu's (1) Ex Parte Application to Expedite Hearing on Motion to Stay and (2) Motion to Stay, ¶¶ 20-21; *see also* Declaration of Maile R. Chun in Support of Defendant City and County of Honolulu's Opposition to Proposed Intervenors' Motion to Intervene in *EPA I* (March 27, 2007).

This is false. The Citizens never communicated at any time that they were withdrawing from settlement discussions. Instead, CCH on its own initiative informed EPA and DOH in August 2006 and again in February 2007 that it would only communicate about settlement with the agencies and *provided that* the agencies kept these communications from the Citizens. EPA and DOH informed the Citizens that confidential talks were occurring, but EPA and DOH both met CCH's demand and did not reveal the content of the discussions. CCH informed Citizens that if they proceeded with their Motion to Intervene, CCH would halt negotiations with the Citizens. CCH did end such negotiations and pursued settlement negotiations exclusively with EPA and DOH. The Citizens meanwhile continued to make settlement proposals to CCH in a March 2007 meeting with CCH counsel and in an April 2007 letter.

24. The Citizens urged EPA, DOH and CCH not to enter into a settlement that excluded the Citizens while the question of the

Citizens' party status remained unresolved. These requests were unavailing. CCH, EPA, and DOH instead entered into a proposed Stipulated Order in *EPA II* now lodged with the Court. The Citizens are excluded from the proposed Order. A true and correct copy of this proposed Stipulated Order is attached as **Exhibit G**.

25. The proposed Stipulated Order in *EPA II* indicates that CCH, EPA, and DOH contemplate more negotiations and more judicial relief to address the remainder of CCH's on-going sewage spill problems. CCH has not proposed to the Citizens that they be included in these discussions without pre-conditions. Discussions with EPA and DOJ indicate the talks may be scheduled to begin in early October without the Citizens.

26. CCH's Motion to Stay states CCH "is willing to discuss terms under which plaintiffs may participate in these negotiations." CCH Motion to Stay at 16. Based on past experience, the Citizens have concluded that CCH will only agree to the Citizens' participation in settlement discussions if the Citizens agree to a stay of all litigation. The Citizens are not willing to agree to such a condition given their experience with the lack of progress in negotiations unsupervised by the Court while litigation is stayed. CCH lacks any motivation to respond meaningfully to the Citizens' settlement proposals without court rulings resolving the issues on which the Citizens and CCH disagree.

27. Attached as **Exhibit H** is a true and correct copy of the transcript of the April 17, 2007 Hearing before Magistrate Judge Kevin Chang on the Citizens' Motion to Intervene in *EPA I* (that was also attached as Exhibit E to the Declaration of Maile Chun in Support of CCH's Response to the Citizens' Amended Motion to Intervene in *EPA* II).

28. Attached as **Exhibit I** is a true and correct copy of a City Counsel resolution adopted on June 6, 2007 authorizing at least $1.2 million to fund CCH's future litigation related to opposing EPA revocation of CWA section 301(h) waivers for CCH's Honouliuli and Sand Island WWTPs. This resolution is published on CCH's internet website at: http://www4.honolulu.gov/docushare/dsweb/Get/Document-63163/2bfqhkvc.pdf

29. Attached as **Exhibit J** is a true and correct copy of CCH's NPDES Permit issued for its Sand Island WWTP that the Citizens obtained from EPA in response to a Freedom of Information Act request.

30. Attached as **Exhibit K** is a true and correct copy of this Court's April 16, 2007 Order Granting Plaintiff's Motion for Reconsideration in this case. 486 F. Supp. 2d 1185 (2007).

Executed in San Francisco, California on August 28, 2007.

*/s/ Christopher A. Sproul*

_____
Christopher Sproul