**ENVIRONMENTAL ADVOCATES**
1004 O'REILLY AVENUE
SAN FRANCISCO, CALIFORNIA  94129
TELEPHONE: (415) 561-2222
FAX: (415) 561-2223

May 4, 2004

Mayor Jeremy Harris
City and County of Honolulu
Honolulu Hale 530 S. King St.
Honolulu, HI  96813

*VIA CERTIFIED MAIL*
*RETURN RECEIPT REQUESTED*

 Re:  Sixty-Day Notice of Violations of Clean Water Act and Notice of Intent to File Suit

Dear Mayor Harris:

 I am writing on behalf of the Sierra Club, Hawaiʻi Chapter ("Sierra Club"), Hawaiʻi's Thousand Friends ("HTF"), and Our Children's Earth Foundation ("OCE") to notify you of serious and ongoing violations of the federal Clean Water Act ("CWA") at the City and County of Honolulu's publicly owned treatment works ("POTWs") for the collection and treatment of sanitary sewage.  These POTWs include the Sand Island Wastewater Treatment Plant ("Sand Island WWTP"), the Honouliuli Wastewater Treatment Plant ("Honouliuli WWTP"), the Kailua Regional Wastewater Treatment Plant ("Kailua WWTP"), the Waiʻanae Wastewater Treatment Plant ("Waiʻanae WWTP"), and the collection systems which are appurtenant to these wastewater treatment plants.  The purpose of this letter is further to provide notice of Sierra Club's, HTF's and OCE's intent to file a civil action against the City and County of Honolulu ("CCH") and the Director of the Department of Environmental Services for such violations, sixty days (60) days after the date of this letter.

## I. IDENTITY OF PERSONS GIVING NOTICE AND THEIR COUNSEL

 In accord with 40 C.F.R. section 135.3(b), Sierra Club, HTF, and OCE hereby give notice of the names, addresses, and telephone numbers of the persons giving notice, which are the Sierra Club, HTF, and OCE.

 The Sierra Club is America's oldest and largest grassroots environmental organization, with 700,000 members joined together to protect and preserve natural ecosystems and work against environmental degradation from a variety of causes.  The Sierra Club is particularly focused on protecting Hawaiʻi's ocean environment via its "Blue Water Campaign." Members of the Sierra Club include residents of Oʻahu who regularly use Oʻahu's waters for fishing, body contact water sports and other forms of recreation, wildlife observation, aesthetic enjoyment,

# EXHIBIT F

Notice of Intent to File Suit
May 4, 2004

educational study, and spiritual contemplation. These Sierra Club members are concerned about water quality and are and will continue to be adversely affected by CCH's sewage discharge violations. The Sierra Club may be contacted at:

> Sierra Club, Hawai'i Chapter
> 1040 Richards Street, Room 306
> Mail: P.O. Box 2577, Honolulu, Hawai'i 96803
> Tel.: (808) 538-6616; Fax: (808) 537-9019
> Attn: Laura Edmunds

HTF is a non-profit public benefit corporation dedicated since 1980 to ensuring that appropriate planning, management and land use decisions are made that protect the environment, human health and cultural and natural resources of Hawai'i, and that public agency decisions are made and proposals are implemented in conformity with the law. Members of HTF include residents of O'ahu who regularly use O'ahu's waters for body contact water sports and other forms of recreation, wildlife observation, aesthetic enjoyment, educational study, and spiritual contemplation. These HTF members are concerned about water quality and are and will continue to be adversely affected by CCH's sewage discharge violations. HTF may be contacted at:

> Hawai'i's Thousand Friends
> 305 Hahani Street PMB 282
> Kailua, Hawai'i, 96734
> Tel. & Fax: (808) 262-0682
> Attn: Donna Wong

OCE is a non-profit public benefit corporation with members throughout the United States dedicated to protecting the public, especially children, from the health impacts of pollution and other environmental hazards and to improving environmental quality for the public benefit. Another aspect of OCE's mission is to participate in environmental decisionmaking, enforce environmental laws, both federal and state, to reduce pollution, and to educate the public concerning those laws and their enforcement. OCE's members use O'ahu's waters for fishing, body contact water sports and other forms of recreation, wildlife observation, aesthetic enjoyment, educational study, and spiritual contemplation. These OCE members are concerned about water quality and are and will continue to be adversely affected by CCH's sewage discharge violations. OCE may be contacted at:

> Our Children's Earth Foundation
> 100 First Street, Suite 100-367
> San Francisco, CA 94105
> Tel: (415) 896-5289; Fax: (650) 745-2894
> Attn: Tiffany Schauer

Notice of Intent to File Suit
May 4, 2004

Sierra Club, HTF, and OCE have retained the following legal counsel to represent them in this matter:

Christopher A. Sproul, Esq.
Environmental Advocates
Building 1004B O'Reilly Avenue
San Francisco, California 94129
Tel: (415) 561-2222, Fax: (415) 561-2223

Local Hawai'i counsel: Lea Hong, Esq.
Douglas A. Codiga, Esq.
Alston Hunt Floyd & Ing
18th Floor, ASB Tower
1001 Bishop Street
Honolulu, Hawai'i 96813
Tel: (808) 524-1800, Fax: (808) 524-5976

All communications should be addressed to legal counsel at the above addresses.

## II. FACTUAL BACKGROUND

CCH is a municipality incorporated under the laws of the State of Hawai'i. CCH owns and operates the Sand Island, Honouliuli, Kailua, Wai'anae, and Kahuku WWTPs and appurtenant collection systems, all of which are publicly owned treatment works as defined in CWA section 212(2)[1] and 40 C.F.R. section 125.58(s).[2] The Sand Island WWTP and related collection system collect and treat sanitary sewage from portions of Honolulu, Hawai'i. The Sand Island WWTP discharges treated sanitary sewage to receiving waters named Māmala Bay, a bay of the Pacific Ocean. The Honouliuli WWTP and related collection system collects and treats the sanitary sewage from the Western Māmala Bay Service District on O'ahu, which serves Central O'ahu and Ewa with the exception of Pearl Harbor, Wahiawa-Whitmore Village, Ewa Beach and Campbell Industrial Park areas. The Honouliuli WWTP discharges to Māmala Bay of the Pacific Ocean. The Kailua WWTP and related collection system collects and treats sanitary sewage from Kailua and Kāne'ohe. The Kailua WWTP discharges to an outfall located off Mōkapu Point, on the eastern shore of O'ahu. The Wai'anae WWTP and related collection

---

[1] 33 U.S.C. § 1292(2).

[2] The Sand Island WWTP is located at 1150 Sand Island Parkway Road, Honolulu, Hawai'i. The Honouliuli WWTP is located at 91-1501 Geiger Road, Honolulu, Hawai'i. The Kailua WWTP is located at 95 Kāne'ohe Bay Dr., Kailua, Hawai'i. The Wai'anae WWTP is located at 86-100 Farrington Hwy., Wai'anae, Hawai'i. The Kahuku WWTP is located near the Kamehameha Highway in Kahuku, Hawai'i.

Notice of Intent to File Suit
May 4, 2004

system collects and treats sanitary sewage from the Wai'anae community and discharges to an ocean outfall on the western shore of O'ahu. The Kahuku WWTP receives residential wastewater from Kahuku Villages and the other residential and commercial uses in Kahuku town. The Kahuku WWTP system is designed as a gravity flow collection system from the mauka development areas. The Kahuku WWTP discharges to an injection well system.

The CWA prohibits the discharge of pollutants by any person to waters of the United States except in compliance with a permit duly issued under the CWA. CWA § 301(a), 33 U.S.C. § 1311(a). The CWA authorizes EPA, or states with permit programs approved by EPA, to issue National Pollutant Discharge Elimination System (NPDES) permits allowing for the discharge of pollutants into waters of the United States. CWA § 402, 33 U.S.C. § 1342.

Ordinarily, NPDES permits to POTWs must include effluent limitations set according to the level of pollutant reduction attainable via the application of secondary treatment. CWA § 301(b)(1)(B), 33 U.S.C. § 1311(b)(1)(B). CWA section 301(h), however, authorizes EPA, with concurrence from the applicable state, to issue an NPDES permit with limits less stringent than those reflecting the application of secondary treatment provided various specific criteria are met. 33 U.S.C. § 1311(h).

EPA has approved the State of Hawai'i Department of Health ("DOH") to administer an NPDES permit program in Hawai'i. In most instances, DOH thus issues NPDES permits in Hawai'i. Only EPA, however, has authority to issue CWA section 301(h) waivers allowing for more lenient effluent limitations than those based on secondary treatment. CCH sought from EPA, and was granted, CWA section 301(h) waivers for both the Sand Island and Honouliuli WWTPs. For this reason, DOH and EPA jointly issued the NPDES permits authorizing pollutant discharge from the Sand Island and Honouliuli WWTPs. DOH and EPA issued the most recent Sand Island WWTP NPDES permit, NPDES Permit No. HI0020117 ("Sand Island Permit"), on November 2, 1998. EPA and DOH issued the most recent Honouliuli WWTP NPDES permit, NPDES Permit No. HI0020877 ("Honouliuli Permit"), on June 6, 1991. DOH issued the most recent Kailua NPDES permit, NPDES Permit No. HI0021296 ("Kailua Permit"), on November 17, 1999. DOH issued the most recent Wai'anae WWTP NPDES permit, NPDES Permit No. HI0020109("Wai'anae Permit"), on September 20, 1999.[3]

### A. CCH Sewage Spills

CCH has repeatedly spilled raw or inadequately treated sewage from the Sand Island, Honouliuli, Kailua, Wai'anae and Kahuku WWTPs and/or from the collection systems that carry sewage to these WWTPs. Such raw or inadequately treated sewage has repeatedly overflowed or

---

[3] Three of these four NPDES permits have expired. The Honouliuli Permit expired on June 5, 1996. The Wai'anae Permit expired on Sept. 30, 2003. The Sand Island Permit expired on Nov. 3, 2003. The Kailua Permit will expire on June 30, 2004.

Notice of Intent to File Suit
May 4, 2004

spilled from CCH sewer lines, manholes, pump stations, and various equipment/conveyances at the WWTPs. A partial list of very recent sewage spills, provided by way of example, includes the following:

(1) On December 5, 2003, CCH spilled about 4.6 million gallons of raw sewage from the Hart Street pump station due to a short circuit that caused a power failure at the pump station. This spill flowed into Nu'uanu Stream, Kapālama Canal, and Honolulu Harbor, which is continuous with the Pacific Ocean.

(2) Between December 27, 2003 and January 4, 2004, CCH had a series of major spills from its collection systems that caused beach closures all over eastern and southern O'ahu.

(3) Between February 28 and March 1, 2004 CCH spilled about 45,000 gallons of raw sewage from sewer lines or manholes on Wana'ao Road into Ka'elepulu Stream and Kailua Bay. On March 2, 2004 at 394 Wana'ao Road, CCH spilled at least an additional 63,700 gallons of raw sewage into Ka'elepulu Stream and Kailua Bay, bringing the four day total volume of spilled sewage to 108,000 gallons.

(4) On March 1, 2004, CCH spilled a substantial volume of raw sewage from a manhole on Alu Place into Kalihi Stream and Ke'ehi Lagoon.

(5) On March 2, 2004, CCH spilled 25,000 gallons of partially treated sewage from equipment at the Kailua Regional WWTP, which CCH then discharged via the Mōkapu ocean outfall.

(6) Over several days before March 3, CCH had a series of sewage spills at the following locations: Kāne'ohe Preliminary Treatment Facility, 'Ōlepe Loop in Pearl Harbor, and Hele Street and Keolu Drive in Kailua.

(7) On March 3, 2004, the CCH sewer line that transports sewage from Ala Moana Pump Station underneath Honolulu Harbor to Sand Island WWTP ruptured. As a result, CCH spilled 1.7 to 3.6 million gallons of raw sewage into Honolulu Harbor and the Pacific Ocean. Subsequent investigation revealed that this line is in very deteriorated condition, with multiple cracks along its length. CCH continued to spill residual sewage from this line over the next several days. This spill event caused beach closures from Point Panic to Ke'ehi Lagoon.

By way of additional example, as expressly found by EPA in an administrative order issued to CCH, between April 15, 1998 and April 15, 2003, CCH reported to EPA and DOH 15 sewage spills from the Sand Island collection system into Kalihi Stream. During this time period, CCH further reported 18 sewage spills from the Sand Island Collection System to Nu'uanu and Waolani Streams (the latter is a tributary to Nu'uanu Stream). *In the Matter of the City and County of Honolulu*, Docket No. CWA-309-03-019 (June 30, 2003). The dates,

Notice of Intent to File Suit
May 4, 2004

locations and volume of these spills are set forth in EPA's June 2003 order. Kalihi Stream flows to Keʻehi Lagoon, which is continuous with the Pacific Ocean. Nuʻuanu Stream flows to Honolulu Harbor, which is also continuous with the Pacific Ocean.

By way of further additional example, as expressly found by DOH in a proposed administrative order, CCH reported 15 sewage spills from November 1996 to April 2004 from CCH force mains that reached state waters. *Department of Health, State of Hawaiʻi v. The City and County of Honolulu,* Docket Nos. 2004-CW-EO-01N and 04-WW-EO-2. During the same time period, CCH reported 8 additional sewage spills that reached the ground. *Id.* The dates, locations and volume of these spills are set forth in the DOH proposed order.

These spills have resulted from a variety of poor or inadequate system maintenance, operation, repair, replacement and rehabilitation practices. These poor practices have led to sewer line blockages (generally caused by build-up of grease, accumulation of sediment and debris, and root intrusion), unaddressed defects in sewer lines such as extensive line cracking, sags in lines, and misaligned joints; broken sewer lines, pump station equipment failures, undersized sewer lines or pump station pumping and/or storage capacity, and the overwhelming of system capacity due to excessive infiltration and inflow of storm water and ground water during wet weather.

These spills have sent large volumes of raw sewage streaming into private residences and businesses, streets, storm drains, and numerous waterways all over western, southern, and eastern Oʻahu, including coastal waters of the Pacific Ocean from Waiʻanae to Kailua, Pōkaʻi Bay, Keʻehi Lagoon, Honolulu Harbor, Kāneʻohe Bay, Kailua Bay, Kalihi Stream, Nuʻuanu Stream, Waimalu Stream, Puhā Stream, Kawa Stream, and a wetlands/wildlife sanctuary in Kahuku. These spills have repeatedly posed serious public health threats and created severe nuisance in exposing substantial numbers of people to raw or inadequately treated sewage. Raw sewage contains a variety of human bacteriological, viral, and parasitic pathogens, and exposure to raw sewage is well-known to cause various human illnesses. In addition to human waste, sanitary sewage contains various toxic chemicals from the solvents, detergents, cleansers, inks, pesticides, paints, pharmaceuticals and other chemicals discarded by households and businesses. Thus, CCH's sewage spills pose serious public health risk in exposing members of the public to sewage-borne pathogens and various toxic pollutants.

DOH and/or other governmental agencies have repeatedly posted or required posting of closure or health advisory warnings for various waters on or adjoining Oʻahu, including some of the beaches most heavily used for water contact recreation in the State of Hawaiʻi. These beach closures and warnings have caused serious loss of public recreation opportunity and enormous economic harm to businesses that depend on local water-oriented recreation and tourism for their customer base. These persistent, repeated sewage spills also have threatened harm to the sensitive freshwater and marine environments of Oʻahu's waters, as the pathogens and toxic pollutants in sewage can adversely affect freshwater and marine life.

### B. Sand Island Effluent Discharge Problems

The Sand Island WWTP ("Sand Island") discharges an average of about 70 million gallons per day (MGD) of sewage into Māmala Bay, off the south shore of Oʻahu. The outfall discharge point is about 2 miles off-shore (10,400 feet), in 240 feet of water. As noted, the Sand Island Permit incorporates a CWA section 301(h) waiver allowing Sand Island to discharge effluent treated only with "primary treated," rather than the "secondary treatment" normally required of municipal sewage plants.

EPA has recognized Sand Island as a particularly problematic facility, and has increased its inspections from the normal once a year to twice a year as a result. In one recent inspection report, EPA inspectors concluded:

The SIWWTP (Sand Island Plant) effluent remains the lowest quality effluent in Region 9 with a 301(h) waiver so far as the inspectors are aware.

As discussed more fully below, EPA issued an administrative order on September 30, 2002 requiring CCH to take various measures to address various problems at Sand Island. *In the Matter of: the City and County of Honolulu*, Docket No. CWA-402-9-02-61 ("EPA Sand Island Order").

#### 1. Lack of Sewage Disinfection

During the 301(h) waiver approval process, CCH expressly committed to install and operate disinfection facilities to address concerns with pathogen loading from the Sand Island discharge in Māmala Bay. The Sand Island Permit expressly required CCH to have a fully operational disinfection facility for Sand Island more than a year and a half ago, but CCH still lacks such a facility.

Several years ago, a study was done of the potential impacts of CCH's sewage discharges into Māmala Bay by the Māmala Bay Study Commission (MBSC). MBSC confirmed that bacteria levels in Māmala Bay near-shore areas used for surfing, swimming, fishing and other water recreation exceed state water quality standards from time to time, potentially posing health risks to water recreationalists. MBSC concluded that the source of these bacteria exceedances was not clear. MBSC concluded that sewage discharges from Sand Island and other CCH sewage plants could possibly be contributing to the problem. MBSC recommended that it would be prudent to require disinfection of Sand Island effluent as a protective measure, with further study to evaluate the effect of such disinfection.

In issuing Sand Island's 301(h) waiver, EPA analyzed the link between sewage and public health risks from pathogen exposure. EPA's models showed that the Sand Island plume could be impacting nearshore waters. EPA acknowledged that other models had shown risk that

Notice of Intent to File Suit
May 4, 2004

the Sand Island plume could reach near-shore areas. EPA did not analyze whether water contact recreation occurs far from shore, closer to the outfall, and what the risks to people entering the water closer to the outfall (for example, from outrigger canoes, jet skis, and other watercraft) would be. Overall, EPA concluded that there was at least some risk to public health from the Sand Island discharge which warranted requiring CCH to disinfect the Sand Island discharge. *See* EPA Response to Public Comments, Sand Island NPDES Permit.

Some experts who have reviewed the issue for environmental groups warn that the risks to public health from sewage discharges from CCH's sewage plants, including Sand Island, are greater than acknowledged by the MBSC and EPA. Among other things, these experts have stressed that sewage can include "viable, but non-culturable pathogens" (VNC pathogens) that conventional analyses ignore. EPA has acknowledged that the VNC pathogen theory has merit and warrants further study. Pending such study, effective disinfection of the Sand Island discharge is an important step to reducing the health risks associated with VNC pathogens.

An EPA contractor prepared a written evaluation of the issue in May 2002 which concluded:

The *Enterrococcus* data presented in [CCH's report to EPA] appear to indicate that the outfall plume moves shoreward and eastward during at least some times of the year. This pattern of movement could result in the plume contacting recreational waters. The City should add new sampling stations that will allow it to more thoroughly investigate this phenomenon.

While disinfection of Sand Island effluent is an EPA-recognized prudent measure to protect public health and was expressly promised by CCH, CCH has not yet implemented disinfection and will not implement this measure in the near future. The Sand Island Permit requires CCH to install and operate a plant disinfection facility by the following schedule:

| | |
|---|---|
| Planning | June 30, 1999 |
| Design | June 30, 2000 |
| Advertise | August 29, 2000 |
| Bid Opening | August 29, 2000 |
| Award | September 28, 2000 |
| Construction | July 20, 2002 |
| Continuous Operation | July 21, 2002 |

Sand Island Permit ¶ A.2.g.

Thus, as noted, the Disinfection Facility was supposed to be operational more than a year and a half ago. Information available to Sierra Club, HTF, and OCE suggests that the disinfection unit currently planned by CCH may be ineffective given its design and the lack of secondary treatment at Sand Island. The disinfection unit will employ ultraviolet (UV)

Notice of Intent to File Suit
May 4, 2004

disinfection, which will be hampered by the high suspended solids/turbidity level in the primary treated effluent (which absorbs and impedes light transmission needed for UV disinfection to be effective).

The Sand Island Permit further requires that discharges meet the following enterococci limit: 18,000 CFU/100 ml daily maximum, to be monitored by daily grab samples. CCH cannot meet this limit until the disinfection plant is constructed. Enterococci monitoring results reported in CCH's mandatory discharge monitoring reports ("DMRs") indicate daily maximum enteroccoci levels of 10,000,000 CFU/100 ml, about 550 times the allowable level.[4]

As a result of CCH's delay in completing the Disinfection Facility, the EPA Sand Island Order required CCH to comply with the requirement to install disinfection and to report to EPA on measures to comply. CCH's response to EPA's administrative order admitted that CCH is substantially late at meeting this deadline and further indicated that CCH could not commit to EPA when the Disinfection Facility will be completed. CCH indicated that it was mired in a major contract dispute with one of the companies building the facility, had encountered site dewatering problems (which should have been entirely foreseeable given the experience of similar construction projects with high groundwater levels)[5] and has discovered that the construction site is contaminated with PCBs. CCH stated that all these problems are expected to cause substantial delays of unknown length.

### 2. Pesticide Violations

The Sand Island Permit imposes limits on the level of two pesticides, chlordane and dieldren, in the Sand Island discharge. Sand Island Permit ¶ A.1. CCH's DMRs show that CCH has violated its chlordane and dieldren limits every month from January 1999 to July 2002, by very large margins. According to the DMR data posted on EPA's website, Sand Island violates its chlordane limit every month with chlordane values 299% to 871% higher than the NPDES permit limit and violates its dieldrin limit by 50% to 192% every month. *See:*

---

[4] EPA posts DMR data for Sand Island on its website at:
   http://www.epa.gov/cgi-bin/get1cReport.cgi?tool
   =echo&IDNumber=HI0020117&media_tool=ECHO_PCS

More detailed information about the bacteria violations is further set forth on EPA's website at:
   http://oaspub.epa.gov/enviro/pcs_det_reports.pcs_tst?npdesid
   =HI0020117&rvalue=14&npvalue=7

[5] DOH recently cited, but did not fine, CCH for discharging silt-contaminated dewatering effluent to Māmala Bay, a sloppy construction practice that increases turbidity of near-shore waters.

Notice of Intent to File Suit
May 4, 2004

http://www.epa.gov/cgi-bin/get1cReport.cgi?tool
=echo&IDNumber=HI0020117&media_tool=ECHO_PCS

The chlordane and dieldrin flow into CCH's sewer pipes from contaminated groundwater. Groundwater on Oʻahu in built-up areas is often contaminated with these two pesticides, which have been used historically to treat for termites. Groundwater flows into CCH's sewer pipes (a phenomenon called "infiltration") via cracks in pipe joints, leaking manholes, and other holes in the pipes which worsen with age of the pipes. Old sewer pipes tend to be leaky and allow for high infiltration rates in areas of shallow groundwater.

Chlordane and dieldrin are both highly toxic, persistent chemicals. Chlordane is now banned as a human carcinogen. CCH could address its chlordane and dieldrin violations by one or a combination of three remedial measures:

(1) Forgo a waiver and install secondary treatment. In a published study, EPA has estimated that about 81% of dieldrin was removed via secondary treatment. Bhattacharya, Angara, Bishop, Dobbs, and Austin, *Project Summary, Removal and Fate of RCRA and CERCLA Toxic Organic Pollutants in Wastewater Treatment.* EPA/600/S2-89/026, March 1990. Pesticides are known to adsorb onto organic flocculents removed by secondary treatment and thus secondary treatment should remove chlordane, as well.

(2) Replace its old, leaky pipes, especially targeting areas as a high priority where chlordane and dieldrin-contaminated groundwater are entering the sewer line collection system. CCH could discover where the pesticides are leaking into its system by sampling sewage flow from manholes and tracking where pesticide levels spike within the collection system.

(3) Remediate groundwater. CCH could pump and treat contaminated groundwater or install subsurface barriers to prevent the migration of pesticide contaminated groundwater into its sewer lines. A groundwater remediation effort would be especially called for if there were limited groundwater areas where pesticide levels were particularly high and where groundwater is flowing into sewer pipes. Such a groundwater remediation effort would have the added benefit of protecting the public from the larger threat of exposure to pesticide-contaminated groundwater from a variety of sources (drinking water wells, migration of groundwater into surface streams, etc.).

The EPA Sand Island Order requires CCH to comply with these pesticide limits. CCH's response to EPA claimed that CCH should not be required to do anything to address the pesticide violations and that the pesticide limits should be deleted from its permit. These limits, however, were set, as required, in accord with state water quality standards for these two pesticides. CCH should not be allowed to degrade water quality below the level that DOH has found to be

Notice of Intent to File Suit
May 4, 2004

environmentally protective when it set water quality standards.

### 3. Percent Removal of BOD and TSS

The Sand Island Permit requires CCH to achieve, as a monthly average, not less than 30% removal efficiency of the concentration of biochemical oxygen demand ("BOD") in the Sand Island influent stream and not less than 60% removal efficiency of the total suspended solids ("TSS") concentration in the influent stream. Sand Island Permit ¶ A.1. CCH has not consistently achieved these removal percentages. For example, on August and October 2003, CCH only achieved 59% removal of TSS and in December 2003, CCH only achieved 29% removal of BOD.

### 4. Other Plant and System Upgrade Delays

The Sand Island Permit requires CCH to perform a series of other plant and system upgrades beyond the installation of disinfection to address the chronically poor level of treatment attained by Sand Island. CCH is well behind the deadlines for several of these upgrades, and the EPA Sand Island Order also required CCH to comply with these deadlines and to report to EPA concerning progress. The status of these upgrades is discussed below.

#### a. Sand Island Wastewater Treatment Plant Unit 1 Phase 2A

The Sand Island Permit requires CCH to complete an upgrade project known as the Sand Island Wastewater Treatment Plant Unit 1 Phase 2A. This upgrade project is necessary to ensure that Sand Island is able to provide consistent primary level treatment and comply with effluent limitations for biochemical oxygen demand (BOD), total suspended solids (TSS), and percent removal of BOD and TSS present in influent that flows into Sand Island. The Sand Island Permit imposes the following deadlines for completion of the Sand Island Wastewater Treatment Plant Unit 1 Phase 2A (except that the last milestone date is not an enforceable permit term):

| | |
|---|---|
| Planning | October 4, 1999 |
| Design | July 15, 2001 |
| Advertise | September 13, 2001 |
| Bid Opening | September 13, 2001 |
| Award | October 13, 2001 |
| Construction | February 10, 2004 |
| Finish Milestone | *February 18, 2005* |

Sand Island Permit ¶ A.2.e.

CCH is well behind these deadlines. In CCH's response to the EPA Sand Island Order, CCH outlined that this project has been delayed 13 months by construction schedule problems,

Notice of Intent to File Suit                                          Page 12 of 27
May 4, 2004

delay in securing an air emission permit, and the discovery of PCB contamination on the
construction site.

### b. Sand Island Wastewater Treatment Plant Primary Treatment Expansion

The Sand Island Permit requires CCH to complete an upgrade project known as the Sand
Island Wastewater Treatment Plant Primary Treatment Expansion project. This upgrade project
is important for ensuring that Sand Island has adequate system capacity to provide consistent
primary level treatment and comply with effluent limitations for biochemical oxygen demand
(BOD), total suspended solids (TSS), and percent removal of BOD and TSS present in influent
that flows into Sand Island. The Sand Island Permit imposes the following deadlines for the
Sand Island Wastewater Treatment Plant Primary Treatment Expansion project:

| Design | July 14, 2002 |
| Advertise | September 12, 2002 |
| Bid Opening | September 12, 2002 |
| Award | October 12, 2002 |
| Construction | February 18, 2005 |

Sand Island Permit ¶ A.2.f.

CCH is well behind these deadlines. In CCH's response to the EPA Sand Island Order,
CCH stated "Because of the shear [sic] magnitude of the construction effort now underway, and
because the bulk of the improvements will have already been completed and online, it was
determined to delay completion of this project for 30 months" until August 2007. Thus, CCH
has announced a unilateral decision to delay full compliance with this requirement for two and a
half years with no justification other than the "shear [sic] magnitude" of the project. In context,
this appears simply to be a cost cutting move.

### c. Ala Moana Pump Station

The Sand Island Permit requires CCH to complete an upgrade project known as the Ala
Moana Wastewater Pump Station Modification. This upgrade project is important for providing
adequate capacity and reliable pumping service from the Ala Moana Pump Station, a critical
pump station for delivering wastewater from the Sand Island collection system to the Sand Island
Plant and minimizing the risks of massive sewage spills from the collection system. The Sand
Island Permit imposes the following deadlines for completion of the Ala Moana Wastewater
Pump Station Modification (except that the construction completion date is not an enforceable
permit term):

Ala Moana Wastewater Pump Station Modification.

Notice of Intent to File Suit                                    Page 13 of 27
May 4, 2004

Planning      October 22, 2000
Design        July 24, 2002
Advertise     September 22, 2002
Bid Opening   September 22, 2002
Award         October 22, 2002
Construction  *February 18, 2005*

       Sand Island Permit ¶ A.2.a.

       CCH is well behind these deadlines. In its response to EPA's administrative order, CCH indicated that it expected to be a year late in this project and did not expect to finish the project until February 2006. CCH indicated to EPA that there is a dispute over land ownership, requiring CCH to obtain an easement to complete this project.

### 5. Operation and Maintenance Violations

       The Sand Island Permit specifies that CCH "shall at all times properly operate and maintain all facilities and systems of [wastewater] treatment and control (and related appurtenances) which are installed or used by the Permittee to achieve compliance with the conditions of [its] permit." Sand Island Permit, Standard NPDES Permit Conditions, ¶ 9. In the EPA Sand Island Order, EPA expressly found that CCH had violated this requirement with five different types of deficient operation and maintenance practices:

      A.    Inoperable equipment; CCH has equipment that has remained inoperable for extended periods. For example, during all three [recent EPA and DOH] inspections [in August 2001 and 2002], two of the four bar screens were inoperable, one of the three centrifuges was inoperable, and both of the incinerators were inoperable;

      B.    Deficient clarifiers: CCH has failed to ensure that the clarifiers are in good working condition at all times. This deficiency was noted in a number of DOH inspection reports and required to be refurbished by December 15, 2000 under [an EPA order issued in 1999]. While CCH has begun to refurbish the clarifiers, the overall project, which includes conducting related piping work, will not be complete for several more months;

      C.    Flow metering inconsistencies;

      D.    Unexplained variations in influent BOD and TSS concentrations; and

      E.    Lack of operational documentation for process control and routine

maintenance.

The EPA Sand Island Order further found that CCH had violated Standard NPDES Permit Condition ¶ 3.b, which requires that "[a]ppropriate flow measurement devices and methods consistent with accepted scientific practices shall be used so as to insure the accuracy and reliability of measurements of the volume of discharges." As EPA noted in its order, CCH has consistently reported that effluent flow consistently exceeds influent flow by 8% to 10%, clear indication that its flow monitoring is inaccurate (as wastewater flow out of the plant cannot logically consistently exceed wastewater flow into the plant).

The EPA Sand Island Order further found that CCH had violated the Sand Island Permit paragraph J.2., which requires CCH to "maintain in good working order a sufficient alternative power source for operating the wastewater treatment and disposal facilities," or, if there is no alternative power source, to "halt, reduce, or otherwise control all discharges upon the reduction, loss, or failure of the primary source of power." CCH has violated and remains in violation of this condition by neither having an alternative power source sufficient to operate the facility nor the ability to control discharges upon loss of the primary power source.

CCH has not corrected these operational problems.

## 6. Grease Program Violation

The Sand Island Permit requires CCH to implement a grease control pretreatment program designed to minimize the amount of grease discharged into the Sand Island collection system. Sand Island Permit ¶ G.4.e. The goal of this requirement is to reduce the frequency of spills of raw sewage from the Sand Island collection system, which risks exposing the public to raw sewage. The permit imposes the following deadlines for this grease control program:

(1)    Submit an interim progress report to the DOH and EPA six months after the permit effective date;

(2)    Submit the final local limits development report [setting forth specific grease control measures to be developed by local ordinance] to the DOH and EPA 12 months after the permit effective date; and

(3)    Implement the BMP-based program including ordinance changes and issuance of Orders or Permits requiring the installation of oil and grease traps and interceptors within six months after program approval by the DOH and EPA.

CCH has failed to comply with these requirements and continues to have a significant collection system raw sewage spill problem.

### C. Honouliuli WWTP Problems

Like Sand Island, the Honouliuli WWTP ("Honouliuli") also discharges to Māmala Bay (about 25 MGD on average). The Honouliuli Permit also incorporates a CWA section 301(h) waiver allowing the plant to avoid secondary treatment and employ only primary treatment instead.

### 1. Discharge of R-1 Water and Reclamation Plant Brine Water

As part of a judicial settlement with EPA, CCH is required to reclaim about 10 million gallons per day (MGD) of wastewater, i.e., to treat this effluent to a tertiary level so it can be used as reclaimed (R-1) water. More than 10 years from this settlement, CCH still has not accomplished this goal. While CCH is providing tertiary treatment for this volume, it currently only reclaims about 60 to 66% of this amount during dry weather and a lesser amount during wet weather. CCH has contracts for various entities to accept and use about 6 MGD of R-1 water, but during wet weather these entities refuse significant portions of this R-1 water. During dry weather, CCH has been routing about 3.3 to 4.0 MGD of R-1 water into the Honouliuli WWTP final effluent forebay, where it is then dumped out the Honouliuli outfall into the ocean. During wet weather, CCH substantially increases the volume of R-1 water it routes to the Honouliuli WWTP for disposal. CCH is thus dumping useable water which, at great expense, has been treated to tertiary level.[6]

On Sept. 29, 2003, EPA issued an administrative order finding that these practices were illegal and ordering CCH to stop. *In the Matter of City and County of Honolulu, Hawai'i Honouliuli Wastewater Treatment Plant*, Docket No. CWA-402-9-03-28 ("EPA Honouliuli Order"). CCH has neglected for years building the infrastructure and taking other steps needed to distribute the R1 water for true reclamation, however, and thus is continuing this wasteful practice.

### 2. Other Discharge and Operational Problems at the Honouliuli Plant

CCH has been accepting 0.3 MGD of brine water from the Board of Water Supply's Reclamation Plant, which CCH also routes to the Honouliuli final effluent forebay, where it is then dumped out the Honouliuli outfall into the ocean. CCH has no permit authorization to dump this wastewater, however.

---

[6] At the same time, Leeward golf course and land owners divert up to 13.3 MGD from Windward streams (Waiāhole, Waikāne, and Waiau streams) for agricultural and other uses. In hearings before the Commission on Water Resource Management, the CCH supported these stream diversions, despite the fact that the diversions adversely affect stream life (including several species of native stream goby fish (o'opu) and endangered damselflies) and the ability of taro farmers to grow wetland taro or kalo.

CCH also has failed to: (1) repair leaking gate valves from the Honouliuli WWTP primary clarifiers to an unused effluent channel, (2) install and operate devices to accurately measure influent flow to the WWTP, (3) install and operate devices to accurately measure effluent flow from the treatment processes at the WWTP, (4) properly locate and operate sampling devices to accurately measure pollutant concentrations in influent, and (5) properly locate and operate sampling devices to accurately measure pollutant concentrations in effluent. As a result, CCH has not been properly sampling and monitoring the discharge of pollutants in its wastewater discharged from Honouliuli. Among other problems, these practices make it impossible for CCH to determine percent removal of biochemical oxygen demand (BOD) and total suspended solids (TSS) as required by its NPDES permit, which can only be done with accurate monitoring of BOD and TSS levels in influent prior to treatment and in treated effluent. Indeed, CCH has repeatedly indicated in its DMRs submitted since November 2000 that its effluent testing has not been valid.

The EPA Honouliuli Order found these practices to be unlawful and ordered CCH to stop them. CCH has not fully corrected these problems, however.

### 3. Inadequate Storm Water Pollution Control Plan

CCH is required by DOH's Industrial Activities General Permit, NPDES Permit No. HIR90A409, to maintain an updated Storm Water Pollution Control Plan (SWPCP) which documents current facility information and provides for storm water control measures which match the existing configuration and operations of the facility. CCH last adopted a SWPCP for Honouliuli in November 1995, but has modified the Honouliuli WWTP in several material respects since then. Accordingly, CCH's Honouliuli SWPCP is outdated.

The EPA Honouliuli Order found CCH's failure to update its SWPCP to be unlawful and ordered CCH to update its SWPCP. CCH has not done so.

## III. VIOLATIONS OF THE FEDERAL CLEAN WATER ACT

### A. Sewage Spills

As noted above, CCH has repeatedly spilled raw or inadequately treated sewage from its sewage collection systems that convey sewage to the Sand Island, Honouliuli, Kailua, Wai'anae and Kahuku WWTPs and/or has spilled inadequately treated sewage from these WWTPs. These sewage spills have flowed into waters of the United States. CCH does not and could not have NPDES permit authorization to discharge raw or inadequately treated sewage from its collection systems or WWTPs to waters of the United States, which include the Pacific Ocean, all bays of the Pacific Ocean, estuaries connected to the Pacific Ocean, and freshwater streams and other waters that are tributary to the Pacific Ocean. All such discharges of raw or inadequately treated sewage have thus constituted the unauthorized discharge of pollutants in violation of CWA

section 301(a), which expressly provides:

> Except as in compliance with this section and sections . . . 1342 [which provides for
> NPDES permit authorization for pollutant discharges] . . . the discharge of any pollutant
> by any person shall be unlawful.

33 U.S.C. § 1311(a).

As noted, CCH's sewage spills have resulted from a variety of poor or inadequate system
maintenance, operation, repair, replacement and rehabilitation practices. These poor practices
have led to sewer line blockages (generally caused by build-up of grease, accumulation of
sediment and debris, and root intrusion), unaddressed defects in sewer lines such as extensive
line cracking, sags in lines, and misaligned joints; broken sewer lines, pump station equipment
failures, undersized sewer lines or pump station pumping and/or storage capacity, and the
overwhelming of system capacity due to excessive infiltration and inflow of storm water and
ground water during wet weather. In allowing sewage spills from such poor system operation
and maintenance, CCH has violated DOH NPDES Standard Permit Condition paragraph 9,
which is included in all CCH's NPDES permits. This condition provides:

> The Permittee shall at all times properly operate and maintain all facilities and systems of
> treatment and control (and related appurtenances) which are installed or used by the
> Permittee to achieve compliance with the conditions of this permit.

CCH collection systems and WWTPs constitute facilities and systems, and related
appurtenances, installed or used by CCH to comply with its NPDES permits for its WWTPs.
The practices described above violate Standard Permit Condition paragraph 9's requirement to
"at all times properly operate and maintain" these facilities and systems and related
appurtenances.

A partial list of very recent sewage spills, provided by way of example, was set forth
above on pages 4-5 of this letter. As noted, these above-described spills are illustrative of the
types of sewage spills from CCH's sewage systems. CCH has had many additional sewage spills
in the past five years. CCH had at least 309 sewage spills in 1999, 305 spills in 2000, 237 spills
in 2001, 194 in 2002, and 183 in 2003. Each of these spills that have caused sewage to flow into
waters of the United States have violated the CWA. The dates and locations of these spills are
well known to CCH, as CCH is required to monitor and report these spills to EPA and DOH.

## B. Sand Island Effluent Limitation Discharge Violations

### 1. Violation of Enterococcus Effluent Limitation

The Sand Island Permit requires that the Sand Island WWTP discharge meet the following enterococcus limit: 18,000 CFU/100 ml daily maximum, to be monitored by daily grab samples. Sand Island Permit ¶ A.1. This limit has been in effect since July 21, 2002. CCH can not meet this limit until it has constructed and then begins fully operating a disinfection facility. CCH has not yet constructed a disinfection facility. Accordingly, CCH has violated its daily maximum enterococcus limit each and every day since July 21, 2002 and will continue in violation of this limit each and every day until it constructs and operates an effective disinfection facility. Every month since July 2002, CCH's mandatory DMRs have reported daily maximum enterococcus levels in the Sand Island WWTP discharge far exceeding the applicable effluent limitation of 18,000 CFU/100 ml daily maximum.

## 2. Violation of Chlordane and Dieldren Limits

The Sand Island Permit requires that the Sand Island discharge meet the following limits for the pesticides chlordane and dieldren:

| Discharge Parameter | Average Annual | Average Monthly | Average Daily | Units | Minimum Frequency | Sample Type |
|---|---|---|---|---|---|---|
| Chlordane | 0.0076 0.0052 | n/a | 0.38 0.26 | ug/l lbs/day | once/ calendar month | 24 hr composite |
| Dieldrin | 0.012 0.0082 | n/a | 0.18 0.12 | ug/l lbs/day | once/ calendar month | 24 hr composite |

Sand Island Permit ¶ A.1. As reflected in CCH's DMRs, CCH has violated both its average monthly and average daily chlordane and dieldren limits every month from January 1999 to the present. CCH has not instituted any effective measures to comply with its chlordane and dieldren limits and will thus remain in violation of these limits for the foreseeable future.

## 3. Violation of Percent Removal of BOD and TSS

The Sand Island Permit requires CCH to achieve, as a monthly average, not less than 30% removal efficiency of the concentration of BOD in the Sand Island influent stream and not less than 60% removal efficiency of the TSS concentration in the influent stream. Sand Island Permit ¶ A.1. As reflected in CCH's DMRS, CCH has not violated these removal percentage requirements. For example, on August and October 2003, CCH only achieved 59% removal of TSS and in December 2003, CCH only achieved 29% removal of BOD. Past DMRs show additional similar violations. Until CCH completes all of its Sand Island upgrades, it will continue to violate these requirements.

## C. Violations of Sand Island System Upgrade Compliance Schedules

### 1. Violation of Disinfection Facility Requirements

The Sand Island Permit requires that CCH install and operate a plant disinfection facility by the following schedule:

| | |
|---|---|
| Planning | June 30, 1999 |
| Design | June 30, 2000 |
| Advertise | August 29, 2000 |
| Bid Opening | August 29, 2000 |
| Award | September 28, 2000 |
| Construction | July 20, 2002 |
| Continuous Operation | July 21, 2002 |

Sand Island ¶ A.2.g.

CCH has failed to complete construction of a Sand Island WWTP disinfection facility. Thus every day since July 20, 2002, CCH has been in continuous violation of the requirement in the Sand Island WWTP NPDES Permit to construct a disinfection facility. Furthermore, every day since July 21, 2002, CCH has been in continuous violation of the requirement in the Sand Island Permit to operate a disinfection facility.

### 2. Violation of Ala Moana Pump Station Modification Requirements

The Sand Island Permit imposes the following deadlines for an Ala Moana Wastewater Pump Station Modification Project (except that the date in italics is not an enforceable obligation):

Ala Moana Wastewater Pump Station Modification:

| | |
|---|---|
| Planning | October 22, 2000 |
| Design | July 24, 2002 |
| Advertise | September 22, 2002 |
| Bid Opening | September 22, 2002 |
| Award | October 22, 2002 |
| Construction | *February 18, 2005* |

Sand Island Permit ¶ A.2.a.

CCH has failed to meet the above deadlines for this project, and thus is in violation of

paragraph A.2.a. of the Sand Island Permit.

### 3. Sand Island WWTP Unit 1 Phase 2A

The Sand Island Permit imposes the following deadlines for completion of the Sand Island Wastewater Treatment Plant Unit 1 Phase 2A:

| | |
|---|---|
| Planning | October 4, 1999 |
| Design | July 15, 2001 |
| Advertise | September 13, 2001 |
| Bid Opening | September 13, 2001 |
| Award | October 13, 2001 |
| Construction | February 10, 2004 |
| Finish Milestone | February 18, 2005 |

Sand Island Permit ¶ A.2.e.

CCH has failed to meet the above deadlines for this project, and thus is in violation of paragraph A.2.a. of the Sand Island Permit.

### 4. Violation of Sand Island Primary Expansion Project Requirements

The Sand Island Permit requires that CCH complete a Wastewater Treatment Plant Primary Treatment Expansion Project by the following schedule:

| | |
|---|---|
| Design | July 14, 2002 |
| Advertise | September 12, 2002 |
| Bid Opening | September 12, 2002 |
| Award | October 12, 2002 |
| Construction | February 18, 2005 |

Sand Island Permit ¶ A.2.f.

CCH has failed to meet the above deadlines for project design, advertising, bid opening and award and thus is in violation of paragraph A.2.f. of the Sand Island Permit.

### 5. Violation of Reporting Requirements Related to Compliance Schedule Requirements

Notice of Intent to File Suit
May 4, 2004

The Sand Island Permit requires that submit written reports of non-compliance with requirements contained in the compliance schedule of the permit substantially later than "no later than 14 days following each scheduled date." Sand Island Permit ¶ A.2.i.

By making substantially late submittals, CCH is violating paragraph A.2.i. of the Sand Island Permit.

### D. Sand Island Operation and Maintenance Violations

#### 1. Violations of Proper Operation and Maintenance Requirements

The Sand Island Permit specifies that CCH "shall at all times properly operate and maintain all facilities and systems of [wastewater] treatment and control (and related appurtenances) which are installed or used by the Permittee to achieve compliance with the conditions of [its] permit." Sand Island Permit, Standard NPDES Permit Conditions, ¶ 9. CCH has violated this requirement with five different types of deficient operation and maintenance practices:

1. Inoperable equipment: CCH has equipment that has remained inoperable for extended periods. For example, during all three inspections conducted by EPA and DOH staff in August 2001 and 2002, two of the four bar screens were inoperable, one of the three centrifuges was inoperable, and both of the incinerators were inoperable;

2. Deficient clarifiers: CCH has failed to ensure that the clarifiers are in good working condition at all times. This deficiency was noted in a number of DOH inspection reports and EPA required this to be corrected by December 15, 2000 under an order issued in 1999. CCH has not met this timeline;

3. Failing to maintain and operate flow meters properly (as further described below);

4. Unexplained variations in influent BOD and TSS concentrations; and

5. Lack of operational documentation for process control and routine maintenance.

#### 2. Violations of Specific Flow Meter Requirements.

The Sand Island Permit requires that "[a]ppropriate flow measurement devices and

Notice of Intent to File Suit
May 4, 2004

methods consistent with accepted scientific practices shall be used so as to insure the accuracy and reliability of measurements of the volume of discharges." Sand Island Permit, Standard NPDES Permit Conditions ¶ 3.b. CCH is violating this provision, as its reported effluent flow consistently exceeds influent flow by 8% to 10%. This is clear indication that its flow monitoring is inaccurate (as wastewater flow out of the plant cannot logically consistently exceed wastewater flow into the Sand Island WWTP).

### 3. Violations of Alternative Power Requirements.

The Sand Island Permit requires CCH to "maintain in good working order a sufficient alternate power source for operating the wastewater treatment and disposal facilities" or, if there is no alternative power source, to "halt, reduce, or otherwise control all discharges upon the reduction, loss, or failure of the primary source of power." Sand Island Permit ¶ J.2. CCH has consistently violated this provision by neither having an alternate power source sufficient to operate the facility nor the ability to control discharges upon loss of the primary power source. The Sand Island WWTP only has standby generators to operate the effluent pumps.

### E. Sand Island Grease Program/Pretreatment Violations

The Sand Island Permit requires CCH to implement a grease control pretreatment program designed to minimize the amount of grease discharged into the Sand Island collection system. Sand Island Permit ¶¶ G.4.e. and G.4.f. The goal of this requirement is to reduce the frequency of spills of raw sewage from the Sand Island collection system, which risks exposing the public to raw sewage. The permit imposes the following deadlines for this grease control program:

1. Submit an interim progress report to the DOH and EPA six months after the permit effective date;

2. Submit the final local limits development report [setting forth specific grease control measures to be developed by local ordinance] to the DOH and EPA 12 months after the permit effective date; and

3. Implement the BMP-based program including ordinance changes and issuance of Orders or Permits requiring the installation of oil and grease traps and interceptors within six months after program approval by the DOH and EPA.

Sierra Club, HTF, and OCE's sources at EPA indicate that CCH has failed to comply with these requirements, one factor in CCH's continuing raw sewage spill problem.

### F. Violations of EPA's 1999 Sand Island Order

EPA issued an administrative order to CCH in October 1999 that required CCH to take specified measures to correct its NPDES permit violations and ensure permit compliance. *In the Matter of City and County of Honolulu*, Docket No. 309-9-00-003 ("EPA 1999 Sand Island Order"). As expressly found in the Sand Island Order issued in September 2002, CCH has violated various requirements in the EPA 1999 Sand Island Order. Specifically, CCH has failed to implement the following required corrective measures: completing the spare parts inventory evaluation project by December 15, 2000; completing the clarifier refurbishment project by December 15, 2000; and fully implementing the recommendations addressing primary treatment, solids treatment, operation and maintenance effectiveness, and spare parts in a required independent evaluation study, the Independent Evaluation of Operation and Maintenance of Sand Island Wastewater Treatment Plant, by Carollo Engineers, dated May 2000. Accordingly, CCH is in on-going violation of the EPA 1999 Sand Island Order.

### G. Violations of EPA's 2002 Sand Island Order

As noted above, EPA issued an administrative order to CCH in September 2002 that required CCH to take specified measures to correct its NPDES permit violations and ensure permit compliance. Based on information sought and examined by Sierra Club, HTF, and OCE, CCH has violated various requirements in the 2002 EPA Sand Island Order. CCH has failed to implement all remedial measures specified in the 2002 EPA Sand Island Order. Accordingly, CCH is in on-going violation of the 2002 EPA Sand Island Order.

### H. Honouliuli Discharge and Monitoring Violations

#### 1. Unlawful R-1 Water Discharge

As noted, CCH has been consistently routing about 3.3 MGD of R-1 water into the Honouliuli WWTP final effluent forebay, where it is then dumped out the Honouliuli outfall into the ocean. The Honouliuli Permit does not authorize CCH to discharge R-1 water, but only treated sanitary sewage. The Honouliuli Permit further prohibits the "intentional introduction of pollutant free wastewater to the collection, treatment, and disposal system." Honouliuli Permit, ¶ B.6. The Permit also requires CCH to notify EPA of substantial changes in the volume or character of pollutants being introduced into the Honouliuli WWTP, which CCH did not do. Honouliuli Permit ¶ E.14. In addition, 40 C.F.R. section 125.3(f) specifically forbids flow augmentation except under limited circumstances that do not apply to CCH's Honouliuli discharge. For example, such flow augmentation is not allowed unless the discharger has expressly waived its opportunity to request a CWA section 301(h) variance, which CCH has not done.

#### 2. Unlawful Discharge of Reclamation Plant Brine.

CCH has been accepting 0.3 MGD of brine water from the Board of Water Supply's

Reclamation Plant, which CCH also routes to the Honouliuli final effluent forebay, where it is then dumped out the Honouliuli outfall into the ocean. The Honouliuli Permit does not authorize CCH to discharge this wastewater, however, as the permit only authorizes the discharge of treated sanitary sewage.

### 3. Operational and Monitoring Problems at the Honouliuli Plant.

CCH also has failed to: (1) repair leaking gate valves from the Honouliuli WWTP primary clarifiers to an unused effluent channel, (2) install and operate devices to accurately measure influent flow to the WWTP, (3) install and operate devices to accurately measure effluent flow from the treatment processes at the WWTP, (4) properly locate and operate sampling devices to accurately measure pollutant concentrations in influent, (5) properly locate and operate sampling devices to accurately measure pollutant concentrations in effluent. As a result, CCH has not been properly sampling and monitoring the discharge of pollutants in its wastewater discharged from Honouliuli.

These failures to repair the leaking gate valves and to install and operate flow meters and take influent and effluent samples has placed CCH in on-going violation of (1) Standard Provision ¶ C.2 of the Honouliuli Permit, which requires CCH to "at all times properly operate and maintain all facilities and systems of treatment and control (and related appurtenances) . . . necessary to comply with the conditions of this permit," and (2) paragraphs C.1.a and C.1.b. of the Honouliuli Permit, which require CCH to have and employ influent and effluent flow monitoring and sampling devices properly located such that CCH's compliance with effluent limitations can be verified. Among other problems, CCH's practices make it impossible for CCH to determine percent removal of biochemical oxygen demand (BOD) and total suspended solids (TSS) as required by its NPDES permit, which can only be done with accurate monitoring of BOD and TSS levels in influent prior to treatment and in treated effluent.

CCH's practices further make it impossible to determine the quality of effluent discharged. Indeed, CCH has repeatedly indicated in its DMRs submitted since November 2000 that its effluent testing has not been valid. CCH has thus further violated paragraph E.13 of the Standard Conditions of the Honouliuli Permit, which requires that all DMRs be properly certified as to the truth, accuracy and completeness of the monitoring data reported. The data reported has not been complete as required by the Honouliuli Permit.

### 4. Inadequate Storm Water Pollution Control Plan.

CCH is required by Part 6 of DOH's Industrial Activities General Permit, NPDES Permit No. HIR90A409, to maintain an updated Storm Water Pollution Control Plan (SWPCP) which documents current facility information and provides for storm water control measures which match the existing configuration and operations of the facility. CCH last adopted a SWPCP for Honouliuli in November 1995, but has modified the Honouliuli WWTP in several material

respects since then. Accordingly, CCH's Honouliuli SWPCP is outdated in violation of Part 6 of NPDES Permit No. HI90A409.

## I. Unpermitted Discharges

As noted, the Honouliuli, Waiʻanae, and Sand Island Permits have all expired. The Honouliuli Permit expired on June 5, 1996. The Waiʻanae Permit expired on Sept. 30, 2003. The Sand Island Permit expired on Nov. 3, 2003. CCH may contend that these permits have been administratively extended pursuant to 40 C.F.R. section 122.6 or comparable provision of Hawaiʻi law, but any such claims would be erroneous for two reasons.

One, the CWA specifies that NPDES permits can be issued *only* for fixed terms not to exceed five years. CWA § 402(b)(1)(B), (a)(3) (33 U.S.C. § 1342(b)(1)(B), (a)(3)). To the extent that 40 C.F.R. section 122.6 contradicts this plain and unambiguous meaning of the CWA, it is *ultra vires*. In addition, no provision of state law can override this unequivocal federal law mandate. Accordingly, neither EPA nor DOH can extend the term of an NPDES permit beyond five years.

Two, 40 C.F.R. section 122.6 requires submittal of a timely and complete individual application that meets all of the requirements of 40 C.F.R. section 122.21 before an expired permit may be extended. CCH has not submitted such applications for renewal of the Sand Island and Honouliuli Permits. Complete permit applications, *inter alia*, would include information on the effect of Sand Island disinfection on the levels of bacteria in receiving waters. The absence of such data is one reason why EPA and DOH have been unable to process and issue renewals of the Sand Island and Honouliuli Permits. Additional similar information gaps have precluded permit renewals.

Consequentially, every day that CCH discharges sewage from the Honouliuli, Waiʻanae, or Sand Island WWTPs, CCH is discharging a pollutant without NPDES permit authorization in violation of CWA section 301(a), 33 U.S.C. § 1311(a). In addition, CCH no longer has an NPDES permit shield pursuant to CWA section 402(k) for discharges from the Honouliuli, Waiʻanae, or Sand Island WWTPs, nor a valid CWA section 301(h) waiver for discharges from Honouliuli or Sand Island. Without such a permit shield and without CWA section 301(h) waivers, CCH's discharge from all three WWTPs must comply with EPA's secondary treatment-based effluent limitations promulgated pursuant to CWA section 301(b)(1)(B), 33 U.S.C. § 1311(b)(1)(B), which are set forth at 40 C.F.R. section 133.102. CCH lacks the treatment facilities at Honouliuli and Sand Island needed to comply with secondary treatment-based effluent limitations. Accordingly, each and every day since its Honouliuli and Sand Island NPDES permits expired, CCH has discharged effluent from Honouliuli and Sand Island in violation of secondary-treatment based effluent limitations set forth at 40 C.F.R. section 133.102.

## IV.    NOTICE OF INTENT TO SUE CCH FOR VIOLATIONS OF THE CLEAN WATER ACT

Sierra Club, HTF, and OCE contend that CCH has failed in the respects set forth above to comply with the requirements imposed by the Sand Island and Honouliuli WWTP's NPDES Permits and the Clean Water Act. CWA section 505(b), 33 U.S.C. § 1365(b), requires that sixty (60) days prior to the initiation of a civil action under CWA section 505(a), a citizen must give notice of his/her intention to sue. 40 C.F.R. section 135.2 provides that, if the alleged violator is a State or local agency, service of notice shall be accomplished by certified mail addressed to, or by personal service upon, the head of such agency. This section further provides that a copy of the notice shall be mailed to the chief administrative officer of the water pollution control agency for the State in which the violation is alleged to have occurred, the EPA Administrator and the EPA Regional Administrator for the EPA Region in which such violation is alleged to have occurred. Accordingly, this notice is being sent to you as the head of the City and County of Honolulu. In addition, a copy of this notice is being sent to the Director of the CCH Environmental Services Department. We are also sending copies to the EPA Administrator, the Regional Administrator of EPA Region 9, and the Director of the Hawai'i Department of Health (and courtesy copies to CCH Corporation Counsel and the U.S. Department of Justice).

By this letter, pursuant to CWA section 505(a) and (b), 33 U.S.C. §1365(a) and (b), Sierra Club, HTF, and OCE hereby put you on notice that after the expiration of sixty (60) days from the date of this Notice of Intent To File Suit, Sierra Club, HTF, and OCE intend to file an enforcement action in federal court against CCH for its violations of the Clean Water Act.

Sierra Club, HTF, and OCE intend to seek civil penalties and, in addition, injunctive relief preventing further CWA violations pursuant to CWA sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), and such other relief as is permitted by law. Pursuant to CWA section 309(d), 33 U.S.C. § 1319(d), and 40 C.F.R. section 19.4, each of the above-described CWA violations subjects CCH to a penalty of up to $27,500 per day per violation for all violations occurring after January 30, 1997 and civil penalties of up to $32,500 per day per violation for all violations on or after March 15, 2004. *See* 69 Fed. Reg. 7121 (Feb. 13, 2004).

In addition to the violations set forth above, this notice covers all ongoing violations of the Clean Water Act and violations evidenced by information that becomes available to Sierra Club, HTF, and OCE after the date of this Notice of Intent to File Suit.

Sierra Club, HTF, and OCE are interested in discussing effective remedies for the violations noted in this letter. If you wish to pursue such discussions in the absence of further litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period. Although Sierra Club, HTF, and OCE are always interested in avoiding unnecessary litigation, it does not intend to delay the filing of a complaint in federal court if discussions are continuing when the notice period ends.

Sincerely,

Christopher A. Sproul, Esq.
Lea Hong, Esq.
Attorneys for Sierra Club, Hawai'i's Thousand Friends,
and Our Children's Earth Foundation

CC:

| | |
|---|---|
| Michael Leavitt, Administrator<br>U.S. Environmental Protection Agency<br>401 M Street, S.W.<br>Washington, D.C. 20460 | John Ashcroft, U.S. Attorney General<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20530-0001 |
| Wayne Nastri<br>Regional Administrator<br>U.S. Environmental Protection Agency, Region 9<br>75 Hawthorne Street<br>San Francisco, California 94105-3901 | Mark Bennett<br>Attorney General, State of Hawai'i<br>Hale Auhau Building<br>425 Queen Street<br>Honolulu, HI 96813 |
| Chiyome Fukino, M.D., Director<br>Hawai'i State Department of Health<br>1250 Punchbowl Street<br>Honolulu, HI 96813 | Kenneth E. Sprague, Director<br>Environmental Services Department<br>City and County of Honolulu<br>Uluohia Street, Suite 308<br>Kapolei, HI 96707 |
| David Z. Arakawa, Corporation Counsel<br>City and County of Honolulu<br>530 S. King Street<br>Honolulu, HI 96813 | |