1
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

2

UNITED STATES OF AMERICA,    )    Case No. CV94-00765DAE-KSC
3    ET AL.,                      )
                                  )    Honolulu, Hawaii
4             Plaintiffs,         )    April 17, 2007
                                  )    9:03 a.m.
5             v.                  )
                                  )
6    CITY AND COUNTY OF HONOLULU, )
     ET AL.,                      )
7                                 )
              Defendants.         )
8    _____ )

9    TRANSCRIPT OF SIERRA CLUB, HAWAII CHAPTER, HAWAII'S THOUSANDS
               FRIENDS AND OUR CHILDREN'S EARTH FOUNDATIONS
10                       MOTION TO INTERVENE
           BEFORE THE HONORABLE KEVIN S.C. CHANG
11             UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18   Transcriber:                 Jessica B. Cahill
                                  P.O. Box 1652
19                                Wailuku, Maui, Hawaii 96793
                                  Telephone: (808)244-0776
20

21

22

23   Proceedings recorded by electronic sound recording, transcript
     produced by transcription service
24

25
26

**EXHIBIT H**                                    **EXHIBIT E**

```
 1   APPEARANCES:

 2   For the Plaintiff:             U.S. DEPARTMENT OF JUSTICE
     UNITED STATES OF AMERICA       By: ROBERT MULLANEY, ESQ.
 3                                  301 Howard Street, #870
                                    San Francisco, California 94105
 4
     For the Plaintiff:             OFFICE OF THE ATTORNEY GENERAL
 5   STATE OF HAWAII                By: EDWARD BOHLEN, ESQ.
 6                                  465 S. King Street, #200
                                    Honolulu, Hawaii 96813
 7
     For the Defendant:             OFFICE OF CORPORATION COUNSEL
 8   CITY AND COUNTY OF HONOLULU    By: CARRIE OKINAGA, ESQ.
                                        MAILE CHUN, ESQ.
 9                                  530 S. King Street, #110
                                    Honolulu, Hawaii 96813
10                                          and
                                    BINGHAM & McCUTCHEN, LLP
11                                  By: JAMES DRAGNA, ESQ.
                                    355 S. Grand Avenue, #4400
12                                  Los Angeles, California 90071

13   For the Defendant:             ALSTON HUNT FLOYD & ING
     HAWAII'S THOUSAND FRIENDS      By: WILLIAM TAM, ESQ.
14                                  1001 Bishop Street, #1800
                                    Honolulu, Hawaii 96813
15                                          and
                                    ENVIRONMENTAL ADVOCATES
16                                  By: CHRISTOPHER SPROUL, ESQ.
                                    5135 Anza Street
17                                  San Francisco, California 94121

18

19

20

21

22

23

24

25

26
```

1              THE CLERK:  The United States District Court for the

2    District of Hawaii, with the Honorable Kevin S.C. Chang

3    presiding is now in session.  Civil 94-765DAE-KSC, United States

4    of America versus City and County of Honolulu.  This case has

5    been called for a hearing -- this case has been called for a

6    hearing on the case of Sierra Club Hawaii Chapter motion to

7    intervene.  May I have your appearances?

8              MR. SPROUL:  This is Christopher Sproul for proposed

9    plaintiff intervenors Sierra Club, et al.

10             THE COURT:  Good morning.

11             MR. TAM:  Good morning, your Honor, William Tam for

12   Intervenors, your Honor.

13             THE COURT:  Good morning.

14             MR. BOHLEN:  Edward Bohlen, Deputy Attorney General

15   for the Hawaii Department of Health.

16             THE COURT:  Good morning.

17             MR. DRAGNA:  Good morning, your Honor, James Dragna

18   for City and County of Honolulu.

19             THE COURT:  Good morning.

20             MS. OKINAGA:  Carrie Okinaga on behalf of City and

21   County.

22             THE COURT:  Good morning.  Mr. Mullaney.

23             MR. MULLANEY:  Yes, Robert Mullaney on behalf of the

24   United States.

25             THE COURT:  Good morning.  Mr. Sproul.

Case 1:04-cv-00463-DAE-BMK    Document 129-10    Filed 08/31/2007    Page 4 of 30
Case 1:07-cv-00235-DAE-KSC    Document 21-7    Filed 06/08/2007    Page 5 of 31

4

1           MR. SPROUL:  Yes, your Honor, we have brought a motion

2   to intervene here.  The -- we had originally filed an original

3   citizens' suit before -- there was also something referred to

4   Judge Ezra.  Judge Ezra dismissed that case in April of 2005, or

5   actually there was a hearing on the motion to dismiss in April

6   2005.  The actual order of dismissal wasn't until the following

7   Fall.

8           We moved to intervene shortly after that in January of

9   2006.  During that -- the April hearing, April 2005 hearing, the

10  City and County of Honolulu indicated, well, we had barked up

11  the wrong strategic tree.  That the appropriate vehicle for us

12  to assert our claims about sewage spill problems was to seek to

13  intervene in the 1995 EPA action that they viewed as still

14  pending, as being "diligently prosecuted," therefore barring us

15  from bringing our own independent stand alone lawsuit.

16          Judge Ezra ultimately agreed although he used a

17  slightly different legal rationale and held that our -- that our

18  claims were not barred by the statutory Clean Water Act bar

19  which barred -- barred citizens from bringing their own action

20  when the Government was diligently prosecuting an action, but

21  instead dismissed the action on "res judicata grounds."

22          However, the elements of res judicata are -- are

23  substantially similar at least in -- in the legal import here in

24  that one of the elements of res judicata is that the plaintiff

25  -- the party being dismissed on res judicata grounds be in

1    privity with the -- the party is bringing -- has brought a prior

2    action.  And Judge Ezra in effect held that we were in privity

3    with the EPA and to be in privity with the EPA the EPA has to

4    have -- has to be diligently prosecuting our -- our claims.

5            So, that ultimately the res judicata finding is a

6    claim that the '95 consent decree constitutes diligent -- an

7    ongoing diligent prosecution of the claims that we assert or

8    seek to assert in our motion to intervene.

9            The -- the Clean Water Act is clear that when the

10   Government is diligently prosecuting an action --

11           THE COURT:  I've read the submissions, Mr. Sproul.  If

12   we look at the conditions that are proposed by the Federal

13   Government you object to two of the four.

14           MR. SPROUL:  That's correct, or partially object to

15   one of the conditions and object fully to one of the conditions.

16           THE COURT:  I'm looking at your footnote on page 18 of

17   the reply that basically you say that your clients would work

18   together with EPA and the Department of Hawaii -- the Department

19   of Health such that any stand alone motion to enforce would be

20   unnecessary.  Considering the history of the case is that a

21   statement I can believe?

22           MR. SPROUL:  Well, your Honor, it's certainly our

23   intention to not bring -- to ultimately have to bring stand

24   alone motions, but the -- the prior history of this case

25   indicates that -- that there's a crying need for citizen

1   watchdogs to be available should the Government decline to

2   enforce the decree altogether.  I mean our -- our -- certainly

3   immediately going forward we propose to agree to a -- a stay --

4   a limited stay for four months to allow settlement negotiations

5   to proceed, multi-party negotiations to proceed.  Certainly

6   during that four months there'll be no stand alone motions from

7   the citizens.

8           Thereafter if those -- if that four month period of

9   negotiations doesn't prove fruitful and the Government doesn't

10  step forward to enforce the consent decree which we think is not

11  being complied with, then we think the citizens do need a -- a

12  right to bring in a motion -- their own motion, but only in the

13  circumstance where the Government doesn't have its own

14  enforcement action.

15          Where -- where the Government takes the lead we

16  recognize that it's appropriate for the citizens to take the

17  backseat, and that would -- that would be our intention.  But

18  where the Government doesn't act that's where a need for citizen

19  watchdog action.  That's the intent of the Clean Water Act, and

20  the caselaw under the Clean Water Act Section 505 makes that

21  crystal clear.

22          THE COURT:  In part the Government suggests that

23  they're at a point with the City in the conduct of negotiations

24  such that an interim agreement may be reached within the next so

25  many days, and then thereafter there would another set of

1    negotiations for further, I guess, finalization of additional

2    terms and conditions.

3            Now, Mr. Sproul, you and your clients, if I were to

4    allow you to intervene, why shouldn't I allow the parties to

5    finish the interim negotiations now, and then for you to

6    intervene at a later date?

7            MR. SPROUL:  Because if we're denied intervention,

8    then we're denied a seat at the table in fashioning that -- that

9    relief that's -- that's -- that's now being fashioned.  And

10   we've attempted to negotiate.  We've been -- we were allowed to

11   participate in the negotiations for quite some time.  There was

12   some disagreements between us and the City, and we were

13   disinvited to the settlement process for a while.

14           We continued to have some settlement discussions, but

15   it's -- it's clear that after a year of discussion that if we're

16   not parties to this -- to the -- the sewage spill claim lawsuit

17   that we -- we're not taken seriously and that we don't have an

18   opportunity to meaningfully assert and vindicate our public

19   interest rights.

20           THE COURT:  Well, and part -- part of your argument is

21   -- is that there is a stage -- a different -- we're moving into

22   a different stage of the proceedings, and I'm wondering whether

23   or not what the Government is saying, the Federal Government in

24   this case, is suggesting that perhaps that stage of the

25   proceedings hasn't quite started yet, because they need to

1    finish whatever interim negotiations are going on such that you

2    would be allowed to intervene at the next stage consistent with

3    your request as opposed to sort of immediate and unscrambling

4    whatever negotiations may have occurred to date.

5          MR. SPROUL:  Well, the negotiations that -- that may

6    -- may conclude imminently in a -- in an interim settlement we

7    were party to that off and on.  And we think that we should --

8    and -- and it's the sense of Congress that we should have the

9    right to participate in that interim negotiation stage.  That we

10   have a right -- an unconditional right to intervene under the

11   Clean Water Act Section 505.

12         THE COURT:  And I guess my -- my question is whether

13   you were disinvited, or whether there was an impasse, or who

14   slammed the door after whoever is going out the door.  You know,

15   I'm -- I'm trying to find out exactly where we are so that

16   consistent with the unconditional right that -- that you may

17   have to intervene as to whether or not the conditions which may

18   be imposed by the Court, if any, what those reasonable

19   conditions might include.

20         MR. SPROUL:  Well, this much seems to be clear that

21   there -- it's very likely that there is going to be some form of

22   interim consent decree, or -- or settlement order, or stipulated

23   order, and to vindicate our rights to participate in that

24   process it -- it's clear that we need to be granted party

25   status.  That this is -- there has been an impasse between the

1   citizens and -- and the City and County of Honolulu, and it's --

2   there -- there have been, you know, various -- various points of

3   disagreement, but this has been central to -- to the

4   disagreement, is whether -- whether the citizens are entitled to

5   party status.

6         So, without a resolution of that, then continued

7   negotiation between the City and the citizens is -- is just a

8   talk fest.  We keep saying the same things to each other, and

9   we're not making -- we're not making any progress.

10        The City and County takes the view that we

11  unilaterally withdrew from the settlement process by -- by

12  reinitiating litigation.  We -- we certainly didn't communicate

13  to the City and County we are now withdrawing from the

14  settlement process, and we did reinitiate litigation, because

15  after a year of discussion it was clear that we weren't going to

16  resolve it.  And that only having this issue about whether we're

17  entitled to party status resolved, only with that issue resolved

18  one way or another will there be any chance of an accord between

19  the -- the City and -- and the citizens.

20        I mean from our -- from our perspective we're still in

21  the settlement talks.  I mean they've -- they have been

22  continuing to talk with the Government without us, but the

23  Government keeps informing us about what's happening, and we

24  continue to communicate our settlement views to the City, and

25  the City has even recently communicated their settlement views

1    back to us.  So, to take the view that we've withdrawn from the

2    settlement process when we're still talking to each other seems

3    not entirely accurate, your Honor.

4                THE COURT:  Mr. Dragna.

5                MR. DRAGNA:  Thank you, your Honor.  I will not

6    belabor the materials and briefs, or of our position with

7    respect to their right, and traditional right to intervene as

8    set forth in the papers.

9                I -- I think it's very important though we focus on

10   your Honor's question and that is paraphrased can we believe the

11   NGO's representations that they simple want to play as a team

12   player in the process.

13               We've had this discussion, as your Honor is aware, at

14   least once last September where there were representations made

15   about there being seats at the table for NGOs.  The City and

16   County of Honolulu has always had a seat open for the NGOs since

17   the commencement of these negotiations.  All we have asked is

18   that as part of the negotiations there be a stay or a non-

19   participation in litigation.

20               And what we've experienced over the last several years

21   is that whenever there has been a differing opinion NGOs asked

22   for ten, we offer five, we're out of here.  And we have the

23   marching out and off the table, initiating whether it be a

24   notice letter of activating litigation, whether it be

25   reinitiating the intervention papers, or there being some other

1  action taken either in front of your Honor or in front of Judge

2  Ezra, there has been this continuous process of negotiation.

3  Well, if we don't get what we want, we'll leave, and we'll go to

4  litigation.   And -- and it's not a warning, or a threat, or a

5  risk that we saw two years ago, it actually has been the

6  practice in this case.   We're now in the third time after

7  negotiations have broken down.

8          Our response in each of those situations have been we

9  ask as a condition of discussions that you not litigate, and

10  that you litigated this is the cause of the problem for us.   We

11  did not stop the negotiations.   We continued to negotiate with

12  the United States and, in fact, we have a separate agreement

13  that we are in the process of resolving, and the NGOs

14  participated in the negotiation although not substantively they

15  were there at the table throughout the process, and then they

16  walked out a month ago.

17          When they got wind of the fact that there was going to

18  be a resolution they sent us back a letter and said we'd like to

19  get back in the process.   There was this pending intervention

20  motion.   Nevertheless, we said sure you can get back in the

21  process here's our proposal.   And we told them that the proposal

22  was in need of immediate response, because we have to go to the

23  Council to get approval for the settlement, which is happening

24  this week in large part because the United States had put a very

25  strict proof of compliance and approval deadline for the

1    settlement.

2          We -- we were unable to reach an agreement in the time

3    period that we provided because of the gap in positions.  And we

4    still responded by saying that's okay, we'll go ahead and

5    complete these negotiations, and we'll still sit down with you.

6          The disagreement has never been over the substance of

7    the underlying positions.  In fact, the substance of this

8    consent decree is going to be entered with the Court we believe

9    in the next several weeks.  There has never been a dispute over

10   what work should be done under the consent decree.  The NGOs, in

11   fact, I don't think ever submitted a substantive proposal that

12   dictated the nature of the work which is being driven by the

13   United States and by the EPA.

14         The problem that we've been having is over the shape

15   of the table and is whether they should be a party or not.  It

16   is -- it is a ridiculous debate at this point for two reasons,

17   and they're two important reasons for us.

18         One, the -- the -- the distinction that Judge Ezra

19   recommended and that essentially is the United States is

20   pursuing this case, the claims with respect to the NGOs have

21   been effectively resolved by the United States, and there is no

22   mod -- moderating factor in the interim that so long as the

23   United States is diligently prosecuting the Judge may note such

24   conditions.  Basically, the Judge said these claims -- the

25   collection of these claims are being preempted, if you will, by

1   the United States.  You can continue with your collection --

2   your -- excuse me, your discharge NPS violation covers the NGOs,

3   but with respect to skills they're not your claims.  We want to

4   honor that, and they don't have claims.

5        Yet we want to balance that between them not having

6   claims, but having a seat at the table, and that is how we have

7   acted since the beginning of these negotiations, and how we're

8   to continue that.

9        Now, why -- why -- why?  What's the big deal about

10   parties?  You know, it seems like a ridiculous argument.  From

11   our perspective we have two primary reasons.  They were fears

12   two years ago, they are realities now.  The first was what I

13   just explained to your Honor, and that is this constant running

14   to the Court which they would have a right to do as a party to

15   seek to either hijack or to redirect the process by using their

16   status as a party.  We think that has been a problem to date.

17   It has been a serious problem to date, and we want to avoid that

18   problem.

19        The second, even more nefarious, is the statement in

20   their brief where they think they can enforce the consent

21   decrees better essentially.  They don't finish the sentence

22   better than whom, but better than the United States.

23        We have enough problems, your Honor, and enough folks

24   asking us to do the work.  We've got as you -- you -- I'm sure

25   you've read the newspapers we've got tentative waiver with

1    respect to the Honouliuli plant that has been tentatively

2    rejected.  We've got the anticipation of a decision on Sand

3    Island.  We've got the United States collection system consent

4    decree that we are complying with the -- with the 1994 consent

5    decree.  We've got what we will -- we will soon learn to be the

6    force main settlement.  That's a separate settlement that would

7    deal with force mains.  These are hundreds and hundreds of

8    millions of dollars at issue that we're giving them.  We're

9    trying to limit the number of times we have to appear in front

10    of your Honor not increase the number of times.

11         So, to have an NGO say that they can enforce this

12    better than the United States causing big problems for us, and

13    those problems have been demonstrated by the last

14    (unintelligible).  It's instructive to see what the Federal

15    Government is asking for.  And we note this -- well, we oppose

16    in the papers the motion to intervene on the grounds set forth

17    in the papers.

18         We don't have an objection to having these folks sit

19    at the table with us.  We are not unreasonable folks who will

20    not listen to these folks.  In fact, it is in our overall

21    interests to have them singing Kumbaya with us as we go forward

22    in these settlements.  This is not an annuity that we'd like to

23    litigate with these folks forever.  We'd like to have them

24    settle.  We don't want to give them the -- the veto authority

25    over the settlements.

1          And so, we agree with the United States, and we'll

2     (unintelligible).   There has to be an intervention.   If there

3     has to be a role for these guys we think it's not necessary, but

4     to be reasonable, to find the middle ground in this whole crises

5     give them a seat at the table to participate in the

6     negotiations, but importantly to defer to the United States for

7     enforcement.   They can fight with the United States all the

8     time.   If the United States feels that something should be done,

9     and we disagree, and the United States makes the decision, and

10    they disagree with the United States decision, let them fight

11    with the United States, but keep us out of the process.   That's

12    all we're asking for.

13          We're trying to line these issues up.   You know,

14    everybody wants to take a shot at us, and that's fine.   We just

15    want to organize them, line them up, and do them effectively --

16    cost effectively without a multiple number of plaintiffs.

17          So, we're not taking an unreasonable position here,

18    your Honor.   We -- as I said over the phone in September when we

19    had this exact discussion, we'll sit down with them at the

20    table.   We'd love to have an agreement with them.   We sat down

21    with them at the table.   Twice since then they left, because

22    they didn't like the positions, and it wasn't because we were

23    not replacing the force main the way they like, it wasn't

24    because we weren't replacing it fast enough, it wasn't because

25    we weren't doing this study or that study, it's because we

 1  didn't give them rights as a unilateral plaintiff to pursue

 2  this.

 3          That's the issue here, and we think there are good

 4  reasons that were originally espoused in the -- the 1993 consent

 5  decree mind you.  This went back to 1993 or 1994 when Judge Ezra

 6  said, you don't need to invoke the consent decree with the

 7  United States.  But there was a good reason then, there was a

 8  good reason in 2004 when Judge Ezra dismissed their claims

 9  because the United States had preempted the field, there was

10  good reason in September when your Honor sent it back to

11  negotiating table, and there's a good reason now to do the same.

12  Give them a seat at the table, don't give them a weapon.

13          THE COURT:  Mr. Mullaney --

14          MR. MULLANEY:  Yes, your Honor.

15          THE COURT:  -- any comment or argument?

16          MR. MULLANEY:  One thing that I -- I did want to say

17  is that from our perspective these types of settlements are very

18  complicated, and they take a long time to finally get an

19  agreement on it.  And I think we're -- we're fairly close on an

20  interim agreement, and I know that it's going to take more than

21  four months to do a -- a final agreement.  I can -- I can assure

22  everyone of that without any question.

23          So, my sense of this and what we're interested in is

24  that we -- we feel like we've made progress.  It has taken a

25  year for us, but we've made significant progress and that we are

1    on the verge of reaching a settlement with the City on an

2    interim agreement.

3            We believe that we will have momentum going forward,

4    but we also know that it's going to take a good long time,

5    because they're complicated issues.  And that is why we're

6    asking for -- in essence for a stand still here.  We don't want

7    to have a situation where litigation is proceeding while we're

8    trying to resolve this finally.  So, that's -- that's my two

9    cents.

10           I think our proposal -- is in essence we -- we believe

11   things are going in the right direction now.  We also welcome

12   the citizens to the negotiations, and we also believe that it

13   would be helpful to have a -- some kind of a mechanism in which

14   we check in with the Court.  You know, we proposed every other

15   month.  We're willing to -- to accept whatever you're willing to

16   give us on time.  I think that'll be it.

17           THE COURT:  Mr. Mullaney, I -- I'm somewhat reluctant

18   to -- to have an indefinite stay basically of the litigation

19   without knowing, for example, where the -- the status of the

20   interim agreement may be or whether it's forthcoming, because

21   one seems to lead to the next.  And without some degree of

22   certainty or probability with regards to the interim agreement,

23   the final agreement may be as indefinite as the stay.  And that

24   --

25           MR. MULLANEY:  I -- I definitely understand your

1   concern there, and the United States shares it.  And as I think

2   Mr. Dragna said earlier the United States has put some definite

3   timeframe in -- into the picture here and, you know, it's --

4   it's -- we don't control the City Council process, but our

5   understanding is that this is going to be debated in some

6   executive session.  Mr. Dragna can speak to this, I think it's

7   this week, and we're expecting the City then to address it in

8   open session sometime either late month or -- or early -- early

9   May.  Again, I'm not certain of the exact dates.  But we are

10  very interested in resolving this, the interim agreement, and

11  we're -- we're assuming that once the City's process is finished

12  that we'll be able to get this to the Court within a month or

13  so.

14          MR. DRAGNA:  Your Honor, can I make just one

15  clarifying point?

16          THE COURT:  Sure.

17          MR. DRAGNA:  And that is what -- what we're staying

18  and what we're not staying.  There are several planets circling

19  the collection system.

20          The -- the current litigation in which the NGOs would

21  like to intervene is the 1994 lawsuit that's been resolved.

22  There is no pending litigation battle.  We're complying with

23  that consent decree.  We're spending tens of millions of dollars

24  in compliance with that consent decree.

25          The interim agreement that the United States is

1    referring to is a separate settlement that incorporates a new

2    part of the City's program that was not in the original consent

3    decree.   It has to do with (unintelligible) a force main

4    specific settlement.

5           So, it's -- it's -- it's -- it's kind of an expanded

6    component that was focused upon as a result of the Beachwalk

7    Spill which your Honor is aware of.   And as part of the

8    Government's oversight of the program they identified what they

9    believed to be deficiencies in how the City operated and

10   maintained those force mains.   The City identified those same

11   deficiencies.

12          So, the parties quite quickly, and I use quickly

13   advisably, were able to agree on what in essence is a over $300

14   million industrial relief program that focuses only on force

15   mains.   That will be a separate settlement with a separate

16   component.

17          The third litigation is the litigation that the NGOs

18   have brought that deal -- dealt with originally treatment system

19   issues and collection system issues.   The collection system

20   issues were thrown out by Judge Ezra.   What remains in that

21   third litigation are treatment issues.   And when I say treatment

22   issues I mean meeting standards for the discharges that come out

23   of the pipe at the treatment plants.   When we talk about

24   collection system issues we're talking about the spilling of

25   sewage on its way to the treatment plants.

1    So, that -- that's kind of how these systems have been

2  broken down.  Treatment is Honouliuli and Sand Island out the

3  pipe into the ocean.  Are we complying with the various

4  standards that govern the effluent from those pipes?  That's the

5  NGOs lawsuit.

6    The United States lawsuits there will be two.  There's

7  the 1994 lawsuit that dealt with collection system spills from

8  the point of generation to the treatment plant.  That was

9  settled in 1994.  We're complying with that consent decree now.

10    And in this new settlement which deals with the force

11  mains which as your Honor knows are pressurized pipes that are

12  operated and maintained differently, and pose a different level

13  of -- of risk, because many of them go under water bodies, many

14  of them are in critical areas, and those need to be addressed,

15  and we agree that those need to be addressed.

16    So, when -- when Mr. Mullaney says a stay we're really

17  talking about new litigation, or we're talking about some kind

18  of enforcement with respect to the 1994 consent decree, but none

19  of -- none of -- neither of which arrive (unintelligible)

20  systems.

21    This long term settlement negotiation that Mr.

22  Mullaney talks about after the interim agreement is going to be

23  an effort to clean up the loose ends, to the extent that there

24  are any loose ends with respect to the collection system.  And

25  we, of course, with open arms and if we can reach an agreement

1   with the Feds we'll do that.

2          To the extent we can't, then there may be a third

3   litigation within a few years that -- that would be a

4   significant time away (unintelligible) unsuccessfully pursue

5   these settlement negotiations.  But the hope is, again, to

6   address the force mains out of the way first with the most acute

7   problems, and then deal with the cleanup of the other issues, to

8   the extent that there are other issues out there.  And when

9   we're lined up we have the Honolulu waiver we have to deal with,

10  and then the Sand Island waiver decision which -- which comes

11  out of -- is anticipated in the Fall.

12         And to add to the sewage 101 the waiver applications

13  and decisions have to do with the level of treatment of

14  pollutants that are coming out of the two treatment plants.  Up

15  to this point for the last 15 years or more the City and County

16  of Honolulu have operated under a waiver of secondary treatment.

17  There's the tertiary -- the primary treatment and the secondary

18  treatment.  Cut me off if this is elementary, your Honor.  I

19  just thought I'd give you some background.

20         We -- we received a waiver -- the secondary treatment

21  obliga -- obligations for various reasons both oceographic and

22  technology based, the EPA is now reconsidering those, 12 years

23  later, and has issued a tentative denial on Honouliuli but that

24  withstands challenge, or if the City decides to concede

25  (unintelligible), then Honouliuli will have to be upgraded to

1    secondary treatment.

2        If there is a denial on Sand Island -- the same thing

3    with Sand Island, that's another (unintelligible) problem.

4    We're just going to add that to the list of -- of -- of expenses

5    that are lined up with respect to a collection treatment system.

6        THE COURT:  Mr. Bohlen.

7        MR. BOHLEN:  Thank you, your Honor.  The State has

8    little to add to what's already been said by the parties.  I'm

9    sitting geographically in the middle and that's where we stand.

10   On the one hand --

11       UNIDENTIFIED MALE:  Your Honor, you can see our hands.

12       THE COURT:  Yeah.

13       UNIDENTIFIED MALE:  (Inaudible).

14       MR. BOHLEN:  Nobody is at the table.  On the one hand

15   we -- we -- we think it's appropriate for the citizens to have a

16   seat at the table.  On the other hand the State and the Federal

17   Government do have a preeminent role in enforcement that we

18   think should be respected.

19       You've got this interim settlement coming in.  As to

20   whether it's appropriate to wait until the next phase I'll leave

21   that to you.  But we can see a role for the citizens.  We just

22   don't want them to take over too much of it.  It's appropriate

23   to have them there, but -- but recognize that the City and

24   County and the -- and the State and Federal Governments have --

25   have a larger role that -- that needs to be respected as well.

1    Thank you.

2         THE COURT:  Mr. Sproul, it -- it occurs to me that one

3    of the concerns that some of the defendants may have is -- is

4    that you may seek to use the 1995 consent decree and enlarge the

5    scope of that so as to include some of the items that may be the

6    subject of ongoing discussions.  Is that your intent?

7         MR. SPROUL:  It is -- it is not our intent, your

8    Honor, and we would -- again, we recognize as the State puts it

9    the preeminent role of the Department of Health and the U.S.

10   Environmental Protection Agency.  For our -- from our

11   perspective, however, it's crucial that we be parties so that we

12   are taken seriously in the negotiation process and the dialogue.

13        And it's not -- it's not true as the City and County

14   represented that we haven't had somewhat differing substantive

15   positions on the issues.  We have endeavored as we made it clear

16   to all parties we will try, to the extent possible, to present a

17   united plane of slash environmental front on -- on the issues.

18   And for the most part in the negotiation process we've ended up

19   differing to the EPA and the Department of Health on substantive

20   issues, but there have been a few issues where we thought the

21   EPA and Department of Health weren't being quite green enough or

22   quite aggressive enough, and we have -- we have communicated

23   somewhat different positions on -- on some of the issues.

24        But none of our positions are -- are taken seriously

25   if we're not parties to the table and ultimately it's our

1    concern in being parties that what if we have a repeat of the

2    1990 -- the post 1995 scenario where the Mayor himself in the

3    State and City address said, you know, we stopped complying with

4    the consent decree.  We -- we started diverting sewage funds to

5    -- to other projects.  And for years the EPA and Department of

6    Health did not come back to Court, did not seek redress for --

7    for that violation of the '95 consent decree that the Mayor

8    himself publicly addressed in -- in an important, you know, City

9    wide address.

10           And so, that's why it's important to us to be -- to

11   have party status.  If the EPA and Department of Health move to

12   enforce the consent decree we'll stand back, and we'll sit for

13   it.  We'll join in those -- those types of motions.  But it's

14   the scenario where there's wholesale non-compliance or

15   significant non-compliance with requirements of the '95 consent

16   decree and no Government enforcement where -- where there's a

17   role for -- for citizen watchdog action.  That -- the

18   legislative history of Clean Water Act Section 505 makes that

19   clear that Congress intended this precise role for the citizens.

20   That they serve as a -- as a backstop, as a -- as a watchdog in

21   situations where the Government hasn't been enforcing

22   environmental laws and the citizens can.  Where -- where the --

23   the agencies have enforced the environmental laws the citizens

24   are to take the backseat.  That's why we can't bring an

25   independent action if the Government is bringing its own action.

1          But nonetheless, even when the Government is bringing

2    its own action citizens are still allowed to participate and not

3    really have a seat at the table as -- as part of a debating

4    society, but a seat at the table with substantive rights.  The

5    rights granted to -- to party -- party intervenors.  And we

6    would -- again, if there's any future dispute it would be our

7    intention in the first instance to try to resolve it through the

8    settlement process with both the City and County of Honolulu,

9    the EPA, Department of Health, and us citizens.  We've all

10   weighed in favor of -- of having an ongoing supervised

11   negotiation process with bimonthly meetings with the Court.

12         So, we would apprise the Court of -- of any problems.

13   We would hope that that would be sufficient and it would obviate

14   the need for any future motion practice of our own.  But if that

15   breaks down we need to have this backstop of the citizens being

16   allowed to go forward and move to enforce the decree.  And if we

17   bring a motion the Government thinks it's well founded, they can

18   always step in and preempt us.

19         THE COURT:  Mr. Dragna.

20         MR. DRAGNA:  Can I make a suggestion, your Honor?  We

21   -- we seem to be going around in circles on this --

22         THE COURT:  Sure.

23         MR. DRAGNA:  -- should I be a party, shouldn't I be a

24   party.  I'm going to do good, I'm not going to do good.  I won't

25   get in the way, I will get in the way.

1          It's clear that -- that the arguments are what if

2    arguments.  Counsel's made clear that they have no intention of

3    doing anything to upset the 1994 consent decree.  Counsel's made

4    clear that they're happy with the interim settlement even though

5    they walked out the week before it's finalization.

6          Perhaps -- and -- and I think all to make clear that

7    they have a seat at the table.  The NGOs have made clear that

8    they want to be able to move if the Governments are deficient in

9    their oversight, but everyone agrees that they have not been

10   deficient in their oversight to date.  Perhaps the answer is a

11   -- a two step process.

12         The first step process being the limited kind of

13   participation that the Government is proposing -- the

14   Government's are proposing, State and Federal Governments.  That

15   is a seat at the table, and that your dispute with the United

16   States and the State, and if it comes to fruition, we don't

17   think it will, but if it comes to fruition where they have a

18   significant concern with -- with respect to how the process is

19   being resolved by the United States, so it truly is a dilatory

20   action, it truly is some kind of malfeasance, bring your motion.

21   Bring your motion and then with specifics as opposed to -- to

22   hypotheticals.

23         THE COURT:  And -- and actually, Mr. Dragna, that was

24   something that had crossed my mind which was to allow

25   intervention, but since everyone was talking about sort of a

1    supervised process going forward that in the event Mr. Sproul's

2    clients sought to bring a motion to enforce the consent decree

3    that they would be required to seek leave of Court before filing

4    that motion to enforce.

5         It would seem as though that given that supervised

6    process going forward where there be additional court assistance

7    perhaps in the process or involvement in the process that the

8    Court would be in a -- in a better position to address issues

9    with regards to enforcement motions which may be brought by the

10    intervenors.

11         MR. DRAGNA:  And -- and, your Honor, I -- I think that

12    direction is the right direction.  My -- my one friendly

13    amendment to that would be to have the decision on the -- the

14    decision at this point be limited intervention as proposed by

15    the United States.  The incremental expansion of the role of

16    intervention granting the party status, full party status would

17    be reserved by the Court until there is real facts other than

18    hypotheticals to suggest that there is an enforcement of

19    malfeasance.

20         So, we -- we would start with the United States

21    version which we would accept, and -- and then expand that to a

22    more in depth rights and obligations.  And it's not just --

23    again, this is just a hypothetical for us.  We also have the

24    question of attorney's fees.  I mean you know these -- these --

25    their participation is not free to us.  And so, although we may

1   argue later when they seek to have it recovered that it's not

2   appropriate.  But there is a risk here that -- that this

3   participation is on our nickel and while it's clear -- it's not

4   clear in the intervention context there is that possibility.

5            So, we want to make sure that their participation is

6   incremental and that their litigation posture is reserved to a

7   further decision on their status and that status would be

8   determined based on whether there's -- there's -- as I said for

9   true malfeasance.

10            THE COURT:  Mr. Mullaney.

11            MR. MULLANEY:  Yes, your Honor.

12            THE COURT:  What do you think?

13            MR. MULLANEY: It's hard to say in the abstract what --

14   what that means.  I mean I -- I think I'd be happier to see

15   something in writing than -- than to hear it over the phone

16   actually.

17            THE COURT:  I can understand that, Mr. Mullaney.  Mr.

18   Sproul.

19            MR. SPROUL:  Yes, your Honor.  We think the

20   formulation that you put forward was one that is acceptable and

21   clear.  We think that as embellished by the City and County it's

22   muddled.  That to be -- the -- the rules and the law are clear

23   that we're granted an unconditional right of intervention under

24   Rule 24(A)(1) of the Clean Water Act, Section 505(E)(1)(b), but

25   we've already indicated we'd be willing to consent to certain

1  limits of a housekeeping nature.  We think that your limitation

2  is an appropriate housekeeping restriction.  We're full parties.

3  We will not bring a motion without leave of Court.  That's a

4  sensible management of the docket in keeping with the caselaw

5  that suggests you grant intervention as a right unconditionally

6  subject to the caveat of housekeeping management of the docket.

7        THE COURT:  Mr. Bohlen, last comment.

8        MR. BOHLEN:  I -- I don't have anything to add, your

9  Honor.

10        THE COURT:  All right.  I'll take -- take this matter

11  under advisement, and we'll issue a written finding and

12  recommendation.  Thank you very much for your briefing and

13  arguments.

14        MR. SPROUL:  Thank you, your Honor.

15        MR. DRAGNA:  Thank you, your Honor.

16        THE COURT:  We'll be in recess.

17        (At which time the above-entitled proceedings were

18  concluded.)

19

20

21

22

23

24

25

1

2

3                              CERTIFICATE

4         I, court approved transcriber, certify that the

5   foregoing is a correct transcript from the official electronic

6   sound recording of the proceedings in the above-entitled matter.

7         Dated this 30th day of May, 2007.

8

9

10

11                              Jessica B. Cahill

12

13

14

15

16

17

18

19

20

21

22

23

24

25