CARRIE OKINAGA, 5958
Corporation Counsel
MAILE R. CHUN, 4906
Deputy Corporation Counsel
City and County of Honolulu
530 South King Street, Room 110
Honolulu, Hawaii 96813
Telephone: (808) 527-5351
Facsimile: (808) 523-4583
Email: mchun@co.honolulu.hi.us

BINGHAM McCUTCHEN LLP
JAMES J. DRAGNA (CA SBN 91492)
NANCY M. WILMS (CA SBN 111837)
BRYAN K. BROWN (CA SBN 192924)
355 South Grand Avenue, Suite 4400
Los Angeles, CA 90071-3106
Telephone: (213) 680-6400
Facsimile: (213) 680-6499
Email: nancy.wilms@bingham.com

Attorneys for Defendant:
CITY AND COUNTY OF
HONOLULU

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| SIERRA CLUB, HAWAI'I CHAPTER; HAWAI'I'S THOUSAND FRIENDS; and OUR CHILDREN'S EARTH FOUNDATION,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>CITY AND COUNTY OF HONOLULU,<br><br>　　　　　Defendant. | CIVIL NO. CV 04-00463 DAE-BMK<br><br>**DEFENDANT CITY AND COUNTY OF HONOLULU'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' THIRD, FOURTH, AND EIGHTH CLAIMS**<br><br>Date:　October 9, 2007<br>Time:　10:30 a.m.<br>Judge:　Hon. David E. Ezra |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ....................................................................................1

II.   BACKGROUND ....................................................................................4

    A.    Sand Island Permit....................................................................4

        1.    Overview ........................................................................4

        2.    Permit Ambiguities ........................................................5

    B.    The 2002 EPA Administrative Order ........................................6

    C.    Motion Practice Regarding Third, Fourth And Eighth Claims............7

        1.    Plaintiffs' Prior Motion Is Similar To The Current Motion ........................................................................7

        2.    The September 30 Order Denying The Prior Motion ..............8

        3.    Reconsideration Order ....................................................9

    D.    Outstanding Issues Of Fact ....................................................12

        1.    New Testing Methodology Puts Into Question The Presence Of Dieldrin And Chlordane In Effluent..................12

        2.    Construction Delays And Factual Errors................................13

        3.    Plaintiffs' Counting Of Enterococcus Violations Is Wrong........................................................................15

    E.    Plaintiffs' Double-Counting........................................................15

III.  THIS MOTION IS PREMATURE UNDER THIS COURT'S EXPLICIT RULINGS ............................................................................16

IV.   PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ......17

    A.    Summary Judgment Standard........................................................17

    B.    CCH's Prior Statements Do Not Preclude A Genuine Issue Of Fact........................................................................19

    C.    The Number Of CWA Violations Associated With Plaintiffs' Third Claim Is Disputed........................................................21

        1.    Plaintiffs Have Not Established CCH Violated The Enterococcus Limit 1,684 Times............................................21

A/72214310.4/2017866-0000309724

# TABLE OF CONTENTS
(continued)

Page

2.      Plaintiffs Have Not Established That CCH Violated The
        Permit's Dieldrin And Chlordane Daily And Average
        Annual Limits ......................................................................25

3.      Plaintiffs Have Not Established That CCH Violated The
        Permit's Dieldrin Maximum Daily Limit ...............................31

4.      Plaintiffs Have Not Established BOD And TSS
        Violations ..............................................................................33

D.   Under The Plain Language Of The Reconsideration Order,
     Issues Of Fact Exist As To The Number Of Violations Under
     Plaintiffs' Fourth Claim ...................................................................34

     1.      Disinfection Facility ..............................................................34

     2.      Hart Street..............................................................................35

E.   Plaintiffs Are Not Entitled To Summary Judgment On Their
     Eighth Claim......................................................................................37

     1.      Plaintiffs Mischaracterize The AO ........................................38

     2.      Plaintiffs May Not Double-Count Violations ........................39

V.   CONCLUSION .........................................................................................39

## TABLE OF AUTHORITIES

Page

Cases

Adickes v. S.H. Kress & Co.,
    398 U.S. 144 (1970)..............................................................................18, 33

Am. Title Ins. Co. v. Lacelaw Corp.,
    861 F.2d 224 (9th Cir. 1988).................................................................19, 20

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986).....................................................................................17

Atl. States Legal Found., Inc. v. Tyson Foods, Inc.,
    897 F.2d 1128 (11th Cir. 1990)............................................................29, 39

Bauerline v. Equity Residential Props. Mgmt. Corp.,
    2006 WL 3834285 (D. Ariz. Dec. 29, 2006) ..............................................20

Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell,
    138 F.3d 772 (9th Cir. 1998).......................................................................18

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986).................. 17, 21, 22, 23, 24, 26, 30, 31, 32, 33, 34, 37

Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd.,
    791 F.2d 304 (4th Cir. 1986)......................................................................27

Ctr. for Bio-Ethical Reform, Inc. v. CCH,
    345 F. Supp. 2d 1123 (D. Haw. 2004)........................................................36

Eastman Kodak Co. v. Impage Technical Servs., Inc.,
    504 U.S. 451 (1992).....................................................................................18

First Nat'l Bank of Ariz. v. Cities Serv. Co.,
    391 U.S. 253 (1968).....................................................................................18

Fontenot v. Upjohn Co.,
    780 F.2d 1190 (5th Cir. 1986).....................................................................18

Garamendi v. SDI Vendome S.A.,
    276 F. Supp. 2d 1030 (C.D. Cal. 2003)......................................................20

A/72214310.4/2017866-0000309724

TABLE OF AUTHORITIES
(continued)

Page

Hawaii's Thousand Friends v. CCH,
    821 F. Supp. 1368 (D. Haw. 1993)....................................................28, 29, 39

Lawmaster v. Ward,
    125 F.3d 1341 (10th Cir. 1997).................................................................36

Northwest Envtl. Advocates v. City of Portland,
    56 F.3d 979 (9th Cir. 1995)......................................................................23

Oregon State PIRG v. Pac. Coast Seafoods Co.,
    361 F. Supp. 2d 1232 (D. Or. 2005)..........................................................27

PIRG NJ v. Monsanto,
    1988 WL156691 (D.N.J. March 24, 1988)...........................................28, 33

PIRG NJ v. Star Enter.,
    771 F. Supp. 655 (D.N.J. 1991) ...............................................................27

PIRG NJ v. Yates Indus.,
    757 F. Supp. 438 (D.N.J. 1991) ...............................................................35

PIRG NJ v. Elf Atochem N. Am., Inc.,
    817 F. Supp. 1164 (D.N.J. 1993)..............................................................33

Russian River Watershed Protection Comm. V. City of Santa Rosa,
    142 F.3d 1136 (9th Cir. 1998)...................................................................23

Save Our Bays & Beaches v. CCH,
    904 F. Supp. 1098 (D. Haw. 1994)........................................... 1, 16, 20, 27

Sicor Ltd. v. Cetus Corp.,
    51 F.3d 848 (9th Cir. 1995)...........................................................20, 24, 36

Sierra Club v. Union Oil Co.,
    813 F.2d 1480 (9th Cir. 1987)...................................................................20

U.S. v. Allegheny Ludlum Corp.,
    366 F.3d 164 (3d Cir. 2004)...............................................................21, 29

iv

## TABLE OF AUTHORITIES
(continued)

Page

U.S. v. Amoco Oil,
  580 F. Supp. 1042 (W.D. Mo. 1984)...........................................................27

Watts v. United States,
  703 F.2d 346 (9th Cir. 1983)...................................................................17

### Statutes

33 U.S.C. §1318(a)(4)(A)(iv)...................................................................32

CWA §301(h) ...................................................................................... 4

CWA §308.........................................................................................32

CWA §309(d) .....................................................................................38

CWA §505(a)(1)...................................................................................38

### Rules

Fed. R. Civ. P. 56(c) ...................................................................17, 18

Fed. R. Civ. P. 56(e) ...........................................................................17

### Regulations

40 C.F.R. §122.21 .............................................................................. 4

A/72214310.4/2017866-0000309724

I.    <u>INTRODUCTION</u>

Plaintiffs Sierra Club, Hawai'i Chapter, Hawai'i's Thousand Friends, and Our Children's Earth Foundation (collectively, "plaintiffs") seek partial summary judgment against the City and County of Honolulu ("CCH") on their Third, Fourth, and Eighth Claims, and ask the Court to find CCH violated the Clean Water Act ("CWA") as many as 17,595 times by failing to comply with its Sand Island Wastewater Treatment Plant ("Sand Island WWTP") NPDES Permit ("Permit") and a 2002 Environmental Protection Agency ("EPA") administrative order ("AO").

This Motion is premature under the plain language of the Court's April 16, 2007 Reconsideration Order ("Reconsideration Order").  As this Court held, it is inappropriate to assess liability until "***all possible violations have been conclusively established as to each count in the complaint.***"  In fact, Judge Ezra's own prior ruling in <u>Save Our Bays & Beaches v. CCH</u>, 904 F. Supp. 1098, 1125 (D. Haw. 1994), found "that the issue of assessing civil liabilities is more appropriately dealt with at a later date, after all possible violations have been conclusively established as to each count in the complaint."   Here, contrary to the Court's prior rulings, plaintiffs improperly seek to rack-up multiple violations based on the same alleged wrongful conduct through a piecemeal approach to litigation.  Given the serious ramifications of plaintiffs' claims and the breadth of

alleged liability at issue, this Court should again decline to assess liability and deny plaintiffs' Motion in its entirety.

Further, plaintiffs mischaracterize the Reconsideration Order, which addressed only two narrow issues in this case. Specifically, the Court (1) held CCH's Permit provides for liability for each day of any *month* for which a *monthly* average limitation is exceeded and (2) declined to impose one violation for each day the construction deadline in the Permit for the Disinfection Facility was exceeded. Plaintiffs attempt to expand this ruling in a number of ways. For example, regarding the first issue, plaintiffs incorrectly claim that the Reconsideration Order resolved whether plaintiffs can inflate one violation of an *annual* average limit into *365* violations—an inflation factor of 36,500%. Neither this Court, nor any other court, has made such a ruling. Regarding the second issue, the Court did not assess any violations, and also took notice that evidence has not been submitted "regarding attempts to meet the scheduling deadline" or the "reasons for its delay." Accordingly, CCH provides evidence herein regarding the reasons for construction project delays, thereby creating a genuine issue of triable fact.

Additionally, CCH presents recent evidence that shows that dieldrin and chlordane may be present in the effluent at significantly lower levels than reported in CCH's monitoring reports, or in the case of dieldrin, not present at all.

A/72214310.4/2017866-0000309724

Thus, the evidence upon which plaintiffs rely for their pesticide claims has been superseded by more sensitive technology. Accordingly, a triable issue of fact exists as to this issue and plaintiffs' Motion must be denied.

Further, ambiguities in the Permit call into question plaintiffs' Motion regarding their enterococcus and Hart Street Pump Station allegations. Accordingly, as a matter of law, the Court cannot assess violations based on these claims until these ambiguities are resolved. Moreover, plaintiffs make assumptions about the number of enterococcus exceedances which are simply untrue.

Finally, as to their Eighth Claim, plaintiffs' Motion asks this Court to assess a violation of the 2002 AO for every day the Permit was allegedly violated under the Third and Fourth Claims. Thus, plaintiffs seek a *second* violation for the *same* alleged wrongful conduct. According to the Reconsideration Order, such "double-counting" is impermissible. Thus, this Motion should be denied.

If this Motion is granted as proposed, CCH would be subjected to hundreds of millions of dollars in penalties to the government (the imposition of which CCH would vigorously oppose). Thus, plaintiffs' piecemeal litigation tactics do not serve the interests of the citizens of Oahu, nor do they benefit the wastewater system. Indeed, this approach contradicts plaintiffs' own statements in their Opposition to Entry of the pending Stipulated Order, where they admit that

CCH's "finite resources [should be allocated] to the remedial actions that provide the most benefit."  Opp. to Request for Entry, CV-07-00235DAE(KSC) (Docket #46).

　　　　　For these reasons and the reasons stated below, CCH respectfully requests the Court deny this Motion in its entirety.

II.　　BACKGROUND

　　A.　　Sand Island Permit

　　　　1.　　Overview

　　　　　CCH operates nine WWTPs, including the Sand Island WWTP.  The Sand Island WWTP is the largest Oahu treatment facility and serves most areas of Honolulu, treating approximately 67 million gallons of flow per day.  Declaration of Ross Tanimoto in Support of CCH's Opposition ("Tanimoto"), ¶2.  The Sand Island Permit, which was issued by EPA because it has a waiver of secondary treatment under CWA §301(h), became effective on November 2, 1998 and expired on its face on November 3, 2003.  Id.  On May 5, 2003, CCH submitted to EPA a renewal application for the Permit under 40 C.F.R. §122.21  Id.  EPA has not yet made a decision on the renewal application.  Id.  Accordingly, as the Court found in its September 30, 2005 Order, the Sand Island Permit remains in effect under administrative extension.  Declaration of Maile R. Chun in Support of CCH's Opposition ("Chun"), Exh. A.  Plaintiffs' Third and Fourth Claims are based on alleged violations of the Sand Island Permit.

4

2.    Permit Ambiguities

There are ambiguities in the language of the Permit that give rise to material factual disputes which are fatal to plaintiffs' Motion.

For example, the Sand Island Permit states, "[f]ollowing at least *one year* of continuous operation of the . . . Disinfection Facility, at the request of the Permittee, the EPA and DOH will re-evaluate the need for continuous effluent disinfection." Chun, Exh. D, 54 (emphasis added). In recognition of this test period, the Permit implies there can only be a *maximum* of one year of violations of the daily enterococcus standard.

Moreover, the Sand Island Permit provides that the enterococcus level must be reported as a "geometric mean." Chun, Exh. D, 10. Contradicting this requirement, the Permit also states that enterococcus effluent monitoring "*shall consist of one* grab sample collected between 12 noon and 3:00 p.m." Id. (emphasis added). Obviously, it is impossible to take a daily *average* based on just *one* daily grab sample. Such a sampling would lead to an absolute number rather than an average number, the latter of which is required by the Permit reporting requirement. Because the Permit's language is internally inconsistent, there is a question of fact regarding what constitutes non-compliance with the enterococcus limit.[1]

---

[1] More than 6 years ago, CCH requested from EPA a modification clarifying the

Finally, the Permit contains a construction deadline for the Hart Street Pump Station of February 18, 2005, which is more than one year after the Permit's expiration date of November 3, 2003.  Chun, Exh. D, 7.  Under the Permit, non-enforceable deadlines are *italicized*.  Id., 6.  Of all the deadlines occurring after the Permit's expiration date, the Hart Street construction deadline is the *only* deadline not italicized.  Id.  Furthermore, in EPA's Response to Comments to the Final Permit, the Hart Street construction deadline *is* italicized.  Chun, Exh. E, 12.  Thus, the fact the February 18, 2005 deadline is not italicized in the Sand Island Permit is almost certainly a typographical error.

B.    The 2002 EPA Administrative Order

Plaintiffs' Eighth Claim is based on alleged violations of the 2002 AO.  The AO requires CCH to initiate measures to prevent violations of the Permit, including the development and implementation of three plans to address, respectively, operational and maintenance issues, exceedances of effluent limitations, and delay in the construction schedule.  Concise Statement, Exh.10, 23.  CCH submitted these plans in 2002, revised the plans in response to EPA's written and verbal comments in 2003, and responded to three EPA comment letters in

---

ambiguity in how to determine compliance.  Tanimoto, ¶6.  In a July 26, 2001 reply, EPA stated the request "is still pending before us, and we shall respond to this request shortly."  Id.  EPA has yet to respond.  Id.

A/72214310.4/2017866-0000309724

2004. Tanimoto, ¶7. Additionally, CCH submitted annual progress reports under the AO in March 2005, 2006, and 2007. Id.

    C.    <u>Motion Practice Regarding Third, Fourth And Eighth Claims</u>

        1.    <u>Plaintiffs' Prior Motion Is Similar To The Current Motion</u>

On January 6, 2005, plaintiffs filed a similar Motion for Partial Summary Judgment on, in part, their Third, Fourth, and Eighth Claims ("Prior Motion", Docket #52). Chun, ¶3. With regard to the Third Claim, plaintiffs alleged in both the Prior and Current Motions CCH violated the following pollutant discharge limitations in the Permit:

Daily Maximum Enterococcus

Daily Maximum Dieldrin

Annual Average Dieldrin

Annual Average Chlordane

Monthly Average Biochemical Oxygen Demand ("BOD")

Monthly Average Total Suspended Solids ("TSS")

Id.

With regard to the Fourth Claim, plaintiffs alleged in the Prior Motion (and allege in the current Motion) that CCH violated the Permit's construction

deadline for the Disinfection Facility on every day after July 21, 2002.[2]  Chun, ¶4.

In the current Motion, plaintiffs also allege that CCH violated the construction

deadline for the Hart Street Pump Station.[3]

      2.    <u>The September 30 Order Denying The Prior Motion</u>

      On September 30, 2005, this Court denied plaintiffs' Prior Motion in

its entirety ("September 30 Order"), finding issues of material fact (September 30

Order, 21-22), and granted CCH's Motion for a More Definite Statement ("MDS")

as to plaintiffs' Eighth Claim (September 30 Order, 19-20).  Chun, Exh. A.

Plaintiffs filed their MDS (Docket #104) on November 14, 2005.  <u>Id.</u>, Exh. B.  The

MDS alleges CCH is in on-going violation of the AO because CCH failed to (1)

initiate all necessary measures to prevent further Permit violations, (2) submit three

timely and adequate plans, and (3) complete capital improvement projects,

including the Hart Street.  <u>Id.</u>  Notably, plaintiffs' Motion does not allege CCH

failed to submit plans or that these plans were not approved by EPA.

---

[2] In the current Motion, plaintiffs claim that the violations ceased on December 19, 2006, the day the Disinfection Facility became operational under the Permit.  Mtn., 21.  The Facility actually was placed online on November 15, 2006.  Tanimoto, ¶5.

[3] Plaintiffs do not allege violations based on the Hart Street Pump Station in their Second Amended Complaint under their Fourth Claim.  Sec. Am. Compl., ¶¶ 94-109 (Docket #55).

3.    <u>Reconsideration Order</u>

On October 14, 2005, plaintiffs filed a Motion for Reconsideration of the September 30 Order, seeking reconsideration of the Court's ruling on the Third and Fourth Claims only.  Chun, Exh. C.  On April 16, 2007, the Court issued its Reconsideration Order.

a.    <u>Court's Holdings</u>

The Reconsideration Order resolved two issues of law: (1) as to the Third Claim, "a violation of a *monthly* average will be counted as a violation of every day of the month[]"[4] (Chun, Exh. C, 11) (emphasis added), and (2) as to the Fourth Claim, "the continuous failure to construct and operate the *disinfection facility* as required by the NPDES Permit constitutes a continuous daily violation and should be counted as such" (<u>id.</u>, 15) (emphasis added). The Court, however, ***made no findings as to the number of violations, if any, noting***:

> [E]vidence has not yet been presented regarding attempts to meet the scheduling deadline for the disinfection facility or reasons for its delay.  Thus, ***this Court does not find [plaintiffs'] case as providing it with the***

---

[4] The Reconsideration Order did not explicitly discuss or rule on how to compute violations of (1) annual chlordane and dieldrin limits (*i.e.*, can plaintiffs claim 365 violations based on one exceedance?) or (2) daily dieldrin (*i.e.*, can plaintiffs extrapolate 30 daily violations based one exceedance of a daily maximum?).

*authority to count each day in which the facility has*

*not been operational as a violation.*

Id.,13 (emphasis added).  Thus, because outstanding fact issues may still exist, the Court "finds it appropriate to wait to make assessments [regarding the actual number of violations and civil penalties] *until after **all possible** violations have been conclusively established as to each count in the complaint in order to avoid any double counting of violations*."  Id.,16 (emphasis added).

        b.    Plaintiffs Mischaracterize The Reconsideration Order

In their Motion, plaintiffs repeatedly mischaracterize the Reconsideration Order as having definitively resolved issues that were simply not resolved.  For example, plaintiffs wrongly assert the Order:

- "found that CCH violated its enterococcus limit every day from July 21, 2002 . . . through July 31, 2004" (Mtn., 17);

- "held that CCH's Sand Island WWTP discharges violated the annual mass and concentration limits for dieldrin continuously from May 30, 1999 . . . through July 31, 2004 (a time period of 1,890 days)" (Mtn., 19);

- "established that CCH violated the Sand Island Permit's: (a) annual mass chlordane effluent limitation on 1,890 days; and (b) annual concentration chlordane limitation also on 1,890 days through July 31, 2004" (Mtn., 19);

- "established that CCH committed a total of 3,873 CWA violations for excessive dieldrin discharge through July 31, 2004" (Mtn., 20);

- "establishes that CCH violated the Sand Island Permit's: (a) daily maximum mass limit for dieldrin on 62 days; and (b) daily maximum concentration limit for dieldrin on 31 days" (Mtn., 20); and

- "held that CCH violated [its Permit] every day after July 21, 2002 that CCH failed to complete the disinfection facility until the date of Plaintiffs' January 5, 2005 Motion, 900 days of violations." Mtn., 21.

In fact, contrary to these assertions, the Court did not make any numerical findings of violations but rather held "*it [is] appropriate to wait to make assessments until after all possible violations have been conclusively established as to each count in the complaint.*"  Chun, Exh. C, 16.  Moreover, plaintiffs' assertion regarding the disinfection facility directly contradicts the Reconsideration Order, which held that because "*evidence has not yet been presented regarding attempts to meet the scheduling deadline for the disinfection facility or reasons for its delay[,] . . . this Court does not find [plaintiffs'] case as providing it with the authority to count each day in which the facility has not been operational as a violation.*"  Chun, Exh. C, 13.  Thus, these holdings attributed by plaintiffs to the Court appear nowhere in the Reconsideration Order.

A/72214310.4/2017866-0000309724

D.    Outstanding Issues Of Fact

    1.    New Testing Methodology Puts Into Question The
        Presence Of Dieldrin And Chlordane In Effluent

Relying on Discharge Monitoring Reports ("DMRs"), plaintiffs allege

11,545 violations of the CWA based on the alleged failure to meet effluent limits

for dieldrin and chlordane on 32 occasions from May 30, 1999 through March 31,

2007.  Mtn., 19-20.  The reported exceedances of these pesticides were based on a

standard analytical technique that uses gas chromatography with an electron

capture detector ("GC/ECD").  Tanimoto, ¶8.

In preparing its technical response to EPA's March 27, 2007 Tentative

Decision for the Honouliuli WWTP, CCH become aware that GC/ECD is not

sensitive or specific enough to accurately detect the presence of dieldrin and

chlordane in the effluent at the extremely low permit levels.  Tanimoto, ¶9.  To test

GC/ECD's reliability, CCH (through its consultant) tested effluent samples from

both the Sand Island and Honouliuli WWTP using both GC/ECD and a more

sensitive EPA-approved methodology, gas chromatography-mass spectrometry

("GC/MS").  Id.

Specifically, from April 24 to May 5, 2007, 12 samples (6 from the

Honouliuli WWTP, 6 from the Sand Island WWTP) were analyzed simultaneously

using both methods.  Tanimoto, ¶9.  Samples tested using GC/MS found that

*actual dieldrin and chlordane levels were significantly lower than the results based*

*on GC/ECD.*  Id., 10.  With regard to chlordane, the GC/MS results were approximately half the level of those using GC/ECD.  Id.  With regard to dieldrin, *the GC/MS testing for all samples indicated that dieldrin was not present in those samples*.  Id.  Further, for each of the 12 dieldrin samples, the conventional testing method indicated an exceedance of the permit limit; because dieldrin was not detected using GC/MS, the conventional method resulted in *false positive exceedances* for each of these samples.  Id.

These results demonstrate two things:

- The conventional testing reflected in the DMRs likely resulted in "false positive" exceedances.

- There is a possibility that dieldrin is not even present in the effluent.[5]

2.    Construction Delays And Factual Errors

a.    Disinfection Facility

As noted above, in the Reconsideration Order the Court held that because "evidence has not yet been presented regarding attempts to meet the scheduling deadline for the disinfection facility or reasons for its delay[,] . . . this Court does not find [plaintiffs'] case as providing it with the authority to count

---

[5] The prior samples were not preserved and, accordingly, CCH cannot apply the GC/MS methodology retroactively to past sampling.  Tanimoto, ¶11.

each day in which the facility has not been operational as a violation." Chun, Exh. C, 13. In their Motion, despite the obvious implications of the Court's Order, plaintiffs have failed to provide *any* evidence demonstrating there is no factual issue as to the assessment of violations. In fact, there are numerous factual issues that resulted in the delay, including disputes with contactors, theft, water damage, equipment damages and defects, and discovery of hazardous materials. See Declaration of Guy M. Inouye in Support of Opposition ("Inouye").

The delays in construction of the Disinfection Facility directly resulted in CCH's failure to meet its Permit limit for enterococcus. Tanimoto, ¶5. This fact is intrinsically recognized in the Permit as the daily enterococcus limit became effective on July 21, 2002—the *same date* as the continuous operation deadline for the Disinfection Facility. Chun, Exh. D, 9. Due to the delays in completing the construction of the Disinfection Facility, as described above, the Facility was not placed online until November 15, 2006. Tanimoto, ¶5. On that *same date*, and nearly every date thereafter, CCH has met the daily enterococcus limit. See id.

b.     Hart Street Pump Station

Under the Permit, the construction deadline for the Hart Street Pump Station was February 18, 2005. Chun, Exh. D, 7. Plaintiffs claim that the Hart Street Pump Station was not complete as of May 30, 2007, and allege 832

14

violations for every date between February 18, 2005 and May 30, 2007.  Mtn., 22.

Plaintiffs have provided *no evidence* supporting this assessment.  In fact, the Hart

Street Pump Station was substantially completed by December 28, 2004, when the

pumps were placed in operation *and has been in operation since that date*.  Inouye,

¶15.  Project close out, however, was delayed due to cavitation problems

encountered during the commissioning phase.  Id., ¶14.  These problems, however,

have not delayed the use of the Hart Street for its intended purpose.  Id., ¶15.  In

fact, during the extremely heavy rainfalls in late winter and early spring 2006, the

Hart Street performed as necessary.  Id.

> ### 3.    Plaintiffs' Counting Of Enterococcus Violations Is Wrong

Even though plaintiffs acknowledge the construction of the

Disinfection Facility was completed by December 19, 2006, they wrongly allege

violations of the daily enterococcus limit on every day from July 21, 2002 through

March 31, 2007.  Mtn., 16-18.  In fact, between November 15, 2006, the date the

Disinfection Facility was placed online, and March 31, 2007, CCH met daily

enterococcus limit on 112 days.  Tanimoto, Exh. G.

> ### E.    Plaintiffs' Double-Counting

Under the Eighth Claim, plaintiffs allege a violation of the AO on

every day between October 1, 2002 (the AO is dated September 30, 2002) and

May 30, 2007.  Sproul, Table 8.  According to plaintiffs, CCH violated the AO on

every day in this period because it violated the Permit on every day during this period.  <u>See</u> Mtn., 22-25.  Thus, because the alleged violations under the Eighth Claim are based on the *same alleged wrongful conduct* for which plaintiffs seek liability under the Third and Fourth Claims, each alleged violation of the Eighth Claim is wholly duplicative of a *second* violation alleged in the Motion.

III.    <u>THIS MOTION IS PREMATURE UNDER THIS COURT'S EXPLICIT RULINGS</u>

Under the plain language of the Reconsideration Order, this Court held **"*it [is] appropriate to wait to make assessments [of liability or penalties] until after all possible violations have been conclusively established as to each count in the complaint.*"**  Chun, Exh. C,16.  The Reconsideration Order was based on Judge Ezra's own prior ruling in <u>Save Our Bays & Beaches v. CCH</u>, 904 F. Supp. 1098, 1125 (D. Haw. 1994), where the Court declined to assess civil *liabilities* until after *all* violations have been established ("The court, however, finds that the issue of assessing civil liabilities is more appropriately dealt with at a later date, after all possible violations have been conclusively established as to each count in the complaint").[6]

---

[6] Is important to note the Court's ruling in <u>Beaches</u> was not limited to the circumstances where double-counting was necessarily a concern.  Thus, plaintiffs cannot argue that the Reconsideration Order only applies to assessments of liability under the Eighth Claim.  (This is further confirmed by the fact that the Eighth Claim *was not even at issue* in the Reconsideration Order.)  Even if double-counting were the only concern in <u>Beaches</u>, there is still a danger of double-

Thus, unless plaintiffs stipulate that their Motion represents *all* their alleged CWA violations under their Second Amended Complaint (including the MDS), then this Court has specifically found that an assessment of the number of CWA violations or civil penalties is premature. As the Court recognizes, such a piecemeal approach increases the likelihood of double-counting. For this reason alone, plaintiffs' Motion should be denied in its entirety.

## IV.    PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT

### A.    Summary Judgment Standard

Material facts are those necessary to the proof or defense of a claim, and are determined by reference to the substantive law—here, the CWA. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment may not be granted where a dispute exists as to any material fact. See Fed. R. Civ. P. 56(e). The moving party bears the burden of proving that (1) there is no genuine issue of material fact; and (2) that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Watts v. United States, 703 F.2d 346, 347 (9th Cir. 1983). Trial courts should act with caution in granting summary judgment. Anderson, 477 U.S. at 255.

---

counting under the Third and Fourth Claims. See Section IV.C.2.b.ii. Furthermore, it is unknown what additional double-counting dangers are presented under plaintiffs' remaining Claims (Fifth, Sixth, Seventh and Tenth).

An issue of fact is genuine if the evidence, viewed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party. <u>Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell</u>, 138 F.3d 772, 780-81 (9th Cir. 1998). Plaintiffs must establish that there is no genuine issue of material fact as to each and every element of the claims upon which they move. <u>Fontenot v. Upjohn Co.</u>, 780 F.2d 1190, 1194 (5th Cir. 1986). In opposing a motion for summary judgment, "[t]he issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." <u>First Nat'l Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 288-89 (1968). Moreover, any inferences to be drawn from the factual record must be drawn in favor of, and in the light most favorable to, the party opposing the motion. <u>Eastman Kodak Co. v. Impage Technical Servs., Inc.</u>, 504 U.S. 451, 456 (1992); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158-59 (1970).

B.    CCH's Prior Statements Do Not Preclude A Genuine
      Issue Of Fact

In its Prior Opposition and supporting documents, including the

Brown Declaration, CCH acknowledged certain CWA violations[7] in an effort to

compromise as to a fair calculation and thereby conserve its resources and focus on

the needs of the wastewater system.  See Prior Opp.,4.  Since that time, CCH has

learned of new factual and technical information that dramatically affects its

potential liability, as discussed above.  Given the broad scope of plaintiffs' Motion,

the breadth of potential liability, and the importance of these issues, CCH should

not be bound by these statements to the extent they can be considered factual

admissions.

Indeed, the Ninth Circuit expressly has held that the question of

whether statements of fact contained in a brief are binding judicial admissions is

within the *court's discretion*.  Am. Title Ins. Co. v. Lacelaw Corp., 861 F.2d 224,

227 (9th Cir. 1988) ("statements of fact contained in a brief *may* be considered

admissions of the party in the discretion of the district court") (emphasis in

original).[8]  Further, even where the court finds that statements are judicial

---

[7] For example, CCH "acknowledge[d] it has violated effluent limitations in the
Permit a total of 977 times during the time period covered by the Motion . . . ."
(Prior Opp.,n.5), "acknowledge[d] it is subject to the four annual average effluent
limitations at issue in the Motion" (Prior Opp.,18), and "acknowledge[d] liability
for 225 violations of annual averages" (Prior Opp.,22).

[8] "Judicial admissions are formal admissions . . . which have the effect of

19

admissions, *the party asserting the statements may explain them at a later date if they were made in error*, and the court "*must* accord the explanation due weight." Garamendi v. SDI Vendome S.A., 276 F. Supp. 2d 1030, 1038 n.5 (C.D. Cal. 2003) (emphasis added) (quoting Sicor Ltd. v. Cetus Corp., 51 F.3d 848, 859-60 (9th Cir. 1995) ("Where . . . the party making an ostensible judicial admission explains the error in a subsequent pleading or by amendment, the trial court must accord the explanation due weight")); see also Bauerline v. Equity Residential Props. Mgmt. Corp., 2006 WL 3834285, at *5 (D. Ariz. Dec. 29, 2006) (finding that "[p]laintiffs . . . sufficiently retracted their judicial admission" in a later opposition to co-defendants' motion for summary judgment).[9]

---

withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." American Title, 861 F.2d at 226.

[9] Relying on Sierra Club v. Union Oil Co., 813 F.2d 1480 (9th Cir. 1987), and Beaches, 904 F. Supp. 1098, plaintiffs argue that DMRs are conclusive evidence of permit limit exceedances and are therefore binding admissions. Mtn., 13-14. These cases are not applicable here. In Union Oil, the court's conclusion was based, in part, on a concern that "allowing permittees to excuse their reported exceedances by showing sampling error would create the perverse result of rewarding permittees for *sloppy laboratory practices*." 813 F.2d at 1492 (emphasis added). Similarly, in Beaches at 1138, information was not properly recorded in the DMRs. Here, the DMRs are not a result of "sloppy laboratory practices," but rather, discovering a more sensitive testing methodology. Tanimoto, ¶¶8-10.

The Third Circuit has rejected the notion that DMRs are conclusive: "If a permittee reports that it has violated a permit limit, the [DMR] is sufficient to discharge the . . . burden of production, *but neither the CWA itself nor any regulation of which we are aware makes such a report conclusive*. The trier of fact must still be convinced that the permit was in fact violated. *Evidence that the*

CCH requests that the Court not bind CCH to its prior statements and consider all the arguments and evidence presented herein.

C.    The Number Of CWA Violations Associated With
      Plaintiffs' Third Claim Is Disputed

Plaintiffs' Third Claim alleges CCH is liable for either 13,229 or 13,447 CWA violations based on effluent limitations in the Permit.[10]  However, for the reasons below, plaintiffs have not met their burden of proof as genuine issues of material fact and questions of law remain regarding the total number of effluent limitation violations.  See Celotex, 477 U.S. at 322.

1.    Plaintiffs Have Not Established CCH Violated The
      Enterococcus Limit 1,684 Times

For the reasons set forth below, at least four factual and/or legal issues exist as to the number of violations of the enterococcus limit.

---

reports inaccurately overreported the level of discharge are certainly relevant to show that no violation occurred."  U.S. v. Allegheny Ludlum Corp., 366 F.3d 164, 174 (3d Cir. 2004) (emphasis added).  Given that CCH is not trying to excuse its own behavior, CCH requests the Court follow the Third Circuit's approach and consider evidence contrary to the DMRs.

[10] Plaintiffs' Motion is internally inconsistent.  At pages 25-26, plaintiffs allege 13,447 violations of the Third Claim.  However, at pages 16-20, plaintiffs allege 13,229 violations.  Thus, it is impossible for CCH to fully understand or respond to plaintiffs' claims and an obvious factual dispute exists.  For these reasons alone, plaintiffs' Motion should be denied.  See Celotex, 477 U.S. at 322.

a.    <u>Plaintiffs' Table 1 Is Wrong</u>

Plaintiffs' Table 1 alleges violations of daily maximum enterococcus limits every day between August 1, 2004 and February 28, 2007, for a total of 942 violations during this period.[11]  Sproul, Table 1.  Plaintiffs' Table 1 "assumes this reported value [in the DMRs] is representative of the level of enterococcus in Sand Island WWTP effluent each day in the month for purposes of counting number of violations."  <u>Id.</u>,n.4.  This *assumption* simply does not reflect reality and is insufficient to support a grant of summary judgment here—*CCH did not violate the enterococcus limit on each day during the cited time period*.  Rather, the actual daily sampling data shows that between November 15, 2006 (the date the Disinfection Facility went online) and March 31, 2007, CCH met daily maximum limit for enterococcus on *112 days*.  Chun, Exh. G.  Thus, there is question of fact as to the number of exceedances of the daily enterococcus limit, and plaintiffs' Motion should be denied.  <u>See</u> <u>Celotex</u>, 477 U.S. at 322.

---

[11] Again, plaintiffs' Motion is internally inconsistent.  At pages 16 and 18, plaintiffs allege violations of the enterococcus limit through March 31, 2007.  On page 17 and in Table 1, however, plaintiffs allege violations through February 28, 2007.  Consequently, it is impossible for CCH to fully understand or respond to plaintiffs' claims.  Thus, plaintiffs' Motion should be denied.  <u>See</u> <u>Celotex</u>, 477 U.S. at 322.

      b.    <u>Ambiguous Permit Terms Call Into</u>
<u>Question The Number of Violations</u>

          i.    <u>The Permit Anticipates A Maximum</u>
<u>Of 365 Enterococcus Violations</u>

As described above, the Permit specifically provides for re-evaluation of the effectiveness of the Disinfection Facility in meeting enterococcus limits "[f]ollowing at least *one year* of continuous operation of the . . . Disinfection Facility, at the request of the Permittee, the EPA and DOH will re-evaluate the need for continuous effluent disinfection." Chun, Exh. D, 54 (emphasis added). Thus, the first year of operation of the Facility is explicitly contemplated by the Permit to be a "pilot" period. In recognition of this initial evaluation of the effectiveness of disinfection, the Permit implies that there is a maximum of one year (*i.e.*, 365) of violations of the daily enterococcus limit. Accordingly, based on ambiguity in the language, the maximum number of violations of the enterococcus limit that can be imposed is unclear. Thus, a question of fact exists, and plaintiffs' Motion should be denied.[12] See <u>Celotex</u>, 477 U.S. at 322.

---

[12] The Ninth Circuit has recognized that the interpretation of ambiguous terms of a NPDES permit is analogous to a court's review of a contract. <u>Northwest Envtl. Advocates v. City of Portland</u>, 56 F.3d 979, 982 (9th Cir. 1995) ("We review the district court's interpretation of the 1984 [NPDES] permit as we would the interpretation of a contract or other legal document"); <u>Russian River Watershed Protection Comm. v. City of Santa Rosa</u>, 142 F.3d 1136, 1141 (9th Cir. 1998) (stating the court may look to extrinsic evidence to discern permit's meaning whenever the terms of the permit are ambiguous). "Where there is a dispute over a material fact deemed necessary to a contract's interpretation, based on evidentiary

        ii.      The Language Of The Permit Creates
                    An Issue Of Fact

As noted above, the Permit is internally inconsistent about how CCH must report enterococcus, as the Permit both requires CCH to report the limit as a "geometric mean" (*i.e.*, average of two or more samples) while requiring CCH's monitoring to "consist of *one* grab sample collected between 12 noon and 3:00 p.m." Chun, Exh. D,10 (emphasis added). Thus, from the Permit language, a question of fact exists as to whether compliance is determined through an *average* or a *single* sample, and plaintiffs' Motion should be denied. See Celotex, 477 U.S. at 322; Sicor, 51 F.3d at 856.

        c.      Construction Delays Resulted In
                   Enterococcus Exceedances

Despite the fact that exceedances of the limit were the direct result of delays in completing the Disinfection Facility, plaintiffs allege violations of the enterococcus limit *every day*. In fact, as set forth in Section II.D.2 above and the Inouye Declaration, there are factual issues regarding the attempts to meet the Disinfection Facility schedule deadline. Inouye, ¶¶3-10. Accordingly, plaintiffs' Motion should be denied. See Celotex, 477 U.S. at 322.

---

support for competing interpretations, summary judgment is inappropriate." Sicor, 51 F.3d at 856 (reversing lower court's grant of summary judgment). For the reasons below, there are ambiguities in the Permit that are fatal to plaintiffs' Motion.

24

2.    <u>Plaintiffs Have Not Established That CCH Violated
      The Permit's Dieldrin And Chlordane Daily And
      Average Annual Limits</u>

Plaintiffs allege 11,452 violations of the CWA based on only 32

reported exceedances of dieldrin and chlordane average annual limits.  Mtn., 18-

20; Tables 2-5.  In addition, plaintiffs allege 93 violations of daily dieldrin limits.

Mtn., 20.  The Motion should be denied as to these allegations for two reasons: (1)

new evidence creates a question of fact as to whether the permit limits were

exceeded, and (2) these allegations are an improper attempt to inflate one

exceedance of an annual average into 365 distinct CWA violations and one

exceedance of a daily violation into 30 daily violations.

a.    <u>A Factual Issue Exists Regarding
      Chlordane/Dieldrin Levels In The Effluent</u>

As discussed fully in Section II.D.1 above, the reported exceedances

of dieldrin and chlordane were based on a testing methodology (GC/ECD) that has

been superseded by more sensitive technology.  Tanimoto, ¶¶8-10.  From April 24

to May 5, 2007, CCH (through its consultant) analyzed 12 effluent samples using

both GC/ECD and a more sensitive EPA-approved methodology—GC/MS.  <u>Id.</u>, 9.

Samples tested using the more sensitive GC/MS found that *actual dieldrin and*

*chlordane levels were significantly lower than the results based on GC/ECD.*  <u>Id.</u>,

10.  With regard to chlordane, the GC/MS results were approximately half the level

of those using GC/ECD.  <u>Id.</u>  With regard to dieldrin, *the GC/MS testing for all*

25

*samples indicated that dieldrin was not present in those samples.* Id. Further, for each of the 12 dieldrin samples, the conventional testing method indicated an exceedance of the permit limit; thus, because dieldrin was not detected using GC/MS, the conventional method resulted in *false positive exceedances* for each of these samples. Id.

These results demonstrate a question of fact exists as to whether the dieldrin and chlordane limits were actually exceeded, and plaintiffs' Motion must be denied. See Celotex, 477 U.S. at 322.

b.    Plaintiffs Have Not Established That CCH
Violated The Permit's Dieldrin And
Chlordane Annual Average Limits

Even if the Court determines that no question of fact exists, plaintiffs have not met their burden regarding the number violations of annual pesticide limits and cite no support for their claim that *one* sample exceeding an annual limit counts as one violation for *each day of the year*—a 36,500% inflation rate.

i.    Plaintiffs Cite No Law Supporting
Their Position, And Instead Ask This
Court To Make New Law

Plaintiffs mischaracterize the Reconsideration Order, claiming that the Court held that the Order "established" that CCH violated annual mass and concentration limits on thousands of days. Mtn., 19. Rather, the Court found that "a violation of a *monthly* average will be counted as a violation of every day of the

26

month[]," but made no express finding with regard to annual averages. See Chun,

Exh. C,11(emphasis added). In fact, the Court's Reconsideration Order

specifically and repeatedly addressed only average *monthly* violations—not

average *annual* violations. Indeed, *all* of the cases cited in the Reconsideration

Order as to this issue relate to monthly—not annual—average limits. See Chun,

Exh. C, at 8-9 (the Court's discussion of and quotations from Chesapeake Bay

Found., Inc. v. Gwaltney of Smithfield, Ltd., 791 F.2d 304, 307 (4th Cir. 1986),

include the phrases "monthly average" and "monthly violations" 8 times); at 10

(according to Court, in Oregon State PIRG v. Pac. Coast Seafoods Co., 361 F.

Supp. 2d 1232, 1241 (D. Or. 2005), "the court held that it 'must construe a

violation of a *monthly average* discharge limit as a violation for each day during

that month'") (emphasis added); at 10 (the Court notes that in U.S. v. Amoco Oil,

580 F. Supp. 1042, 1045 (W.D. Mo. 1984), the "defendant was subject to a penalty

for each day of each month in which a *monthly average* limitation was exceeded . .

. . ") (emphasis added); at 10-11 (Beaches, 904 F. Supp. at 1125: "assuming that

'violation of a *30-day average* counts as a violation for every day of that month . . .

.' ") (emphasis added); at 11 (the Court quotes PIRG NJ v. Star Enter., 771 F.

Supp. 655, 668 (D.N.J. 1991), as follows: "'if a defendant has violated a *monthly

average* limitation, it has committed thirty violations'") (emphasis added).

*Extending this ruling to annual averages would be unprecedented—CCH has*

*found no case supporting an extrapolation of one exceedance into a violation on each day of the year.*

In addition to mischaracterizing the Reconsideration Order, plaintiffs cite only Hawaii's Thousand Friends v. CCH, 821 F. Supp. 1368, 1393 (D. Haw. 1993), which likewise involved *monthly* average limits. Friends should not be applied to annual averages for at least two reasons. First, Friends did not involve the situation here—where the defendant is also subject to a daily maximum limit for the same pollutant. 821 F. Supp. at 1377. CCH is also subject to daily maximum limits for dieldrin and chlordane (plaintiffs only allege 93 exceedances of the maximum daily limits for dieldrin and no exceedances of the daily maximum chlordane (see Mtn., 20)). Plaintiffs should not be allowed to invent what in effect would be a *lower* maximum daily limit (applying the average annual limit on a daily basis) than that contained in the Permit (the maximum daily limit) in their quest to hold CCH liable for daily violations under the average annual requirements. See PIRG NJ v. Monsanto, 1988 WL156691, at *11 (D.N.J. March 24, 1988) (because of the penal nature of civil penalties, permit requirements must be "strictly construed"). Friends simply did not invent a *new and lower* daily limit *different* than what was already in the permit. Rather, it treated the monthly average limit *as set forth in the permit* as 30 separate daily limits, each of which was exceeded. See 821 F. Supp. at 1394.

28

Second, <u>Friends</u> does not address the significant "inflation factor" involved with annual average violations—36,500%.  Given the ambiguity in the Permit, the lack of law on point, and the serious implications of inflating CCH's liability by 36,500%, the Court should decline to count one exceedance as 365 violations.  <u>See</u> <u>Allegheny</u>, 366 F.3d at 188 ("Given the opaqueness of the statute and the consequent muddle that we have described [regarding inflation of a single exceedance into multiple violations of the CWA], we urge either that the Congress amend the statute to clarify its intentions or that the EPA consider the matter and, after notice and comment, promulgate regulations that will give more guidance"); <u>accord</u> <u>Atl. States Legal Found., Inc. v. Tyson Foods, Inc.</u>, 897 F.2d 1128, 1137 (11th Cir. 1990) (CWA section 309(d) "is not a model of clarity").  Thus, plaintiffs' Motion should be denied.

ii.    <u>Plaintiffs' Position Would Result in<br>Double-Counting</u>

Additionally, plaintiffs' inflation factor would result in impermissible double-counting, which the Court was careful to avoid in its Reconsideration Order.  <u>See</u> Chun, Exh. C, 16.  If each day counts as a separate violation under the *annual* average limit for dieldrin, redundant violations occur if a second violation is assessed based on the daily limit.  Thus, plaintiffs' Motion should be denied. <u>See</u> <u>Tyson</u>, 897 F.2d at 1140; <u>Friends</u>, 821 F. Supp. at 1394.

iii.    <u>Plaintiffs' Counting Methodology Is Incorrect</u>

<u>Each monthly sample taken should count as only one violation</u>.  Each of the four annual average limitations are sampled once a month.  Concise Statement, Exh. 3,22928.  Each monthly sample is then averaged with the samples taken in the prior 11 months to generate the annual average.  Tanimoto, ¶12.  Each month generates a new annual average because the annual averages are calculated on a rolling basis (*e.g.*, the September 2000 sample, averaged with the eleven prior monthly samples, generates the annual average for October 1999-September 2000).  <u>Id.</u>  Thus, each month's sampling which results in an exceedance of an annual average over the past twelve-month period should fairly be considered one violation of that annual average.

<u>Plaintiffs incorrectly argue that annual average violations date back to May 1999</u>.  Mtn., 19.  The Permit became effective in November 1998.  Accordingly, prior to that time there simply was no annual average data (*i.e.*, 12 monthly samples) collected *under* the Permit to calculate an annual average.  Tanimoto, ¶12.  Consequently, no violations of the annual average effluent limitations were possible prior to October 1999.

For these reasons, a question of fact exists as to the number of violations and plaintiffs' Motion should be denied.  <u>See</u> <u>Celotex</u>, 477 U.S. at 322.

3.    Plaintiffs Have Not Established That CCH Violated
The Permit's Dieldrin Maximum Daily Limit

Based on only 3 exceedances of dieldrin daily maximum limits,

plaintiffs infer 93 violations of the dieldrin daily maximum limit.  Plaintiffs fail to

meet their burden for a least four reasons.

a.    The New Evidence Demonstrates That
Dieldrin Is Not Present In The Effluent

As an initial matter, as discussed in detail in Section II.D.1 above,

more sensitive testing methodology demonstrates that dieldrin may not be present

in the effluent.  Tanimoto, ¶¶8-10.  At the very least, this information calls into

question the reliability of the DMRs and raises a genuine issue of material fact.

Accordingly, plaintiffs' Motion should be denied.  See Celotex, 477 U.S. at 322.

b.    Plaintiffs Mischaracterize The
Reconsideration Order

Plaintiffs wrongly assert that the Reconsideration Order "established

that CCH violated the Sand Island Permit's: (a) daily maximum mass limit for

dieldrin on 62 days; and (b) daily maximum concentration limit for dieldrin on 31

days." Mtn., 20.  In fact, the Reconsideration Order is *silent* on the issue of daily

maximum dieldrin limitations.[13]  As explained above, the Court expressly found

that "a violation of a monthly average will be counted as a violation of every day

_____

[13] In particular, the Reconsideration Order did not address whether plaintiffs could
infer 90 violations based on 3 exceedances.

31

of the month." Chun, Exh. C,11. It did not find a violation of a *daily* maximum

limitation should be counted as a violation of *every day* of the month. Further, the

Court declined to assess any violations "until after all possible violations have been

conclusively established as to each count in the complaint." Id.,16. Because this

issue was not addressed in the Reconsideration Order, the Court's September 30

Order, which denied plaintiffs' Prior Motion in full, remains law of the case and

prevents plaintiffs from seeking liability based on these alleged violations.

c.    Plaintiffs Do Not Provide Evidence

Plaintiffs fail to submit *any evidence* that CCH violated the dieldrin

daily maximum limit. Plaintiffs simply cannot establish liability based on bare

assertions without submitting any evidence backing it up. Thus, a question of fact

exists, and plaintiffs' Motion should be denied. See Celotex, 477 U.S. at 322.

d.    Plaintiffs Provide No Legal Authority For
Inflation Of Violations

To find for plaintiffs, the Court must necessarily infer daily violations

based on sampling events that never occurred and were not required.[14] This

---

[14] Section 308 of the CWA vests EPA with discretion to determine the frequency
with which the holder of an NPDES permit must sample effluent. 33 U.S.C.
§1318(a)(4)(A)(iv). The Sand Island Permit requires dieldrin samples be taken at
least "once/calendar month." Chun, Exh. D,6. Thus, in its discretion, EPA
declined to prescribe a more frequent sampling interval for dieldrin (EPA knows
how to mandate more frequent monitoring intervals when it deems such necessary,
as demonstrated by the Permit's requirement of daily sampling of enterococci (Id.,
5)).

A/72214310.4/2017866-0000309724

approach was flatly rejected in <u>Monsanto</u>, 1988 WL156691, at *11 ("The DMR

can only establish a single violation on the day of the monitored report").

Moreover, inferences cannot be made in plaintiffs' favor as all inferences must be

drawn in favor of the non-moving party.  <u>Adickes</u>, 398 U.S. at 158-59; <u>PIRG NJ v.

Elf Atochem N. Am., Inc.</u>, 817 F. Supp. 1164, 1182 (D.N.J. 1993).  Thus, a

question of fact exists as to the number of violations, and plaintiffs' Motion should

be denied.  <u>See</u> <u>Celotex</u>, 477 U.S. at 322.

>        4.      <u>Plaintiffs Have Not Established BOD And TSS
>                Violations</u>

Plaintiffs vaguely allege 218 violations of monthly average BOD and

TSS limits.[15]  Although the Reconsideration Order held that "a violation of a

monthly average will be counted as a violation of every day of the month[]," the

Court declined to assess *any* violations until "all possible violations have been

conclusively established."  Chun, Exh. C,11,16.  Here, plaintiffs have not provided

*any evidence* of exceedances of monthly average limitations for these constituents

---

[15]  BOD and TSS are mentioned in only 3 places in their moving papers, and then
only perfunctorily: Mtn., 25 (alleging unspecified number of "violations of . . .
BOD and TSS limits"); Sproul, Table 9 (listing the total number of BOD and TSS
violations without providing any evidence of exceedances); Concise Statement,
No.3 ("BOD, TSS, and pesticides can negatively impact the environment and
human health.").  Indeed, plaintiffs do not even mention BOD and TSS in their
Third Claim argument.  <u>See</u> Mtn., 16-20.

and, accordingly, have failed to meet their burden.  Their Motion, therefore, must

be denied.  See Celotex, 477 U.S. at 322.

      D.      Under The Plain Language Of The Reconsideration
              Order, Issues Of Fact Exist As To The Number Of
              Violations Under Plaintiffs' Fourth Claim

In their Motion, plaintiffs seek liability based on CCH's failure to

meet the construction deadlines under the Permit for the Disinfection Facility and

the Hart Street Pump Station.  Mtn., 10-11,21-22.  Plaintiffs have not established

the number of CWA violations for either of these facilities and, as discussed above,

the Court declined to assess any violations.  See Chun, Exh. C,16.  In fact, the

Court made it clear that it does not have "authority to count each day in which the

facility has not been operational as a violation" because evidence may exist

"regarding attempts to meet the scheduling deadline for the disinfection facility or

reasons for its delay."  Id.,13.  Factual issues exist as to both projects; thus, the

Motion should be denied.

      1.     Disinfection Facility

Plaintiffs have not attempted to provide any evidence relating to

CCH's "attempts to meet the scheduling deadline" for the Disinfection Facility or

the "reasons for [the] delay."  See Chun, Exh. C,13.  In fact, as set forth in Section

II.D.2 above, there are numerous reasons for CCH's delay in meeting the

construction deadline, many beyond CCH's control.

34

2.    Hart Street

In their Motion, plaintiffs seek 832 violations based on Hart Street construction deadline.  Mtn., 22.  Plaintiffs' Motion must fail for the reasons below.

a.    The Hart Street Deadline Is Not Enforceable

As set forth in Section II.A.2 above, the Hart Street construction deadline is not legally enforceable.  First, the deadline of February 18, 2005 is *after* the Permit expiration date of November 3, 2003.  Chun, Exh. C, 7.  Second, each of the other four deadlines in the Permit after this expiration are *italicized*—which, according to the terms of the Permit, indicates unenforceable deadlines.  See id., 6.  The *only* exception is the Hart Street construction deadline.  Third, EPA's Response to Comments to the Final Permit indicate (through italicization) that the Hart Street Construction deadline is unenforceable.  Chun, Exh. E, 12.  For these reasons, any indication in the Permit that the Hart Street construction deadline is enforceable is almost certainly a typographical error.  In PIRG NJ v. Yates Indus., 757 F. Supp. 438, 448 (D.N.J. 1991) (denying summary judgment because there was a material issue of fact whether lack of double asterisk in a permit entry was a typographical error:  While it "would certainly be a more logical explanation" if double asterisks were included, "this court does not have enough information to make a decision at the summary judgment stage").  At the very least, the ambiguity

in the Permit creates an issue of fact which must be resolved and requires denial of plaintiffs' Motion.  See Sicor, 51 F.3d at 856.

> b.    Plaintiffs Cannot Seek Hart Street
> Violations Under Their Fourth Claim

Plaintiffs allege 832 violations under their Fourth Claim based on the Hart Street construction deadline.  Mtn., 22.  Plaintiffs' Fourth Claim, however, *does not allege violations based on the Hart Street.*  Sec. Am. Compl., ¶¶94-109 (Docket #55).  In fact, the only place Hart Street is mentioned is in their MDS as to the Eighth Claim ("CCH further failed to complete [Hart Street] by February 18, 2005 as required by the compliance schedule provisions of the Sand Island Permit").  Having failed to raise Hart Street under the Fourth Claim, and having not sought leave to amend their Second Amended Complaint, plaintiffs are precluded from seeking summary judgment for violations of Hart Street under their Fourth Claim.  See, e.g., Ctr. for Bio-Ethical Reform, Inc. v. CCH, 345 F. Supp. 2d 1123, 1138 (D. Haw. 2004) ("plaintiffs must at a minimum allege facts in the pleadings sufficient to place defendants on notice of plaintiffs' claims"); Lawmaster v. Ward, 125 F.3d 1341, 1346 n.2 (10th Cir. 1997) (refusing to consider claim not raised in complaint or before district court on appeal of summary judgment).

c.     Reasons For Delay

Further, as with the Disinfection Facility, plaintiffs have not attempted

to provide any evidence relating to CCH's "attempts to meet the scheduling

deadline" for Hart Street or the "reasons for [the] delay."  See Chun, Exh. C,13.

As set forth fully in Section II.D.2.b above, Hart Street has been in operation since

December 28, 2004, and therefore in substantial compliance with the Permit.  See

Inouye, ¶¶11-15.  Further, there were numerous reasons for delay as described in

the Inouye Declaration.  Thus, a question of fact exists, and plaintiffs' Motion must

be denied.  See Celotex, 477 U.S. at 322.

E.     Plaintiffs Are Not Entitled To Summary Judgment On
       Their Eighth Claim

The 2002 AO "requires CCH to initiate measures to prevent all further

violations of the NPDES permit for Sand Island."  Concise Statement,

Exh.10,25018.  In furtherance of that objective, the AO called upon CCH to submit

various action plans and progress reports.  Id., 25018,25023-25025.  Based on the

AO's requirement to submit plans, plaintiffs allege that each day upon which there

was a permit violation under the Third and Fourth Claims, there was also a

violation of the AO.  See Mtn., 22-25.  Plaintiffs' Motion must be denied for at

least two reasons.

1.    <u>Plaintiffs Mischaracterize The AO</u>

The Motion is refuted by the plain language of the AO.  The AO only required CCH to develop three plans regarding operational and maintenance issues, exceedances of effluent limits, and the permit schedules, which are subject to EPA's approval.  Concise Statement, Exh. 10,25018,25023-25025.  The AO also requires annual progress reports.[16]  <u>Id.</u>  Thus, the AO establishes a compliance *process*, and it is CCH's obligation to adhere to that *process* that is enforceable under CWA §309(d).[17]  Notably absent from the AO is any duplication of the Permit's requirements.  EPA did not need to impose redundant substantive requirements, as those were already in the Permit, which remains effective and enforceable.  Plaintiffs simply have shown no basis for their claim that a violation of the Permit is also a violation of the AO.  Thus, plaintiffs' Motion on the Eighth Claim fails. [18]

---

[16] In accordance with these requirements, CCH submitted an Effluent Limits Action Plan, an Operations & Maintenance Plan and a Compliance Schedule in November 2002.  Tanimoto, ¶7.  CCH revised the plans in May 2003 in response to EPA verbal and written comments.  <u>Id.</u>  In 2004, CCH received and responded to 3 comment letters from EPA.  <u>Id.</u>  CCH submitted annual progress reports in March of 2005, 2006 and 2007.  <u>Id.</u>

[17] As for any argument plaintiffs might make that such reading of the AO would leave EPA powerless to enforce the AO, the AO itself provides for various forms of relief for failure to comply with it.  <u>See</u> Concise Statement, Exh.10,25026.

[18] Plaintiffs cite no legal authority in support of their assertion that a violation of the Permit is also a violation of the AO.  <u>See</u> Mtn., 22-25  In fact, the only legal authority plaintiffs cite in their entire Eighth Claim argument is CWA §505(a)(1)

2.    <u>Plaintiffs May Not Double-Count Violations</u>

As set forth above, the Court declined to assess violations "*until after all possible violations have been conclusively established as to each count in the complaint in order **to avoid any double counting of violations**.*"  Chun, Exh. C, 16 (emphasis added).  Thus, this Court has made it clear that counting multiple violations based on the same event is improper.  <u>See</u> <u>Tyson</u>, 897 F.2d at 1140; <u>Friends</u>, 821 F. Supp. at 1394.

Here, plaintiffs do exactly what the Court ruled they could not—seek redundant liability for the same act.  Thus, even if the Court finds a violation under the Third or Fourth Claim, it cannot also find a concomitant violation of the Eighth Claim.  For this reason, plaintiffs' Motion as to the Eighth Claim fails and should be denied.

V.    <u>CONCLUSION</u>

For the reasons stated above, the Court should deny plaintiffs' Motion in its entirety.

---

(for the proposition that CWA authorizes citizens to enforce AOs issued under CWA).  Mtn., 22.

A/72214310.4/2017866-0000309724

DATED:    Honolulu, Hawaii        Respectfully submitted,
          September 21, 2007

                                  CARRIE OKINAGA
                                  Corporation Counsel


                                  By:  /s/ Maile R. Chun
                                       Maile R. Chun
                                       Attorneys for Defendant
                                       City and County of Honolulu