# EXHIBIT F

DEPARTMENT OF ENVIRONMENTAL SERVICES
# CITY AND COUNTY OF HONOLULU
1000 ULUOHIA STREET, SUITE 308, KAPOLEI, HAWAII 96707
TELELPHONE: (808) 692-5159 ● FAX: (808) 692-5113 ● WEBSITE: http://www.co.honolulu.gov

MUFI HANNEMANN
MAYOR



ERIC S. TAKAMURA, Ph.D., P.E.
DIRECTOR

KENNETH A. SHIMIZU
DEPUTY DIRECTOR

ROSS S. TANIMOTO, P.E.
SECOND DEPUTY DIRECTOR

IN REPLY REFER TO:
DIR 07-037

August 27, 2007

VIA HAND DELIVERY AND ELECTRONIC MAIL

United States Environmental Protection Agency
Region IX, WTR-5
75 Hawthorne Street
San Francisco, California 94105-3901
Attn: Ms. Sara Roser

Subject: City and County of Honolulu Response and Comments to Tentative Decision of the Regional Administrator Pursuant to 40 CFR Part 125, Subpart G Regarding the City and County of Honolulu's Honouliuli Wastewater Treatment Plant Application for a Modified NPDES Permit Under Section 301(h) of the Clean Water Act

Dear Ms. Roser:

The City and County of Honolulu (CCH) hereby submits its response and comments regarding the March 27, 2007 Tentative Decision (TD) of the Regional Administrator Wayne Nastri to deny CCH's Honouliuli Wastewater Treatment Plant (HWWTP) application for a modified NPDES Permit under Section 301(h) of the Clean Water Act (301(h) permit).

In 1991, when EPA issued CCH the 301(h) permit for the HWWTP, EPA found that CCH met each of the nine criteria necessary for issuance of such a "waiver from secondary treatment" permit. The nine criteria have not changed since then. What has happened since 1991 is that (1) the effluent quality from HWWTP has improved, (2) CCH has made significant upgrades to HWWTP, and (3) years of expensive environmental monitoring, done in reliance on EPA's decisions and guidances, confirms CCH is in compliance with the nine criteria. Yet, more than 11 years after CCH's application, instead of affirming its 1991 decision, the EPA has gone 180 degrees in the opposite direction, without technical bases to do so. The TD is not supported by the monitoring data, is inconsistent with the EPA's reasoning in its 1991 decision, and is

**EXHIBIT F**

United States Environmental Protection Agency
Page 2
August 27, 2007

utterly void of evidence that the HWWTP has had a detrimental effect on the environment or caused risk to human health. In summary, the TD appears to be the result of EPA making up its mind in advance, and overreaching for justifications to bolster an arbitrary decision.

    Since taking office in January 2005, Mayor Mufi Hannemann and our City Council have demonstrated CCH's commitment to addressing the needs of our wastewater system; we have committed approximately $1 billion in resources, and raised sewer fees twice. We understand that certain aspects of the collection system in particular need attention, and every day, we are working to address those needs. What we do not intend to do is impose a huge financial burden on our citizens when there is no benefit to their health or to the environment. Requiring secondary treatment at HWWTP, with its deep ocean outfall over which recreational activities are actually prohibited by federal regulation, after years of monitoring that demonstrate no negative impact to the environment, would be arbitrary, and we request that the EPA withdraw its TD and grant the 301(h) waiver for the HWWTP.

    If you have any questions about the attachment or would like to meet to further discuss CCH's application, please feel free to call me at (808) 768-3486.

Very truly yours,

*[signature]*

ERIC S. TAKAMURA, Ph.D., P.E.
Director

EST:mw

Enclosures

# Response and Comments to Tentative Decision of the Regional Administrator Pursuant to 40 CFR Part 125, Subpart G, Regarding the City and County of Honolulu's Honouliuli Wastewater Treatment Plant Application for a Modified NPDES Permit Under Section 301(h) of the Clean Water Act

Submitted to the
**United States Environmental Protection Agency**





Submitted by the
**City and County of Honolulu**



August 27, 2007

# Contents

Executive Summary ........................................................................................................... xiii

I. Introduction ............................................................................................................. I-1
   IA. Section 301(h) and the Nine Statutory 301(h) Waiver Criteria ............................. I-4
   IB. Effluent Quality Is Improved Over That Approved for a Waiver in 1988 ........... I-6
       I.  HWWTP Plant Upgrades .................................................................................. I-6
       II. HWWTP Performance Has Improved Since EPA Approved the
           Waiver in 1988 ................................................................................................... I-7
   IC. Past Bases for 301(h) Waiver Approval Remain True Today ............................... I-8
   ID. Without Basis, EPA Changed Its Approach to Justify a Different Result in
       2007 ......................................................................................................................... I-9
   IE. Constitutional Due Process Requires an Evidentiary Hearing .......................... I-13
   IF. Altered Discharge .................................................................................................. I-13

II. City and County of Honolulu's Detailed Response and Comments to EPA's
    Application of Statutory and Regulatory Criteria ............................................. II-1
    IIA. CWA Criterion 1: Applicable Water Quality Criteria for BOD and
         Turbidity ................................................................................................................ II-1
    IIB. CWA Criterion 1: Attainment of Primary Treatment and Water Quality
         Standards ............................................................................................................... II-1
         I.  Compliance with Primary Treatment Requirements and Attainment
             of Water Quality Standards for BOD and Turbidity ................................... II-1
             A. Primary Treatment Requirements ........................................................... II-1
             B. WQS for BOD and Turbidity ..................................................................... II-2
                1. Dissolved Oxygen ................................................................................. II-2
                2. Turbidity ................................................................................................ II-2
         II. Attainment of Other Water Quality Standards and Criteria ..................... II-2
             A. Appropriate Calculation of Dilution Values ........................................... II-3
                1. Density Profile Data ............................................................................. II-3
                2. Critical Initial Dilution Modeling Results ........................................ II-4
             B. Bacteria ........................................................................................................ II-5
                1. Inappropriate Evaluation of Bacteria Criteria ................................. II-5
                   a. Appropriate Use of Geometric Mean ............................................ II-5
                   b. Appropriate Application of Numeric Criteria for
                      Enterococcus Bacteria ...................................................................... II-5
                2. Evaluation of Criteria at Monitoring Stations ................................. II-5
                   a. Shoreline Stations ............................................................................. II-6
                   b. Nearshore Stations ........................................................................... II-6
                   c. Offshore Stations .............................................................................. II-8
             C. Toxics ........................................................................................................... II-9
                1. Existing Priority Pollutant Results ..................................................... II-9

Case 1:04-cv-00463-DAE-BMK   Document 137-7   Filed 09/21/2007   Page 6 of 17

RESPONSE AND COMMENTS TO TENTATIVE DECISION OF THE REGIONAL ADMINISTRATOR PURSUANT TO 40 CFR PART 125, SUBPART G, REGARDING THE CITY AND COUNTY OF HONOLULU'S HONOULIULI WASTEWATER TREATMENT PLANT APPLICATION FOR A MODIFIED NPDES PERMIT UNDER SECTION 301(h) OF THE CLEAN WATER ACT

|   |   |   |   |   |   |
|---|---|---|---|---|---|
|   |   |   | a. | Fish Consumption WQS | II-10 |
|   |   |   | b. | Chronic Aquatic Marine Life WQS | II-10 |
|   |   | 2. | New Information Regarding Analytical Detection of Pesticides with GC/MS | | II-10 |
|   |   | 3. | Conclusions of WQS Evaluations | | II-11 |
|   | D. | Whole Effluent Toxicity | | | II-12 |
|   |   | 1. | Summary of Urchin WET Test Results from 2002 to 2007 | | II-13 |
|   |   | 2. | Alternative EPA-Approved WET Test Data Evaluation Methods Applied to the WET Tests Conducted by CCH | | II-13 |
|   |   |   | a. | Point Estimation Method for Identifying Toxicity | II-13 |
|   |   |   | b. | Consideration of Biological Relevance | II-15 |
|   |   | 3. | WET Test Data for Alternative Species that EPA Has Not Considered | | II-17 |
|   |   | 4. | Conclusions of WET Evaluations | | II-17 |
|   | E. | Nutrients | | | II-18 |
|   |   | 1. | Ammonia | | II-19 |
|   |   | 2. | Chlorophyll $a$ | | II-19 |
|   |   | 3. | Eutrophication and Algal Growth | | II-19 |
|   |   | 4. | Conclusion Regarding Nutrients | | II-22 |
|   | F. | pH | | | II-22 |
| IIC. | CWA Criterion 2: Protection of Public Water Supplies, BIP, and Recreational Activities | | | | II-22 |
|   | I. | Impact of Discharge on Public Water Supplies | | | II-22 |
|   | II. | Impact of Discharge on Shellfish, Fish, and Wildlife | | | II-22 |
|   |   | A. | Summary of Existing Biological Monitoring Results | | II-23 |
|   |   |   | 1. | Benthic Infaunal Abundance and Diversity | II-24 |
|   |   |   | 2. | Sediment Monitoring | II-24 |
|   |   |   | 3. | Fish Health Metrics | II-25 |
|   |   |   | 4. | Fish Tissue Residue Effects | II-26 |
|   |   |   | 5. | Coral Reef Surveys | II-26 |
|   |   |   | 6. | Nutrient-Related Impacts | II-27 |
|   |   |   | 7. | Water Quality Monitoring Data | II-27 |
|   |   |   | 8. | Whole Effluent Toxicity | II-27 |
|   |   | B. | Weight of Evidence Evaluation | | II-27 |
|   | III. | Impact of Discharge on Recreational Activities | | | II-28 |
|   |   | A. | Fish Consumption Evaluation | | II-29 |
|   |   |   | 1. | Fish Consumption and Fish Tissue Data | II-29 |
|   |   |   | 2. | Fish Consumption and Effluent Quality Data | II-31 |
|   |   |   | 3. | Fish Consumption and Sediment Quality Data | II-31 |
|   |   | B. | Fish Catchment Surveys | | II-31 |
|   |   | C. | Water Contact Recreation | | II-32 |
|   |   | D. | Weight of Evidence Evaluation | | II-32 |
| IID. | CWA Criterion 3: Establishment of a Monitoring Program | | | | II-34 |
| IIE. | CWA Criterion 4: Impact of Modified Discharge on Other Point and Nonpoint Sources | | | | II-37 |

Case 1:04-cv-00463-DAE-BMK   Document 137-7   Filed 09/21/2007   Page 7 of 17

RESPONSE AND COMMENTS TO TENTATIVE DECISION OF THE REGIONAL ADMINISTRATOR PURSUANT TO 40 CFR PART 125, SUBPART G, REGARDING THE CITY AND COUNTY OF HONOLULU'S HONOULIULI WASTEWATER TREATMENT PLANT APPLICATION FOR A MODIFIED NPDES PERMIT UNDER SECTION 301(h) OF THE CLEAN WATER ACT

　　　　IIF.　CWA Criterion 7: Toxics Control ............................................................................ II-37
　　　　IIG.　CWA Criterion 6: Urban Area Pretreatment Program (UAPP) ...................... II-38
　　　　IIH.　CWA Criterion 5 : Industrial User Pretreatment Program ............................... II-39
　　　　　　　I.　The Honolulu Advertiser ............................................................................ II-39
　　　　　　　II.　Pepsi Cola Bottling Group .......................................................................... II-40
　　　　III.　CWA Criterion 8: Increase in Effluent Volume or Amount of Pollutants
　　　　　　　Discharged ............................................................................................................. II-43
　　　　IIJ.　Compliance with Other Applicable Laws .......................................................... II-43
　　　　IIK.　State Determinations and Concurrence .............................................................. II-44

III.　Costs and Financial Capability ...................................................................................... III-1
　　　IIIA.　Legislative and Regulatory Intent ........................................................................ III-1
　　　IIIB.　Holistic Perspective .................................................................................................. III-1
　　　　　　　I.　Financial Risks ............................................................................................... III-2
　　　　　　　II.　Economic Risks ............................................................................................. III-3
　　　　　　　III.　Social/Environmental Justice Risks ........................................................... III-4
　　　IIIC.　Investment Prioritization ........................................................................................ III-4
　　　IIID.　Demonstrated Commitment .................................................................................. III-5
　　　IIIE.　Summary ..................................................................................................................... III-6

IV.　Conclusion ............................................................................................................................ IV-1

Tables

IIB-1　Chlordane and Dieldrin Concentrations Exceeding WQS-based Effluent Limits for Fish Consumption

IIB-2　Sea Urchin (*Tripneustes gratilla*) WET Test Results from 164 Test Events Generated Over the Period of January 6, 2002, Through April 11, 2007

IIB-3　Summary of Chronic Test Results (TUc) for Alternate Species Mysid Shrimp *Mysidopsis bahia* and the Sheepshead Minnow *Cyprinodon variegatus*

IIB-4　Comparison of Results for Hypothesis Test and IC25 Statistical Methods for Identifying Toxicity in the HWWTP Effluent

IIC-1　Summary of Available Tissue Residues Versus Effects Data

IIC-2　Summary of Literature Sources for Available Fish Tissue Residue Versus Effects Data

IIC-3　Results of the Fish Tissue Screening with Human Health Risk-Based Concentrations

IID-1　Summary of Monitoring Requirements Included in the NPDES Permit

IIF-1　Potential Source of Priority Pollutants

Case 1:04-cv-00463-DAE-BMK    Document 137-7    Filed 09/21/2007    Page 8 of 17

RESPONSE AND COMMENTS TO TENTATIVE DECISION OF THE REGIONAL ADMINISTRATOR PURSUANT TO 40 CFR PART 125, SUBPART G,
REGARDING THE CITY AND COUNTY OF HONOLULU'S HONOULIULI WASTEWATER TREATMENT PLANT APPLICATION FOR A MODIFIED NPDES PERMIT
UNDER SECTION 301(h) OF THE CLEAN WATER ACT

**Figures**

IIB-1   30 August 2000 Profiles

IIB-2   Cumulative Frequency Distribution

IIB-3   Location of the HWWTP Outfall in Relation to the Restricted Area (as Defined by 33 CFR 334.1360)

IIB-4   Comparison of GC/MS and GC/ECD Results for Dieldrin

IIB-5   Comparison of GC/MS and GC/ECD Results for Technical Chlordane

IIB-6   Honouliuli TUc Results for 2002–2007 Sea Urchin Tests, Using Hypothesis Testing Method

IIB-7   Comparison of Permit TUc and IC25 TUc Methods for 2002–2007 Sea Urchin Tests

IIB-8   Fertilization Rates Reported at the LOEC Over the 5-Year Period 2002–2007

IIB-9   Distribution of Reported LOECs with Fertilization Rates Above 70 Percent

**Appendix**

A   Brock, R.E. May 2006. *Analysis of the Fish Communities Along the Barbers Point Ocean Outfall, 'Ewa Beach, O'ahu, Hawai'i, Using Remote Video – 2006 Data*. Prepared for: Water Resources Research Center (WRRC). University of Hawaii at Manoa.

B   CH2M HILL Applied Sciences Laboratory. March 29, 2007. *Bioassay Report Chronic Bioassays Conducted March 6 through 13, 2007*.

C   CH2M HILL Applied Sciences Laboratory. July 6, 2007. *Bioassay Report Chronic Bioassays Conducted June 19 through 26, 2007*.

D   CH2M HILL Applied Sciences Laboratory. July 25, 2007. *Bioassay Report Chronic Bioassays Conducted July 17 through 24, 2007*.

E   CH2M HILL Applied Sciences Laboratory. August 7, 2007. Technical Memorandum on Organochlorine Pesticide Analysis by Large Volume Injection Gas Chromatography with Mass Spectrometric Detection Operating in Selected Ion Monitoring Mode.

F   City and County of Honolulu (in CD form). Data obtained from CCH:
  - Bacteria and Nutrient Data
  - BOD and TSS Data
  - Fish Tissue Data
  - Sediment Data
  - Priority Pollutant and Pesticide Data

# I. Introduction

On March 27, 2007, the United States Environmental Protection Agency (EPA), Region 9, issued its Tentative Decision of the Regional Administrator Pursuant to 40 CFR Part 125, Subpart G Regarding the City and County of Honolulu's Honouliuli Wastewater Treatment Plant Application for a Modified NPDES Permit Under Section 301(h) of the Clean Water Act (Tentative Decision or TD). This Tentative Decision tentatively denied the City and County of Honolulu's (CCH) reapplication for a modified National Pollutant Discharge Elimination System (NPDES) permit for the Honouliuli Wastewater Treatment Plant (HWWTP) under Section 301(h) of the Clean Water Act (CWA or the Act). The Tentative Decision was issued 13 years after the permit went into effect on December 16, 1993, at which time CCH began a comprehensive and EPA-sanctioned Section 301(h) monitoring program. EPA's initial position supporting the Section 301(h) waiver for the HWWTP was set forth in an April 4, 1988, Tentative Decision. The 2007 Tentative Decision comes more than 11 years after CCH initially timely submitted a reapplication under 40 *Code of Federal Regulations* (CFR) 122.6 on December 1, 1995.

This Response and Comments, submitted under 40 CFR 124.11, provides an evaluation of the negative TD in light of the Section 301(h) waiver criteria and standards for review governing EPA's decision making under the Act, and the relevant regulations under 40 CFR Part 124 and Part 125, Subpart G. The evaluation also considers EPA's approach to evaluating the waiver criteria as set forth in the 1988 TD. Finally, this Response and Comments considers the overall impacts of the Honouliuli discharge on the marine environment as evidenced by 13 years of sampling conducted under the Section 301(h) monitoring program, which was established by EPA "to provide data to demonstrate compliance with the applicable water quality standards and 301(h) criteria, to evaluate the impact of the Honouliuli discharge on the marine biota, and to measure toxic substances in the discharge" (HWWTP NPDES Permit, page 6). Based on these data, EPA must "assess whether the Section 301(h) modified permit should be terminated or renewed and determine compliance with applicable Federal and Hawaii water quality standards." (HWWTP NPDES Permit, page 6). This Response and Comments contains all issues reasonably ascertainable by CCH as of the date of this submittal.

As set forth in this Response and Comments, EPA's tentative conclusions are not supported by the Section 301(h) monitoring data, and are often arbitrary, conclusory, speculative, or not rationally related to the waiver criteria. As shown herein, CCH's Section 301(h) monitoring data demonstrate that CCH has complied with applicable water quality standards, has maintained a balanced indigenous population of fish and wildlife in the vicinity of the outfall, has prevented toxics from negatively affecting marine biota or human health, and has otherwise met all of the Section 301(h) criteria. Indeed, the TD is devoid of evidence that the HWWTP has had a detrimental effect on the environment or caused risk to human health. Further, rather than conducting an objective and holistic evaluation of overall ocean conditions and the actual impacts of the HWWTP discharge, EPA improperly works backwards from its TD — to deny the waiver — and "cherry picks" from the

Case 1:04-cv-00463-DAE-BMK   Document 137-7   Filed 09/21/2007   Page 10 of 17

RESPONSE AND COMMENTS TO TENTATIVE DECISION OF THE REGIONAL ADMINISTRATOR PURSUANT TO 40 CFR PART 125, SUBPART G, REGARDING THE CITY AND COUNTY OF HONOLULU'S HONOULIULI WASTEWATER TREATMENT PLANT APPLICATION FOR A MODIFIED NPDES PERMIT UNDER SECTION 301(h) OF THE CLEAN WATER ACT

voluminous monitoring data to support its tentative conclusions. As a result of this approach, the TD is arbitrary, unjustified, and improper for the following reasons.

<u>EPA's approach imposes an unjustified burden on CCH, which has limited resources, and is contrary to public policy.</u> At great expense, CCH has been diligently monitoring the effects of its discharge under EPA's 301(h) monitoring program for the last 13 years, with the expectation that its reapplication for continuation of its waiver would receive a fair review by EPA in light of the monitoring data provided. On the basis of the monitoring data and the other information submitted by CCH in the reapplication process, CCH meets the 301(h) criteria. Just as important, however, the monitoring data also make clear that *secondary treatment will not provide any environmental benefits to the citizens of Oahu*. As EPA is aware, CCH is committed to continuing and completing pressing improvements that will provide real-world environmental benefits, including more than $1 billion in upgrades to its collection system and force mains. By "cherry picking" selected data in an attempt to justify a rescission of the waiver after 13 years of monitoring that clearly indicate no harm, EPA pays only lip service to its regulations and the 301(h) criteria to achieve its predetermined outcome. This approach is arbitrary and conclusory, and is in contravention of Congress' public policy intent in establishing the 301(h) program: i.e., the prevention of "treatment for treatment's sake, involving the expenditure of funds which could better be used to achieve additional water quality benefits elsewhere" (H.R. Rep. No. 97-270, at 28 (1981), reprinted in 1981 U.S.C.C.A.N. 2629, 2646).

<u>EPA's approach is inconsistent with its 1988 TD.</u> EPA's 1988 and 2007 TDs reach opposite conclusions based on similar facts. In both documents, EPA found that the discharge had no detrimental impacts to the marine environment or risk to human health in both documents. In 1998, EPA found:

> "Thus, on the basis of the information currently available, EPA Region 9 does not expect that the proposed altered discharge will adversely impact the marine benthic community found in the vicinity of the outfall."

The monitoring data have confirmed this conclusion. In 2007, EPA recognizes:

> "In general, diversity and evenness were similar across all stations. Further, there is no indication of a marked alteration in the benthic community in terms of species composition. Responses of the benthic community and sediment analysis provided no indication of the types of changes expected in the benthic community associated with organic enrichment."

Yet EPA goes on to find in its 2007 TD that the monitoring data indicate that the discharge may be harming the balanced, indigenous population and associated recreational uses and utilizes these findings as a part of its flawed rationale to support its negative decision. The arbitrary nature of EPA's approach in the 2007 TD is further highlighted if one compares the "quality" of the discharge in 1988 with the "quality" of the discharge in 2007. EPA's 2007 TD, for example, does not consider the fact that more than 25 percent of the HWWTP effluent receives secondary and more advanced treatment—a fact not true in 1988, when the quality of the effluent nevertheless supported the granting of a waiver. In 2007, however, while the discharge to the ocean overall is improved, EPA arbitrarily tentatively denied the waiver application.

Case 1:04-cv-00463-DAE-BMK   Document 137-7   Filed 09/21/2007   Page 11 of 17

RESPONSE AND COMMENTS TO TENTATIVE DECISION OF THE REGIONAL ADMINISTRATOR PURSUANT TO 40 CFR PART 125, SUBPART G, REGARDING THE CITY AND COUNTY OF HONOLULU'S HONOULIULI WASTEWATER TREATMENT PLANT APPLICATION FOR A MODIFIED NPDES PERMIT UNDER SECTION 301(h) OF THE CLEAN WATER ACT

Further, EPA established the 301(h) monitoring program to evaluate whether the discharge would comply with water quality standards and whether the waiver would affect marine biota—and thereby validate its judgment in issuing the 1988 TD and the permit ("*the monitoring program will be required to confirm this prediction*" [1988 TD, page 41]). Now, in contrast, EPA downplays the lack of actual harm and instead relies on "potential" impacts. EPA's contradictory approach again evidences that the 2007 TD is speculative, conclusory, arbitrary, and not rationally based on monitoring program data.

<u>EPA's 2007 TD is inconsistent with relevant data and not supported by the Administrative Record.</u> Rather than basing its decision on more than 13 years of data and actual impacts, EPA relies heavily on "potential" alleged impacts to human health or the environment that are not rationally based on the entire scope of the monitoring data cited. For example, EPA acknowledges the lack of a real world impact within the Zone of Initial Dilution (ZID):

> "*Video recording of fish near the length of the diffuser revealed a diverse community. Internal and external assessments of fish caught near the outfall did not indicate signs of disease. There is no indication of any marked alteration of the benthic community composition related to the outfall. There were no reports of algae blooms in the ZID.*
> 
> *As described in the preceding section, EPA's analysis is that the discharge may have stimulated algae blooms beyond the ZID and that the proposed discharge could contribute to algae blooms. If these blooms were to occur, it is likely that the area within the ZID would be affected as well. EPA does not, however, consider it likely that the proposed discharge would cause algae blooms so severe that they should be characterized as extreme adverse biological impacts.*"

Despite these findings,

> "*EPA concludes that the applicant has failed to demonstrate to the satisfaction of EPA that a modified discharge would not interfere with the attainment or maintenance of that water quality which assures protection of a balanced, indigenous population of shellfish, fish, and wildlife.*"

These "potential" impacts have no basis in fact, and EPA clearly is overreaching in an attempt to justify its desired outcome. For example, EPA's 301(h) monitoring program has shown that there are no elevated levels of pesticides in tissue collected from fish in the vicinity of the outfall and that metals in fish tissues collected from this vicinity are equal to or lower than levels found in reference stations.

Further, EPA acknowledges in its TD that, in the 13 years since the monitoring program was established, there have been *no exceedances* of state and federal bacteria standards at nearshore or shoreline waters that are the result of discharge from the HWWTP outfall, which occurs approximately 1.7 miles offshore. At the same time, EPA has failed to show that there are direct-contact recreational water users in the vicinity of the outfall, i.e., where it alleges violations of bacterial standards, and does not acknowledge that recreation in the vicinity of the outfall is in fact prohibited by federal regulations (33 CFR 334.1360—Danger Zone and Restricted Area Regulations).

Case 1:04-cv-00463-DAE-BMK   Document 137-7   Filed 09/21/2007   Page 12 of 17

RESPONSE AND COMMENTS TO TENTATIVE DECISION OF THE REGIONAL ADMINISTRATOR PURSUANT TO 40 CFR PART 125, SUBPART G,
REGARDING THE CITY AND COUNTY OF HONOLULU'S HONOULIULI WASTEWATER TREATMENT PLANT APPLICATION FOR A MODIFIED NPDES PERMIT
UNDER SECTION 301(h) OF THE CLEAN WATER ACT

Finally, EPA's heavy reliance on whole effluent toxicity (WET) test results is misplaced, given the following:

- There is no evidence supporting the actual presence or accumulation of toxicity in fish or sediment.

- The EPA-approved sensitive species tested (*Ceriodaphnia dubia*) consistently passes the toxicity evaluations.

- The second species and test protocol used (an indigenous sea urchin with draft protocols that are much more likely to produce adverse results than other EPA-approved protocols for urchin tests) is not an EPA-approved WET test species.

- Under the permit, the WET test results are designed to determine whether further investigation is necessary to evaluate whether toxic compounds are being discharged at unacceptable concentrations.

- The WET test evaluation technique (statistical hypothesis testing) used by EPA to draw its negative conclusions is contradicted by EPA's own guidance in the 1991 *Technical Support Document for Water Quality-Based Toxics Control* (TSD) and several subsequent and much more recent CFR publications.

<u>This Response and Comments raises substantial new questions, and the comments raised herein are significant.</u> The issues raised herein are "substantial" within the meaning of 40 CFR 124.14 and "significant" under 40 CFR 124.17. For example, more sensitive testing methodology demonstrates that EPA's basis for concluding that dieldrin and chlordane are present in the discharge is unreliable and, in fact, CCH provides evidence herein that dieldrin is *not present* in the discharge and chlordane — to the extent that it is present — is present at *far lower concentrations* than those cited and relied on by EPA in reaching its negative TD. Similarly, as demonstrated in this document, EPA relies solely on an inappropriate method (statistical hypothesis testing) to evaluate the sea urchin WET tests and ignores EPA-recommended methods of interpretation, such as 25 percent inhibition concentration (IC25) and biological significance, which are being used in other EPA regions. When appropriate interpretation methods are considered, along with new information presented herein, it is clear that EPA's heavy reliance on the reported WET test interpretations is based more on its determination to find support for its desired outcome than to conduct an unbiased evaluation of actual toxic impacts.

On the basis of these and the other substantial new questions and significant issues raised herein, EPA should rescind and reconsider its TD, which clearly is not justified based on a fair and objective review of the waiver criteria and the 301(h) monitoring data. At the very least, EPA is required under its own regulations to respond to these and other significant issues and substantial questions, and to reopen the public comment period.

## IA. Section 301(h) and the Nine Statutory 301(h) Waiver Criteria

Congress amended the CWA in 1977 by adding Section 301(h), giving EPA authority to issue modified NPDES permits for primary treatment by publicly owned treatment works

Case 1:04-cv-00463-DAE-BMK     Document 137-7     Filed 09/21/2007     Page 13 of 17

RESPONSE AND COMMENTS TO TENTATIVE DECISION OF THE REGIONAL ADMINISTRATOR PURSUANT TO 40 CFR PART 125, SUBPART G,
REGARDING THE CITY AND COUNTY OF HONOLULU'S HONOULIULI WASTEWATER TREATMENT PLANT APPLICATION FOR A MODIFIED NPDES PERMIT
UNDER SECTION 301(h) OF THE CLEAN WATER ACT

### C.  Toxics

In its TD, EPA stated the following:

> "The Honouliuli discharge contains concentrations of chlordane and dieldrin that exceed water quality standards. These standards were established to protect human health from ingestion of carcinogens through fish consumption. Based on three 24-hour composite samples, the discharge meets all other water quality standards for toxic pollutants and pesticides. The proposed discharge is of a lower quality than the current discharge. Therefore, EPA concludes that the proposed discharge, at a minimum, will not comply with water quality standards for chlordane and dieldrin."

As noted earlier, CCH is withdrawing its request for an altered discharge. Therefore, there is no longer any reason for EPA to conclude that the proposed discharge would be any different from the current discharge.

The EPA assessment and conclusions concerning toxic compounds are addressed in this section. An overview of the effluent priority pollutant results as reported by CCH over the last 5 years is provided. Concentrations of pesticides that have been noted by EPA as exceeding WQS are reinterpreted in light of new information generated using a more sensitive and definitive analytical method than that used to report concentrations in the past under the requirements of the EPA-approved 301(h) effluent monitoring program. This new information is based on the results of GC/MS analyses that indicate the absence of dieldrin and much lower levels of chlordane than reported in the results of historical monitoring.

### 1.  Existing Priority Pollutant Results

State of Hawaii guidance in HAR 11-54-4(b)(3) specifies WQS that are to be met for discharges to waters of the State. CCH has monitored the HWWTP effluent for priority pollutants since 1986. The current NPDES permit specifies monitoring once per year, using a 24-hour composite sample. These analyses have included more than 160 target analytes on the EPA priority pollutant list. The available database of priority pollutant data spans the period from September 1986 to January 2007. A total of 4,483 analytical records are in the effluent database (and a similar number of records exist for the influent). Annual priority pollutant and pesticide data are available since 2004 on the primary clarifier effluent at the HWWTP.

The evaluation in this Response and Comments is limited to a 5-year period between February 20, 2002, and January 17, 2007, consistent with the regulatory NPDES permitting cycle. Constituents detected in effluent over this period were compared with the WQS, using EPA's unrealistically low calculated Average Dilution Coefficient (ADC) of 412 for consumption of fish containing carcinogens, and an unrealistically low Minimum Dilution Coefficient (MDC) of 118 for consumption of fish containing noncarcinogens, and for protection of marine chronic aquatic toxicity. For the purposes of this evaluation, a correction was made for a 10-fold error inherent in the water quality criteria (WQC) reported in HAR 11-54-4(b)(3) for chlordane (as EPA recognizes, corrected value is 0.00016 micrograms per liter [µg/L]).

Case 1:04-cv-00463-DAE-BMK   Document 137-7   Filed 09/21/2007   Page 14 of 17

RESPONSE AND COMMENTS TO TENTATIVE DECISION OF THE REGIONAL ADMINISTRATOR PURSUANT TO 40 CFR PART 125, SUBPART G, REGARDING THE CITY AND COUNTY OF HONOLULU'S HONOULIULI WASTEWATER TREATMENT PLANT APPLICATION FOR A MODIFIED NPDES PERMIT UNDER SECTION 301(h) OF THE CLEAN WATER ACT

### a. Fish Consumption WQS

Table IIB-1 provides a summary of the detected concentrations of chlordane and dieldrin that have exceeded WQS-based effluent limits for fish consumption (sorted by factor of exceedance). The results indicate that, out of 1,090 analytical records since 2002, fish consumption-based effluent limits were exceeded only 11 times. There were six detections of dieldrin that exceeded the WQS (by up to 5.3-fold), four detections of chlordane that exceeded the WQS (by up to 3.2-fold), and a single detection of 4,4'-DDT that exceeded the WQS (by 59-fold; this is considered an analytical outlier in the database and is not listed on the table). It should be noted that, when using the most current EPA *National Recommended Water Quality Criteria* (which include the most current toxicity factors and regulatory defaults for fish consumption, etc.), there were only two detections of dieldrin that exceeded the WQS (by up to 2.5-fold), a single detection of 4,4'-DDT that exceeded the WQS (by 2.2-fold), and no exceedances of chlordane over the 5-year period.

CCH has evidence showing that these exceedances for pesticides are likely false positives due to the analytical method used, as discussed below.

### b. Chronic Aquatic Marine Life WQS

A comparison of the effluent priority pollutant data with chronic WQS protective of marine aquatic organisms indicates that, over the entire course of the analytical record since 1986 (approximately 20 years), there has been only a single exceedance of WQS, for 4,4'-DDT by only 1.7-fold, in January 2007. It is believed that this anomalous exceedance is likely a false positive due to the analytical method used, as discussed in the next subsection. These results provide a strong line of evidence that the effluent is not interfering with the protection and propagation of a BIP of fish, shellfish, and wildlife, supporting the conclusions of the WET test evaluation (the CCH WET test evaluation is provided in Section IIB.II.D) and the many years of marine biological community monitoring around the outfall.

### 2. New Information Regarding Analytical Detection of Pesticides with GC/MS

The compliance limits for pesticides, as outlined in HAR 11-54-4(b)(3), are inherently very low due to the conservative assumptions used for their derivation. These include assumptions regarding the extent and rate of bioaccumulation in fish, assumed fish consumption rates that are three times the national average, assumed daily frequency of fish ingestion, and a target of one in one million excess cancer risk. It should be noted that these WQS are currently under revision by HDOH to potentially address outdated assumptions.

Given these conservative assumptions, the WQS for several pesticides are at levels below or very near the levels of detection using the standard analytical techniques specified in the EPA-approved 301(h) monitoring program (EPA Method 608) that uses gas chromatography with an electron capture detector (GC/ECD). Moreover, the matrix characteristics typical of municipal wastewater (that is, co-occurrence of many interfering constituents such as fats and proteins) make it difficult for standard analytical methods to provide reliable results for pesticides such as chlordane, dieldrin, and DDT. To overcome these deficiencies, a GC/MS method (EPA Method SW8270SIM) was used to provide more sensitivity and, more important, better selectivity of analytical response for the individual parameters that are of concern to EPA. A white paper describing the advantages of using GC/MS and the associated quality assurance and quality control (QA/QC) methods is provided in the Appendix.

Case 1:04-cv-00463-DAE-BMK   Document 137-7   Filed 09/21/2007   Page 15 of 17

RESPONSE AND COMMENTS TO TENTATIVE DECISION OF THE REGIONAL ADMINISTRATOR PURSUANT TO 40 CFR PART 125, SUBPART G, REGARDING THE CITY AND COUNTY OF HONOLULU'S HONOULIULI WASTEWATER TREATMENT PLANT APPLICATION FOR A MODIFIED NPDES PERMIT UNDER SECTION 301(h) OF THE CLEAN WATER ACT

To test the benefit of using GC/MS versus the conventional GC/ECD, split samples were analyzed using each method. A total of 12 split samples were analyzed (six from the HWWTP and six from the Sand Island WWTP) from April 24 to May 5, 2007. The GC/MS samples were analyzed by the CH2M HILL Applied Sciences Laboratory (an EPA-certified laboratory), and the GC/ECD samples were analyzed by CCH using its normal compliance testing analytical protocol. The laboratory analytical reports, and associated QA/QC documentation, are provided in the Appendix.

Figures IIB-4 and IIB-5 show the comparison of the GC/MS and GC/ECD results for dieldrin and technical chlordane, respectively. As shown in Figure IIB-4, dieldrin was not detected using GC/MS at a detection limit of 0.002 µg/L, well below the effluent limit of 0.01 µg/L. However, the corresponding GC/ECD results showed dieldrin detections over an order of magnitude higher, up to 0.029 µg/L, and well above the effluent limit of 0.01 µg/L. For chlordane (Figure IIB-5), detected levels using GC/MS were 20 to 70 percent lower than the levels detected using GC/ECD. However, none of the levels detected during this sampling event was above the effluent limits. The GC/MS detection limits for both dieldrin and chlordane were half the values reported for GC/ECD. Although not analyzed by CCH during this study, preliminary results indicate that DDT was not detected using GC/MS in any of the 12 samples at a detection limit of 0.002 µg/L, below the effluent limit of 0.0033 µg/L.

These results indicate that a more appropriate conclusion concerning pesticides in the HWWTP effluent is that there is a considerable likelihood that those constituents noted by EPA as exceeding WQS are false positives. During this comparative testing series, dieldrin and DDT appeared to be absent from the effluent, and chlordane was detected at substantially lower levels using GC/MS. CCH will continue to evaluate the correspondence of results between GC/MS and GC/ECD to further support a recommendation for the most appropriate analytical protocol for pesticides in the next NPDES permit.

It is important to note that these results do not question the quality of laboratory performance conducted by CCH during its compliance monitoring; rather, they reflect only the limitations inherent within the conventional EPA-approved analytical methods themselves, relative to the very low compliance limits for the HWWTP.

### 3.  Conclusions of WQS Evaluations

The analytical methods for pesticides specified by EPA in the HWWTP permit led to the reporting of probable false positives. This, in turn, has led EPA to reach a mistaken conclusion concerning the potential for adverse effects of pesticides on human health and maintenance of a BIP beyond the ZID boundary. It is noted that EPA has reached this conclusion in contradiction to years of evidence from the marine monitoring program that indicates that the pesticides of concern are not bioaccumulating in the target species that are specified in the permit. Therefore, alleged priority pollutant exceedances do not provide a justification for denial of CCH's waiver application and, in light of this information, EPA's tentative conclusion should be reconsidered.



Figure IIB-4  Comparison of GC/MS and GC/ECD Results for Dieldrin

**Figure IIB-5 Comparison of GC/MS and GC/ECD Results for Technical Chlordane**

Cross-hatched bars represent non-detects at specified detection limit