CARRIE OKINAGA, 5958
Corporation Counsel
MAILE R. CHUN, 4906
Deputy Corporation Counsel
City and County of Honolulu
530 South King Street, Room 110
Honolulu, Hawaii 96813
Telephone: (808) 527-5351
Facsimile: (808) 523-4583
Email: mchun@co.honolulu.hi.us

BINGHAM McCUTCHEN LLP
JAMES J. DRAGNA (CA SBN 91492)
NANCY M. WILMS (CA SBN 111837)
BRYAN K. BROWN (CA SBN 192924)
355 South Grand Avenue, Suite 4400
Los Angeles, CA 90071-3106
Telephone: (213) 680-6400
Facsimile: (213) 680-6499
Email: nancy.wilms@bingham.com

Attorneys for Defendant:
CITY AND COUNTY OF
HONOLULU

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| SIERRA CLUB, HAWAI'I CHAPTER; HAWAI'I'S THOUSAND FRIENDS; and OUR CHILDREN'S EARTH FOUNDATION,<br><br>Plaintiffs,<br><br>v.<br><br>CITY AND COUNTY OF HONOLULU,<br><br>Defendant. | CIVIL NO. CV 04-00463 DAE-BMK<br><br>**DECLARATION OF GUY M. INOUYE IN SUPPORT OF DEFENDANT CITY AND COUNTY OF HONOLULU'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' THIRD, FOURTH, AND EIGHTH CLAIMS**<br><br>Date: October 9, 2007<br>Time: 10:30 a.m.<br>Judge: Hon. David E. Ezra |

## DECLARATION OF GUY M. INOUYE

I, Guy M. Inouye, P.E., declare as follows:

1. I have personal knowledge of the following facts and would testify competently thereto if called as a witness.

2. I am employed by the City and County of Honolulu ("CCH"), Dept. of Design and Construction. My job title is Wastewater Branch Engineer. I am responsible for the design of CCH wastewater facilities (including the Sand Island Wastewater Treatment Plant), including collection systems, pump stations, force mains, treatment plants and disposal methods. I have been in this position for approximately 11 years.

### UV Disinfection Facility

3. The Sand Island Permit-required scope of the Ultraviolet ("UV") Disinfection Facility project is to investigate and determine appropriate disinfection technology, and design, construct, and operate continuously for one year an effluent disinfection facility that achieves effective effluent disinfection.

4. During the preliminary engineering (planning) phase, it was determined that, in order to be effective, the scope of the project had to be significantly increased from that originally stated in the Permit. Instead of installing UV equipment within the existing effluent pump station, as originally intended, a new effluent pump station to include new effluent screens, UV

equipment channels, effluent pumps and wet well, power substation, and large diameter yard piping was required. The construction cost of the facility increased from $20M to $83.5M. CCH discussed these improvements with EPA, and then proposed that the Permit be modified to reflect new dates for award of construction contract and commencement of UV operation.

5. The contract was awarded to Robison Construction, Inc. ("RCI") on May 1, 2001. Based upon contract performance periods, beneficial use of the new Disinfection Facility was expected by July 2, 2003. CCH intended to meet the proposed start of UV operation by August 2, 2003.

6. A separate contract was awarded to Sumitomo Corporation of America ("Sumitomo") in August 2000 for the manufacturing, furnishing and delivery of the effluent pumping systems. Because of the long lead time in manufacturing the effluent pumping systems, the Sumitomo contract was procured prior to the award of the construction contract to RCI. The Sumitomo contract had two phases: Phase I consisted of the design of the four effluent pumping systems; Phase II consisted of the manufacture and delivery of the four effluent pumping systems and special services.

7. Included in both the RCI contract and the Sumitomo contract was the provision that the Sumitomo contract will be assigned to the construction contractor (that is, RCI). The Sumitomo contract was to be assigned to RCI after

the execution of the RCI contract and during the completion of Phase I of the Sumitomo contract. However, as of June 2004, the Sumitomo contract had not been assigned to RCI. There were many reasons why the Sumitomo contract was not immediately assigned to RCI. Some of these reasons include the following:

a) Delay in finalizing the engineering design and shop drawings.

b) RCI's contract required that all technical changes to the Sumitomo equipment be included in an amendment to the Sumitomo contract prior to assignment to RCI.

c) RCI raised a concern about the general excise tax and its implication on the assignment. RCI asserted that it would face $250,000 in additional cost for taxes if the Sumitomo contract was assigned to RCI.

d) Sumitomo was obligated to provide a new performance and payment bond covering Phase II.

e) Sumitomo raised the issue of payment for special services once its contract was assigned to RCI.

f) RCI submitted a request for a delay in delivery of the Sumitomo equipment, as RCI was not ready to take delivery of the Sumitomo equipment.

8. Once the contract was assigned to RCI, RCI and Sumitomo began having problems in terms of completing the project. CCH made several attempts to resolve the issues with RCI which included release of RCI's retention monies, additional payments for special services provided by Sumitomo, establishment of a new completion date, compensable and non-compensable delay days, among other things.

9. There was also a dispute involving the individual component plans and the integrated testing plan that were to be produced by Sumitomo. Sumitomo had been uncooperative and did not produce these plans. In order to move the project along, a workshop was held on March 14 and 15, 2005 which included CCH, RCI, Brown & Caldwell (the CCH's design consultant), Sumitomo, and several of Sumitomo's vendors. The workshop was successful. At the conclusion of the workshop, another intense effort was made to settle all remaining matters with RCI.

10 In addition to the contractor issues, there are other reasons for the delay, among which include (1) theft of the electrical cable used for the load bank testing of the generator, (2) water damage to the UV modules, (3) switchgear damage and high neutral ground voltage issues, (4) discovery of hazardous materials (Polychlorinate Biphenols (PCB)), (5) claims of Differing Site Conditions/Defective Specifications, and (6) engine generator manufacturing

defect. During these numerous setbacks, CCH directed the contractor to continue with the work to the extent feasible.

### Hart Street Pump Station

11. The Permit-required scope of this project is to modify the Pump Station to upgrade/improve station reliability, accommodate higher collection flows, and accommodate higher heads of downstream facilities.

12. As reported to EPA, construction of the required improvements had progressed satisfactorily and was effectively completed by October 2004. On October 18, 2004, testing of the new wastewater pumps started.

13. Excessive noise and vibration was discovered during testing and attributed to cavitation (the creation and collapse of voids within the fluid being pumped) within the pumps.

14. Since the discovery of the cavitation, CCH has taken steps to identify the potential cause or causes of the cavitation and have included the full scale testing with the installation of an eccentric suction elbow, larger diameter suction piping and the rotation of a suction bell.

15. Despite the cavitation issue, since December 28, 2004, the Hart Street pumps have been satisfactorily operating and have been conveying wastewater to the Sand Island Wastewater Treatment Plant. The pumps satisfactorily conveyed the minimum and maximum flows during the extreme wet

weather peak flows of March 2006 (period of approximately 40 consecutive days of rainfall).

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on September 21, 2007, in Honolulu, Hawaii.

Guy M. Inouye