CHRISTOPHER SPROUL
Environmental Advocates
1004 O'Reilly Avenue
San Francisco, California  94129
Tel: (415)561-2222, Fax:(415)561-2223
Email: csproul@enviroadvocates.com

PAUL ALSTON
WILLIAM M. TAM
ALSTON HUNT FLOYD & ING
Attorneys At Law,
A Law Corporation
18th Floor, ASB Tower
1001 Bishop Street
Honolulu, Hawai'i  96813
Tel:(808)524-1800; Fax:(808)524-5976
Email: palston@ahfi.com
        wtam@ahfi.com

Attorneys for Plaintiffs
SIERRA CLUB, HAWAI'I CHAPTER,
HAWAI'I'S THOUSAND FRIENDS
and OUR CHILDREN'S EARTH FOUNDATION

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| SIERRA CLUB, HAWAI'I CHAPTER;<br>HAWAI'I'S THOUSAND FRIENDS; and<br>OUR CHILDREN'S EARTH FOUNDATION,<br><br>        Plaintiffs,<br><br>   v.<br><br>CITY AND COUNTY OF HONOLULU,<br><br>        Defendants. | Civil No. 04-00463 DAE/BMK<br><br>**PLAINTIFFS' REPLY MEMORANDUM<br>IN SUPPORT OF THEIR MOTION FOR<br>PARTIAL SUMMARY JUDGMENT;<br>DECLARATION OF CHRISTOPHER<br>SPROUL; EXHIBITS 1-6;<br>CERTIFICATE OF WORD COUNT;<br>CERTIFICATE OF SERVICE**<br><br>Hearing: October 9, 2007<br>Time:     10:30 am<br>Judge:    David Alan Ezra |

## TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . .  ii

I.   CCH's DMRs and Admissions Establish CCH's
     Enterococcus Violations . . . . . . . . . . . . . . . . . 3

     A.   CCH's Enterococcus Limit Remain Continuously
          In Effect . . . . . . . . . . . . . . . . . . . . . 3

     B.   CCH's Enterococcus Limit is Unambiguous . . . . . . . 5

     C.   There Is No Genuine Fact Issue Concerning the
          Number of CCH's Enterococcus Violations . . . . . . . 6

     D.   CCH Is Strictly Liable for its Enterococcus
          Violations . . . . . . . . . . . . . . . . . . . . . 7

II.  CCH's DMRs Establish CCH's Dieldrin and Chlordane
     Violations . . . . . . . . . . . . . . . . . . . . . . . 8

     A.   CCH May Not Contradict Its Own DMRs . . . . . . . . . 8

     B.   A Violation of an Annual Average Must Be
          Counted as 365 Violations . . . . . . . . . . . . . 11

     C.   CCH's DMRs Establish CCH's Daily Dieldrin
          Limit Violations . . . . . . . . . . . . . . . . . 14

          1.   Plaintiffs Have Submitted Evidence of
               CCH's Dieldrin Violations . . . . . . . . . . 14

          2.   The Court May Now Properly Count CCH's
               Total Days of Dieldrin Daily Mass and
               Concentration Violations . . . . . . . . . . 15

III. CCH's DMRs Establish CCH's BOD and TSS Violations  . . .  16

IV.  Each Day That CCH Failed To Complete Construction
     and Operate the Disinfection Facility Is a Separate
     CWA Violation . . . . . . . . . . . . . . . . . . . . . 18

V.   CCH Violated the EPA 2002 Administrative Order . . . . . 20

VI.  CCH's Sand Island WWTP Violations Should Be Counted
     Up Until the Present Day . . . . . . . . . . . . . . . . 22

VII. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 24

TABLE OF AUTHORITIES

FEDERAL CASES

*America Canoe Association v. D.C. Water & Sewer Authority,*
306 F. Supp. 2d 30 (D.D.C. 2004) ............................. 4

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) .................................... 10, 11

*British Airways Board v. Boeing Co.,*
585 F.2d 946 (9th Cir. 1978) ............................... 11

*CALPIRG v. Shell Oil Co.,*
840 F. Supp. 712 (N.D. Cal. 1993) ..................... 5, 8, 9

*Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield,*
791 F.2d 304 (4th Cir. 1986), *vacated on other grounds,*
484 U.S. 49 (1987) ........................................ 12

*Hawaii's Thousand Friends ("HTF") v. City and County of
Honolulu,* 821 F. Supp. 1368 (D. Haw. 1993) ........ 2, 7, 8, 16,
                                                   17, 19, 21

*Natural Resource Defense Council ("NRDC") v.
Southwest Marine, Inc.,* 236 F.3d 985 (9th Cir. 2000) ........ 18

*Natural Resources Defense Council, Inc. v. Texaco
Refining & Marketing, Inc.,* 800 F. Supp. 1 (D. Del. 1992) ... 13

*Northwest Environmental Advocates v. City of Portland,*
56 F.3d 979 (9th Cir. 1995) ............................... 4

*Public Interest Research Group of New Jersey, Inc. v.
Powell Duffryn Terminals, Inc.,* 913 F.2d 64 (3d Cir. 1990) .. 13

*Save Our Bays and Beaches v. City and County of Honolulu,*
904 F. Supp. 1098 (D. Haw. 1994)(Ezra, J.) ........ 8, 9, 10, 19
*Sierra Club v. Chevron U.S.A., Inc.,*
834 F.2d 1517 (9th Cir. 1987) ............................. 14

*Sierra Club v. Chevron U.S.A., Inc.,*
834 F.2d 1517 (9th Cir. 1987) ............................. 14

*Sierra Club v. Electronic Control Design,*
909 F.2d 1350 (9th Cir. 1990) .............................. 2

*Sierra Club v. Union Oil Co. of California,*
813 F.2d 1480 (9th Cir. 1987), vac'd on other
grounds 485 U.S. 931 (1988), reinstated 853 F.2d 667
(9th Cir. 1988) ........................................ 3, 6, 8,
9, 10, 15

*Texas Municipal Power Agency v. EPA,* 836 F.22d 1482
(5th Cir. 1988) ........................................ 10

*U.S. v. Weitzenhoff,*
35 F.3d 1275 (9th Cir. 1993) .......................... 5

*United States v. Amoco Oil Co.,*
580 F. Supp. 1042 (W.D. Mo. 1984) ..................... 13

*United States v. Earth Sciences, Inc.,*
599 F.2d 368 (10th Cir. 1979) ......................... 8

*United States v. Smithfield Foods, Inc.,*
191 F.3d 516 (4th Cir. 1999) .......................... 13

*U.S. v. Allegheny Ludlum Corp.,*
366 F.3d 164 (3rd Cir. 2004) .......................... 10

## STATE CASES

*U.S. v City of San Diego,*
1991 WL 163747  21 Envtl. L. Rep. 21 .................. 2

## FEDERAL STATUTES

40 C.F.R. § 136, App. A, Meth. 608, ¶ 2.1 ............ 10

CWA section 309(d), 33 U.S.C. § 1319(d) .............. 11

CHRISTOPHER SPROUL
Environmental Advocates
1004 O'Reilly Avenue
San Francisco, California  94129
Tel: (415)561-2222, Fax:(415)561-2223
Email: csproul@enviroadvocates.com

PAUL ALSTON
WILLIAM M. TAM
ALSTON HUNT FLOYD & ING
Attorneys At Law,
A Law Corporation
18th Floor, ASB Tower
1001 Bishop Street
Honolulu, Hawai'i  96813
Tel:(808)524-1800; Fax:(808)524-5976
Email: palston@ahfi.com
       wtam@ahfi.com

Attorneys for Plaintiffs
SIERRA CLUB, HAWAI'I CHAPTER,
HAWAI'I'S THOUSAND FRIENDS
and OUR CHILDREN'S EARTH FOUNDATION

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| SIERRA CLUB, HAWAI'I CHAPTER;<br>HAWAI'I'S THOUSAND FRIENDS; and<br>OUR CHILDREN'S EARTH FOUNDATION,<br><br>              Plaintiffs,<br><br>     v.<br><br>CITY AND COUNTY OF HONOLULU,<br><br>              Defendants. | Civil No. 04-00463 DAE/BMK<br><br>**PLAINTIFFS' REPLY MEMORANDUM<br>IN SUPPORT OF THEIR MOTION FOR<br>PARTIAL SUMMARY JUDGMENT;<br>DECLARATION OF CHRISTOPHER<br>SPROUL; EXHIBITS 1-6;<br>CERTIFICATE OF WORD COUNT;<br>CERTIFICATE OF SERVICE**<br><br>Hearing:  October 9, 2007<br>Time:     10:30 am<br>Judge:    David Alan Ezra |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs move for partial summary judgment on their

Third, Fourth, and Eighth Claims against the City and County of

Honolulu ("CCH") for the City's Clean Water Act ("CWA")

658217_5/7502-3

violations at the Sand Island Wastewater Treatment Plant ("Sand Island WWTP") in Honolulu.  Plaintiffs seek final resolution of CCH's liability for all its Sand Island WWTP violations so this Court may redirect its attention to remedying these problems.

The ultimate goal in all three CCH sewage system cases before this Court is to fashion appropriate, effective, and speedy injunctive relief to protect the public from sewage pollution.[1]  Whether CCH committed exactly 17,097 or some other large number of violations is only a means to this larger end. CCH is ultimately liable.  This court should so rule.  CCH is slow to act and often evasive.  CCH's tortured explanations and protracted proceedings serve to delay and benefit CCH. They should not be tolerated. CCH would have the Court ignore CCH's detailed prior admissions in reports, briefs, and oral argument, prolonging debate over a few hundred violations.  The court

---

[1]  The CWA provides for both injunctive relief to abate and assessment of civil penalties to deter CWA violations.  *See Hawaii's Thousand Friends ("HTF") v. City and County of Honolulu*, 821 F. Supp. 1368, 1390 (D. Haw. 1993).  Plaintiffs' focus is prevent and stop sewage pollution.  Regarding civil penalties, Plaintiffs urge this court to examine and consider the flexible and sensible approach adopted in *U.S. v City of San Diego*, 1991 WL 163747 at *5-*6 (S.D. Cal. April 18, 1991), 21 Envtl. L. Rep. 21,223.  In *San Diego*, the court deferred payment of civil penalties to the United States Treasury so long as San Diego funded local environmental improvement projects with widespread community benefit.  *See also Sierra Club v. Electronic Control Design*, 909 F.2d 1350, 1355-56 (9th Cir. 1990) (approving CWA consent decree mandating payment to environmental protection projects in lieu of civil penalties and noting that "Congress 'encourages' settlements of this type '*which preserve the punitive nature of enforcement actions* while putting the funds collected to use on behalf of environmental protection.'").

should reach over the morass of detail and focus on the end game:
Given thousands of violations, what injunctive relief is
required?

The proof issues are straight-forward.  The Ninth Circuit is
clear.  CCH's Discharge Monitoring Reports ("DMRS") are
conclusive proof of CWA violations.  The court should not spend
"countless additional hours of NPDES litigation ... creating new,
complicated factual questions for district courts to resolve."
*Sierra Club v. Union Oil Co. of California*, 813 F.2d 1480, 1490-
91 (9th Cir. 1987), *vac'd on other grounds*, 485 U.S. 931, (1988),
*reinstated*, 853 F.2d 667 (9th Cir. 1988).  This Motion is based
on CCH's own DMRs and similar admissions.  Summary judgment
should be granted forthwith.

CCH argues summary judgment should be denied until the Court
has all the evidence to assess all civil penalties.  CCH Opp. at
1, 24.  This is wrong.  Plaintiffs are not seeking civil
penalties in this motion.  Penalties are an issue in the remedy
phase.[2]

I.   **CCH's DMRs and Admissions Establish CCH's Enterococcus
     Violations.**

     A.   **CCH's Enterococcus Limit Remain Continuously In Effect.**

     CCH argues incorrectly that the Sand Island Permit
("Permit") enterococcus limit has a one year maximum duration.
CCH Opposition to Plaintiffs' Motion for Partial Summary Judgment

---

     [2]  The Court should defer civil penalties in favor of
locally beneficial environmental projects.  See footnote no. 1.

("CCH Opp.") at 23.   The Permit states unambiguously: "[d]uring
the period beginning with July 21, 2002 *and lasting through the
expiration date of this permit*" CCH shall meet a daily maximum
enterococcus limit.   Sproul Reply Decl., Ex. 2 at 9-10 (footnotes
omitted, emphasis added).

The Permit's "reopener clause" allows EPA and DOH to modify
the limit, but not shorten the time CCH must meet the standard.
If CCH requests reconsideration, EPA will re-evaluate the need
for continuous effluent disinfection "[f]ollowing at least one
year of continuous operation of the Sand Island WWTP Disinfection
Facility."   CCH must first submit one year of data demonstrating
disinfection can be halted without adverse environmental impact
and CCH must also comply with all permit and CWA requirements.
*Id.* at 54.   CCH admits that it did neither. *See* Declaration of
Ross Tanimoto in Support of CCH's Opposition to Plaintiffs'
Motion for Partial Summary Judgment ("Tanimoto Decl."), ¶ 5. *See
id*; Sproul Reply Decl. ¶¶ 6-8.   The enteroccocus limit remained
continuously in effect since July 2002.   *See Northwest Envtl.
Advocates v. City of Portland*, 56 F.3d 979, 982 (9th Cir.
1995)(giving effect to an NPDES permit's plain and unambiguous
language); *see Am. Canoe Ass'n v. D.C. Water & Sewer Auth.*, 306
F. Supp. 2d 30, 41-42 (D.D.C. 2004) (same).

> The EPA's and DOH's intent regarding the
> duration of continuous disinfection has been
> clarified in the final permit. . . . *The EPA
> and DOH intend that the Sand Island WWTP
> discharge shall continue to meet an
> enterococcus discharge limitation of 18,000*

> *CFU/100 ml until the EPA and DOH complete*
> *their assessment of all bacteriological*
> *indicator monitoring data required by the*
> *permit, in addition to other pertinent*
> *information provided by the Permittee.*

Sproul Reply Decl., ¶ 2 & Ex. 1 at 17 (emphasis added).

**B.    CCH's Enterococcus Limit is Unambiguous.**

CCH claims the Permit is ambiguous because the limit could be calculated on the basis of a single wastewater sample or the average of samples, thereby creating a question of fact.  CCH Opp. at 24.  CCH is wrong on both points.  The Permit's terms are matters of law, not of fact.  *See, e.g., U.S. v. Weitzenhoff*, 35 F.3d 1275, 1287-88 (9th Cir. 1993) (admission of expert testimony on meaning of NPDES permit terms is erroneous; "construction of the permit is a matter of law"); *CALPIRG v. Shell Oil Co.*, 840 F. Supp. 712, 716-17 (N.D. Cal. 1993).  The Permit specifies that CCH is to take a single grab daily wastewater sample between noon and 3:00 pm to determine compliance with a "daily maximum" limitation.  The Permit excludes *averaging* the results of multiple samples.

The Court should determine as a matter of law that the Permit requires CCH to "[r]eport enterococci as geometric mean"[3] of three tests from a single sample.  The Permit specifies that "enterococci samples shall be analyzed using Method 1600, Membrane Filter Test Method for Enterococci in Water (EPA 821-R-97-004, May 1997)."  *Id.*  This EPA methodology specifies

---

[3]    *See* Sproul Reply Decl., Ex. 2 at 10, n.2.

that CCH divide its *single* grab sample into multiple "replicates" in separate containers and report a single value based on the geometric mean of these multiple replicates.  Sproul Decl., ¶ xx & Ex. 3 at 6-7.  The EPA Permit directs CCH to calculate a geometric mean level of enteroccocus from these replicates, not to average different samples.

CCH certifies under penalty of law that its DMRs are accurate and that they state daily maximum values as required by the Sand Island Permit.  *See* Sproul Reply Decl., Ex. 2 at 42-50 (monitoring and reporting requirements in NPDES Permit).  As a matter of law, these DMRs accurately state the enterococcus value used to determine CCH's compliance with enterococcus limits.  *See Union Oil,* 813 F.2d at 1490-91.

   **C.    There Is No Genuine Fact Issue Concerning the Number of CCH's Enterococcus Violations.**

CCH erroneously contends there are factual questions concerning the total number of CCH's enterococcus violations. CCH admits it was impossible to meet the enterococcus limit before CCH's completed the Disinfection Facility.  This is not remarkable since EPA set the limit to ensure CCH effectively operated the Disinfection Facility.  *See* Tanimoto Decl., ¶ 5; Sproul Decl., Ex. 1 at 9; Sproul Reply Decl., Ex. 1 at 9.

CCH offered no evidence contradicting the claim that the City's own DMRs establish CCH's violations of the enterococcus limits every day **from July 21, 2002** (effective date of the permit) **to November 15, 2006** (when the Sand Island Disinfection

Facility became operational)-a total of 1,578 days. *See* CCH Opp. at 22; Sproul Reply Decl., ¶ 5.

CCH further admits that it violated its enterococcus limits on 25 days **between November 15, 2006 and March 31, 2007.** *See* Declaration of Maile Chun in Support of CCH's Opposition to Plaintiffs' Motion for Partial Summary Judgment("Chun Declaration"), ¶ 13 & Ex. G; Tanimoto Decl., ¶ 5; Sproul Reply Decl., ¶ 6. Plaintiffs stipulates to CCH's representation for this period. Thus, Plaintiffs and CCH do not dispute any material fact concerning the number of days on which CCH exceeded the enterococcus limits. CCH committed 1,603 violations of this limit from July 21, 2002 through March 31, 2007: (a) 1,578 continuous violations from July 21, 2002 to November 14, 2006; and (b) 25 violations between November 15, 2006 and March 31, 2007.[4] Summary judgment should be granted for Plaintiffs.

> **D.    CCH Is Strictly Liable for its Enterococcus Violations.**

CCH claims factual issues exist concerning CCH's failed attempts to meet the Permit's enterococcus limit. CCH Opp. at 24. CCH is wrong. Good faith efforts to comply with the CWA may be relevant to assessing civil penalties, but they are not relevant to CCH's liability.

-------

[4] CCH claims Plaintiffs' Motion is inconsistent, arguing both that CCH violated limits through February <u>and</u> through March 2007 also. CCH is wrong. Plaintiffs used March 31, 2007 as a cutoff date to add up all CCH's violations, not that CCH violated limits <u>in</u> March. Even if there were such an error, this Court may perform its own independent count. *HTF*, 821 F. Supp. 1368, 1393-94 (D. Haw. 1993).

> The [Clean Water] Act imposes strict
> liability for NPDES violations.  The Act does
> not allow for "de minimus" or "rare" permit
> violations, and the permit-holder's good
> faith is not relevant to the issue of
> liability.

*Save Our Bays and Beaches v. City and County of Honolulu*, 904 F.

Supp. 1098, 1105 (D. Haw. 1994)(Ezra, J.); *see also HTF*, 821 F.

Supp. 1368, 1392 (D. Haw. 1993) ("Courts throughout the country

have held that NPDES compliance is a matter of strict liability

and a defendant's intent and good faith are irrelevant."); *United

States v. Earth Sciences, Inc.*, 599 F.2d 368, 374(10th Cir. 1979)

(same); *CALPIRG*, 840 F. Supp. at 714-715("neither good faith,

impossibility, nor data reporting errors, are accepted as valid

defenses to [CWA] liability, although such factors may be

relevant to the penalty phase.").  CCH's DMRs and admissions

establish that CCH Sand Island WWTP's discharges contained

enterococcus levels exceeding the limit.  *E.g., Union Oil*, 813

F.2d at 1490-91.  CCH is strictly liable.

II.  **CCH's DMRs Establish CCH's Dieldrin and Chlordane
     Violations.**

     A.   **CCH May Not Contradict Its Own DMRs.**

     CCH asks this Court to disregard several years of CCH's

self-reported DMRs and CCH's admitted violations of its chlordane

and dieldrin limits because a different technology produces new

results from recent water samples.  CCH Opp. at 25-26.  This is

speculation and it is irrelevant.  CCH no longer has the original

water samples and has no way to retest wastewater from the days

in question.  Moreover, new techniques may lead to different
results, but reports submitted under penalty of law by CCH using
methods mandated by the NPDES permit itself are binding and
cannot be second guessed after-the-fact.

CCH says it analyzed wastewater samples in *April and May
2007* and compared results from a new methodology (gas
chromatography -mass spectrometry ("GC/MS")) with results from
the standard methodology routinely used for years (gas
chromatography with an electron capture detector ("GC/ECD")).
Tanimoto Decl., ¶ 9.  CCH claims the new GC/MS methodology showed
lower levels in 2007 wastewater samples than levels measured by
the existing GC/ECD methodology and no detectable dieldrin
whereas the GC/ECD tests found dieldrin exceeding CCH's permit
limits.  Tanimoto Decl., ¶ 10.  CCH then argues these tests are
sufficient to prove CCH's DMRs unreliable and CCH's chlordane and
dieldrin violations suspect.  New tests have no bearing on old
results.  Ninth Circuit law is clear.  A CWA DMR "self-monitoring
report is to be considered... conclusive evidence of an
exceedance of a permit limitation." *Union Oil,* 813 F.2d at 1492.
This Court's prior decision precludes CCH dismissing its own DMR
data.  *Save Our Bays & Beaches*, 904 F. Supp. at 1138 ("Because
these reports are submitted under penalty of perjury, they
constitute admissions of noncompliance which bind the
defendant."); *see also CALPIRG*, 840 F. Supp. at 714-715 (DMR data
reporting errors is not valid defenses to CWA liability).

CCH is barred from disputing the validity of the GC/ECD monitoring it used to generate its own DMRs. *Union Oil Co.*, 813 F.2d at 1486; *Texas Municipal Power Agency v. EPA*, 836 F.22d 1482, 1484-85 (5th Cir. 1988). The Sand Island Permit requires CCH to use EPA Method 608. Sproul Reply Decl., ¶ x, Ex. 2 at 43. EPA Method 608 requires the very GC/ECD methodology that CCH would have this Court find unreliable. 40 C.F.R. § 136, App. A, Meth. 608, ¶ 2.1; Sproul Reply Decl., Ex. 4. Given NPDES Permit specification that CCH use the GC/ECD method to monitor chlordane and dieldrin, CCH is barred from arguing this methodology should now be rejected in determining CCH's prior compliance with its limits. Rewriting CCH's NPDES Permit is not authorized. *See, e.g.*, *Union Oil Co.*, 813 F.2d at 1486.

CCH frivolously argues this Court should disregard *Union Oil* and *Save Our Bays & Beaches* and instead follow the Third Circuit in *U.S. v. Allegheny Ludlum Corp.*, 366 F.3d 164, 174 (3rd Cir. 2004) allowing defendants to contradict their own DMRs. CCH Opp. at 20 n. 9. This is not Ninth Circuit law and must be rejected. *Allegheny* does not allow a court to disregard the official monitoring methodology in the NPDES permit.

CCH failed to offer any evidence that its past DMRs *in fact* overestimated CCH's chlordane and dieldrin levels. CCH admitted it does not have past samples of wastewater to test. CCH Opp. at 13 n.5; Tanimoto Decl., ¶ 11. The only evidence available are CCH's DMRs. Summary judgment against CCH is required. *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-52 (1986) (opposing party must affirmatively introduce specific facts which controvert the facts presented by the moving party); *British Airways Board v. Boeing Co.*, 585 F.2d 946, 951-52 (9th Cir. 1978).

The Tanimoto Declaration provides no foundation that Mr. Tanimoto (or anyone else) performed these GC/MS and GC/ECD tests accurately or that the GC/MS testing more accurately detected chlordane and dieldrin than GC/ECD tests.  The Court should disregard the Tanimoto Declaration.

**B.   A Violation of an Annual Average Must Be Counted as 365 Violations.**

CCH claims its violations of its annual average chlordane and dieldrin limits should be counted as a single violation each month (i.e., a maximum total of 12 violations per year), rather than violations for each day within the averaging period (i.e., 365 violations).  CCH Opp. at 26-29, 30.  This Court's April 16, 2007 Order Granting Reconsideration ("Reconsideration Order") cited the Fourth Circuit with approval in holding that a violation of a monthly average constitutes separate CWA violations *for every day in the month*:

> This language [CWA section 309(d), 33 U.S.C. § 1319(d)] strongly suggests that where a violation is defined in terms of a time period longer than a day, the maximum penalty assessable for that violation should be defined in terms of the number of days in that time period.

*Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield*, 791 F.2d 304, 314 (4th Cir. 1986), *vacated on other grounds*, 484 U.S. 49 (1987); Reconsideration Order at 8-9.[5]  Under *Gwaltney*'s logic endorsed by this Court, courts should respect the multiple facets of the CWA and Congress's provision for tiered violations over different and overlapping time periods greater than a single day so that one day counts as a violation *of every day in that time period*--whether a week, a month or a year.

CCH contends it is impermissible to count 365 days of violations when CCH exceeds the annual average limits because the Sand Island Permit also imposes separate daily limits on these pollutants.  CCH Opp. at 29.  The Court already found CCH's violations of a monthly average limitations count as thirty violations (the Permit imposes weekly limitations on those same pollutants).  *See* Reconsideration Order at 8-11; Sproul Reply Decl., Ex. 2 at 4 (Permit impose both monthly and weekly average effluent limitations for biochemical oxygen demand and total suspended solids).  This Court already held that each day of a time period covered by a given permit limit counts as a separate violation even when that time period overlaps with a lesser time period covered by a different permit limit for the same pollutant.

---

[5]  Reconsideration Order is attached as Exhibit C to the Chun Declaration.

Case law supports this approach of violations for *both* daily and monthly average limitations.

> [T]he two limits are included in [an
> NPDES] Permit for different reasons and serve
> distinct purposes: daily maximum effluent
> limits protect the environment from the acute
> effects of large, single releases, and
> monthly averages protect against chronic
> effects occurring at lower levels. . . .
> [T]he different pollutants and their daily
> maximum and monthly average loading limits
> are separate requirements listed in the
> Permit and therefore represent distinct
> violations. . . . It is clear from the
> language of § 309(d) of the CWA that such a
> penalty structure was anticipated.

*United States v. Smithfield Foods, Inc.*, 191 F.3d 516, 527 (4th Cir. 1999); *see also Pub. Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 78-79 (3d Cir. 1990) ("permits provide limits for both the daily average and daily maximum concentration of certain pollutants . . . . These are clearly separate limitations and we see no reason why [the discharger] should not be penalized separately for violating each limitation.); *cf. Natural Resources Defense Council, Inc. v. Texaco Ref. & Mktg., Inc.*, 800 F. Supp. 1, 21 (D. Del. 1992) ("separate exceedances of weight and concentration limits can constitute separate violations"); *United States v. Amoco Oil Co.*, 580 F. Supp. 1042, 1046 n.1 (W.D. Mo. 1984) (CWA allows for separate penalties for violations of the daily limit of different pollutants).

CCH argues Plaintiffs cannot establish CCH violations of the dieldrin and chlordane annual average limits for the Permits'

first year from November 1998 to October because CCH had not yet
collected 12 monthly samples needed to calculate an annual
average. CCH Opp. at 30. CCH ignores simple logic. While CCH
did not collect 12 months of data until October 1999, CCH
collected such data *by* October 1999. Bu October 1999, CCH
reported annual average dieldrin and chlordane levels exceeded
annual average limits for the November 1998 to October 1999
period. Sproul Reply Decl., ¶ 2, Ex. 5 at Bates 29003. CCH's
self-reported dieldrin and chlordane violations date back to the
beginning of the Permit. Plaintiffs properly seek to establish
CCH's violation of these limits back to the May 30, 1999 starting
point in this case.[6]

### C. CCH's DMRs Establish CCH's Daily Dieldrin Limit Violations.

#### 1. Plaintiffs Have Submitted Evidence of CCH's Dieldrin Violations.

CCH contends that Plaintiffs failed to offer evidence of
CCH's violations of its daily maximum dieldrin limit. CCH Opp.
at 32. CCH is playing games. On March 31, 2005, Plaintiffs
included DMRs for May 1999 to July 2004 in their January 2005
Motion for Partial Summary Judgment on Plaintiffs' Third, Fourth,
Eighth and Twelfth Claims ("January 2005 MSJ"). Sproul Reply
Decl., ¶ 2. In these DMRs, CCH self-reported violations of its

---

[6] The applicable statute of limitations period in this
action is five years and sixty days before the Plaintiffs filed
suit on July 29, 2004, i.e., May 30, 1999. See *Sierra Club v.
Chevron U.S.A., Inc.*, 834 F.2d 1517, 1521, 1523-24 & n.5 (9th
Cir. 1987).

dieldrin daily maximum mass discharge limit in May 2002 and December 2003[7] and its dieldrin daily maximum concentration dieldrin effluent limit in May 2002. Sproul Reply Decl., Ex. 5 at Bates 29102, 29165. This DMR evidence is clearly before the Court.[8] CCH violated its daily maximum dieldrin limits. *Union Oil*, 813 F.2d at 1492.

> 2. **The Court May Now Properly Count CCH's Total Days of Dieldrin Daily Mass and Concentration Violations.**

The Sand Island Permit requires CCH to monitor its dieldrin discharges from the Sand Island WWTP once per month. Sproul Reply Decl., Ex. 2 at 6. CCH's DMRs report a single dieldrin daily maximum mass level and a single dieldrin daily maximum concentration level exceeding the Sand Island Permit's limits in May 2002 and a single dieldrin daily maximum concentration level in December 2003 exceeding the Sand Island Permit's limits. *See* Sproul Reply Decl., Ex. 5 at Bates 29102, 29165. Based on these DMRs, CCH violated the daily maximum dieldrin limits three times.[9]

---

[7]   The Sand Island Permit mass daily maximum limit for dieldrin is defined as 0.12 pounds per day, which equals 0.05 kilograms ("kg") per day. CCH reports dieldrin mass effluent level data on its DMRs in metric units, i.e., kg/day. In May 2002, CCH reported discharging 0.057 kg/day and in December 2003 0.051 kg/day.

[8]   Plaintiffs are resubmitting the relevant pages of the DMRs with this brief for the Court's convenience. *See* Sproul Reply Decl., Ex. 5.

[9]   CCH's simultaneous violation of the separate dieldrin
(continued...)

The Court should also reasonably infer that CCH's single monitoring event per month is representative for the entire month. *See* Sproul Reply Decl., Ex. 2 at 11 (Sand Island Permit requires that CCH take "representative" effluent samples). Otherwise, CCH's daily dieldrin maximum limits would become mere "not to exceed twelve times per year" limit, a loophole eviscerating CCH's daily limits. Thus, the Court should find that CCH violated its daily maximum dieldrin limits in every day of the month covered by a DMR whenever that DMR has reported a dieldrin value exceeding the daily maximum limits for this pollutant.[10]

### III. CCH's DMRs Establish CCH's BOD and TSS Violations.

CCH contends that the Plaintiffs offered no evidence establishing CCH's violations of the Sand Island Permit's biochemical oxygen demand (BOD) and total suspended solids (TSS) limits. CCH Opp. at 33-34. Again, CCH is playing games. In CCH's DMRs (that the Plaintiffs filed on March 31, 2005 as part

---

[9](...continued)
daily maximum mass and dieldrin daily maximum concentration limits in May 2002 constitutes two violations. *See, e.g., HTF*, 821 F. Supp. at 1395 (CCH's effluent limitations for the mass and for the concentration of a given pollutant are separate requirements. CCH's simultaneous violation of a mass limit and of a concentration limit on the same day constitutes two separate CWA violations).

[10]   If the Court rejects this inference approach, the Court should now resolve the number of CCH's dieldrin daily maximum limits violations on summary judgment and find that CCH committed three such violations. The only available evidence are CCH's DMRs now before the Court. CCH did not archive past wastewater samples. CCH Opp. at 13 n.5; Tanimoto Decl., ¶ 11.

of the Plaintiffs' briefing on their January 2005 MSJ), CCH self-reported numerous violations of monthly average BOD and TSS limits.

This Court already held that violating a monthly average limit constitutes a violation for every day of that month. Reconsideration Order at 8-11. On summary judgment, the court need only count the number of days in each of the months of CCH's violations, separately, for each limit. See *HTF*, 821 F. Supp. at 1395 (CCH's violation of BOD and TSS concentration and percent removal requirements on the same day constitute multiple, separate CWA violations):

(1)   Failure to meet the Sand Island Permit's monthly average percent removal of BOD requirement in July 1999, August 1999, November 2003, and January 2004: 123 days of violation.

(2)   Failure to meet the Sand Island Permit's monthly average percent removal of TSS in August 2003 and October 2003: 62 days of violation.

(3)   Exceeding the Sand Island Permit's BOD monthly average concentration limit in May 1999 and July 1999: 62 days of violation (but only 33 of these days fall after the applicable May 30, 1999 statute of limitations date, leaving 33 actionable violations).

(4)   In total, CCH committed 218 actionable CWA violations of the Sand Island Permit's BOD and TSS limits.

Plaintiffs' Separate and Concise Statement in Support of:  (1)
Plaintiffs' Reply Memorandum in Support of Motion for Partial
Summary Judgment on Plaintiffs' Third, Fourth, Eighth and Twelfth
Claims,[11] ¶¶ 15, 25; *see also* Sproul Reply Decl., Ex. 5 and Ex. 2
at 4.

## IV.  Each Day That CCH Failed To Complete Construction and Operate the Disinfection Facility Is a Separate CWA Violation.

CCH erroneously argues that the Court declined to hold CCH
liable for violating the Sand Island Permit's requirement to
construct and operate the Sand Island WWTP Disinfection Facility
by July 21, 2002 without evidence "regarding attempts [by CCH] to
meet the scheduling deadline for the disinfection facility or
reasons for its delay."  CCH Opp. at 34 (quoting Reconsideration
Order at 13).  The Court only indicated that it did not find a
case cited by Plaintiffs, *Natural Res. Def. Council* ("*NRDC*") *v.*
*Southwest Marine, Inc.*, 236 F.3d 985 (9th Cir. 2000), to control
whether each day that CCH failed to construct and operate the
Disinfection Facility constituted a separate CWA violation.  The
*NRDC* case addressed a situation where a failure to attempt to
reduce pollutant discharges was itself the substantive violation
in issue.  While the Court did not find *NRDC* controlling, the
Court nonetheless ruled in Plaintiffs' favor, unequivocally
holding:

---

[11]  Filed on March 31, 2005, Court Docket item no. 81.

> [T]his Court finds that the continuous
> failure [by CCH] to construct and operate the
> disinfection facility as required by the
> NPDES Permit constitutes a continuous daily
> violation and should be counted as such.

Reconsideration Order at 15.

It would be impermissible for the Court to hold that CCH

cannot be found liable for failing to construct and operate the

Disinfection Facility without evidence concerning CCH's efforts

to comply.   This would contradict CWA's strict liability standard

that makes *attempts* to comply irrelevant.  *E.g.*, *Save Our Bays

and Beaches*, 904 F. Supp. at 1105; *HTF*, 821 F. Supp. at 1392.

CCH admits that it did not place the Disinfection Facility

online until November 15, 2006.   CCH Opp. at 14; Tanimoto Decl.,

¶ 5.   While Plaintiffs have offered evidence that CCH did not

begin full operation of the Disinfection Facility until

December 20, 2006,[12] Plaintiffs will now stipulate to CCH's

representation that it commenced operation of the Disinfection

Facility on November 15, 2006.   Thus, there is no genuine issue

of material fact that CCH did not comply with the Sand Island

Permit's requirement for CCH to complete construction and

commence operation of the Disinfection Facility from July 21,

2002 until November 15, 2006.   The Court should find that CCH

committed one violation on each of the days between these dates,

---

[12]   *See* SCSF, ¶ 7.

for a total of 1,578 CWA violations, and award summary judgment

accordingly.  Sproul Reply Decl., ¶ 5.[13]

**V.    CCH Violated the EPA 2002 Administrative Order.**

CCH erroneously contends that EPA's September 30, 2002

Administrative Order ("EPA 2002 Order") does not obligate CCH to

comply with the Permit's requirements, only submit certain plans

to EPA for review and approval.  CCH Opp. at 38.  The EPA 2002

Order (paragraph I of the Order) requires CCH to initiate "all

necessary measures" to halt its Sand Island Permit violations and

come into "immediate and continuous" compliance with the Permit.

SCSF ¶ 13.  CCH's DMRs report on-going violations of the Sand

Island Permit from the date of the EPA Order (September 2002)

through March 2007.  See SCSF ¶¶ 7, 14, 17-20; Sproul Reply

Decl., ¶¶ 6-8.  A fortiori, this five year pattern of on-going

violation demonstrates that CCH failed to meet these

requirements.

The EPA 2002 Order (paragraphs II and III) further required

CCH to submit to EPA:  (1) an Effluent Limitations Action Plan

setting forth actions "to ensure immediate and continuous

compliance with the effluent limits" in the Sand Island Permit;

---

[13]  Plaintiffs' Motion alleged that CCH failed to comply
with the requirement to complete the Hart Street Pump Station
(New/Alternative) project by February 18, 2005.  CCH offered
evidence that despite problems, the Hart Street Pump Station did
start functioning before the deadline. CCH Opp. at 37, Inouye
Decl., ¶¶ 11-15.
    In light of this evidence and to resolve this issue,
Plaintiffs will dismiss their claims related to the Hart Street
Pump Station.

and (2) a Compliance Schedule Action Plan "to ensure immediate and continuous compliance with the compliance schedules" for construction projects in the Sand Island Permit, including the Disinfection Facility.  *Id.*  While CCH submitted plans to EPA, these plans were clearly inadequate given the CCH's on-going violations of the Sand Island Permit discussed above.  The Court should grant summary judgment on this basis.

CCH further contends that finding CCH separately liable for violating both the Sand Island Permit's effluent limits and the EPA 2002 Order due to the same discharges from its Sand Island WWTP is double counting.  CCH Opp. at 39.  The law is well established on this issue.  When a discharge on any given day violates multiple regulatory requirements, each violation of a regulatory requirement is counted as a separate CWA violation. *See, e.g., HTF*, 821 F. Supp. at 1394-95.  CCH's continuing violation of the Sand Island Permit's NPDES permit limits after EPA ordered CCH's violations halted is a legal wrong separate from violating these permit limits.  Each violation of the 2002 EPA Order must be a separate violation; otherwise EPA administrative orders would be rendered meaningless.

Plaintiffs are entitled to summary judgment on their Eighth Claim that CCH violated the 2002 EPA Order on every day *from*

*October 1, 2002 to March 31, 2007.* This is a total of 1,643
violations.[14]

## VI.  CCH's Sand Island WWTP Violations Should Be Counted Up Until the Present Day.

CCH erroneously contends that additional claims pending
beyond those addressed by Plaintiffs' Motion should preclude
summary judgment because there is a danger of double-counting
violations until CCH's liability on all claims is resolved.  CCH
Opp. at 16-17 n.6.  Plaintiffs have seven pending claims:  Third,
Fourth, Fifth, Sixth, Seventh, Eighth, and Tenth Claims.[15]

To resolve the liability issues and expedite the remedy
phase, Plaintiffs will stipulate to dismiss their Fifth, Seventh,
and Tenth Claims.  Only Plaintiffs' Third, Fourth, Sixth and
Eighth Claims remain to be resolved.[16]  Plaintiffs' Third,

---

[14]  To resolve the Eighth Claim now, Plaintiffs stipulate
they will offer no further evidence on this claim.  Thus, no
material facts are in dispute.  The Court may determine summary
judgment on Plaintiff's Eighth Claim.  CCH's DMRs establish that
CCH did not comply with the EPA 2002 Order's requirements to
immediately take action to halt its violations and to submit
plans to EPA to accomplish this requirement.  If the Court does
not find the DMRs support such judgment, Plaintiffs will dismiss
their Eighth Claim to achieve finality.

[15]  Plaintiffs originally brought Twelve Claims. Pursuant to
the Court's September 2005 Order and Plaintiffs' stipulation, the
First, Second, Ninth, Eleventh and Twelfth Claims are dismissed.

[16]  Plaintiffs do not stipulate to dismiss their Fifth,
Seventh, and Tenth Claims because they lack merit.
The Fifth Claim (failure to properly operate and maintain)
is based on EPA's repeated complaints about CCH's substandard
operation and maintenance. 2005 SCSF, ¶¶ 4-7 (filed January 11,
2005 as Docket Item No. 58).
The Seventh Claim (failure to comply with the October 1999
                                              (continued...)

Fourth, and Eighth Claims go to the core issue of preventing CCH's excessive discharge of pollutants.

Plaintiffs' remaining Sixth Claim addresses permit violations designed to minimize CCH's spills of raw sewage from its sewage collection system due to clogging of sewer lines with fats, oil and grease ("FOG conditions"), but unrelated to CCH's failure to treat sewage effectively. The FOG claims are based on different factual and legal grounds from those at issue here. . The court may calculate the final number of CCH's violations under the Third, Fourth, and Eighth Claims without risk of double counting Fog claims.

/

/

/

/

/

---

[16](...continued)
EPA administrative order and take remedial measures to abate WWTP's violations) is based on EPA findings (September, 2002 EPA administrative order)that CCH violated the 1999 Administrative Order. *See* Declaration of Patricia Nelson To Plaintiffs' Concise Statement and Exhibit 38 to this Declaration (filed January 10 and 11, 2005 as Item Nos. 57 and 58 in the Court's Docket).
The Tenth Claim (failure to properly monitor wastewater discharges from the Honouliuli WWTP) was based on 2003 EPA Order finding CCH failed to monitor its Honouliuli WWTP discharges as required by the Honouliuli Permit (2005 SCSF ¶¶ 61, 81, 82)and invalid effluent monitoring data for the Honouliuli WWTP discharge(from 11/2000 to 7/2003). *Id.*, ¶ 81. These problems can be remedied through the remaining Claims.

## VII. CONCLUSION

This Court should find that CCH committed 16,573 CWA violations.[17]  Accordingly, this court should enter summary judgment in favor of Plaintiffs.

Dated: Honolulu, Hawaii, September 28, 2007.

                              /s/ William M. Tam
                         CHRISTOPHER SPROUL
                         PAUL ALSTON
                         WILLIAM M. TAM
                         Attorneys for Plaintiffs

---

[17] 17,097 if April 1 to July 31, 2007 violations are included.  Sproul Reply Decl., ¶ xi.