U. S. Environmental Protection Agency, Region IX
and
Hawaii State Department of Health

Response to Comments
for the
Sand Island Wastewater Treatment Plant
301(h)-modified NPDES Permit[1]

Carl Takamura, Hawaii Business Roundtable, Incorporated (August 20, 1998 letter)

1.   **COMMENT:**

All businesses and taxpayers will be better served because of the U. S. Environmental
Protection Agency, Region IX's (EPA) responsible and prudent action to grant the 301(h)
variance for the Sand Island Wastewater Treatment Plant (WWTP), as long as public
health and safety are not compromised.

**RESPONSE:**

The EPA agrees and will grant a 301(h) variance for the Sand Island WWTP which
assures the protection of public health and the environment.

Roger Fujioka, University of Hawai'i at Manoa (August 21, 1998 letter)

2.   **COMMENT:**

The commentor writes that his microbial monitoring studies show that fecal indicators in
sewage discharged from the Sand Island ocean outfall into Mamala Bay cannot be
detected at nearby shoreline stations in marine recreational waters (1,000 feet from
shore); and that the Mamala Bay Study Commission's (MBSC) assessment of pollution
in Mamala Bay by the Sand Island ocean outfall was not limited to meeting federal
301(h) decision criteria and impacts beyond 1,000 feet from the shoreline. Because
some sewage-borne pathogens are more stable in the marine environment than
enterococcus, it is possible that these pathogens may reach the shoreline. Also, because
higher levels of these pathogens can be expected in areas closer to the outfall, people

---

[1] Comments/Responses are organized by date. These response to comments are supplemental to the fact sheet for
the 07/24/98 *draft* 301(h)-modified National Pollutant Discharge Elimination System (NPDES) permit for the Sand
Island WWTP.

# EXHIBIT 1

using these waters for recreation may be exposed to unacceptable risks. It was this concern and predictive times when sewage-borne pathogens were expected to reach the shoreline that the MBSC recommended chemically enhanced primary treatment (CEPT) and effluent disinfection at the Sand Island WWTP. The commentor supports this recommendation and the use of ultraviolet radiation (UV) disinfection over chlorine disinfection. From the perspective of protecting public health, continuous disinfection of sewage prior to ocean discharge will be more reliable than disinfecting the sewage only under some defined conditions.

**RESPONSE:**

The EPA and DOH agree with the commentor (see also response to comment number 14), but have provided the Permittee an opportunity to demonstrate, after at least one year of continuous disinfection, that continuous disinfection is not needed.

[The EPA also notes that publicly owned treatment works (POTWs) discharging secondary treated wastewater to the ocean must conduct receiving water monitoring to demonstrate compliance with federal ocean discharge criteria, in accordance with the Clean Water Act (CWA) section 403 and Title 40 of the *Code of Federal Regulations* (CFR) Part 125, Subpart M.]

Donna Wong, Hawaii's Thousand Friends (August 21, 1998 letter)

3.    **COMMENT:**

After studying current patterns and the Sand Island WWTP, the MBSC determined two things: (1) treatment at the Sand Island WWTP should be improved to "advanced primary", and (2) Sand Island WWTP effluent should be disinfected to prevent viruses and bacteria from impacting public health.

To protect public health, Hawaii's Thousand Friends strongly opposes any 301(h) variance that permits the Permittee to discharge at anything less than recommended by the MBSC. To require less will place the public at risk from sewage-borne pathogens in the water in which they recreate and will mock the MBSC and their recommendations. Hawaii's Thousand Friends recommends that the Permittee be required to implement the following conditions at the Sand Island WWTP: (1) permanent disinfection; (2) continuous use of UV disinfection; and (3) that the amount of total suspended solids (TSS) removed be increased.

**RESPONSE:**

The draft permit contains a schedule of compliance which requires the Permittee to plan, design, construct, and continuously operate during this permit term, the Sand Island

WWTP Disinfection Facility. This facility must be operated in a manner which achieves effective disinfection, as defined by the discharge limitation for enterococci of 18,000 CFU/100 ml. As clarified in the final permit, it is the EPA's and DOH's intent that the Sand Island WWTP discharge shall meet an enterococcus discharge limitation of 18,000 CFU/100 ml during this permit term. The Permittee may request that the EPA and DOH reevaluate the need for continuous effluent disinfection following at least one year of continuous operation of the Sand Island WWTP Disinfection Facility. See also response to comment numbers 14 and 31.

WRRC Biomonitoring Team, University of Hawai'i at Manoa (August 21, 1998 letter)

4.    **COMMENT:**

A decade of ocean monitoring shows no impact from sewage to the biological indigenous population near the Sand Island ocean outfall. Based on long-term evidence from the WRRC Biomonitoring Team's monitoring results, the commentor endorses the Permittee's 301(h) variance request to remain at advanced primary treatment.

**RESPONSE:**

The EPA agrees and is granting the Permittee a 301(h) variance for the Sand Island WWTP discharge.

Roy Abe, private citizen (August 22, 1998 letter)

5.    **COMMENT:**

The commentor supports requiring only a primary level of treatment for the Sand Island WWTP discharge. The commentor expresses that primary treatment without disinfection is adequate to protect the marine environment and public health and disagrees that CEPT and continuous disinfection is needed at the Sand Island WWTP.

**RESPONSE:**

The EPA and DOH disagree and believe that disinfection is necessary to minimize risks to public health (see also the Tentative Decision Document; TDD). However, following at least one year of continuous disinfection at the Sand Island WWTP, the EPA and DOH will consider evidence which demonstrates that continuous disinfection is not needed. The final permit contains a special condition which provides for this opportunity.

Peg Sullivan-Miller, private citizen (August 22, 1998 letter)

6.    **COMMENT:**

Water contact recreation in Keehi Lagoon may be the likely cause of gastrointestinal illness, the infection of cuts and scrapes, and bacterial infections requiring medical attention experienced by the commentor over the past few months. The commentor has seen first hand how dirty the water in Keehi Lagoon is and questions whether it is safe to continue boating there. The commentor believes that water in Keehi Lagoon is not as clean as it should be for public use, including water contact recreation.

**RESPONSE:**

While this comment is beyond the scope of the proposed 301(h)-modified NPDES permit for the Sand Island WWTP, the DOH responds that Keehi Lagoon receives polluted runoff from both Kalihi and Moanalua Streams which flow through heavy industrial, military, and commercial areas, as well as the Tripler Army Hospital and residential properties in Moanalua Valley. For this reason, waters most heavily impacted by polluted runoff from these areas are at the newly developed beach park which is often used for canoe paddling and other types of water recreation. The DOH Polluted Runoff Control Program is currently sponsoring a project for the improvement of water quality in Kalihi Stream.

Leighton Lum, Hawaii Water Environment Association (August 24, 1998 letter)

7.    **COMMENT:**

The commentor supports the proposed NPDES permit conditions for percent removal of influent biochemical oxygen demand (5-day) ($BOD_5$) and TSS, and enterococci concentration. The commentor would have preferred definitive documentation of the need for disinfection at the Sand Island WWTP, both epidemiological and detailed modeling activities, in addition to the MBSC's effort.

**RESPONSE:**

The EPA and DOH agree that epidemiological and detailed modeling activities would have facilitated the 301(h) decision-making process; however, limited resources continue to constrain these types of activities. Consequently, the 301(h)-modified NPDES permit contains disinfection conditions which reduce risks to public health. See also response to comment number 14.

Victor Moreland, University of Hawai'i at Manoa (August 25, 1995 letter)

8.    **COMMENT:**

Commentor supports the re-issuance of a 301(h)-modified NPDES permit for the Sand Island WWTP discharge. This action confirms what various studies and monitoring conducted over the last three decades have shown, that primary treatment with a deep ocean outfall discharge is sufficient environmental protection for our island marine water environment. This also means that CEPT and disinfection is not needed to protect public health from yet to be measured microbial risks.

Commentor concludes that the water quality management strategy (primary treatment with a deep ocean outfall discharge) being pursued by the CCH is consistent with the present-day regulatory philosophy of risk assessment, and risk management applied to the environment and to public health.

**RESPONSE:**

The EPA and DOH disagree with the commentor's conclusion and believe that disinfection, in addition to primary treatment, is necessary to minimize risks to public health (see also the TDD). The final permit implements an environmental water quality based approach for protecting the island marine water environment and contains specific disinfection requirements to minimize risks to public health in recreational waters of Mamala Bay. See also response to comment numbers 5, 14, and 31.

Kenneth Sprague, City and County of Honolulu (August 25, 1998 letter)

9.    **COMMENT:**

For $BOD_5$, the Permittee requests that the maximum daily discharge limitation (see Part A.1 of the draft permit) be eliminated and replaced with an average weekly discharge limitation of 174 mg/l. If this is not acceptable to the EPA, the Permittee requests that the maximum daily discharge limitation be increased to 232 mg/l (i.e., twice the average monthly discharge limitation, per footnote 1, of the draft permit).

For TSS, the Permittee requests that the maximum daily discharge limitation (see Part A.1 of the draft permit) be eliminated and replaced with an average weekly discharge limitation of 104 mg/l.

For mass emissions, the Permittee is requesting that exact, rather than estimated, mass emission discharge limitations for $BOD_5$ and TSS (see Part A.1 of the draft permit) be included in the final permit. Requested values for these discharge limitations are:

|                              |                  |
|------------------------------|------------------|
| BOD$_5$ Average Monthly      | 79,330 lbs/day   |
| BOD$_5$ Average Weekly       | 118,995 lbs/day  |
| TSS Average Monthly          | 47,187 lbs/day   |
| TSS Average Weekly           | 71,124 lbs/day   |

If the Permittee's request to eliminate maximum daily discharge limitations for BOD$_5$ and TSS is not granted by the EPA, the following maximum daily discharge limitations should be included in the final permit:

|                                              |                 |
|----------------------------------------------|-----------------|
| BOD$_5$ Maximum Daily (2 x Average Monthly)  | 158,660 lbs/day |
| TSS Maximum Daily (2 x Average Monthly)      | 94,375 lbs/day  |

**RESPONSE:**

The Permittee requests that maximum daily discharge limitations for BOD$_5$ and TSS be replaced by average weekly and average monthly discharge limitations for BOD$_5$ and TSS. Because technology-based federal secondary treatment requirements for publicly owned treatment works (POTWs) are based on average monthly and average weekly discharge limitations, the EPA believes that the Permittee's request for average weekly, rather than maximum daily, discharge limitations for BOD$_5$ and TSS are appropriate averaging periods which will ensure efficient POTW operations. The Permittee's request is also consistent with 40 CFR 122.45(d) which requires that discharge limitations for POTWs be expressed as average monthly and average weekly limitations, unless impracticable (e.g., for pH, toxic pollutants, etc.).

The Permittee also requests an average weekly discharge limitation for BOD$_5$ of 174 mg/l and an average weekly discharge limitation for TSS of 104 mg/l. These requested values are 1.5 times the average monthly discharge limitations for BOD$_5$ and TSS (in mg/l). While the EPA believes that the Permittee's proposed average weekly discharge limitation for TSS will continue to ensure efficient operations at the Sand Island WWTP, the Permittee does not provide a clear basis or need for the proposed average weekly value for BOD$_5$. (This value is greater than the draft permit's proposed maximum daily discharge limitation of 160 mg/l and greater than any maximum daily discharge concentration for BOD$_5$ observed during months achieving ≥30% removal of influent BOD$_5$ since cannery discharges ceased in 1992). Consequently, the final permit contains discharge limitations for BOD$_5$ and TSS (in mg/l), as summarized in the following table.

Also, the EPA agrees with the Permittee's request to include <u>exact</u> mass emission discharge limitations (in lbs/day) in the final permit, rather than the approximate values in the draft permit. Mass emission discharge limitations for BOD$_5$ and TSS (in lbs/day) in the final permit are summarized in the following table:

| Discharge Limitations | | | | |
|---|---|---|---|---|
| Discharge Parameter | Average Monthly | Average Weekly | Maximum Daily | Units |
| Biochemical Oxygen Demand (5-day) | 116 ~~79,300~~ 79,330 | ~~report~~ 160 109,421 | ~~160~~ ~~109,000~~ report | mg/l lbs/day |
| | As a monthly average, not less than 30% removal efficiency from influent stream | | | |
| Total Suspended Solids | 69 ~~47,000~~ 47,187 | ~~report~~ 104 71,124 | ~~138~~ ~~94,400~~ report | mg/l lbs/day |
| | As a monthly average, not less than 60% removal efficiency from influent stream | | | |

10.   **COMMENT:**

There is no need for requirements regarding total oil and grease (O&G), total petroleum hydrocarbons (TPH), or fats, oil and grease (FOG) in the draft permit and these requirements should be removed from the final permit. If these discharge parameters remain in the final permit, the sampling method should be changed to either a single sample during peak flow or a composite sample using a NPDES composite sampler, as described in the Permittee's July 28, 1998 letter to the EPA. In addition, the Permittee should be allowed to use Solid Phase Extraction, as discussed in its July 29, 1998 letter to the EPA.

**RESPONSE:**

In 1991, the EPA issued an administrative order to the City and County of Honolulu (CCH) (File IX-FY91-19) which, among other actions, required the CCH to take steps to control O&G in the collection system to reduce collection system sewage spills. In the draft permit, the EPA included a schedule for completing the O&G control program begun under the administrative order. Final permit requirements for O&G, TPH, and FOG are necessary to fully evaluate the effectiveness of the Permittee's efforts under the O&G control program proposed in the draft permit and retained in the final permit.

The EPA and DOH have reviewed the Permittee's proposed sampling method for O&G as outlined in its July 28, 1998 letter to the EPA and have also reviewed sampling methods for O&G utilized by other 301(h) permittees. Based on this review, footnote number 7 in the permit has been revised as follows:

Influent and effluent monitoring shall consist of a minimum of

three grab samples collected over a 24 hour period at approximately equal intervals. One grab sample shall be ~~taken~~ collected during peak flow. Grab samples shall be analyzed individually, as specified in EPA Method 1664. Individual analytical results shall be mathematically flow proportioned to derive a single value for reporting.

11.  **COMMENT:**

Add a footnote to the final permit allowing the use of EPA-approved Method 1600, *Membrane Filter Test Method for Enterococci in Water* (EPA 821-R-97-004, May 1997). This is requested since Method 1600 has yet to be published in 40 CFR 136.

**RESPONSE:**

The EPA strongly recommends the use of Method 1600, *Membrane Filter Test Method for Enterococci in Water* (EPA 821-R-97-004, May 1997) for all forms of ambient water quality monitoring for enterococci in marine waters, including monitoring for ambient water quality by States under Clean Water Act (CWA) sections 303 and 305. The EPA intends to approve this method for other nationwide uses (e.g., NPDES permitting under CWA section 402 and State certification under CWA section 401) (see May 23, 1997 memorandum from R. Perciasepe to Regional Administrators). Because the EPA has not promulgated analytical methods for enumerating enterococci in 40 CFR 136 and because the EPA intends to approve the use of this method for NPDES permitting, footnote numbers 4 and 12 in the final permit will be revised as follows:

> Report [enterococci] as geometric mean. Effluent monitoring . . . .
> Enterococci samples shall be analyzed using Method 1600, *Membrane Filter Test Method for Enterococci in Water* (EPA 821-R-97-004, May 1997).

12.  **COMMENT:**

The Permittee proposes the following language to clarify its intent regarding Part A.2 of the permit:

> The purpose of the following requirements is to improve Sand Island WWTP performance and reliability, and to select and implement an effluent disinfection treatment option that will reduce the risk of human exposure to pathogenic organisms in marine recreational waters of Mamala Bay by decreasing the bacterial indicator loadings from the Sand Island ocean outfall during periods of prolonged plume surfacing combined with

onshore surface currents, or problems with the outfall pipe.

After one year of continuous disinfection, the Permittee intends to disinfect only when oceanographic conditions indicate a period of prolonged plume surfacing combined with onshore surface currents, or problems with the outfall pipe.

## RESPONSE:

The Permittee has communicated to the EPA and DOH that, following one year of continuous operation of the Sand Island WWTP Disinfection Facility, it plans to disinfect the Sand Island WWTP discharge "only when oceanographic conditions indicate a prolonged plume surfacing combined with onshore surface currents or problems with the outfall pipe." The EPA's and DOH's viewpoint on effluent disinfection at the Sand Island WWTP has been clarified in response to comments and is reflected in Parts A.2.g and J.7 of the final permit (see also response to comment number 14). The final permit requires at lease one year of continuous effluent disinfection following which time, the Permittee may request that the EPA and DOH re-evaluate this permit condition. It is the EPA's and DOH's intent that the Sand Island WWTP discharge continue to meet an enterococci discharge limitation of 18,000 CFU/100 ml, until the EPA and DOH complete their assessment of all bacterial indicator monitoring data required by the permit, in addition to other pertinent information provided by the Permittee.

To further clarify the EPA's and DOH's intent for continuous disinfection, the following permit reopener condition (special condition #7) has been added to Part J of the final permit:

> Following at least one year of continuous operation of the Sand Island WWTP Disinfection Facility, at the request of the Permittee, the EPA and DOH will re-evaluate the need for continuous effluent disinfection. To facilitate this process, the EPA and DOH will work with the Permittee and interested parties to evaluate all available information to assess the effects of the Sand Island WWTP discharge on nearshore and shoreline water quality without and with the operation of the Sand Island WWTP Disinfection Facility, where effective effluent disinfection is achieved (as specified in Part A.2.g of this permit). In order for the EPA and DOH to complete this assessment, the Permittee must provide all bacteriological indicator monitoring data required by this permit and other pertinent information to the EPA and DOH. The EPA and DOH will consider modifying this permit if: (1) the Permittee can demonstrate that the requested modification will not interfere with the attainment or maintenance of water quality that allows recreational activities in and on the water, consistent with federal 301(h) decision criteria, and will meet other NPDES permitting requirements; and (2) the Permittee is in compliance with the terms of this permit and all other applicable EPA requirements.

These permit conditions best reflect the EPA's and DOH's viewpoint on this issue; consequently, the final permit has not been revised in response to this comment.

13.   **COMMENT:**

The following comments pertain to Part A.2 of the draft permit, where changes to Sand Island WWTP upgrade project descriptions and completion dates are requested.

Because all Sand Island WWTP upgrade projects are currently in the planning or design stage, the detail of actual changes that will be incorporated into the projects is not yet known.  Consequently, the Permittee requests that project descriptions be revised, in accordance with the Permittee's August 25, 1998 letter to the EPA, and incorporated into the final permit.

In the draft permit, "early finish" dates rather than "late finish" dates are listed in the schedules of compliance for project activities.  (Early and late finish dates were provided to the EPA by the Permittee in a letter dated May 4, 1998.)  Late finish dates take into account float times in the overall Sand Island WWTP upgrade schedule for projects which can be delayed (i.e., those projects not on critical path) without effecting the overall schedule.  In many cases, some of these projects cannot be fully completed (e.g., performance tested and accepted) until projects with later completion dates are finished.  As a result, the Permittee requests that early finish dates in the draft permit be replaced by late finish dates in the final permit.

It is further requested that only the final completion dates for projects be made compliance items.  All other dates, if not met, shall be reported within 30 days as not having been met and the new projected finish date will be furnished to the EPA and DOH.  If the missed date is on critical path, information will be submitted on how the project will be brought back on schedule.

**RESPONSE:**

The Permittee's recommended project descriptions for Parts A.2.a, A.2.b, A.2.d, and A.2.e have been incorporated into the final permit, with the following exceptions.  The Permittee's recommended language for projects required by Parts A.2.c and A.2.e of the permit--which would allow changes to project "late finish" dates to coordinate construction phasing with the Sand Island WWTP Primary Treatment Expansion project (see Part A.2.f of the permit)--has not been incorporated into the final permit.  The EPA and DOH believe that the Permittee's recommended language compromises the EPA's and DOH's intent that Sand Island WWTP upgrade project activities be completed without delay, in accordance with the schedules of compliance specified in the final permit.  Finally, the Permittee's recommended phrase ". . . as appropriate. . ." has not been included in revised project descriptions where the EPA and DOH believe that its addition would compromise project goals set by the final permit.

Because the "late finish" dates provided by the Permittee (see the Permittee's August 25, 1998 letter to the EPA) do not delay completion of the overall Sand Island WWTP upgrade schedule and do not delay the completion of project activities critical to this permit term, late finish dates are incorporated into the final permit, as shown below.

The Permittee's request that only final completion dates for projects be made compliance items has not been incorporated into the final permit. The EPA and DOH believe that the Permitee's request compromises the EPA's and DOH's ability to ensure that Sand Island WWTP upgrade project activities be completed without delay, in accordance with the schedules of compliance specified in the final permit. However, the EPA and DOH agree to delete "start" dates from the final permit; in conjunction, Parts A.2 and Part I.1.g have been revised, as shown in the redline/~~strikeout~~ format below.

To summarize, Part A.2 of the permit has been revised as follows:

a.   **Ala Moana Wastewater Pump Station Modification:** This project is required to accommodate higher collection system flows and the higher head of the new Sand Island WWTP headworks. ~~The Permittee shall replace existing pumps, electrical works, and associated appurtenances to upgrade/improve pump station reliability.~~ The Permittee shall modify the pump station to upgrade/improve station reliability, accommodate higher collection flows, and accommodate higher heads of downstream facilities. Modifications shall include replacing/rehabilitating existing pumps, generator facility, electrical works, and associated appurtenances, as appropriate. The Permittee shall conduct this project in accordance with the following schedule of activities:

| Activity Description | Start | Finish |
|---|---|---|
| Planning | ~~January 22, 1996~~ | ~~July 31, 1998~~ October 22, 2000 |
| Design | ~~March 2, 1998~~ | ~~August 11, 2000~~ July 24, 2002 |
| Advertise | ~~August 12, 2000~~ | ~~October 10, 2000~~ September 22, 2002 |

| Activity Description | Start | Finish |
|---|---|---|
| Bid Opening | n/a | ~~October 10, 2000~~ September 22, 2002 |
| Award | ~~October 11, 2000~~ | ~~November 9, 2000~~ October 22, 2002 |

| Construction | ~~March 9, 2001~~ | ~~March 9, 2003~~ |
| | | *February 18, 2005* |

b.  **Hart Street Wastewater Pump Station (New/Alternative):** This project is required to accommodate higher collection system flows and the higher head of the new Sand Island WWTP headworks. ~~The Permittee shall rehabilitate the existing Hart Street pump station complete with generator facility, new pumps, and electrical works. This work includes all piping to connect to inflow lines and new and existing force mains.~~ The Permittee shall modify the pump station to upgrade/improve station reliability, accommodate higher collection flows, and accommodate higher heads of downstream facilities. Modifications shall include replacing/rehabilitating existing pumps, generator facility, electrical works, and associated appurtenances, as appropriate. The Permittee shall conduct this project in accordance with the following schedule of activities:

| Activity Description | Start | Finish |
|---|---|---|
| Planning | ~~January 12, 1996~~ | ~~April 28, 1998~~ |
| | | June 4, 2000 |
| Design | ~~June 9, 1998~~ | ~~July 27, 2000~~ |
| | | July 24, 2002 |
| Advertise | ~~July 28, 2000~~ | ~~September 25, 2000~~ |
| | | September 22, 2002 |
| Bid Opening | ~~n/a~~ | ~~September 25, 2000~~ |
| | | September 22, 2002 |
| Award | ~~September 26, 2000~~ | ~~October 25, 2000~~ |
| | | October 22, 2002 |
| Construction | ~~February 23, 2001~~ | ~~February 22, 2003~~ |
| | | *February 18, 2005* |

c.  **Hart Street Wastewater Pump Station Force Main Replacement:** The Permittee shall install a new force main extending from Hart Street pump station to Sand Island WWTP to replace the existing 47-year old force main. The Permittee shall conduct this project in accordance with the following schedule of activities:

| Activity Description | Start | Finish |
|---|---|---|

| Planning | ~~*October 1, 1994*~~ | *May 5, 1998* |
| Design | ~~*March 9, 1998*~~ | May 4, 2000 |
| Advertise | ~~May 5, 2000~~ | July 3, 2000 |
| Bid Opening | ~~n/a~~ | July 3, 2000 |
| Award | ~~July 4, 2000~~ | August 2, 2000 |
| Construction | ~~December 1, 2000~~ | November 30, 2002 |

d.   **Sand Island Parkway Wastewater Pump Station Modification:**
This project is required to accommodate the higher head of the
new Sand Island WWTP headworks. ~~The Permittee shall replace
existing pumps, electrical works, and associated appurtenances to
upgrade/improve pump station reliability.~~ The Permittee shall
modify the pump station to upgrade/improve station reliability,
accommodate higher collection flows, and accommodate higher
heads of downstream facilities. Modifications shall include
replacing/ rehabilitating existing pumps, electrical works, and
associated appurtenances, as appropriate. The Permittee shall
conduct this project in accordance with the following schedule of
activities:

| Activity Description | Start | Finish |
|---|---|---|
| Planning | ~~*September 1, 1998*~~ | ~~May 12, 2000~~ <br> April 30, 2001 |
| Design | ~~May 13, 2000~~ | ~~January 22, 2002~~ <br> January 10, 2003 |
| Advertise | ~~January 23, 2002~~ | ~~February 21, 2002~~ <br> February 9, 2003 |
| Bid Opening | ~~n/a~~ | ~~February 21, 2002~~ <br> February 9, 2003 |
| Award | ~~February 22, 2002~~ | ~~March 23, 2002~~ <br> March 11, 2003 |
| Construction | ~~June 22, 2002~~ | ~~*March 4, 2004*~~ <br> *February 18, 2005* |

e.   **Sand Island Wastewater Treatment Plant Unit 1 Phase 2A:** ~~The
Permittee shall construct new headworks and associated facilities
to satisfy 301(h) requirements to consistently remove ≥30% of
influent BOD, and improve WWTP performance.~~ The Permittee

shall construct facilities to satisfy 301(h) requirements to consistently remove ≥30% of influent $BOD_5$ and improve WWTP performance. Facilities shall include replacing/expanding headworks and associated facilities, as appropriate. The Permittee shall conduct this project in accordance with the following schedule of activities:

| Activity Description | Start | Finish |
|---|---|---|
| Planning | ~~December 1, 1994~~ | ~~September 11, 1999~~ October 4, 1999 |
| Design | ~~February 24, 1999~~ | ~~June 22, 2001~~ July 15, 2001 |
| Advertise | ~~July 16, 2001~~ | September 13, 2001 |
| Bid Opening | ~~n/a~~ | September 13, 2001 |
| Award | ~~September 14, 2001~~ | October 13, 2001 |
| Construction | ~~February 11, 2002~~ | *February 10, 2004* |
| Finish Milestone | ~~n/a~~ | *February 18, 2005* |

f.   **Sand Island Wastewater Treatment Plant Primary Treatment Expansion:** The Permittee shall construct additional primary treatment facilities, including pretreatment facilities, to expand treatment plant capacity from 82 MGD to 90 MGD (average daily design flow) and improve plant hydraulic capacity, and increase solids handling capacity. The Permittee shall conduct this project in accordance with the following schedule of activities:

| Activity Description | Start | Finish |
|---|---|---|
| Design | ~~September 12, 1999~~ | ~~May 18, 2002~~ July 14, 2002 |
| Advertise | ~~July 15, 2002~~ | September 12, 2002 |
| Bid Opening | ~~n/a~~ | September 12, 2002 |
| Award | ~~September 13, 2002~~ | October 12, 2002 |
| Activity Description | Start | Finish |
| Construction | ~~February 10, 2003~~ | *February 18, 2005* |

g.   **Sand Island Wastewater Treatment Plant Disinfection Facility:** The Permittee shall .... The Permittee shall conduct this project

in accordance with the following schedule of activities:

| Activity Description | Start (no later than) | Finish |
|---|---|---|
| Planning | ~~February 28, 1998~~ | ~~April 24, 1999~~ June 30, 1999 |
| Design | ~~July 1, 1999~~ | June 30, 2000 |
| Advertise | ~~July 1, 2000~~ | August 29, 2000 |
| Bid Opening | ~~n/a~~ | August 29, 2000 |
| Award | ~~August 30, 2000~~ | September 28, 2000 |
| Construction | ~~December 28, 2000~~ | July 20, 2002 |
| ~~1-Year~~ Continuous Operation | July 21, 2002 | ~~July 20, 2003~~ |

During the period beginning with July 21, 2002 and lasting through the expiration date of this permit, the authorized discharge of treated wastewater from Discharge Serial No. 001 shall be limited and monitored by the Permittee as specified below: . . . .

h.  **Sand Island Wastewater Treatment Plant Interim Chemical Treatment Facility Improvements:** The Permittee shall . . . . The Permittee shall conduct this project in accordance with the following schedule of activities:

| Activity Description | Start | Finish |
|---|---|---|
| Design | ~~June 1, 1998~~ | ~~July 31, 1999~~ January 12, 2000 |
| Advertise | ~~August 1, 1999~~ | ~~September 29, 1999~~ March 12, 2000 |
| Bid Opening | ~~n/a~~ | ~~September 29, 1999~~ March 12, 2000 |
| Award | ~~September 30, 1999~~ | ~~October 29, 1999~~ April 11, 2000 |
| Activity Description | Start | Finish |
| Construction | ~~February 27, 2000~~ | ~~August 29, 2001~~ February 10, 2002 |

i.  **Sand Island Wastewater Treatment Plant Chlorination Study:**

The Permittee shall . . . . The Permittee shall conduct this project in accordance with the following schedule of activities:

| Activity Schedule | Start | Finish |
|---|---|---|
| Data Collection | ~~January 1, 1997~~ | December 30, 1998 |
| Interim Report | ~~January 1, 1998~~ | *April 15, 1998* |
| Final Report | ~~December 31, 1998~~ | March 31, 1999 |

In accordance with 40 CFR 122.41(l)(5), written reports of compliance or noncompliance with, or any progress reports on, requirements contained in these schedules of compliance for the Sand Island WWTP Upgrade shall be submitted by the Permittee no later than 14 days following each scheduled date. In addition, beginning March 31, 1998, written progress reports shall be submitted quarterly to the EPA and DOH detailing the status of project activities described in Part A.2 of this permit. Reports shall also include a discussion of the status of project activities in relation to project activity description "early" and "late" start dates provided in the Permittee's August 25, 1998 letter to the EPA (WMC 98-736).

Part I.1.g has been revised as follows:

| Report | Reporting Period | Report Due Date |
|---|---|---|
| Discharge Monitoring Report | Monthly | 28th day of month following completed reporting period |
| Compliance Schedule Reports in Part A.2 of this permit | n/a | 14th day following each scheduled date |
| | Quarterly | As specified in Part A.2 of this permit |
| Initial Investigation TRE Workplan | Once/permit | 90th day after permit effective date |
| Report | Reporting Period | Report Due Date |
| Wastewater Pollution Prevention Program Annual Report | Annually | March 31 |
| Pretreatment Annual Report | Annually | March 31 |

| SIU Compliance Status Report | Semi-annually | July 31 |
|---|---|---|
| Sludge/Biosolids Annual Report | Annually | February 19 |

14.    **COMMENT:**

Part A.2.g of the draft permit includes language implying that continuous operation of
the Sand Island WWTP Disinfection Facility is required after one year of continuous
operation. This requirement is not supported by the TDD, by testing done by the
Permittee and the Mamala Bay Study (MBS), and has not been agreed to by the
Permittee. The Permittee agreed to do "appropriate disinfection." It is requested that
such an appropriate disinfection requirement be incorporated into the final permit. The
following wording is suggested:

> The City shall, after one year of continuous disinfection, operate
> the Disinfection Facility during periods of prolonged plume
> surfacing combined with onshore surface currents, or problems
> with the outfall pipe. The "periods of prolonged onshore current
> movement" shall be determined by evaluating all ocean current
> and bacteriological monitoring data collected since 1976, when the
> existing outfall went into operation. The applicant, EPA Region
> IX, and State DOH shall jointly set up criteria for the
> determination of prolonged onshore current movement and shall
> jointly agree to that determination. When the Disinfection facility
> is operating during the one year period, a maximum daily limit for
> enterococcus of 18,000 CFU/100 ml shall be achieved.

**RESPONSE:**

The Permittee has communicated to the EPA and DOH that, following one year of
continuous operation of the Sand Island WWTP Disinfection Facility, it plans to disinfect
the Sand Island WWTP discharge "only when oceanographic conditions indicate a
prolonged plume surfacing combined with onshore surface currents or problems with the
outfall pipe." The EPA's and DOH's intent regarding the duration of continuous
disinfection has been clarified in the final permit. Part A.2.g of the final permit requires
a minimum of one year continuous disinfection during the permit term (see response to
comment number 13), following which time the Permittee may request that the EPA and
DOH re-evaluate permit conditions for disinfection (see special condition #7 in Part J of
the final permit). The EPA and DOH intend that the Sand Island WWTP discharge shall
continue to meet an enterococcus discharge limitation of 18,000 CFU/100 ml until the
EPA and DOH complete their assessment of all bacteriological indicator monitoring data
required by the permit, in addition to other pertinent information provided by the
Permittee.

This disinfection requirement is supported by the EPA's TDD. As described in the TDD, various analyses have indicated that the risks of contracting an infection by bathing, swimming, surfing, or fishing in Mamala Bay waters inshore from the Sand Island ocean outfall are low. However, the EPA's simulation effort for the Sand Island discharge provided approximately a 1% probability of impact to nearshore areas. In addition, other predictive studies have shown that the Sand Island discharge can reach the shoreline. While the EPA believes that the probability of these events occurring is low (based on existing ambient data including bacteria monitoring and physical oceanographic measurements collected by the Permittee during the ongoing *Sand Island WWTP Chlorination Study*), the EPA is taking appropriate measures to ensure that marine recreational areas are fully protected; the enterococci discharge limitation of 18,000 CFU/100 ml will ensure that the Sand Island discharge will not adversely impact marine recreational waters of Mamala Bay.

To further clarify the EPA's and DOH's intent for continuous disinfection, the following permit reopener condition (special condition #7) has been added to Part J of the final permit:

> Following at least one year of continuous operation of the Sand Island WWTP Disinfection Facility, at the request of the Permittee, the EPA and DOH will re-evaluate the need for continuous effluent disinfection. To facilitate this process, the EPA and DOH will work with the Permittee and interested parties to evaluate all available information to assess the effects of the Sand Island WWTP discharge on nearshore and shoreline water quality without and with the operation of the Sand Island WWTP Disinfection Facility, where effective effluent disinfection is achieved (as specified in Part A.2.g of this permit). In order for the EPA and DOH to complete this assessment, the Permittee must provide all bacteriological indicator monitoring data required by this permit and other pertinent information to the EPA and DOH. The EPA and DOH will consider modifying this permit if: (1) the Permittee can demonstrate that the requested modification will not interfere with the attainment or maintenance of water quality that allows recreational activities in and on the water, consistent with federal 301(h) decision criteria, and will meet other NPDES permitting requirements; and (2) the Permittee is in compliance with the terms of this permit and all other applicable EPA requirements.

The EPA and DOH believe that the addition of this permit reopener condition and revisions to Part A.2.g of the permit (see response to comment number 13), in conjunction with existing requirements in the draft permit, best reflect the EPA's and DOH's viewpoint on this issue; consequently, further revisions to the permit will not be made in response to this comment.

15.    **COMMENT:**

The Permittee recommended that the EPA and DOH continue to conduct whole effluent toxicity (WET) testing using the test species *Ceriodaphnia dubia* and *Trypneustes*

*gratilla*; however, because the recommended protocol is still draft, compliance monitoring should not be required using the test species, *T. gratilla*, until the protocol is refined through inter-laboratory testing, etc. In addition, the Permittee recommends the addition of reporting conditions for consistent unacceptable control performance that may occur during the reporting period.

**RESPONSE:**

The EPA and DOH concur with the Permittee, that at this time the Permittee should continue testing using *T. gratilla* for monitoring purposes only. The EPA and DOH deny the Permittee's request that the Permittee's recommended reporting condition for unacceptable control performance be added to the final permit; where the Permittee is unable to successfully conduct WET tests during the reporting, the permittee should follow reporting procedures outlined in Part B.6 of the final permit. In response to this comment, Parts B.1.a and B.1.b of the draft permit are wholly replaced in the final permit by the following conditions:

1.   Chronic Toxicity

The Permittee shall conduct monthly chronic toxicity tests on flow-weighted 24-hour composite effluent samples.

a.   Test Species and Methods

The Permittee shall conduct monthly tests with the following invertebrate species.

(1)   Invertebrate:   Water flea, *Ceriodaphnia dubia.*

(2)   Invertebrate:   Hawaiian sea urchin, *Trypneustes gratilla.*

For *Ceriodaphnia dubia*, the presence of chronic toxicity shall be estimated as specified in *Short-Term Methods for Estimating the Chronic Toxicity of Effluents and Receiving Water to Freshwater Organisms* (EPA-600-4-91-002, 1994). For *Trypneustes gratilla*, the presence of chronic toxicity shall be estimated as specified in *Hawaiian Collector Urchin, Trypneustes gratilla (hawa'e) Fertilization Test Method*[14].

    b.    Definition of Chronic Toxicity

Chronic toxicity measures a sublethal effect (e.g., reduced growth) to experimental test organisms exposed to an effluent compared to that of the control organisms. The no observed effect concentration (NOEC) is the highest effluent concentration to which organisms are exposed in a chronic test, that causes no observable adverse effect on the test organisms (e.g., the highest concentration of toxicant to which the values for the observed responses are <u>not</u> statistically significantly different from the controls). Test results shall be reported in TUc, where TUc = 100/NOEC. For this discharge, chronic toxicity for *Ceriodaphnia dubia* is defined by an exceedance of a chronic toxicity discharge limitation specified in Part A.1 of this permit.

The chronic toxicity discharge limitation in Part A.1 of this permit does not apply to monitoring results for toxicity tests using *Trypneustes gratilla.* Chronic toxicity for *Trypneustes gratilla* is defined by an exceedance of an average daily chronic toxicity discharge value of 94 TUc.

In conjunction, the phrase ". . . chronic toxicity discharge limitation . . ." in Parts B.4.a, B.6.a, and B.6.b of the draft permit has been revised to ". . . chronic toxicity discharge limitation (or value) . . .", and references to Part "A.1" in Parts B.4.b and B.4.c of the draft permit have been revised to "B.1".

16.    **COMMENT:**

The Permittee's comments and support of the draft permit are based on the use of enterococcus as an indicator organism. The imposition of additional monitoring requirements is strongly objected to with the exception of limited testing for *Clostridium perfringens* during the one year of continuous disinfection mandated in the draft permit.

**RESPONSE:**

The EPA and DOH note that, as continuous disinfection conditions in the final permit have been clarified by the EPA and DOH, the Permittee <u>may</u> be required to monitor for *Clostridium* perfringens for longer than a one year period, in accordance with

modifications to the DOH/EPA-approved *Sand Island Wastewater Treatment Plant Chlorination Study Plan*. This plan was last modified by the DOH on February 23, 1998.

17.    **COMMENT:**

The Permittee requests that the location and dimensions of the official Zone of Initial Dilution and Zone of Mixing be included in the permit.

**RESPONSE:**

The following two sentences have been added to footnote 17 of the final permit:

> The ZOM area is 427 meters (1,400 feet) wide and 1,463 meters (4,800 feet) along the centerline of the diffuser, and extends vertically downward to the ocean floor. The center of the ZOM is at Latitude 21°16'58"N, Longitude 157°54'21"W, with the major axis located on an azimuth of 80°01'40" from the south.

The dimensions of the Zone of Initial Dilution (ZID) for the Sand Island WWTP discharge are 143.1 meters (469.5 feet) wide and 1,176.6 meters (3,860.2 feet) along the centerline of the diffuser. These dimensions are not specified in the final permit; however, the EPA has designated nominal ZID stations in Part E of the final permit.

18.    **COMMENT:**

Flow rate notification as outlined in the draft permit is provided in the Permittee's comment letter. The Permittee requests that Part F.2 of the draft permit be deleted or annotated "as applicable" or "if applicable" in the final permit.

**RESPONSE:**

The EPA and DOH have deleted Part F.2 from the final permit.

19.    **COMMENT:**

Part G.4.a: Correct "Part G.4.c of this permit . . ." to read "Part G.4.d of this permit . . .".

**RESPONSE:**

Citation is corrected in the final permit to read: "Part G.4.d of this permit . . .".

20.   **COMMENT:**

The term "BMP-based" in the draft permit should be replaced with the term "Policy/BMP-based."

**RESPONSE:**

The 1991 administrative order to the CCH included a requirement for the CCH to perform a local limits evaluation. On November 29, 1994, the CCH submitted to the EPA a local limits evaluation and proposed limits for several toxic pollutants. In addition, the CCH proposed regulating animal and vegetable-based oil and grease with a local limit of 500 mg/l. In an April 20, 1995 letter to the CCH, the EPA responded by explaining that, based on the CCH's analysis, local limits were not needed for the ten metals studied in detail, or for any of the other priority pollutants evaluated in the study. Furthermore, the EPA explained that the CCH's proposed local limit for animal and vegetable-based oil and grease required additional justification and recommended that oil and grease be regulated under a program based on non-numeric best management practices (BMPs) which includes the installation and maintenance of properly sized oil and grease traps and interceptors. In an April 15, 1997 letter to the EPA, the CCH outlined several actions it was taking to support a BMP-based approach for controlling animal and vegetable oil and grease.

The reference to "BMP-based" controls correctly reflects the EPA's view that these measures are the best controls for preventing collection system obstructions. There are several methods for implementing such controls, including the use of municipal policy documents. However, in all cases the "BMP-based" controls must be enforceable under the CCH's ordinance. Part G.4.f.3 of the permit addresses the schedule for changes to the CCH's ordinance. The EPA believes the existing requirement in the draft permit best reflects the Agency's viewpoint on this issue; consequently, the final permit has not been revised in response to this comment.

21.   **COMMENT:**

Part G.4.e.1 of the permit should be revised as follows: The development of ~~an objective procedure~~ a program with the objective to identify, remedy, and prevent obstructions in the wastewater collection system involving animal and vegetable oil and grease;

**RESPONSE:**

The language in the draft permit correctly reflects the EPA's view that the animal and vegetable oil and grease control program must be objective. The Permittee must be able to provide the regulated community, DOH, and the EPA with clear basis and criteria for implementing the program. In addition, the quality and quantity of data and analysis

must be sufficient to support a program that is enforceable under the CCH's ordinance. The EPA has not revised the draft permit in response to this comment.

22.  **COMMENT:**

The reporting requirements in Part G.6 of the permit should also be included in the Honouliuli WWTP's NPDES permit, in order to allow the Permittee to consolidate its reports.

**RESPONSE:**

The EPA and DOH concur with this comment and will draft the Honouliuli WWTP's NPDES permit accordingly.

23.  **COMMENT:**

The Permittee requests that Part H.10 of the draft permit be revised in the final permit to read: "a. Biosolids that are land applied shall be tested semi-annually for all pollutants. . .", if testing of biosolids that are land applied is not required by regulation. If this a regulatory requirement, then reference the regulation.

**RESPONSE:**

The requirement to test sludge semi-annually for all priority pollutants listed under section 307 of the CWA is needed in order to: (1) determine the effectiveness of the pretreatment program; and (2) determine that sludge is of sufficient quality for all use or disposal options. In the past, the EPA has included this requirement as part of the permit conditions for pretreatment, along with semi-annual influent and effluent testing for priority pollutants. It is required of all POTW's with pretreatment programs, regardless of their current sludge use or disposal practice. This requirement is different from the specific metals testing required for sludge that is land applied. If sludge is land applied, then it must be tested monthly for nine metals using analytical methods in SW-846. The EPA has not revised the draft permit in response to this comment.

24.  **COMMENT:**

The draft permit requirements for the analysis of Priority Pollutants are inconsistent between samples. It is requested that the permit be modified to allow methods included in 40 CFR 136. The Permittee, therefore, requests that either the tables indicating analytical methods be deleted from the permit or that the changes suggested in its August 25, 1998 letter to the EPA be incorporated into the final permit.

**RESPONSE:**

Analytical methods requested by the Permittee have been incorporated into the final permit, with the exception of Flame/AA for zinc, due to higher detection limits.

25.   **COMMENT:**

The Permittee requests that the requirement for ODES reporting be eliminated and replaced with another database that can be used to assess the impacts of the Sand Island WWTP discharge. The Permittee also requests an eight month transition period to rewrite and test the new database reporting system to comply with the new database reporting requirement.

**RESPONSE:**

Part I.1.e of the final permit has been revised, as follows:

> All influent, effluent, and receiving water data shall be submitted annually to the EPA (WTR-2) for the ODES (Ocean Data Evaluation System) in accordance with the specifications in the ODES Data Submission Guidelines Manual (or equivalent data base/submission guidelines, as directed by the EPA).

The EPA believes that adding "as directed by the EPA" provides the Permittee the flexibility it has requested.

26.   **COMMENT:**

The Permittee requests that the annual report requirement in Part F.1 of the permit be added to Part I.1.g of the final permit. Also, the Permittee recommends that Offshore Sediment and Fish Monitoring report due dates be revised to March 31 following the year of the reporting period to allow for the submission of a single Annual Assessment Report incorporating many of the smaller reports required under the permit. The Permittee requests that additional report due dates be changed to March 31.

**RESPONSE:**

Reporting for the annual report requirement in Part F.1 of the permit is required in Part I.1.g of the permit.

Part I.1.h of the final permit has been revised, as follows:

| Report | Reporting Period | Report Due Date |
|--------|------------------|-----------------|

| Quality Assurance Project Plan | Annually | March 31 |
|---|---|---|
| Shoreline water quality monitoring | Monthly | 28th day of month following completed reporting period |
| Offshore water quality monitoring | Quarterly/ Semi-annually | 90th day following completed reporting period (years 1, 2, and 4/ years 3 and 5) |
| Offshore sediment (chemistry and benthic organisms) | Annually | ~~120th day~~ March 31 following completed reporting period (years 1, 2, and 4) |
| Fish Monitoring | Annually | ~~90th day~~ March 31 following completed reporting period (years 1, 2, and 4) |
| Regional Monitoring Activities Report | Annually | March 31 following completed reporting period (years 3 and 5) |
| ODES (or equivalent) Data Submission Report (EPA only) | Annually | ~~90th day~~ March 31 following completed reporting period |

Paul Achitoff, Earthjustice Legal Defense Fund (August 25, 1998 public hearing)

27.     **COMMENT:**

Earthjustice Legal Defense Fund questions whether the level of treatment required in the draft permit will allow effective disinfection as the MBSC advised and particularly whether it will allow UV disinfection which the MBSC specifically recommended be investigated. The EPA and DOH are urged to insist that the CCH commit to UV disinfection at all times.

**RESPONSE:**

The Sand Island WWTP's 301(h)-NPDES permit issued by the EPA and DOH addresses these concerns (see response to comment numbers 14 and 31).

Jim Anthony, Hawaii-Laieikawai Associated Incorporated (August 25, 1998 public hearing)

28.     **COMMENT:**

The crucial issue before the EPA and DOH is whether the 301(h)-modified NPDES permit granted to the Permittee will carry with it a mandatory routine disinfection requirement. The permit should not leave to the discretion of the Permittee when it will

disinfect its effluent. The EPA should impose on the Permittee the requirement of mandatory disinfection that is contained in the draft permit. This permit condition, with respect to mandatory disinfection, is not as stiff and clear and concise as it ought to be.

**RESPONSE:**

The EPA and DOH agree and in response have revised Parts A.2.g and J.7 of the permit (see also response to comment number 14).

Richard Brock, University of Hawai'i at Manoa (August 25, 1998 public hearing)

29.     **COMMENT:**

The commentor questions the importance of viable but nonculturable (VNC) pathogens raised in testimony earlier in the evening and concludes that there is a lack of evidence to show that VNC pathogens are a problem in Mamala Bay.

**RESPONSE:**

See response to comment number 31.

David Frankel, Sierra Club (August 25, 1998 public hearing)

30.     **COMMENT:**

Several things need to be done to improve the CCH's sewage system: (1) more TSS removal; (2) routine sewage disinfection; and (3) the CCH needs to begin earnestly reusing wastewater so that freshwater can be conserved.

**RESPONSE:**

See response to comment numbers 14, 31, and 33. Also, it is the policy of the DOH to promote the reuse of properly treated wastewater for irrigation provided that groundwater will not be adversely affected. There is presently no demand to support the reuse of Sand Island WWTP effluent. Moreover, potential applications for reuse are further limited due to the effluent's relatively high salinity which results from infiltration/ inflow into the collection system.

Steve Holms, Honolulu City Council (August 25, 1998 public hearing) including Donald Harleman, Massachusetts Institute of Technology (August 18, 1998 letter)

31.  **COMMENT:**

The commentor's biggest concern is in the area of microbiology and the potential impact of the Sand Island ocean outfall on public health. (Commentor provided letter from D. Harleman to S. Holms, dated August 18, 1998, which summarizes the results of section MB-11A of the MBS and recommendations of the MBSC relative to upgrading treatment at the Sand Island WWTP.) Donald Harleman was involved in the MBS for technology improvements at the Sand Island WWTP. His report assumed that the Sand Island WWTP would be achieving 85% removal of influent $BOD_5$ and TSS and would be using medium pressure UV disinfection. The draft permit requires 60% removal efficiency of influent TSS which may result in inefficient UV disinfection.

Due to the lifestyle in Hawaii, there is a much higher threshold of potential human exposure to pathogens in the water. Because bacteria can be VNC and because indicator organisms simply "point the finger" at other types of disease-causing organisms, the commentor urges the EPA to establish new water quality criteria for Hawaii. Moreover, until better indicator organisms are developed, the Sand Island WWTP should be held to a higher level of treatment until water quality standards without flaws have been adopted.

**RESPONSE:**

In accordance with the CWA and its implementing regulations, the EPA must establish 301(h) discharge limitations for $BOD_5$ and TSS which protect State water quality criteria directly related to the <u>pollutant being waived</u>. In addition, the EPA's TDD may require additional permit conditions to protect State water quality criteria for other types of pollutants (e.g., water quality based discharge limitations to protect recreational uses in the receiving water). The EPA and DOH believe that a water quality based discharge limitation for enterococci of 18,000 CFU/100 ml will protect marine recreational waters in Mamala Bay (see page 44 of the TDD). The EPA and DOH agree that the Permittee may need to reduce effluent turbidity in order to achieve effective disinfection as required by Part A.2.g of the permit, depending on the disinfection technology implemented by the Permittee. While the EPA's NPDES permitting regulations do not allow the Agency to select treatment technologies which a permittee must implement to achieve compliance with water quality based permit conditions, the EPA and DOH retain authority to take appropriate enforcement action should a permittee be found in non-compliance with any condition of its permit.

The EPA and DOH also recognize that due to the potential presence of VNC pathogenic bacteria there may be concern that detected levels of bacterial contamination may be lower than those actually occurring and affecting public health. While the EPA and DOH accept that VNC forms of pathogens exist, their public health significance has not been established. The Agency believes that water quality criteria based on enterococci, an indicator of bacteriological pathogens in beach water, continue to provide a better

correlation with swimming-associated gastrointestinal illnesses. These criteria are particularly useful to public health administrators because they enable quantitative estimates of illness rates associated with swimming in polluted water. The Agency also recognizes the need for improved indicators of pathogenic organisms and is conducting studies to achieve this end.

The Agency has been increasingly concerned with the public health risks of infectious diseases caused by microbial organisms at our nation's beaches. To address this concern, the Agency has established the Beaches Environmental Assessment Closure and Health (BEACH) Program. This program is directed toward strengthening State, Tribal and local beach programs, improving scientific methods, and informing the public. In 1997, under the BEACH Program, the Agency made available a new faster method to detect the presence of enterococcus bacteria. The Sand Island WWTP's final permit requires monitoring using this new enterococcus method which reduces analysis time to 24 hours and improves analytical quality. The EPA views the use of this method as the first important step toward improving science to better protect public health at beaches.

[The EPA also notes that in accordance with 40 CFR 125.57(a)(9), the Permittee has demonstrated that the Sand Island WWTP routinely achieves $\geq 30\%$ removal of influent $BOD_5$. To ensure compliance with the average monthly discharge limitation of $\geq 30\%$ removal of influent $BOD_5$, the Permittee maintains the ability to utilize chemical addition and other operational configurations to facilitate compliance with this permit condition.]

Hans Krock, University of Hawai'i at Manoa (August 25, 1998 public hearing)

32.    **COMMENT:**

With respect to the CCH's 301(h) application and the granting of an extension of its 301(h) variance, the results of the monitoring program show that the effects of the wastewater discharge on the receiving water with the present treatment scheme has been negligible on benthic organisms, and have not been detrimental as far as the common water quality parameters are concerned. In terms of the overall environmental effects of the discharge, secondary treatment would produce more air pollution. The CCH's approach to the need for disinfection is correct: study the problem, take appropriate action if necessary, and utilize the latest technology. The commentor supports the CCH's 301(h) application.

**RESPONSE:**

The EPA and DOH have reached, in part, a similar conclusion. The final 301(h)-modified NPDES permit contains conditions for effluent disinfection which will protect public health and the environment.

Reese Liggett, private citizen (August 25, 1998 public hearing)

33.    **COMMENT:**

Commentor does not understand why and disagrees completely with EPA's tentative decision to grant a variance to the CCH for the Sand Island WWTP discharge. Fresh water is too valuable to flush into the ocean; it should be cleaned and reused on the Oahu. The EPA should do it's duty and stop waiving federal Clean Water law, and the DOH should begin mandating the reuse of properly treated effluent.

**RESPONSE:**

The EPA is mandated by the U. S. Congress to oversee implementation of section 301(h) of the CWA. This law and its implementing regulations allow the EPA to grant variances from federal secondary treatment standards in accordance with nine decision criteria where human health and the environment are protected. The EPA agrees that water reuse is good policy and that the CCH should be encouraged to reuse as much wastewater as possible. The EPA is currently working with the Permittee to implement a water reclamation program at the Honouliuli WWTP which is currently discharging under a 301(h) -modified NPDES permit. This joint effort will eventually result in the reclamation of at least 10 MGD of tertiary treated wastewater on the Ewa plain. See also response to comment number 30.

Keith Palmer, private citizen (August 25, 1998 public hearing)

34.    **COMMENT:**

The impact of the Sand Island WWTP discharge on the productivity of a relatively non-productive water body [Mamala Bay] should be considered. The fact that pathogen testing is only done through indicator organisms needs to be better addressed by the CCH and State. Better indicators could lead to requiring a higher standard for treatment of the Sand Island WWTP discharge. Until these things are better understood, there should be no diminution of the quality of wastewater treatment. The State and CCH should try and maintain at least secondary treatment quality of sewage discharged to Mamala Bay.

The discharge should be tested before it gets into the ocean. The use of better test methods for pathogens is advocated.

**RESPONSE:**

The draft and final permit require frequent influent and effluent monitoring as outlined in Part A.1 of the permit. See also response to comment number 31. In addition, a new indicator, *Clostridium perfringens*, is currently being proposed by the DOH in revisions

to its State Water Quality Standards.

Anthony Russo, University of Hawai'i at Manoa (August 25, 1998 public hearing)

35.  **COMMENT:**

For the past decade, scientists with the Water Resources Research Center at UH Manoa have been monitoring the effects of CCH's sewer outfalls on the surrounding marine communities. To summarize, there is no evidence to indicate a developing problem to the marine environment in the area near or at a distance from the Sand Island WWTP discharge. A move to secondary treatment at this time is unnecessary and would be fiscally unsound.

**RESPONSE:**

The EPA agrees and is issuing its final decision and 301(h)-modified NPDES permit for the Sand Island WWTP discharge.

Kenneth Sprague, City and County of Honolulu (August 25, 1998 public hearing)

36.  **COMMENT:**

The CCH is generally pleased with the proposed granting of the Sand Island WWTP 301(h)-modified NPDES permit; however, the CCH has two major concerns regarding disinfection conditions and regional monitoring conditions of the draft permit. The draft permit specifies continuous disinfection and does not clearly state the CCH's intent as discussed with the EPA. We are requesting revisions to reflect the CCH's intent. Also, the draft permit conditions on regional monitoring incorrectly hold the CCH solely responsible for conducting the entire program. While the CCH is already committed to conducting the core monitoring program to assess the impact of the Sand Island WWTP discharge, we will not be solely responsible for the regional program. Revisions are being requested to clarify our role in the regional monitoring program. A full list of comments and proposed changes have been submitted to the EPA under a separate cover (see CCH's August 25, 1998 and September 1, 1998 letters to the EPA).

**RESPONSE:**

See response to comment number 14 and response to comments for Part E of the permit.

Kenneth Sprague, City and County of Honolulu (September 1, 1998 letter)

37.  **COMMENT:**

Regarding Part A.2.g of the draft permit, the CCH comments: "We have agreed to implement appropriate and continuous disinfection as recommended by the Mamala Bay Study. We request, over the long term and after the permit specified one year continuous disinfection period (July 21, 2002 - July 20, 2003), to appropriately and continuously disinfect primary treated effluent according to the enterococcus limits specified in the permit or when it can be shown that the discharge of primary treated effluent from the Sand Island Ocean Outfall results in exceedance the State recreational waters standards at applicable monitoring stations."

**RESPONSE:**

In response to this comment and comments the CCH dated August 25, 1998, Parts A.2.g and Part J.7 of the permit have been revised (see response to comment number 14).

38.    On September 25, 1998, Don Peipgrass (CCH) spoke by telephone with Robyn Stuber (EPA) and requested that the EPA review the basis for the total chlorine residual discharge limitation proposed in Part A.2.g of the draft permit. In response, the EPA reviewed applicable water quality based discharge limitations and technology based discharge limitations for this discharge parameter and has determined the following:

Based on State water quality criteria, the applicable water quality based discharge limitation would be 705 ug/l (see draft permit fact sheet for the derivation of water quality based discharge limitations).

Based on the EPA's Best Professional Judgment, the applicable technology based discharge limitation would be the Minimum Level of 64 ug/l (i.e., Method Detection Limit of 20 ug/l x 3.18; see also footnotes 21 and 22 in the final permit).

Based on this assessment, the discharge limitation for total chlorine residual in Part A.2.g of the final permit has been revised, as follows:

| Discharge Parameter | Discharge Limitations | | | | Monitoring Requirements | |
|---|---|---|---|---|---|---|
| | Average Monthly | Average Weekly | Maximum Daily | Units | Minimum Frequency | Sample Type |
| Enterococci | report[12] | report[12] | 18,000 | CFU/100 ml | daily | grab[12] |
| Total Chlorine Residual[13] | ~~At any time, not less than 0.1 nor greater than 0.6~~ | | | ug/l | ~~continuous~~ daily | ~~analyzer~~ grab[12] |
| | report | report | 64 | | | |

In addition, the first sentence of footnote number 12 in the final permit has been revised,

as follows:

Report enterococci as geometric mean.

39.    As noticed in the draft permit fact sheet, prior to the public hearing the EPA re-evaluated "reasonable potential" (in accordance with 40 CFR 122.44(d)) for the following discharge parameters: beryllium, chlordane, dieldrin, and heptachlor.  At the public workshop conducted in Honolulu, HI on August 25, 1998, the EPA announced its finding that chlordane and dieldrin have the reasonable potential to cause or contribute to an exceedance of State water quality criteria.  Consequently, the following discharge limitations will be incorporated into Part A.1 of the final permit:

| Discharge Limitations | | | | |
|---|---|---|---|---|
| Discharge Parameter | Average Annual | Average Monthly | Average Daily | Units |
| Chlordane | 0.0076 0.0052 | n/a | 0.38 0.26 | ug/l lbs/day |
| Dieldrin | 0.012 0.0082 | n/a | 0.18 0.12 | ug/l lbs/day |