CARRIE OKINAGA, 5958
Corporation Counsel
KATHLEEN A. KELLY, 6729
Deputy Corporation Counsel
City and County of Honolulu
530 South King Street, Room 110
Honolulu, Hawaii 96813
Telephone: (808) 523-4203
Facsimile: (808) 523-4583
Email: kkelly@honolulu.gov

BINGHAM McCUTCHEN LLP
JAMES J. DRAGNA (CA SBN 91492)
NANCY M. WILMS (CA SBN 111837)
BRYAN K. BROWN (CA SBN 192924)
355 South Grand Avenue, Suite 4400
Los Angeles, CA 90071-3106
Telephone: (213) 680-6400
Facsimile: (213) 680-6499
Email: nancy.wilms@bingham.com

Attorneys for Defendant
CITY AND COUNTY OF
HONOLULU

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI'I

SIERRA CLUB, HAWAI'I CHAPTER; HAWAI'I'S THOUSAND FRIENDS; and OUR CHILDREN'S EARTH FOUNDATION,

Plaintiffs,

v.

CITY AND COUNTY OF HONOLULU,

Defendant.

CIVIL NO. CV 04-00463 DAE-BMK

**DEFENDANT CITY AND COUNTY OF HONOLULU'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' THIRD, FOURTH, AND EIGHTH CLAIMS; DECLARATION OF ROSS TANIMOTO; EXHIBITS A THROUGH D; DECLARATION OF KATHLEEN A. KELLY; CERTIFICATE OF SERVICE**

Heard: October 9, 2007
10:30 a.m.
Hon. David E. Ezra

**SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

At the October 9, 2007 hearing on plaintiffs'[1] Motion for Partial Summary Judgment, defendant City and County of Honolulu ("CCH") informed the Court that its Sand Island Permit contains an error in its annual average effluent limitations for chlordane. The United States Environmental Protection Agency ("EPA") has recognized this error, and the State of Hawaii Department of Health ("DOH") has acknowledged that the standard upon which the Permit limit is based is a typographical error. As a result, CCH's DMRs -- while accurately setting forth the testing results under the methodology prescribed in the Permit -- incorrectly characterize those results as exceedances of the chlordane annual average limit for 106 months between May 1999 and August 2007.

Through the submission of this information, CCH is not attempting to challenge the Permit terms pursuant to Section 509(b)(1) of the Clean Water Act ("CWA"). Indeed, CCH acknowledges that it is subject to annual average limits for chlordane and does not dispute the methodology for determining those limits as set forth in the Permit. Rather than taking an adversarial position to the Permit, CCH is merely pointing out an error of fact inadvertently made by the regulators. Both the federal regulations governing NPDES permits and the Sand Island

---

[1] Plaintiffs Sierra Club, Hawai'i Chapter, Hawai'i's Thousand Friends, and Our Children's Earth Foundation are collectively referred to herein as "plaintiffs."

Standard Permit Conditions allow for such minor modifications in these circumstances.

Furthermore, by pointing out this permit error, CCH is not challenging the data reported in the DMRs. Rather, CCH disputes that the reported data in certain cases violates permit requirements. There is no legal authority to bind CCH to reported noncompliances that are based on exceedances of limits based on a typographical error. The case cited by plaintiffs -- Union Oil )-- only prohibits the permittee from impeaching its DMRs based on sampling error (the so-called "sampling error defense"). There simply is no sampling error at issue here. Further, CCH has found no case expanding the narrow holding of Union Oil beyond errors in sampling, sloppy laboratory practices, or incorrect recording of data. This Court should decline to expand the Union Oil ruling here to demand strict adherence to erroneously derived permit limitations.

As a result of the information presented herein and in CCH's Opposition to plaintiffs' Motion for Partial Summary Judgment and Supporting Declarations ("Opposition"), a question of fact exists as to the number of pesticide violations.[2] Neither this Court -- nor plaintiffs -- should hold CCH liable based on

[2] Through this Supplemental Memorandum, CCH does not intend to concede its position expressed in the Opposition regarding the appropriate methodology for the counting of violations of annual average effluent limitations. Instead, CCH wishes to avail itself of the opportunity graciously granted by the Court to address the issues raised herein.

permit limits that the State Department of Health admits are based on a discrete typographical error, the addition of an extra “0”, in its water quality standards for chlordane.

## I. CCH MET THE CORRECTED ANNUAL AVERAGE CHLORDANE LIMITS ON 106 MONTHS BETWEEN MAY 1999 AND AUGUST 2007

The State of Hawaii Water Quality Standard (“WQS”), as set forth in Hawaii Administrative Rule §11-54-4, provides numeric standards for toxic pollutants. Declaration of Ross Tanimoto in Support of Supplemental Memorandum (“Tanimoto 2 Decl.”), ¶ 2. The published fish consumption for chlordane is 0.000016 µg/l. This standard inadvertently includes an extra “0” and is therefore incorrect by a factor of 10. The correct standard is 0.00016 µg/l. Because the Sand Island Permit’s annual average concentration and mass limits for chlordane are based on the numeric fish consumption standards set forth in the State WQS, the Permit’s concentration and mass limits are likewise erroneously and unduly stringent. When these limits are corrected, CCH’s DMRs actually show that CCH met the corrected chlordane annual average concentration limit for 51 months since May 1999 and met the corrected chlordane annual average mass limit for 55 months since 1999. Tanimoto 2 Decl., ¶¶ 14, 15.

A. The Fish Consumption WQS For Chlordane, As Published In The State Of Hawaii Administrative Rules, Is A Typographical Error

The State of Hawaii Department of Health ("DOH"), the agency responsible for promulgating the State WQS, has explicitly recognized that the fish consumption WQS for chlordane contains an extra "0" and is a typographical error. The correct standard, acknowledged by DOH, is 0.00016 µg/l, and not 0.000016 µg/l, as published in the Hawaii Administrative Rules. Declaration of Kathleen A. Kelly in Support of Supplemental Memorandum ("Kelly Decl."), attaching Declaration of Laurence K. Lau, Deputy Director, Department of Health; see also Tanimoto 2 Decl., ¶¶ 2-10. DOH has stated that it intends "to rectify this error" and notes that EPA has confirmed the error. Kelly Decl., ¶ 2. EPA has also acknowledged the error in its March 27, 2007 Tentative Decision regarding the Honouliuli WWTP, wherein EPA recognizes that the "water quality criterion for chlordane, to protect human consumption of fish, is 0.00016 µg/." Tanimoto 2 Decl., Exh. D.

Given that EPA and DOH both agree that the correct fish consumption WQS for chlordane is 0.00016 µg/l, the permit limits for chlordane must likewise be corrected.

B. As A Direct Result Of The Typographical Error In the WQS, The Annual Average Chlordane Limits In The Sand Island Permit Are Likewise Incorrect

The Permit contains annual average concentration and mass limits for chlordane, which are based on the incorrect fish consumption WQS for chlordane set forth under §11-54-4. The chlordane annual average limits are calculated based on mathematical equations expressly set forth in the Permit.

1. Concentration Limit

Under Section A, footnote 4 of the Sand Island Permit, the annual average concentration limitation for chlordane is derived by multiplying the “fish consumption (carcinogen) criterion” by the long-term dilution factor of 476:1. Declaration of Maile Chun in Support of CCH’s Opposition (“Chun Decl.”), Exh D at 5; Tanimoto 2 Decl., ¶ 12. Thus, the annual average concentration limit for chlordane is calculated as follows:

| ANNUAL AVERAGE CONCENTRATION LIMIT FOR CHLORDANE | | | |
|---|---|---|---|
| | Fish Consumption WQS | Dilution Factor | **Permit Limit** |
| Based on Erroneous WQS | 0.000016 µg/l | 476:1 | 0.0076 µg/l |
| Based on Corrected WQS | 0.00016 µg/l | 476:1 | **0.076 µg/l** |



A/72252860.3/2017866-0000309724

Thus, the annual average concentration limit for chlordane set forth in the Permit is incorrect by a factor of 10.

Based on the correct limit, CCH's DMRs show that CCH met the annual average concentration limit for chlordane on 51 months between May 1999 and August 2007. Tanimoto 2 Decl., ¶ 14.

2. Mass Limit

Under Section A, footnote 4 of the Sand Island Permit, the annual average mass limitation for chlordane is derived by multiplying the average annual concentration limit (in mg/l) by the average daily design flow and the constant. Chun Decl., Exh D at 4; Tanimoto 2 Decl., ¶ 13. This is calculated as follows:

| ANNUAL AVERAGE MASS LIMIT FOR CHLORDANE | | | | | |
|---|---|---|---|---|---|
| | Concentration Limit | Unit Conversion | Daily Design Flow | Constant | **Permit Limit** |
| Based on Erroneous WQS | 0.0076 µg/l | 0.001 mg/µg | 82 MGD | 8.34 lbs/gal | 0.0052 lbs/day |
| Based on Corrected WQS | 0.076 µg/l | 0.001 mg/µg | 82 MGD | 8.34 lbs/gal | **0.052 lbs/day**<br>**0.24 kgs/day** |

Thus, the annual average mass limit for chlordane set forth in the Permit is also incorrect by a factor of 10.

Based on the correct limit, CCH's DMRs show that CCH met the annual average mass limit for chlordane on 55 months between May 1999 and August 2007. Tanimoto 2 Decl., ¶ 15.

## II. THE COURT SHOULD CONSIDER EVIDENCE OF THE ERRONEOUS CHLORDANE STANDARD

As set forth above, the State DOH has acknowledged that the annual fish consumption WQS as set forth in §11-54-4 is a typographical error and should in fact be 0.00016 µg/l. Both the federal regulations governing the Sand Island Permit (40 C.F.R. § 122.63), as well as the Standard Permit Conditions incorporated into the Permit (Tanimoto 2 Decl., ¶ 8), state that "corrections or allowances for changes in the permitted activity" may be made to a NPDES permit to correct typographical errors. Such minor modifications may be made without public review as required for "modifications for cause" under 40 C.F.R § 122.62. As described above, both DOH and EPA have recognized the error in the fish consumption WQS for chlordane under §11-54-4.

As 40 C.F.R. § 122.63 makes clear, CCH is not precluded from identifying typographical errors for consideration and correction, and in doing so, *CCH is not challenging the terms of the Permit* under CWA § 509(b)(1). CCH does not argue that it should not be subject to annual average limitations for chlordane. Nor does CCH take issue with the methodology for calculating the annual average limits as clearly set forth in the Permit. See Chun Decl., Exh. D.

Indeed, the CWA explicitly contemplates modifications to a permit in circumstances like these.[3] See CWA § 402(b)(1). Simply put, CCH's position is consistent with that of EPA, DOH and the independent terms of the Permit itself. CCH is merely providing evidence that because of typographical error, CCH in fact met the annual average limits for chlordane for 106 months between May 1999 and August 2007. See Pub. Interest Research Group of New Jersey v. Yates Indus., 757 F. Supp. 438, 448 (D.N.J. 1991) (court considered existence of a potential typographical error in the permit in denying summary judgment, entering summary judgment only after the regulating agency clarified error was made). Given that EPA and DOH both agree as to the correct fish consumption WQS for chlordane, that the chlordane limits in the Permit are not independent terms of the Permit, but are expressly *dependent* upon the fish consumption WQS, and that the Permit itself expressly allows for modification under the precise circumstances present here, it would be highly inequitable to, as plaintiffs advocate, impose liability on CCH where no violations exist.

---

[3] Accordingly, case law relating to permit challenges under CWA § 509(b)(1) simply is not relevant here. Those cases involve adversarial challenges to the permit terms, not the identification of typographical errors and mistakes of fact addressed under Section 402(b)(1).

## III. THIS COURT SHOULD NOT EXPAND THE NARROW HOLDING IN *UNION OIL* BEYOND SAMPLING ERRORS ENTIRELY OF PERMITTEE'S OWN MAKING

The Ninth Circuit's holding relating to DMRs in Sierra Club v. Union Oil Co., 813 F.2d 1480 (9th Cir. 1987) (*vacated on other grounds*, 485 U.S. 931 (1988)), is narrowly tailored and inapplicable here. In Union Oil, the defendant argued that DMRs reflecting seven exceedances of its permit limitations should not be the basis of liability because the DMRs were "invalid due to sampling error." 813 F.2d at 1491. The district court agreed, finding that the permit exceedances were "caused by error in wastewater sampling or analysis." Sierra Club v. Union Oil. Co., No. C-84-3435, 1985 U.S. Dist. LEXIS 14129, at *9-10 (N.D. Cal. Nov. 5, 1985) (*vacated, remanded on other grounds*, 485 U.S. 931 (1988)). The Ninth Circuit reversed, concluding,

> when a permittee's reports indicate that the permittee has exceeded permit limitations, *the permittee may not impeach its own reports by showing sampling error.*

Union Oil, 813 F.2d at 1492 (emphasis added).

The facts, rationale and holding of Union Oil are limited to the "sampling error defense" and have no bearing here. According to the Ninth Circuit, the "most important[]" reason for not allowing a permittee to bring forth evidence showing sampling error is that it would "create the perverse result of



A/72252860.3/2017866-0000309724

rewarding permittees for sloppy laboratory practices." Union Oil, 813 F.2d at 1492. Here, neither sampling nor quality of laboratory work is at issue. Rather, the DMRs show that CCH has in fact met the correct annual average limits for chlordane. Indeed, with regard to Union Oil's alleged violations that were not the result of sampling error, the Ninth Circuit itself remanded to the district court the question of whether two exceedances set forth in the DMRs were *in fact* a violation. Id. at 1491.

The Union Oil court also noted that "the use of sampling errors to excuse" reported exceedances would lead to more litigation and factual issues for the district court to resolve. Union Oil, 813 F.2d at 1492. In contrast, here, CCH is not seeking to capitalize on its own error to interject issues in this litigation, or to impose an additional burden on the Court or other parties. Instead, CCH is setting forth virtually incontrovertible evidence that the chlordane annual limits set forth in the permit are incorrect, calling into question whether reported annual averages were in fact violations. This is no different from any other question of fact that precludes entry of summary judgment. Finally, the court in Union Oil was concerned that if the permittee had "additional information unavailable to citizen groups indicating that sampling error rendered the report meaningless," the citizens would be undertaking a "considerable risk" in suing. Id. Here, again, the court's rationale is not applicable because there is no sampling error involved.

Furthermore, CCH does not claim that the DMRs are meaningless, but that evidence exists that creates a question of fact about whether they reflect noncompliance with proper permit limits. Finally, CCH has not been withholding information from plaintiffs; the fact that the annual average limits for chlordane were in many cases in compliance with the Permit only recently has been confirmed by DOH's acknowledgment of the error in the State WQS.[4] See Kelly Decl, ¶ 2.

---

[4] Courts in other circuits allow a permittee to present evidence contrary to its DMRs, even when that evidence is based on sampling errors (i.e., the "sampling error defense"). For example, in United States v. Allegheny Ludlum Corp., 366 F.3d 164 (3rd Cir. 2004), the Third Circuit considered the Ninth Circuit's holding "recognizing a laboratory error defense would reward sloppy practices and undermine the self-monitoring program by giving companies an invitation to wait until they are sued." 366 F.3d at 176. The Third Circuit, however, found that this rationale underlying Union Oil did not apply to "overreporting" of violations -- the situation here. Id. at 175. The Allegheny court was also "underwhelmed" by the rationale that questioning the DMRs would add time to the litigation, stating "[a]t bottom, we do not believe that efficiency should override fairness in administration." Id. at 176. The Third Circuit also noted that "while the CWA unambiguously imposes strict liability for unlawful discharges, it is by no means obvious that a similar strict liability regime has been imposed on faulty reporting." Id. at 175.

Similarly, in United States v. Massachusetts Water Resources Auth., 97 F. Supp. 2d 155, 175-76 (D. Mass. 2000), the permittee also overreported violations as reflected in its DMRs due not to sloppy practices, but by using a methodology that went above and beyond that required by the permit. The court, in showing a willingness to consider evidence that contradicted the DMRs, noted the limited nature of the Union Oil )holding: Union Oil "stands for something less than EPA contends, emphasizing as it does the unfairness of permitting a defendant to *impeach its own reported excursions by claiming sampling error*, thereby 'creating the perverse result of rewarding permittees for sloppy laboratory practices' . . .

The case law does not hold that DMRs are absolute and incontrovertible evidence of discharge violations under the circumstances presented here, where permit limits were derived based on error, and sampling error or sloppy laboratory practices are not at issue. Indeed, no case was found expanding Union Oil's narrow holding beyond prohibiting the "sampling error defense." See, e.g., Save Our Bays & Beaches v. City & County Honolulu, 904 F. Supp. 1098, 1138 (D. Haw. 1994) (information was "not properly recorded" in the DMRs); CALPIRG v. Shell Oil Co., 840 F.Supp. 712, 714 (N.D. Cal. 1993) (involving "data reporting errors"); Or. State PIRG, Inc. v. Pac. Coast Seafoods Co., 361 F.Supp. 2d 1232, 1240-41 (D. Or. 2005) ("defendant may not impeach its own reports by showing sampling error"); Envtl. Prot. Info. Ctr. v. Pac. Lumber Co., 430 F. Supp. 2d 996, 1010 (N.D.Cal. 2006) ("it is reasonable to preclude a permittee from impeaching its own DMRs . . . by showing sampling error").

To hold CCH liable under the circumstances presented here, based on the concededly erroneous and inadvertent insertion of an extra "0" in the State's fish consumption WQS for chlordane, would be unduly and, CCH submits, inappropriately, punitive. Accordingly, CCH requests the Court not expand the

---

Here the issue is not whether the results are bad because of sampling error, but whether they are better than they should have been because the testing method used was more accurate than what the regulations require." 97 F. Supp. 2d at 175-76 (emphasis added).

Ninth Circuit's narrow holding to the inapplicable situation here, and find that a question of fact exists as to the number of pesticide exceedances.

IV. PLAINTIFFS' ANNUAL AVERAGE COUNTING METHODOLOGY IS INCONSISTENT WITH CCH'S SIGNIFICANT PERIODS OF COMPLIANCE

Plaintiffs' argument is premised on continuous uninterrupted noncompliance after May 1999. The fact that CCH complied with the corrected annual chlordane limitations illustrates the flaws in plaintiffs' method for calculating violations of permit annual average limitations. As previously noted, CCH calculates its annual average limitations at the end of each month for a twelve month period by averaging the results of that month's sample with the results of the samples take in the past 11 months. CCH has demonstrated that since May 1999 and through August 2007 there have been many consecutive 12-month periods when it has met its annual average limitations for chlordane -- 51 months for annual concentration and 55 months for annual mass. This presents an issue of material fact on the assessment of the number of violations. First, one would need to define the appropriate baseline 12-month compliance period as either a calendar year or a permit anniversary year. Second, one would need to determine when during this period there was a violation of an annual average standard. Third, one would need to adjust these calculations to provide for the effect of compliance on that proposed period by giving credit when the average annual limitation was met.

To illustrate, CCH met the corrected chlordane average annual limits from February 2000 through January 2001. If, as plaintiffs have suggested, the 12-month period for assessing violations corresponds to the calendar year, CCH met the corrected chlordane limits for 11 months of that year, but under plaintiffs' proposed method of counting violations, CCH would still be subject to violations for every day of that entire 11-month period when CCH was actually in compliance. If, as plaintiffs have alternatively suggested, the 12-month period corresponds to the permit anniversary date, CCH met the corrected chlordane limits for 9 months of that year, but under plaintiffs' proposed method, CCH would still be subject to violations for every day of that entire 9-month period when CCH was actually in compliance. If the 12-month period corresponds to the monthly rolling annual average, CCH was compliant from February 2000 through January 2001, but based on exceeding the chlordane concentration limit in February 2001, under plaintiffs' proposed method, CCH would be subject to violations for every day of the preceding 12-month period when CCH was actually in compliance. In short, even if CCH complies with an annual average in a given month or series of months, CCH may still be assessed violations during that compliance period if it violates the annual average in a later month. Unlike compliance with a monthly average, compliance with the annual average would not afford CCH any protection against the assessment of violations.

Moreover, even under plaintiffs' formulation, plaintiffs' proposed method must be reexamined in light of the significant periods, in excess of 12 months, where CCH complied with the annual chlordane limits. Plaintiffs' arguments do not address how violations should be counted under such circumstances.

Accordingly, CCH encourages the Court to allow for an opportunity to present information at an evidentiary hearing on a reasonable baseline period, chlordane counting methodology, and other material issues of fact raised by the inadvertent typographical error in the chlordane annual average limits set forth in the Permit. It is simply not appropriate, as plaintiffs advocate, to rush to judgment before resolving the significant and complex issues of material fact existing here at trial or other evidentiary hearing before the Court.

## V. CONCLUSION

It is undisputed that the annual average chlordane permit limits are off by a factor of 10 due to a typographical error. The Declaration of Laurence Lau provides uncontroverted evidence on this point. It is also undisputed that EPA has expressly recognized that such typographical errors occur and should be corrected (see 40 C.F.R. § 122.63) and has placed a mechanism for doing so in the Sand Island Permit. What is a disputed issue of material fact is the number of violations of annual average chlordane limits that should properly be imposed on CCH in

light of the typographical error in its Permit. To simply ignore this error, as plaintiffs would have this Court do, would unjustly punish CCH for violations it did not commit. Such a result would neither promote the purposes of the Clean Water Act nor further the interests of justice. CCH respectfully requests that plaintiffs' motion be denied to allow this Court to weigh evidence, either at trial or at an earlier proceeding, on the material disputed issues of fact raised in the Opposition and herein.

DATED: Honolulu, Hawaii
October 16, 2007

Respectfully submitted,
CARRIE OKINAGA
Corporation Counsel

By: /s/ Kathleen A. Kelly
Kathleen A. Kelly
Attorneys for Defendant
City and County of Honolulu

# TABLE OF CONTENTS

**Page**

I. CCH MET THE CORRECTED ANNUAL AVERAGE CHLORDANE LIMITS ON 106 MONTHS BETWEEN MAY 1999 AND AUGUST 2007 .......... 3

A. The Fish Consumption WQS For Chlordane, As Published In The State Of Hawaii Administrative Rules, Is A Typographical Error .......... 4

B. As A Direct Result Of The Typographical Error In the WQS, The Annual Average Chlordane Limits In The Sand Island Permit Are Likewise Incorrect .......... 5

1. Concentration Limit .......... 5

2. Mass Limit .......... 6

II. THE COURT SHOULD CONSIDER EVIDENCE OF THE ERRONEOUS CHLORDANE STANDARD .......... 7

III. THIS COURT SHOULD NOT EXPAND THE NARROW HOLDING IN UNION OIL BEYOND SAMPLING ERRORS ENTIRELY OF PERMITTEE'S OWN MAKING .......... 9

IV. PLAINTIFFS' ANNUAL AVERAGE COUNTING METHODOLOGY IS INCONSISTENT WITH CCH'S SIGNIFICANT PERIODS OF COMPLIANCE .......... 13

V. CONCLUSION .......... 15



A/72252860.3/2017866-0000309724

**TABLE OF AUTHORITIES**

**Page**

Cases

CALPIRG v. Shell Oil Co.
840 F.Supp. 712 (N.D. Cal. 1993)........................................................12

Envtl. Prot. Info. Ctr. v. Pac. Lumber Co.
430 F. Supp. 2d 996 (N.D.Cal. 2006)....................................................12

Or. State PIRG, Inc. v. Pac. Coast Seafoods Co.
361 F.Supp. 2d 1232 (D. Or. 2005)........................................................12

Pub. Interest Research Group of New Jersey v. Yates Indus.
757 F. Supp. 438 (D.N.J. 1991) ............................................................ 8

Save Our Bays & Beaches v. City & County Honolulu
904 F. Supp. 1098 (D. Haw. 1994)........................................................12

Sierra Club v. Union Oil Co.
813 F.2d 1480 (9th Cir. 1987)..........................................2, 9, 10, 11

Sierra Club v. Union Oil. Co.
No. C-84-3435, 1985 U.S. Dist. LEXIS 14129 (N.D. Cal. Nov. 5, 1985)..... 9

United States v. Allegheny Ludlum Corp.
366 F.3d 164 (3rd Cir. 2004) ...............................................................11

United States v. Massachusetts Water Resources Auth.
97 F. Supp. 2d 155 (D. Mass. 2000)......................................................11

Rules

CWA § 402(b)(1)........................................................................................ 8

CWA § 509(b)(1)......................................................................................7, 8

Hawaii Administrative Rule §11-54-4 .............................................3, 5, 7

Regulations

40 C.F.R § 122.62....................................................................................... 7

40 C.F.R. § 122.63..................................................................................7, 15