CARRIE OKINAGA, 5958
Corporation Counsel
KATHLEEN A. KELLY, 6729
Deputy Corporation Counsel
City and County of Honolulu
530 South King Street, Room 110
Honolulu, Hawaii 96813
Telephone: (808) 523-4203
Facsimile: (808) 523-4583
Email: kkelly@co.honolulu.hi.us

BINGHAM McCUTCHEN LLP
JAMES J. DRAGNA (CA SBN 91492)
NANCY M. WILMS (CA SBN 111837)
BRYAN K. BROWN (CA SBN 192924)
355 South Grand Avenue, Suite 4400
Los Angeles, CA 90071-3106
Telephone: (213) 680-6400
Facsimile: (213) 680-6499
Email: nancy.wilms@bingham.com

Attorneys for Defendant:
CITY AND COUNTY OF
HONOLULU

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| SIERRA CLUB, HAWAI'I CHAPTER; HAWAI'I'S THOUSAND FRIENDS; and OUR CHILDREN'S EARTH FOUNDATION,<br><br>Plaintiffs,<br><br>v.<br><br>CITY AND COUNTY OF HONOLULU,<br><br>Defendant. | CIVIL NO. CV 04-00463 DAE-BMK<br><br>**DECLARATION OF ROSS TANIMOTO IN SUPPORT OF DEFENDANT CITY AND COUNTY OF HONOLULU'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' THIRD, FOURTH, AND EIGHTH CLAIMS**<br><br>Heard:  October 9, 2007<br>            10:30 a.m.<br>            Hon. David E. Ezra |

## DECLARATION OF ROSS TANIMOTO

I, ROSS TANIMOTO, declare as follows:

1. I am Deputy Director of the Department of Environmental Services of the City and County of Honolulu ("CCH"), a defendant in this action. I have personal knowledge of the following facts, or have been informed of them and believe them to be true, and would testify competently thereto if called as a witness.

2. Attached hereto as **Exhibit A** is a true and correct copy of the Rationale for the Proposed Revisions to the Department of Health Administrative Rules, Title 11, Chapter 54, Water Quality Standards (the "WQS Rationale"). According to the WQS Rationale, the State of Hawaii Water Quality Standards for toxic pollutants, as set forth in Hawaii Administrative Rule §11-54-4 ("WQS"), were derived from the U.S. Environmental Protection Agency ("EPA") Water Quality Criteria (the "EPA Criteria"). See, e.g., id., at 14, 19.

3. In particular, the WQS for fish consumption were derived from the EPA Criteria based on a carcinogenicity of $10^{-6}$ risk. As stated in the WQS Rationale:

> For carcinogens, the acceptable daily intake values are calculated upon increased cancer risk. A higher risk level will result in a higher acceptable daily intake, which will result in a higher water quality standard. The human health-based water quality standards proposed for

1

> carcinogenic pollutants *have been set at the one in one million lifetime excess cancer risk level,* which is the level EPA considers to be negligible.

Id. at 24 (emphasis added).

4. The WQS fish consumption standards were also 3.06 times more stringent than the EPA Criteria, because the average daily consumption of fish locally was presumed to be 3.06 times higher than the average underlying the EPA Criteria:

> The EPA criteria assume a daily consumption of 6.5 grams per day. The average consumption in Hawaii, however, is about three times the national average, and the average per capita consumption of locally caught fish and shellfish is 16.0 pounds per year, or 19.9 grams per day. The proposed Hawaii fish consumption standards are based upon 19.9 rather than 6.5 grams per day, *and are therefore approximately 3.1 times more stringent than the national criteria.*

Id. (emphasis added).

5. The WQS Rationale is borne out by a comparison between the WQS for fish consumption and corresponding EPA Criteria, for pollutants identified as carcinogens. Attached as **Exhibit B** is a comparison between the WQS for fish consumption for all pollutants identified as carcinogens, and the corresponding EPA Criteria, based on carcinogenicity of $10^{-6}$ risk.

6. In all cases, with the sole exceptions of chlordane and polychlorinated biphenyls, the WQS for fish consumption correspond to 1/3.06 of

2

the EPA Criteria, based on carcinogenicity of $10^{-6}$ risk. For polychlorinated biphenyls, the WQS for fish consumption is identical to the EPA criterion.

7. As shown in **Exhibit B**, chlordane is the only carcinogenic pollutant for which the WQS (adjusted for Hawaii consumption rate) for fish consumption differs, by a factor of 10, from the corresponding EPA criterion.

8. Given the methodology outlined in the WQS Rationale, and that virtually all other carcinogen WQS for fish consumption conform to this methodology, the most reasonable explanation for the discrepancy in the chlordane WQS is a typographical or transcription error. Both the federal regulations governing the Sand Island Permit (40 C.F.R. § 122.63) as well as the Standard Permit Conditions incorporated into the Permit state that "corrections or allowances for changes in the permitted activity" may be made to a NPDES permit to correct typographical errors.

9. Attached as **Exhibit C** is a true and correct copy of an excerpt from the EPA Ambient Water Quality Criteria for Chlordane, dated October 1980. The EPA fish consumption criterion for chlordane, based on carcinogenicity of $10^{-6}$ risk (as listed on page vi), is 0.48 ng/l. 1/3.06 of that value is 0.16 ng/l or 0.00016 µg/l.

10. Applying the same methodology that was used to derive the WQS for all other carcinogenic pollutants, the correct WQS for fish consumption

3

for chlordane would be 0.00016 µg/l, rather than 0.000016 µg/l as listed in HAR §11-54-4.

11.   Attached as **Exhibit D** is a true and correct copy of an excerpt from the EPA's Tentative Decision of the Regional Administrator Pursuant to 40 CFR Part 125, Subpart G, Regarding CCH's Honouliuli Wastewater Treatment Plant Application For a Modified NPDES Permit Under Section 301(h) of the Clean Water Act (the "Honouliuli Tentative Decision"). On Page 56 of the Honouliuli Tentative Decision, the EPA states that, "The water quality criterion for *chlordane*, to protect human consumption of fish, is *0.00016 µg/l,*" (emphasis added) which reflects the corrected, not published, WQS for chlordane.

12.   Based on footnote 4 of the NPDES Permit for Sand Island, the correct average annual discharge (concentration) limitation should be 0.076 µg/l. This is calculated as follows:

   fish consumption criterion of 0.00016 µg/l **X** long-term dilution value of 476:1 = 0.076 µg/l

13.   Based on footnote 4 of the NPDES Permit for Sand Island, the correct average annual discharge (mass) limitation should be 0.052 lbs/day, or 0.024 kg/day. This is calculated as follows:

   daily design flow of 82 MGD **X** annual average concentration limit of 0.076 µg/l **X** unit conversion of 0.001 mg/µg **X** 8.34 lbs/gallon = 0.052 lbs/day = 0.024 kg/day

4

14. According to the CCH Discharge Monitoring Reports, as summarized in plaintiffs' submissions in support of their Motion for Partial Summary Judgment, CCH complied with the corrected annual average concentration limit of 0.076 µg/l for 51 months:

- February 2000 through January 2001
- April 2001 through January 2004
- April 2007 through August 2007

Plaintiffs allege CCH exceeded the annual average concentration limit for each of these months; however, CCH was actually in compliance for each of these months.

15. According to the CCH Discharge Monitoring Reports, as summarized in the plaintiffs' submissions in support of their Motion for Partial Summary Judgment, CCH complied with the corrected annual average mass limit of 0.024 kg/day for 55 months:

- February 2000 through February 2004
- March 2007 through August 2007

Plaintiffs allege CCH exceeded the annual average mass limit for each of these

//
//
//
//

ACTIVE/72255714.1/2017866-0000309724

months; however, CCH was actually in compliance for each of these months.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on October 16, 2007, in Honolulu, Hawaii.

By: _____

ACTIVE/72255714.1/2017866-0000309724