# EXHIBIT A-1

RATIONALE FOR THE PROPOSED REVISIONS

TO DEPARTMENT OF HEALTH

ADMINISTRATIVE RULES,

TITLE 11, CHAPTER 54 –

WATER QUALITY STANDARDS

DEPARTMENT OF HEALTH
ENVIRONMENTAL PROTECTION AND HEALTH SERVICES DIVISION
ENVIRONMENTAL PLANNING OFFICE
HONOLULU, HAWAII

EXHIBIT A-1

1 3 1 1

1

## CONTENTS

PAGE

I.    Executive Summary.................................................    2

II.   Existing and Proposed Subsection 11-54-04(b)...................    4

III.  Rationale for Proposed Revisions to 11-54-04(b)

      A.    Introduction.............................................    13

      B.    Definitions, Paragraph 11-54-04(b)(1)....................    17

      C.    Narrative Toxicity and Human Health Standards,
            Paragraph 11-54-04(b)(2).................................    18

      D.    Numeric Standards for Toxic Pollutants,
            Paragraph 11-54-04(b)(3).................................    19

            (1)    Aquatic toxicity criteria.........................    19
            (2)    Human health criteria.............................    23
            (3)    Metals............................................    25
            (4)    Tributyltin.......................................    27
            (5)    Chemical analytic detection levels................    28

      E.    Basic Discharge Standards, Paragraph 11-54-04(b)(4)......    30

      F.    Class 1 Waters...........................................    32

      G.    References...............................................    33

      H.    Glossary of Chemicals....................................    36

IV.   Existing and Proposed Subsection 11-54-08......................    46

V.    Rationale for Proposed Revisions to 11-54-08...................    47

2

## Part I. Executive Summary

This document contains proposed revisions to subsections 11-54-04 and 11-54-08 of the State Water Quality Standards. These revisions will provide greater protection to users of state surface waters, and to the aquatic environment.

The purpose of the proposed revisions to subsection 11-54-04 is to protect the beneficial uses of state surface waters from adverse impacts due to toxic pollutants. Under section 11-54-03 of the existing standards, all state surface waters, including the lowest Class 2 freshwater and Class A marine classifications, have designated beneficial uses which include recreation, and the propagation of fish, shellfish and wildlife. The proposed revised water quality standards are intended to protect these beneficial uses by preventing direct impacts from toxic pollutants to aquatic life, and indirect impacts to human health and wildlife from the bioaccumulation of toxic pollutants in edible aquatic organisms.

The prevention of toxic impacts is a basic requirement of all waters, under the existing paragraph 11-54-04(a)(4) narrative "freedom from toxicity" standard. This requires that:

> "All state waters shall be free of substances attributable to domestic, industrial, or other controllable sources of pollutants including: high temperatures; biocides; pathogenic organisms; toxic, radioactive, corrosive, or other deleterious substances at levels or in combination sufficient to be toxic or harmful to human, animal, plant, or aquatic life, or in amounts sufficient to interfere with any beneficial use of the water."

Past implementation of this regulation has been limited due in part to a lack of numeric standards for toxic pollutants. The existing water quality standards contain no specific limitations for toxic pollutants. In addition, the state has lacked a policy for translating the narrative "freedom from toxicity" standard above, into discharge permit limitations.

3

The proposed revised subsection 11-54-04(b) contains standards for approximately 100 toxic pollutants. The proposed standards also contain minimum requirements for the discharge of toxic pollutants and effluent toxicity. A companion document has been prepared entitled "State Toxics Control Program: Derivation of Water Quality-based Discharge Toxicity Limits for Biomonitoring and Specific Pollutants," which provides detailed procedures for enforcing the proposed standards through the National Pollutant Discharge Elimination System (NPDES) wastewater discharge permits program.

The purpose of the proposed revision to subsection 11-54-08 is to increase the protection to recreational swimmers and bathers from bacterial contamination. The Department of Health has concluded that the risks associated with the existing standard are unacceptably high, and is therefore proposing a more protective water quality standard.

Questions concerning the proposed standards may be addressed to Andrew Lincoff of the Environmental Planning Office, at 548-6767.

4

**Part II. Section 11-54-04, <u>Basic water quality criteria applicable to all waters:</u>**

Existing Subsection 11-54-04(b):

(b) All state waters are subject to monitoring unless the director determines it to be unnecessary, to identify the actual or potential effects of a discharge that may violate subsection (a)(4), as a minimum, a 96-hour Standard Methods (section 11-54-10 (b)) bioassay or other standardized toxicity tests approved by the director shall be required. The methods and test procedures in section 11-54-10 shall be followed, provided that modifications may be prescribed to meet conditions specified to the disposal situation. Survival of test organisms shall not be less than that in controls which utilize appropriate experimental water. Field monitoring may further be required to insure conformance with this standard as long as a discharge or suspected discharge is occurring.

Proposed Subsection 11-54-04(b):

(b)    To ensure compliance with paragraph (a)(4) above, all state waters are subject to monitoring and to the following standards for acute and chronic toxicity and the protection of human health.

(1)    As used in this section:

"Acute Toxicity" means the degree to which a pollutant, discharge, or water sample causes a rapid adverse impact to aquatic organisms. The acute toxicity of a discharge or receiving water is measured using the methods in section 11-54-10, unless other methods are specified by the director.

5

"Chronic Toxicity" means the degree to which a pollutant, discharge, or water sample causes a long-term adverse impact to aquatic organisms, such as a reduction in growth or reproduction. The chronic toxicity of a discharge or receiving water is measured using the methods in section 11-54-10, unless other methods are specified by the director.

"Dilution" means, for discharges through submerged outfalls, the average and minimum values calculated using the models in the EPA publication, Initial Mixing Characteristics of Municipal Ocean Discharges (EPA/600/3-85/073, November, 1985).

"No Observed Effect Concentration" (NOEC), means the highest percent concentration of a discharge or water sample, in dilution water, which causes no observable adverse effect in a chronic toxicity test. For example, an NOEC of 100 percent indicates that an undiluted discharge or water sample causes no observable adverse effect to the organisms in a chronic toxicity test.

(2)    Narrative toxicity and human health standards.

   (A)    Acute Toxicity Standard:  All state waters shall be free from pollutants in concentrations which exceed the acute standards listed in paragraph (3), below. All state waters shall also be free from acute toxicity as measured using the toxicity tests listed in section 11-54-10, or other methods specified by the director.

   (B)    Chronic Toxicity Standard:  All state waters shall free from pollutants in concentrations which on average during any 24-hour period exceed the chronic standards listed in paragraph (3), below. All state waters shall also be free from chronic toxicity as measured using the toxicity tests listed in section 11-54-10, or other methods specified by the director.

6

(C) Human Health Standards: All state waters shall be free from pollutants in concentrations which, on average during any 30-day period, exceed the "fish consumption" standards for non-carcinogens in paragraph (3), below. All state waters shall also be free from pollutants in concentrations, which on average during any 12 month period, exceed the "fish consumption" standards for carcinogens in paragraph (3), below.

(3) Numeric standards for toxic pollutants applicable to all waters. The freshwater standards apply where the dissolved inorganic ion concentration is less than 0.5 parts per thousand; saltwater standards apply above 0.5 parts per thousand. Values for metals refer to the dissolved fraction. All values are expressed in micrograms per liter.

| Pollutant | Freshwater | | Saltwater | | Fish Consumption |
|---|---|---|---|---|---|
| | Acute | Chronic | Acute | Chronic | |
| Acenaphthene | 570 | ns | 320 | ns | ns |
| Acrolein | 23 | ns | 18 | ns | 250 |
| Acrylonitrile* | 2,500 | ns | ns | ns | 0.21 |
| Aldrin* | 3.0 | ns | 1.3 | ns | 0.000026 |
| Aluminum | 750 | 260 | ns | ns | ns |
| Antimony | 3,000 | ns | ns | ns | 15,000 |
| Arsenic | 360 | 190 | 69 | 36 | ns |
| Benzene* | 1,800 | ns | 1,700 | ns | 13 |
| Benzidine* | 800 | ns | ns | ns | 0.00017 |
| Beryllium* | 43 | ns | ns | ns | ns |
| Cadmium | 3+ | 3+ | 43 | 9.3 | ns |
| Carbon tetra-chloride* | 12,000 | ns | 16,000 | ns | 2.3 |
| Chlordane* | 2.4 | 0.0043 | 0.09 | 0.004 | 0.000016 |
| Chlorine | 19 | 11 | 13 | 7.5 | ns |

7

| Pollutant | Freshwater | | Saltwater | | Fish Consumption |
|---|---|---|---|---|---|
| | Acute | Chronic | Acute | Chronic | |
| Chloroethers- | | | | | |
| ethyl(bis-2)* | ns | ns | ns | ns | 0.44 |
| isopropyl | ns | ns | ns | ns | 1,400 |
| methyl(bis)* | ns | ns | ns | ns | 0.00060 |
| Chloroform* | 9,600 | ns | ns | ns | 5.1 |
| Chlorophenol(2) | 1,400 | ns | ns | ns | ns |
| Chlorpyrifos | 0.083 | 0.041 | 0.011 | 0.0056 | ns |
| Chromium (VI) | 16 | 11 | 1,100 | 50 | ns |
| Copper | 6+ | 6+ | ns | ns | ns |
| Cyanide | 22 | 5.2 | 1 | 1 | ns |
| DDT* | 1.1 | 0.001 | 0.013 | 0.001 | 0.000008 |
| metabolite TDE* | 0.03 | ns | 1.2 | ns | ns |
| Demeton | ns | 0.1 | ns | 0.1 | ns |
| Dichloro- | | | | | |
| benzenes | 370 | ns | 660 | ns | 850 |
| benzidine* | ns | ns | ns | ns | 0.007 |
| ethane(1,2)* | 39,000 | ns | 38,000 | ns | 79 |
| ethylene(1,1)* | 3,900 | ns | 75,000 | ns | 0.60 |
| phenol(2,4) | 670 | ns | ns | ns | ns |
| propane | 7,700 | ns | 3,400 | ns | ns |
| propene(1,3) | 2,000 | ns | 260 | ns | 4.6 |
| Dieldrin* | 2.5 | 0.0019 | 0.71 | 0.0019 | 0.000025 |
| Dinitro- | | | | | |
| o-cresol(2,4) | ns | ns | ns | ns | 250 |
| toluene* | 110 | ns | 200 | ns | 3.0 |
| Dioxin* | 0.003 | ns | ns | ns | 0.000000005 |
| Diphenyl- | | | | | |
| hydrazine(1,2) | ns | ns | ns | ns | 0.018 |

8

| Pollutant | Freshwater | | Saltwater | | Fish Consumption |
|---|---|---|---|---|---|
| | Acute | Chronic | Acute | Chronic | |
| Endosulfan | 0.22 | 0.056 | 0.034 | 0.0087 | 52 |
| Endrin | 0.18 | 0.0023 | 0.037 | 0.0023 | ns |
| Ethylbenzene | 11,000 | ns | 140 | ns | 1,070 |
| Fluoranthene | 1,300 | ns | 13 | ns | 18 |
| Guthion | ns | 0.01 | ns | 0.01 | ns |
| Heptachlor* | 0.52 | 0.0038 | 0.053 | 0.0036 | 0.00009 |
| Hexachloro- | | | | | |
| benzene* | ns | ns | ns | ns | 0.00024 |
| butadiene* | 30 | ns | 11 | ns | 16 |
| cyclohexane- | | | | | |
| alpha* | ns | ns | ns | ns | 0.010 |
| beta* | ns | ns | ns | ns | 0.018 |
| technical* | ns | ns | ns | ns | 0.014 |
| cyclopentadiene | 2 | ns | 2 | ns | ns |
| ethane* | 330 | ns | 310 | ns | 2.9 |
| Isophorone | 39,000 | ns | 4,300 | ns | 170,000 |
| Lead | 29+ | 29+ | 140 | ns | ns |
| Lindane* | 2.0 | 0.08 | 0.16 | ns | 0.020 |
| Malathion | ns | 0.1 | ns | 0.1 | ns |
| Mercury | 2.4 | 0.55 | 2.1 | ns | ns |
| Methoxychlor | ns | 0.03 | ns | 0.03 | ns |
| Mirex | ns | 0.001 | ns | 0.001 | ns |
| Naphthalene | 770 | ns | 780 | ns | ns |
| Nickel | 5+ | 5+ | 75 | 8.3 | 33 |
| Nitrobenzene | 9,000 | ns | 2,200 | ns | ns |
| Nitrophenols | 77 | ns | 1,600 | ns | ns |
| Nitrosamines* | 1,950 | ns | ns | ns | 0.41 |

9

| Pollutant | Freshwater | | Saltwater | | Fish Consumption |
| --- | --- | --- | --- | --- | --- |
| | Acute | Chronic | Acute | Chronic | |
| Nitroso- | | | | | |
| dibutylamine-N* | ns | ns | ns | ns | 0.19 |
| diethylamine-N* | ns | ns | ns | ns | 0.41 |
| dimethylamine-N* | ns | ns | ns | ns | 5.3 |
| diphenylamine-N* | ns | ns | ns | ns | 5.3 |
| pyrrolidine-N* | ns | ns | ns | ns | 30 |
| Parathion | 0.065 | 0.013 | ns | ns | ns |
| Pentachloro- | | | | | |
| ethanes | 2,400 | ns | 130 | ns | ns |
| benzene | ns | ns | ns | ns | 28 |
| phenol | 20 | 13 | 13 | ns | ns |
| Phenol | 3,400 | ns | 170 | ns | ns |
| 2,4-dimethyl | 700 | ns | ns | ns | ns |
| Phthalate esters | | | | | |
| dibutyl | ns | ns | ns | ns | 50,000 |
| diethyl | ns | ns | ns | ns | 590,000 |
| di-2-ethylhexyl | ns | ns | ns | ns | 16,000 |
| dimethyl | ns | ns | ns | ns | 950,000 |
| Polychlorinated | | | | | |
| biphenyls* | 2.0 | 0.014 | 10 | 0.03 | 0.000079 |
| Polynuclear aromatic | | | | | |
| hydrocarbons* | ns | ns | ns | ns | 0.01 |
| Selenium | 20 | 5 | 300 | 71 | ns |
| Silver | 1+ | 1+ | 2.3 | ns | ns |

10

| Pollutant | Freshwater | | Saltwater | | Fish |
| | Acute | Chronic | Acute | Chronic | Consumption |
|---|---|---|---|---|---|
| Tetrachloro- | | | | | |
| ethanes | 3,100 | ns | ns | ns | ns |
| benzene(1,2,4,5) | ns | ns | ns | ns | 16 |
| ethane(1,1,2,2)* | ns | ns | 3,000 | ns | 3.5 |
| ethylene* | 1,800 | ns | 3,400 | 145 | 2.9 |
| phenol(2,3,5,6) | ns | ns | ns | 440 | ns |
| Thallium | 470 | ns | 710 | ns | 16 |
| Toluene | 5,800 | ns | 2,100 | ns | 140,000 |
| Toxaphene* | 0.73 | 0.0002 | 0.21 | 0.0002 | 0.00024 |
| Tributyltin | ns | 0.026 | ns | 0.01 | ns |
| Trichloro | | | | | |
| ethane(1,1,1) | 6,000 | ns | 10,400 | ns | 340,000 |
| ethane(1,1,2)* | 6,000 | ns | ns | ns | 14 |
| ethylene* | 15,000 | ns | 700 | ns | 26 |
| phenol(2,4,6)* | ns | ns | ns | ns | 1.2 |
| Vinyl chloride* | ns | ns | ns | ns | 170 |
| Zinc | 22+ | 22+ | 95 | 86 | ns |

ns – No standard has been developed.

* – Carcinogen.

+ – The value listed is the minimum standard. Depending upon the receiving water $CaCO_3$ hardness, higher standards may be calculated using the respective formula in the U.S. Environmental Protection Agency publication Quality Criteria for Water (EPA 440/5-86-001, Revised May 1, 1987).

11

(4)    The following are basic requirements applicable to discharges to state waters. These standards shall be enforced through effluent limitations or other conditions in discharge permits. The director may apply more stringent discharge requirements to any discharge if necessary to ensure compliance with all standards in paragraph (2), above.

(A)    Continuous discharges through submerged outfalls.    The No Observed Effect Concentration (NOEC), expressed as percent effluent, of continuous discharges through submerged outfalls shall not be less than 100 divided by the minimum dilution.    In addition, such discharges shall not contain:

(i)    pollutants in 24-hour average concentrations greater than the values obtained by multiplying the minimum dilution by the standards in paragraph (3), above, for the prevention of chronic toxicity.

(ii)    non-carcinogenic pollutants in 30-day average concentrations greater than the values obtained by multiplying the minimum dilution by the standards in paragraph (3), above, for fish consumption.

(iii)    carcinogenic pollutants in 12-month average concentrations greater than the values obtained by multiplying the average dilution by the standards in paragraph (3), above, for fish consumption.

12

(B) Discharges without submerged outfalls. The survival of test organisms in an undiluted acute toxicity test of any discharge shall not be less than 80 percent. In addition, no such discharge shall contain pollutants in concentrations greater than the standards in paragraph (3), above, for the prevention of acute toxicity to aquatic life. The director may make a limited allowance for dilution for a discharge in this category if it meets the following criteria: the discharge velocity is greater than 3 meters per second; the discharge enters the receiving water horizontally, and; the receiving water depth at the discharge point is greater than zero.

13

Part III. <u>Rationale for Proposed Revisions to 11-54-04</u>

A.    <u>Introduction.</u>

Although the water quality in Hawaii is generally excellent compared to the mainland, toxic chemicals are used extensively here in industry, agriculture, transportation, the military, and residential areas, and the state is clearly not immune to toxic pollution. Examples include:

- A national survey of organochlorine pesticide contamination conducted by the U. S. Fish and Wildlife Service in the late 1970's found that tilapia taken from Manoa Stream had the highest levels of the pesticides chlordane, dieldrin, and heptachlor. PCB residues were also found.

- Surveys conducted by the Health Department have found high levels of metals, and the pesticides chlordane and dieldrin, in sediments from the Ala Wai and Honolulu Harbor areas.

- Arsenic contamination, probably from the use of arsenic trioxide as a termite treatment agent, has been found in sediments from Waiakea Pond in Hilo.

- Residues of the pesticide DDT have been found in sediments from Pearl Harbor and Manele Harbor on Lanai.

- Polychlorinated biphenyl, or PCB, residues have been found in sediments from the Ala Wai and Hilo Harbor.

- Recent surveys by the Department of Health for the marine anti-fouling agent tributyltin found higher levels in the Lahaina Boat Harbor than have been reported elsewhere in the nation. High levels were also found in the Pokai Bay and Ala Wai Harbors.

14

From the examples above, it is clear that toxic pollutants are entering and accumulating in certain aquatic environments in Hawaii. As waste discharges may be permitted in any waterbody except Class 1 waterbodies, it is important that the state regulate the discharge of toxic pollutants to ensure that the beneficial uses of state waters will be protected. The proposed toxics standards will provide a mechanism for limiting sources of toxic pollutants in waste discharges, and for determining if a waterbody has received an excessive pollutant loading.

The proposed standards for specific toxic pollutants are based primarily on the extensive body of aquatic toxicity and human health effects data which the U. S. Environmental Protection Agency (EPA) has compiled since 1976 in its Quality Criteria for Water (EPA 440/5-86-001, Revised May 1, 1987).    On February 4, 1987, Congress made several amendments to the Clean Water Act (33 U.S.C.A. 1251 et seq.) intended to enhance the control of toxic pollutants in the nation's surface waters. Included in these amendments is the requirement that states adopt specific water quality standards for toxic pollutants for which EPA has developed water quality criteria.

Section 303(c)(2)(B) of the amended Clean Water Act states in part:

"Whenever a State revises water quality standards pursuant to paragraph (1) of this subsection, or revises or adopts new standards pursuant to this paragraph, such State shall adopt criteria for all pollutants listed pursuant to section 307(a) of this Act for which criteria have been published under section 304(a), the discharge or presence of which could reasonably be expected to interfere with those designated uses adopted by the State, as necessary to support such designated uses. Such criteria shall be specific numerical criteria for such toxic pollutants."

In the paragraph above, section 307(a) refers to the Clean Water Act's list of toxic pollutants. "Criteria...published under section 304(a)," refers to EPA's Quality Criteria for Water.

15

A glossary of the toxic pollutants for which standards are proposed in Section H of to this rationale. The glossary describes the primary uses of each pollutant. It includes both toxic pollutants listed under section 307(a) of the Clean Water Act, and other toxic pollutants for which EPA has developed water quality criteria. The majority of the pollutants are used extensively or were used extensively in the past and may persist as potential sources of pollution. Moreover, the Department of Health has concluded that there is a reasonable potential for all of the chemicals to pollute waters of the state either presently or in the future. The list of 97 pollutants does not include all potentially toxic or hazardous pollutants. However, EPA is continually revising its Quality Criteria for Water, and as new criteria are developed, they will be reviewed for adoption into the state standards.

The proposed numeric standards for toxic pollutants are divided into five categories: four of these are aquatic toxicity standards and the last contains human health-related fish consumption standards. The aquatic standards contain acute and chronic toxicity values to protect freshwater and saltwater organisms. Acute toxicity causes rapid adverse impacts to aquatic life, such as fish kills. Chronic toxicity occurs over longer periods and generally causes more subtle adverse impacts, such as reduced reproduction. Both acute and chronic impacts to aquatic life must be prevented to ensure the propagation of fish, shellfish, and wildlife. The fish consumption standards are calculated to provide protection to public health from the consumption of contaminated aquatic organisms.

In addition to the numeric standards for individual toxic pollutants the proposed standards contain a second approach for measuring and preventing toxicity. This is called "biomonitoring." An acute biomonitoring requirement was included in the existing subsection 11-54-04(b) of the water quality standards. The proposed revision contains both acute and chronic biomonitoring standards. The purpose of biomonitoring, and the need for an integrated strategy using both biomonitoring and numeric standards for individual pollutants is discussed below.

16

The primary purpose of biomonitoring is to protect aquatic life. Biomonitoring involves exposing test organisms, such as juvenile fish, to a waste stream or water sample and observing the effects after a specified period of time. The toxicity of waste streams measured using biomonitoring is often referred to as "whole effluent toxicity" which signifies that the test organisms react to the combination of all pollutants present in the sample. This is one advantage over chemical analyses for individual pollutants which provide no information on the potential toxic effects of pollutants in combinations. Biomonitoring is therefore the only method available for enforcing the "deleterious substances in combination" provision of the basic water quality standard quoted in the executive summary. Other advantages of biomonitoring are that the test organisms may be affected by pollutants which are not limited in the water quality standards, or by concentrations of pollutants which are below chemical detection levels, or by pollutants whose toxicity to aquatic organisms has never been determined. Biomonitoring tests are also less expensive than thorough chemical scans.

The main disadvantage of biomonitoring is that it provides little protection to human health from certain pollutants, particularly carcinogens, which may accumulate in edible aquatic organisms. The concentrations which have been calculated to produce carcinogenic risks through bioaccumulation are often orders of magnitude below the concentrations which have been determined to cause aquatic toxicity. Another disadvantage of biomonitoring is that the organism used in a test may not be sensitive to a particular pollutant whose toxicity to sensitive aquatic organisms has already been established. For these reasons, an integrated approach, using standards for both biomonitoring toxicity and specific pollutants is necessary to protect state waters.

The goal of the proposed standards is to maintain the water quality necessary for the propagation of fish, shellfish, and wildlife, and to ensure that toxic pollutants do not bioaccumulate in edible aquatic organisms. The attainment of this goal should, in addition to having a positive environmental impact, also have a positive economic impact by ensuring the continued propagation and marketability of important commercial and recreational fish species. In addition, the adoption of the proposed standards will not result in a significant new burden to the regulated

17

community. Although the proposed standards contain limits for more than 100 toxic pollutants, this does not mean that all wastewater discharge permits will contain limits or testing requirements for all pollutants. A detailed discussion of the derivation of water quality-based effluent limitations for toxic pollutants is contained in the document, "State Toxics Control Program: Derivation of Water Quality-based Discharge Toxicity Limits for Biomonitoring and Specific Pollutants." Effluent limits will be established only for those toxic pollutants which a facility discharges or may discharge, as necessary to ensure compliance with the standards. Finally, the proposed standards will also not cause a significant increase in application monitoring requirements for most dischargers, since most dischargers are already required by federal law to perform chemical analyses for all priority pollutants known or suspected to be present in their effluent.

B.    Definitions.

Proposed paragraph 11-54-04(b)(1) contains a definition of dilution, and of three terms related to acute and chronic aquatic toxicity. The existing 11-54-04(b) referred only to acute toxicity biomonitoring tests, however tests are now available to measure both acute toxicity and chronic toxicity. The pollutant levels which cause chronic toxicity are lower than those which cause acute toxicity. The aquatic toxicity terms defined include "acute" and "chronic toxicity," and the "No Observed Effect Concentration" (NOEC), which is the measurement obtained in a chronic toxicity test. These terms are used in the proposed minimum standards for discharge toxicity discussed in section E, below.

"Dilution" is the reduction in concentration of a discharge which occurs when it mixes with a receiving water. In controlling toxicity, the state can make only very limited allowances for dilution, because the "freedom from toxicity" standard quoted in the introduction is a basic standard, applicable to all waters, including those within the immediate vicinity of discharges and within any Zones of Mixing approved under section 11-54-09. The dilution factors defined in this section are

18

limited to "discharge-induced" dilution, which is generally provided only by submerged outfalls. Use of these limited dilution factors will ensure that all state waters are free from toxicity.

### C.    Narrative Toxicity and Human Health Standards.

Proposed paragraph 11-54-04(b)(2) contains narrative acute and chronic toxicity and human health standards. These narrative standards refer to the list of numeric standards for individual pollutants in proposed paragraph 11-54-04(b)(3). The bases of the numeric standards are discussed in greater detail in section D, below.

The acute toxicity standards (11-54-04(b)(2)(A)) require that all waters be free from acute toxicity, measured by biomonitoring, and from concentrations of pollutants which exceed the numeric standards in proposed paragraph 11-54-04(b)(3) for the prevention of acute toxicity to aquatic life. These standards are expressed as maximum concentrations which must never be exceeded.

The chronic toxicity standards (11-54-04(b)(2)(B)) require that all waters be free from chronic toxicity, measured by biomonitoring, and from pollutants in concentrations which exceed the numeric chronic standards in proposed paragraph 11-54-04(b)(3) on average during any 24-hour period. These standards are expressed as averages rather than maximums like the acute standards, because the lower pollutant levels which cause chronic impacts must be present for a longer time period than the levels which cause acute impacts.

The human health standards (11-54-04(b)(2)(C)) require that the numeric standards for fish consumption listed in paragraph 11-54-04(b)(3) not be exceeded on average during any 12 month period for carcinogens, or 30-day period for non-carcinogens. These standards are calculated to prevent public health impacts from the bioaccumulation of toxics in edible aquatic organisms. The averaging period

19

for non-carcinogens is shorter because their adverse effects occur over much shorter periods than the lifetime exposure basis used to calculate the standards for carcinogens.


D.    Numeric Standards for Toxic Pollutants.

As stated in the introduction, the numeric standards for specific toxic pollutants listed in proposed paragraph 11-54-04(b)(3) are based upon the Environmental Protection Agency's Quality Criteria for Water. The derivation of these criteria is discussed below. The standards are divided into five categories. Four of these are intended to prevent acute and chronic impacts to fresh and saltwater aquatic life. The fifth is intended to protect public health from the consumption of contaminated fish and shellfish. For most toxic pollutants, EPA has not developed criteria in all five categories. Where criteria have not been developed, or, as discussed in section 3 below, where the Department has not concluded its review of particular EPA criteria for metals, the proposed standards list "ns," meaning no standard has been developed.

(1)    Aquatic toxicity criteria.

The criteria for preventing acute and chronic toxicity to fresh and saltwater organisms are based upon an extensive review of aquatic toxicity research. To derive a final criteria for a particular pollutant, EPA requires that toxicity test results, meeting quality assurance standards, be available for aquatic organisms from at least eight different families; that the ratio of acute to chronic toxicity be known for at least three families; and that the toxicity to an aquatic plant be known.

20

For the saltwater criteria, for example, these requirements are:

1.  Acceptable acute tests for at least eight different saltwater families including:

    a.  two different families in the phylum Chordata

    b.  a family in a phylum other than Arthropoda or Chordata

    c.  either the Mysidae or Penaeidae family

    d.  three other families not in the phylum Chordata

    e.  any other family

2.  Acute to chronic toxicity ratios for at least three families including a fish, an invertebrate, and at least one sensitive saltwater species.

3.  At least one test with a saltwater alga or a chronic test with a saltwater vascular plant.

The criteria are based on large and diverse groups of organisms in order to ensure that the most sensitive organisms in the receiving water are likely to be protected. One concern with the adoption of the national EPA criteria in Hawaii is that very few Hawaiian species are represented in the national database. Nevertheless, the Department is proposing adoption of the national criteria for a number of reasons.

First, repetition of the national database using Hawaiian species is clearly impossible. Although the Department is working to develop more bioassay test protocols for Hawaiian species, there are not a sufficient number of tests available using indigenous species to meet the three requirements for developing criteria listed above. Even if all the tests were available, it would take years to repeat the research for all of the toxic pollutants, and the cost would be prohibitive in the

21

extreme. Secondly, although few Hawaiian species are represented in the national database (the striped mullet, Mugil cephalus, and Pacific oyster, Crassostrea gigas, being two important exceptions), many families are represented. Examples are: a Hawaiian shrimp in the family Penaeidae; nehu in the family Engraulidae; and oopu (various Hawaiian gobies) in the family Gobiidae. Finally, the limited data which are available for Hawaiian species do not indicate that they are more or less sensitive to toxic pollutants than are North American species. In a recent Department of Health adaptation of a bioassay protocol for five species of Hawaiian sea urchin, none of which was even in the same family as a North American urchin, it was found that all showed sensitivities within the range shown by continental U. S. urchins.

For some of the toxic pollutants listed in the proposed toxicity standards, particularly chlorinated organic compounds (e.g., trichloroethylene), there has been insufficient research done for EPA to develop final criteria. EPA has however published "Lowest Observed Effect Levels." While these levels may not protect the most sensitive aquatic organisms, they represent the best scientific information currently available. In the future, EPA is planning to issue aquatic life advisories rather than full criteria documents. The minimum database for advisories will be three organisms from at least two phyla. In order to provide the greatest degree of protection at the present time, the Department of Health has decided to propose adoption of acute standards based on Lowest Observed Effect Levels, where the EPA database meets the minimum requirements above. Since the acute Lowest Observed Effect Levels listed by EPA represent LC50's (i.e., the level which is lethal to 50 percent of test organisms), these levels have been divided by three to estimate the level of no acute toxicity. For example, the proposed saltwater acute toxicity standard of 170 micrograms per liter for phenol, is based upon the reported LC50 of 510 for the Hawaiian species, nehu. These standards may change in the future as more information becomes available. The Department is not proposing adoption of chronic standards based on Lowest Observed Effect Levels because of the very limited chronic database. However, discharge limits may be calculated to prevent chronic toxicity using the proposed acute standards.

22

The acute and chronic toxicity standards in proposed paragraphs 11-54-04(b)(2)(A) and (B), apply the numeric acute and chronic criteria for toxic pollutants as maximums and 24-hour averages. This is consistent with the approach taken by EPA in the derivation of water quality criteria between 1980 and 1985. More recently, EPA has begun expressing acute and chronic criteria in terms of a recommended exceedence frequency which would allow a toxic event to occur once every three years. In this approach, the acute value is not to be exceeded for more than 1 hour once every three years, and the chronic value is not to be exceeded for more than 96 hours once every three years. EPA states that "the recommended exceedence frequency of 3 years is the Agency's best scientific judgment of the time it will take an unstressed system to recover from a pollution event in which exposure exceeds the criterion. A stressed system, for example, one in which several outfalls occur in a limited area, would be expected to require more time for recovery."

The Department of Health has not based the proposed standards on the three year recovery period for the following reasons. First, the three year period is based primarily on freshwater systems, which are the main concern in the continental United States. Oceanic systems, which are of primary importance in Hawaii, are estimated to require much longer periods to recover from toxic stress - from 10 to 100 years. Secondly, the EPA criteria are intended to provide guidance for assessing impacts to aquatic ecosystems, but are not themselves a part of a regulatory program for protection, as are state water quality standards. Although ecosystems may recover over time, it is clearly not protective or desirable to allow a continual cycle of toxic impact. Finally, in proposing standards, the Department must ensure that they can be practically implemented, and must consider factors such as the logistics of sampling to determine compliance. The vast majority of samples taken by both the state and permitted dischargers will be either single grab samples or 24-hour composite samples. The Department has therefore retained the more protective and readily implementable approach of single sample maximum and 24-hour average acute and chronic water quality standards.

23

(2)    Human health criteria.

The human health criteria are calculated to prevent public health impacts from the long term consumption of contaminated aquatic organisms. These criteria, in conjunction with the acute and chronic criteria above, will also prevent pollutant concentrations in commercially or recreationally important aquatic species from affecting marketability because of exceedence of applicable Food and Drug Administration (FDA) action levels, and protect wildlife, including fishes and birds that consume aquatic organisms, from adverse effects.

The Environmental Protection Agency calculates human health criteria using research data from two different fields of scientific research: human toxicology and aquatic organism bioaccumulation. These are used to first determine the acceptable daily intake of the toxic pollutant which will protect human health, and then calculate the water quality concentration, which given bioaccumulation in aquatic organisms, will not cause the acceptable daily intake to be exceeded.

The acceptable daily intake for a specific pollutant is determined from a review of medical research on its pharmokinetics and toxic effects. As discussed in the EPA Quality Criteria for Water document:

"Specific health-based criteria are developed only if a weight of evidence supports the occurrence of the toxic effect and if dose/response data exist from which criteria can be estimated. The pharmokinetics section reviews data on absorption, distribution, metabolism, and excretion to assess the biochemical fate of the compounds in the human and animal system. The toxic effects section reviews data on acute, subacute, and chronic toxicity, synergistic and antagonistic effects, and specific information on mutagenicity, teratogenicity, and carcinogenicity. From this review, the toxic effect to be protected against is identified taking into account the quality, quantity, and weight of evidence characteristic of the data."

24

Each individual EPA Water Quality Criteria Document contains an extensive review of the scientific literature on human health effects, which has been used to determine the acceptable daily intake for the pollutant. For carcinogens, the acceptable daily intake values are calculated based upon increased cancer risk. A higher risk level will result in a higher acceptable daily intake, which will result in a higher water quality standard. The human health-based water quality standards proposed for carcinogenic pollutants have been set at the one in one million lifetime excess cancer risk level, which is the level EPA considers to be negligible.

Organisms which are exposed to contaminated water may "bioaccumulate" pollutants in their tissues. Pollutants which are more soluble in fats than in water are particularly likely to accumulate in aquatic organisms. Given long term exposure, the concentration of a pollutant accumulated in an organism may be thousands of times higher than the concentration contaminating the water. The concentration to which a pollutant will accumulate in aquatic organisms, relative to the concentration of the pollutant in water, is called a "bioconcentration factor."

Once both the acceptable daily intake and the bioconcentration factor are known for a pollutant, a water quality criteria can be calculated which will ensure that the pollutant cannot bioaccumulate to a level which will threaten public health or the marketability of commercial or recreational catches. This calculation is based upon the average amount of fish and shellfish a person is likely to consume. The EPA criteria assume a daily consumption of 6.5 grams per day. The average consumption in Hawaii, however, is about three times the national averge, and the average per capita consumption of locally caught fish and shellfish is 16.0 pounds per year, or 19.9 grams per day. The proposed Hawaii fish consumption standards are based upon 19.9 rather than 6.5 grams per day, and are therefore approximately 3.1 times more stringent than the national criteria.