CHRISTOPHER SPROUL
Environmental Advocates
5135 Anza Street
San Francisco, California  94121
Tel:  (415) 553-3376
Fax:  (415) 358-5695
E-mail: csproul@enviroadvocates.com

PAUL ALSTON            1259-0
WILLIAM TAM            1887-0
BLAKE K. OSHIRO        6746-0
Alston Hunt Floyd & Ing
ASB Tower, 18th Floor
1001 Bishop Street
Honolulu, Hawai'i  96813
Tel:  (808) 524-1800
Fax:  (808) 524-5976
Email: palston@ahfi.com
       wtam@ahfi.com
       boshiro@ahfi.com

Attorneys for Applicants
SIERRA CLUB, HAWAI'I CHAPTER,
HAWAI'I'S THOUSAND FRIENDS and
OUR CHILDREN'S EARTH FOUNDATION

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| SIERRA CLUB, HAWAI'I CHAPTER; HAWAI'I'S THOUSAND FRIENDS; and OUR CHILDREN'S EARTH FOUNDATION,<br><br>　　　　Plaintiffs,<br><br>　　vs.<br><br>CITY AND COUNTY OF HONOLULU and FRANK DOYLE, DIRECTOR OF THE DEPARTMENT OF ENVIRONMENTAL SERVICES, in his official capacity,<br><br>　　　　Defendants. | Civil No. 04-00463 DAE-BMK<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANT CITY AND COUNTY OF HONOLULU'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' THIRD, FOURTH, AND EIGHTH CLAIMS; DECLARATION OF CHRISTOPHER SPROUL; EXHIBITS 1-2; TABLES; CERTIFICATE OF SERVICE**<br><br>Heard:    October 9, 2007<br>Judge:    David Alan Ezra |

660327-1 / 7502-3

**PLAINTIFFS' RESPONSE TO DEFENDANT CITY AND COUNTY
OF HONOLULU'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION
TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
ON PLAINTIFFS' THIRD, FOURTH, AND EIGHTH CLAIMS**

The Supplemental Memorandum filed by the City and County of Honolulu ("CCH") in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("CCH Supp. Mem.") improperly requests this Court to modify the NPDES permit ("Sand Island NPDES Permit") issued by the U.S. Environmental Protection Agency ("EPA") for CCH's Sand Island Wastewater Treatment Plant ("Sand Island").

## I. INTRODUCTION

The Sand Island NPDES Permit expressly imposes an annual average chlordane discharge concentration effluent limit of 0.0076 micrograms per liter (µg/l) and an annual average chlordane mass discharge limit of 0.0052 pounds (lbs)[1] per day. Declaration of Christopher Sproul in Support of Plaintiffs' Reply Memorandum in Support of Motion for Partial Summary Judgment ("Sproul Reply Decl."), Ex. 2 at ¶ A.2.  CCH argues EPA erred in setting these permit limits and that the Court should make these permit limits ten times more lenient.  CCH's argument is meritless.

Even if EPA mistakenly made these limits more stringent than the Clean Water Act ("CWA") dictates, this Court may not modify CCH's NPDES permit in this enforcement proceeding.  The

---

[1] 0.0024 kilograms (kg) per day.

Court must instead enforce the permit as written.  *Sierra Club v. Union Oil Co. of California,* 813 F.2d 1480, 1486-87 (9th Cir. 1987), *vac'd on other grounds*, 485 U.S. 931, (1988), *reinstated*, 853 F.2d 667 (9th Cir. 1988).  CCH failed to pursue its sole avenue for challenging EPA's alleged permit decision error-- exhaustion of its administrative remedies with EPA and then pursuit of Court of Appeals review in accord with CWA section 509(b).  CCH must abide by the permit as written.  *Id.*

　　　　CCH argues that EPA recognizes its error.  CCH's contention is not well-founded.  It is irrelevant even if true.  First, the Court may not modify CCH's permit in this enforcement proceeding even if EPA plainly stated that the permit limits are erroneous.  This would contradict the Ninth Circuit's *Union Oil* holding.  Second, even if EPA were to modify the Permit in the future, this would have no affect on CCH's permit limits during the period for which Plaintiffs seek summary judgment.  Third, contrary to CCH's suggestions, EPA cannot promptly modify CCH's permit under the minor modification provisions of 40 C.F.R. § 122.62.  EPA cannot modify an expired, administratively extended NPDES permit.  The Sand Island Permit expired in November 2003.  Furthermore, EPA could not modify CCH's chlordane limits until the Hawai'i Department of Health ("DOH") amends the Hawai'i water quality standards ("WQS") upon which these permit limits are based and EPA then approves this amendment to Hawai'i WQS.  Given EPA's demonstrable slowness to date in addressing its regulatory

duties, any amendment to the WQS standard will take considerable time. This Court will not face an EPA modified Sand Island Permit anytime soon.

Finally, even if the Court could somehow unilaterally modify CCH's chlordane limits to be ten times more lenient than stated in the Sand Island Permit, the Court should still grant summary judgment now and find CCH liable for numerous violations of the Sand Island Permit's chlordane limits.

## II.  FACTUAL BACKGROUND

EPA set CCH's chlordane limits in the Sand Island Permit based on Hawai'i WQS[2] set forth in Hawai'i Administrative Rules ("HAR") § 11-54-4. As published, HAR § 11-54-4 states that the maximum concentration of chlordane allowable in Hawai'i marine waters is 0.000016 µg/l. In setting the Sand Island Permit annual average chlordane limit of .0076 µg/l, EPA determined that Sand Island WWTP effluent at the point of discharge must contain no more than 0.0076 µg/l chlordane to meet the Hawai'i WQS for chlordane of 0.000016 µg/l, given that the effluent receives an initial dilution in receiving waters of 476:1. EPA followed similar methodology to calculate average annual mass limits for chlordane based upon the total volume of

---

[2]  CWA section 303(c) requires all states to establish WQS consisting of "the designated uses" of a given waterbody and "water quality criteria," i.e., the level of water quality needed to ensure attainment of these designated uses. 33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. § 131.3(I); *see generally Pronsolino v. Nastri*, 291 F. 3d 1123, 1127 (9th Cir. 2002).

effluent Sand Island discharges times the maximum allowable concentration of chlordane in Sand Island effluent.  *See* CCH Supp. Mem. at 5-7.  In so doing, EPA followed CWA § 301(b)(1)(C) and EPA regulations requiring EPA to include effluent limitations in an NPDES permit sufficient to achieve state WQS.  33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. § 122.44(d); *see generally, Union Oil*, 813 F.2d at 1483; *Oklahoma v. EPA*, 908 F.2d 595, 597-98 (10th Cir. 1990), *rev'd on other grounds*, *Arkansas v. Oklahoma*, 503 U.S. 91 (1992).

CCH submitted a declaration from DOH Deputy Director Laurence Lau stating that (a) the Hawai'i WQS in HAR § 11-54-4 is erroneous; and (b) DOH actually should have set a WQS for chlordane that is 10 times more lenient, 0.00016 µg/l.  Declaration of Kathleen A. Kelly in Support of CCH's Supplemental Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Kelly Decl.") (attachment to Kelly Decl.).  Mr. Lau's Declaration indicates that "the Department of Health intends to rectify this error," but provides no indication when or how DOH intends to rectify this alleged error.  Id.

### III. ARGUMENT

#### A. CCH CAN NOT AMEND ITS CHLORDANE PERMIT LIMITS IN THIS PROCEEDING.

CCH argues that the Sand Island Permit's chlordane limits as written by EPA are erroneous.  CCH argues that EPA *should* have set the chlordane limits based on chlordane WQS, that DOH *should* have published a different limit ten times more

lenient than the limit DOH DID actually publish and lawfully set. CCH Supp. Mem. at 6-8. CCH argues it is not challenging the terms of its Permit under CWA § 509(b)(1), but that the Court should only hold CCH liable for violating the Sand Island Permit (and the CWA) when CCH's discharges exceed limits not written in the Sand Island Permit, but the "corrected" limits. *Id.* CCH plays with words. Either the Court must order CCH's chlordane permit limits (as formally adopted by rule and as they now appear in the Sand Island Permit) "amended" or the Court must find that CCH has continuously violated those limits every day since May 30, 1999.[3] CCH does not dispute that its DMRs report chlordane levels exceed the limits as written in the Permit.

The fatal flaw in CCH's argument is that the Ninth Circuit has made it unequivocally clear that a district court in an enforcement proceeding must enforce NPDES permits **as written**, erroneous or not. District courts lack authority to amend NPDES permits in enforcement proceedings. *Union Oil*, 813 F.2d at 1486-87. Instead, EPA-issued NPDES permits can only be challenged by first exhausting administrative remedies and then petitioning a Court of Appeals pursuant to CWA section 509. *Id.*

In *Union Oil*, the discharger argued it should not be found liable under the CWA in a district court enforcement

---

[3] The applicable statute of limitations period in this action is five years and sixty days before the Plaintiffs filed suit on July 29, 2004, i.e., May 30, 1999. See *Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1521, 1523-24 & n.5 (9th Cir. 1987).

proceeding because its NPDES permit was unlawfully stringent. The Ninth Circuit rejected this argument:

> This is an enforcement action in which Sierra Club alleged that Union Oil failed to comply with the terms of a[n NPDES] permit issued by the California Water Board.  Union Oil was essentially asking the district court to modify its permit. . . . .  This the district court was not entitled to do.  To obtain modification of its permit, Union Oil should have acted through the proper administrative channels.  Because Union Oil failed to exhaust its administrative remedies, it is bound by the terms of the permit [as] issued . . . .

*Id.* at 1486.

The Ninth Circuit added that "the fact that the agency may not have complied with the statute" in issuing the NPDES permit was irrelevant; the permittee had to be found strictly liable for violating the permit as written as any legal errors in "adopting a more stringent standard should be subject to scrutiny only at the permit issuance stage."  *Id.* at 1488.

CCH failed to exhaust administrative remedies and/or file a timely Court of Appeals petition pursuant to CWA § 509(b) seeking redress for EPA's alleged error in setting the Sand Island Permit's chlordane limits.  Accordingly, CCH is now barred from seeking judicial amendment to the Permit as written.  *Id.*

This Court's task on summary judgment is simple.  The Court must simply review CCH's DMRs and determine whether they report levels of chlordane exceeding the Sand Island Permit's limits as written.  *Id.* at 1490-91.  As repeatedly detailed in briefing to the Court, this is unequivocally the case. Plaintiffs is entitled to summary judgment.  See Declaration of

Christopher Sproul in Support of Plaintiffs' Response to CCH's Supplemental Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Sproul Supp. Decl."), ¶¶ 5-7, Tables 1-2.

### B. AGENCY PAROLE REPRESENTATIONS CAN NOT CONTRADICT THE PERMIT LIMITS' PLAIN LANGUAGE REGARDING CHLORDANE.

CCH contends that EPA "has recognized" that the Sand Island Permit contains an error in its annual average chlordane limits. CCH Supp. Mem. at 1, 4, 7. While it is fanciful to contend that EPA has done so,[4] this is irrelevant even if true.

First, the Court may not modify the Sand Island Permit in this enforcement proceeding even if EPA plainly stated that the chlordane limits are erroneous. The Court may not, consistent with *Union Oil*, modify NPDES permit terms. The Court may not treat EPA statements that the Permit is erroneous as the equivalent of EPA modification of an NPDES permit. EPA may only modify an NPDES permit by following the rigorous procedural requirements for such modifications established by EPA regulations. *Citizens for a Better Environment v. Union Oil Co. of California*, 83 F.3d 1111, 1119-20 (9th Cir. 1996);

---

[4] CCH contends that EPA's March 27, 2007 Tentative Decision Document ("TDD") regarding EPA's tentative permit decision for the Honouliuli WWTP acknowledges that the proper Hawai'i WQS for chlordane is 0.00016 µg/l. While EPA on page 56 of the TDD refers states this, in Table 18 attached to the TDD EPA correctly indicates that the actual published chlordane WQS is 0.000016 µg/l. Sproul Supp. Decl., Ex. 1. Beyond these conflicting notations, EPA has said nothing regarding whether DOH should amend HAR § 11-54-4 and whether EPA regards CCH's current chlordane permit limits as erroneous.

*Pennsylvania Public Interest Research Group, Inc. ("PIRG") v. P.H. Glatfelter Co.*, 128 F. Supp.2d 747, 758-62 (M.D. Pa. 2001); *U.S. v. Gulf States Steel, Inc.* 54 F. Supp.2d 1233, 1245 (N.D. Ala. 1999) ("representations by officials that certain portions of a permit will not be enforced, without formal modifications in the permit, will not excuse the holder from the terms of that permit.").

Second, even if EPA modifies CCH's NPDES permit at some future date, this could not change CCH's chlordane permit limits for the May 1999 through July 2007 period at issue in Plaintiffs' Summary Judgment motion. *PIRG*, 128 F. Supp.2d at 758-62 (M.D. Pa. 2001) (NPDES permits can only be amended in accord with the administrative procedures and time limits mandated for such amendments. Subsequent agency determination past the time for permittee to appeal that a permit limit was erroneously issued does not alter or affect the permit limit as it was originally issued).

Third, contrary to CCH's suggestions, EPA may not modify CCH's permit under the minor modification provisions of 40 C.F.R. § 122.63.  EPA may not modify an expired, administratively extended NPDES permit.[5]  The Sand Island Permit expired on

---

[5] EPA regulations provide that "*the conditions* of an expired permit continue in force" while EPA action on a permit renewal are pending.  40 C.F.R. § 122.6(a) (emphasis added).  By the plain language of the regulation, it is the permit terms as originally framed that continue in effect past a permit's expiration.  This is only sensible as administrative extensions of expired NPDES permits happen automatically by force of law due

November 3, 2003. No action may be taken to modify the present permit. Furthermore, EPA may not modify CCH's chlordane limits until DOH amends the Hawai'i WQS for chlordane (upon which the permit limits are based). EPA must first approve this amendment to Hawai'i WQS pursuant to CWA § 303(d). EPA must then set NPDES permit limits based on WQS as they are published. 40 C.F.R. § 122.44(d); *see generally, Union Oil*, 813 F.2d at 1483; *Oklahoma v. EPA*, 908 F.2d 595, 597-98 (10th Cir. 1990), *rev'd on other grounds*, *Arkansas v. Oklahoma*, 503 U.S. 91 (1992). DOH can only amend WQS following public notice and comment procedures. 40 C.F.R. § 131.10(e); *City of Albuquerque v. Browner*, 97 F.3d 415, 419 (10th Cir. 1996). Such amendments only take effect following EPA approval. *Alaska Clean Water Act Alliance* v. *Clark*, 1997 U.S. District LEXIS 11144 at *5-*12 (W.D. Wash. July 8, 1997). Such agency actions will certainly take considerable time.[6]

---

to EPA inaction on pending permit applications. *Natural Resources Defense Council, Inc*. v. U.S. EPA, 859 F.2d 156, 214 (D.C. Cir. 1988) If EPA were to take affirmative action to amend a permit past its expiration date, then the EPA inaction on the NPDES permit renewal which is a necessary condition for the extension of an expired permit no longer exists. Accordingly, EPA's NPDES Permit Manual acknowledges that modifications of NPDES permits can only occur *before* they expire. See Sproul Supp. Decl., Ex. 2.

[6] EPA is not an agency known for expeditious action. For example, as noted, the Sand Island Permit expired nearly four years ago on November 3, 2003. EPA has yet to issue even a draft new permit, even though NPDES permits are supposed to be issued for fixed terms not to exceed five years. CWA § 402 (b)(1)(B), (a)(3); 33 U.S.C. § 1342 (b)(1)(B), (a)(3); see Sproul Supp. Decl., ¶ 4.

Thus, the Court will not be presented with an EPA modification of the Sand Island Permit anytime soon.[7]

### C. EVEN IF THE COURT WERE TO MODIFY THE SAND ISLAND PERMIT AS CCH REQUESTS, SUMMARY JUDGMENT IS STILL APPROPRIATE FOR MANY CCH CHLORDANE VIOLATIONS.

Even if the Court were to deem CCH's chlordane limits amended to be ten times more lenient as urged by CCH, the Court should still issue summary judgment finding CCH liable for 3,661 violations of even the much more lenient Sand Island Permit chlordane limits advocated by CCH. *See* Sproul Reply Decl., ¶¶ 5-7.

The only evidence relevant to this Court's summary judgment determination of CCH's liability are CCH's DMRs (whether the Court deems the Sand Island Permit amended or not). *Union Oil,* 813 F.2d at 1490-91. Thus, even if this Court deems CCH's permit limits "modified," summary judgment still consists of a straight forward calculation: compare CCH's DMRs (duly filed with the Court[8]) to the appropriate limits. *Id.* CCH's suggestion that an evidentiary hearing is now required is baseless. *See* CCH Supp. Mem. at 13-15.

---

[7] Notably, EPA could not in any case employ 40 C.F.R. § 122.63 to amend the Sand Island Permit as urged by CCH. This regulation allows for minor modifications to correct typographical errors in NPDES permits. The error CCH alleges, however, was not in EPA's permit drafting, but in DOH's drafting of Hawai'i WQS. EPA correctly derived the Sand Island Permit chlordane limits from Hawai'i WQS as published.

[8] *See* Sproul Supp. Decl., ¶ 5.

CCH's DMRs report 2,135 instances in which the DMR exceeds CCH's proposed adjusted annual average chlordane concentration limit (0.076 µg/l) in the following months: (1) from May 30, 1999 through January 2000, (2), from March 1, 2000 through March 31, 2001 and (3), from March 1, 2003 through March 31, 2007. This constitutes a total of 2,135 days of violation. Sproul Supp. Decl., ¶ 7, Table 1.

CCH's DMRs further report 1,526 instances in which the DMR exceeds CCH's proposed adjusted annual average chlordane mass limit (0.024 kg/day) in the following months: (1) from May 31, 1999 through January 31, 2000 and (2) from April 1, 2003 through September 30, 2006. This constitutes a total of 1,526 days of violation. Sproul Supp. Decl., ¶ 7, Table 2.

CCH contends that its DMRs depict CCH in compliance with its advocated adjusted annual average chlordane concentration limit for some of this time (specifically from March 1, 2000 to January 31, 2001 and from March 1, 2003 through January 31, 2004). CCH Supp. Mem. at 13-15; Declaration of Ross Tanimoto in Support of CCH's Supplemental Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Tanimoto Decl."), ¶ 14. CCH further contends that its DMRs depict CCH in compliance with its advocated adjusted annual average chlordane mass limit for some of this time (specifically from April 1, 2003 through February 29, 2004). CCH Supp. Mem. at 13-15; Tanimoto Decl., ¶ 15. This is wrong.

The Sand Island Permit requires CCH to meet annual average chlordane limits and to submit DMRs every month reporting the average annual chlordane values. If a given DMR reports that CCH has exceeded its annual average chlordane limits, this constitutes a violation for every day in the preceding year, i.e., the time period over which the annual average was calculated. *E.g., Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield*, 791 F.2d 304, 314 (4th Cir. 1986), *vacated on other grounds*, 484 U.S. 49 (1987).

CCH's DMR for February 2001 reported a chlordane level exceeding 0.076 µg/l.[9] Thus, CCH was in continuous violation of even its advocated relaxed chlordane concentration limit for the time period March 1, 2000 to February 29, 2001 (i.e., the year preceding February 29, 2001). This contradicts CCH's argument that it complied with its annual average chlordane concentration limit from March 1, 2000 through January 31, 2001. CCH's DMR for February 2004 reported a chlordane level exceeding 0.076 µg/l.[10] Thus CCH was in continuous violation of even its advocated relaxed chlordane concentration limit for the time period March 1, 2003 to February 29, 2004 (i.e., the year preceding February 29, 2004). This contradicts CCH's argument that it

---

[9] This DMR reported a chlordane concentration of 0.0767 µg/l. Sproul Supp. Decl., ¶ 7, Table 1.

[10] This DMR reported a chlordane concentration of 0.0832 µg/l. Sproul Supp. Decl., ¶ 7, Table 1.

complied with its annual average chlordane concentration limit from March 1, 2003 through January 31, 2004.

CCH's DMR for March 2004 reported a chlordane level exceeding 0.024 kg/day.[11] CCH was in continuous violation of even its advocated relaxed chlordane mass limit for the time period April 1, 2003 to March 31, 2004 (i.e., the year preceding March 31, 2004). This contradicts CCH's argument that it complied with its annual average chlordane mass limit from April 1, 2003 through February 29, 2004.

## IV. CONCLUSION

The Court should immediately grant summary judgment to Plaintiffs and find CCH liable for: (a) 2,985 violations of CCH's chlordane annual average chlordane discharge concentration effluent limit; and (b) 2,985 violations of CCH's annual average chlordane mass discharge limit from May 30, 1999 to July 31, 2007, for a grand total of 5,970 such violations. *See* Sproul Reply Decl., ¶¶ 5-6.

DATED: Honolulu, Hawai'i, October 22, 2007.

                                                 /s/ William M. Tam
                                                CHRISTOPHER SPROUL
                                                Environmental Advocates
                                                PAUL ALSTON
                                                WILLIAM M. TAM
                                                BLAKE K. OSHIRO
                                                Alston Hunt Floyd & Ing
                                                Attorneys for Plaintiffs

---

[11] This DMR reported a chlordane mass level of 0.0255 kg/day. Sproul Decl., ¶ 7, Table 2.