IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

SIERRA CLUB, HAWAII ) CV. NO. 04-00463 DAE-BMK
CHAPTER, HAWAII'S )
THOUSAND FRIENDS; and OUR )
CHILDREN'S EARTH )
FOUNDATION, )
)
        Plaintiffs, )
)
    vs. )
)
CITY AND COUNTY OF )
HONOLULU, and FRANK DOYLE, )
DIRECTOR OF THE )
DEPARTMENT OF )
ENVIRONMENTAL SERVICES, in )
his official capacity, )
)
       Defendants. )
_____ )

ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
ON PLAINTIFFS' THIRD, FOURTH AND EIGHTH CLAIMS

On October 9, 2007, the Court heard Plaintiffs' Motion. William

Tam, Esq., and Christopher Sproul, Esq., appeared at the hearing on behalf of

Sierra Club, Hawai`i Chapter, Hawai`i's Thousand Friends and Our Children's

Earth Foundation (collectively, "Plaintiffs"); James J. Dragna, Esq., Bryan K.

Brown, Esq., and Kathleen A. Kelly, Deputy Corporation Counsel, appeared at the

hearing on behalf of Defendant City and County of Honolulu ("CCH").  After

reviewing Plaintiffs' motion and the supporting and opposing memoranda, the

Court GRANTS IN PART AND DENIES IN PART Plaintiffs' Motion for Partial

Summary Judgment on Plaintiffs' Third, Fourth, and Eighth Claims.

<u>BACKGROUND</u>

Plaintiffs filed the instant lawsuit in July 2004, pursuant to the citizen

suit provision of the Clean Water Act ("CWA").  This lawsuit involves alleged

violations of the Sand Island and Honouliuli National Pollution Discharge

Elimination System ("NPDES") Permits.  Plaintiffs have seven claims remaining in

the instant lawsuit.  The third, fourth, and eighth claims are at issue in this motion.

Plaintiffs' third claim is based on alleged violations of effluent limitations in the

Sand Island Wastewater Treatment Plant ("WWTP") NPDES Permit (the

"Permit").  The fourth claim is based on alleged violations of the NPDES Permit

deadlines to construct and operate a disinfection facility, in violation of the CWA.

Plaintiffs' eighth claim for relief is based on alleged violations of the 2002 EPA

Sand Island Order, which required CCH to take specific measures to correct its

NPDES Permit violations and ensure Permit compliance.

On April 16, 2007, this Court granted Plaintiffs' reconsideration

motion and resolved the legal methodology for counting CWA violations with

respect to Plaintiffs' third and fourth claims.  This Court found that with respect to claim three, "a violation of a monthly average will be counted as a violation of every day of the month."  (Reconsideration Order at 11.)  With respect to claim four, this Court found that "the continuous failure to construct and operate the disinfection facility as required by the NPDES Permit constitutes a continuous daily violation and should be counted as such."  (Id. at 15.)  This Court reserved for later decision the actual number of violations since Plaintiffs' eighth claim was related to the third and fourth claims, Plaintiffs had not moved for summary judgment with respect to that claim, and this Court wanted to avoid any possible double counting of violations.

On July 26, 2007, Plaintiffs filed a motion for partial summary judgment on its third, fourth, and eighth claims to provide this Court with a basis for counting the total number of CWA violations.  CCH filed an opposition on September 21, 2007, and Plaintiffs filed a reply on September 28, 2007.  After the hearing in this matter, on October 16, 2007, CCH filed a supplemental memorandum regarding an error in the annual average effluent limitations for chlordane in its Permit.  Plaintiffs filed a response to the supplemental brief on October 22, 2007.

Plaintiffs seek a finding that CCH is liable for 17,595 violations of the

CWA, based on:

> (1) 8,613 violations of the enterococcus, chlordane, dieldrin, Biochemical Oxygen Demand ("BOD"), and total suspended solids ("TSS") Sand Island Permit limits from May 30, 1999 to July 31, 2004;

> (2) 4,834 violations of the Sand Island Permit Limits for enterococcus, chlordane, and dieldrin between August 1, 2004 and March 31, 2007;

> (3) 900 violations of the Sand Island Permit's provisions to complete the Sand Island disinfection facility between July 21, 2002 and January 5, 2005;

> (4) 713 violations of the Sand Island Permit's compliance schedule requirement between January 6, 2005, and December 19, 2006, for failing to complete the Sand Island disinfection facility;

> (5) 832 violations of the Sand Island Permit's compliance schedule requirement between February 19, 2005, and May 30, 2007, for failing to complete the Hart Street Pump Station project; and

> (6) 1,703 violations of the 2002 EPA Order between October 1, 2002 and May 30, 2007.

Plaintiffs request that this Court defer civil penalties in favor of

locally beneficial environmental projects.

4

A.    The Permit Provisions

The Permit contains effluent limitations for enterococcus bacteria and sets average daily maximum limit for concentration of enterococcus of 18,000 Colony Forming Units per 100 milliliters, starting on July 21, 2002.

Chlordane and dieldrin are pesticides.  The Permit sets both an average annual limitation for concentration and discharge for discharge of Chlordane.  The average annual limitation for the concentration limit of Chlordane is 0.0076 micrograms per liter and the mass discharge limit is 0.0052 pounds per day.   The average annual limitation for the concentration limit of Dieldrin is 0.012 micrograms per liter and the mass discharge limit is 0.0082 pounds per day.  CCH must report to the Environmental Protection Agency ("EPA") and the State Department of Health ("DOH") the level of pollutant discharged in monthly Discharge Monitoring Reports, which are submitted under penalty of perjury.

The Permit also includes a schedule by which CCH must construct and operate and effluent disinfection system, and it must be completed by July 21, 2002.  The disinfection facility was not completed until November 15, 2006.  The Permit also requires CCH to upgrade the Hart Street Wastewater Pump Station by February 18, 2005.

B.     <u>Administrative Orders</u>

In October 1999, the EPA issued an order requiring CCH to take specific measures to correct the on-going violations of the Permit.  In September 2002, the EPA issued a second order requiring CCH to take all measures to prevent further Permit violations and bring the Sand Island WWTP into compliance with the Permit.

STANDARD OF REVIEW

Rule 56 requires summary judgment to be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); <u>see</u> <u>also</u> <u>Porter v. California Dept. of Corrections</u>, 419 F.3d 885, 891 (9th Cir. 2005); <u>Addisu v. Fred Meyer, Inc.</u>, 198 F.3d 1130, 1134 (9th Cir. 2000). A main purpose of summary judgment is to dispose of factually unsupported claims and defenses.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  <u>See</u> <u>id.</u> at 323.  A moving party without the ultimate burden of persuasion at trial–usually, but not always, the defendant–has both the initial burden of production and the

6

ultimate burden of persuasion on a motion for summary judgment.  <u>Nissan Fire &
Marine Ins. Co. v. Fritz Cos.</u>, 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden
initially falls upon the moving party to identify for the court those "portions of the
materials on file that it believes demonstrate the absence of any genuine issue of
material fact."  <u>T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d
626, 630 (9th Cir. 1987) (citing <u>Celotex Corp.</u>, 477 U.S. at 323).

      Once the moving party has carried its burden under Rule 56, the
nonmoving party "must set forth specific facts showing that there is a genuine
issue for trial" and may not rely on the mere allegations in the pleadings.  <u>Porter</u>,
419 F.3d  at 891 (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256
(1986)).  In setting forth "specific facts," the nonmoving party may not meet its
burden on a summary judgment motion by making general references to evidence
without page or line numbers.  <u>S. Cal. Gas Co. v. City of Santa Ana</u>, 336 F.3d 885,
889 (9th Cir. 2003); Local Rule 56.1(f) ("When resolving motions for summary
judgment, the court shall have no independent duty to search and consider any part
of the court record not otherwise referenced in the separate concise statements of
the parties.").  "[A]t least some 'significant probative evidence'" must be
produced.  <u>T.W. Elec. Serv.</u>, 809 F.2d at 630  (quoting <u>First Nat'l Bank of Ariz. v.
Cities Serv. Co.</u>, 391 U.S. 253, 290 (1968)).  "A scintilla of evidence or evidence

7

that is merely colorable or not significantly probative does not present a genuine issue of material fact." Addisu, 198 F.3d at 1134.

When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." T.W. Elec. Serv., 809 F.2d at 631.  In other words, evidence and inferences must be construed in the light most favorable to the nonmoving party.  Porter, 419 F.3d at 891.  The court does not make credibility determinations or weigh conflicting evidence at the summary judgment stage.  Id.  However, inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. T.W. Elec. Serv., 809 F.2d at 631.

## DISCUSSION

A.    Plaintiffs' Third Claim for Relief

In the third claim for relief, Plaintiffs seek a finding that CCH violated the Permit.  The CWA imposes strict liability for violations of NPDES permits. Save Our Bays and Beaches v. City and County of Honolulu, 904 F. Supp. 1098, 1138 (D. Haw. 1994).

8

1.    <u>Violations of Enterococcus, TSS, BOD, Chlordane, and Dieldrin Limits</u>

    a.    <u>Enterococcus</u>

Plaintiffs seek a finding that CCH violated the enterococcus limits a total of 1,684 times.

CCH's monthly Discharge Monitoring Reports establish that CCH exceeded the enterococcus limit from the date that the limit took place on July 31, 2002, through February 28, 2007.  The Ninth Circuit has held that Discharge Monitoring Reports, are "conclusive evidence of an exceedance of a permit limitation."  <u>Sierra Club v. Union Oil Co. of Cal.</u>, 813 F.2d 1480, 1492 (9th Cir. 1987) <u>vac'd on other grounds</u>, 485 U.S. 931 (1988), <u>judgment reinstated and amended</u>, 853 F.2d 667 (9th Cir. 1988).  This Court has also previously held that Discharge Monitoring Reports constitute admissions of noncompliance that bind the defendant in an enforcement proceeding because the reports are submitted under penalty of perjury.  <u>Save Our Bays and Beaches</u>, 904 F. Supp. at 1138 ("these self-monitoring reports, known as "Discharge Monitoring Reports" or "DMRs," are public documents and are submitted under penalty of perjury.").

CCH contends that the Permit anticipates a maximum of only 365 enterococcus violations because the Permit provides "[f]ollowing at least one year

of continuous operation of the . . . Disinfection Facility . . . the EPA and DOH will re-evaluate the need for continuous effluent disinfection." (CCH Ex. D at 54.) CCH argues that since the first year of operation of the disinfection facility is essentially a pilot period, the number of violations that can be imposed is unclear.

CCH's argument is meritless. The Permit clearly provides that from July 21, 2002, until the expiration of the Permit, CCH shall meet the daily maximum enterococcus limit. (Id. at 9-10.) The "one year" language only allows re-evaluation after CCH has already completed the disinfection facility and submitted data demonstrating that disinfection can be stopped. In no way does the Permit allow a maximum of 365 days of violations. Instead, the Permit makes it quite clear that CCH had to be in compliance with the effluent limitations for enterococcus from July 21, 2002, onward. If this Court were to accept CCH's position, then again, as found in the Reconsideration Order, once 365 days had past, there would be little incentive to build the disinfection facility and come into compliance with the enterococcus effluent limitations since CCH would only be subject to a maximum of 365 days of penalty, far less than the 1,684 violations at issue here, and possibly less that the costs of construction and operation.

CCH argues that the Permit is ambiguous because on the one hand it requires CCH to report the enterococcus limit as a geometric mean (an average of

10

two or more samples), but on the other hand requires that CCH take only one grab

sample at a certain time period each day.  (CCH Ex. D at 10.)  The Permit states

that CCH must report "enterococci as geometric mean.  Effluent monitoring shall

consist of one grab sample collected between 12 noon and 3:00 p.m.  Enterococci

samples shall be analyzed using Method 1600, *membrane Filter Test Method for*

*Enterocci in Water* (EPA 821-R-97-004, May 1997)."  (Id. at 10 n12.)  CCH

asserts it is therefore unclear whether compliance is determined through an average

or by a single sample.

This argument lacks merit.  Although not completely clear to this

Court from only the attached exhibit with no expert explanation, Method 1600

indicates that CCH is to determine the geometric mean by taking three tests of a

single sample, e.g. dividing its single grab into multiple containers and report a

single value based upon the geometric mean of those containers.  (Pls.' Reply Ex. 3

at 6-7.)  Notwithstanding, it is irrelevant that the Permit may be ambiguous on this

issue because CCH used a certain method for testing its samples and reported the

tests for years, from 2002 through 2007, using that method in its Discharge

Monitoring Reports.  If CCH was confused whether it was using the correct

method, it could and should have sought clarification years ago.  Having filed its

Discharge Monitoring Reports, which demonstrate violations of the effluent

limitations, CCH is now bound by those reports and cannot claim it was uncertain

as how compliance should be determined.  Indeed, the Ninth Circuit has held that

"when a permittee's reports indicate that the permittee has exceeded permit

limitations, the permittee may not impeach its own reports by showing sampling

error."  <u>Sierra Club</u>, 813 F.2d at 1492.  The court explained that if a court were to

excuse reported permit exceedances on the basis of sampling errors, the court

> would be sanctioning countless additional hours of
> NPDES litigation and creating new, complicated factual
> questions for district courts to resolve. As indicated by
> the legislative history, Congress hoped to limit such
> situations. In addition, if each self-monitoring report is to
> be considered only prima facie rather than conclusive
> evidence of an exceedance of a permit limitation, citizen
> groups like the Sierra Club would be taking a
> considerable risk whenever they initiated a citizen
> enforcement action pursuant to 33 U.S.C. § 1365. While
> a permittee's publicly filed reports might clearly indicate
> that illegal pollution was taking place, the permittee
> might have additional information unavailable to citizen
> groups indicating that sampling error rendered the reports
> meaningless. Finally and most importantly, allowing
> permittees to excuse their reported exceedances by
> showing sampling error would create the perverse result
> of rewarding permittees for sloppy laboratory practices.
> Such an approach would surely undermine the efficacy of
> the self-monitoring program.

<u>Id.</u>

12

CCH next asserts that exceedances of the enterococcus limit were the direct result of construction delays in completing the Disinfection Facility, such as disputes with contractors, theft, water damage, equipment damages and defects, and discovery of hazardous materials.  This argument is premature because the CWA imposes strict liability for violations of NPDES permits and "the permit holder's good faith is not relevant to the issue of liability."  Save Our Bays, 904 F. Supp. at 1105 ("The Act imposes strict liability for NPDES violations. The Act does not allow for "de minimus" or "rare" permit violations, and the permit-holder's good faith is not relevant to the issue of liability."); see also Hawaii's Thousand Friends v. City and County of Honolulu, 821 F. Supp. 1368, 1392 (D. Haw. 1993) ("The fact that a violator is 'without fault' in committing violations of the Clean Water Act does not absolve the violator from penalties, although it may mitigate the amount of the penalties assessed.").

Finally, CCH does not dispute that it failed to comply with the Permit limits for most of the time period in question.  CCH states only that the daily sampling shows that between November 15, 2006, and March 31, 2007, it met the daily maximum limit for enterococcus on 112 days.

Accordingly, excluding the days that CCH met the Permit limits for enterococcus, as agreed to by Plaintiffs, the sum total of violations of the Permit's

enterococcus limit is 1,603 for the time period of July 31, 2002, through March 31, 2007. This number is derived by counting the number of days in each month for which the monthly average limit was violated, pursuant to this Court's previous order. (Reconsideration Order at 11) (holding that "a violation of a monthly average will be counted as a violation of every day of the month."). Thus, this Court GRANTS Plaintiffs' motion with respect to the number of enterococcus limits.

b.    Chlordane and Dieldrin

In an errata to their opposition filed October 2, 2007, after Plaintiffs filed their reply brief, CCH states that Plaintiffs have not alleged violations of the dieldrin and chlordane average annual limits in their Complaint, and therefore, until they amend the Complaint, their summary judgment motion on these alleged violations is premature. CCH is incorrect. Plaintiffs' Second Amended Complaint discusses chlordane and dieldrin, and that the Permit includes annual limitations. (Compl. ¶¶ 41-44, 89-91.) Under the notice pleading standard of Rule 8, this is sufficient to provide CCH with notice that Plaintiffs would be bringing claims for violations of the annual limits.

Plaintiffs seek a finding that CCH violated the Permit limitations for annual mass and concentration for chlordane from May 30, 1999 through March

14

31, 2007, for a total of 5,726 violations.  Plaintiffs seek a finding that CCH

violated the Permit limitations for annual mass and concentration for dieldrin from

May 30, 1999 through March 31, 2007, for a total of 5,726 violations.  These

numbers represent the number of violations for the annual mass plus that same

number for violations of concentration, based on the number of days in the period.

In addition, Plaintiffs seek a finding that CCH violated its daily maximum mass

limits for dieldrin on 62 days and its concentration limits for dieldrin on 31 days.

CCH asserts that there is new testing technology for chlordane and

dieldrin that is more sensitive than the testing method actually used and that this

new technology shows that the actual levels of chlordane and dieldrin are

significantly lower than results based on the old methods.  This argument is

irrelevant.  First, CCH admits that it no longer has the water samples that it tested

years ago, when it reported the exceedances and thus, there is no way to retest

those samples.  Second, CCH submitted Discharge Monitoring Reports reporting

these exceedances under penalty of perjury.  As set forth above, this is conclusive

evidence of an exceedance of a permit limitation and "the permittee may not

impeach its own reports by showing sampling error."  Sierra Club, 813 F.2d at

1492.

15

CCH next argues that a violation of an annual average cannot be counted as 365 violations, and should instead be counted as 12 violations, one for each month of the year.  Plaintiffs argue that this Court should expand its previous ruling that "a violation of a monthly average will be counted as a violation of every day of the month," and rule that a violation of an annual average will be counted as a violation for each day in the year.  (Reconsideration Order at 11.)

Although the parties and this Court are unaware of any court making a finding that violations of annual averages constitute a violation for every day of the year, this Court sees no reason why the logic from the Ninth Circuit and Fourth Circuit cases discussed in the Reconsideration Order should not be extended to an annual average violation.  Indeed, as discussed in the previous order, the Fourth Circuit in <u>Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd.,</u> held that while 33 U.S.C. § 1319(d)

> does not address directly the matter of monthly average limitations, it does speak in terms of penalties per day of violation, rather than penalties per violation. This language <u>strongly suggests that where a violation is defined in terms of a time period longer than a day, the maximum penalty assessable for that violation should be defined in terms of the number of days in that time period</u>.

16

791 F.2d 304, 314 (4th Cir. 1986), <u>vacated on other grounds</u>, 484 U.S. 49 (1987) (emphasis added).  The Fourth Circuit reasoned that it did not make sense to treat a monthly violation as one day of violation because such approach is inconsistent with the language of section 1319(d) because it would set a maximum penalty per violation, rather than per day of violation.  <u>Id.</u>  In addition, as noted in the Reconsideration Order, in <u>Borden Ranch Partnership v. U.S. Army Corps of Engineers</u>, the Ninth Circuit found that

> [t]he statute imposes a maximum penalty "per day for each violation." 33 U.S.C. § 1319(d). It does not say "per each day in which violations occur" or "per day in which a party pollutes." The focus is clearly on each violation, and courts have consistently rejected attempts to limit civil penalties to the number of days in which violations occur. A contrary rule would encourage individuals to stack all their violations into one "Pollution Day," in which innumerable offenses could occur, subject only to the $25,000 maximum.

 261 F.3d 810 (9th Cir. 2001) (the court rejected the defendant's argument that he should be assessed a penalty for any day in which violations occurred, and not a separate penalty for each violation).  Similarly, here, the focus should continue to be imposing liability for each day for the time period that the defendant is in violation of a Permit standard.

Although this Court finds that a violation of an annual limit counts as a violation of each day of the year, and thus could result in numerous violations, this Court has broad discretion in determining the actual amount of the penalty for each violation.  Haw. Thousand Friends, 821 F. Supp. at 1394 (the amount to be assessed is wholly within the discretion of the court); Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc., 897 F.2d 1128, 1142 (11th Cir. 1990) ("the amount of penalty to be levied is discretionary with the district court").  For example, during the penalty phase it would be appropriate for a court to "assess higher penalties for the polluter engaging in high discharges on a daily basis than for the polluter who violates the monthly limitation because of a single discharge."  Id. at 1140.  Although the penalty statute sets a maximum amount of penalty that can be assessed, it does not provide a required minimum amount, and sets forth factors for this Court to consider in making the penalty determination.  See 33 U.S.C.A. § 1319 (a violator "shall be subject to a civil penalty not to exceed $25,000 per day for each violation); see also United States v. Allegheny Ludlum Corp., 366 F.3d 164, 189 (3rd Cir. 2004) (noting that "the statute merely sets a maximum penalty [and] the District Court retains the discretion to assess a smaller penalty where appropriate.") (citations omitted).  Indeed, during the penalty assessment phase of this case, it would be appropriate for this Court to consider

18

days or continuous periods where CCH was in compliance with its annual limits, the degree to which it is being punished for violations of different time periods of the Permit, and CCH's good faith in attempting to comply.  <u>See</u> 33 U.S.C.A. § 1319 ("In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require."); <u>see</u> <u>also</u> <u>Atlantic States Legal Foundation</u>, 897 F.2d at 1141 (reviewing section 1319 and holding that "Congress' use of the words 'shall consider' suggests that in arriving at a dollar figure for penalties, the court is to take each listed factor into account as well as any additional factors the court feels have bearing on the question of penalties."); <u>Allegheny Ludlum Corp.</u>, 366 F.3d at 189 ("in exercising its discretion, a district court should take into account the degree to which the polluter's conduct had already been punished by penalties for daily violations and to use the maximum penalty for a daily violation as a basis for comparison.")

However, this Court finds that on the current record it cannot determine the total number of violations of the annual averages for chlordane or dieldrin because there is a question as to how the year should be calculated.  Since

19

there are no cases on point and CCH only touched on this issue, this Court orders the parties to address whether the 365 days of violation for violating an annual average should run on a calendar year, a permit year, or a rolling basis.  In addition, because CCH presented evidence that it complied with the annual average limitations for several months in a row, this Court orders the parties to address whether this Court should subtract a certain number of days from the otherwise 365 days of violation where there is evidence of compliance.  This Court orders the parties to address this issue at the penalty phase.

CCH further argues that counting 365 days for one annual average violation is unfair and results in double counting with respect to dieldrin violations because CCH is also subject to separate daily limits for dieldrin.  This Court disagrees.  As pointed out by Plaintiffs, in United States v. Smithfield Foods, Inc., the Fourth Circuit rejected a similar argument.  191 F.3d 516, 527 (4th Cir. 1999).  In Smithfield Foods, the defendant argued that by counting daily limitation violations after having imposed thirty days of violations for exceedances of the monthly average limit for the same substance, the court had double counted violations.  The Fourth Circuit determined that

> the two limits are included in the Permit for different
> reasons and serve distinct purposes: daily maximum
> effluent limits protect the environment from the acute

> effects of large, single releases, and monthly averages
> protect against chronic effects occurring at lower
> levels. . . . the different pollutants and their daily
> maximum and monthly average loading limits are
> separate requirements listed in the Permit and therefore
> represent distinct violations. . . . It is clear from the
> language of § 309(d) of the CWA that such a penalty
> structure was anticipated.

Id. (citations omitted).  In addition, in Pub. Interest Research Group of NJ, Inc. v. Powell Duffryn Terminals Inc., the court found that Congress did not intend that "any single discharge which violates several permit parameters be counted as a single violation."  913 F.2d 64, 77 (3rd Cir. 1990).

In Atlantic States Legal Foundation, however, the Court held that if a polluter exceeds both the daily average and a daily maximum limitation for the same pollutant on a given day, only one violation is counted.  897 F.2d at 1140.  The court reasoned that it would be unfair to fine a violator twice for what could be a single act. Id.  Applying that reasoning, this Court found in Hawaii's Thousand Friends, that it "should eliminate the penalties for exceeding the 7 day averages, since those are duplicative of the 30 day averages."  821 F. Supp. at 1394.

The instant case is similar to the Smithfield Foods case and the Pub. Interest Research Group of New Jersey case because like the monthly average and the daily limit, the annual average and the daily limit are included in the Permit for

21

different reasons and serve different purposes.  The instant case differs from this Court's previous ruling in <u>Hawaii's Thousand Friends</u> and the <u>Atlantic States Legal Foundation</u> case cited therein because this Court is comparing annual averages to daily limits.  This Court is not comparing averages over different periods of time, such as monthly averages to annual averages, or seven day averages to monthly averages.  Accordingly, this Court would not be imposing duplicative fines for the same illegal act by finding an annual average violation to count as 365 violations and also counting a violation of the daily limit.

Furthermore, in <u>Smithfield</u>, the court explained that, far from double counting, treating each violation as a separate infraction for penalty purposes made sense because it gives the "courts considerable flexibility to tailor penalties to the unique facts of each case."  191 F.3d at 527.  The court noted that "a permittee who violates a monthly average limit is less culpable and causes less harm than a permittee who violates daily maximum and monthly average limits in the same month. . . . [and] this method of counting violations creates the proper incentives for polluters to comply."  <u>Id.</u>

CCH next argues that annual average violations cannot date back to May 1999, which is the starting point for this case, because the Permit only became effective in November 1998, and prior to that time there was no annual average

22

data.  Thus, according to CCH, no violations of the annual average were possible prior to October 1999.  Again, this Court disagrees.  Certainly, by May 2000, the data was collected to show violations of the annual limit for the previous 12 months.  In addition, by October 1999, data was collected which could show violations of the limit for the preceding year to November 1998, the effective date of the Permit.  However, as stated above, there is a question as to whether the annual average year should be treated as a calendar year, a permit year, or a rolling twelve month basis.

CCH next argues that Plaintiffs incorrectly infer 93 violations of the dieldrin daily maximum limits based on only three exceedances, and that Plaintiffs did not provide evidence of these exceedances.  Plaintiffs, however, have provided the Discharge Monitoring Reports, which demonstrate that CCH violated the dieldrin daily maximum mass discharge limit in May 2002 and December 2003, and its concentration limit in May 2002.  Plaintiffs assert that since CCH only monitored the daily limits once per month, that this Court should infer that the single monitoring event is representative for the entire month and that CCH violated its daily maximum limit every day of the month.  This Court refuses to make such an inference as there was no requirement in the Permit for CCH to take samples to test the daily maximum every day of the month.  Furthermore, Plaintiffs

23

did not provide any authority in support of their argument and this Court found none.  Accordingly, this Court finds that CCH violated its dieldrin daily maximum limit three times.

Finally, at the hearing in this matter and in their supplemental memorandum, CCH argues that this Court cannot determine the requested number of violations because the standard upon which the annual average effluent limitations for chlordane is based in the Permit is a typographical error.  CCH states that the EPA has recognized this error, which resulted from the Hawaii Administrative Rules water quality standards including an extra zero, and therefore, being incorrect by a factor of ten.  CCH states that based on this recognized error in the Permit limitations, there are 106 months between May 1999 and August 2007 in which it incorrectly characterized results as exceedances of the chlordane annual average limit.  CCH states that based on the corrected standard, those 106 months should not be considered exceedances of the standard.

Plaintiffs point out that CCH's Permit has not actually been amended to remove the typographical error and replaced with a different standard.  Plaintiffs argue that CCH is in essence asking this Court to amend its Permit limits.  Plaintiffs state that pursuant to Sierra Club, this Court does not have authority to

change the terms of a permit because this case is an enforcement action and CCH

did not exhaust its administrative remedies. 813 F.2d at 1480.

       CCH asserts that it is not attempting to challenge its Permit terms and

that the <u>Sierra Club</u> case does not apply because it is limited to only the sampling

error defense discussed above, and that is not at issue here. CCH is mistaken. The

<u>Sierra Club</u> case is not limited to an application of the sampling error defense.

Indeed, in <u>Sierra Club</u>, Union Oil argued not only the "sampling error" defense, but

also argued the "upsets defense," which is that many of the permit violations were

due to heavy rainfall during certain winters and therefore qualified as upsets under

40 C.F.R. § 122.41(n), and should not be counted as violations. <u>Id.</u> at 1482. In

discussing Union Oil's "upsets defense," the Ninth Circuit noted that the case was

an enforcement action brought by the Sierra Club for Union Oil's alleged failure to

comply with the terms of a state permit, which did not include an "upsets

defense." <u>Id.</u> at 1487. The court held "Union Oil was essentially asking the

district court to modify its permit to include an upset provision," something which

the district court did not have authority to do. <u>Id.</u> at 1486. Instead, the court held

that Union Oil should have exhausted its administrative remedies to modify the

terms of the permit. <u>Id.</u> Since Union Oil had failed to proceed through the proper

administrative channels, it was bound by the terms of the permit. <u>Id.</u>

The Ninth Circuit also held that the state agency's alleged failure to comply with its own state statute that precluded omitting an upset defense from a permit unless the agency made proper findings of necessity for doing so, did not result in implicit insertion of the upset defense into the permit. Id. at 1488. The court held that the state could adopt more stringent standards than those required by the EPA, and the "state's method of adopting a more stringent standard should be subject to scrutiny only at the permit issuance stage." Id.

Similarly, in United States v. BP Oil, Inc., the court concluded that because the permit did not include an upset defense, "the defendant must seek a modification of the permit through appropriate administrative channels; it cannot use this action to obtain such a modification." BP Oil, Inc., CIV. A. No. 86-0792, 1989 WL 83623, at *5 (E.D. Pa. July 27, 1989) (citing Sierra Club, 813 F.2d at 1486-88); see also Pub. Interest Research Group of NJ, 913 F.2d at 78 (finding that the defendant could not challenge BOD and TSS limits in its permit in the court enforcement action since it failed to challenge the permit in an agency proceeding).

Here, similar to the cases discussed above, the Permit does not include a revised effluent standard, nor has it been amended to provide such a standard. Moreover, CCH has not proceeded through the proper administrative channels to

26

rectify the problem. Accordingly, CCH may not now challenge the effluent limitations.

CCH also asserts that it is asking for only a minor modification of the Permit, which is allowed by 40 C.F.R. 122.63. That section of the Code of Federal Regulations provides in part that "the Director may modify a permit to make the corrections or allowances for changes in the permitted activity . . . Minor modifications may only . . . Correct typographical errors . . ." 40 C.F.R. § 122.63. Although that provision allows for minor modifications for typographical errors, it only gives the Director the authority to make such a modification to the permit, and does not grant this Court authority to do so, especially in an enforcement action where the permittee has not exhausted administrative remedies.

Indeed, it has long been held that "neither good faith, impossibility, nor data reporting errors, are accepted as valid defenses to liability, . . . In short, excuses are irrelevant; under the Clean Water Act the party must either achieve the discharge levels it has been allowed, or pay the consequences of its discharge, or stop discharging." Cal. Pub. Interest Research Group v. Shell Oil Co., 840 F. Supp. 712, 714-15 (N.D. Cal. 1993) (internal quotations, brackets and citations omitted). This alleged typographical error, however, may be relevant to the penalty phase of this case. See Id.

27

Accordingly, the total violations for daily maximum limits for dieldrin is three. Although Plaintiffs seek a finding that the sum total of violations of the Permit's annual mass and concentration for chlordane from May 30, 1999 through March 31, 2007, is 5,726, and the sum total of violations of the Permit's annual mass and concentration for dieldrin from May 30, 1999 through March 31, 2007, is 5,726, as stated above, because there is a question as to how the annual average year should run and whether compliance periods should be subtracted, this Court cannot make this determination at this time. For these reasons, Plaintiffs' summary judgment motion with respect to the number of CWA violations for chlordane and dieldrin is denied.

        c.    <u>BOD and TSS</u>

Plaintiffs seek a finding that CCH committed 218 violations of the Permit's BOD and TSS limits. CCH asserts that Plaintiffs failed to provide evidence of these violations. Plaintiffs, however, provided Discharge Monitoring Reports that establish the following violations:

        (1) monthly average percent removal of BOD in July and August 1999, November 2003, and January 2004;

        (2) monthly average percent removal of TSS in August and October 2003; and

(3) monthly average concentration limit for BOD in May
and July 1999.

Accordingly, the total violations for BOD and TSS limits is 218.

B.     Fourth Claim for Relief

In the fourth claim for relief, Plaintiffs seek finding that CCH violated

the compliance schedules of the permit.  The Disinfection Facility was to be

completed by July 21, 2002.  CCH did not complete the facility until November

15, 2006.  Plaintiffs seek a finding that a violation occurred on each day between

July 21, 2002 until November 15, 2006.

CCH argues that this Court declined to find it liable for every day that

the Disinfection Facility was not completed and operational without considering its

attempts to meet the schedule deadline and the reasons for its delay.  CCH is

mistaken.  This Court found that because evidence had not "yet been presented

regarding attempts to meet the scheduling deadline for the disinfection facility or

reasons for its delay[,] . . this Court [did] not find the Natural Res. Def. Council

case as providing it with the authority to count each day in which the facility has

not been operational as a violation."  (Reconsideration Order at 13.)  This Court,

however, ultimately found unequivocally that "the continuous failure to construct

29

and operate the disinfection facility as required by the NPDES Permit constitutes a continuous daily violation and should be counted as such." (Id. at 15.)

Accordingly, based upon the number of days between July 21, 2002, until November 15, 2006, CCH committed a total of 1,578 violations of the Permit. This Court therefore grants Plaintiff's summary judgment motion on this issue.

The Hart Street Pump Station was to be fully upgraded by February 18, 2005. The project has not yet been completed. Plaintiffs, therefore, seek a total of 832 violations based upon this construction deadline.

CCH argues that the February 18, 2005 deadline is not legally enforceable because the Permit is ambiguous by setting a construction deadline that is more than one year after the Permit expiration date of November 3, 2003, but failing to put that deadline in italics. CCH states that the non-enforceable deadlines are italicized in the Permit, and all deadlines that occur after the expiration, except the Hart Street construction deadline, are italicized. CCH states that this failure to be italicized must be a typographical error and therefore creates an ambiguity in the Permit. Plaintiffs did not address this argument in their reply brief.

As set forth above, however, this is an enforcement action and CCH having failed to exhaust its administrative remedies, is bound by the Permit. This

30

Court does not have authority to change the Permit terms. Thus, even if this alleged failure to italicize were a typographical error, this Court has no authority to change the Permit. For this reason, this Court enters summary judgment on the total number of violations related to the Hart Street Pump Station at 832.

C.    <u>Eighth Claim for Relief</u>

In their eighth claim, Plaintiffs seek a finding that CCH violated the EPA 2002 Administrative Order, which required CCH to submit an effluent limitations action plan and a compliance schedule action plan. Plaintiffs base their claim on the Discharge Monitoring Reports, arguing that the violations of the Permit demonstrate that CCH did not make the Effluent Limitations Action Plan and the Compliance Schedule Action Plan, and failed to ensure immediate and continuous compliance with the effluent limits and the compliance schedule. Plaintiffs assert that CCH thus violated the 2002 EPA Administrative Order every day between October 1, 2002 and March 31, 2007, for a total of 1,703 violations.

CCH argues that the Administrative Order only required it to submit certain plans and progress reports, and that it has submitted the required forms. CCH asserts that the Administrative Order does not duplicate the Permit's requirements, and thus, there is no basis for a claim that a violation of the Permit is also a violation of the Administrative Order. In addition, CCH contends even if

31

this Court did enter summary judgment on Plaintiffs' eighth claim, finding the

requested violations would result in double counting since it is redundant liability

for the same acts. This Court agrees. Although the plans submitted by CCH may

have been inadequate to meet the purpose of the plan, the Permit is what provides

Plaintiffs with the relief they seek. Therefore, Plaintiffs' request for summary

judgment on their eighth claim is DENIED.

<u>CONCLUSION</u>

For the reasons stated above, this Court GRANTS IN PART AND

DENIES IN PART Plaintiffs' Motion for Partial Summary Judgment on Plaintiffs'

Third, Fourth and Eighth Claims as specified herein.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, October 30, 2007.



_____
David Alan Ezra
United States District Judge

Sierra Club, Hawaii Chapter, et al. v. City and County of Honolulu et al., CV. NO.
04-00463 DAE-BMK; ORDER GRANTING IN PART AND DENYING IN
PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
ON PLAINTIFFS' THIRD, FOURTH AND EIGHTH CLAIMS