# EXHIBIT E

RONALD J. TENPAS
Acting Assistant Attorney General
Environment and Natural Resources Division
U.S. Department Of Justice
ROBERT D. MULLANEY
Trial Attorney
Environmental Enforcement Section
U.S. Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6491
Fax: (415) 744-6476
E-mail: Robert.Mullaney@usdoj.gov

EDWARD H. KUBO, JR.
United States Attorney
District of Hawaii
DERRICK K. WATSON
Assistant United States Attorney
Room 6-100, PJKK Federal Building
300 Ala Moana Boulevard
Honolulu, Hawaii 96850
Tel: (808) 541-2850
Fax: (808) 541-3752

Attorneys for Plaintiff United States of America

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, et al.,<br><br>        Plaintiffs,<br><br>     v.<br><br>CITY AND COUNTY OF HONOLULU,<br><br>        Defendant. | Civil No. 1:07-00235 DAE-KSC<br><br>UNITED STATES' REPLY TO SIERRA CLUB'S OPPOSITION TO ENTRY OF STIPULATED ORDER<br><br>Date: October 9, 2007<br>Time: 10:30 a.m.<br>Judge David Alan Ezra |

**EXHIBIT E**

## TABLE OF CONTENTS

I.      INTRODUCTION ............................................... 1

II.     BACKGROUND ............................................... 2

        A.    The 1995 Consent Decree .................................. 2

        B.    The Complaint in this Action .............................. 4

        C.    The Proposed Stipulated Order ............................ 4

        D.    Sierra Club's Motion to Intervene in this Action and Opposition
              to Entry of the Stipulated Order .......................... 5

III.    THE STIPULATED ORDER IS FAIR, REASONABLE, AND IN THE
        PUBLIC INTEREST ......................................... 6

        A.    Standard for Approving Settlements ........................ 6

        B.    The Proposed Stipulated Order is Fair, Reasonable, and Furthers
              the Goals of the Clean Water Act .......................... 7

              1.    The Stipulated Order is the Product of Good Faith, Arm's
                    Length Negotiations and is Fair ...................... 7

              2.    The Stipulated Order is Substantively Fair .............. 10

              3.    The Stipulated Order is a Reasonable Settlement that
                    Should Be Approved by the Court ..................... 12

              4.    After Considering the Public Comments, the United
                    States Has Concluded that the Stipulated Order is Fair
                    and Reasonable ................................... 14

IV.     THE UNITED STATES IS NOT BOUND BY A DECISION IN A
        CITIZEN SUIT UNDER THE CLEAN WATER ACT IN AN ACTION TO
        WHICH IT WAS NOT A PARTY .............................. 21

V.      THIS COURT SHOULD REJECT SIERRA CLUB'S PROPOSAL TO
        REQUIRE THE PARTIES TO LITIGATE THIS MATTER ........... 22

VI.     CONCLUSION ............................................. 24

## TABLE OF AUTHORITIES

<u>FEDERAL CASES</u>

<u>Ahern v. Central Pacific Freight Lines</u>, 846 F.2d 47 (9th Cir. 1988) . . . . . . . . 6, 24

<u>Antrim Min., Inc. v. Davis</u>, 775 F. Supp. 165 (M.D.Pa. 1991) . . . . . . . . . . . . . . 21

<u>Citizens for a Better Env't v. Gorsuch</u>, 718 F.2d 1117 (D.C. Cir. 1983) . . . . . . . . 7

<u>Dubois v. Thomas</u>, 820 F.2d 943, 949 (8th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . 15

<u>Ellis v. Gallatin Steel Co.</u>, 390 F.3d 461 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . 22

<u>EPA v. City of Green Forest, Arkansas</u>, 921 F.2d 1394 (8th Cir. 1990) . . . . 16, 22

<u>Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.</u>,
     484 U.S. 49 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

<u>Jones v. Nuclear Pharmacy, Inc.</u>, 741 F.2d 322 (10th Cir. 1984) . . . . . . . 10, 13, 14

<u>Kelly v. Thomas Solvent Co.</u>, 717 F. Supp. 507 (W.D. Mich. 1989) . . . . . . . . . . 10

<u>Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland</u>,
     478 U.S. 501 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16

<u>Northeast Iowa Citizens for Clean Water v. Agriprocessors</u>, 469 F. Supp. 2d 666
     (N.D. Iowa 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Officers for Justice v. Civil Serv. Comm'n of City and
    County of San Francisco, 688 F.2d 615 (9th Cir. 1982) . . . . . . . . . . . 7, 12

SEC v. Randolph, 736 F.2d 525 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Sierra Club, Inc. v. Electronic Controls Design, Inc.,
    909 F.2d 1350 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Southern California Edison Co. v. Lynch,
    307 F.3d 794 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 24

St. Bernard Citizens for Environmental Quality, Inc. v. Chalmette
    Refining, L.L.C., No. 04-0398, 2007 WL 2323387
    (E.D. La. August 10, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

U.S. v. Charles George Trucking, Inc., 34 F.3d 1081 (1st Cir. 1994) . . . . . . . . . 13

U.S. v. District of Columbia, 933 F. Supp. 42 (D.D.C. 1996) . . . . . . . . . . 8, 11, 12

U.S. v. East Baton Rouge Parish School Bd., 594 F.2d 56 (5th Cir. 1979) . . . . . 21

U.S. v. Telluride Co., 849 F. Supp. 1400 (D. Colo. 1994) . . . . . . . . . . . . . . . 9, 10

United States v. Armour & Co., 402 U.S. 673 (1971) . . . . . . . . . . . . . . . . . . . . . 12

United States v. Bechtel Corp., 648 F.2d 660 (9th Cir. 1981) . . . . . . . . . . . . . . . 6

United States v. BP Exploration & Oil Co.,
        167 F. Supp. 2d 1045 (N.D. Ind. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

United States v. Cannons Eng'g Corp., 899 F.2d 79
        (1st Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 8, 10, 24

United States v. Chevron U.S.A. Inc., 380 F. Supp. 2d 1104
        (N.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 11, 14, 18, 23

United States v. Microsoft Corporation, 56 F.3d 1448 (D.C. Cir. 1995) . . 7, 10, 11

United States v. Montrose Chemical Corp. of California,
        50 F.3d 741 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

United States v. SEPTA, 235 F.3d 817 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . 6

United States v. Seymour Recycling Corp.,
        554 F. Supp. 1334 (S.D. Ind. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. State of Oregon, 913 F.2d 576 (9th Cir. 1990) . . . . . . . . . 6, 7, 9

FEDERAL STATUTES

33 U.S.C. § 1251 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

33 U.S.C. § 1311 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 22

33 U.S.C. § 1319 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 22

33 U.S.C. § 1362 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

33 U.S.C. § 1365 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15

## LEGISLATIVE HISTORY

S.Rep. No. 92-414, p. 64 (1971), reprinted in 2 A Legislative History of the
      Water Pollution Control Act Amendments of 1972, p. 1482 (1973) . . . . . 15

## FEDERAL REGULATIONS

28 C.F.R. § 50.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

## I.    INTRODUCTION

The United States and the State of Hawaii filed a Complaint against the City and County of Honolulu ("CCH") on May 8, 2007, asserting claims against CCH under the Clean Water Act ("CWA" or "Act") and State law for unlawful discharges from its sewage collection system into waters of the United States. Concurrently with the filing of the Complaint, the United States and the State of Hawaii lodged a proposed Stipulated Order with the Court to resolve the allegations of the Complaint. The proposed Stipulated Order provides for a set of injunctive measures to address critical, high priority compliance issues associated with CCH's sewage collection system. The United States and the State expressly reserve in the Stipulated Order their claims for further injunctive relief and civil penalties for future negotiations or litigation. In the Stipulated Order, the parties state their intention to negotiate in good faith a comprehensive remedy addressing all compliance issues associated with CCH's wastewater system.

On May 17, 2007, the United States published notice of the Stipulated Order in the Federal Register. See 72 Fed. Reg. 27,849.[1] Pursuant to 28 C.F.R. § 50.7, we requested comments from the public on the proposed Stipulated Order for a period of thirty days. The comment period concluded on June 18, 2007, and the United States received two public comments objecting to the Stipulated Order, one from the Sierra Club, Hawaii Chapter, Hawaii's Thousand Friends, and Our Children's Earth Foundation (collectively, "Sierra Club"), and a second from the City of Cartersville.

On May 24, 2007, Sierra Club moved to intervene in this case. The Court issued an Order on June 26, 2007, staying any decision on the Stipulated Order until resolution of the motion to intervene to give Sierra Club an opportunity to challenge or concur in the Stipulated Order. After the Court issued an Order on

---

[1] Attachment A, which is appended to this Reply brief, contains a copy of the Federal Register notice.

July 25, 2007, granting intervention, Sierra Club filed its opposition to entry of the Stipulated Order on August 24, 2007.

As explained below, after consideration of the two public comments and Sierra Club's opposition, the United States has concluded that the proposed settlement is in the public interest and is not "inappropriate, improper or inadequate." 28 C.F.R. § 50.7. Accordingly, in this Reply brief, the United States asks this Court to approve and enter the Stipulated Order, which will resolve the claims brought in the Complaint filed in this action.[2] The State of Hawaii supports entry of the Stipulated Order. Defendant CCH consented to entry of the Stipulated Order without further notice in Paragraph 71 of the Order and supports its entry.

## II.    BACKGROUND

### A.    The 1995 Consent Decree

The United States and the State of Hawaii filed a Complaint against CCH in October 1994, alleging that CCH had violated the Act, State law, and the conditions of its National Pollutant Discharge Elimination System ("NPDES") permits issued under the CWA. See United States, et al., v. City and County of Honolulu, Civ. No. 94-00765 DAE/KSC (hereafter "CCH I"). The Complaint alleged, among other things, that CCH had for several years discharged raw or partially treated sewage from its sewage collection system into waters of the United States.

Concurrently with the filing of the Complaint in CCH I, the United States and the State of Hawaii lodged a proposed Consent Decree with the Court to resolve the allegations of the Complaint. The Consent Decree, as modified by

---

[2] The United States titled this pleading as a "Reply" in accordance with the Court's Order dated September 19, 2007. Because this is the only pleading filed by the United States regarding entry of the Stipulated Order, however, the United States believes that this pleading is covered by the page limitations of LR7.5(a).

stipulation, was entered by the Court on May 15, 1995 (the "1995 Consent Decree"), and provides for a comprehensive set of injunctive measures to address compliance issues associated with CCH's sewage collection system. For example, pursuant to Section VII.E. of the 1995 Consent Decree, CCH is required to undertake a 20-year rehabilitation program to reduce and prevent spills from its collection system. This rehabilitation program commenced in 1999 and is to be completed by December 31, 2019.

For more than a decade, the U.S. Environmental Protection Agency ("EPA") has monitored CCH's compliance with the 1995 Consent Decree. Cola Decl. ¶¶4, 5. The State of Hawaii Department of Health ("DOH") issued an Administrative Order to CCH in April 2004, requiring CCH to conduct a broad reaching assessment of its force mains. Id. at ¶31. Beginning in 2004, EPA and DOH conducted a comprehensive review of CCH's collection system and two of its wastewater treatment plants. Id. at ¶¶6, 7. As a result of this review, EPA and DOH identified a number of compliance issues relating to CCH's collection system and treatment plants and advised CCH of their concerns. Id. at ¶8. EPA and DOH, together with Sierra Club, engaged in a series of settlement meetings with CCH beginning in March 2006 to discuss compliance issues relating to CCH's collection system and treatment plants. Id. These settlement discussions led to the negotiation of this Stipulated Order. Cola Decl. ¶11.

In March 2007, Sierra Club moved to intervene in *CCH I*, basing its motion on Section 505, the CWA's citizen suit provision. 33 U.S.C. § 1365(b)(1)(B). Section 505 provides that no citizen's suit may be commenced if the EPA or a State has commenced and is diligently prosecuting a civil action in a federal court. However, "in any such action in a court of the United States any citizen may intervene as a matter of right." Id. On May 24, 2007, this Court adopted Magistrate Judge Chang's Findings and Recommendations, and granted Sierra Club's motion to intervene in *CCH I* subject to certain conditions.

B.    The Complaint in this Action

CWA Section 301(a) prohibits the discharge of pollutants except in compliance with specific sections of the Act. CWA Section 309(b) authorizes EPA's Administrator to commence a civil action for appropriate relief, including a permanent or temporary injunction, for any violation of CWA Section 301(a). The Complaint in this case states a claim against CCH for injunctive relief pursuant to CWA Section 309(b), 33 U.S.C. § 1319(b), for a violation of CWA Section 301(a), 33 U.S.C. § 1311(a).[3/]

The Complaint alleges that beginning on March 24, 2006, the Beachwalk Force Main suffered a failure, resulting in CCH's discharge of approximately 48.7 millions gallons of raw sewage into the Ala Wai Canal, which flows into the Pacific Ocean. The Beachwalk Force Main is a point source within the meaning of Section 502(14) of the CWA. 33 U.S.C. § 1362(14). The Ala Wai Canal and the Pacific Ocean into which CCH spilled sewage are waters of the United States and navigable waters within the meaning of Section 502(7) of the Act. 33 U.S.C. § 1362(7). CWA Section 502(6) defines "pollutant" to include sewage. 33 U.S.C. § 1362(6). Therefore, the Beachwalk Spill involved a discharge of pollutants from a point source into navigable waters of the United States without an NPDES permit or other exception specified in CWA Section 301(a), 33 U.S.C. § 1311(a).

C.    The Proposed Stipulated Order

The Stipulated Order provides for critical, high priority injunctive relief measures that will protect water quality and significantly reduce the risk of major sewage spills from six force mains and a pump station in CCH's sewage collection system. The Stipulated Order requires CCH to build, at a minimum, three new force mains, and to maintain back-up force mains at four critical places in its

---

[3/] The Complaint does not state a claim for civil penalties. However, the United States and the State reserve the right to seek civil penalties in the future. Stipulated Order ¶54.

collection system. Stipulated Order ¶¶8-11. In addition, CCH is required to implement a condition assessment and repair program for six critical force mains and one pump station to minimize the risk of future failures from these facilities. Id. at ¶¶8-13. Finally, CCH is required to implement a Spill Contingency Plan to minimize the adverse consequences of a spill from six of its force mains. Id. at ¶15. According to CCH, the work required by this Stipulated Order is valued at approximately $300 million. Cola Decl. ¶12. The United States and the State expressly reserve their claims for further injunctive relief and civil penalties in the Stipulated Order. Stipulated Order ¶¶54-58. Furthermore, the parties state their intention to negotiate in good faith a comprehensive remedy addressing all compliance issues associated with CCH's wastewater system. Id. at 2.

D.    Sierra Club's Motion to Intervene in this Action and Opposition to Entry of the Stipulated Order

On May 26, 2007, Sierra Club moved to intervene in this case. The United States filed a statement of conditional nonopposition, asking the Court to impose conditions on Sierra Club's intervention similar to those that the Court had adopted in *CCH I* in its Order dated May 24, 2007. On July 25, 2007, this Court issued an Order adopting the Magistrate's Findings and Recommendation and granting Sierra Club's motion to intervene in this action. The Order allowed Sierra Club thirty days to file an opposition or a concurrence to the Stipulated Order. After this Court's decision on entry of the Stipulated Order, the matter will be referred back to the Magistrate to decide what, if any, conditions on intervention are necessary in order to promote the efficient conduct of this proceeding. Findings and Recommendation at 7-8.

On August 24, 2007, Sierra Club filed its opposition to entry of the Stipulated Order. In this Reply brief, the United States responds to two comments (from Sierra Club and the City of Cartersville) received during the public comment period as well as to Sierra Club's opposition.

-5-

## III.  THE STIPULATED ORDER IS FAIR, REASONABLE, AND IN THE PUBLIC INTEREST

The trial court should enter a settlement agreement if it is "'reasonable, fair, and consistent with the purposes that [the statute] is intended to serve.'" United States v. Montrose Chemical Corp. of California, 50 F.3d 741, 747 (9th Cir. 1995) (citation omitted).  Because this Stipulated Order meets this governing standard, the United States requests the Court to approve and enter the Stipulated Order.

### A.  Standard for Approving Settlements

Approval of a proposed settlement is committed to the informed discretion of the district court. United States v. State of Oregon, 913 F.2d 576, 580 (9th Cir. 1990); SEC v. Randolph, 736 F.2d 525, 529 (9th Cir. 1984).  The court's discretion should be exercised in favor of the strong policy favoring voluntary settlement of litigation. Ahern v. Central Pacific Freight Lines, 846 F.2d 47, 48 (9th Cir. 1988).  This policy has "particular force where . . . a government actor committed to the protection of the public interest has pulled the laboring oar in constructing the proposed settlement." United States v. Cannons Eng'g Corp., 899 F.2d 79, 84 (1st Cir. 1990); see also United States v. SEPTA, 235 F.3d 817, 822 (3d Cir. 2000) (judicial review of a settlement negotiated by the United States should be informed by the deference owed to "EPA's expertise and to the law's policy of encouraging settlement").  Accordingly, the Ninth Circuit stated that "a district court reviewing a proposed consent decree 'must refrain from second-guessing the Executive Branch.'" Montrose Chemical Corp. of California, 50 F.3d at 746; see also United States v. Bechtel Corp., 648 F.2d 660, 666 (9th Cir. 1981) (the balancing of interests "must be left, in the first instance, to the discretion of the Attorney General").

In undertaking its review, a court is not required to make the same in-depth analysis of a proposed settlement that it would be required to make in order to enter a judgment on the merits after trial.  "The trial court in approving a settlement need not inquire into the precise legal rights of the parties nor reach and

resolve the merits of the claims or controversy, but need only determine that the settlement is fair, adequate, reasonable and appropriate under the particular facts and that there has been valid consent by the concerned parties." <u>Citizens for a Better Env't v. Gorsuch</u>, 718 F.2d 1117, 1126 (D.C. Cir. 1983); <u>accord</u>, <u>State of Oregon</u>, 913 F.2d at 582 ("'trial court may limit its proceedings to whatever is necessary to aid it in reaching an informed, just and reasoned decision'"). Moreover, when an objecting party, as in this case, is essentially challenging a settlement because the government did not bring as extensive an action as it might have, a court should be careful not to exceed its "constitutional role." <u>United States v. Microsoft Corporation</u>, 56 F.3d 1448, 1462 (D.C. Cir. 1995). Thus, a court's task is not to "reach beyond the complaint to evaluate claims that the government did not make and to inquire why they were not made." <u>Id.</u> at 1459.

A court does not have the authority to modify the settlement document. Instead, it must either accept or reject the settlement as submitted. <u>See</u> <u>Officers for Justice v. Civil Serv. Comm'n of City and County of San Francisco</u>, 688 F.2d 615, 630 (9th Cir. 1982). The relevant standard "is not whether the settlement is one which the court itself may have fashioned, or considers as ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute." <u>Cannons Eng'g Corp.</u>, 899 F.2d at 84.

  B.   <u>The Proposed Stipulated Order is Fair, Reasonable, and Furthers the Goals of the Clean Water Act</u>

     1.   The Stipulated Order is the Product of Good Faith, Arm's Length Negotiations and is Fair

In assessing a settlement, courts consider both procedural and substantive fairness. <u>Cannons Eng'g Corp.</u>, 899 F.2d at 86-88. Typically, courts first examine procedural fairness to determine whether the negotiation process was "'fair and full of adversarial vigor.'" <u>United States v. Chevron U.S.A. Inc.</u>, 380 F. Supp. 2d 1104, 1111 (N.D. Cal. 2005) (citation omitted). As the Ninth Circuit concluded in <u>State of Oregon</u>, 913 F.2d at 581, if a settlement is the product of good faith, arm's

length negotiations, it is "presumptively valid and the objecting party 'has a heavy burden of demonstrating that the decree is unreasonable.'"

In this case, the Court should find that the settlement meets the test of procedural fairness: the settlement was the product of arm's length negotiations conducted among the United States, the State, and CCH since March 2006 with all parties represented by legal and technical staff who approved the terms of the settlement. Cola Decl. ¶11. Sierra Club now asserts that the negotiations unfairly excluded it. In fact, the United States is not obligated to ensure that every interested party is permitted to negotiate in settlement discussions. See, e.g., Cannons Eng'g Corp., 899 F.2d at 87, 93 (Congress did not intend to handcuff government negotiators; as long as it operates in good faith, EPA is at liberty to negotiate and settle with whomever it chooses). Nevertheless, the United States made every effort to include Sierra Club in negotiations in this case. As Sierra Club stated, the government entered into a Confidentiality Agreement with Sierra Club to coordinate settlement positions. Sproul Decl. ¶15. Furthermore, attorneys for Sierra Club participated in many settlement meetings, received and reviewed copies of the settlement proposal that culminated in the Stipulated Order, and were able to make their positions known to the parties throughout the negotiations. Cola Decl. ¶11. The United States even provided Sierra Club with copies of settlement proposals when Sierra Club representatives did not attend the settlement negotiations. Id. Therefore, contrary to Sierra Club's unsupported assertion, it was not excluded from negotiations. The fact that Sierra Club was not able to reach a settlement agreement with CCH and become a party to the Stipulated Order does not reflect any procedural unfairness. See U.S. v. District of Columbia, 933 F. Supp. 42, 49 (D.D.C. 1996) (State of Virginia's exclusion from CWA negotiations when it was not a party did not prove that settlement agreement was unfair); Northeast Iowa Citizens for Clean Water v. Agriprocessors, 469 F. Supp. 2d 666, 673-74 (N.D. Iowa 2006) (court rejected argument that the

exclusion of a citizen group from negotiations constituted procedural unfairness); cf. State of Oregon, 913 F.2d at 580 (although the State of Idaho participated in the negotiations, it was not a party to the final settlement agreement).

Relying on U.S. v. Telluride Co., 849 F. Supp. 1400 (D. Colo. 1994), Sierra Club also argues that the Stipulated Order was not adopted in a procedurally fair process. Telluride is distinguishable from this case. First, as the Telluride court expressly stated, the government's practice of filing a complaint concurrently with the lodging of a settlement is not improper. Indeed, the court recognized that this practice "serves a laudable purpose when the negotiations leading to the decree are themselves adversarial." Id. at 1403. As Sierra Club acknowledges, the negotiations in this case were indisputably adversarial. See, e.g., Sproul Decl. at ¶¶17, 19, 20-22. Second, in this Reply brief, the United States has responded to the two public comments in this case as well as to Sierra Club's opposition.[4] Finally, in stark contrast to Telluride, the United States relied on its own investigation and reasoned judgment to determine the scope of the relief necessary to address the violations in this case. EPA and DOH conducted a comprehensive review of CCH's wastewater collection system and evaluated the compliance status of CCH's two major wastewater treatment plants in 2004 and 2005. Cola Decl. ¶¶6, 7.[5] When the Beachwalk spill occurred in March 2006, EPA,

---

[4] On June 26, 2007, the Court issued an Order, staying any decision on the Stipulated Order until resolution of the motion to intervene to give Sierra Club an opportunity to challenge or concur in the Stipulated Order. Sierra Club's comments submitted during the public comment period and its opposition to entry of the Stipulated Order repeat many of the same arguments. For the sake of efficiency, we have addressed these overlapping arguments in this Reply brief.

[5] Due to its participation in settlement negotiations, Sierra Club is well aware of EPA's and DOH's extensive investigations. Cola Decl. ¶¶8, 9, 10, 11. The Court should reject Sierra Club's unfounded speculation that EPA lacked an independent basis for its conclusions.

exercising its independent judgment, determined to focus its immediate efforts on upgrades to CCH's most vulnerable force mains and the Beachwalk pump station. Id. at ¶10. As the Telluride court aptly stated, "An agency's judgment is entitled to deference when it is based on reasoned decisionmaking." 849 F. Supp. at 1404.

>            2.    The Stipulated Order is Substantively Fair

In Cannons Eng'g Corp., the court explained that substantive fairness addresses "concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible." 899 F.2d at 87. Moreover, "[t]o the extent that the process was fair and full of 'adversarial vigor' . . . the results come before the court with a much greater assurance of substantive fairness." Id. at 87 n.4. In assessing the fairness of a proposed settlement, courts have considered several factors, such as the strength of the plaintiff's case, the good faith efforts of the negotiators, the likely complexity, length, and expense of the litigation, the amount of opposition to the settlement among affected parties, and the opinion of counsel. Jones v. Nuclear Pharmacy, Inc., 741 F.2d 322, 324 (10th Cir. 1984); United States v. BP Exploration & Oil Co., 167 F. Supp. 2d 1045, 1051-52 (N.D. Ind. 2001); Kelly v. Thomas Solvent Co., 717 F. Supp. 507, 517 (W.D. Mich. 1989). Finally, as the court explained in District of Columbia, 933 F. Supp. at 50, "[a]ny focus on fairness must address this Complaint and Agreement alone."

Sierra Club argues that the settlement is not substantively fair because the Stipulated Order does not correct all wrongs associated with CCH's sewage system in order to fully protect the environment, and does not impose appropriate civil penalties. In essence, Sierra Club's argument amounts to an assertion that the United States and the State of Hawaii did not bring as extensive an enforcement action as they could have brought against CCH. This argument is simply not relevant to the Court's decision to enter the Stipulated Order. As the Microsoft court stated, it would exceed the court's constitutional role to "reach beyond the

-10-

complaint to evaluate claims that the government did not make and to inquire as to why they were not made." 56 F.3d at 1459. In determining whether to enter the Stipulated Order, it is not the court's role "to impose its own judgments as to how it would prosecute and resolve a particular case." District of Columbia, 933 F. Supp. at 51. Similarly, with respect to substantive fairness, it is not the court's duty "to determine whether 'the settlement is one which the court itself might have fashioned, or considers ideal.'" Chevron U.S.A. Inc., 380 F. Supp. 2d at 1111.

    In light of the March 2006 Beachwalk spill, EPA determined that it was appropriate to focus its immediate attention on upgrades to the force mains that EPA regarded as most vulnerable. Cola Decl. ¶10. While the Stipulated Order does not impose a civil penalty, the United States and the State specifically reserve their rights to obtain penalties in a future enforcement action. Stipulated Order ¶54. Moreover, the United States and the State also reserve their rights to require additional injunctive relief beyond what is required by the Stipulated Order. Id. at ¶¶54-58. Under these circumstances, the decision of the United States to seek high priority civil injunctive relief in this case is within the prosecutorial discretion of the United States and should not be disturbed by the Court. See District of Columbia, 933 F. Supp. at 52.

    In this enforcement action, the United States and the State of Hawaii focused on the alleged CWA violations associated with the March 2006 Beachwalk spill. While the United States and the State of Hawaii believe that they have a strong case, CCH maintained that it had viable defenses to the claims and disputed the scope of required injunctive relief. Resolution of issues regarding liability and appropriate injunctive relief would have required the expenditure of significant resources by both the parties and the Court, involving extensive discovery, motions practice, expert testimony, and detailed judicial findings of fact and law. Instead of years of potential litigation regarding the scope of the appropriate injunctive relief, the parties agreed to the Stipulated Order, which

requires CCH to begin work on critical tasks affecting the parts of its wastewater collection system that EPA and DOH regarded as the most vulnerable. As the court stated in District of Columbia, 933 F. Supp. at 51, "[i]t is almost axiomatic that voluntary compliance on an issue where there is a potential disagreement is a better alternative than the uncertainty of litigation over that issue." See also Officers for Justice, 688 F.2d at 625 ("it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements").

In sum, the parties reached this settlement after careful consideration of both the costs, risks, and inherent delays that litigation would entail, and the benefits of settlement, including the reduction of risk to human health. As with any settlement, the proposed Stipulated Order represents a compromise: "in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation." United States v. Armour & Co., 402 U.S. 673, 681 (1971). The United States, the State, and CCH all support the fairness of the settlement. Under these circumstances, the Court should find that the Stipulated Order is fair.

      3.    The Stipulated Order is a Reasonable Settlement that Should Be Approved by the Court

In ascertaining whether a settlement is reasonable, a court considers factors such as the nature and extent of the potential hazards, the availability and likelihood of alternatives to the settlement, whether the settlement is technically adequate to accomplish the goal of cleaning up the environment, and the extent to which the settlement furthers the statute's goals. BP Exploration & Oil Co., 167 F. Supp. 2d at 1053; see also United States v. Seymour Recycling Corp., 554 F. Supp. 1334, 1339 (S.D. Ind. 1982). The underlying purpose of the review is to determine whether the settlement adequately protects the public interest. BP Exploration & Oil Co., 167 F. Supp. 2d. at 1049.

The settlement in this case addresses hazards to the environment and public

health by tailoring relief to reduce the potential of sewage releases from CCH's sewage collection system. The alternative to this negotiated resolution would be litigation, requiring the government to establish liability and to seek a remedy for the violations. In this case, the relief that will be required if the Court enters Stipulated Order is consistent with the violations alleged in the Complaint and the relief that the United States would have sought at a trial. Pursuant to the Stipulated Order, CCH will take steps to conduct condition assessments of vulnerable force mains and will begin to prepare spill contingency plans for those force mains upon entry of the Order. Stipulated Order ¶¶8-13, 15. Moreover, CCH will not only provide for a back-up force main at the Beachwalk Force Main, it will also begin the process of providing back-up force mains at three other large force mains in its sewage collection system. Id. at ¶¶8-11.[9] Thus, the results accomplished through this Stipulated Order protect the public interest and are consistent with the primary purpose of the Clean Water Act, through which Congress sought to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. 33 U.S.C. § 1251(a).

If this case had been litigated, the Court would have needed to decide the technically complex issues associated with the remedy for CCH's violations. Assuming that the Court would have granted the United States' request for relief, a potential appeal of the Court's ruling would have delayed implementation of the remedy even farther into the future. In assessing this case, the United States properly determined that the value of the concrete results achieved by this Stipulated Order clearly outweighed the value of possible future relief to be ordered by this Court after protracted and expensive litigation. Nuclear Pharmacy,

---

[9] A consent decree may provide broader relief than a court could have awarded after trial. Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 525 (1986); U.S. v. Charles George Trucking, Inc., 34 F.3d 1081, 1090-91 (1st Cir. 1994).

741 F.2d at 324; <u>Chevron U.S.A. Inc.</u>, 380 F. Supp. 2d at 1118.

> 4.    After Considering the Public Comments, the United States Has Concluded that the Stipulated Order is Fair and Reasonable

Two public comments were received during the public comment period, one from Sierra Club and another from the City of Cartersville.[2]/ These comments are summarized below.

> a.    Sierra Club's Comments

Comment #1:  The Stipulated Order lacks citizen participation provisions.  Sierra Club believes that the settlement would be stronger if it included citizen "watchdogs."

Comment #2:  The Stipulated Order reflects an inappropriate "piecemeal approach" to CCH's sewer system problems, and does not address all of CCH's sewage problems.

Comment #3:  The force main compliance schedule is inadequate because it does not address all force main problems, leaves a loophole for two of the critical force mains, and contains lenient deadlines.

> b.    City of Cartersville's Comment

Comment:  Requiring redundant force mains will not eliminate 100 percent of the problems and will cause the ratepayers to pay too much for service.

> c.    United States' Response to Comments

As explained below, after considering these public comments, the United States has concluded that the Stipulated Order in its entirety is adequate and reasonable.

> i. Sierra Club's comment #1

As Congress and the Courts have repeatedly observed, the United States and the States have primary responsibility for ensuring compliance with the Clean Water Act.  <u>See, e.g., Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation,</u>

---

[2]/ These comments are appended as Attachment B to this Reply brief.

-14-

Inc., 484 U.S. 49, 60 (1987) (citizen enforcement is meant to supplement rather than supplant government action); Dubois v. Thomas, 820 F.2d 943, 949 (8th Cir. 1987) (CWA "was not intended to enable citizens to commandeer the federal enforcement machinery"); S.Rep. No. 92-414, p. 64 (1971), reprinted in 2 A Legislative History of the Water Pollution Control Act Amendments of 1972, p. 1482 (1973) (citizen enforcement is proper in circumstances where governments fail to exercise their enforcement responsibilities). The United States and the State of Hawaii have assumed this primary responsibility as plaintiffs in this case. The Stipulated Order provides both plaintiffs with adequate authority to ensure compliance with the terms of the Order. See Stipulated Order, Section VIII (Stipulated Penalties).

Although citizens can play a legitimate role in enforcing the Act when the United States and the State have failed to act, there is no need for such a role here. Since the March 2006 Beachwalk spill, the United States and the State of Hawaii have been diligent in pursuing an enforcement action against CCH. This action included not only EPA's and DOH's investigation into the causes and impacts of the Beachwalk spill, but also the extensive negotiations that resulted in the Stipulated Order at issue in this Reply brief. Cola Decl. ¶¶9-11, 17.

When the United States and the State are diligently prosecuting CWA violations, Congress provided that citizen groups may intervene in such actions as a matter of right. 33 U.S.C. § 1365. The United States and the State of Hawaii did not oppose Sierra Club's intervention in this action, and the Court granted Sierra Club's motion to intervene on July 25, 2007.[8] However, even when a court grants a citizen group the right to intervene, an intervenor does not have the right to prevent other parties from entering into a settlement agreement. Southern California Edison Co. v. Lynch, 307 F.3d 794, 806-07 (9th Cir. 2002); see also

---

[8] In this case, the United States and the State of Hawaii carefully considered the views of Sierra Club throughout the negotiations. Cola Decl. ¶11.

Local No. 93, Int'l Ass'n of Firefighters, 478 U.S. at 528-29; EPA v. City of
Green Forest, Arkansas, 921 F.2d 1394, 1402 (8th Cir. 1990) ("Had the citizens
intervened, they still would not have been able to compel a consent decree on their
own terms"). Moreover, the fact that Sierra Club is not a party to this settlement
does not detract from the value of this settlement in addressing threats to public
health and the environment.

Sierra Club also takes the position that its participation is essential to ensure
public "buy-in" to this settlement. We do not agree with this supposition. First,
the Stipulated Order is a Court Order that subjects CCH to stringent sanctions in
the event of noncompliance. See Stipulated Order, Section VIII (Stipulated
Penalties). The plaintiffs' oversight and the Court's enforcement authority are the
appropriate guarantors of compliance. Second, the work provided for by this
settlement is designed to substantially reduce the risk of further catastrophic
sewage spills. Addressing this threat to public health and the environment is the
key to public support for this settlement. Finally, Sierra Club had the opportunity
to participate in settlement negotiations in this case (Cola Decl. ¶11) and is now a
party in this action. Subject to any conditions imposed by this Court, Sierra Club
can raise a compliance issue that merits attention of the parties and the Court.

ii. Sierra Club's comment #2

The United States strongly disputes the argument that the Stipulated Order
is an inappropriate, piecemeal approach to Clean Water Act compliance in this
case. The United States and the State of Hawaii decided to focus their initial
enforcement efforts on force main issues after a careful evaluation of CCH's
wastewater system. Since late 2004, EPA and DOH have conducted a series of
intensive inspections of CCH's wastewater system, addressing both CCH's
collection system and two of its wastewater treatment plants. Cola Decl. ¶¶6, 7.
These investigations resulted in the identification of a number of CWA
compliance issues. Id. at ¶8. In particular, these investigations identified the

-16-

condition of several critical CCH force mains as a key issue. Id. at ¶¶10, 13, 17.

Several factors combined to raise particular concerns with the force mains at issue in the Stipulated Order. First, each of the six force mains addressed by the Stipulated Order has such a large capacity that, if the force main were to fail, CCH would not have an effective back-up system in place.[9]  Cola Decl. ¶17.  In addition, the four force mains that must be replaced or, in the case of Hart Street, supported by a back-up force main, are either nearing the end of their useful life, or have demonstrated their vulnerability through their history of sewage spills.  Id. The urgency of this problem was then brought into stark relief by the March 2006 Beachwalk spill.  Id. at ¶16.

Following a comprehensive investigation of CCH's wastewater system, EPA's and DOH's investigations have amply demonstrated the risks presented by these force mains.  In the aftermath of the catastrophic March 2006 Beachwalk spill, the United States and the State of Hawaii legitimately concluded that certain critical compliance work simply could not wait.  The public interest would not be served if these significant risks went unaddressed while the parties attempted to negotiate or litigate for broader relief.  In fact, such a delay would be directly contrary to the public interest.

The United States and the State recognize that CCH's remaining CWA compliance issues also require attention.  Cola Decl. ¶¶8, 10, 30, 31.  For this reason, the United States and the State expressly reserve their claims for further injunctive relief and civil penalties in the Stipulated Order, and have scheduled future negotiations to deal with these issues.  See Stipulated Order ¶¶54-58; Cola Decl. ¶33.  However, it is not consistent with the public interest to leave the

---

[9] The Ala Moana Force Main is a partial exception to this because an old back-up force main remains in place if the current force main fails. However, the old Ala Moana Force Main lacks sufficient capacity to handle peak flows for this area. Cola Decl. ¶18.

serious threats posed by the six force mains unaddressed in the interim. The Stipulated Order is carefully tailored to ensure that timely and effective action is taken to reduce the risk of further catastrophic failures in CCH's wastewater collection system. Accordingly, the United States requests this Court to enter the Stipulated Order without further delay. See Chevron U.S.A. Inc., 380 F. Supp. 2d at 1118 (because of the complexity of environmental litigation, court ruled that it was reasonable for EPA to conclude that a negotiated settlement could result in an environmental benefit earlier than litigating).

### iii. Sierra Club's comment #3

Sierra Club contends that the Stipulated Order is an inadequate remedy for CCH's force main problems, arguing that: (1) there are additional force mains that require remedial work; and (2) regarding the force mains addressed by the Stipulated Order, the work required is inadequate. We believe that these contentions are unfounded.

Regarding the first point, EPA and DOH carefully evaluated the force mains that most urgently needed attention. This evaluation included consideration of the age of the force mains, the history of spills associated with the force mains, and CCH's ability to minimize the risk of spills to the environment. Cola Decl. ¶17.

Sierra Club asserts that other force mains also warrant remedial action. Even assuming that this assertion is correct, this would not warrant a finding that the Stipulated Order is contrary to the public interest. First, CCH remains subject to the State's 2004 Force Main Order. Cola Decl. ¶31. Second, as discussed previously, the United States and the State reserved the right in the Stipulated Order to seek further injunctive relief. Stipulated Order ¶¶54-56. In negotiations or litigation regarding further injunctive relief for the CCH wastewater system, the United States and the State will, among other things, evaluate whether additional injunctive relief is appropriate to address force mains. Cola Decl. ¶¶30, 31. This evaluation will include, but not be limited to, CCH's compliance with the State's

2004 Force Main Order. Id. at ¶31.

With respect to the Kamehameha, Kailua Heights, and Lualualei Force Mains identified by Sierra Club, EPA and DOH assessed those force mains and determined that they did not require attention as urgently as the six force mains addressed by the Stipulated Order. Cola Decl. ¶29. In negotiating the Stipulated Order, EPA focused on the largest and most vulnerable force mains in CCH's collection system, reserving its right in the Stipulated Order to seek further injunctive relief. Cola Decl. ¶¶17, 30, 31; Stipulated Order ¶¶54-56. This choice represents a proper exercise of prosecutorial discretion.

Sierra Club also contends that the Stipulated Order is deficient because CCH may not be required to construct replacements for the Waimalu and Kahala Force Mains. EPA and DOH assessed the available information regarding these force mains and concluded that the parties lacked sufficient information at this time to determine whether there was an immediate need to construct new force mains at Waimalu and Kahala. Cola Decl. ¶28. Instead, the Stipulated Order requires CCH to carefully evaluate this question in the Condition Assessment process. Stipulated Order ¶¶12-13. Under the Stipulated Order, the United States and the State reserve the right to require new and back-up force mains for Waimalu and Kahala if the Condition Assessments indicate that such work is necessary. Id.

Finally, Sierra Club contends that the Stipulated Order's work schedules are insufficiently rigorous with regard to the force mains addressed. Specifically, Sierra Club claims that Stipulated Order allows CCH too much time: (1) to construct the Kaneohe-Kailua Force Main; and (2) to perform the remedial work required by the condition assessment process.

With regard to the Kaneohe-Kailua schedule, EPA and DOH determined that the schedule authorized by the Stipulated Order was reasonable in light of the planning and construction difficulties associated with the project. Cola Decl. ¶26.

-19-

Moreover, the Condition Assessment process will allow for a careful assessment of work needed to keep the existing force main operational while work is under way on the new line. Stipulated Order ¶11.a. Consequently, the compliance schedule for the force main work must be evaluated as a whole. In sum, the United States and the State accepted a reasonable compromise that ensures prompt action to address immediate problems while allowing sufficient time for the force main replacement to ensure that the work is properly performed. Cola Decl. ¶27.

Regarding the remedial work required by the Condition Assessments, Sierra Club mischaracterizes the Stipulated Order's provisions. The Stipulated Order requires a schedule for this work that "provide[s] for the expeditious completion of the work provided for in the follow-up action plan consistent with sound engineering practices." See, e.g., Stipulated Order ¶8.C.i. These schedules are subject to the United States' and the State's review and approval. See, e.g., Stipulated Order ¶8.C.ii. Although it is conceivable that some of this work may not be completed until 2018, the reason for any delay would be that sound engineering practices require that amount of time for the work required by a particular Condition Assessment. For example, some of the work required by a Condition Assessment may be possible only when a new force main is in place, which would allow an old line to be taken out of service and repaired. Cola Decl. ¶20.

### iv. City of Cartersville's comment

This comment argues that requiring back-up force mains is unduly costly and ultimately futile because spills can still occur even with back-up force mains in place. The United States believes that this comment is not applicable to this case.

The United States disagrees that the requirement to maintain back-up force mains is too costly. The Stipulated Order is structured to require CCH to maintain back-up force mains when certain specified older force mains require replacement.

At that point, CCH would have two options: either maintain its old force main as a back-up line, or build its new force main with a back-up line. CCH may select the most appropriate approach. For the Hart Street Force Main, CCH is required to maintain the existing old force main as a functional back-up line. Given the significant environmental benefits of having back-up force mains in place in critical locations, the United States is convinced that these provisions serve the public interest and are reasonable.

While back-up force mains cannot guarantee that no spills will occur, a back-up force main may play a vitally important role in reducing the size of such spills. According to CCH, the March 2006 Beachwalk spill totaled 48.7 million gallons. Cola Decl. ¶16. This spill not only caused economic disruption and significant environmental damage, it also put public health at risk by exposing the public to untreated sewage. Id. If a back-up force main had been in place, this spill could have either been avoided or dramatically reduced in scope. Id. at ¶19.

## IV.    THE UNITED STATES IS NOT BOUND BY A DECISION IN A CITIZEN SUIT UNDER THE CLEAN WATER ACT IN AN ACTION TO WHICH IT WAS NOT A PARTY

Sierra Club argues that the Court should dismiss the Complaint in this action because it had previously dismissed the Sierra Club's sewage spill claims in Sierra Club v. City and County of Honolulu, Civil No. 04-00463. This argument is meritless. First, the United States was not a party to that action and is not bound by the decision in that case. See, e.g., Sierra Club, Inc. v. Electronic Controls Design, Inc., 909 F.2d 1350, 1356 n. 8 (9th Cir. 1990) (United States is not bound by a proposed consent decree in a case in which it was not a party and could bring its own enforcement action at any time); U.S. v. East Baton Rouge Parish School Bd., 594 F.2d 56, 58 (5th Cir. 1979) (United States is not barred from independent litigation by the failure of a private plaintiff); Antrim Min., Inc. v. Davis, 775 F. Supp. 165, 170-71 (M.D.Pa. 1991) (CWA legislative history endorsed rule permitting government relitigation of previously litigated private claims to protect

the public from collusive or inadequate settlements and to maintain the government's ability to set enforcement priorities). Second, in *CCH I*, the United States and the State expressly reserved all remedies available to them for all violations of the Act not specifically pled in the Complaint filed in that case. See 1995 Consent Decree at Section XVII.C. CWA Section 309(b) expressly authorizes EPA's Administrator to commence a civil action for appropriate relief, including a permanent or temporary injunction, for any violation of CWA Section 301(a). 33 U.S.C. §§ 1311, 1319(b). This Court's September 2005 decision dismissing Sierra Club's collection system claims on res judicata grounds has no impact on the United States' authority to bring a claim for a March 2006 violation.[10] Therefore, the United States properly exercised its prosecutorial discretion to bring this new action against CCH.

## V.    THIS COURT SHOULD REJECT SIERRA CLUB'S PROPOSAL TO REQUIRE THE PARTIES TO LITIGATE THIS MATTER

In April 2006, the United States and the State informed CCH that they wanted negotiations to focus on a response to the March 2006 Beachwalk spill. Cola Decl. ¶¶10, 11. On May 8, 2007, after a year of extensive negotiations, the United States lodged a Stipulated Order with the Court. That Order requires CCH to address the six force mains and a pump station that EPA regarded as the most vulnerable to spills. Id. at ¶¶10, 13. According to CCH, work under the

---

[10] Contrary to Sierra Club's assertion, entry of the Stipulated Order in this case does not necessarily mean that the Court would need to set aside its dismissal of Sierra Club's sewage spill claims. In similar cases, courts have determined that a citizen plaintiff's claim under the CWA or the Clean Air Act was barred by the entry of a consent decree involving the United States when the decree contained long-term injunctive relief measures. See, e.g., Ellis v. Gallatin Steel Co., 390 F.3d 461, 476-77 (6th Cir. 2004); City of Green Forest, Arkansas, 921 F.2d at 1403-04; St. Bernard Citizens for Environmental Quality, Inc. v. Chalmette Refining, L.L.C., No. 04-0398, 2007 WL 2323387, at *13, *16 (E.D. La. August 10, 2007).

Stipulated Order will cost approximately $300 million. Id. at ¶12. CCH has already commenced work under the Stipulated Order despite the fact that the Stipulated Order has not yet been entered. Id. at ¶32. For example, CCH has installed the temporary back-up to the Beachwalk force main. Id. EPA believes that installation of this back-up force main effectively prevented a second major spill on the Beachwalk Force Main. Id. at ¶19; cf. St. Bernard Citizens, 2007 WL 2323387, at *13 (court referred to evidence that measures required by a recently entered consent decree were already producing positive results at a facility). In addition, EPA and DOH have met and conferred with CCH on condition assessments required by the Stipulated Order for the Beachwalk, Ala Moana #2, Waimalu, and Kahala force mains. Cola Decl. ¶32. CCH has already begun preliminary work on each of these condition assessments, and has completed much of the inspection of the Beachwalk force main. Id. Finally, in the Stipulated Order, the parties stated their intention to negotiate in good faith a comprehensive remedy addressing all compliance issues associated with CCH's wastewater system. Stipulated Order at 2. To begin this task, the parties have scheduled negotiations to commence on October 1, 2007, to deal with other compliance issues identified by the United States and the State. Cola Decl. ¶33.

As the court noted in Chevron U.S.A. Inc., 380 F. Supp. 2d at 1118, EPA can reasonably conclude that even an extended compliance schedule in a consent decree may create environmental benefits earlier than litigating. Sierra Club's litigation against CCH illustrates the point. Its citizen suit against CCH was filed in July 2004. In that litigation, CCH has prevailed on a motion to dismiss Sierra Club's collection system claims while Sierra Club has established liability on certain claims regarding CCH's NPDES permit violations. After three years, litigation is still proceeding.

In its opposition, Sierra Club now seeks to persuade the Court not to enter the Stipulated Order in favor of more litigation. The Court should decline the

-23-

invitation. <u>See</u> <u>Southern California Edison Co.</u>, 307 F.3d at 806-07 (an intervenor
does not have the right to prevent other parties from entering into a settlement
agreement). Instead, the United States requests the Court to exercise its discretion
in favor of the strong policy favoring voluntary settlement of litigation, as well as
timely protection of public health and the environment, particularly considering
that EPA "pulled the laboring oar in constructing the proposed settlement."
<u>Cannons Eng'g Corp.</u>, 899 F.2d at 84; <u>Ahern</u>, 846 F.2d at 48.

     In his Findings and Recommendation to grant Sierra Club's motion to
intervene issued on June 28, 2007, Magistrate Judge Chang recommended:
"following [the Court's] approval or decision on the Stipulated Order, . . . that this
matter be referred back to this Court to determine what, if any, conditions on
Applicants' intervention are necessary in order to promote the efficient conduct of
the proceeding and the orderly administration of justice." Findings and
Recommendation at 7-8. This Court adopted the Findings and Recommendations
in its Order entered on July 26, 2007. The United States requests the Court to
enter the Stipulated Order and refer the matter back to Magistrate Chang for
further consideration of the appropriate conditions to impose on Sierra Club's
intervention.[1]

## VI.    CONCLUSION

     The proposed Stipulated Order secures timely and effective environmental
benefits that protect public health. The terms of the settlement are fair, reasonable,
and adequate, and consistent with the goals and purposes of the Clean Water Act.
Counsel for the State of Hawaii and CCH support the entry of the Stipulated
Order. The Court does not have to wait for a response from CCH before entering
the Stipulated Order because CCH has consented to entry of the Stipulated Order
without further notice in Paragraph 71 of the Order. For the reasons stated above,

---

[1] The United States has submitted a proposed Order for the Court concurrently
with this Reply brief.

the United States requests this Court to approve and enter the Stipulated Order.

Respectfully submitted,

FOR THE UNITED STATES OF AMERICA

Date:  September 26, 2007        /s/ Robert D. Mullaney

ROBERT D. MULLANEY
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources
  Division
U.S. Department of Justice
301 Howard Street, Suite 1050
San Francisco, California  94105
Tel:  (415) 744-6491
Fax:  (415) 744-6476

OF COUNSEL:

HUGH BARROLL
Assistant Regional Counsel
U.S. EPA, Region 9
75 Hawthorne Street
San Francisco, California  94105

## CERTIFICATE OF SERVICE

I, Robert D. Mullaney, hereby certify that, on the dates and by the methods of service noted below, a true and correct copy of the documents entitled "United States' Reply to Sierra Club's Opposition to Entry of Stipulated Order" and "Declaration of JoAnn Cola in Support of United States' Reply to Sierra Club's Opposition to Entry of Stipulated Order" was served on the following at their last known addresses:

Served by Electronic Mail:

| | |
|---|---|
| Carrie Okinaga<br>Corporation Counsel<br>cokinaga@honolulu.gov | September 26, 2007 |
| Nancy Wilms<br>James Dragna<br>Bingham McCutchen LLP<br>jim.dragna@bingham.com | September 26, 2007 |
| Mark Bennett, Attorney General<br>Kathleen Ho, Deputy Attorney General<br>State of Hawaii Office of the Attorney General<br>kathleen.s.ho@hawaii.gov | September 26, 2007 |
| Christopher Sproul<br>Environmental Advocates<br>csproul@enviroadvocates.com | September 26, 2007 |
| Bill Tam<br>Alston Hunt Floyd & Ing<br>wtam@ahfi.com | September 26, 2007 |

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on September 26, 2007, at San Francisco, California.

/s/ Robert D. Mullaney
Robert D. Mullaney

ATTACHMENT A

United States' Reply to Sierra Club's Opposition to Entry of Stipulated Order, Civil No. 1:07-00235 DAE-KSC

(Federal Register Notice)

Westlaw.
72 FR 27849-01                                                    Page 1
72 FR 27849-01, 2007 WL 1433611 (F.R.)
(Cite as: 72 FR 27849)

NOTICES
DEPARTMENT OF JUSTICE
Notice of Lodging of Stipulated Order Under the Clean Water Act
Thursday, May 17, 2007

*27849 Notice is hereby given that on May 8, 2007, a proposed Stipulated Order in
United States and State of Hawaii v. City and County of Honolulu, Case No. CV
07-00235 HG-KS (D. Hawaii), relating to the City and County of Honolulu's (CCH)
sanitary sewage collection system, was lodged with the United States District
Court for the District of Hawaii.

The proposed Stipulated Order is a settlement of claims for injunctive relief
brought against CCH pursuant to the Clean Water Act, 33 U.S.C. 1251-1387, for the
unauthorized discharge of pollutants into waters of the United States. The
proposed Stipulated Order requires CCH to: (1) Construct replacement force mains;
(2) assess the condition of specific force mains and a pump station and implement
necessary repairs; and (3) submit site-specific spill contingency plans for
designated force mains.

The Department of Justice will receive for a period of thirty (30) days from the
date of this publication comments relating to the Stipulated Order. Comments
should be addressed to the Assistant Attorney General, Environment and Natural
Resources Division, and either e-mailed to pubcomment-ees.enrd @usdoj.gov, or
mailed to P.O. Box 7611, U.S. Department of Justice, Washington, DC 20044-7611,
with a copy to Robert Mullaney, U.S. Department of Justice, 301 Howard Street,
Suite 1050, San Francisco, CA 94105, and should refer to United States and State
of Hawaii v. City and County of Honolulu, D.J. Ref. 90-5-1-1- 3825/1.

The Stipulated Order may be examined at U.S. EPA Region 9, Office of Regional
Counsel, 75 Hawthorne Street, San Francisco, California. During the public comment
period, the Stipulated Order may also be examined on the following Department of
Justice Web site: http://www.usdoj.gov/enrd/Consent-- Decrees.html. A copy of the
Stipulated Order may also be obtained by mail from the Consent Decree Library,
P.O. Box 7611, U.S. Department of Justice, Washington, DC 20044-7611 or by faxing
or e-mailing a request to Tonia Fleetwood (tonia.fleetwood@usdoj.gov), fax number
(202) 514-0097, phone confirmation number (202) 514-1547. In requesting a copy
from the Consent Decree Library, please enclose a check in the amount of $9.75 (25
cents per page reproduction cost) payable to the U.S. Treasury or, if by e-mail or
fax, forward a check in that amount to the Consent Decree Library at the stated
address.

Henry Friedman,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 FR 27849-01
72 FR 27849-01, 2007 WL 1433611 (F.R.)
**(Cite as: 72 FR 27849)**

Assistant Chief, Environmental Enforcement Section, Environment and Natural
Resources Division.

[FR Doc. 07-2407 Filed 5-16-07; 8:45 am]

BILLING CODE 4410-15-M

72 FR 27849-01, 2007 WL 1433611 (F.R.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ATTACHMENT B

United States' Reply to Sierra Club's Opposition to Entry of Stipulated Order, Civil No. 1:07-00235 DAE-KSC

(Public Comments Received)

ENVIRONMENTAL ADVOCATES
ATTORNEYS AT LAW

5135 ANZA STREET
SAN FRANCISCO, CALIFORNIA 94121
(510) 847-3467
FAX: (415) 358-5695
E-mail: jisaacs@enviroadvocates.com

June 13, 2007

Matthew J. McKeown
Acting Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611

Via Electronic Mail

Re:    Comments on Proposed Stipulated Order *United States and State of Hawai'i v. City and County of Honolulu*, Civ. No. 07 00235 DAE KSC

Dear Mr. McKeown:

Sierra Club, Hawai'i Chapter, Hawai'i's Thousand Friends, and Our Children's Earth Foundation (collectively, "the Citizens") are writing to comment upon the proposed Stipulated Order in the above-referenced case ("the Stipulated Order"). The Citizens urge the United States that the Stipulated Order has some serious shortcomings which the United States should promptly address in additional multi-party negotiations between the U.S. Environmental Protection Agency ("EPA"), the State of Hawai'i's Department of Health ("DOH"), the City and County of Honolulu ("CCH"), and the Citizens. The United States should request the Court to defer entry of the Stipulated Order pending the outcome of these additional negotiations.

As EPA is well aware, CCH's sewage system is in dire condition. Due to numerous structural and operational problems with its sewage collection system, CCH has spilled millions of gallons of raw sewage in numerous spill incidents, repeatedly contaminating and closing streams and beaches all over O'ahu. In addition, CCH's sewage treatment plants are poorly run and lack needed upgrades, and CCH's discharges from these plants routinely violate CCH's NPDES permit effluent limits. The Stipulated Order falls far short of requiring the measures needed to curb these Clean Water Act (CWA) violations. Specifically, the Stipulated Order is flawed for failing: (1) to provide for citizen participation, (2) to adopt a comprehensive approach to addressing CCH's sewage collection system problems and (3) to address *all* CCH's force main problems.

**I.  *The Stipulated Order Lacks Needed Citizen Participation Provisions.***

M. McKeown
June 13, 2007

The Stipulated Order's omission of provisions for the Citizens' participation is a serious error. The Citizens have long been active in addressing CCH's sewage problems--and in reaching out to other local environmental groups and community organizations to enlist their support and input. In the end, no solution will prove workable without broad community input and support. The United States cannot foster this community support by entering into an agreement that provides no role for the public's involvement and for the Citizens as the most active set of groups concerned with CCH's sewage problems.

In 1995, the United States entered into a similar sewage spill consent decree with CCH in the case *United States, et al. v. City and County of Honolulu*, Civ. No. 94-00765 DAE-KSC. *See Order for Entry of Consent Decree as Modified; Consent Decree as Modified by Stipulation, U.S. v. CCH* (May 15, 1995) (the "1995 Consent Decree"). Just like the Stipulated Order, the 1995 Consent Decree included no citizen involvement or oversight role. The 1995 Consent Decree has failed to meet its stated goals of abating CCH's sewage spills and bringing CCH into CWA compliance, and the Stipulated Order is likely to similarly fail.

### A. *The 1995 Consent Decree Failed To Curb CCH's Spills.*

The 1995 Consent Decree required CCH to set annual goals for reduction of sewage spills, but CCH has failed to meet these goals. In addition, the 1995 Consent Decree required CCH to prepare and implement a long-term comprehensive Spill Reduction Action Plan (SRAP) "that is specifically aimed at reducing the number and volume of [sewage s]pills from its Collection System to the maximum extent practicable." The 1995 Consent Decree at 16. More than twelve years into the 1995 Consent Decree, CCH's sewage spill rate has remained essentially constant--and excessively high (more than one every other day).

Before the 1995 Consent Decree, CCH routinely spilled raw sewage from its collection systems due to sewer line blockages (generally caused by root intrusion, build-up of grease, and accumulation of sediment and debris), pump station failures, collapsing sewer lines, and excessive "infiltration and inflow" ("I/I") into sewer lines (rising groundwater or storm water runoff flowing into leaky sewer lines during rainy weather). Twelve years later, CCH still routinely spills sewage due to the same causes.

Some of CCH's spills have been spectacularly large. About a year ago, CCH spilled about 48 million gallons of raw sewage into the Ala Wai Canal from March 26-30, 2006 when its Beachwalk force main sewer line ruptured. The spill forced the closure of Waikiki Beach for several days, as the foul plume of raw sewage spread from the Ala Wai Canal to Waikiki. During the massive Beach Walk spill, CCH was simultaneously spilling large volumes of raw sewage from its Sand Island Wastewater Treatment Plant ("WWTP") and several Windward locations, causing additional beach closures.

For additional example, on December 4-5, 2003, CCH spilled about 7.5 million gallons of raw sewage from the Hart Street pump station due to a short circuit that caused a power failure at the pump station. This spill flowed into Nu'uanu Stream, Kapālama Canal, and Honolulu Harbor. In early January 2004, CCH had a series of major spills that caused beach closures all over eastern and southern O'ahu. In March 2004, the CCH force main line that

transports sewage from Ala Moana Pump Station underneath Honolulu Harbor to Sand Island Waste Water Treatment Plants ("WWTP") ("Ala Moana force main") ruptured, spilling 2 million gallons of raw sewage into Honolulu Harbor and the Pacific Ocean and closing beaches from Point Panic to Keʻehi Lagoon. CCH's repeated spill problem remains frequent front page news in Hawaiʻi.

EPA's and DOH's recent actions further underscore that the 1995 Consent Decree has failed and that CCH *did not* prepare and *has not been* implementing a SRAP which reduces sewage spills "to the maximum extent practicable." Subsequent to the 1995 Consent Decree, one, EPA and DOH have both issued administrative orders imposing additional requirements on CCH designed to curb CCH's sewage spills. EPA issued an administrative order on June 30, 2003 requiring CCH to develop a new action plan for reducing sewage spills into Kalihi and Nuʻuanu streams. *In the Matter of the City and County of Honolulu*, Docket No. CWA-309-03-019 (June 30, 2003). DOH further issued a proposed administrative order on April 15, 2004 that would require CCH to implement various measures to reduce spills from CCH's force mains. *Department of Health, State of Hawaiʻi v. The City and County of Honolulu*, Docket Nos. 2004-CW-EO-01N and 04-WW-EO-2. Two, EPA and DOH have entered into the Stipulated Order which imposes yet additional sewage spill reduction requirements on CCH. EPA and DOH's election to issue these administrative orders and to enter into the Stipulated Order underscores that the SRAP has not reduced sewage spills "to the maximum extent practicable" and that the 1995 Consent Decree has not been an effective remedy for CCH's sewage spill woes.

As CCH's current Mayor admitted in his State of the City Address in February 2005, CCH for years failed to comply with the 1995 Consent Decree's mandates:

> [T]he previous administration failed to raise sewer fees since 1994
> to underwrite the mandated improvements [required to comply
> with the 1995 Consent Decree]. . . . The prior administration's
> approach to the sewage system . . . put us no closer to fixing the
> sewers. . . . [W]e have not paid enough attention to our sewer
> system. There were shortcomings in the past administration's
> efforts to comply with the EPA's mandates. And no financial
> commitment was ever made to fund those needs.

In our view, CCH's failure to vigorously implement the 1995 Consent Decree chiefly due to the lack of local community involvement in its design and implementation. With no local constituency advocating and working for the Decree's success, CCH simply failed to abide by its letter and spirit--exemplified by CCH diverting sewage enterprise funds to non-sewage related projects for years. Without citizen watchdogs to bring these failures to EPA's attention, EPA overlooked these failures. EPA has limited resources and vast jurisdiction, and it is not unexpected that EPA will occasionally fail to discover and act on all the CWA noncompliance

M. McKeown                                                          Page 4 of 7
June 13, 2007

within its jurisdiction.[1] It is precisely this reason that Congress provided for citizen suits, prompting one court to observe:

> [I]n environmental lawsuits, the intent of Congress is clearly that "citizen groups are not to be treated as nuisances or troublemakers but rather as welcomed participants in the vindication of environmental interests." *See Friends of the Earth v. Carey*, 535 F.2d 165, 172 (2d Cir. 1976).

*U.S. v. Hooker Chems. and Plastics*, 540 F. Supp. 1067, 1082 (W.D. New York 1982).

### B. *The United States Should Follow Its Own Examples of Past Citizen Cooperation.*

As the United States is aware, the Citizens were the first to return to court after it became abundantly clear that the 1995 Consent Decree had failed and that additional judicial relief was needed to remedy CCH's sewage spill problem. The Citizens filed a separate CWA citizen suit action in May 2004, long before the United States sought its own supplemental judicial relief. *Sierra Club, et al. v. City and County of Honolulu*, Civil No. 04-00463 DAE/BMK. In similar situations, when EPA has encountered citizens so motivated by CWA violation that they have filed their own citizen suit actions, EPA has often, wisely, sought to partner with the Citizens in joint consent decrees rather than to enter into decrees that exclude the citizens. *See, e.g., United States, State of Maryland, and Anacosta Watershed Society, et al. v. Washington Suburban Sanitary Commission*, Civ. No. PJM-04-3679, and *United States, People of the State of California, and Santa Monica Baykeeper v. City of Los Angeles*, Civ. No. 01-191-RSWL and 98-9039-RSWL; *Upper Chattahoochee Riverkeeper Fund, Inc., the United States, and the State of Georgia v. the City of Atlanta*, Civ. No 95-CV-2550 TNT. Such partnerships have increased the community support for and the successes achieved by these decrees.

The United States should follow the examples of these cases and decline now to ask the Court to enter the Stipulated Order to which the Citizens are not signatory and which provides for no citizen involvement.

## II. *The Stipulated Order Reflects an Inappropriate Piecemeal Approach.*

Another serious shortcoming of the Stipulated Order is that it addresses but one aspect of CCH's sewer system problems–CCH's failure to inspect, assess, and replace or rehabilitate its force main sewer lines. The Citizens agree that all available evidence suggests that CCH has

---

[1] The Citizens specifically note that the 1995 Consent Decree provides for stipulated penalties against CCH for violations of the decree. the 1995 Consent Decree at 47-50. Despite what is by now obvious CCH noncompliance with the 1995 Consent Decree (for example, CCH clearly has not met the water reclamation supplemental environmental project requirements of the decree as evidenced by numerous documents EPA has provided the citizens in response to our Freedom of Information Act requests), EPA has never sought recovery of these stipulated penalties. This underscores that EPA, for resource and other reasons, has not been able alone to ensure that CCH's noncompliance is addressed by appropriate judicial relief.

urgent problems with its force mains, and we generally laud the United States for attempting to address these problems with supplemental judicial relief. The Citizens disagree, however, with EPA's approach of addressing just the force main lines at this time while leaving CCH's many other sewage system issues unaddressed.

EPA, DOH, and the Citizens commenced joint negotiations with CCH over securing additional judicial relief to address CCH's sewage problems in March 2006. It has taken EPA fifteen months to reach an agreement with CCH which addresses only one of the many remaining problems confronting CCH's sewage system. At this pace, it will be a very long time before a complete supplemental package of judicial relief is secured.

The optimum approach would be to defer entry of the Stipulated Order while EPA, DOH and the Citizens jointly pursue with CCH a global settlement that resolves all CCH's sewage problems—with a firm court deadline for completion of these negotiations. Ultimately, a sewage collection system is a dynamic, interdependent system that must be looked at comprehensively to maximize its performance and to minimize its spill rate. By far the best management technique is to look at the system as a whole and to set priorities for actions based on the relative sewage spill risks posed by different aspects of the system and available resources. This can only be accomplished by a global collection system settlement.

## III. *The Stipulated Order's Force Main Compliance Schedule Is Inadequate.*

### A. *The Stipulated Order Does Not Address All CCH's Force Main Problems.*

The Stipulated Order imposes remedial action requirements on CCH with respect to only six force main lines: the Beachwalk, Ala Moana, Old Hart Street, Kailua/Kaneohe, Waimalu, and Kahala lines (collectively, "the Target Force Mains"). This is an inadequate remedial response as CCH's force main problems obviously extend beyond the Target Force Mains. This is made abundantly clear, for example, by DOH's April 15, 2004 administrative order, *Department of Health, State of Hawai'i v. The City and County of Honolulu*, Docket Nos. 2004-CW-EO-01N and 04-WW-EO-2 ("the DOH Administrative Order"). The DOH Administrative Order found that CCH had 27 sewage spills from various force main lines between November 1996 to April 2004, primarily due to breaks caused by corrosion, malfunctioning of air relief valves, and contractor-caused damage. At least some of these spills were from force mains not addressed by the Stipulated Order. The DOH Administrative Order required CCH to implement various remedial measures directed toward all of CCH's force mains. Specifically, this order required CCH (1) to assess the condition of "*each* force main in CCH's collection system," (2) develop a force main contingency plan for addressing force main sewage spills "which includes *all* force mains in CCH's collection system," and (3) develop plans for maintenance and repair measures "for *all* CCH force mains" including redundant force main lines where CCH's contingency plans showed a risk of uncontrollable discharge from a failed force main (emphasis added).

In addition, CCH's own consultant's report, Fukunaga & Associates, "Force Main Condition Assessment Program" (Oct. 2004) identified seven critical force main lines where CCH should have redundant backup lines given a combination of the risk and consequence of

force main failure. The Stipulated Order fails to address three of these lines: Kamehameha, Kailua Heights and Lualualei Force Mains. Failure to address the Lualualei Force Main is particularly problematic; the line is old, has likely been subject to corrosion, and is located such that a major failure would likely lead to a large, uncontrollable spill.

The Citizens have acquired numerous documents from EPA, DOH and CCH via Freedom of Information Act requests, Uniform Information Practices Act requests, and discovery production. Based on our review of these documents, CCH has not complied with the DOH Administrative Order and has not (1) assessed the condition of each force main in CCH's collection system," (2) developed a force main contingency plan for addressing force main sewage spills from all force mains in CCH's collection system nor (3) developed plans for maintenance and repair measures for all CCH force mains including redundant force main lines where CCH's contingency plans show a risk of uncontrollable discharge from a failed force main. Indeed, if CCH had done so, the Stipulated Order would be superfluous. The Stipulated Order will provide little remedy to this CCH failure to comply with the DOH Administrative Order, as it addresses but a small subset of CCH's force mains.

The United States should forego requesting entry of the Stipulated Order and should instead renegotiate a comprehensive settlement that judicially mandates CCH's compliance with the same measures required by the DOH Administrative Order. CCH's lack of compliance with the DOH Administrative Order demonstrates that judicial compulsion is needed to secure CCH's compliance with these measures, and the United States has no evidence before it to suggest that DOH's Administrative Order was in any respect erroneous in imposing these requirements.

**B.    *The Stipulated Order Has an Inappropriate Loophole with Respect to Redundancy at the Waimalu and Kahala Force Mains.***

The Stipulated Order laudably requires CCH to take the steps needed to have redundant force main lines for the Beachwalk, Ala Moana, Old Hart Street, and Kailua/Kaneohe force mains. CCH's past spill performance, including the disastrous Beachwalk force main spill in March 2006, demonstrates the need for redundant lines to serve as backup force mains should any of these lines fail. The Stipulated Order also requires CCH to have redundant force main lines for the Waimalu and Kahala Force Mains, *but only if* CCH's condition assessment shows that these lines are defective. If CCH's condition assessment does not show that these lines are defective, then the Stipulated Order would allow CCH indefinitely to avoid securing redundant lines to serve as backup force mains should these lines fail in the future. Eventually, these force mains will likely deteriorate to the point where they will be at risk for failure, and CCH should be required to have redundant lines for these force mains to guard against this long-term risk. These force mains are located such that major failures of these lines would likely lead to uncontrolled spills, making redundancy an appropriate precautionary measure regardless of their current condition.

The United States should renegotiate to secure a judicial order mandating that CCH eventually have redundant lines for the Waimalu and Kahala Force Mains.

**C. *The Stipulated Order's Time Schedule Is Unduly Lenient*.**

The Stipulated Order grants CCH until January 2009, more than a year and a half, to
assess the Target Force Mains, and until December 2018 to implement remedial actions with
respect to all these lines, more than eleven and a half years. The Stipulated Order's unduly
lenient time schedule is most problematic with respect to the schedule for remedial action for the
Kaneohe/Kailua Force Main (to be addressed in about seven and a half years) and Waimalu
Force Main (to be addressed in about eleven and a half years). Both of these force mains are
very old; the Kaneohe/Kailua Force Main is over thirty years old and the Waimalu Force Main is
about forty-three years old). Given CCH's track record of recent force main failures and the
likely similar condition of the Kaneohe/Kailua and Waimalu Force Mains compared to other
CCH force mains that recently failed, a significant spill on one or the other of these lines before
the Stipulated Order deadlines for remedial action would appear to be likely.

The United States should renegotiate to secure a judicial order providing for tighter
deadlines for completion of CCH's force main remedial work.

Thank you for consideration of these comments. We look forward to receiving the
United States' response.

Sincerely,

Jodene Isaacs
Environmental Advocates

**From:** Jim Stafford[SMTP:JSTAFFORD@CITYOFCARTERSVILLE.ORG]
**Sent:** Monday, May 14, 2007 8:56:18 AM
**To:** ENRD, WebContentMgr (ENRD)
**Subject:** concent decree
**Auto forwarded by a Rule**

Obvioulsy the decision made on Honolulu forced mains was made by someone with no knowledge about waster water collection.  There is no fool proof method to
stop overflows.  You can put in a totally redundent system but that does not assure 100% success.  Much money will be spent and the public will pay.
outrageous rates but it will not guarantee anything, but higher payments.  Someone needs to use some common sense in dealing with these issues.  Before the clean water act all WW was discharged to streams without treatment.  An occasional overflow will not equal what was happening pryor to CWA .  A plan should be developed and some  actions taken but people still have to be able to afford the service.  These knee jurk reactions and unfunded mandates are killing our ability
to pay.

5/16/2007