LOIS J. SCHIFFER
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
LESLIE ALLEN
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
Telephone:  (202) 514-4114

STEVEN S. ALM
United States Attorney
District of Hawaii
MICHAEL CHUN
Assistant United States Attorney
Room 6100, PJKK Federal Building
300 Ala Moana Blvd., Box 50183
Honolulu, Hawaii  96850
Telephone:  (808) 541-2850

MARGERY S. BRONSTER    4750
Attorney General of Hawaii
HEIDI M. RIAN   3473
LAURENCE K. LAU    1466
Deputy Attorneys General, State of Hawaii
Kekuanao'a Building, Room 200
465 South King Street
Honolulu, Hawaii 96813
Telephone (808) 587-3050

Attorneys for Plaintiffs

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

MAY 1 5 1995

at __9__ o'clock and __44__ min. __ω__ M
WALTER A. H. Y. CHINN, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CIV. NO. 94-00765DAE |
| | ) | |
| and | ) | |
| | ) | |
| STATE OF HAWAII, by Margery S. | ) | |
| Bronster, Its Attorney General, | ) | |
| and LAWRENCE MIIKE, M.D., | ) | [~~PROPOSED~~] |
| Director of Health, State of | ) | ORDER FOR ENTRY OF |
| H᷿aii, | ) | CONSENT DECREE |
| | ) | AS MODIFIED; CONSENT DECREE |
| Plaintiffs, | ) | AS MODIFIED BY STIPULATION |

OR ENTRY
NT DECREE,
ᴿD - 1 -

ATTEST: A True Copy
WALTER A.Y.H. CHINN
Clerk. United States District
Court District of Hawaii
B᷿_____
                        Deputy

EXHIBIT 3

25108

                            v.

CITY AND COUNTY OF HONOLULU,
                  Defendant.

This Court finds that the proposed Consent Decree, signed by all parties and lodged with this Court on October 3, 1994, together with the amendments made to pages 42 and 49 (as agreed to by the parties pursuant to their Joint Stipulation for Modification of Lodged Consent Decree, filed on February 24, 1995) is fair, reasonable, consistent with the Clean Water Act, and in the public interest.

Accordingly, IT IS HEREBY ORDERED that the decree, as modified, is entered as an Order of this Court. A copy of the Consent Decree, which incorporates the modifications, is attached hereto.

DATED THIS ____15____ DAY OF ____May____, 1995.

                            DAVID A. EZRA

                            DAVID A. EZRA
                            UNITED STATES DISTRICT JUDGE

Submitted by:

LESLIE ALLEN
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice

USA & STATE OF HAWAII, et al. v. CITY & COUNTY OF
HONOLULU, ET AL., CIVIL NO. 94-00765 DAE
"[PROPOSED] ORDER FOR ENTRY OF CONSENT DECREE AS MODIFIED";
"CONSENT DECREE AS MODIFIED BY STIPULATION"
ORDER FOR ENTRY
OF CONSENT DECREE,
AS MODIFIED - 2 -

EXHIBIT 3

25109

LOIS J. SCHIFFER
Acting Assistant Attorney General
Environment and Natural Resources Division
LESLIE ALLEN
Environmental Enforcement Section
U.S. Department of Justice, P.O. Box 7611
Washington, D.C.  20044-7611
Telephone:  (202) 514-4114

ELLIOT ENOKI
United States Attorney
District of Hawaii
MIKE CHUN
Assistant United States Attorney
Room 6100, PJKK Federal Building
300 Ala Moana Blvd., Box 50183
Honolulu, Hawaii  96850
San Francisco, California  94105
Telephone:  (808) 541-2850

ROBERT A. MARKS   2163
Attorney General of Hawaii
SONIA FAUST        627
LAURENCE K. LAU    1466
Deputy Attorneys General, State of Hawaii
Kekuanao'a Building, Room 200
465 South King Street
Honolulu, Hawaii 96813
Telephone (808) 587-3050

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       and<br><br>STATE OF HAWAII, by Robert A. Marks, Its Attorney General, and PETER A. SYBINSKY, Ph.D., Director of Health, State of Hawaii,<br><br>       Plaintiffs,<br><br>       v.<br><br>CITY AND COUNTY OF HONOLULU,<br><br>       Defendant | Civil No.<br><br>CONSENT DECREE |

EXHIBIT 3
25110

## TABLE OF CONTENTS

I.      JURISDICTION AND VENUE . . . . . . . . . . . . . . . 2

II.     BINDING EFFECT . . . . . . . . . . . . . . . . . . 2

III.    BACKGROUND  . . . . . . . . . . . . . . . . . . . 3

IV.     OBJECTIVES . . . . . . . . . . . . . . . . . . . 5

V.      DEFINITIONS . . . . . . . . . . . . . . . . . . . 6

VI.     PRETREATMENT COMPLIANCE PROGRAM . . . . . . . . . . 7

VII.    COLLECTION SYSTEM COMPLIANCE PROGRAM  . . . . . . . 15

VIII.   SUPPLEMENTAL ENVIRONMENTAL PROJECTS . . . . . . . . 31

IX.     PROGRAM MANAGEMENT AND PROGRESS REPORTS . . . . . . 43

X.      PENALTY FOR PAST VIOLATIONS . . . . . . . . . . . 46

XI.     STIPULATED PENALTIES . . . . . . . . . . . . . . 47

XII.    Procedure for Submittals and Approvals of Plans . . 50

XIII.   FORCE MAJEURE . . . . . . . . . . . . . . . . . . 50

XIV.    DISPUTE RESOLUTION  . . . . . . . . . . . . . . . 53

XV.     CERTIFICATION . . . . . . . . . . . . . . . . . . 54

XVI.    RIGHT OF ENTRY  . . . . . . . . . . . . . . . . . 54

XVII.   EFFECT OF DECREE AND NONWAIVER PROVISIONS . . . . . 55

XVIII.  FAILURE OF COMPLIANCE . . . . . . . . . . . . . . 57

XIX.    COSTS OF SUIT . . . . . . . . . . . . . . . . . . 57

XX.     CONTINGENT LIABILITY OF STATE OF HAWAII . . . . . . 57

XXI.    FORM OF NOTICE . . . . . . . . . . . . . . . . . 58

XXII.   MODIFICATION . . . . . . . . . . . . . . . . . . 59

XXIII.  PUBLIC COMMENT . . . . . . . . . . . . . . . . . 59

XXIV.   CONTINUING JURISDICTION OF THE COURT . . . . . . . 60

i

EXHIBIT 3

25111

XXV.   EFFECTIVE AND TERMINATION DATES . . . . . . . . . .   60

EXHIBIT A:   PRETREATMENT SCHEDULE

EXHIBIT B:   SEWER I/I SCHEDULE

ii

EXHIBIT 3

25112

WHEREAS:

Plaintiff United States of America ("United States"), on behalf of the United States Environmental Protection Agency ("EPA"), and Plaintiffs State of Hawaii, by Robert A. Marks, its Attorney General, and Peter A. Sybinsky, Ph.D., Director of the Hawaii Department of Health ("DOH") (collectively, "State"), filed a Complaint herein concurrently with the lodging of this Consent Decree, alleging that Defendant, City and County of Honolulu ("CCH"), has violated the Clean Water Act, 33 U.S.C. § 1251 et seq. ("the Act"), the Hawaii Revised Statutes, Chapter 342D ("H.R.S."), and the conditions and limitations of its National Pollutant Discharge Elimination System ("NPDES") permits.

CCH does not admit any allegations of the United States' and the State of Hawaii's Complaint and denies that it has willfully, knowingly, or negligently violated any provision of the Act or the conditions or limitations of its NPDES permits.

Pursuant to Section 309(e) of the Act, 33 U.S.C. § 1319(e), the State of Hawaii shall be liable for payment of any judgment, or any expenses incurred as a result of complying with any judgment entered against CCH to the extent that the laws of the State prevent CCH from raising the revenues needed to comply with such judgment.

The Parties agree, and the Court finds, that settlement of these matters without further litigation or trial of any issues is in the public interest and that the entry of this Decree is

1

EXHIBIT 3
25113

EXHIBIT 3

25114

Consent Decree. In any action to enforce this Consent Decree, CCH shall not raise as a defense the failure by any of its agents, servants, contractors, employees, successors or assigns to take actions necessary to comply with the Decree. Nothing herein is intended to restrict or limit any remedies and legal rights of CCH against those whose actions or inactions prevented compliance with this Decree.

B. CCH shall provide a copy of this Decree, or make the Consent Decree available, to each contractor retained to perform any activity required by this Decree. Prior to transfer of ownership, operation, or other interest in CCH's facilities, including the collection system or any part thereof, CCH shall provide a copy of this Decree to any successor in interest. Such transfer, however, shall have no effect on CCH's obligation to comply with this Consent Decree unless the Consent Decree is modified pursuant to Section XXII to reflect such a change. CCH shall notify in writing the United States Department of Justice (DOJ), EPA, and DOH at least thirty (30) days in advance of any such transfer.

III. BACKGROUND

A. Defendant CCH is itself a publicly-owned treatment works ("POTW"), and owns and operates eleven "POTWs," as defined in Section 212 of the Act and in 40 C.F.R. § 403.3(o), which are referred to herein as "wastewater treatment plants" ("WWTPs"). These treatment plants treat domestic and industrial wastewater for the major portions of the island of Oahu, Hawaii.

3

EXHIBIT 3

25115

B.    On July 29, 1982, EPA approved a pretreatment program
for the POTW.  In accordance with the approved POTW pretreatment
program, CCH was required to develop and administer a pretreat-
ment program for its entire service area, including developing
and enforcing local limits to implement general and specific
prohibitions set forth in the pretreatment regulations.

C.    In its Complaint, the United States alleges that by
failing to develop and administer a pretreatment program for all
of its treatment plants and by failing to comply with certain of
the pretreatment conditions of the Sand Island NPDES permit,
Permit No. HI 0020117, CCH has violated Section 307 of the Act,
33 U.S.C. § 1317, which prohibits persons from operating any
source in violation of any applicable pretreatment requirements.

D.    CCH's treatment plants receive wastewater from an
approximately 1900 mile collection system, which includes pipes,
manholes, sewer lines, pump stations, and appurtenances thereto
that convey domestic and industrial wastewater to CCH's WWTPs.
In its Complaint, the United States alleges that because of
problems with line blockages, pump station equipment failures,
and structural pipe failures associated with inadequate preven-
tive maintenance, and excessive infiltration and inflow in its
system, there have been chronic overflows and spills from CCH's
collection system that have resulted in discharges of raw sewage
or partially treated wastewater to surface waters.

E.    CCH's NPDES permits authorize discharges from specific
points of the WWTPs and do not authorize discharges from the

4

EXHIBIT 3
25116

Collection System.  In its Complaint, the United States alleges that, by its discharges of raw sewage or partially-treated effluent from its collection system, CCH has violated Section 301 of the Act, 33 U.S.C. § 1311, which prohibits the discharge of pollutants except in compliance with NPDES permits.

IV.   <u>OBJECTIVES</u>

The objectives of this Consent Decree are:

A.  To require CCH to come into and maintain compliance with the Clean Water Act, specifically Section 301, which prohibits discharging pollutants except in compliance with the Act, and Section 307, which prohibits persons from operating any source in violation of any applicable pretreatment requirements;

B.  To  require CCH to revise and implement its pretreatment program to regulate industrial discharges to the WWTPs, including developing and enforcing technically-based local limits to implement general and specific prohibitions set forth in the pretreatment regulations.

C.  To require CCH to establish a schedule under which CCH shall install or implement preventive maintenance and sewer replacement and rehabilitation necessary to reduce and prevent Spills from its collection system; and

D.  To further the goals and objectives of the Act, particularly Sections 101, 301, and 307 of the Act, 33 U.S.C. §§ 1251, 1311, and 1317.

5

EXHIBIT 3
25117

V.  DEFINITIONS

Unless otherwise defined herein, terms used in this Decree shall have the meaning given to those terms in the Clean Water Act, 33 U.S.C. § 1251 et seq., the regulations promulgated thereunder, and in any applicable NPDES permit.

"CCH or POTW Pretreatment Program" or "Pretreatment Program" shall mean the following collection of documents and any subsequent lawful amendments thereto:  the pretreatment program originally approved by EPA Region 9 on July 29, 1982, for the City and County of Honolulu; CCH's Sewer Ordinance implementing the pretreatment program; the proposed revisions to CCH's Sewer Ordinance (which were submitted by CCH to EPA on August 27, 1992, and are currently being rewritten in accordance with EPA's recommendations); and the pretreatment requirements incorporated as permit conditions in the NPDES permit for the Sand Island treatment plant (NPDES permit No. HI 0020117).

"Collection System" shall mean all pipes, manholes, sewer lines, pump stations, and appurtenances thereto under ownership of CCH that convey domestic and industrial wastewater to CCH's WWTPs.

The term "day" as used herein shall mean calendar days.  If a submission is due on a weekend or a federal holiday, the submission date will be the next business day.

"Surface Waters" shall mean waters of the United States as defined by 40 C.F.R. § 122.2.

"Spills" shall mean Dry Weather Spills from CCH's Collection

6

EXHIBIT 3
25118

System that reach Surface Waters or Storm Drains.  "Dry Weather Spills" shall mean any overflows from CCH's Collection System that are caused by any reason other than infiltration and inflow (I&I) related to heavy rains.  Examples of Spills include but are not limited to, overflows caused by grease blockage, root blockage, sewer line collapse, power outage or pump station malfunction.

"Storm Drain" shall mean pipes, conduits, or channels, excluding street gutters, used for conveying storm and surface runoff from rainstorms.

VI.   PRETREATMENT COMPLIANCE PROGRAM

    A.   Implementation of CCH Pretreatment Program

        1.   CCH shall fully and effectively implement and enforce, throughout its entire service area, the provisions of 40 C.F.R. Part 403, the CCH Pretreatment Program and any pretreatment requirements that have been, or are in the future, incorporated in its NPDES permits.

        2.   CCH's failure to fully and timely implement any provisions of 40 C.F.R. Part 403, the CCH Pretreatment Program or any pretreatment requirements in its NPDES Permits, shall constitute a violation of this Consent Decree.

        3.   CCH shall review and implement its Pretreatment Program as follows and in accordance with the schedule identified in Exhibit A attached to this Consent Decree:

    B.   Island-Wide Industrial User Survey and Database

7

EXHIBIT 3

25119

CCH shall update the Industrial User (IU) inventory compiled pursuant to 40 C.F.R. § 403.8(f)(6), at a minimum, on an annual basis in accordance with its approved IU survey plan.

C. **Industrial Wastewater Discharge Permits**

1.    CCH shall ensure that no Industrial Wastewater Discharge Permits (IWDPs) are issued with variances from limits in either applicable national categorical pretreatment standards or local limits. CCH shall immediately initiate a review of all existing IWDPs to eliminate all such variances as soon as practicable.

2.    CCH shall not include compliance schedules in any existing or new IWDPs that extend the deadline for compliance with national categorical pretreatment standards or any pretreatment standard in 40 C.F.R. § 403.5 that is currently effective.

3.    Within 90 days after issuance of an IWDP to any newly-identified SIU, CCH shall verify through its own inspection, sampling and analysis, that the SIU has attained compliance with all applicable pretreatment standards.

D. **Compliance Monitoring**

1.    In the period from July 1, 1993 to June 30, 1994, and annually thereafter, CCH shall inspect all SIUs, including those newly identified through the IU survey, complete an inspection report for each SIU, and place that report in the respective file for each SIU within 45 days of the date of inspection. Each inspection shall include, at a minimum, visual inspections of all industrial processes that generate a wastewater discharge, a

8

EXHIBIT 3
25120

visual review of all treatment, sampling, and laboratory equipment, a review of plant records, and a review of all outfalls and sampling points. In the event sampling and laboratory testing is required to determine whether an IU is an SIU, and if such testing may prevent completion of the report within the 45-day period, CCH shall notify EPA and identify a schedule subject to EPA approval for completion of the report.

2.    CCH shall obtain an initial sample of the process wastewater discharge of any newly identified SIUs and analyze it for all applicable categorical pretreatment standards, local limits, and prohibitive discharge limits set forth in 40 C.F.R. § 403.5. Annually, CCH shall sample and analyze the process wastewater discharge of each permitted SIU for all applicable categorical pretreatment standards plus those parameters with established local limits and prohibitive discharge limits set forth in 40 C.F.R. § 403.5 that are reasonably expected to be present in the SIU's wastewater discharge.

3.    CCH shall confirm once annually during an SIU inspection that the SIU sample location provides a representative sample and flow of each regulated process stream and satisfies any requirements imposed by the categorical pretreatment standards applicable to such SIU. For those SIUs for which sampling at the end of process is not feasible and where more than one categorical regulated process stream exists, CCH shall apply the combined wastestream formula set forth in 40 C.F.R. § 403.6(e) to determine appropriate downstream limits for each process flow.

9

EXHIBIT 3

25121

4.   CCH shall ensure that all of its SIUs perform appropriate sampling and analysis techniques and accurate reporting in accordance with 40 C.F.R. Part 136 and 40 C.F.R. § 403.12 respectively, or CCH shall take appropriate enforcement actions against the SIUs for noncompliance with such requirements.

E.    Development of Technically-Based Local Limits

1.   CCH shall develop technically-based local limits as required in 40 C.F.R. § 403.5(c)(1), or demonstrate that they are not necessary as provided in 40 C.F.R. § 403.8(f)(4).  The development of technically-based local limits shall be performed for each WWTP in accordance with the schedule in Exhibit A and with the guidelines in EPA's "Guidance Manual on the Development and Implementation of Local Discharge Limitations under the Pretreatment Program" (December 1987, supplemented in May 1991). The local limits development shall include the following: sampling and analysis, identification of pollutants of concern, determination of maximum allowable headwork loadings, development of allocation methodology, and proposed local limit revisions.

2.   CCH shall analyze the influent, effluent and sludge at each of its WWTPs for the following pollutants:  all priority pollutants identified under Section 307(a) of the Act, 33 U.S.C. § 1317(a), pollutants that are regulated by its existing local limits, pollutants under national categorical pretreatment standards that apply to its IUs, and all other pollutants that are regulated by CCH's NPDES permits.  CCH shall sample and assess the impacts of these pollutants on its WWTPs, sludge

10

EXHIBIT 3
25122

disposal options and receiving waters.

3. CCH shall conduct flow-proportional, composite sampling of the effluent and influent at each WWTP for all of the pollutants described in Paragraph 2 above, as well as composite sampling of the sludge at each WWTP, with a minimum of twelve (12) discrete samples taken at equal time intervals over the 24-hour period. CCH shall sample and analyze the sludge for the same pollutants as the influent and effluent sampling and analysis. Furthermore, CCH shall establish sample points in its collection system that will allow CCH to sample residential domestic wastewater within the collection system to determine the background concentration and loading from domestic sources.

4. In the event that a pollutant scan indicates the presence of any pollutants described in Paragraph 2 above, CCH shall conduct follow-up investigations, which may include sampling of that pollutant, to determine whether a local limit for such pollutant is necessary. CCH shall conduct a headwork analysis to determine the maximum allowable influent loadings that will ensure that CCH can meet the requirements of 40 C.F.R. § 403.5.

5. By July 31, 1994, CCH shall submit a report to EPA and to DOH of the maximum allowable headwork loadings to its WWTPs that will still allow the WWTP to meet the effluent limitations contained in its NPDES Permits. This report shall:

a. Include calculations of the treatment plant removal efficiencies and provide sufficient documentation of the

11

EXHIBIT 3

25123

residential contribution to justify the amount of loading that is available to the industrial and commercial users;

   b. Describe any actions that will be taken to lower contributions from domestic or water supply sources; and

   c. Include the calculation of the loading that remains for allocation to the non-domestic (both commercial and industrial) sources.

   6. By July 31, 1994, CCH shall submit a report to EPA and to DOH describing the proposed method for determining loading allocation for each non-domestic user.  The allocation may include an analysis of methods such as industrial contributory limits, mass-based limits, concentration limits, required percentage reduction of pollutants, etc.  CCH shall provide data on the industrial and commercial users to justify the methodology of required reductions.

   7. By July 31, 1994, CCH shall submit a report to EPA for review and concurrence, and to DOH for review and approval, proposing revisions to the local limits and the timeline for compliance with the limits by Industrial Users, including any commercial users.

   8. In the event that local limits revisions are necessary, CCH shall enact a sewer ordinance containing the revised local limits no later than 150 days following EPA concurrence and DOH approval of the revised local limits.

   9. In the event that the local limits are revised, CCH shall notify, in writing, each industrial user of the revised

EXHIBIT 3
25124

local limits within 30 days following CCH's enactment of the amended sewer ordinance.

10. Within three (3) months of enacting the amended sewer ordinance that contains the revised local limits, CCH shall issue, reissue or modify the Industrial Wastewater Discharge Permit for each SIU to include the revised local limits. CCH shall establish an enforceable compliance schedule for each SIU that cannot comply with the revised local limits within 3 months of notification of the local limits. The compliance schedule shall require the SIU to achieve final compliance with all revised local limits as soon as practicable.

F.   Enforcement Response Plan

CCH shall fully implement its Enforcement Response Plan (ERP), as reviewed by EPA, in accordance with 40 C.F.R. § 403.8(f)(5).

G.   Adequate Legal Authority in Sewer Ordinance

By December 31, 1994, CCH shall enact a revised Sewer Ordinance consistent with the proposed Sewer Ordinance that has been reviewed by EPA and approved by DOH.

H.   Program Staffing and Resources

1. Within 30 days of the date of entry of the Consent Decree, CCH shall have committed sufficient resources and qualified staff to fully implement its Pretreatment Program and comply with this Consent Decree.

2. CCH shall provide regular training to its pre-treatment staff on regulations and program implementation suffi-

13

EXHIBIT 3
25125

cient to fully implement its Pretreatment Program and comply with
this Consent Decree.

I.  <u>Compliance Certifications</u>

     1.  By December 31, 1994, CCH shall submit a certifica-
tion to EPA and DOH that it has reviewed its existing approved
Pretreatment Program and its Sewer Ordinance to ensure that it is
fully consistent with 40 C.F.R. Part 403.

     2.  By December 31, 1994, CCH shall submit a certifica-
tion to EPA and DOH stating either 1) that as to all SIUs
identified as of December 31, 1993, none is in significant
noncompliance ("SNC," as defined at 40 C.F.R. §403.8(f)(2)(vii));
or 2) for any SIU that is in SNC, that an appropriate enforcement
action has been taken in accordance with the ERP and that the SIU
has been required to achieve full compliance as soon as
practicable in accordance with the ERP.  CCH shall base its
certification on monitoring data collected by CCH and the IUs
within the previous 6 months.

     3.  By December 31, 1994, CCH shall submit a certifica-
tion to EPA and DOH stating that all SIUs that were identified as
of December 31, 1993, and that are subject to national cate-
gorical pretreatment standards have:  (a) installed treatment
equipment necessary to comply with all applicable categorical
pretreatment standards (or any more stringent local limits) and
are properly operating such equipment; and (b) have achieved
"full compliance" with these pretreatment standards.

     4.  For purposes of this subsection, "full compliance"

14

EXHIBIT 3
25126

means that the SIU has demonstrated three consecutive months of compliance with all applicable pretreatment standards and report-ing requirements, with no pretreatment violations during this period, as evidenced by sampling data collected by CCH during this period to confirm compliance.

     5.   The certifications required by this subsection may be submitted in parts, provided certifications covering all SIUs are completed by the dates specified.

     6.   If EPA disagrees with CCH's certifications, EPA may require CCH to undertake additional work in order to come into full compliance with its Pretreatment Program and this Decree.

VII.  COLLECTION SYSTEM COMPLIANCE PROGRAM

    A.  Reduction of Spills from Collection System

     1.   CCH shall use its best efforts to prevent, to the maximum extent reasonably possible, Collection System Spills in terms of frequencies, duration and volume. At a minimum, CCH shall improve the allocation and use of its maintenance crew and equipment so that CCH can respond to reported Spills in a timely manner, thereby preventing, containing, or minimizing Spills.

     2.   Within 30 days of the date of entry of the Consent Decree, CCH shall submit to EPA for review and approval its annual goals for 1994 through 1999 for reduction of Spill fre-quencies and/or volumes from its Collection System. These projected annual goals for reduction of Spill frequencies and/or volumes will be in effect beginning January 1, 1994, and CCH will use its best efforts to meet these goals. These goals will be

15

EXHIBIT 3

25127

reviewed annually and may be adjusted to reflect improvements in
CCH's Collection System preventive maintenance efforts.

       3.   CCH remains liable under the Act for <u>any</u> unautho-
rized discharges from its Collection System, and the United
States and the State retain all authority, judicial and adminis-
trative, to seek injunctive relief and/or penalties pursuant to
federal and State laws concerning such unauthorized discharges.
Discharges that meet the definition of bypass under 40 C.F.R. §
122.41 as well as discharges excused under Section XIII (Force
Majeure) of this Consent Decree are not unauthorized discharges
for the purpose of this Consent Decree.

       4.   <u>Spill Reduction Action Plan</u>:  By December 31,
1995, CCH shall submit to DOH for review and to EPA for review
and approval, a long-term comprehensive Spill Reduction Action
Plan (SRAP) that is specifically aimed at reducing the number and
volume of Spills from its Collection System to the maximum extent
practicable.  Upon approval of the plan by EPA, CCH shall
implement the plan in accordance with the approved schedule.  At
a minimum, the SRAP shall include the following items:

       a.  A Preventive Maintenance Plan for the entire
CCH Collection System which shall have the following:

       i.  Schedules for preventive maintenance
activities and a system for setting priorities for sewer line
inspections and cleaning based on the history of Spills and the
incidence of problems with grease and root blockages in a partic-
ular sewer line;

16

EXHIBIT 3

25128

    ii. Schedules for surveillance of all sewer lines including one or more of the following methods, as appropriate: surface inspections, direct visual inspections, closed circuit television inspections and/or smoke testing;

    iii. Flow velocity observations, as necessary, for the purpose of maintenance planning;

    iv. Schedules for regular cleaning of all sewer lines using appropriate equipment on an appropriate frequency, based on the data used in analyzing and developing the Preventive Maintenance Plan;

    v. Schedules for inspection, flushing and/or cleaning of the entire Collection System.  The SRAP shall identify an appropriate schedule and frequency for cleaning and/or flushing the entire Collection System;

    vi. Procedures for responding to and containing Spills and minimizing Spill volume;

    vii. Procedures for performing routine sewer line repairs to prevent Spills due to improper pipe bedding, line loads, earth movement, root growth damage, openings in sewer line and faulty building sewer connections;

    viii. Procedures for identifying and correcting any other system deficiencies, such as misaligned pipes, grade deviations, solids build-up, hydrogen sulfide gas generation, pipe deformation, hydraulic overloads, misaligned or damaged manhole covers and manholes;

    ix. Procedures for conducting grease-trap

17

EXHIBIT 3

inspections at each IU with grease traps at least once every six month period and, where necessary, procedures for taking enforcement action against such non-complying IUs;

        x.   Use of maps of the sewer system with numbered manholes for easy reference in locating Spills and performing corrective maintenance; and

        xi.  Procedures for identifying and replacing pipelines and facilities that are reaching the end of their useful lives, including addressing the need for replacement of all sewer lines in the Facility Plans developed by CCH in the future.

        b.  An evaluation of CCH's Collection System staff, listing the existing staff and their functions and CCH's plans for meeting the staffing demands of each element of the SRAP as enumerated in Paragraph 4.a above;

        c.  A system for monitoring the inventory of available spare components for CCH's Collection System equipment, including pump station components, and a plan and schedule for normal replacement of these components; and

        d.  An analysis of available data concerning CCH's Collection System, including the Spills from the Collection System for the two-year period covering October 1, 1991 to September 30, 1993, the causes of these Spills and a schedule for future preventive maintenance work to prevent these Spills from recurring.

        5.   Interim Preventive Maintenance Activities:  Until

18

EXHIBIT 3

CCH commences implementation of the SRAP, CCH shall perform, at a minimum, the following interim preventive maintenance activities:

      a. Using the list of Collection System Spills from the four quarters prior to the entry of the Consent Decree, conduct inspections as well as flushing and/or cleaning, where necessary, in areas and segments of sewer lines where there has been a history of Spills. During the cleaning and/or flushing of these lines, if the crew detects or suspects a problem at the sewer line, CCH shall take the necessary corrective action as soon as possible;

      b. Conduct inspection, flushing and/or cleaning of at least 300 miles of sewer line per year. If necessary, CCH shall schedule its existing maintenance crew for overtime work during weekends and/or contract out to private firms some of the sewer line cleaning to accomplish these cleaning requirements;

      c. Conduct surface and direct visual inspections of sewer lines during routine cleaning. All crews shall report inspections of lines where Spills are caused primarily by grease and/or roots blockage;

      d. Conduct grease-trap inspections at each IU with grease traps at least once every six month period and, where necessary, take enforcement actions against such non-complying IUs; and

      e. Provide maintenance crews with copies of its sewer system maps with numbered manholes.

    B. Collection System and Pump Station Personnel Training

19

EXHIBIT 3
25131

1.    Annually, at a minimum, CCH shall conduct regular training of its Collection System and pump station personnel on the following:

a.    operation of pump stations and optimization of pump operation;

b.    use of the bypass/overflow/spill report;

c.    measurement and estimation of the rates of flow or total volume of wastewater released;

d.    cleanup and remedial measures following a Spill;

e.    posting of notices of Spills for the protection of public health;

f.    monitoring and collecting samples for fecal coliform bacteria and other human health related concerns; and

g.    performing routine and on-call grease trap inspections.

C.    Information Management

1. By December 31, 1995, CCH shall have completed the installation and shall have begun use of a computerized Wastewater Information Management System (WIMS) as described in detail below. This system shall provide the ability to maintain both graphical and descriptive data of the CCH sewer system, track all major maintenance activities and allow the evaluation of the data collected, thereby assisting CCH in evaluating the needs and problems of its collection system. By the deadline stated above, CCH shall have a minimum of four (4) staffing

20

EXHIBIT 3
25132

positions available to support this system and shall have
completed the application, development and initial database for
the modules of the system described in this paragraph.  By August
31, 1994, CCH shall have ordered the computer hardware consisting
of work stations, personal computers, printers, and network
appurtenances and software consisting of Arc/Info, Oracle RDMS,
network, work order management, Windows emulation, and word
processing to support a minimum of twenty-seven (27) users on
this system which CCH shall install as soon as possible after
receipt.  The following modules shall be installed and their use
shall have begun by August 31, 1994:

   a. The Sewer Information Maintenance System
(SIMS) module will be developed to update the CCH Geographic
Information System (GIS) sewer coverage, thereby maintaining both
graphical and descriptive data of the CCH sewer system.  As new
sewer construction is completed or corrections are identified by
maintenance crews, the drawings received will be entered into the
information management system.  Information regarding sewer
length, size, material, manhole inverts, lateral location,
lateral size, lateral length, installation date, and installation
project name will be entered into the GIS sewer coverage.

   b. The Collection System Maintenance System
(CSMS) module will be developed to provide tracking capabilities
of the major maintenance activities such as television inspec-
tions, line flushing, construction repairs, and lateral installa-
tions.  Daily records of these activities will be inputted and

21

EXHIBIT 3
25133

stored in this subsystem for later evaluation.  This subsystem will also include the ability to generate work orders and track costs for scheduled and emergency maintenance activities.

c.    The General Applications (GA) module will consist of a collection of tools to query the data collected by maintenance personnel and evaluate the data with respect to the spatial distribution of the sewer system, and produce reports and plots of the results of the analysis.  These analyses can be used to adjust preventive maintenance schedules and program any necessary line rehabilitation projects.

2.    By December 31, 1995, CCH shall complete the development of the Sewer Connection Application System (SCAS) and the Sewer Flow Analysis System (SFAS) modules as described below:

a.    The SFAS will provide the calculation tools to determine the approval or denial of sewer connection requests.

b.    The SCAS will be developed to process CCH sewer connection application forms, check the results of flow analysis performed by SFAS for approval or denial of connection requests, and issue connection permits and receipts for approved applications.

3.    Until the WIMS comes on line, CCH shall use an interim data system to track the following information regarding all Spills from its Collection System:  date(s) and volume of Spill; size and location of the sewer line involved in the Spill; history of the problems with that particular sewer line; a summary of the preventive maintenance at that sewer line since

22

EXHIBIT 3

July 1, 1992; and, any information about the cause of the Spill that could be useful in preventing a recurrence of the problem.

D. <u>Pump Station Operation</u>

1.   Within 60 days of the date of entry of this Consent Decree, and annually thereafter on January 31st of each year, the City shall submit to DOH and EPA a report regarding the status of the operation and maintenance of all pump stations. This report shall be submitted as part of the progress report required in Section IX of this Decree, and it shall list any pump station breakdowns that resulted in unauthorized discharges to Surface Waters in the prior year as well as actions the City has taken or will take to prevent similar occurrences in the future.

E.   <u>Program for Sewer Rehabilitation and Minimization of</u>
<u>Infiltration and Inflow</u>

1.   To prevent and/or reduce the frequency and volume of dry weather and wet weather spills from its Collection System and wet weather bypasses at Sewer Pump Stations and WWTPs, CCH shall undertake rehabilitation of its entire Collection System; institute corrective measures to minimize infiltration and inflow ("I&I"); and provide adequate hydraulic capacity for its system. To achieve this program for sewer rehabilitation and minimization of I&I, CCH shall prepare a Long-Term Sewer Rehabilitation and I&I Minimization Plan (Sewer I/I Plan) in accordance with the guidelines and the performance standards described in the EPA Handbook "Sewer System Infrastructure Analysis and Rehabilitation," (EPA/625/6-91/030 October 1991) hereinafter called "the

23

EXHIBIT 3
25135

EPA Handbook." The Sewer I/I Plan shall be developed and implemented in accordance with the phasing and schedule shown in Exhibit B and described as follows:

  2. Sewer I/I Plan Phases and Schedule:

    a. CCH shall conduct the assessment of the infiltration and inflow problem and shall develop and implement the Long Term Sewer I/I Plan in the following phases:

      i. Phase I: I&I Assessment Phase

      ii. Phase II: Pilot Study Phase

      iii. Phase III: Rehabilitation Program

    b. Phase I (I&I Assessment Phase) shall be conducted in three stages as follows:

      i. Stage I:  Interim I&I Assessment

      ii. Stage II: Preliminary Cost-Effectiveness Assessment

      iii. Stage III: Final Sewer I/I Plan

This phase, in Stages I and II, shall also involve hydraulic capacity and structural integrity assessments of the Collection System.

    c. In Phase II (Pilot Study Phase), CCH shall undertake a pilot study covering one or more basins as appropriate.  The pilot study shall involve rehabilitating all main sewer lines under the ownership of CCH within the selected pilot study basins to determine the cost-effectiveness of the various methods and techniques as may be currently in general use for rehabilitating sewer lines.

24

EXHIBIT 3
25136

d.    In Phase III (Rehabilitation Program), CCH shall develop and undertake a 20-year rehabilitation program covering the remainder of its island-wide collection system, based on the findings, conclusions and cost-effectiveness evaluations resulting from Phases I and II.

e.    The schedule for completion of the phases shall be as follows:

| Phase and Activity | Completion Deadline |
| --- | --- |
| Phase I: I&I Assessment Reports | |
| Interim Assessment | October 1, 1994 |
| Preliminary Cost-Effectiveness | December 31, 1995 |
| Final Sewer I/I Plan | December 31, 1999 |
| Phase II: Pilot Study | December 31, 1998 |
| Phase III: Rehabilitation Program | December 31, 2019 |

3.    Deliverables:  The work to be accomplished within each of the phases and the deliverables that will be submitted by CCH to EPA for review and approval are as follows:

a.    Phase I:  I&I Assessment

i.    Interim I&I Assessment:  By October 1, 1994, CCH shall submit a report that includes:

(a)    A description of the flow monitoring program conducted during the winter months of November 1992 to March 1993, including a delineation of the collection system basins that were monitored;

(b)    A description and characterization of the extent and impact of I&I problems for each collection

25

EXHIBIT 3

system basin identified above, based on the available flow
monitoring data; .

    (c) An interim hydraulic capacity
assessment which shall consist of interim dynamic modeling of the
larger collection system sewer lines using the flow monitoring
data obtained as of the winter season 1992-1993.  (This hydraulic
capacity assessment shall not include capacity assessments of
pump stations and treatment plants.);

    (d) An interim structural integrity
assessment of selected sewer lines in the collection systems
based on limited field inspections performed during 1993; and

    (e) Identification of projects included
by CCH in its Fiscal Year 1994-1995 Capital Improvements Program
(CIP) and Operating Budgets which relate to the conclusions of
the interim hydraulic capacity and structural integrity
assessments and which CCH will implement.  CCH may identify other
projects that will be included in later, but not necessarily
specific, fiscal year budgets.

    ii. <u>Preliminary Cost-Effectiveness</u>
<u>Assessment:</u> By December 31, 1995, CCH shall submit a report that
includes:

    (a) a description of the flow monitoring
program conducted as of March 31, 1995, including delineation of
all collection system basins monitored as of that date;

    (b) a description and characterization
of the extent and impact of I&I problems for each collection

26

EXHIBIT 3
25138

system basin, based on the flow monitoring data collected as of March 31, 1995;

       (c) identification of "problem" basins which shall be programmed, in accordance with the EPA Handbook, for future Sewer System Evaluation Surveys (SSES) and identification of "non-problem" basins which shall be eliminated from further I&I investigations;

       (d) a preliminary cost-effectiveness analysis for all "problem" basins identified as described above conducted in accordance with the EPA Handbook to tentatively identify the most cost effective method or methods for addressing excessive I&I conditions;

       (e) an assessment of the hydraulic capacity of pump stations, main sewer lines and treatment plants in each collection system basin which shall include: (1) an analysis of groundwater intrusion and exfiltration; (2) dry weather and wet weather flow estimates using the flow monitoring data available as of March 31, 1995; and (3) identification of operational problems such as surcharges and bypasses in the collection system.

       (f)  An assessment of the structural integrity of those collection system sewer lines which will be investigated in 1994.  The assessment shall: (1) report the results of corrosion studies; and (2) make recommendations for replacing or rehabilitating sewer lines which are identified as in need of structural repair, rehabilitation or replacement.

27

EXHIBIT 3
25139

(g) Identification of priorities for the sewers to be rehabilitated, as a result of structural assessments, including identification of projects for funding in the budgets for each fiscal year from July 1, 1996 to June 30, 2001, which CCH will implement once funded.

iii. <u>Final Sewer I/I Plan</u>:  By December 31, 1999, CCH shall submit a Final Sewer I/I Plan that includes:

(a)  Flow monitoring to determine the resulting conditions in the basin after the rehabilitation work required by the Pilot Study in Subsection b (Phase II: Pilot Study) is completed;

(b)  An analysis of the flow data to determine the extent of I&I reduction in the pilot study basin;

(c)  An assessment of the potential for extending the rehabilitation work to other basins including the need for rehabilitating private sewer laterals, if appropriate;

(d)  A plan for rehabilitating the sewer collection systems over a 20-year period based on a final cost effectiveness assessment of the available techniques for rehabilitation which have been evaluated as a result of the Pilot Study Phase;

(e)  Identification of an appropriate "design storm" in terms of exceedance frequency and magnitude for the purpose of determining the level of allowable infiltration and inflow in each basin;

(f)  Standards for the allowable

28

EXHIBIT 3

infiltration and inflow in each basin in units of gallons per capita per day or gallons per acre, as appropriate;

(g)  Prioritization of the collection system basins for the 20-year rehabilitation program based on the extent of I&I and the frequency and volume of spills;

(h)  Detailed project descriptions for the rehabilitation work that needs to be done in each "problem" collection basin including:  (1) project name or facility identifier; (2) length of sewer or description of facility; (3) type of rehabilitation work including technical description of rehabilitation method; (4) project timeframe for completion of construction; and (5) engineering and construction cost estimates.

(i)  Five-year milestones for completion of the entire twenty-year sewer rehabilitation program.  These milestones shall be selected to ensure that the work is conducted in a priority order throughout the twenty-year period.

b.  Phase II:  Pilot Study - By December 31, 1998, CCH shall submit a plan for conducting a pilot study in one or more collection system basins selected on the basis of the flow monitoring results from 1992-1993.  The pilot study shall:

(1)  Perform flow monitoring to determine the conditions in the basin prior to the rehabilitation work;

(2) Investigate the feasibility of using various techniques as may be generally in use for rehabilitating and correcting I/I problems; and

29

EXHIBIT 3

25141

(3) Undertake complete rehabilitation of all main sewer lines and those portions of laterals under the ownership of CCH within the pilot study basin.

c.    Phase III:  Rehabilitation Program - CCH shall undertake a 20-year rehabilitation program to be completed by December 31, 2019, based on the Final Sewer I/I Plan, as approved by EPA, and in accordance with the priorities and schedules presented in the approved plan.  The rehabilitation program priorities and project schedules shall be reviewed annually and all revisions shall be submitted to EPA for review and approval.

F.    Quarterly Spill and Bypass Reports

Commencing with the first progress report required by Section IX of this Decree, and as part of each progress report thereafter, CCH shall include details of all Collection System spills (dry and wet weather) and WWTP emergency bypasses caused by I&I that occurred in the previous quarter.  For each spill and bypass reported therein, CCH shall provide the following information, if available:

1.    the remedial actions it took to prevent a recurrence of such a spill;

2.    the last date the sewer line was cleaned;

3.    the time CCH received notice of the spill or bypass;

4.    the actions taken to prevent the discharge from reaching surface waters;

30

EXHIBIT 3
25142

5. the history of spills in that particular line; and

6. plans for additional actions to decrease the frequency and/or volume of spills in the area in the future, including plans for increasing preventive maintenance at the spill site, increasing grease trap inspections in the affected areas where appropriate (in cases where the spills are related to chronic grease blockages), and short-term and long-term rehabilitation of any damaged area of the sewer line.

VIII.  SUPPLEMENTAL ENVIRONMENTAL PROJECTS

A.  CCH's Commitment to Effluent and Sludge Reuse Projects

1.  It has been CCH's policy to make advancements in the areas of effluent and sludge reuse. CCH's interest in reuse projects is reflected by its commitment to these Supplemental Environmental Projects (SEPs) as provided herein in this Consent Decree.

2.  CCH is committed to the undertaking of beneficial and feasible effluent and sludge reuse projects and, to this end, commits to spend the following amounts for each project under the conditions provided for in this Consent Decree:

a.  For Effluent Reuse, CCH commits to spend at least $20 million, unless EPA agrees otherwise;

b.  For Sludge Reuse, CCH commits to spend at least $10 million, unless EPA agrees otherwise.

31

EXHIBIT 3

25143

3.    CCH's commitments provided in this Section will in no manner restrict or prohibit any further actions CCH chooses to take in the area of reuse, so long as it does not conflict with the provisions herein.

B.    EPA's and DOH's Acceptance of CCH's Proposals for Reuse Projects

EPA and DOH accept CCH's voluntary proposals toward the undertaking of environmentally beneficial projects, which are now incorporated into this Consent Decree.

C.    Joint Statement of Commitment

EPA, DOH and CCH jointly commit herein to mutually work in good faith towards the feasible undertaking of these supplemental environmental projects.  To this end, the parties commit to:

1.    Communicate regularly on at least a quarterly basis on the status of the projects; and

2.    Expedite decision-making and review and approval processes for the SEPs.

D.    Sludge Reuse SEP

1.    EPA, DOH and CCH recognize that currently there are several methods for beneficial sludge reuse.  For purposes of this SEP, CCH agrees to implement one or more of the following methods toward a SEP that shall beneficially reuse sludge: recycling sludge into compost and marketing as a soil conditioner; agricultural use; energy production; conversion to fuel; or other uses approved by EPA.  CCH agrees that the reuse of sludge as landfill cover shall be considered a secondary

32

EXHIBIT 3

method for beneficial reuse and will resort to this secondary reuse method only if all other methods are not feasible.

     2.    In order for CCH to fulfill this commitment, CCH is currently undertaking an Invitation for Bids for a Beneficial Reuse Project and agrees to meet the following schedule should an award be made as a result of the Invitation for Bids:

     a.    Two and a half (2.5) dry tons of municipal sludge per day by December 31, 1995;

     b.    An additional two and half (2.5) dry tons of municipal sludge per day by December 31, 1996; and

     c.    At least ten (10) dry tons of municipal sludge per day from January 1, 1998 until December 31, 2005.

     3.    Submittals of Beneficial Sludge Reuse Proposals:

     EPA acknowledges that CCH is currently inviting bids for a Beneficial Sludge Reuse Project to be undertaken by a privately-owned company with financial commitment from CCH. CCH shall send to EPA via telefax a summary of the proposal it plans to accept, indicating the time by which EPA's approval or disapproval must be received. If EPA fails to approve the proposal within the time specified in CCH's telefax, the proposal shall be deemed approved by EPA. In the event CCH submits data or information subject to any confidentiality restrictions imposed by the selected proposer with respect to any proprietary data and information, and the information is subject to confidentiality pursuant to 40 C.F.R. §§ 2.201 et seq., EPA agrees to keep the information confidential in accordance with 40

33

EXHIBIT 3
25145

C.F.R. §§2.201 et seq. EPA also agrees to keep the content of the proposal confidential until CCH awards the contract.

    4.    Procedure if No Contract is Awarded

        a.    In the event that the current Invitation for Bids does not result in an award for a Beneficial Sludge Reuse project and if no protests are filed, within the time required by City regulations for filing protests, CCH will notify EPA of its intention not to award a contract. Within ninety (90) days of such notice, CCH agrees to submit a plan and a schedule for undertaking its own project. CCH agrees that the plan will investigate the most economically viable and ecologically beneficial reuse project. The plan shall identify an appropriate course of action to achieve feasible beneficial reuse of sludge. CCH agrees to conduct a one year investigation of:

        i. the feasibility of various treatment/reuse projects for CCH sludge, including direct land application of "Class B" sludge, composting and marketing of "Class A" sludge, alkali treatment and reuse, and other heat-treatment and other treatment methods;

        ii. the existing and potential market for treated sludge, including the potential for CCH and the State to use sludge products, and the potential market for landscaping, agriculture, golf courses, etc.; and

        iii. the costs versus benefits of various reuse options, taking into account the future landfill costs and capacities, the capital and operational costs of incineration,

34

EXHIBIT 3

25146

and the costs and relative benefits and risks of various reuse options as compared to landfilling or incineration.

b. CCH agrees to submit the final report to EPA for approval in accordance with the schedule submitted pursuant to paragraph a above. The report shall include conclusions, recommendations, and a plan and schedule for implementation of the sludge reuse project. The report shall also identify any revisions to the sludge reuse commitment schedule outlined in Paragraph D.2 of this Section, provided, however, CCH agrees to make all practicable efforts to meet the volume commitment set forth in Paragraph D.2. In addition, this report shall include identification of, and a statement of qualifications for, the supervising contractor or engineer selected by CCH to perform the proposed SEP.

c. Upon EPA's approval of the report, CCH agrees to implement the SEP in accordance with the approved plan and schedule.

E. **Effluent Reuse SEP**

1. CCH agrees to implement a SEP that shall beneficially reuse effluent by one or more of the following methods:

a. **Surface Reuse**

Application of treated wastewater effluent for decorative impoundments, irrigating park land, golf courses and

35

EXHIBIT 3

other large landscapes as well as agricultural fields, cooling industrial processes, and other uses conceptually approved by DOH and EPA.

      b.  Subsurface Reuse

      Recharging treated wastewater effluent into local groundwater aquifers. Use of treated wastewater by recharging groundwater aquifers may be considered a beneficial reuse if the quality of the treated wastewater does not degrade the existing quality and uses of the aquifer, and CCH can demonstrate to DOH and EPA that the treated wastewater being injected into these aquifers will be beneficially used. Any groundwater recharge of treated effluent must comply with State and federal health regulations.

      2.  CCH agrees to beneficially reuse wastewater under the following schedule:

      a.  Two (2) million gallons per day (mgd) of municipal effluent by July 1, 1998;

      b.  An additional three (3) mgd of municipal effluent by June 30, 1999;

      c.  At least ten (10) mgd of municipal effluent per day by from July 1, 2001 until at least July 1, 2011.

      3.  By July 1, 1995, CCH agrees to prepare a plan and schedule for implementation of the effluent reuse SEP that shall achieve the schedule set forth in paragraph E.2 of this Section. The plan shall also include identification of, and a statement of qualifications for, the supervising contractor or engineer

36

EXHIBIT 3

25148

selected by CCH to perform the proposed SEP. CCH agrees to submit this plan to EPA for approval by July 1, 1995.

4. Upon approval of the plan, CCH agrees to implement the SEP in accordance with the approved plan and schedule.

F.    Alternative SEPs

1. If, after making all good faith efforts necessary, CCH determines that it is infeasible to achieve the maximum commitment for sludge reuse or effluent reuse required by Paragraphs D.2 or D.4 or E.2 above, but that reuse below the required volume is feasible, the amount of sludge or effluent reuse may be reduced upon mutual concurrence. Unless EPA agrees otherwise, CCH agrees to implement an alternative SEP.

2. If, after making all good faith efforts necessary, CCH determines that the sludge reuse or effluent reuse SEP is wholly infeasible, CCH may petition EPA to implement an alternative SEP upon concurrence by EPA.

3. In developing an alternative SEP, CCH agrees to describe the efforts it has made to implement the initial SEP and the basis for the determination that the specified reuse levels or the SEP cannot be feasibly met. Within 60 days of EPA's written concurrence that it is infeasible for CCH to achieve the reuse schedule set forth in Paragraphs D.2 or D.4 or E.2 above, or that the initial SEP is infeasible altogether, CCH agrees to submit a detailed proposal for one or more alternative SEP(s) to EPA unless EPA agrees otherwise.

a.    CCH agrees to propose alternative SEP(s) that

37

EXHIBIT 3
25149

cost at least as much as the cost avoided by CCH being unable to fully implement the original SEP.

   b.  The alternative SEP(s) must satisfy the criteria for such projects set forth in EPA's SEP policy ("Policy on the Use of Supplemental Enforcement Projects in EPA Settlements," February 2, 1991) and/or other applicable policy or guidance documents identified by EPA.

   4.  CCH agrees that the proposal for each alternative SEP will include:  (a) a conceptual technical description of the proposed SEP, together with any relevant documents to explain the SEP; (b) a statement of the specific objectives of the proposed SEP and how such project will satisfy the requirements of EPA's SEP policy; (c) a preliminary budget for both completion and operation of the SEP; and (d) a conceptual implementation plan and schedule for completion of the proposed SEP.

   5.  EPA agrees to review any alternative SEP proposal(s) submitted pursuant to this Subsection of the Decree and inform CCH in writing of its approval, conditional approval (subject to modification by CCH of the proposal in accordance with EPA's comments), or disapproval of the SEP.  If EPA disapproves or conditionally approves an alternative SEP subject to modification by CCH, CCH agrees to either modify the alternative SEP in accordance with EPA's comments and resubmit it for EPA approval, or propose a substitute alternative SEP in place of the disapproved alternative SEP within sixty (60) days from its receipt of EPA's written disapproval or conditional

38

EXHIBIT 3

approval. If CCH's resubmittal of the alternative SEP or new proposal for a substitute alternative SEP is not approved as submitted, EPA may allow CCH to make a resubmittal or reproposal. Upon receipt of notice that the original resubmittal or reproposal (or subsequent resubmittal or proposal, if allowed) has also been disapproved, CCH agrees to pay the penalty(ies) set forth in Subsection I.2, below.

6. CCH agrees that EPA's decision to approve, disapprove, or to conditionally approve (subject to modification by CCH in accordance with EPA's comments) a proposed alternative SEP shall not be subject to Section XIV (Dispute Resolution) of this Consent Decree and shall not be subject to judicial review.

7. Upon receipt of written notice of EPA's approval of any proposed alternative SEP(s), CCH agrees to implement the approved SEP in accordance with the schedule in the approved SEP.

8. Each alternative SEP proposed by CCH and approved by EPA shall be set forth by the parties in a proposed agreed order modifying this Consent Decree which shall be submitted for approval by the Court and thereupon will become enforceable under this Consent Decree.

G. <u>Reporting Requirements</u>

In order to keep EPA informed of CCH's progress on each SEP, CCH agrees to include in each quarterly progress report that it submits pursuant to Section IX.B of this Decree the following information about each SEP: (a) a description of the actions taken to commence, complete and operate the SEP during the

39

EXHIBIT 3

25151

previous quarter, and of the actions planned for the next six months; (b) an itemized summary of all expenditures that were incurred during the previous quarter in performing the SEP; (c) information regarding percentage of completion, unresolved delays encountered or anticipated that may affect the schedule for implementation of the SEP, and efforts made to mitigate any actual or anticipated delays; and (d) any modifications to the approved SEP that CCH has proposed to EPA or that have been approved by EPA.

H.   Completion of SEP

1.   When CCH has fully completed a reuse SEP, including completion of the requirements set forth in Paragraphs D.2.C or D.4 and E.2.C of this Section, or has fully completed an alternative approved SEP, CCH agrees to submit to EPA a written Notification of SEP Completion, which will consist of a written report, including appropriate supporting documentation, that summarizes the work done to complete the SEP, the amount of reuse achieved (if applicable), and a detailed accounting of the costs incurred to complete the SEP.  This provision applies separately to each SEP performed by CCH to fulfill its commitments as stated in this Consent Decree.

2.   Upon receipt of the Notification of SEP Completion, EPA agrees to review the report and supporting documentation and may conduct an on-site inspection of the work completed to perform the SEP.  Upon EPA's concurrence that the SEP has been completed as agreed, and that CCH has incurred the costs to

40

EXHIBIT 3

commence and complete the SEP, EPA shall issue a Certification of SEP Completion to CCH. EPA and CCH agree that the level of detail submitted in the report to support costs incurred and the review by EPA of such cost accounting shall not necessarily be of the level of detail required for EPA's Construction Grants Program audits. EPA and CCH agree that the objectives of the cost accounting in the Notification of SEP Completion shall be to assure EPA that CCH has incurred the stated project costs in a good faith effort to commence and complete the SEP.

3.  If EPA's review reveals that CCH has not fully completed the SEP, EPA shall inform CCH in writing of whatever additional work must be performed to complete the SEP. CCH agrees to expeditiously perform this work and, upon completion, agrees to resubmit a Notification of Completion to EPA.

4.  If EPA disagrees with CCH's cost accounting, EPA shall inform CCH of its disagreement and the required corrections. Within 30 days of receipt of EPA's comments, CCH agrees to amend its Notification of Completion in accordance with EPA's comments and agrees to resubmit it to EPA.

5.  Until final approval of a SEP, CCH agrees to retain, and upon request make available to EPA, all documentation relating to the reports, work, and expenditures applicable thereto. Prior to the destruction or long-term storage of any documentation relating to the SEP(s), CCH shall give EPA the opportunity to take custody of the documentation without charge.

I.  <u>Failure to Implement SEPs</u>

41

EXHIBIT 3

25153

1.    In the event CCH fails to achieve beneficial reuse as required by Paragraphs D.2 or D.4 or E.2 above, or otherwise fails to implement an initial or approved alternative SEP in accordance with its approved plan and schedule, CCH will comply with the requirements set forth in Section XI.A.3 of this Decree, unless CCH is excused under Section XIII (Force Majeure) of this Decree.

2.    In the event CCH informs EPA and United States Department of Justice (DOJ) in writing that it will abandon a SEP (either one of the initial reuse SEPs or an approved alternative SEP) and that it will not submit an alternative SEP, CCH agrees to be liable for an additional civil penalty as follows:

a.    If CCH abandons the sludge reuse SEP or a SEP that was proposed and approved as an alternative to the sludge reuse SEP, pursuant to Paragraph F above, CCH agrees to pay the difference between One Million Two Hundred Thousand Dollars ($1,200,000) and an amount equal to one-half the money already spent (if any) implementing the abandoned SEP, provided, however, that EPA finds the money was spent in reasonable and good faith efforts to implement the SEP in conformance with EPA's SEP policy.

b.    If CCH abandons the wastewater effluent reuse SEP or a SEP that was proposed and approved as an alternative to the wastewater effluent reuse SEP, pursuant to Paragraph F above, CCH agrees to pay the difference between Two Million Four Hundred Thousand Dollars ($2,400,000) and an amount equal to one-half the

42

EXHIBIT 3
25154

money already spent (if any) implementing the abandoned SEP, provided, however, that EPA finds the money was spent in reasonable and good faith efforts to implement the SEP in conformance with EPA's SEP policy.

c.   In its notice of its intention to abandon a SEP, CCH agrees to include an accounting of the amounts it has spent to date to implement the SEP and its analysis of the additional civil penalty that it must pay, calculated in accordance with Subparagraphs a and/or b, above.

d.   EPA shall review the submittal and shall notify CCH of the appropriate civil penalty figure, if any. Within 30 days of receipt of EPA's notice, CCH agrees to pay any additional civil penalty by warrant payable to the "Treasurer of the United States" to the United States Attorney for the District of Hawaii, together with a letter explaining what the warrant is for. A copy of the warrant and the letter tendering such warrant shall be mailed to EPA and DOJ.

IX.   PROGRAM MANAGEMENT AND PROGRESS REPORTS

A.   PROGRAM MANAGEMENT - CCH and EPA agree that a coordinated effort among all of the programs described in this Consent Decree is necessary to meet the objectives outlined in the Consent Decree. To this end, CCH agrees to develop and implement a Consent Decree Program Management System to coordinate all the various tasks and activities required under this Consent Decree. CCH agrees to maintain the Program Management System until the termination of the Consent Decree.

43

EXHIBIT 3

25155

At a minimum, the Program Management System will perform the following activities:

1.    Coordinate the efforts of CCH's contract management staff to ensure that the various consultant and construction contracts that may be let for the activities within the Consent Decree are in conformance with approved schedules and program objectives;

2.    Develop, monitor and maintain a Master Schedule for the completion of the Consent Decree programs;

3.    Ensure communication among the various consultants and contractors involved in the projects, and ensure communication between EPA/DOH and CCH;

4.    Maintain program and project documentation to support the City's compliance with the Consent Decree;

5.    Develop and implement engineering and construction standards for the rehabilitation of the wastewater collection system;

6.    Develop and implement construction and project management procedures for construction contracts and consultant contracts under the Consent Decree programs;

7.    Develop and implement a "Conflict Resolution Process" within CCH to minimize any contractual and program conflicts that may occur within or between the Consent Decree programs; and

8.    Coordinate CCH's submittals to meet the reporting requirements outlined in this Section.

44

EXHIBIT 3

25156

B.   PROGRESS REPORTS - Beginning with the first full calendar quarter after entry of this Decree, and for every calendar quarter thereafter, CCH shall submit in writing to EPA Region 9 a report containing the following information:

1.   The status and progress of projects under this Decree, including but not limited to:

a. Progress of the development and implementation of the SRAP, including a description of the interim preventive maintenance activities in the previous quarter;

b. Progress of the development and implementation of the Sewer I/I Plan, including information on the assessment of I&I for each Collection System Basin; the sewer collection line rehabilitation projects CCH has completed and is planning to undertake; hydraulic capacity rehabilitation projects CCH has completed and is planning to undertake; corrosion rehabilitation projects CCH has completed and is planning to undertake; quantitative descriptions of reductions in I&I that have resulted from completed sewer rehabilitation projects and expected reductions in I&I from ongoing and planned rehabilitation projects;

2.   Information as to compliance or noncompliance with the requirements of this Decree (including any plans that are enforceable through this Decree) and any reasons for noncompliance;

3.   A projection of the work to be performed pursuant to this Decree during the following twelve month period.

C.   Notification to EPA pursuant to this Section of any

45

EXHIBIT 3

25157

anticipated delay shall not, by itself, excuse the delay.

D.    The reports shall be submitted no later than the twentieth day of the next quarter. These reports need not be subject to EPA's approval. The full report shall be made available for inspection by any person at CCH's offices.

E.    In addition, unless CCH has already given notice of noncompliance pursuant to paragraph A, Section XIII, within ten (10) days immediately following the deadline date of any require-ment contained in Sections VI, VII, or VIII of this Decree, or in approved plans under those Sections, CCH shall notify EPA in writing of compliance or noncompliance with said requirement, the reason(s) for any noncompliance, and a plan for preventing such noncompliance in the future.

X.    PENALTY FOR PAST VIOLATIONS

A.    Within 60 days after the date of entry of the Decree, CCH shall pay a civil penalty in the amount of One Million Two Hundred Thousand Dollars ($1,200,000) plus interest at the rate established by the Secretary of the Treasury pursuant to 31 U.S.C. § 3717, calculated from the date of entry of the Decree until the date of payment.

B.    CCH shall pay Nine Hundred Fifty Thousand Dollars ($950,000) of this $1,200,000 plus interest to the United States by delivering a warrant in the sum stated above payable to the "Treasurer of the United States" to the United States Attorney for the District of Hawaii. A copy of the warrant and the letter tendering such warrant shall be mailed to EPA and to the United

46

EXHIBIT 3

25158

States Department of Justice.

C.    CCH shall pay Two Hundred Fifty Thousand Dollars ($250,000) of the $1,200,000, plus interest, into a separate interest earning escrow account to be established in an independent financial institution by CCH.  The funds in the escrow account shall be paid pursuant to a separate escrow agreement between CCH and the State.

XI.   STIPULATED PENALTIES

A.  Failure by CCH to fully and timely comply with any requirement in this Consent Decree shall require CCH to pay stipulated penalties as follows

1.   Pretreatment Program

a.  For the following violations of the Pretreatment Program requirements, CCH shall pay the following stipulated penalties:

| Pretreatment Program Requirement | Stipulated Penalty Per Day, Per Violation |
|---|---|
| Failure to submit SIU list (Section VI.B.1) | $2000 |
| Failure to submit maximum allowable headwork loading report (Section VI.E.5) | $2000 |
| Failure to submit proposed revisions to local limits (Section VI.E.7) | $2000 |
| Failure to meet certification requirements in Section VI.I. | $2000 |
| Failure to enact amended Sewer Ordinance (Section VI.G.2) | $2000 |

b.  CCH shall pay a stipulated penalty of $1000

47

EXHIBIT 3

per day for each violation of any other pretreatment requirement of this Decree that is not specifically covered by the stipulated penalties in Subparagraph a above.

    2. <u>Collection System Compliance Program</u>

      a. For the following violations of the Collection System requirements, CCH shall pay the following stipulated penalties:

| <u>Collection System Requirement</u> | <u>Stipulated Penalty<br>Per Day, Per Violation</u> |
|---|---|
| Failure to submit SRAP (Section VII.A.4) | $2000 |
| Failure to meet any requirement<br>in the SRAP (Section VII.A.4) | $2000 |
| Failure to submit Sewer I/I<br>Plan Deliverables (Section VII.E.3) | $2000 |
| Failure to meet any requirements<br>in the Sewer I/I Plan<br>(Section VII.E.3.(a)(iii) and (c)) | $2000 |

      b. CCH shall pay a stipulated penalty of $1000 per day for each violation of any other Collection System requirement in Section VII of this Consent Decree that is not specifically covered by the stipulated penalties in Subparagraph a above.

    3. <u>Supplemental Environmental Projects</u>. For failure to meet the schedules set forth in Paragraphs VIII.D.2 or D.4 or E.2 for the Supplemental Environmental Projects that CCH is required to implement under Section VIII of this Decree, CCH agrees to pay a stipulated penalty of $1000 per day for each calendar day the failure continues for the first sixty (60) days of any such failure; thereafter, CCH agrees to pay a stipulated

48

EXHIBIT 3

penalty of $2000 per day for each calendar day the failure continues; provided, however, that if CCH informs EPA and DOJ in writing of its intent to abandon the SEP(s), the stipulated penalties set forth in this Paragraph shall stop accruing as of the date that EPA and DOJ receive notice. CCH agrees to pay any stipulated penalties that had accrued up to this date, and in addition, CCH agrees to pay the additional civil penalty(ies) set forth in Section VIII.I.2.

4. CCH shall pay a stipulated penalty of $200 per day for each violation of Section IX.B (Reporting) of this Decree.

B. The stipulated penalties herein shall be in addition to other remedies or sanctions available to the United States by reason of CCH's failure to comply with the requirements of this Decree, the NPDES Permit, or the Clean Water Act. The payment of such stipulated penalties shall not be construed so as to relieve CCH from specific compliance with this Decree or federal or State law, or limit the authority of EPA or DOH to require compliance with such laws.

C. Any stipulated penalties incurred by CCH shall be paid by a warrant payable to "Treasurer of the United States," and are to be tendered to the United States Attorney for the District of Hawaii by the 15th day of the month following the month in which the violations occurred, together with a letter describing the basis for the penalties. A copy of the letter and the warrant shall be sent to the United States Department of Justice and EPA.

D. CCH shall pay interest, at the rate established by the

49

EXHIBIT 3
25161

Secretary of the Treasury pursuant to 31 U.S.C. § 3717, for any delinquent payments of a civil or stipulated penalty.

E.  In any dispute over the applicability of stipulated penalties, CCH shall bear the burden of proving that it is not subject to stipulated penalties.

XII.  Procedure for Submittals and Approvals of Plans

Unless otherwise specified, where the Decree requires CCH to submit a plan or report or other submittal to EPA for its review, comments, approval, and/or concurrence, EPA shall, as expeditiously as possible, review and approve or comment on the plan.  If EPA cannot complete its review of the plan or submittal within 60 days of receipt of the plan or submittal, EPA shall so notify CCH.  Such notice shall be given within the 60-day period following receipt of the plan or submittal, and EPA shall identify a schedule for completion of its review and/or approval. In response to any comments by EPA, CCH shall make appropriate revisions to the plan and resubmit it to EPA within 60 days. Upon approval of the plan by EPA, the plan is incorporated by reference as an enforceable part of this Decree and CCH shall implement the plan.  Disputes between EPA and CCH about the plan or portions of the plan shall be resolved by the Dispute Resolution provisions of this Decree.

XIII.  FORCE MAJEURE

A.  If any event occurs which causes or which CCH reasonably believes may cause CCH to violate any provision of this Decree, CCH shall notify in writing the Department of Justice and EPA

50

EXHIBIT 3
25162

within ten working days of the event. In the notice, CCH shall
specifically reference this Section of the Decree and describe in
detail the anticipated length of time the violation may persist,
the precise cause or causes of the violation as is reasonably
determinable at the time of notice, the measures taken or to be
taken by CCH to prevent or minimize the violation as well as to
try to prevent future violations, and when possible, the schedule
by which those measures will be implemented. If an
implementation schedule cannot reasonably be determined at the
time of notification, CCH shall include an estimate of the date
by which the implementation schedule shall be submitted. CCH
shall adopt all reasonable measures to avoid or minimize any such
violation. In the notice, CCH shall also assert whether it is
claiming that the violation should be excused due to force
majeure circumstances, as set forth in paragraph B., below.

B.  If CCH asserts in its notice, or in a subsequent notice
sent to EPA within ten (10) days of discovery of the cause of the
violation reported pursuant to subsection A, that the violation
has been or will be caused entirely by circumstances beyond the
reasonable control of CCH or any entity controlled by CCH,
including CCH's consultants and contractors, and that CCH could
not have reasonably foreseen or reasonably prevented such
violation, and EPA agrees with such assertion, the time for
performance of such requirement may be extended for a period not
to exceed the actual delay resulting from such circumstance, and
stipulated penalties shall not be due for said delay. In the

51

EXHIBIT 3
25163

event EPA does not so agree, CCH may submit the matter to the
Court for resolution pursuant to Section XIV of this Decree.  EPA
shall notify CCH in writing of EPA's agreement or disagreement
with CCH's claim of a delay or impediment to performance within
45 days of receipt of CCH's notice under paragraph A of this
section.  If CCH submits the matter to the Court for resolution
and the Court determines that the violation was caused entirely
by circumstances beyond the reasonable control of CCH or any
entity controlled by CCH, including CCH's consultants and
contractors, CCH shall be excused, and no stipulated penalties
shall be due as to that violation, but only for the period of
time the violation continues due to such circumstances.

C.   Failure by CCH to comply with the notice requirements of
this Section, except if notice is impossible due to catastrophic
circumstances, shall render this Section void and of no effect as
to the particular incident involved, and shall constitute a
waiver of CCH's right to obtain an extension of time for its
obligations under this Section based on such incident.

D.   CCH shall bear the burden of proving that any delay or
violation of any requirement of this Consent Decree was caused
entirely by circumstances beyond the reasonable control of CCH or
any entity controlled by CCH, including CCH's consultants and
contractors.  CCH shall also bear the burden of proving the
duration and extent of any delay or violation attributable to
such circumstances.

E.   Unanticipated or increased costs or expenses associated

52

EXHIBIT 3
25164

with the implementation of this Decree, changed financial circum-
stances, or technical infeasibility of meeting NPDES effluent
limitations shall not, in any event, serve as a basis for
modifications to this Decree or extensions of time under this
Decree. Upon EPA's concurrence, this provision shall not apply
to changed financial circumstances of any contractor or
consultant hired by CCH.

   F.  Compliance with any requirement of this Decree by itself
shall not constitute compliance with any other requirement. An
extension of one compliance date based on a particular incident
does not necessarily result in an extension of a subsequent
compliance date or dates. CCH must make an individual showing of
proof regarding each delayed incremental step or other require-
ment for which an extension is sought.

XIV. DISPUTE RESOLUTION

   A.  If the parties are unable to agree upon any plan,
procedure, schedule, extension of time, requirement, or other
matter described herein, or in the event a dispute should arise
among the parties regarding the implementation of the require-
ments of this Decree, such dispute shall be in the first instance
the subject of informal negotiations for a fifteen day period, or
for a longer period mutually agreed upon by the parties.

   B.  If the parties are not in agreement at the end of this
informal negotiations period, the position of the United States
shall be controlling unless CCH files a petition with the Court
for resolution of the dispute within 30 days of receipt of the

EXHIBIT 3
25165

United States' final position.  The petition shall set out the nature of the dispute with a proposal for its resolution.  The United States shall have 30 days to file a response with an alternate proposal for resolution.  In any such dispute, CCH shall have the burden of proving that the United States' proposal is arbitrary and capricious and that CCH's position will achieve compliance with the terms and conditions of its permit and the Act in an expeditious manner. During the informal negotiation period, to the extent CCH provides the information, EPA may consider reasonable industry practices as demonstrated by other municipalities of similar size or geography as that of CCH.

## XV.  CERTIFICATION

Any report, plan or other submission required by this Decree shall be signed by an official or authorized agent of CCH and shall include the following certification:

> I certify under penalty of law that the docu-
> ment and all attachments were prepared under
> my direction or supervision in accordance
> with a system designed to assure that quali-
> fied personnel properly gathered and evaluat-
> ed the information submitted.  Based on my
> inquiry of the person or persons who manage
> the system, or those persons directly respon-
> sible for gathering the information, the
> information submitted is, to the best of my
> knowledge and belief, true, accurate and
> complete.  I am aware that there are signifi-
> cant penalties for submitting false informa-
> tion, including the possibility of fine and
> imprisonment for knowing violations.

## XVI.  RIGHT OF ENTRY

Until termination of this Consent Decree, EPA and its

54

EXHIBIT 3

representatives, contractors, consultants, and attorneys shall have the authority to enter any facility covered by this Decree, at all reasonable times, upon proper presentation of credentials, for the purposes of:

    1.    monitoring the progress of activities required by this Decree;

    2.    verifying any data or information submitted to EPA in accordance with the terms of the Decree;

    3.    obtaining samples, and, upon request, splits of any samples taken by CCH or its consultants; and

    4.    otherwise assessing CCH's compliance with this Decree.

This provision in no way limits any rights of entry or inspection that the United States otherwise has under any federal law or regulation.

XVII.    EFFECT OF DECREE AND NONWAIVER PROVISIONS

    A.    This Consent Decree is neither an NPDES permit nor a modification of any existing permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342, nor shall it be interpreted to be such.  The pendency or outcome of any proceeding concerning the issuance, reissuance, or modification of an NPDES permit shall neither affect nor postpone CCH's duties and obligations as set forth in this Consent Decree.

    B.    This Consent Decree in no way affects or relieves CCH of its responsibility to comply with any federal, State, or local law, regulation, or permit.  The parties agree that CCH is responsible for achieving and maintaining complete compliance with all applicable federal and State laws, regulations, and permits, and that compliance with this Decree shall be no defense

55

EXHIBIT 3

25167

to any actions commenced pursuant to said laws, regulations, or permits. Except as expressly provided herein, CCH's complete performance of all obligations established pursuant to this Consent Decree, including payment of all penalties hereunder, shall be in full satisfaction of all civil claims of the United States and the State alleged in their complaint through the date of lodging of this Consent Decree.

C.    The United States and the State expressly reserve all remedies available to it for all violations of the Act not specifically pled in the Complaint filed in this matter.

D.    Nothing herein shall be construed to limit the authority of the United States or the State to undertake any action against any person, including CCH, in response to conditions that may present an imminent and substantial endangerment to the public health, welfare, or the environment.

E.    Nothing herein shall be construed to limit the authority of the United States to act under Section 308 of the Act, 33 U.S.C. § 1318.

F.    The United States and the State reserve any and all legal and equitable remedies available to enforce the provisions of this Decree.

G.    This Consent Decree does not limit or affect the rights of CCH, the State, or the United States as against any third parties, nor does it limit the rights of third parties, not parties to this Consent Decree, against CCH.

H.    Upon entry of this Decree, Administrative Order CWA-IX-

56

EXHIBIT 3

25168

FY91-19 issued by EPA on September 17, 1991 concerning pretreatment violations, and Administrative Order CWA-IX-FY92-03 issued by EPA on November 22, 1991 concerning Spills from its Collection System, shall be considered terminated and no longer in effect.

XVIII.  FAILURE OF COMPLIANCE

The United States does not, by its consent to the entry of this Decree, warrant or aver in any manner that CCH's compliance with this Decree will result in compliance with the provisions of the Act, or its NPDES permits.  Notwithstanding EPA's review and approval of any plans formulated pursuant to this Consent Decree, CCH shall remain solely responsible for compliance with the terms of the Act, applicable regulations, this Decree, and CCH's NPDES permits.

XIX.  COSTS OF SUIT

Each party shall bear its own costs and attorney's fees in this action.  Should CCH subsequently be determined to have violated the terms and conditions of this Decree, then CCH shall be liable to the United States for any costs and attorney's fees incurred by the United States in any actions against CCH for noncompliance with this Decree, as approved by the Court.

XX.  CONTINGENT LIABILITY OF STATE OF HAWAII

This Decree does not resolve the contingent liability of the State of Hawaii under Section 309(e) of the Act, 33 U.S.C. § 1319(e).  The United States specifically reserves its claims against the State, and the State reserves its defenses.

57

EXHIBIT 3

25169

XXI.   FORM OF NOTICE

Except as specified otherwise, when written notification to or communication with the United States EPA, DOJ, U.S. Attorney, the State, or the Defendant is required by the terms of this Consent Decree, it shall be addressed as follows:

As to the United States Department of Justice:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7611
Washington, D.C.  20044-7611
Reference Case No. 90-5-1-1-3825

As to the United States Attorney:

Mike Chun
Assistant United States Attorney
Room 6100, PJKK Federal Building
300 Ala Moana Blvd., Box 50183
Honolulu, Hawaii  96850

As to EPA :

Chief, Permits and Compliance Branch
Water Management Division
Attn:  Steve Fuller, W-5-3
U.S. Environmental Protection Agency, Region 9
75 Hawthorne Street
San Francisco, California 94105

Thelma Estrada
Assistant Regional Counsel
Office of Regional Counsel, RC-2-4
U.S. Environmental Protection Agency, Region 9
75 Hawthorne Street
San Francisco, California 94105

As to the State:

Thomas Arizumi
Chief, Environmental Management Division

58

EXHIBIT 3

25170

P.O.Box 3378
Honolulu, Hawaii 96801

As to CCH:

Director
Department of Wastewater Management
650 S. King Street, 3rd Floor
Honolulu, HI 96813

Corporation Counsel
City and County of Honolulu
530 S. King Street, 1st Floor
Honolulu, HI 96813

Notifications to or communications with EPA, DOJ, the
U.S. Attorney, or the State shall be deemed submitted on the date
they are postmarked and sent by certified mail, return receipt
requested.

XXII.  MODIFICATION

Except for minor modifications of the SRAP and the Sewer I/I
Plan, which the parties determine do not warrant formal modifica-
tion, there shall be no modification of this Consent Decree
without written approval of all of the parties to this Consent
Decree and the Court.

XXIII.  PUBLIC COMMENT

A.   The parties agree and acknowledge that final approval
by the United States and entry of this Decree is subject to the
requirements of 28 C.F.R. § 50.7 which provides for notice of the
lodging of this Consent Decree in the Federal Register, an
opportunity for public comment, and consideration of any com-
ments.

B.   CCH shall not withdraw its consent to this Decree

59

EXHIBIT 3
25171

during the period of governmental and judicial review between
lodging and entry of this Decree, and hereby consents to entry of
this Decree without further notice.

XXIV.  CONTINUING JURISDICTION OF THE COURT

The Court shall retain jurisdiction to enforce the terms and
conditions of this Decree and to resolve disputes arising hereun-
der as may be necessary or appropriate for the construction or
execution of this Decree.

XXV.  EFFECTIVE AND TERMINATION DATES

A.    The effective date of this Consent Decree shall be the
date upon which the Decree is signed by the court.

B.    CCH's obligations under Sections VI (Pretreatment
Compliance Program) and X (Penalty for Past Violations) shall
terminate when CCH has paid all penalties due (including any
stipulated penalties due pursuant to Section XI), has completed
all requirements specified therein, and EPA and DOH have deter-
mined that CCH has satisfactorily achieved compliance with its
Pretreatment Program and the requirements of Section VI of this
Decree for a period of one year.  (Assuming that CCH achieves and
maintains compliance with Section VI of this Decree, one year of
compliance should occur on or about December 31, 1995, one year
following EPA's and DOH's receipt of the certifications required
by Section VI.I.

C.    All other provisions of this Decree shall terminate
when CCH has completed all requirements specified in Sections VII
(Collection System Compliance Program) and VIII (Supplemental

60

EXHIBIT 3

Environmental Projects), has paid any and all stipulated penalties due pursuant to Section XI, and EPA has determined that CCH has satisfactorily complied with the requirements of its approved SRAP and Sewer I/I Plan and completed the sewer rehabilitation and I&I minimization work required in the Sewer I/I Plan. (Assuming CCH complies with the schedules in the Sewer I/I Plan and in Section VIII (Supplemental Environmental Projects), this should occur on or about the year 2019.) However, the requirement that CCH continue to implement and comply with its approved SRAP and Sewer I/I Plan shall remain in effect as an order of this Court.

D.    Upon EPA's determination that CCH has satisfied the terms of the Decree, the United States will file a motion for the termination of the Consent Decree.

Dated and entered this ____ day of _____, 1994.

_____
UNITED STATES DISTRICT JUDGE

WE HEREBY CONSENT to the entry of this Decree, subject to the public notice requirements of 28 C.F.R. § 50.7.

FOR THE UNITED STATES OF AMERICA:

_____        _____
DATE                           LOIS J. SCHIFFER
                               Acting Assistant Attorney General
                               Environment and Natural Resources
                                   Division

61

EXHIBIT 3
25173

United States Department of Justice

_8/28/94_
**DATE**

_Leslie allen_

**LESLIE ALLEN**
**Senior Attorney**
**Environmental Enforcement Section**
**Environment and Natural Resources**
    **Division**
**United States Department of Justice**
**P.O. Box 7611**
**Washington, D.C.  20044-7611**
**(202) 514-4114**


**ELLIOT ENOKI**
**United States Attorney**
**District of Hawaii**

By:

_____
**DATE**

_____
**MIKE CHUN**
**Assistant United States Attorney**
**Room 6100, PJKK Federal Building**
**300 Ala Moana Blvd., Box 50183**
**Honolulu, Hawaii  96850**


_7/25/94_
**DATE**

**STEVEN A. HERMAN**
**Assistant Administrator for**
**Enforcement**
**U.S. Environmental Protection**
    **Agency**
**Washington, D.C.**

62

EXHIBIT 3
25174

_____
DATE

_____
FELICIA MARCUS
Regional Administrator
U.S. Environmental Protection
  Agency, Region IX
San Francisco, CA

OF COUNSEL:

THELMA ESTRADA
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 9
75 Hawthorne Street
San Francisco, California 94105

JOSEPH THEIS
Attorney Advisor
Office of Enforcement
U.S. Environmental Protection Agency
401 M Street, S.W.
Washington, D.C.  20460

63

EXHIBIT 3
25175

FOR THE STATE OF HAWAII

JUN 1 6 1994
_____
DATE

ROBERT A. MARKS
Attorney General of Hawaii

JUN 1 4 1994
_____
DATE

SONIA FAUST        627
LAURENCE K. LAU    1466
Deputy Attorneys General
State of Hawaii
Kekuanao'a Building, Room 200
465 South King Street
Honolulu, Hawaii 96813
(808) 587-3050

JUN 3 0 1994
_____
DATE

PETER A. SYBINSKY, Ph.D.
Director of Health
State of Hawaii

64

EXHIBIT 3
25176

_6/24/04_
**DATE**

_[signature]_
**FELICIA MARCUS**
**Regional Administrator**
**U.S. Environmental Protection**
**Agency, Region IX**
**San Francisco, CA**

OF COUNSEL:

THELMA ESTRADA
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 9
75 Hawthorne Street
San Francisco, California 94105

JOSEPH THEIS
Attorney Advisor
Office of Enforcement
U.S. Environmental Protection Agency
401 M Street, S.W.
Washington, D.C. 20460

EXHIBIT 3
25177

FOR CITY AND COUNTY OF HONOLULU

7-6-94
DATE

FOR THE STATE OF HAWAII

JUN 1 6 1994
DATE

ROBERT A. MARKS
Attorney General of Hawaii

JUN 1 4 1994
DATE

SONIA FAUST          627
LAURENCE K. LAU    1466
Deputy Attorneys General
State of Hawaii
Kekuanao'a Building, Room 200
465 South King Street
Honolulu, Hawaii 96813
(808) 587-3050

JUN 3 0 1994
DATE

PETER A. SYBINSKY, Ph.D.
Director of Health
State of Hawaii

64

EXHIBIT 3
25178

FOR CITY AND COUNTY OF HONOLULU

7-6-94
DATE

FRANK F. FASI
Mayor, City and County of Honolulu

7/5/94
DATE

FELIX B. LIMTIACO
Acting Director
Department of Wastewater Management
City and County of Honolulu

7/5/94
DATE

CHERYL K. OKUMA-SEPE
Deputy Corporation Counsel
Department of Corporation Counsel
City and County of Honolulu

65

EXHIBIT 3

25179

EXHIBIT A



| ID | Name | 1992 | | | 1993 | | | | 1994 | | | | 1995 | | | | 1996 | | | | 1997 | | | | 1998 | | | | 1999 | | | | |
|----|------|------|---|---|------|---|---|---|------|---|---|---|------|---|---|---|------|---|---|---|------|---|---|---|------|---|---|---|------|---|---|---|---|
| | | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 |
| 1 | Island Wide Industrial User Survey and Database | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 2 | Identify IUs/SIUs | | | | 5/30/93 - 12/31/93 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 3 | Compile & Submit SIU Database (EPA/DOH) | | | | 9/1/93 - 3/31/94 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 4 | Update IU/SIU Database (once annually as per NPDES permit) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 1/1/94 - Thereafter | | |
| 5 | Compliance Monitoring | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 6 | Once a year Sampling | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 7/1/93 - Thereafter | | |
| 7 | Development of Technically Based Local Limits | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 8 | Sampling | | | | 7/1/92 - 12/31/93 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 9 | Maximum Headworks Loading Report | | | | 6/30/93 - 7/31/94 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 10 | Allocation of Maximum Allowable Loading | | | | 1/1/94 - 7/31/94 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 11 | Local Limits (Proposed Revised Limit) | | | | 1/1/94 - 7/31/94 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 12 | EPA/DOH Review | | | | 8/1/94 - 9/30/94 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 13 | Ordinance Enactment | | | | 10/1/94 - 2/28/95 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 14 | Notice to Industrial Users | | | | 2/28/95 - 3/29/95 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 15 | Industrial Wastewater Discharge Permit MODs | | | | 2/28/95 - 4/28/95 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 16 | Revised Sewer Ordinance | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 17 | Adequate Legal Authority | | | | 6/30/93 - 3/31/94 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 18 | Ordinance Review (EPA/DOH) | | | | 4/1/94 - 6/1/94 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 19 | Enactment of Revised Ordinance | | | | 6/1/94 - 10/1/94 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 20 | Program Staffing & Resources | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 21 | Recruitment | | | | 5/1/93 - 2/28/94 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 22 | Training | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 10/1/93 - Thereafter | | |
| 23 | Certifications | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 24 | Program & Ordinance Review | | | | 10/1/93 - 12/31/94 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 25 | SIU Action | | | | 10/1/93 - 12/31/94 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 26 | SIU Compliance to Categorical Pretreatment Stds. | | | | 10/1/93 - 12/31/94 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

"In Progress" or Future Tasks    Completed Task    Total Time Extent

Revised 2/15/94

EXHIBIT 3



EXHIBIT 3

25181

EXHIBIT B

| ID | Name | Proposed WWL SEP Schedule |
|---|---|---|
| 28 | 5.0 TONS (Dry) | |
| 29 | 10.0 TONS (Dry) | 7/1/95-12/31/97 |
| 30 | Beneficial Effluent Reuse | 7/1/96-12/31/98 |
| 31 | 2.0 MGD | 7/1/95-7/31/99 |
| 32 | 5.0 MGD | 7/1/96-12/31/00 |
| 33 | 10.0 MGD | 7/1/97-12/31/01 |
| 34 | Program Management System and Progress Reporting | 7/1/94-12/31/19 |

"In Progress" or Future Tasks

Completed Task

Total Time Extent

EXHIBIT 3
25182