CARRIE OKINAGA, 5958
Corporation Counsel
KATHLEEN A. KELLY, 6729
Deputy Corporation Counsel
City and County of Honolulu
530 South King Street, Room 110
Honolulu, Hawaii 96813
Telephone: (808) 768-5235
Facsimile: (808) 768-5105
Email: kkelly@honolulu.gov

BINGHAM McCUTCHEN LLP
JAMES J. DRAGNA (CA SBN 91492)
NANCY M. WILMS (CA SBN 111837)
BRYAN K. BROWN (CA SBN 192924)
355 South Grand Avenue, Suite 4400
Los Angeles, CA 90071-3106
Telephone: (213) 680-6400
Facsimile: (213) 680-6499
Email: nancy.wilms@bingham.com

Attorneys for Defendant
City and County of Honolulu

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAI'I

| | | |
|---|---|---|
| SIERRA CLUB, HAWAI'I CHAPTER; HAWAI'I'S THOUSAND FRIENDS; and OUR CHILDREN'S EARTH FOUNDATION,<br><br>      Plaintiffs,<br><br>    v.<br><br>CITY AND COUNTY OF HONOLULU,<br>      Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL NO. CV 04-00463 DAE-BMK<br><br>**CITY AND COUNTY OF HONOLULU'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' FIRST AND SECOND CLAIMS; DECLARATION OF KATHLEEN A. KELLY; EXHIBITS A-F; DECLARATION OF JAMES ROSSO; LR 7.5 CERTIFICATE OF COUNSEL; CERTIFICATE OF SERVICE**<br><br>Date:     June 30, 2008<br>Time:    9:00 a.m.<br>Judge:   Hon. David Alan Ezra |

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ........................................................................................1

II.  BACKGROUND ........................................................................................3

    A.  Plaintiffs' Complaint..........................................................................3

        1.  The First Claim.......................................................................3

        2.  The Second Claim...................................................................4

    B.  Plaintiffs' MPSJ Lacks Sufficient Evidentiary Support.....................5

III.  ARGUMENT..............................................................................................7

    A.  Summary Judgment Standard.............................................................7

    B.  Plaintiffs' MPSJ Regarding Their Second Claim Fails As A
        Matter Of Law Because This Court Lacks Jurisdiction .....................8

        1.  Congress' Limited Authority ..................................................8

            a.  The Commerce Clause Limits Congress' Power
                Over Wholly Local Matters ...........................................8

            b.  Given The Constitutional Limit, Federal Powers
                Under The CWA Are Limited To "The Waters Of
                The United States".........................................................9

        2.  Under The Law Of This Circuit, Federal Jurisdiction Is
            Limited To Traditionally Navigable Waters Or
            Waters/Wetlands That Have A Significant Nexus To
            Waters That Are Actually Navigable .....................................11

            a.  *SWANCC* (Supreme Court, 2001): The
                "Significant Nexus" Test Established............................11

            b.  *Rapanos* (Supreme Court, 2006): The "Significant
                Nexus" Test Applies Even When There Is A
                Hydrological Connection To Navigable Waters...........13

            c.  Post *Rapanos* Ninth Circuit Cases................................20

        3.  This Court Lacks Subject Matter Jurisdiction Over the
            Concededly Ground-Only Spills Under The Second
            Claim....................................................................................24

## TABLE OF CONTENTS
(continued)

Page

C.  An Issue Of Fact Exists Regarding The Majority Of The Spills At Issue In Plaintiffs' Motion And Plaintiffs Are Not Entitled To Judgment As A Matter Of Law ....................................................27

   1.  Plaintiffs' First Claim ...........................................................27

      a.  Plaintiffs Are Not Entitled To Judgment Regarding Spills With No Reported Volume To Receiving Waters, Including Spills To The Ground.....................28

      b.  Plaintiffs Are Not Entitled To Judgment Regarding Contained And Recovered Spills ................................29

      c.  Plaintiffs Are Not Entitled To Judgment Regarding Spills To Storm Drains.................................................29

      d.  Plaintiffs Are Not Entitled To Judgment Regarding Spills To Dry Stream Beds...........................................31

      e.  Plaintiffs Are Not Entitled To Judgment Regarding Discharges In Accord With The Wahiawa Consent Decree.......................................................................33

      f.  Plaintiffs Are Not Entitled To Judgment Regarding Sand Island And Kailua Bypasses................................34

      g.  Summary Judgment Must Be Denied For Multiple Violations Based On Individual Spills That Are Not Supported By The Record ....................................35

      h.  Plaintiffs Are Not Entitled To Judgment Regarding Non-CCH Facility Spills...............................................36

   2.  Plaintiffs' Second Claim ........................................................37

# TABLE OF AUTHORITIES

Page

Cases

Adickes v. S.H. Kress & Co.
398 U.S. 144 (1970).................................................................8

Anderson v. Liberty Lobby, Inc.
477 U.S. 242 (1986).................................................................7

Atl. States Legal Found., Inc., v. Tyson Foods, Inc.
897 F.2d 1128 (11th Cir. 1990)..............................................4

Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell
138 F.3d 772 (9th Cir. 1998)...................................................7

Carabell v. United States Army Corps of Engineers
391 F.3d 704 (6th Cir. 2004)....................... 14, 15, 16, 18

Celotex Corp. v. Catrett
477 U.S. 317 (1986)...................... 7, 28, 29, 31, 33, 34, 35, 36, 37, 38

Conn. Fund for the Env't v. Raymark Indus., Inc.
631 F. Supp. 1283 (D. Conn. 1986) ...............................25

Eastman Kodak Co. v. Impage Technical Servs., Inc.
504 U.S. 451 (1992)................................................................8

Environmental Protection Information Center v. Pacific Lumber Co.
469 F. Supp. 2d 803 (N.D. Cal. 2007).........................23, 33

First Nat'l Bank of Ariz. v. Cities Serv. Co.
391 U.S. 253 (1968)................................................................8

Fontenot v. Upjohn Co.
780 F.2d 1190 (5th Cir. 1986)...............................................8

Locust Lane v. Swatara Township Auth.
636 F. Supp. 534 (M.D. Pa. 1986) .................................25

A/72564886.1/2017866-0000309724

# TABLE OF AUTHORITIES
(continued)

Page

Northern California River Watch v. City of Healdsburg
496 F.3d 993 (9th Cir. 2007), cert. denied,
2008 U.S. LEXIS 1230 ........................................................ 14, 17, 22, 31, 32

Northwest Envtl. Advocates v. City of Portland
56 F.3d 979 (9th Cir. 1995), rehearing en banc denied, 74 F.3d
945, cert. denied, 518 U.S. 1018 (1996) ....................................................... 25

Rapanos v. United States
547 U.S. 715 (2006) ...... 13, 14, 15, 16, 17, 18, 20, 25, 26, 28, 29, 30, 31, 32, 33

San Francisco Baykeeper v. Cargill Salt Division
481 F.3d 700 (9th Cir. 2006) ............................................. 10, 20, 21, 22, 30, 32

Save our Bays and Beaches v. City and County of Honolulu
904 F. Supp. 1098 (D. Haw. 1994) ................................................................ 25

Solid Waste Agency of Northern Cook County v. United States Army
Corps of Engineers
531 U.S. 159 (2001) ................................... 11, 13, 14, 16, 17, 20, 25, 26, 30, 32

Toscano v. Prof'l Golfers' Ass'n
258 F.3d 978 (9th Cir. 2001) ............................................................................ 7

U.S.A. v. Lopez
514 U.S. 549 (1995) ......................................................................................... 9

U.S.A. v. Wilson
133 F.3d 251 (4th Cir. 1997) ......................................................................... 10

United States v. Johnson
467 F.3d 56 (1st Cir. 2006) ........................................................................... 14

United States v. Morrison
529 U.S. 598 (U.S. 2000) ................................................................................. 9

United States v. Moses
496 F.3d 984 (9th Cir. 2007) ......................................................................... 14

A/72564886.1/2017866-0000309724

TABLE OF AUTHORITIES
(continued)

Page

United States v. Rapanos
    376 F.3d 629 (6th Cir. 2004) .............................................................. 14, 15, 16

Watts v. United States
    703 F.2d 346 (9th Cir. 1983) ........................................................................ 7

Statutes

33 U.S.C. § 1251(a) ...................................................................................... 9

33 U.S.C. § 1311(a) ................................................................. 3, 4, 9, 24, 27

33 U.S.C. § 1362(7) .............................................................................. 3, 27

33 U.S.C. § 1365 .......................................................................................... 3

U.S.C. § 1362(12) .................................................................... 3, 9, 24, 27

Rules

Fed. R. Civ. P. 56 ........................................................................................ 7

Fed. R. Civ. P. 56(c) ............................................................................... 7, 8

Fed. R. Civ. P. 56(e) ................................................................................... 7

Regulations

51 Fed. Reg. 41206, 41217 ....................................................................... 11

Constitutional Provisions

U.S. Constitution Article I, § 8, clause 3 ................................................... 8

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS'
FIRST AND SECOND CLAIMS

A/72564886.1/2017866-0000309724

I.    <u>INTRODUCTION</u>

Plaintiffs Sierra Club, Hawai'i Chapter, Hawai'i's Thousand Friends, and Our Children's Earth Foundation (collectively, "plaintiffs") brought their May 20, 2008 motion for partial summary judgment ("MPSJ") (Docket #177) based on certain alleged violations under the first and second claims for relief in plaintiffs' Second Amended Complaint ("Complaint") filed in the within litigation ("First and Second Claims").  Specifically, under their First Claim, plaintiffs seek liability for 332 violations based on spills and bypasses allegedly in violation of Section 301(a) of the Clean Water Act ("CWA" or "Act"), which prohibits the unpermitted discharge of pollutants into "the waters of the United States." Plaintiffs' MPSJ must fail as to 216 of these alleged violations for a number of reasons.  For most of the alleged violations, plaintiffs cannot carry their burden to establish either that (1) there was a discharge into any water whatsoever, let alone a "water of the united States," or (2) the location of the discharge has a "significant nexus" to navigable waters in accordance with binding Ninth Circuit authority. For other of the alleged violations, plaintiffs' MPSJ fails as a matter of law because the discharge at issue is not "unpermitted," either because it was in compliance with the applicable Permit or a controlling Consent Decree.  For still other of the alleged violations, plaintiffs miscount and overstate their number of alleged violations and are thus unable to carry their burden to establish the existence of

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS'
FIRST AND SECOND CLAIMS
1

these alleged violations.  Finally, still others of these alleged violations originated at a non-CCH facility; as a result, CCH cannot be held liable for those alleged violations.

Under their Second Claim, plaintiffs seek liability for 207 Honouliuli basin spills that allegedly violate conditions set forth in the City and County of Honolulu's ("CCH") National Pollution Discharge Elimination System ("NPDES") Permit for its Honouliuli Wastewater Treatment Plant.  Significantly, plaintiffs admit that none of these spills entered "the waters of the United States."  As a result, *as matter of law*, their MPSJ must fail in its entirety as to the Second Claim as the United States Supreme Court has recently affirmed that Congress' Constitutional authority is limited to impacts to "the waters of the United States," and therefore this Court lacks jurisdiction over claims that do not have such an impact.  In order to establish federal jurisdiction, plaintiffs have the burden of showing that the spill either entered a traditionally protected waterway or a waterway with a "significant nexus" to a water that is navigable-in-fact.  Plaintiffs by their own admission cannot do so here with regard to each and every one of the alleged violations in the Second Claim at issue in MPSJ.

In addition, 58 of the 207 Second Claim violations for which plaintiffs seek liability include 58 that occurred within the confines of the Honouliuli treatment plant.  The Honouliuli Permit's overflow prohibition, however, applies

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS'
FIRST AND SECOND CLAIMS

2

only to spills from the collection system, and does not apply to spills at the treatment plant. Consistent with this, plaintiffs' Complaint only alleges spills from the Honouliuli collection system, not the treatment plant, and plaintiffs may not recover for alleged violations they have not pled in the Complaint. Thus, plaintiffs' MPSJ as to these 58 spills must fail as matter of law for this alternative and independent reason.

For these reasons, discussed more fully below, plaintiffs' MPSJ must be denied as to 216 of 332 of their First Claim violations and all 207 of their Second Claim violations.

## II.    BACKGROUND

### A.    Plaintiffs' Complaint

Plaintiffs brought this action on July 29, 2004 under the citizen suit provision of the CWA, 33 U.S.C. § 1365, and filed their Complaint on January 10, 2005. Docket #s 1, 55.

#### 1.    The First Claim

Plaintiffs' First Claim is based on spills that allegedly violate Section 301(a) of the CWA. Complaint, ¶¶ 68-75. CWA Section 301(a) prohibits unpermitted "discharges of any pollutant" (33 U.S.C. § 1311(a)). A "discharge of pollutant," in turn, is specifically defined in the CWA as the addition of any pollutant into "navigable waters" (33 U.S.C. § 1362(12)), which is defined under

the CWA as "the waters of the United States" (33 U.S.C. § 1362(7)).

    2. <u>The Second Claim</u>

    As relevant here, the Second Claim is based on alleged violations of

conditions in the Honouliuli NPDES Permit that prohibit overflows of facilities

(Complaint, ¶ 79). Because it is based on alleged violations of the Permit, the

Second Claim is distinguishable from the First Claim, which is based on discharges

of pollutants to "waters of the United States" in violation of CWA section 301(a),

33 U.S.C. § 1311(a). Were plaintiffs to have alleged that any spills under their

Second Claim *did* enter "the waters of the United States," such spills would be

impermissibly duplicative of plaintiffs' First Claim and would be properly

included *only* under their First Claim based on CWA section 301(a) -- plaintiffs

cannot seek multiple violations based on the same event. <u>See, e.g.</u>, <u>Atl. States</u>

<u>Legal Found., Inc., v. Tyson Foods, Inc.</u>, 897 F.2d 1128, 1140 (11th Cir. 1990).

Evidencing plaintiffs' acknowledgment that it would be improper to seek to

recover twice for the same spill, the spills at issue in MPSJ under the Second

Claim only include spills that plaintiffs *concede* did not enter "waters of the United

States."[1] Indeed, in their MPSJ, they only seek liability under their Second Claim

---

[1] <u>See</u> Complaint, ¶¶ 24 (spills to the ground), 27 (spills into "private residences and businesses, streets, storm drains, and numerous waterways"), 80 (spills to "public streets, waterways, and other areas"); <u>see also</u> MPSJ at 26 ("CCH's sewage spills and bypasses which do not reach waters of the United

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS'
FIRST AND SECOND CLAIMS

4

for spills that that went to the ground.  <u>See</u> MPSJ at 3-4.

      B.    <u>Plaintiffs' MPSJ Lacks Sufficient Evidentiary Support</u>

          Plaintiffs' MPSJ is based on 332 alleged violations of Section 301(a) of the CWA under the First Claim and 207 spills allegedly in violation of ¶ B.7 of the Honouliuli Permit under the Second Claim.  MPSJ at 3.  According to plaintiffs, and as noted above, the Second Claim spills at issue in this MPSJ did not enter "waters of the United States."  <u>Id</u>. at 3-4.  In order to establish the alleged CWA and Honouliuli Permit violations at issue in their MSPJ, plaintiffs rely on the following documentation: CCH's Quarterly and Wastestream Diversion Reports, and DOH Clean Water Branch CCH sewage spills, overflows and bypasses summary lists.  <u>Id.</u>  This documentation is attached to the Declaration of Jodene Isaacs (Docket #178-2) as Exhibits 4 and 5 and was filed as part of plaintiffs' MPSJ.  CCH has undertaken a review of this documentation and determined that 216 of the 332 alleged violations fall into one or more of the following categories:

- spills did not reach receiving waters

- one spill that reached the ground only

- spills were removed and contained

- spills entered a storm drain, but the documentation does not

---

States are nonetheless expressly and categorically prohibited by the [Permit]").

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' FIRST AND SECOND CLAIMS

indicate the spill entered a receiving water

- spills entered a dry bed, and the documentation does not indicate the spill entered a receiving water

- spills that were not "unpermitted discharges" at the Wahiawa WWTP

- alleged bypasses at the Sand Island and Kailua WWTPs

- alleged spills for which plaintiffs overcount

- spills that occurred at non-CCH facilities.

CCH's analysis of the First Claim spills is attached as Exhibit A to the Declaration of Kathleen A. Kelly ("Kelly Decl."). As a result, plaintiffs are unable to carry their burden of proof to establish CWA Section 301(a) violations, and the MPSJ must be denied as to 216 of the 332 alleged violations at issue here under their First Claim.

CCH also under took an analysis of the 207 spills at issue in this MPSJ under the Second Claim, and has determined that plaintiffs' evidence shows that 58 of these spills were treatment plant spills at the Honoluliuli WWTP. CCH's analysis of the Second Claim spills is attached as Exhibit B to the Kelly Declaration. As a result, plaintiffs are unable to carry their burden of proof to establish that these spills violated the Honouliuli Permit, and the MPSJ must also be denied in this regard in addition to plaintiffs' inability to establish federal court

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' FIRST AND SECOND CLAIMS

6

jurisdiction as set forth below.

III.    ARGUMENT

    A.    Summary Judgment Standard

        Courts must grant summary judgment on an action, or any part

thereof, if a moving party can show that there is no genuine issue as to any material

fact and that the party is entitled to a judgment as a matter of law.  Fed. R. Civ. P.

56; see Toscano v. Prof'l Golfers' Ass'n, 258 F.3d 978, 982 (9th Cir. 2001).

Material facts are those necessary to the proof or defense of a claim, and are

determined by reference to the substantive law.  Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 248 (1986).  Summary judgment may not be granted where a dispute

exists as to any material fact.  See Fed. R. Civ. P. 56(e).  The moving party bears

the burden of proving that (1) there is no genuine issue of material fact; and (2)

that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex

Corp. v. Catrett, 477 U.S. 317, 322 (1986); Watts v. United States, 703 F.2d 346,

347 (9th Cir. 1983).  Trial courts should act with caution in granting summary

judgment.  Anderson, 477 U.S. at 255.

        An issue of fact is genuine if the evidence, viewed in the light most

favorable to the non-moving party, is such that a reasonable jury could return a

verdict for the non-moving party.  Cal. ex rel. Cal. Dep't of Toxic Substances

Control v. Campbell, 138 F.3d 772, 780-81 (9th Cir. 1998).  Plaintiffs must

establish that there is no genuine issue of material fact as to each and every element of the claims upon which they move.  Fontenot v. Upjohn Co., 780 F.2d 1190, 1194 (5th Cir. 1986).  In opposing a motion for summary judgment, "[t]he issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).  Moreover, any inferences to be drawn from the factual record must be drawn in favor of, and in the light most favorable to, the party opposing the motion.  Eastman Kodak Co. v. Impage Technical Servs., Inc., 504 U.S. 451, 456 (1992); Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).

      B.      Plaintiffs' MPSJ Regarding Their Second Claim Fails As A Matter Of Law Because This Court Lacks Jurisdiction

            1.      Congress' Limited Authority

                  a.      The Commerce Clause Limits Congress' Power Over Wholly Local Matters

The Commerce Clause[2] of the United States Constitution limits

---

[2]      The Commerce Clause provides Congress the authority to regulate commerce "among the several states."  U.S. Constitution Article I, § 8, clause 3.

A/72564886.1/2017866-0000309724

Congress' authority to legislate over intrastate matters which are entirely within the purview of individual states.  See United States v. Morrison, 529 U.S. 598, 613 (U.S. 2000) (invalidating a federal civil remedy under the Violence Against Women Act on the grounds Congress lacked authority under the Commerce Clause to regulate gender-motivated violent crimes because they were not considered economic activities affecting interstate commerce); U.S.A. v. Lopez, 514 U.S. 549 (1995) (invalidating the federal Gun-Free School Zones Act on the grounds Congress lacked authority under the Commerce Clause to regulate wholly intrastate activity that has no substantial effect on interstate commerce).  As discussed below, this Constitutional limit defines the outside limit of Congress' authority to regulate municipal wastewater systems under the Clean Water Act.

b.  Given The Constitutional Limit, Federal Powers Under The CWA Are Limited To "The Waters Of The United States"

Congress passed the CWA in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  86 Stat. 816, codified at 33 U.S.C. § 1251(a).  Given the limits of federal power, the CWA expressly prohibits only discharge of pollutants into "navigable waters" (33 U.S.C. § 1311(a)), which have been defined by Congress as "the waters of the United States." (33 U.S.C. § 1362(12), (7)).  Although this definition recognizes Congress' lack of authority under the Commerce Clause to legislate purely

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' FIRST AND SECOND CLAIMS

9

intrastate matters, federal agencies and courts have often taken an expansive view of "the waters of the United States" in an attempt to expand federal jurisdiction over wholly intrastate, non-navigable waters.  See San Francisco Baykeeper v. Cargill Salt Division, 481 F.3d 700, 704 (9th Cir. 2006) (holding the district court "improperly expanded" the regulatory definition of "the waters of the United States" when it found a non-navigable, wholly intrastate pond adjacent to navigable water was subject to the CWA merely because of its adjacency); U.S.A. v. Wilson, 133 F.3d 251, 257 (4th Cir. 1997) (invalidating the Army Corps of Engineers' ("Corps") regulation defining "the waters of the United States" to include non-navigable, wholly intrastate waters because the regulation improperly enlarged the Corps' jurisdiction under the CWA).

Plaintiffs here are likewise improperly attempting to use the CWA to seek redress over a purely intrastate, local matter -- spills to the ground only or that otherwise do not enter a "water of the United States."  As described below, the United States Supreme Court and other federal courts have repeatedly acknowledged that Congressional authority -- as couched in the phrase "the waters of the United States" -- does not and cannot reach such local matters.  Indeed, since 2001, the Supreme Court in two separate cases has found that the CWA does not regulate and may not be used to seek redress for matters that have no or little impact to waters that are actually navigable.  Accordingly, this Court lacks subject

matter jurisdiction over plaintiffs' spill claims that lack the Constitutionally required connection or impact to navigable waters.  To that extent, plaintiffs' motion must be denied.

        2.      <u>Under The Law Of This Circuit, Federal<br>Jurisdiction Is Limited To Traditionally<br>Navigable Waters Or Waters/Wetlands That Have<br>A Significant Nexus To Waters That Are Actually<br>Navigable</u>

        a.      <u>*SWANCC* (Supreme Court, 2001): The<br>"Significant Nexus" Test Established</u>

In <u>Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers</u>, 531 U.S. 159 (2001) ("<u>SWANCC</u>"), the Supreme Court firmly established that Congress' constitutional authority to legislate under the CWA "is not unlimited" and attempts to expand federal jurisdiction to purely peripheral matters like those alleged here are improper.  <u>See</u> 531 U.S. at 173.

In <u>SWANCC</u>, several suburban municipalities purchased an abandoned gravel mine to be used as a disposal facility, which required filling permanent, seasonal, intrastate ponds.  531 U.S. at 162-63.  The Army Corps of Engineers ("Corps") had determined that it had jurisdiction over the wholly intrastate ponds based on the Corps' "migratory bird" regulation,[3] even though the

---

[3]    The "migratory bird" regulation stated that if migratory birds used or would use an isolated intrastate body of water as a habitat, that water would be considered a "jurisdictional" water of the United States.  <u>See</u> 51 Fed. Reg. 41206, 41217 (Nov.

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS'
FIRST AND SECOND CLAIMS

ponds had no connection whatsoever to waters that were actually navigable.  Id. at

163-65.  The municipalities sued, arguing that (1) the Corps had exceeded its

authority under the CWA by promulgating the regulation and applying that rule to

the wholly intrastate, isolated waters at issue; and (2) Congress lacked power under

the Commerce Clause to legislate or grant jurisdiction over such waters.  Id. at

165-66.

        The Supreme Court agreed.  Striking down the "migratory bird"

regulation, the Court found the ponds were "a far cry, indeed" from "the waters of

the United States" as that term was defined by Congress.  Id. at 173.  According to

the Court's construction of the CWA, Congress only intended to legislate over

waters with a "significant nexus" to "open water[s]" that were navigable in fact.

Id. at 167-68.  In so holding, the Court found Congress intended only to regulate

waters "inseparably bound up with the 'waters' of the United States."  Id. at 167.

Congress' inclusion of the term "navigable" in the CWA is therefore significant,

because it reveals "what Congress had in mind as its authority for enacting the

CWA: its traditional jurisdiction over waters that were or had been navigable in

fact or which could reasonably be made so."  Id. at 172 (citation omitted).  The

Corps' more expansive regulation "would result in a significant impingement of

13, 1986).

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS'
FIRST AND SECOND CLAIMS

the States' traditional and primary power over land and water use" and would raise "significant constitutional questions." Id. at 174 (citation omitted).  According to the Court, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems." Id. at 173 (citation omitted).

          b.     *Rapanos* (Supreme Court, 2006): The "Significant Nexus" Test Applies Even When There Is A Hydrological Connection To Navigable Waters

        Because government agencies continued to test the Constitutional concern expressed in SWANCC through "expansive interpretation" of the CWA that impinged on traditional state authority and "stretche[d] the outer limit of Congress's commerce power," the Supreme Court recently revisited the boundaries of federal power in Rapanos v. United States, 547 U.S. 715, 737-38 (2006).  In a concurring opinion that has been adopted by the Ninth Circuit as controlling authority, Justice Kennedy found that the "significant nexus" test established in SWANCC should be applied even where there is a hydrological connection to waters that are actually navigable.[4]  547 U.S. at 750.

_____

[4]     The plurality opinion in Rapanos found Congressional authority even more limited.  Rapanos was decided 4-4-1, with Justice Scalia writing the plurality opinion, Justice Stevens penning the dissent, and Justice Kennedy concurring and writing a separate opinion.  The plurality's restrictive construction of "the waters of the United States" would cover traditionally protected waters -- "relatively

(1)    Background of the *Rapanos*
Consolidated Cases

*Rapanos* resolved two consolidated Sixth Circuit cases, United States

v. Rapanos, 376 F.3d 629 (6th Cir. 2004) ("Rapanos I") and Carabell v. United

States Army Corps of Engineers, 391 F.3d 704 (6th Cir. 2004).  In the consolidated

cases, the Supreme Court considered whether four wetlands that had an actual

hydrological connection through ditches or man-made drains to traditionally

navigable waters were part of "the waters of the United States" under the CWA,

and therefore subject to federal regulation.  Rapanos, 547 U.S. at 729.  In

Rapanos I, the Rapanos and affiliated businesses (referred to herein as "the

Rapanos") deposited fill material without a CWA Section 404 permit from the

Corps onto wetlands at three sites they planned to develop.  Unlike the isolated

ponds at issue in SWANCC, the three wetlands at issue had an actual hydrological

---

permanent, standing or continuously flowing bodies of water 'forming geographic
features' that are described in ordinary parlance as 'streams[,] . . . oceans, rivers,
[and] lakes'" and to "wetlands with a continuous surface connection to" such
relatively permanent waters.  Rapanos, 547 U.S. at 739 (citations omitted).  The
dissent would have given deference to and upheld the Corps' historically broad
exercise of jurisdiction.  Id. at 788.  Although the issue of which opinion controls
has caused controversy and some courts have found that the plurality and
concurring opinions provide two alternative standards for CWA jurisdiction (see,
e.g., United States v. Johnson, 467 F.3d 56, 66 (1st Cir. 2006)), the Ninth Circuit
has unequivocally determined Kennedy's concurrence and the test set forth therein
are the controlling rule of law in this Circuit.  N. Cal. River Watch v. City of
Healdsburg, 496 F.3d 993, 999-1000 (9th Cir. 2007); United States v. Moses, 496
F.3d 984, 990 (9th Cir. 2007).

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS'
FIRST AND SECOND CLAIMS
14

connection to a traditional navigable water: (1) site one connected to a man-made

drain, which drained into a creek, which flowed into a river that emptied into a bay

and Lake Huron; (2) site two connected to a drain with a surface connection to the

navigable Tittabawasseee River and (3) site three had a direct surface connection

to a river that flowed into Lake Huron. Rapanos, 547 U.S. at 729. The Corps

brought an action against the Rapanos for CWA Section 301 violations, alleging

that the defendants illegally discharged fill material into "the waters of the United

States" without a permit. Rapanos, 547 U.S. at 763; Rapanos I, 376 F.3d at 632.

The district court found each of the wetlands were "within federal jurisdiction"

since they were "adjacent to other waters of the United States." Rapanos I, 376

F.3d at 634; Rapanos, 547 U.S. at 729. The Sixth Circuit affirmed, holding federal

jurisdiction existed, noting "there were hydrological connections between all three

sites and corresponding adjacent tributaries of navigable waters." Rapanos I, 376

F.3d at 643; Rapanos, 547 U.S. at 729.

        In the second consolidated case, Carabell, 391 F.3d 704, the plaintiffs

were denied a Section 404 permit to deposit fill material to a wetland on their

property. Carabell, 391 F.3d at 705; Rapanos, 547 U.S. at 730. The wetland at

issue was located about one mile from Lake St. Clair. Rapanos, 547 U.S. at 730.

A ditch, separated by a man-made berm, ran alongside one side of the wetland.

Rapanos, 547 U.S. at 730. The berm was impermeable to water and blocked

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS'
FIRST AND SECOND CLAIMS

15

drainage from the wetland, but may have allowed occasional overflow to the ditch.

Rapanos, 547 U.S. at 730.  Any flow in the ditch would empty to another ditch or

drain, which connected to a creek, and finally would empty into Lake St. Clair.

Rapanos, 547 U.S. at 730.[5]  After exhausting their administrative appeals, the

Carabells filed suit in district court, challenging the Corps' jurisdiction over the

wetland even thought it had a potential hydrological connection to an actual

navigable water.  Rapanos, 547 U.S. at 730.  The district court found federal

jurisdiction because the wetland was "adjacent to neighboring tributaries of

navigable waters and has a significant nexus to 'waters of the United States.'"

Rapanos, 547 U.S. at 730.  Once again, the Sixth Circuit affirmed, holding that

because the wetland was separated from a tributary of "waters of the United

States" only by a man-made berm, it was considered an "adjacent wetlands" and

thus fell within the Corps' jurisdiction.  Carabell, 391 F.3d at 708-09; Rapanos,

547 U.S. at 730.

> (2)    Justice Kennedy Applied The
> SWANCC "Significant Nexus" Test
> Even When There Is A Hydrological
> Connection To A Navigable Water

---

[5]     The Court stated it was unclear whether the hydrological connections between the wetlands and the drains (at Rapanos I sites one and two) and ditches (in Carabell) were continuous or intermittent, or if they contained continuous or occasional water flows.  Rapanos, 547 U.S. at 729.

The Supreme Court consolidated the cases and granted *certiorari* to determine whether these four wetlands were subject to federal regulation, given their close proximity and actual hydrological connections to waters that were actually navigable.  See Rapanos, 547 U.S. at 730.  Justice Kennedy's concurrence, which, as noted above, is recognized as controlling authority in the Ninth Circuit (Healdsburg, 496 F.3d at 999-1000), reiterated the test established by SWANCC that federal jurisdiction under the CWA only extends to "a water or wetland" that has a "significant nexus" to "waters that are or were navigable in fact or that could reasonably be so made."  Rapanos, 547 U.S. at 759 (citation to SWANCC omitted).  According to Justice Kennedy, a "significant nexus" is found when the tributaries/wetlands

> either alone or in combination with similarly situated
>
> lands in the region, significantly affect the chemical,
>
> physical, and biological integrity of other covered waters
>
> more readily understood as 'navigable.'  When, in
>
> contrast, wetlands' *effects on water quality are*
>
> *speculative or insubstantial, they fall outside the zone*
>
> *fairly encompassed by the term 'navigable waters.'*

Rapanos, 547 U.S. at 780 (emphasis added).  Moreover, addressing whether a hydrological connection satisfies the "significant nexus" test, Justice Kennedy

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS'
FIRST AND SECOND CLAIMS

17

explained "*mere hydrologic connection should not suffice in all cases*." <u>Rapanos</u>, 547 U.S. at 784 (emphasis added).

Because Justice Kennedy believed the record suggested the possible existence of a "significant nexus" (<u>Rapanos</u>, 547 U.S. at 783), he recommended remanding the cases to determine whether the wetlands possessed the necessary nexus with navigable waters.[6] <u>Rapanos</u>, 547 U.S. at 787.

(3)    <u>Joint EPA And Corps *Rapanos* Guidance</u>

Nearly a year after <u>Rapanos</u> was decided, the Environmental Protection Agency ("EPA") and the Corps issued a Joint Guidance that provides the agencies' interpretation of the divided opinion. <u>See</u> EPA/Corps, Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in <u>Rapanos v. United States</u> & <u>Carabell v. United States</u> (June 5, 2007) ("Joint Guidance"), attached to the Kelly Declaration as Exhibit C. The Joint Guidance adopted the position that if a wetland or tributary[7] is jurisdictional under either the <u>Rapanos</u> plurality or Kennedy test, it is a "water of the United States." <u>Joint Guidance</u> at 3.

---

[6]    The plurality ultimately vacated the lower courts' judgments and remanded the cases for further proceedings due to "the paucity of the record." <u>Rapanos</u>, 547 U.S. at 757.

[7]    The Joint Guidance defines a tributary to include "natural, man-altered, or man-made water bodies that carry flow directly or indirectly into a traditional navigable water." <u>Joint Guidance</u> at 5 n.21.

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS'
FIRST AND SECOND CLAIMS
18

Thus, according to Scalia's plurality opinion, EPA and the Corps determined the agencies will assert jurisdiction over traditionally navigable waters and the wetlands adjacent to them, non-navigable tributaries of traditional navigable waters that are relatively permanent where the tributaries typically flow year-round or have continuous flow at least seasonally, and wetlands that directly abut such tributaries.  Id. at 1, 4-6.  Further, in deference to Justice Kennedy's "significant nexus" test and based on a fact-specific inquiry, EPA and the Corps will determine whether jurisdiction extends to the following waters:  non-navigable tributaries that are not relatively permanent and the wetlands adjacent to them, and wetlands adjacent to but that do not directly abut a relatively permanent non-navigable tributary.  Id. at 1, 7-10.  Finally, the Joint Guidance states it generally will not assert jurisdiction over swales or erosional features (gullies, small washes), or over ditches, including roadside ditches, "excavated wholly in and draining only uplands and that do not carry a relatively permanent flow of water," because such erosional features and ditches are not tributaries and do not have a significant nexus to downstream navigable waters.  Id. at 11.

In determining whether a "significant nexus" exists between a wetland or water and a traditional navigable water, EPA and the Corps will look at a variety of factors including the "volume, duration, and frequency of flow," "size of . . . watershed, average annual rainfall, average annual winter snow pack, slope, and

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS'
FIRST AND SECOND CLAIMS

19

channel dimensions," "water temperatures," "habitat," "physical proximity,"
"shared hydrological and biological characteristics," in addition to other
"ecological characteristics." Joint Guidance at 7, 9-10.  After assessing these
factors, the agencies will evaluate whether the water at issue is "likely to have an
effect that is more than speculative or insubstantial on the chemical, physical, and
biological integrity of a traditional navigable water." Joint Guidance at 10.

c.    Post Rapanos Ninth Circuit Cases

Following the Supreme Court's lead first in SWANCC and later
Rapanos, the Ninth Circuit and lower courts have recognized the limited nature of
federal jurisdiction under the CWA and have provided additional guidance about
what constitutes a "significant nexus" for the purposes of federal jurisdiction.

(1)    Cargill (9th Cir., 2006)

In San Francisco Baykeeper v. Cargill Salt Division, 481 F.3d 700
(9th Cir. 2006), Baykeeper brought a citizen suit alleging that defendant salt
producer Cargill discharged pollutants without a permit into "the waters of the
United States" in violation of CWA Section 301(a).  Cargill, 481 F.3d at 702.
Cargill allegedly discharged pollutants into a non-navigable, wholly intrastate pond
that collected runoff within Cargill's waste containment facility near the San
Francisco Bay.  Cargill, 481 F.3d at 702.  The district court granted summary
judgment for Baykeeper, finding that the pond was a "water[] of the United States"

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS'
FIRST AND SECOND CLAIMS

20

because it was adjacent to a protected water, the Mowry Slough.  <u>Cargill</u>, 481 F.3d

at 702.

The Ninth Circuit reversed and found Baykeeper failed to state a

claim, holding that the district court "improperly expanded the regulatory

definition of 'waters of the United States.'"  <u>Cargill</u>, 481 F3d at 705; 709 at n 9.

Although the Ninth Circuit's holding that federal agencies *are not required* to

regulate all water bodies with a significant nexus to navigable waters is not

material to the question of whether this Court lacks subject matter jurisdiction, the

court, in *dictum*, elaborated on the application of Justice Kennedy's "significant

nexus" test, noting that

> [b]y any permissible view of the evidence, the effect of
> Cargill's Pond on Mowry Slough is speculative or
> insubstantial; the Pond does not significantly affect the
> integrity of the Slough.  First, there is no evidence that
> any water has ever flowed from the Pond to the Slough.
> One expert, asked whether 'given the right hydrology
> conditions,' water could flow from the Pond to the
> Slough, answered that 'it is possible.'  There is no
> evidence, however, that those 'right hydrology
> conditions' have ever existed or were likely to exist.

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS'
FIRST AND SECOND CLAIMS

This testimony fits the definition of 'speculative.' There

was also much emphasis on the fact that, in some high

tide situations, water from the Slough has flowed over

the levee, or seeped through the levee, into the Pond. But

flow in that direction does not affect the navigable body

of water in the Slough.

Cargill, 481 F.3d at 708.

(2)    City of Healdsburg (9th Cir., 2007)

In Northern California River Watch v. City of Healdsburg, 496 F.3d

993 (9th Cir. 2007), *cert. denied*, 2008 U.S. LEXIS 1230, a citizens group brought

suit against the City of Healdsburg for violating the CWA by discharging sewage

from its WWTP without a Permit into a pond -- a former rock quarry pit near the

Russian River ("river"). 496 F.3d at 996. The pond was separated from the river

by a levee and wetlands. Id. The wetlands were extensive, surrounded the pond,

and directly connected to the river. Id. at 998. In fact, the pond's shoreline had

receded, transforming much of the original pond area itself into wetlands. Id.

Moreover, the WWTP's outflow would overflow the pond were the pond not

draining into a surrounding aquifer, and the pond water overflow in the aquifer

seeped into the river along a couple of thousand feet of riverbank. Id.

The Ninth Circuit first found that the pond was a wetlands and not an

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS'
FIRST AND SECOND CLAIMS

22

isolated water, distinguishing it from the isolated pond in <u>Cargill</u>. <u>Healdsburg</u>, 496 F.3d at 998. The Court next determined the pond was a "water of the United States" both because it was a wetlands adjacent to the navigable river (<u>id.</u> at 998-99) and because it had a "substantial nexus" to the river (<u>id.</u> at 1000-001). With regard to the latter finding, the Court found the following facts pertinent:

- An obvious hydrological connection was established because pond water seeped into the river from surface wetlands and an underground aquifer. <u>Id.</u> at 1000.

- The hydrological connection affected the river's physical, chemical integrity. <u>Id.</u> at 1000.

- The wetlands and the river were ecologically connected as the wetlands were indistinguishable from the rest of the river's ecosystem, and thus threatened the river's biological integrity. <u>Id.</u> at 1000-001.

(3)    <u>Pacific Lumber</u> (N.D. Cal. 2007)

In <u>Environmental Protection Information Center v. Pacific Lumber Co.</u>, 469 F. Supp. 2d 803 (N.D. Cal. 2007), a citizens group brought suit against lumber companies for, among other things, violating CWA Section 301 by discharging silts and sediments into streams that flowed into the "undisputedly navigable" Bear Creek, a tributary of the Eel River. 469 F. Supp. 2d at 809-10. The district court found that although plaintiffs had established a hydrologic

connection between the streams and Bear Creek (Pacific Lumber, 469 F. Supp. 2d

at 824), because evidence showed the streams were intermittent or ephemeral (id.

at 823), plaintiffs had to demonstrate, under Justice Kennedy's "controlling"

significant nexus test, "that the streams in dispute have a significant nexus to Bear

Creek." Id. As plaintiffs provided no evidence of the streams' chemical, physical,

or biological effect on Bear Creek, they failed to establish the streams were waters

of the United States. See id. at 824.

3.    This Court Lacks Subject Matter Jurisdiction
      Over the Concededly Ground-Only Spills Under
      The Second Claim

Under a plain reading of the CWA's enforcement provision, a citizen

plaintiff is limited to enforcing permit conditions which implement, among other

things, the Act's prohibition against unpermitted "discharge[s] of any pollutant"

(33 U.S.C. §1311(a)) which, in turn, is specifically defined as the addition of any

pollutant into "the waters of the United States" (33 U.S.C. §§1362(12),(7)).

Despite this limitation, which recognizes the limits of federal authority under the

Constitution, plaintiffs' Second Claim, admittedly, is based on spills that *did not*

*involve* the discharge of a pollutant into "the waters of the United States." See.

e.g., MPSJ at 3-4. Indeed, in this MPSJ, plaintiffs only seek liability under their

Second Claim for spills to the ground. Thus, plaintiffs simply cannot establish --

as they must under the controlling Ninth Circuit authority -- that any violation

alleged under their Second Claim involves impacts to the physical, chemical or biological character of a navigable water, or otherwise threatens the integrity of the water quality of such a water.  Without such a showing, this Court does not have jurisdiction over the alleged 207 Second Claim spills at issue in the MPSJ under the Constitutional limits recognized in <u>SWANCC</u> and <u>Rapanos</u>.  Furthermore, it is highly significant that in deference to the Supreme Court's Constitutional pronouncements, EPA has issued a guidance document that *confirms its lack of jurisdiction* over the alleged violations under plaintiffs' Second Claim.  If EPA cannot enforce those alleged violations under the CWA given the Constitutional limits to its jurisdiction, how can plaintiffs?

In opposition to this Motion, plaintiffs may try to get around the Constitutional limits on the Court's jurisdiction by arguing that all NPDES permit conditions are enforceable in CWA citizen suits, citing such cases as <u>Save our Bays and Beaches v. City and County of Honolulu</u>, 904 F. Supp. 1098, 1115-16 (D. Haw. 1994), <u>Northwest Envtl. Advocates v. City of Portland</u>, 56 F.3d 979, 986 (9th Cir. 1995), *rehearing en banc denied*, 74 F.3d 945, *cert. denied*, 518 U.S. 1018 (1996), <u>Conn. Fund for the Env't v. Raymark Indus., Inc.</u>, 631 F. Supp. 1283, 1285 (D. Conn. 1986), and <u>Locust Lane v. Swatara Township Auth.</u>, 636 F. Supp. 534, 537-38 (M.D. Pa. 1986).  These cases, however, are unavailing here because they (1) do not address the Constitutional issue raised in this Motion, and (2) were

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS'
FIRST AND SECOND CLAIMS

25

all decided before the Supreme Court's seminal <u>Rapanos</u> and <u>SWANCC</u> decisions. In addition, while CCH is not (at this time) challenging either any specific permit term or EPA's authority to prescribe any particular permit condition, it is important to note that each of the permit conditions at issue were established before <u>SWANCC</u> and <u>Rapanos</u> were decided.  Finally, plaintiffs may argue that Standard Permit Condition ¶ 9 requires CCH to comply with all applicable laws and regulations, and that spills outside of federal jurisdiction under <u>SWANCC</u> and <u>Rapanos</u> are nonetheless enforceable under State law.  Plaintiffs, however, *brought their claims in federal court under the federal Clean Water Act--not Hawaii state law.*  Therefore, the Constitutional limits on this Court's jurisdiction are dispositive.

In sum, recognizing Constitutional limitations, the CWA's enforcement provision simply does not extend to the 207 Second Claim spills at issue here, each one of which plaintiffs *concede* do not impact "the waters of the United States."  Accordingly, just as the Corps in <u>Rapanos</u> and <u>SWANCC</u> was not authorized to regulate non-navigable, intrastate bodies of water, plaintiffs similarly are not authorized to enforce any of the 207 Second Claim spills on which they seek judgment in their MPSJ.  Any other interpretation of the citizen enforcement provision would raise the same serious Constitutional issues that the Supreme Court recognized in <u>Rapanos</u> and <u>SWANCC</u>--issues that, according to the Court in

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' FIRST AND SECOND CLAIMS

26

SWANCC, should be avoided if there is an otherwise acceptable interpretation of the statute.

Accordingly, this Court lacks jurisdiction over the 207 Second Claim spills at issue here and summary judgment as to each of those spills must be denied.

C.    An Issue Of Fact Exists Regarding The Majority Of The Spills At Issue In Plaintiffs' Motion And Plaintiffs Are Not Entitled To Judgment As A Matter Of Law

As set forth below, a question of fact exists as to the following categories of spills upon which the MPSJ is based and plaintiffs are not entitled to judgment as a matter of law.

1.    Plaintiffs' First Claim

Plaintiffs' First Claim is based on spills that allegedly violate Section 301(a) of the CWA. Complaint, ¶¶ 68-75. CWA Section 301(a) prohibits unpermitted "discharges of any pollutant" (33 U.S.C. § 1311(a)). A "discharge of pollutant," in turn, is specifically defined in the CWA as the addition of any pollutant into "navigable waters" (33 U.S.C. § 1362(12)), which is defined under the CWA as "the waters of the United States" (33 U.S.C. § 1362(7)). It is therefore axiomatic that a plaintiff seeking a judgment for a Section 301(a) discharge violation must prove that the discharge entered "the waters of the United States." As set forth below, a genuine issue of fact exists as to 216 of the alleged

A/72564886.1/2017866-0000309724

violations at issue in this MPSJ under the First Claim and plaintiffs are not entitled to judgment as a matter of law.

<blockquote>
a.     Plaintiffs Are Not Entitled To Judgment Regarding Spills With No Reported Volume To Receiving Waters, Including Spills To The Ground
</blockquote>

As set forth in Exhibit A to the Kelly Declaration, the records relied on by plaintiffs do not reflect that *any* of the reported spill volume reached *any* receiving water whatsoever for 24 alleged violations.[8]  In fact, for 1 of these 24 alleged violations, the records relied on by plaintiffs show that the spill only entered the ground.  Id.  Plaintiffs have failed to carry their burden that these spills, including those that only reached the ground, violated Section 301(a) because plaintiffs have failed to prove that the spills entered a "water of the United States," a necessary requirement to recovery under the CWA.  See Rapanos, 547 U.S. at 759.  In fact, the documents do not establish that any of these spills entered "water" at all.  As a result, plaintiffs are not entitled to judgment as a matter of law and their MPSJ on these spills must be denied.  At the very least, a genuine issue of fact exists regarding whether each of these spills entered a "water of the United

---

[8]       7/1/02, 1/2/04 (Lehua, Kekau, 388 and 394 Wanaaʻao, Palanehe), 2/27/04, 3/1/04, 3/2/04 (Wanaʻao, Waimanalo), 5/20/04, 8/4/04 (Waikalua, Pilikea), 7/26/05, 9/24/05, 10/13/05, 3/3/06, 3/7/06 (no reported volume to receiving water); 12/01/02 (ground only).  Kelly Decl., Exh. A.

States", and on this basis also, summary judgment as to these spills must be denied. Celotex, 477 U.S. at 322.

        b.        Plaintiffs Are Not Entitled To Judgment Regarding Contained And Recovered Spills

        As set forth in Exhibit A to the Kelly Declaration, the records relied on by plaintiffs reflect that 4 of the alleged violations at issue under the First Claim in plaintiffs' MPSJ involved spills where the entire volume of the spill was contained and returned to the collection system.[9] As with the spills that did not reach receiving waters, including those that only entered the ground, plaintiffs have failed to prove that these spills are discharges to the "the waters of the United States" as required by Section 301(a) of the CWA. See Rapanos, 547 U.S. at 759. In fact, none of these spills entered a "water" at all. As a result, plaintiffs are not entitled to judgment as a matter of law and their MPSJ on these spills must be denied. At the very least, a genuine issue of fact exists regarding whether each of these spills entered a "water of the United States," and on this basis also, summary judgment as to these spills must be denied. Celotex, 477 U.S. at 322.

        c.        Plaintiffs Are Not Entitled To Judgment Regarding Spills To Storm Drains

        According to the records relied on by plaintiffs, 102 of the alleged

---

[9]    9/28/99, 12/29/99, 3/13/00, 4/28/05. Kelly Decl., Exh. A.

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' FIRST AND SECOND CLAIMS

29

violations at issue under the First Claim in plaintiffs' MPSJ reached a storm

drain.[10]  Kelly Decl., Exh. A.  These records, however, do not indicate that any of

these spills entered a receiving water.  Id., ¶ 3.  As a result, plaintiffs have not

offered *any* evidence that these spills entered "the waters of the United States," and

even if they had, that the location of the spills had a "significant nexus" with a

navigable-in-fact water.  See, e.g., Rapanos, 547 U.S. at 759 (a "significant nexus"

is found when a tributary, "either alone or in combination with similarly situated

lands in the region, significantly affect the chemical, physical, and biological

integrity of other covered waters more readily understood as 'navigable.'  When, in

contrast, [the] effects on water quality are speculative or insubstantial, they fall

outside the zone fairly encompassed by the term 'navigable waters'"); SWANCC,

531 U.S. at 172-74 (the CWA only regulates waters "inseparably bound up with

---

[10]      7/13/99, 7/17/99, 8/31/99, 12/29/99, 1/12/00, 1/19/00, 2/27/00, 4/16/00,
7/27/00, 8/1/00, 8/2/00, 9/2/00, 9/14/00, 10/16/00, 12/11/00, 12/28/00, 2/25/01,
3/1/01, 3/3/01, 3/25/01, 6/5/01, 10/31/01, 1/29/02, 6/30/02, 11/11/02, 4/7/03,
4/18/03, 6/29/03, 7/15/03, 8/19/03, 9/18/03, 11/29/03, 1/2/04 (Hihiwai, Olepe,
Pahemo, Kawaihae), 1/3/04 (5307C and 5403 Kalanianaole), 2/6/04, 2/27/04,
4/6/04, 7/26/04, 8/8/04, 11/6/04, 11/21/04 (La-I, Linapuni), 12/22/04, 1/29/05
(Kalanianaole, Pu'u Ikena, Aliamanu), 2/2/05, 2/24/05, 2/26/05, 4/28/05, 6/15/05,
7/26/05, 8/20/05, 11/2/05, 11/5/05, 2/12/06, 2/24/05, 3/3/06 (Kailua, Waikalua),
3/28/06, 3/29/06, 3/31/06 (Umi, Aliamanu, School, Piikea, Olepe, Pacific Heights,
Malia, Coral, Ala Moana), 4/4/06, 5/5/06, 6/16/06, 11/2/06, 12/27/06, 3/23/07,
7/31/07, 10/17/07, 11/4/07.  Kelly Decl., Exh. A.

A/72564886.1/2017866-0000309724

the 'waters' of the United States"); <u>Cargill</u>, 481 F.3d at 708 (impacts on navigable waters must not be "speculative or insubstantial"); <u>N. Cal. River Watch v. City of Healdsburg</u>, 496 F.3d 993, 1000-001 (9th Cir. 2007) ("significant nexus" exists when there is hydrological connection that affected the physical, chemical or biological integrity of the navigable water); EPA/Corps Joint Guidance at 7, 9-10 (listing the factors the agencies consider in determining whether a "significant nexus" exists).  Furthermore, a "mere hydrological" connection to a navigable water is not sufficient to establish a "significant nexus." <u>Rapanos</u>, 547 U.S. at 784. For example, plaintiffs have not demonstrated that these spills ever left the storm drain catch basin, let alone actually had a "significant nexus" with a navigable-in-fact water.  Therefore, plaintiffs have not met their burden of demonstrating that there is no genuine issue of fact regarding whether each of these spills entered a "water of the United States," and summary judgment as to these spills must be denied.  <u>Celotex</u>, 477 U.S. at 322.

> d.    <u>Plaintiffs Are Not Entitled To Judgment</u>
> <u>Regarding Spills To Dry Stream Beds</u>

According to the records relied on by plaintiffs, 8 of the alleged violations at issue under the First Claim in plaintiffs' MPSJ entered a dry stream bed.[11]  Here, plaintiffs have not met their burden of either showing that the dry

---

[11]    9/28/99, 3/13/00, 4/24/00, 10/17/01, 1/6/02, 6/17/05, 2/13/07, 7/31/07.

stream beds at issue are "waters of the United States" or have a "significant nexus" to actually navigable waters.  See, e.g., Rapanos, 547 U.S. at 759, 780, 782 (a "significant nexus" is found when a tributary, "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'  When, in contrast, [the] effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the term 'navigable waters'"); SWANCC, 531 U.S. at 172-74 (the CWA only regulates waters "inseparably bound up with the 'waters' of the United States"); Cargill, 481 F.3d at 708 (impacts on navigable waters must not be "speculative or insubstantial"); EPA/Corps Joint Guidance at 7, 9-10 (listing the factors the agencies consider in determining whether a "significant nexus" exists).  Furthermore, plaintiffs have not even established that the dry stream beds at issue have a hydrological connection to navigable waters.  Kelly Decl., ¶ 3.  Even if they had, such a showing of a hydrological connection is not alone sufficient to establish a "significant nexus." N. Cal. River Watch v. City of Healdsburg, 496 F.3d 993, 1000-001 (9th Cir. 2007) ("significant nexus" exists when there is hydrological connection that

---

Kelly Decl., Exh. A.

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' FIRST AND SECOND CLAIMS

32

affected the physical, chemical or biological integrity of the navigable water);

Envtl. Prot. Info. Ctr. v. Pac. Lumber, 469 F. Supp. 2d 803 (N.D. Cal. 2007)

(holding plaintiffs failed to establish intermittent streams were waters of the United

States because they provided no evidence the streams had a significant nexus to

navigable waters); Rapanos, 547 U.S. at 784 (a "mere hydrological" connection to

a navigable water is not sufficient to establish a "significant nexus").  Accordingly,

plaintiffs have not met their burden of demonstrating that there is no genuine issue

of fact regarding whether each of these spills entered a "water of the United

States," and summary judgment as to these spills therefore must be denied.

Celotex, 477 U.S. at 322.

        e.        Plaintiffs Are Not Entitled To Judgment
                  Regarding Discharges In Accord With
                  The Wahiawa Consent Decree

As shown in Exhibit A to the Kelly Declaration, 22 of the alleged

violations under the First Claim at issue in plaintiffs' MPSJ involve allegedly

unpermitted discharges from the Wahiawa WWTP in violation of Section 301(a).[12]

Plaintiffs have also characterized these discharges of secondary-treated but non-

disinfected effluent from the Wahiawa WWTP as "bypasses," and accordingly

[12]    8/11/01, 7/13/02, 2/17/03, 2/22/03, 4/10/03, 4/23/03, 6/18/03, 9/24/03,
1/14/04, 1/19/04, 1/22/04, 1/27/04, 2/28/04, 6/22/05, 9/14/06, 10/15/06, 1/29/07.
Kelly Decl., Exh. A.

violations of Section 301(a).  However, the Wahiawa WWTP effluent is regulated under a March 2, 1998 Consent Decree and Modification thereto (collectively, the "Consent Decree"), attached to the Kelly Decl. as Exhs. D and E, and there is nothing in the Consent Decree that requires the continuous, uninterrupted operation of disinfection at the Wahiawa WWTP.  As a result, those releases do not constitute unpermitted discharges or bypasses; consequently, there is no violation of Section 301(a), plaintiffs are not entitled to judgment as a matter of law, and their MPSJ on these alleged discharges or bypasses must be denied.  At the very least, a genuine issue of fact exists regarding whether each of these releases constitutes an unpermitted discharge or bypass, and on this basis also, summary judgment as to these alleged discharges or bypasses must be denied.  <u>Celotex</u>, 477 U.S. at 322.

> f.    <u>Plaintiffs Are Not Entitled To Judgment Regarding Sand Island And Kailua Bypasses</u>

As shown in Exhibit A to the Kelly Declaration, three of the First Claim alleged violations at issue in plaintiffs' MPSJ (4/9/07, 11/4/07 and 12/0/07) are alleged unlawful "bypasses" from the Sand Island WWTP and one of the First Claim alleged violations at issue in plaintiffs' MPSJ (10/15/06) is an alleged unlawful "bypass" from the Kailua WWTP.  The Sand Island and Kailua Permits, however, define a "bypass" to "mean[] the *intentional diversion* of any waste

stream from any portion of a treatment facility." Jodene Isaacs Declaration, Exh. 2 at page 20, ¶ 17, Kelly Decl., Exh. F at page 20, ¶ 17. Therefore, unless a bypass is intentional, there can be no *unpermitted* discharge of pollutant in violation of Section 301(a). As plaintiffs have failed to meet their initial burden to establish that these four alleged bypasses were "intentional" under the Sand Island and Kailua Permits, resulting in violations thereof, plaintiffs have failed to meet their burden of demonstrating that there is no genuine issue of fact regarding whether each of these alleged bypasses was an unpermitted discharge in violation of Section 301(a). Furthermore, plaintiffs have failed to establish that the temporary interruption of enhanced treatment processes (UV disinfection at Sand Island and secondary treatment at Kailua) amounts to bypasses, resulting in another genuine issue of fact. Accordingly, summary judgment as to these spills must be denied. Celotex, 477 U.S. at 322.

> g.   Summary Judgment Must Be Denied For Multiple Violations Based On Individual Spills That Are Not Supported By The Record

As set forth in Exhibit A to the Kelly Declaration, plaintiffs have counted multiple violations for individual incidents that are not supported by the records evidencing the duration of the spill. The excess violations amount to 57.[13]

---

[13]    7/5/99 (no evidence of this spill in plaintiffs' records), 12/6/00 (at most, one

As a result, plaintiffs are not entitled to judgment as a matter of law and their MPSJ on these alleged violations must be denied. See, e.g., Atl. States Legal Found., Inc., v. Tyson Foods, Inc., 897 F.2d 1128, 1140 (11th Cir. 1990) (a plaintiff cannot seek multiple violations of the CWA based on the same event). At the very least, a genuine issue of fact exists regarding the number of alleged violations, and on this basis also, summary judgment must be denied. Celotex, 477 U.S. at 322.

h.    Plaintiffs Are Not Entitled To Judgment
       Regarding Non-CCH Facility Spills

As shown in Exhibit A to the Kelly Declaration, 23 of the alleged violations under the First Claim at issue in plaintiffs' MPSJ involve alleged spills that occurred at non-CCH facilities.[14] Clearly, CCH cannot be held liable for spills

---

violation of less than one day for which plaintiffs seek 2 violations), 3/7/02 (at most, one violation of less than one day for which plaintiffs seek 2 violations), 7/4/03 (spill to ground of one day for which plaintiffs seek 34 violations; see Declaration of James Rosso), 1/2/04 (Hihiwai: at most, one violation of less than one day for which plaintiffs seek 2 violations), 1/2/04 (Olepe Loop: at most, one violation of less than one day for which plaintiffs seek 2 violations), 1/2/04 (Pahemo: at most, one violation of less than one day for which plaintiffs seek 2 violations), 1/3/04 (5307 Kalanianaole: at most, one violation of less than one day for which plaintiffs seek 7 violations), 1/3/04 (5403 Kalanianaole: at most, one violation of less than one day for which plaintiffs seek 7 violations, 2/14/05 (at most, one violation of less than one day for which plaintiffs seek 3 violations), 3/22/06 (at most, one violation of less than one day for which plaintiffs seek 3 violations).

[14]    7/5/99, 9/28/99, 12/28/99, 3/20/00, 4/18/00, 4/20/00, 1/6/02, 1/2/04, 3/2/04,

that occurred at another entities' facility.  As a result, plaintiffs are not entitled to judgment as a matter of law and their MPSJ on these alleged spills must be denied. At the very least, a genuine issue of fact exists regarding whether each of these spills occurred at a CCH facility, and on this basis also, summary judgment as to these alleged spills must be denied.  Celotex, 477 U.S. at 322.

>    2.    Plaintiffs' Second Claim

As discussed at length above, this Court is bound by Constitutional limitations to deny plaintiffs' MPSJ as to its Second Claim in its entirety on the ground that it is based entirely on ground-only spills over which this Court lacks subject matter jurisdiction.  If, however, this Court considers plaintiffs' MPSJ as to its Second Claim, this Court must still deny the MPSJ to the extent it is based on ground-only spills at the Honouliuli WWTP, as such spills are not covered by the Honouliuli WWTP Permit or plaintiffs' Complaint.  Of the 207 alleged violations at issue in plaintiffs' MPSJ, 58 are treatment plant spills at the Honouliuli WWTP. Kelly Decl., Exh. B.  Honouliuli Permit Standard Provision B.7 states that "Any 'overflow' or 'bypass' of facilities, including the 'waste' collection system, is prohibited."  Jodene Isaacs Declaration, Exh. 1.  However, Standard Provision A.19 defines "overflow" to "mean[] the intentional or unintentional diversion of

---

1/29/05, 6/17/05, 3/3/06, 3/26/06, 3/30/06, 3/31/06.  Kelly Decl., Exh. A.

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS'
FIRST AND SECOND CLAIMS

A/72564886.1/2017866-0000309724

flow from the *collection and transport systems*, including the pumping facilities." Id. (emphasis added). As the term "overflow" *specifically excludes* spills at the treatment plant, such spills are not permit violations and therefore cannot be the basis for liability here. Furthermore, plaintiffs' Complaint does not even allege spills at the Honouliuli WWTP (Complaint, ¶¶ 79-81) and plaintiffs are not entitled to judgment on alleged violations not even pled in their Complaint. Accordingly, plaintiffs are not entitled to judgment as a matter of law and their MPSJ on these spills must be denied. At the very least, a genuine issue of fact exists regarding whether each of these spills constitutes an overflow as that term is defined in the Permit, and on this basis also, summary judgment as to these spills must be denied. Celotex, 477 U.S. at 322.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

CONCLUSION

For the reasons stated above, plaintiffs' MPSJ must be denied as to

216 of their First Claim violations and all of their Second Claim violations.

DATED:     Honolulu, Hawaii          Respectfully submitted,
           June 12, 2008             CARRIE OKINAGA
                                     Corporation Counsel

                                     By:  /s/Kathleen A. Kelly
                                          Kathleen A. Kelly
                                          Attorneys for Defendant
                                          The City and County Of Honolulu