# EXHIBIT C

 

# Clean Water Act Jurisdiction
## Following the U.S. Supreme Court's Decision in
### Rapanos v. United States & Carabell v. United States

    This memorandum provides guidance to EPA regions and U.S. Army Corps of Engineers ["Corps"] districts implementing the Supreme Court's decision in the consolidated cases Rapanos v. United States and Carabell v. United States[1] (herein referred to simply as "Rapanos") which address the jurisdiction over waters of the United States under the Clean Water Act.[2] The chart below summarizes the key points contained in this memorandum. This reference tool is not a substitute for the more complete discussion of issues and guidance furnished throughout the memorandum.

---

**Summary of Key Points**

The agencies will assert jurisdiction over the following waters:
- Traditional navigable waters
- Wetlands adjacent to traditional navigable waters
- Non-navigable tributaries of traditional navigable waters that are relatively permanent where the tributaries typically flow year-round or have continuous flow at least seasonally (e.g., typically three months)
- Wetlands that directly abut such tributaries

The agencies will decide jurisdiction over the following waters based on a fact-specific analysis to determine whether they have a significant nexus with a traditional navigable water:
- Non-navigable tributaries that are not relatively permanent
- Wetlands adjacent to non-navigable tributaries that are not relatively permanent
- Wetlands adjacent to but that do not directly abut a relatively permanent non-navigable tributary

The agencies generally will not assert jurisdiction over the following features:
- Swales or erosional features (e.g., gullies, small washes characterized by low volume, infrequent, or short duration flow)
- Ditches (including roadside ditches) excavated wholly in and draining only uplands and that do not carry a relatively permanent flow of water

The agencies will apply the significant nexus standard as follows:
- A significant nexus analysis will assess the flow characteristics and functions of the tributary itself and the functions performed by all wetlands adjacent to the tributary to determine if they significantly affect the chemical, physical and biological integrity of downstream traditional navigable waters
- Significant nexus includes consideration of hydrologic and ecologic factors

---

[1] 126 S. Ct. 2208 (2006).
[2] 33 U.S.C. §1251 et seq.

*June 5, 2007*                                                                                              *Clean Water Act Jurisdiction*

**EXHIBIT C**

## Background

Congress enacted the Clean Water Act ("CWA" or "the Act") "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."[3] One of the mechanisms adopted by Congress to achieve that purpose is a prohibition on the discharge of any pollutants, including dredged or fill material, into "navigable waters" except in compliance with other specified sections of the Act.[4] In most cases, this means compliance with a permit issued pursuant to CWA §402 or §404. The Act defines the term "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source[,]"[5] and provides that "[t]he term 'navigable waters' means the waters of the United States, including the territorial seas."[6]

In Rapanos, the Supreme Court addressed where the Federal government can apply the Clean Water Act, specifically by determining whether a wetland or tributary is a "water of the United States." The justices issued five separate opinions in Rapanos (one plurality opinion, two concurring opinions, and two dissenting opinions), with no single opinion commanding a majority of the Court.

## The Rapanos Decision

Four justices, in a plurality opinion authored by Justice Scalia, rejected the argument that the term "waters of the United States" is limited to only those waters that are navigable in the traditional sense and their abutting wetlands.[7] However, the plurality concluded that the agencies' regulatory authority should extend only to "relatively permanent, standing or continuously flowing bodies of water" connected to traditional navigable waters, and to "wetlands with a continuous surface connection to" such relatively permanent waters.[8]

Justice Kennedy did not join the plurality's opinion but instead authored an opinion concurring in the judgment vacating and remanding the cases to the Sixth Circuit Court of Appeals.[9] Justice Kennedy agreed with the plurality that the statutory term "waters of the United States" extends beyond water bodies that are traditionally considered navigable.[10] Justice Kennedy, however, found the plurality's interpretation of the scope of the CWA to be "inconsistent with the Act's text, structure, and purpose[,]" and he instead presented a different standard for evaluating CWA jurisdiction over

---

[3] 33 U.S.C. § 1251(a).
[4] 33 U.S.C. § 1311(a), §1362(12)(A).
[5] 33 U.S.C. § 1362(12)(A).
[6] 33 U.S.C. § 1362(7). See also 33 C.F.R. § 328.3(a) and 40 C.F.R. § 230.3(s).
[7] Id. at 2220.
[8] Id. at 2225-27.
[9] Id. at 2236-52. While Justice Kennedy concurred in the Court's decision to vacate and remand the cases to the Sixth Circuit, his basis for remand was limited to the question of "whether the specific wetlands at issue possess a significant nexus with navigable waters." 126 S. Ct. at 2252. In contrast, the plurality remanded the cases to determine both "whether the ditches and drains near each wetland are 'waters,'" and "whether the wetlands in question are 'adjacent' to these 'waters' in the sense of possessing a continuous surface connection...." Id. at 2235.
[10] Id. at 2241.

wetlands and other water bodies.[11] Justice Kennedy concluded that wetlands are "waters of the United States" "if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.' When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'"[12]

Four justices, in a dissenting opinion authored by Justice Stevens, concluded that EPA's and the Corps' interpretation of "waters of the United States" was a reasonable interpretation of the Clean Water Act.[13]

When there is no majority opinion in a Supreme Court case, controlling legal principles may be derived from those principles espoused by five or more justices.[14] Thus, regulatory jurisdiction under the CWA exists over a water body if either the plurality's or Justice Kennedy's standard is satisfied.[15] Since Rapanos, the United States has filed pleadings in a number of cases interpreting the decision in this manner.

The agencies are issuing this memorandum in recognition of the fact that EPA regions and Corps districts need guidance to ensure that jurisdictional determinations, permitting actions, and other relevant actions are consistent with the decision and supported by the administrative record. Therefore, the agencies have evaluated the Rapanos opinions to identify those waters that are subject to CWA jurisdiction under the reasoning of a majority of the justices. This approach is appropriate for a guidance document. The agencies intend to more broadly consider jurisdictional issues, including clarification and definition of key terminology, through rulemaking or other appropriate policy process.

---

[11] Id. at 2246.
[12] Id. at 2248. Chief Justice Roberts wrote a separate concurring opinion explaining his agreement with the plurality. See 126 S. Ct. at 2235-36.
[13] Id. at 2252-65. Justice Breyer wrote a separate dissenting opinion explaining his agreement with Justice Stevens' dissent. See 126 S. Ct. at 2266.
[14] See Marks v. United States, 430 U.S. 188, 193-94 (1977); Waters v. Churchill, 511 U.S. 661, 685 (1994) (Souter, J., concurring) (analyzing the points of agreement between plurality, concurring, and dissenting opinions to identify the legal "test ... that lower courts should apply," under Marks, as the holding of the Court); cf. League of United Latin American Citizens v. Perry, 126 S. Ct. 2594, 2607 (2006) (analyzing concurring and dissenting opinions in a prior case to identify a legal conclusion of a majority of the Court); Alexander v. Sandoval, 532 U.S. 275, 281-282 (2001) (same).
[15] 126 S. Ct. at 2265 (Stevens, J., dissenting) ("Given that all four justices who have joined this opinion would uphold the Corps' jurisdiction in both of these cases – and in all other cases in which either the plurality's or Justice Kennedy's test is satisfied – on remand each of the judgments should be reinstated if *either* of those tests is met.") (emphasis in original).

<u>Agency Guidance</u>[16]

To ensure that jurisdictional determinations, administrative enforcement actions, and other relevant agency actions are consistent with the <u>Rapanos</u> decision, the agencies in this guidance address which waters are subject to CWA § 404 jurisdiction.[17] Specifically, this guidance identifies those waters over which the agencies will assert jurisdiction categorically and on a case-by-case basis, based on the reasoning of the <u>Rapanos</u> opinions.[18] EPA and the Corps will continually assess and review the application of this guidance to ensure nationwide consistency, reliability, and predictability in our administration of the statute.

*1. Traditional Navigable Waters (i.e., "(a)(1) Waters") and Their Adjacent Wetlands*

> **Key Points**
> - The agencies will assert jurisdiction over traditional navigable waters, which includes all the waters described in 33 C.F.R. § 328.3(a)(1), and 40 C.F.R. § 230.3 (s)(1).
> - The agencies will assert jurisdiction over wetlands adjacent to traditional navigable waters, including over adjacent wetlands that do not have a continuous surface connection to traditional navigable waters.

EPA and the Corps will continue to assert jurisdiction over "[a]ll waters which are currently used, or were used in the past, or may be susceptible to use in interstate or

---

[16] The CWA provisions and regulations described in this document contain legally binding requirements. This guidance does not substitute for those provisions or regulations, nor is it a regulation itself. It does not impose legally binding requirements on EPA, the Corps, or the regulated community, and may not apply to a particular situation depending on the circumstances. Any decisions regarding a particular water will be based on the applicable statutes, regulations, and case law. Therefore, interested persons are free to raise questions about the appropriateness of the application of this guidance to a particular situation, and EPA and/or the Corps will consider whether or not the recommendations or interpretations of this guidance are appropriate in that situation based on the statutes, regulations, and case law.

[17] This guidance focuses only on those provisions of the agencies' regulations at issue in <u>Rapanos</u> -- 33 C.F.R. §§ 328.3(a)(1), (a)(5), and (a)(7); 40 C.F.R. §§ 230.3(s)(1), (s)(5), and (s)(7). This guidance does not address or affect other subparts of the agencies' regulations, or response authorities, relevant to the scope of jurisdiction under the CWA. In addition, because this guidance is issued by both the Corps and EPA, which jointly administer CWA § 404, it does not discuss other provisions of the CWA, including §§ 311 and 402, that differ in certain respects from § 404 but share the definition of "waters of the United States." Indeed, the plurality opinion in <u>Rapanos</u> noted that "... there is no reason to suppose that our construction today significantly affects the enforcement of §1342 ... The Act does not forbid the 'addition of any pollutant *directly* to navigable waters from any point source,' but rather the 'addition of any pollutant *to* navigable waters.'" (emphasis in original) 126 S. Ct. 2208, 2227. EPA is considering whether to provide additional guidance on these and other provisions of the CWA that may be affected by the <u>Rapanos</u> decision.

[18] In 2001, the Supreme Court held that use of "isolated" non-navigable intrastate waters by migratory birds was not by itself a sufficient basis for the exercise of federal regulatory jurisdiction under the CWA. See <u>Solid Waste Agency of Northern Cook County (SWANCC) v. U.S. Army Corps of Engineers</u>, 531 U.S. 159 (2001). This guidance does not address <u>SWANCC</u>, nor does it affect the Joint Memorandum regarding that decision issued by the General Counsels of EPA and the Department of the Army on January 10, 2003. <u>See</u> 68 Fed. Reg. 1991, 1995 (Jan. 15, 2003).

foreign commerce, including all waters which are subject to the ebb and flow of the tide."[19] These waters are referred to in this guidance as traditional navigable waters.

The agencies will also continue to assert jurisdiction over wetlands "adjacent" to traditional navigable waters as defined in the agencies' regulations. Under EPA and Corps regulations and as used in this guidance, "adjacent" means "bordering, contiguous, or neighboring." Finding a continuous surface connection is not required to establish adjacency under this definition. The Rapanos decision does not affect the scope of jurisdiction over wetlands that are adjacent to traditional navigable waters because at least five justices agreed that such wetlands are "waters of the United States."[20]

## 2. Relatively Permanent Non-navigable Tributaries of Traditional Navigable Waters and Wetlands with a Continuous Surface Connection with Such Tributaries

> **Key Points**
> - The agencies will assert jurisdiction over non-navigable tributaries of traditional navigable waters that are relatively permanent where the tributaries typically flow year-round or have continuous flow at least seasonally (e.g., typically three months).
> - The agencies will assert jurisdiction over those adjacent wetlands that have a continuous surface connection to such tributaries (e.g., they are not separated by uplands, a berm, dike, or similar feature.)

A non-navigable tributary[21] of a traditional navigable water is a non-navigable water body whose waters flow into a traditional navigable water either directly or indirectly by means of other tributaries. Both the plurality opinion and the dissent would uphold CWA jurisdiction over non-navigable tributaries that are "relatively permanent" — waters that typically (e.g., except due to drought) flow year-round or waters that have a

---

[19] 33 C.F.R. § 328.3(a)(1); 40 C.F.R. § 230.3(s)(1). The "(a)(1)" waters include all of the "navigable waters of the United States," defined in 33 C.F.R. Part 329 and by numerous decisions of the federal courts, plus all other waters that are navigable-in-fact (e.g., the Great Salt Lake, UT and Lake Minnetonka, MN).

[20] Id. at 2248 (Justice Kennedy, concurring) ("As applied to wetlands adjacent to navigable-in-fact waters, the Corps' conclusive standard for jurisdiction rests upon a reasonable inference of ecologic interconnection, and the assertion of jurisdiction for those wetlands is sustainable under the Act by showing adjacency alone.").

[21] A tributary includes natural, man-altered, or man-made water bodies that carry flow directly or indirectly into a traditional navigable water. Furthermore, a tributary, for the purposes of this guidance, is the entire reach of the stream that is of the same order (i.e., from the point of confluence, where two lower order streams meet to form the tributary, downstream to the point such tributary enters a higher order stream). The flow characteristics of a particular tributary will be evaluated at the farthest downstream limit of such tributary (i.e., the point the tributary enters a higher order stream). It is reasonable for the agencies to treat the stream reach as a whole in light of the Supreme Court's observation that the phrase "navigable waters" generally refers to "rivers, streams, and other hydrographic features." 126 S. Ct. at 2222 (Justice Scalia, quoting Riverside Bayview, 474 U.S. at 131). The entire reach of a stream is a reasonably identifiable hydrographic feature. The agencies will also use this characterization of tributary when applying the significant nexus standard under Section 3 of this guidance.

continuous flow at least seasonally (e.g., typically three months).[22] Justice Scalia emphasizes that relatively permanent waters do not include tributaries "whose flow is 'coming and going at intervals ... broken, fitful.'"[23] Therefore, "relatively permanent" waters do not include ephemeral tributaries which flow only in response to precipitation and intermittent streams which do not typically flow year-round or have continuous flow at least seasonally. However, CWA jurisdiction over these waters will be evaluated under the significant nexus standard described below. The agencies will assert jurisdiction over relatively permanent non-navigable tributaries of traditional navigable waters without a legal obligation to make a significant nexus finding.

In addition, the agencies will assert jurisdiction over those adjacent wetlands that have a continuous surface connection with a relatively permanent, non-navigable tributary, without the legal obligation to make a significant nexus finding. As explained above, the plurality opinion and the dissent agree that such wetlands are jurisdictional.[24] The plurality opinion indicates that "continuous surface connection" is a "physical connection requirement."[25] Therefore, a continuous surface connection exists between a wetland and a relatively permanent tributary where the wetland directly abuts the tributary (e.g., they are not separated by uplands, a berm, dike, or similar feature).[26]

---

[22] See 126 S. Ct. at 2221 n. 5 (Justice Scalia, plurality opinion) (explaining that "relatively permanent" does not necessarily exclude waters "that might dry up in extraordinary circumstances such as drought" or "seasonal rivers, which contain continuous flow during some months of the year but no flow during dry months").

[23] Id. (internal citations omitted).

[24] Id. at 2226-27 (Justice Scalia, plurality opinion).

[25] Id. at 2232 n.13 (referring to "our physical-connection requirement" and later stating that Riverside Bayview does not reject "the physical-connection requirement") and 2234 ("Wetlands are 'waters of the United States' if they bear the 'significant nexus' of physical connection, which makes them as a practical matter *indistinguishable* from waters of the United States.") (emphasis in original). See also 126 S. Ct. at 2230 ("adjacent" means "physically abutting") and 2229 (citing to Riverside Bayview as "confirm[ing] that the scope of ambiguity of 'the waters of the United States' is determined by a wetland's *physical connection* to covered waters...") (emphasis in original). A continuous surface connection does not require surface water to be continuously present between the wetland and the tributary. 33 C.F.R. § 328.3(b) and 40 C.F.R. § 232.2 (defining wetlands as "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support ... a prevalence of vegetation typically adapted for life in saturated soil conditions").

[26] While all wetlands that meet the agencies' definitions are considered adjacent wetlands, only those adjacent wetlands that have a continuous surface connection because they directly abut the tributary (e.g., they are not separated by uplands, a berm, dike, or similar feature) are considered jurisdictional under the plurality standard.

3. *Certain Adjacent Wetlands and Non-navigable Tributaries That Are Not Relatively Permanent*

> **Key Points**
>
> - The agencies will assert jurisdiction over non-navigable, not relatively permanent tributaries and their adjacent wetlands where such tributaries and wetlands have a significant nexus to a traditional navigable water.
> - A significant nexus analysis will assess the flow characteristics and functions of the tributary itself and the functions performed by any wetlands adjacent to the tributary to determine if they significantly affect the chemical, physical and biological integrity of downstream traditional navigable waters.
> - "Similarly situated" wetlands include all wetlands adjacent to the same tributary.
> - Significant nexus includes consideration of hydrologic factors including the following:
>   - volume, duration, and frequency of flow, including consideration of certain physical characteristics of the tributary
>   - proximity to the traditional navigable water
>   - size of the watershed
>   - average annual rainfall
>   - average annual winter snow pack
> - Significant nexus also includes consideration of ecologic factors including the following:
>   - potential of tributaries to carry pollutants and flood waters to traditional navigable waters
>   - provision of aquatic habitat that supports a traditional navigable water
>   - potential of wetlands to trap and filter pollutants or store flood waters
>   - maintenance of water quality in traditional navigable waters
> - The following geographic features generally are not jurisdictional waters:
>   - swales or erosional features (e.g. gullies, small washes characterized by low volume, infrequent, or short duration flow)
>   - ditches (including roadside ditches) excavated wholly in and draining only uplands and that do not carry a relatively permanent flow of water

The agencies will assert jurisdiction over the following types of waters when they have a significant nexus with a traditional navigable water: (1) non-navigable tributaries that are not relatively permanent,[27] (2) wetlands adjacent to non-navigable tributaries that are not relatively permanent, and (3) wetlands adjacent to, but not directly abutting, a relatively permanent tributary (e.g., separated from it by uplands, a berm, dike or similar feature).[28] As described below, the agencies will assess the flow characteristics and functions of the tributary itself, together with the functions performed by any wetlands adjacent to that tributary, to determine whether collectively they have a significant nexus with traditional navigable waters.

The agencies' assertion of jurisdiction over non-navigable tributaries and adjacent wetlands that have a significant nexus to traditional navigable waters is supported by five

---

[27] For simplicity, the term "tributary" when used alone in this section refers to non-navigable tributaries that are not relatively permanent.

[28] As described in Section 2 of this guidance, the agencies will assert jurisdiction, without the need for a significant nexus finding, over all wetlands that are both adjacent and have a continuous surface connection to relatively permanent tributaries. See pp. 6-7, supra.

justices. Justice Kennedy applied the significant nexus standard to the wetlands at issue in <u>Rapanos</u> and <u>Carabell</u>: "[W]etlands possess the requisite nexus, and thus come within the statutory phrase 'navigable waters,' if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'"[29] While Justice Kennedy's opinion discusses the significant nexus standard primarily in the context of wetlands adjacent to non-navigable tributaries,[30] his opinion also addresses Clean Water Act jurisdiction over tributaries themselves. Justice Kennedy states that, based on the Supreme Court's decisions in <u>Riverside Bayview</u> and <u>SWANCC</u>, "the connection between a non-navigable <u>water or wetland</u> may be so close, or potentially so close, that the Corps may deem the water or wetland a 'navigable water' under the Act. ... Absent a significant nexus, jurisdiction under the Act is lacking."[31] Thus, Justice Kennedy would limit jurisdiction to those waters that have a significant nexus with traditional navigable waters, although his opinion focuses on the specific factors and functions the agencies should consider in evaluating significant nexus for adjacent wetlands, rather than for tributaries.

In considering how to apply the significant nexus standard, the agencies have focused on the integral relationship between the ecological characteristics of tributaries and those of their adjacent wetlands, which determines in part their contribution to restoring and maintaining the chemical, physical and biological integrity of the Nation's traditional navigable waters. The ecological relationship between tributaries and their adjacent wetlands is well documented in the scientific literature and reflects their physical proximity as well as shared hydrological and biological characteristics. The flow parameters and ecological functions that Justice Kennedy describes as most relevant to an evaluation of significant nexus result from the ecological inter-relationship between tributaries and their adjacent wetlands. For example, the duration, frequency, and volume of flow in a tributary, and subsequently the flow in downstream navigable waters, is directly affected by the presence of adjacent wetlands that hold floodwaters, intercept sheet flow from uplands, and then release waters to tributaries in a more even and constant manner. Wetlands may also help to maintain more consistent water temperature in tributaries, which is important for some aquatic species. Adjacent wetlands trap and hold pollutants that may otherwise reach tributaries (and downstream navigable waters) including sediments, chemicals, and other pollutants. Tributaries and their adjacent wetlands provide habitat (e.g., feeding, nesting, spawning, or rearing young) for many aquatic species that also live in traditional navigable waters.

---

[29] <u>Id</u>. at 2248. When applying the significant nexus standard to tributaries and wetlands, it is important to apply it within the limits of jurisdiction articulated in <u>SWANCC</u>. Justice Kennedy cites <u>SWANCC</u> with approval and asserts that the significant nexus standard, rather than being articulated for the first time in <u>Rapanos</u>, was established in <u>SWANCC</u>. 126 S. Ct. at 2246 (describing <u>SWANCC</u> as "interpreting the Act to require a significant nexus with navigable waters"). It is clear, therefore, that Justice Kennedy did not intend for the significant nexus standard to be applied in a manner that would result in assertion of jurisdiction over waters that he and the other justices determined were not jurisdictional in <u>SWANCC</u>. Nothing in this guidance should be interpreted as providing authority to assert jurisdiction over waters deemed non-jurisdictional by <u>SWANCC</u>.
[30] 126 S. Ct. at 2247-50.
[31] <u>Id</u>. at 2241 (emphasis added).

When performing a significant nexus analysis,[32] the first step is to determine if the tributary has any adjacent wetlands. Where a tributary has no adjacent wetlands, the agencies will consider the flow characteristics and functions of only the tributary itself in determining whether such tributary has a significant effect on the chemical, physical and biological integrity of downstream traditional navigable waters. A tributary, as characterized in Section 2 above, is the entire reach of the stream that is of the same order (i.e., from the point of confluence, where two lower order streams meet to form the tributary, downstream to the point such tributary enters a higher order stream). For purposes of demonstrating a connection to traditional navigable waters, it is appropriate and reasonable to assess the flow characteristics of the tributary at the point at which water is in fact being contributed to a higher order tributary or to a traditional navigable water. If the tributary has adjacent wetlands, the significant nexus evaluation needs to recognize the ecological relationship between tributaries and their adjacent wetlands, and their closely linked role in protecting the chemical, physical, and biological integrity of downstream traditional navigable waters.

Therefore, the agencies will consider the flow and functions of the tributary together with the functions performed by all the wetlands adjacent to that tributary in evaluating whether a significant nexus is present. Similarly, where evaluating significant nexus for an adjacent wetland, the agencies will consider the flow characteristics and functions performed by the tributary to which the wetland is adjacent along with the functions performed by the wetland and all other wetlands adjacent to that tributary. This approach reflects the agencies' interpretation of Justice Kennedy's term "similarly situated" to include all wetlands adjacent to the same tributary. Where it is determined that a tributary and its adjacent wetlands collectively have a significant nexus with traditional navigable waters, the tributary and all of its adjacent wetlands are jurisdictional. Application of the significant nexus standard in this way is reasonable because of its strong scientific foundation – that is, the integral ecological relationship between a tributary and its adjacent wetlands. Interpreting the phrase "similarly situated" to include all wetlands adjacent to the same tributary is reasonable because such wetlands are physically located in a like manner (i.e., lying adjacent to the same tributary).

Principal considerations when evaluating significant nexus include the volume, duration, and frequency of the flow of water in the tributary and the proximity of the tributary to a traditional navigable water. In addition to any available hydrologic information (e.g., gauge data, flood predictions, historic records of water flow, statistical data, personal observations/records, etc.), the agencies may reasonably consider certain physical characteristics of the tributary to characterize its flow, and thus help to inform the determination of whether or not a significant nexus is present between the tributary and downstream traditional navigable waters. Physical indicators of flow may include the presence and characteristics of a reliable ordinary high water mark (OHWM) with a

---

[32] In discussing the significant nexus standard, Justice Kennedy stated: "The required nexus must be assessed in terms of the statute's goals and purposes. Congress enacted the [CWA] to 'restore and maintain the chemical, physical, and biological integrity of the Nation's waters' ..." 126 S. Ct. at 2248. Consistent with Justice Kennedy's instruction, EPA and the Corps will apply the significant nexus standard in a manner that restores and maintains any of these three attributes of traditional navigable waters.

channel defined by bed and banks.[33] Other physical indicators of flow may include shelving, wracking, water staining, sediment sorting, and scour.[34] Consideration will also be given to certain relevant contextual factors that directly influence the hydrology of tributaries including the size of the tributary's watershed, average annual rainfall, average annual winter snow pack, slope, and channel dimensions.

In addition, the agencies will consider other relevant factors, including the functions performed by the tributary together with the functions performed by any adjacent wetlands. One such factor is the extent to which the tributary and adjacent wetlands have the capacity to carry pollutants (e.g., petroleum wastes, toxic wastes, sediment) or flood waters to traditional navigable waters, or to reduce the amount of pollutants or flood waters that would otherwise enter traditional navigable waters.[35] The agencies will also evaluate ecological functions performed by the tributary and any adjacent wetlands which affect downstream traditional navigable waters, such as the capacity to transfer nutrients and organic carbon vital to support downstream foodwebs (e.g., macroinvertebrates present in headwater streams convert carbon in leaf litter making it available to species downstream), habitat services such as providing spawning areas for recreationally or commercially important species in downstream waters, and the extent to which the tributary and adjacent wetlands perform functions related to maintenance of downstream water quality such as sediment trapping.

After assessing the flow characteristics and functions of the tributary and its adjacent wetlands, the agencies will evaluate whether the tributary and its adjacent wetlands are likely to have an effect that is more than speculative or insubstantial on the chemical, physical, and biological integrity of a traditional navigable water. As the distance from the tributary to the navigable water increases, it will become increasingly important to document whether the tributary and its adjacent wetlands have a significant nexus rather than a speculative or insubstantial nexus with a traditional navigable water.

Accordingly, Corps districts and EPA regions shall document in the administrative record the available information regarding whether a tributary and its adjacent wetlands have a significant nexus with a traditional navigable water, including the physical indicators of flow in a particular case and available information regarding the functions of the tributary and any adjacent wetlands. The agencies will explain their basis for concluding whether or not the tributary and its adjacent wetlands, when considered together, have a more than speculative or insubstantial effect on the chemical, physical, and biological integrity of a traditional navigable water.

---

[33] See 33 C.F.R. § 328.3(e). The OHWM also serves to define the lateral limit of jurisdiction in a non-navigable tributary where there are no adjacent wetlands. See 33 C.F.R. § 328.4(c). While EPA regions and Corps districts must exercise judgment to identify the OHWM on a case-by-case basis, the Corps' regulations identify the factors to be applied. These regulations have recently been further explained in Regulatory Guidance Letter (RGL) 05-05 (Dec. 7, 2005). The agencies will apply the regulations and the RGL and take other steps as needed to ensure that the OHWM identification factors are applied consistently nationwide.

[34] See Justice Kennedy's discussion of "physical characteristics," 126 S. Ct. at 2248-2249.

[35] See, generally, 126 S. Ct. at 2248-53; see also 126 S. Ct. at 2249 ("Just as control over the non-navigable parts of a river may be essential or desirable in the interests of the navigable portions, so may the key to flood control on a navigable stream be found in whole or in part in flood control on its tributaries....") (citing to Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., 313 U.S. 508, 524-25(1941)).

Swales or erosional features (e.g., gullies, small washes characterized by low volume, infrequent, or short duration flow) are generally not waters of the United States because they are not tributaries or they do not have a significant nexus to downstream traditional navigable waters. In addition, ditches (including roadside ditches) excavated wholly in and draining only uplands and that do not carry a relatively permanent flow of water are generally not waters of the United States because they are not tributaries or they do not have a significant nexus to downstream traditional navigable waters.[36] Even when not jurisdictional waters subject to CWA §404, these geographic features (e.g., swales, ditches) may still contribute to a surface hydrologic connection between an adjacent wetland and a traditional navigable water. In addition, these geographic features may function as point sources (i.e., "discernible, confined, and discrete conveyances"), such that discharges of pollutants to other waters through these features could be subject to other CWA regulations (e.g., CWA §§ 311 and 402).[37]

Certain ephemeral waters in the arid west are distinguishable from the geographic features described above where such ephemeral waters are tributaries and they have a significant nexus to downstream traditional navigable waters. For example, in some cases these ephemeral tributaries may serve as a transitional area between the upland environment and the traditional navigable waters. During and following precipitation events, ephemeral tributaries collect and transport water and sometimes sediment from the upper reaches of the landscape downstream to the traditional navigable waters. These ephemeral tributaries may provide habitat for wildlife and aquatic organisms in downstream traditional navigable waters. These biological and physical processes may further support nutrient cycling, sediment retention and transport, pollutant trapping and filtration, and improvement of water quality, functions that may significantly affect the chemical, physical, and biological integrity of downstream traditional navigable waters.

### Documentation

As described above, the agencies will assert CWA jurisdiction over the following waters without the legal obligation to make a significant nexus determination: traditional navigable waters and wetlands adjacent thereto, non-navigable tributaries that are relatively permanent waters, and wetlands with a continuous surface connection with such tributaries. The agencies will also decide CWA jurisdiction over other non-navigable tributaries and over other wetlands adjacent to non-navigable tributaries based on a fact-specific analysis to determine whether they have a significant nexus with traditional navigable waters. For purposes of CWA §404 determinations by the Corps, the Corps and EPA are developing a revised form to be used by field regulators for documenting the assertion or declination of CWA jurisdiction.

Corps districts and EPA regions will ensure that the information in the record adequately supports any jurisdictional determination. The record shall, to the maximum extent practicable, explain the rationale for the determination, disclose the data and information relied upon, and, if applicable, explain what data or information received greater or lesser weight, and what professional judgment or assumptions were used in

---

[36] See 51 Fed. Reg. 41206, 41217 (Nov. 13, 1986).
[37] 33 U.S.C. § 1362(14).

reaching the determination. The Corps districts and EPA regions will also demonstrate and document in the record that a particular water either fits within a class identified above as not requiring a significant nexus determination, or that the water has a significant nexus with a traditional navigable water. As a matter of policy, Corps districts and EPA regions will include in the record any available information that documents the existence of a significant nexus between a relatively permanent tributary that is not perennial (and its adjacent wetlands if any) and a traditional navigable water, even though a significant nexus finding is not required as a matter of law.

All pertinent documentation and analyses for a given jurisdictional determination (including the revised form) shall be adequately reflected in the record and clearly demonstrate the basis for asserting or declining CWA jurisdiction.[38] Maps, aerial photography, soil surveys, watershed studies, local development plans, literature citations, and references from studies pertinent to the parameters being reviewed are examples of information that will assist staff in completing accurate jurisdictional determinations. The level of documentation may vary among projects. For example, jurisdictional determinations for complex projects may require additional documentation by the project manager.

_____
Benjamin H. Grumbles
Assistant Administrator for Water
U.S. Environmental Protection Agency

_____
John Paul Woodley, Jr.
Assistant Secretary of the Army
(Civil Works)
Department of the Army

---

[38] For jurisdictional determinations and permitting decisions, such information shall be posted on the appropriate Corps website for public and interagency information.