CHRISTOPHER SPROUL
Environmental Advocates
5135 Anza Street
San Francisco, California  94121
Tel:  (415) 553-3376
Fax:  (415) 358-5695
E-mail:  csproul@enviroadvocates.com

PAUL ALSTON          1259-0
WILLIAM TAM          1887-0
BLAKE K. OSHIRO      6746-0
Alston Hunt Floyd & Ing
ASB Tower, 18th Floor
1001 Bishop Street
Honolulu, Hawaiʻi  96813
Tel:  (808) 524-1800
Fax:  (808) 524-5976
Email:  palston@ahfi.com
        wtam@ahfi.com
        boshiro@ahfi.com

Attorneys for Applicants
SIERRA CLUB, HAWAIʻI CHAPTER,
HAWAIʻI'S THOUSAND FRIENDS and
OUR CHILDREN'S EARTH FOUNDATION

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| SIERRA CLUB, HAWAIʻI CHAPTER; HAWAIʻI'S THOUSAND FRIENDS; and OUR CHILDREN'S EARTH FOUNDATION, <br><br>        Plaintiffs, <br><br>    vs. <br><br> CITY AND COUNTY OF HONOLULU and FRANK DOYLE, DIRECTOR OF THE DEPARTMENT OF ENVIRONMENTAL SERVICES, in his official capacity, <br><br>        Defendants. | Civil No. 04-00463 DAE-BMK <br><br> **PLAINTIFFS' CONSOLIDATED (1) OPPOSITION TO DEFENDANT CITY AND COUNTY OF HONOLULU'S MOTION TO DISMISS PLAINTIFFS' SECOND CLAIM and (2) PLAINTIFFS' REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' FIRST AND SECOND CLAIMS; CERTIFICATE OF WORD COUNT; CERTIFICATE OF SERVICE** <br><br> Date:    June 30, 2008 <br> Time:    9:00 a.m. <br> Judge:   Hon. David Alan Ezra |

**PLAINTIFFS' CONSOLIDATED (1) OPPOSITION TO DEFENDANT CITY AND COUNTY OF HONOLULU'S MOTION TO DISMISS PLAINTIFFS' SECOND CLAIM and (2) PLAINTIFFS' REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' FIRST AND SECOND CLAIMS**

## I.    INTRODUCTION

Plaintiffs Sierra Club, Hawaiʻi Chapter, Hawaiʻi's Thousand Friends, and Our Children's Earth Foundation (collectively, "Citizens") moved for partial summary judgment on their First and Second Claims to establish the City and County of Honolulu ("CCH")'s Clean Water Act ("CWA") liability for sewage spills from CCH's sewage system.

The Citizens' First Claim alleges that CCH violated CWA section 301(a)[1] by spilling sewage from its sewage system to waters of the United States without National Pollutant Discharge Elimination System ("NPDES") permit authorization.

The Citizens' Second Claim alleges that CCH has violated conditions in its NPDES permits for its wastewater treatment plants ("WWTPs") and related collection systems that prohibit CCH from discharging sewage to any location other than via CCH's authorized WWTP outfalls.

Specifically, Citizens move for summary judgment on their First Claim on the basis that CCH committed 270 CWA violations by spilling sewage to waters of the United States.[2]  In addition,

_____

[1]  33 U.S.C. § 1311(a).

[2]  The Citizens allege less than 270 total sewage spill incidents, even though some of these sewage spills lasted for more than one day.  The Citizens count each sewage spill that occurs as a separate CWA violation.

the Citizens move for summary judgment on their Second Claim on the basis that CCH committed 148 days/incidents of unlawful sewage spills from the Honouliuli collection system.  Each such spill is an separate additional CWA violation.

CCH's own self-monitoring reports and/or the Hawai'i Department of Health ("DOH")'s summary tables of CCH's sewage spills (that DOH prepared from CCH's self-monitoring reports) conclusively establish CCH's sewage spills. The Citizens' motion for summary judgment is soundly based on CCH's and DOH's own reporting and public documents which they may not disclaim.

All of CCH's sewage spills to waters of the United States for which Citizens seek liability (under their First Claim) also constitute violations of CCH's NPDES Permits. The Citizens could have also sought to establish CCH's liability (under their Second Claim) for these spills.  However, to avoid any risk of double-counting violations, Citizens move for summary judgment under their Second Claim *only* for sewage spills not included under their First Claim (i.e., for sewage spills that CCH did not clearly report reached waters of the United States).

CCH committed several hundred more sewage spills than the Citizens present for seek summary judgment here.  For example, CCH experienced numerous spills from its Sand Island, Kailua/Kaneohe, Wai'anae and other collection systems that CCH did not clearly report as reaching the waters of the United States.  However, the Citizens move for summary judgment only on

sewage spills (1) to waters of the United States and (2) from the Honouliuli collection system that CCH did not clearly report reached waters of the United States.  The Honouliuli NPDES Permit was chosen because it contains the clearest prohibition on all sewage spills, regardless of whether such spills reach waters of the United States.

CCH does not dispute that at least 100 of its sewage spills reached waters of the United States in violation of CWA section 301(a).  Thus, at the outset, CCH concedes that the Citizens are entitled to partial summary judgment on their First Claim establishing at least 109 such violations (some of the spills lasted for multiple days).  CCH Opposition to Plaintiffs' Motion for Partial Summary Judgment on Plaintiffs' First and Second Claims("CCH Opposition") (Docket Document No. 184) at 1; Declaration of Kathleen A. Kelly in Support of City and County of Honolulu's Opposition to Plaintiffs' Motion for Partial Summary Judgment on Plaintiffs' First and Second Claims ("Kelly Decl.") (Docket Document No. 184-2), ¶ 3 & Ex. A.

However, CCH argues that the Citizens failed to offer sufficient evidence to establish summary judgment on the remainder of CCH's sewage spills under the Citizens' First Claim.

To simplify the Court's task here, the Citizens will withdraw their request for summary judgment on the spill violations that (1) CCH contends are from facilities it does not own; and (2) those that constitute WWTP "bypasses."  CCH's

challenges to the remainder of the spill violations alleged by the Citizens are without merit.  CCH's own self-monitoring reports establish that CCH discharged sewage to waters of the United States.  Under the CWA, the CCH is strictly liable for such spills.  CCH has no defense.

CCH argues the Court should deny Citizens summary judgment on their Second Claim and should dismiss the Second Claim.  CCH Opposition at 8-27; CCH Motion to Dismiss Plaintiffs' Second Claim CCH & Memorandum of Points and Authorities in Support of Motion ("CCH Motion to Dismiss") (Docket Document No. 182).[3]

CCH in essence argues that the NPDES permit conditions, which explicitly prohibit any CCH sewage spills (regardless of whether those spills reached waters of the United States), exceed federal authority under the Commerce Clause of the Constitution and statutory authority under the CWA.  CCH's arguments are meritless.

While CCH's belated Commerce Clause challenge to its own NPDES permits is dubious, such a challenge is beyond this Court's jurisdiction to consider. Even if the U.S. Environmental Protection Agency ("EPA") or DOH mistakenly included provisions in CCH's NPDES permits that are more stringent than the CWA

---

[3]  CCH's Opposition and its Motion to Dismiss are nearly identical in regard to CCH's arguments related to the Citizens' Second Claim.  Accordingly, to avoid duplicative briefing in this court, the Citizens combine their response to CCH's Opposition and CCH's Motion to Dismiss into this single brief.

dictates, this Court may not modify CCH's NPDES permits in *this* enforcement proceeding.  CCH's appeal lies elsewhere before EPA. This Court must enforce the NPDES permits *as written, not as CCH would like them to read*.

**II.  ARGUMENT**

**A.  THE CITIZENS SECOND CLAIM VALIDLY STATES A CLAIM FOR RELIEF AND THE CITIZENS ARE ENTITLED TO SUMMARY JUDGMENT ON THE SECOND CLAIM**

CCH states that it is not challenging either any specific term of its NPDES permits or EPA or DOH's authority to prescribe any particular permit condition.  CCH Opposition at 26. If this were true, it would foreclose CCH's opposition to summary judgment on and CCH's motion to dismiss the Second Claim.

CCH does not and cannot dispute that the Honouliuli Permit categorically prohibits spills of raw sewage from the Honouliuli WWTP collection system, regardless of whether those sewage spills reach waters of the United States.  CCH also does not and cannot contest that the CWA plainly provides that citizens may bring a CWA citizen's suit to remedy any violation of any NPDES permit condition.   CCH's only recourse to dismiss and /or avoid summary judgment on the Second Claim is to ask this Court to essentially rewrite the Honouliuli Permit.  However, this is plainly impermissible.  As this Court already ruled, the Ninth Circuit's controlling decision in *Sierra Club v. Union Oil Co.*, 813 F.2d 1480, 1490-91 (9th Cir. 1987), *vac'd on other grounds*, 485 U.S. 931 (1988), *reinstated*, 853 F.2d 667 (9th Cir.

1988), bars CCH from collateral attacking EPA's and DOH's NPDES permit decisions in this enforcement proceeding.  Order Granting in Part and Denying in Part Plaintiffs' Motion for Partial Summary Judgment on Plaintiffs' Third, Fourth and Eighth Claims (October 30, 2007) ("October 2007 MSJ Order") (Docket Document No. 153) at 24-27.

Notwithstanding CCH's evasive wording, CCH essentially argues that the limits on federal authority under the Commerce Clause of the Constitution, and the limits on EPA and the States' authority under the CWA, restrict the conditions that EPA and the States may impose in NPDES permits to those restrictions solely focused on the discharge of pollutants to waters of the United States.  In effect, CCH argues that EPA and DOH may not include NPDES permit conditions that categorically prohibit the spill of raw sewage from sewage collection systems.  CCH Opposition at 9-27.  While these propositions are doubtful at best, they are beyond the Court's jurisdiction to decide.  The *only* question properly raised by the Citizens' request for summary judgment on their Second Claim is *whether* the Honouliuli NPDES permit prohibits CCH from spilling raw sewage from the Honouliuli collection system.  The Court must hold CCH strictly liable for violations of its NPDES permits *as those permits are written*. *Sierra Club,* 813 F.2d at 1490-91; *see Hawaii's Thousand Friends v. City and County of Honolulu,* 821 F. Supp. 1368, 1392 (D. Haw. 1993) ("Courts throughout the country have held that NPDES

compliance is a matter of strict liability and a defendant's intent and good faith are irrelevant").

As CCH's own self-monitoring sewage spill reports conclusively establish, CCH repeatedly spilled sewage from the Honouliuli collection system. *All* of these sewage spills violated the Honouliuli NPDES Permit's blanket prohibition on sewage spills. Accordingly, the Court should grant the Citizens summary judgment on their Second Claim.[4]

### 1.   CCH MAY NOT ASK THE COURT TO AMEND THE CCH NPDES PERMITS IN THIS PROCEEDING

CCH's lengthy argument that recent Supreme Court and Ninth Circuit cases limit the definition of "waters of the United States" subject to CWA jurisdiction is irrelevant for this motion. CCH Opposition at 9-27. CCH's arguments are an irrelevant attack on EPA and DOH's permit decisions.

---

[4]   CCH argues that 58 of the sewage overflow violations that the Citizens allege under their Second Claim came from the Honouliuli WWTP rather than the Honouliuli collection system. CCH argues these overflows should not be actionable because the Honouliuli NPDES Permit only prohibits the overflow of sewage from the Honouliuli "collection and transport systems, including the pumping facilities." The WWTPs are part of the Honouliuli sewage transport system as they include pumps used to move Honouliuli sewage to CCH's discharge outfall and to its wastewater recycling distribution system. To ease and simplify the Court's task here, the Citizens will withdraw their request for summary judgment on these 58 overflow violations. Exhibit 11 to the Reply Declaration of Jodene Isaacs in Support Plaintiffs' Motion for Partial Summary Judgment on Plaintiffs' First and Second Claims ("Reply Isaacs Declaration") reflects the Citizen's withdrawal of their request for summary judgment on these violations.

The NPDES permit conditions that the Citizens seek to enforce impose, as is common for NPDES permits, operational restrictions on CCH that are designed to reduce risks of discharge of pollutants to waters of the United States.  While this should make these permit conditions perfectly valid,[5] determining whether they are is beyond this Court's jurisdiction in these proceedings.

---

[5]  For example, the Court held CCH strictly liable for failing to comply with provisions in the Sand Island NPDES Permit that required CCH to build and operate a disinfection facility at the Sand Island WWTP.  October 2007 MSJ at 29-30.  This Sand Island NPDES Permit condition did not in itself prohibit or limit the discharge of pollutants to waters of the United States, but it was a condition imposed on CCH's operations that worked to reduce the discharge of pollutants to waters of the United States.  As this Court noted in its October 2007 MSJ Order, the Sand Island NPDES Permit had other enforceable requirements for CCH to complete various improvements to its sewage system.

To the extent that CCH argues that EPA's standard permit writing approach exceeds the federal government's Commerce Clause authority, CCH's argument is without merit.  It is well-established that Commerce Clause authority is not limited to regulating only activity which directly constitutes interstate commerce, but may include broader regulation to advance ends that are legitimately within Congress' Commerce Clause power to advance.  *E.g., Rapanos v. United States*, 547 U.S. 715, 782-783 (2006) (Kennedy, J. concurring) ("'("[J]ust as control over the non-navigable parts of a river may be essential or desirable in the interests of the navigable portions, so may the key to flood control on a navigable stream be found in whole or in part in flood control on its tributaries . . . . [T]he exercise of the granted power of Congress to regulate interstate commerce may be aided by appropriate and needful control of activities and agencies which, though intrastate, affect that commerce.'") (internal citations omitted).  Thus, EPA may legitimately regulate actions that do not directly constitute the discharge of pollutants to waters of the United States when such actions tend to lead to discharges to these waters-such as poor operation and maintenance of sewage collection system that leads to sewage spills.

The Ninth Circuit has made it unequivocally clear that a district court in an enforcement proceeding must enforce NPDES permits *as written*, erroneous or not.  District courts do not have authority in enforcement proceedings to amend NPDES permits. *Union Oil*, 813 F.2d at 1486-87; October 2007 MSJ Order at 24-27 (citing *Union Oil* and further citing *United States v. BP Oil, Inc.*, Civ. A. No. 86-0792, 1989 WL 83623, at *5 (E.D. Pa. July 27, 1989); *Pub. Interest Research Group of NJ, Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 78 (3rd Cir. 1990)). Instead, EPA-issued NPDES permits may only be challenged by first exhausting administrative remedies and then petitioning a Court of Appeals pursuant to CWA section 509.  *Id.*  Similarly, state-issued NPDES permits may only be challenged by pursuing state law remedies. *Id.*

CCH failed to exhaust its administrative remedies and/or file either a timely Court of Appeals petition pursuant to CWA § 509(b) or any Hawaiʻi state court challenges to the NPDES conditions at issue.  CCH may not now seek judicial amendment to its NPDES permits as written. *Id.*

## 2.   ANY VIOLATION OF AN NPDES PERMIT IS A CWA VIOLATION

All NPDES permit conditions, including standard operation and maintenance conditions similar to those that the form the basis of the Citizens' Second Claim, are enforceable in citizen suits.  *See Save Our Bays & Beaches v. City and County of Honolulu,* 904 F. Supp. 1098, 1115-16 (D. Haw. 1994); *Northwest*

*Envtl. Advocates v. City of Portland*, 56 F.3d 979, 986 (9th Cir. 1995) ("the plain language of CWA section 1365 provides citizens with the authority to enforce all permit conditions"), *rehearing en banc denied*, 74 F.3d 945, *cert. denied*, 518 U.S. 1018 (1996); *Conn. Fund for the Env't v. Raymark Indus., Inc.*, 631 F. Supp. 1283, 1285 (D. Conn. 1986) ("There is nothing in the language or legislative history of the [Clean Water Act] to suggest that a citizens' suit may seek to enforce only those conditions of an NPDES permit that regulate the quality of a discharge immediately before its release into navigable waters."); *Locust Lane v. Swatara Township Auth.*, 636 F. Supp. 534, 537-38 (M.D. Pa. 1986) (plaintiffs may enforce permit provision setting a schedule for the construction of treatment facilities).  Thus, *all* permit conditions are enforceable under CWA § 505, including the NPDES permit conditions that form the basis of the Citizens' Second Claim.  CCH is and must be held strictly liable for any violations of these conditions.  *E.g.*, *Hawaii's Thousand Friends*, 821 F. Supp. at 1392.

> **3.    CCH'S NPDES PERMITS PROHIBIT ALL SEWAGE SPILLS, EVEN THOSE THAT DO NOT REACH WATERS OF THE UNITED STATES**

As noted, Citizens move for summary judgment on their Second Claim only for CCH's sewage spills from the Honouliuli WWTP.  To ensure no double-counting of CCH liability, the Citizens moved to establish liability on their Second Claim *only* for spills from the Honouliuli collection system that did *not*

reach waters of the United States.  For Honouliuli spills that CCH reported reached waters of the United States, Citizens brought only under their First Claim.

The Honouliuli NPDES Permit's Standard Provisions and Reporting Requirements ¶¶ B.7, C.2, and C.4 prohibit CCH from spilling sewage from the Honouliuli collection system, even if such spills do not directly reach waters of the United States. The Honouliuli Permit prohibits "any overflow or bypass of treatment facilities, including the waste collection system." SCSF, ¶ 10.  The Honouliuli Permit defines "overflow" as the intentional or unintentional diversion of flow from the collection and transport systems, including pumping facilities. SCSF, ¶ 11.

**4.  CCH'S OWN SELF-MONITORING REPORTS CONCLUSIVELY ESTABLISH CCH'S SEWAGE SPILL VIOLATIONS UNDER THE CITIZENS' SECOND CLAIM**

As discussed in the Memorandum in Support of the Citizens' Motion for Summary Judgment on First and Second Claims ("Citizens' MSJ") (Docket Document No. 177-2), the Honouliuli Permit strictly requires CCH to report to DOH and EPA any noncompliance with the permit, including sewage spills/overflows and bypasses that may endanger human health or the environment to EPA and DOH.  Citizens' MSJ at 6-7; SCSF ¶¶ 3, 17.  In addition, Hawaiʻi state law requires CCH to submit sewage spill reports under penalty of law. *Id.*  Finally, the 1995 Consent Decree in *United States, et al. v. City and County of Honolulu,*

Civ. No. 94-00765 DAE-KSC ("EPA I") requires CCH to submit Quarterly Reports to DOH and EPA that include reports of all collection system spills.  DOH has prepared summary tables compiling these CCH spill reports.  Citizens' MSJ at 8-9; SCSF, ¶ 29.

CCH does not dispute the accuracy of its sewage spill reports nor the accuracy of DOH's summary table description of what these sewage spill reports stated with respect to the sewage spills at issue in the Citizens' Second Claim.[6]  CCH Opposition at 37-38.  CCH is barred from any such challenge by the Ninth Circuit's *Sierra Club v. Union Oil* decision which held that NPDES permittees are bound by their CWA self-monitoring reports.  *See* October MSJ Order at 9; *Union Oil,* 813 F.2d at 1492; *see Save Our Bays & Beaches v. City and County of Honolulu,* 904 F. Supp. 1098, 1138 (D. Haw. 1994).

B.   **CCH'S SEWAGE SPILLS TO WATERS OF THE UNITED STATES VIOLATED THE CWA**

The Citizens are entitled to summary judgment on their First Claim that CCH committed 270 violations of CWA section

---

[6]  As noted in footnote 3, CCH raises only a legal argument (not a factual dispute) that 58 of the 207 sewage spill violations at issue under the Citizens' Second Claim involved sewage overflows from the Honouliuli WWTP, rather than the Honouliuli collection system.  CCH argues that the Honouliuli NPDES permit only bars sewage overflows from the Honouliuli collection system.  CCH Opposition at 37-38.  To simplify the Court's task here, the Citizens move for summary judgment only on the remaining 148 violations at issue under their Second Claim. Exhibit 11 of the Reply Isaacs Declaration reflects this downward revision of CCH violations.

301(a) by spilling raw sewage to waters of the United States
without NPDES permit authorization.

### 1. CCH DOES NOT CONTEST THAT IT HAS VIOLATED THE CWA BY COMMITTING 109 SEWAGE SPILLS TO WATERS OF THE UNITED STATES

CCH contests only a subset of the Citizens' allegations
that CCH spilled raw sewage to waters of the United States in
violation of CWA section 301(a).  CCH Opposition at 1, 27-37;
Kelly Decl., Ex. A.  CCH has not come forward with evidence or
argument to rebut the Citizens' evidence (CCH's own self-
monitoring reports) that CCH spilled sewage to waters of the
United States from different points within its sewage collection
system on 109 separate days.  Thus, the Citizens are entitled to
summary judgment that CCH committed at least 109 sewage spill
violations of CWA section 301(a).[7]  *E.g.*, *Committee to Save
Mokelumne River v. East Bay Municipal Utility Dist.*, 13 F.3d 305,
308, *cert. denied*, 513 U.S. 873 (1994) (the discharge of
pollutants from a point source to waters of the United States
without NPDES permit authorization is unlawful).

### 2. CCH'S OWN SELF-MONITORING REPORTS ESTABLISH 161 ADDITIONAL CCH SEWAGE SPILLS TO WATERS OF THE UNITED STATES

CCH argues that the Citizens failed to establish any
sewage spill violations other than the 109 violations that CCH

---

[7]  In Exhibit A to the Kelly Declaration, CCH lists the
sewage spill violations alleged by the Citizens that CCH
contests.  Exhibit 4 to the Isaacs Reply Declaration lists the
remaining 109 sewage spill violations that CCH does not contest
via the Kelly Declaration.

concedes.  CCH argues, *inter alia*, that it is not liable for
these sewage spill violations because: (1) the Citizens did not
establish the volume of sewage that CCH spilled into waters of
the United States; (2) CCH pumped the spill back out of the
waters; (3) the spills only reached CCH storm drains; (4) the
spills only reached dry streams; or (5)CCH's sewage spills
stretched over multiple calendar days and should only be counted
as one violation, rather than multiple violations for each day
the spills continued.  None of these arguments have merit.[8]

---

[8]  CCH raises two additional arguments.  First, CCH argues
that it is not liable for several spills alleged by the Citizens
because CCH does not own the facilities from which the spills
originated.  CCH does not offer any admissible evidence to
support this assertion.  The sole support for this contention are
the conclusory statements in Exhibit A to the Kelly Declaration.
CCH fails to establish any foundation by which Ms. Kelly know
what facilities CCH owns.  CCH does not even establish who
prepared or wrote Exhibit A.  CCH's argument is disingenuous.  *CCH
itself reported the sewage spills from these facilities to DOH*.
CCH is estopped from denying responsibility for its own reports
and operations.  Moreover, ownership or operational control is
not the test.  If CCH *caused* the spills it is liable, even if the
spills came from another entities' facilities.  *See, e.g., United
States v. Lambert*, 915 F. Supp. 797 (S.D.W.Va. 1996) (contractor
liable for CWA violations committed on another's property).
       Second, CCH argues that it should not be liable for bypasses
of partially treated sewage from its WWTPs because its NPDES
permits only make CCH liable for intentional bypasses and the
Citizens failed to offer evidence that CCH's discharges were
intentional.  CCH Opposition at 34-35, Kelly Decl., Ex. A.
       Citizens do not agree.  However, to simplify the Court's
task and to reduce the evidentiary issues associated with
scienter, the Citizens will withdraw their request for summary
judgment on these violations.
       Exhibits 5 and 11 to the Isaacs Reply Declaration reflects
the Citizen's withdrawal of their request for summary judgment on
these spills and bypasses.

681253-2 /7502-3                        15

a.    **THE CITIZENS NEED NOT ESTABLISH THE VOLUME OF SEWAGE THAT CCH SPILLED TO ESTABLISH CWA LIABILITY**

CCH erroneously contends that summary judgment should be denied for 24 of its sewage spill violations because the Citizens have not proven that a specific volume of sewage reached a water of the United States for these violations.  CCH Opposition at 28-29.[9]  However, a careful review of CCH's own self-monitoring reports indicates that CCH clearly reported these 24 spills resulted in sewage flowing into the ocean or a waterway that flows into the ocean.[10]  Even if CCH's self-monitoring

---

[9]  CCH's presentation to the Court on this point is contradictory.  Footnote 8 in CCH's Opposition only lists 21 such sewage spill violations that CCH contests on this basis:

7/1/02, 1/2/04 (Lehua, Kekau, 388 and 394 Wanaa'ao (2 violations for each of these two spills), Palanehe), 2/27/04, 3/1/04, 3/2/04 (Wana'ao, Waimanalo), 5/20/04, 8/4/04 (Waikalua, Pilikea), 7/26/05, 9/24/05, 10/13/05, 3/3/06, 3/7/06 (no reported volume to receiving water), 12/01/02 (ground only).

CCH's Exhibit A to the Kelly Declaration omits the 3/2/04 sewage spill from the Waimanalo WWTP and the 12/1/02 spills, but lists five additional sewage spills that CCH contests: one spill on 12/1/03 from the Kaneohe PTF, two spills on 3/26/06 (at 61065 Hele St. and Keolu and Hele Streets) and one 7/16/07 spill at 7124 Olomana Ln.

The 12/1/02 spill in CCH's Opposition appears to be a typographical error.  The Citizens' MSJ does not claim a sewage spill on that date.

[10]  In Exhibit 6 to the Isaacs Reply Declaration, the Citizens prepared a chart comparing and analyzing: (1) a list of the 24 spill violations that CCH identifies in its Kelly Declaration as at issue; (2) CCH's objection to its liability for these spills as set out in Exhibit A to the Kelly Declaration, (3) the text of the relevant CCH sewage spill report that CCH sent to DOH and/or DOH's sewage spill table summation of the CCH

reports did not expressly identify the volume of sewage that entered the waterway as opposed to the total volume of the sewage spill,[11] CCH is still liable.  Citizens need establish only that a given CCH sewage spill resulted in some pollutants entering waters of the United States.  There is no minimum threshold of allowable pollutant discharge under the CWA.  *Sierra Club*, 813 F.2d at 1490-91(rejecting that *de minimus* CWA violations are excusable); *Hawaii's Thousand Friends,* 821 F. Supp. at 1392 (same); *United States v. Alcoa*, 824 F. Supp. 640, 649 (E.D. Tenn. 1993) (a "violation is a violation no matter how statistically insignificant."); *International Union v. Amerace Corp., Inc.*, 740 F. Supp. 1072, 1083, (D.N.J.1990) (there is no *de minimis* CWA defense); *Mumford Cove Assoc. v. Groton*, 640 F. Supp. 392 (W.D.N.Y. 1989) (CWA violations are not be excused on ground that they were insignificant in nature); *Connecticut Fund for the Environment v. Upjohn Co.*, 660 F. Supp. 1397, 1416,(D. Conn. 1987) (rejecting argument that no violation occurred "when defendant discharged only a *de minimis* amount of wastewater into

_____

spill report–along with citations referencing where in the filed exhibits CCH's spill reports can be found; and (4) the Citizens' argument why each spill is a CWA violation.

[11] CCH typically reported a total estimated volume of these spills and then further identified that the spill reached waters of the U.S.  CCH did not expressly indicate the estimated volume of the spill that reached waters.  Isaacs Reply Declaration, Ex. 5, 6.  There are no flow meters on sewage flowing into storm drains or across streets into waterways. CCH could not provide any more than rough estimates as to the total volume of sewage reaching waters.  The volume is irrelevant.

the river.  The FWPCA [CWA] does not distinguish between small discharges and large discharges.  To the extent, in whatever amount of wastewater was discharged to the river, defendant exceeded the effluent limitations on a given day, a violation occurred.").

> **b.    WHETHER CCH RECOVERED SOME OR EVEN ALL OF THE SEWAGE IT SPILLED TO A WATER IS IRRELEVANT TO CCH'S CWA LIABILITY**

CCH erroneously contends that it is not liable for 2 sewage spills because it recovered the volume of sewage spilled into the waters and returned the spilled sewage to its collection system.[12]  CCH Opposition at 29.  Even if this is true, CCH is still liable under the CWA.  CCH cites no authority to support its contention that CWA liability is negated if pollutants are discharged and then subsequently recovered from waters of the United States.  This argument contradicts Ninth Circuit precedent holding simply that the *discharge* of pollutants to a water of the

---

[12]    CCH's Opposition brief argument section C.1.b. objects to 4 spills on this basis.  The Citizens withdraw their claim for two spills (dated 9/28/99 and 12/29/99) due to other CCH objections. Exhibits 5 and 7 to the Isaacs Reply Declaration reflect this change.

In Exhibit 7 to the Reply Isaacs Declaration, the Citizens have juxtaposed for the Court's comparison and analysis: (1) a list of these 2 remaining spills that CCH identifies in its Kelly Declaration as at issue, (2) CCH's objection to its liability for these spills as set out in Exhibit A to the Kelly Declaration,(3) the text of the relevant CCH sewage spill report that CCH sent to DOH and/or DOH's sewage spill table summation of the CCH spill report-along with citations referencing where in the filed exhibits CCH's spill reports can be found, and (4) the Citizens' argument as to why each spill should be deemed to be a CWA violation.

United States without NPDES permit authorization is unlawful, regardless of the subsequent harm caused by or fate of the pollutants. *E.g.*, *Mokelumne River*, 13 F.3d at 308.

### c.    CCH IS WRONG THAT THE CITIZENS FAILED TO ESTABLISH 102 CCH SPILLS TO STORM DRAINS REACHED WATERS OF THE UNITED STATES

CCH contends that the Citizens failed to establish that 102 of CCH's spills reached the ocean, a stream, or other waterway that constitutes a water of the United States. CCH argues these spills only flowed to storm drains.  CCH Opposition at 29-33.  However, CCH's own self-monitoring reports indicate that most of these 102 spills resulted in sewage flowing into various Oʻahu streams and/or the ocean.[13]  The Citizens offered uncontroverted evidence that these Oʻahu streams flow into the Pacific Ocean – an unsurprising fact given that Oʻahu is a volcanic island characterized topographically by sloping gradient running mauka to maʻkai and virtually **all** water migrates to the sea.  McGranaghan Decl., ¶ 5, 6.  CCH offered no evidence to rebut the Citizens' showing.  Citizens to summary adjudication

---

[13]  To simplify matters even further, Citizens withdraw their request for summary judgment on ten of these spills.  In Exhibit 8 to Isaacs Reply Declaration, Citizens compare and analyze: (1) a list of the remaining 92 spills that CCH identifies in its Kelly Declaration as at issue, (2) CCH's objection to its liability for these spills as set out in Exhibit A to the Kelly Declaration,(3) the text of the relevant CCH sewage spill report that CCH sent to DOH and/or DOH's sewage spill table summation of the CCH spill report—along with citations referencing where in the filed exhibits CCH's spill reports can be found, and (4) the Citizens' argument why each spill is a CWA violation.

that their evidence is factually true. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-52 (1986)(party resisting summary judgment may not rely solely on the pleadings or the absence of the moving parties' evidence, but must affirmatively introduce specific facts which controvert the facts presented by party seeking summary judgment); *British Airways Board v. Boeing Co*., 585 F.2d 946, 951-52 (9th Cir. 1978) (same).

CCH erroneously contends that to establish that its sewage spills reached waters of the United States, the Citizens must show that the Oʻahu streams into which CCH spilled sewage have a "'a significant nexus' with a navigable-in-fact water. CCH Opposition at 30-33. CCH further contends that simply showing that these Oʻahu streams flow into the Pacific Ocean, a navigable-in-fact water, is insufficient to establish this "significant nexus." *Id.* at 29-31. Instead, CCH contends that the Citizens must show these streams have a hydrological connection with the ocean that affects the physical, chemical or biological integrity of the ocean. *Id.* CCH is wrong.

CCH misstates controlling Supreme Court and Ninth Circuit precedent. All rivers, streams and similar watercourses that flow to a navigable-in-fact water are necessarily waters of the United States, even if such watercourses are man-made and/or normally dry and only carry flow following rainfall. *United States v. Moses*, 496 F.3d 984, 989 (9th Cir. 2007); *Headwaters, Inc. v. Talent Irrigation Dist*., 243 F.3d 526, 533-34 (9th Cir.

2001); *United States v. Eidson*, 108 F.3d 1336, 1342 (11th Cir. 1997); *Quivira Mining Co. v. United States EPA*, 765 F.2d 126, 129-130, *cert. denied*, 474 U.S. 1055 (1986); *United States v. Phelps Dodge*, 391 F. Supp. 1181 (D. Ariz. 1975); *see also Rapanos v. United States*, 547 U.S. 715, 759-87 (2006) (Kennedy, J. concurring).

CCH misreads the Supreme Court's holding in *Rapanos* to argue for a contrary rule. CCH concedes the Ninth Circuit has established that Justice Kennedy's concurring decision in *Rapanos* is the Court's controlling precedent. *E.g.*, *Moses*, 496 F.3d at 990. Justice Kennedy's concurrence *did not* disturb the long-established precedent discussed above that any tributary stream, river, creek or other watercourse that flows to a navigable-in-fact water are *per se* waters of the United States. Justice Kennedy's concurrence only established a new rule for determining whether *an isolated wetland that is not adjacent to a navigable-in-fact water* is a water of the United States. 547 U.S. at 759, 783-87. While Justice Kennedy's opinion determined that isolated wetlands must have a "significant nexus" with navigable-in-fact waters to be waters of the United States, he *did not* extend this rule to streams and rivers that flow as tributaries to navigable-in-fact waters, an issue not before the Court in *Rapanos*.[14]

---

[14]   Justice Kennedy noted that the U.S. Army Corps of Engineers' CWA regulations define all tributaries to navigable-in-fact waters as *per se* waters of the United States, that he was *not* holding this definition invalid, and may instead vote to uphold it if the issue is presented to the Court in the future.

Justice Kennedy's *Rapanos* concurrence regarding the "significant nexus" of an isolated wetland to navigable-in-fact waters of the United States is *irrelevant* in the present case. The Citizens do not claim nor seek to establish that CCH spilled sewage to any isolated wetlands.  Instead, they move only to establish that CCH spilled sewage into waters that are navigable-in-fact (such as the Pacific Ocean or Lake Wilson/Wahiawa Reservoir) or streams or other watercourses that flow into such navigable-in-fact waters.  All such waters are *per se* waters of the United States under controlling Ninth Circuit precedent. *Moses*, 496 F.3d at 989; *Headwaters*, 243 F.3d at 533-34.

A few of CCH's sewage spill reports could be read as establishing only that CCH's sewage spills reached storm drains that lead to Oʻahu streams and the ocean – with the subsequent fate of these spills not clearly reported.[15]  The Court should follow the Eleventh Circuit's *Eidson* decision and find CCH liable for CWA violation for its storm drain discharges, finding on the

---

*Id.* at 779 ("the Corps deems a water a tributary [and hence a water of the United States] if it feeds into a traditional navigable water (or a tributary thereof) . . . [this regulation] may well provide a reasonable measure of whether specific minor tributaries bear a sufficient nexus with other regulated waters to constitute" waters of the United States.").

[15]  Exhibit 8 of the Reply Isaacs Declaration identifies the 11 spill violations that fall into this category (with the code "C-3").  If the Court declines to follow the *Eidson* precedent and holds that evidence that CCH's spills reached a storm drain that is tributary to waters of the United States is insufficient to establish CWA liability, then the Court should still award summary judgment on the 81 other spill violations remaining in Exhibit 8.

facts of this case that such discharges were effectively discharges to tributaries of waters of the United States. *Eidson*, 108 F.3d at 1342 (discharge of pollutants to storm water ditch that led to drainage canal that in turn flowed into Tampa Bay constitutes discharge to waters of the United States, noting that it is "well established that Congress intended to regulate the discharge of pollutants into all waters that may eventually lead to waters affecting interstate commerce."). Notably, the Ninth Circuit has recently expressly cited the *Eidson* case as persuasive precedent.[16] *Moses*, 496 F.3d at 989. CCH's reports for the spills in issue indicate that all or most of the sewage spill to the storm drain was not recovered/pumped back out of the storm drain. Given that CCH's storm drains in issue flow to the ocean or to streams, this necessarily means that CCH's sewage pollutants discharged into these storm drains eventually had to flow into these waters. This is especially true for the CCH sewage spills that flowed into storm drains *during rainstorms*, as CCH has indicated was true for at least some of its spills. It is logical to infer that storm water flows would necessarily have carried CCH's sewage spills into the waters in which the storm drains empty.[17]

---

[16] While Justice Scalia's plurality decision in *Raponos* criticized the *Eidson* decision, the Ninth Circuit expressly found this plurality decision not to be controlling law. *Id.*

[17] *See* Reply Isaacs Decl., Ex. 4 (spills to storm drains on the following dates occurred during rainstorms: 9/14/00, 6/5/01, 11/29/03, 12/1/03, 1/2/04 (Lehua St), ½/04 (Hihiwai St), ½/04

        d.    **CCH IS WRONG THAT ITS SPILLS TO DRY STREAM BEDS ARE NOT ACTIONABLE UNDER THE CWA**

        CCH erroneously contends that 5 of its sewage spills to dry stream beds are not actionable spills to waters of the United States.[18]  CCH Opposition at 31-33.  The dry streams in issue all intermittently flow to the Pacific Ocean.  McGranaghan Decl., ¶¶ 5, 6.  CCH offered no evidence to rebut the Citizens' showing.  Citizens are entitled to summary adjudication that these claims are factually true.  *Liberty Lobby,* 477 U.S. at 248-52 (1986); *British Airways Board*, 585 F.2d at 951-52.

        As discussed above, controlling Ninth Circuit precedent establishes that streams that only flow intermittently to

---

(Lehua St), ½/04 (Kekau Place), ½/04 (388 Wana'ao Road), ½/04 (394 Wana'ao Road), ½/04 (Pahemo St), ½/04 (Olepe Loop), ½/04 (Kawaihae Street and May Way), ½/04 (Palanehe Place), 1/3/04 (5307C Kalanianaole Hwy), 1/3/04 (5403 Kalanianaole Hwy), 2/27/04 (Olepe Loop), 2/27/04 (Kaneohe PTF), 3/2/04, 8/4/04 (Waikalua Rd),8/4/04 (Piikea St), 11/6/04, 11/21/04, 12/22/04, ½9/05 (5307-L Kalanianaole Hwy), ½9/05 (Kalanianaole Hwy & Pu'u Ikena), ½9/05 (Salt Lake Blvd), 2/24/06, 3/1/06, 3/3/06 (Kailua WWTP), 3/3/06 (Keolu & Hele Sts.), 3/3/06 (Waikalua Rd.), 3/7/06, 3/22/06, 3/31/06 (Umi St.), 3/31/06 (Salt Lake Blvd.), 3/31/06 (N. School St.), 3/31/06 (Olepe Loop), 3/31/06 (Pacific Heights Rd), 3/31/06 (Malia St), 3/31/06 (Coral & Auahi St.), 3/31/06 (Ala Moana Blvd.), 11/4/07).

    [18] Exhibit A to the Kelly Declaration listed 8 such spills in total.  The Citizens withdraw their request for summary judgment on 3 of these spills due to other objections raised by CCH.  In Exhibit 9 to the Isaacs Reply Declaration, the Citizens compare and analyze: (1) a list of these remaining 5 spills that CCH identifies in its Kelly Declaration as at issue, (2) CCH's objection to its liability for these spills as set out in Exhibit A to the Kelly Declaration,(3) the text of the relevant CCH sewage spill report that CCH sent to DOH and/or DOH's sewage spill table summation of the CCH spill report–along with citations referencing where in the filed exhibits CCH's spill reports can be found, and (4) why each spill is a CWA violation.

navigable-in-fact waters such as the Pacific Ocean are waters of
the United States.  *Moses*, 496 F.3d at 989; *Headwaters*, 243 F.3d
at 533-34.

      **e.    CCH SEWAGE SPILLS LASTING MULTIPLE DAYS
CONSTITUTE SEPARATE CWA VIOLATIONS FOR EACH
DAYS A SPILL OCCURS**

      CCH erroneously argues that CCH sewage spills that
stretching over multiple calendar days should be counted as a
single CWA violation rather than as a violations for each of the
days that CCH spilled sewage.  CCH Opposition at 35-36.  This
Court has already addressed the question.  This Court previously
held that when conduct violating the CWA continues over several
days (such as violation of a monthly average NPDES permit limit),
each of the days at issue constitutes a separate CWA violation:

> [CWA section 309(d), 33 U.S.C. § 1319(d)] speak[s] in terms
> of penalties per day of violation, rather than penalties per
> violation.  This language *strongly suggests that where a
> violation is defined in terms of a time period longer than a
> day, the maximum penalty assessable for that violation
> should be defined in terms of the number of days in that
> time period*.

October MSJ Order at 16-17 (quoting *Chesapeake Bay Found., Inc.
v. Gwaltney of Smithfield*, 791 F.2d 304, 314 (4th Cir. 1986),
*vacated on other grounds*, 484 U.S. 49 (1987) (emphasis original).
Given CWA section 309(d)'s provision that CWA civil penalties are
to be assessed "per day," it follows that each calendar day that
a sewage spill continues constitutes a separate CWA violation.[19]

_____

     [19]  In Exhibit 10 of the Isaac's Reply Declaration, the
Citizens compare and analyze: (1) a list of CCH's sewage spills
that occurred on multiple days that CCH contends should count as

III. **CONCLUSION**

CCH's own self-monitoring reports indicate that CCH repeatedly spilled untreated sewage to the Pacific Ocean or to waterways that flow to the Pacific Ocean.[20]  CCH's Opposition admits at least 109 of its sewage spills reached U.S. waters.

Even if the CCH's meritless claims are not counted, Citizens are entitled to summary judgment as a matter of law on those violations CCH does not contest.

CCH's argument that various spills do not violate the CWA because CCH's erroneously reads the law to exclude such liability (not because the spill did not occur)are without merit.

---

a single violation,(2) the text of the relevant CCH sewage spill report and/or DOH summary table summation that demonstrates that these spills occurred over multiple days (along with citations referencing where CCH's spill reports can be found in the filed exhibits), and (3) why multi-day spills are separate CWA violations.

[20]  In its Opposition to Plaintiffs' Separate and Concise Statement of Facts In Support of Their Motion for Partial Summary Judgment (Docket Document No. 185), CCH objects that its sewage spill reports should be excluded from evidence as hearsay.  This is baseless.  Federal Rule of Evidence ("FRE") 801(d) expressly provides that a statement is not hearsay if the statement is offered against a party and is the party's own statement.
CCH further argues that DOH's summary tables of CCH's sewage spills that DOH prepared from DOH's sewage spill reports should also be excluded from evidence as hearsay.  This is similarly baseless.  FRE 803(8) expressly provides that "Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report" are admissible. As discussed in the Citizens' MSJ, CCH had a legal duty to submit the sewage spill reports to DOH, making DOH's summary tables an admissible official record of DOH's tracking of CCH's sewage spills.  *See* MSJ at 7-9, 14-15.

At a minimum, at least 161 of CCH's sewage spills reached the waters of the United States.  The relevant evidence is CCH's self-monitoring reports.[21]  CCH offered no other evidence concerning its sewage spills,[22] nor could it do so consistent with *Sierra Club v. Union Oil*'s rule that dischargers are bound by their CWA self-monitoring reports.

The Citizens necessarily rely on CCH's self-monitoring reports (or DOH's official summaries of these reports).  Thus, there are no material issues of fact.  This Court should grant summary judgment CCH's liability for the sewage spills it reported.

CCH's sewage spill reports establish that CCH spilled sewage directly into waters on 259 days and spilled sewage into

---

[21]  The Citizens provided DOH's sewage spill summary tables as evidence of CCH's sewage spills.  As noted in the Citizens' opening MSJ pleadings, these DOH summary tables consist of DOH's summary of CCH's spill reports.  CCH has not disputed the accuracy of DOH's summary tables.

[22]  For the most part, CCH's sole evidence related to its sewage spills consists of the Kelly Declaration and Exhibit A to the Kelly Declaration.  The Kelly Declaration claims all CCH's factual assertions in Exhibit A were derived from CCH's reading of the CCH sewage spill reports.  Kelly Decl., ¶ 3   The only new evidence that CCH offers concerning its sewage spills is for the 35-day release of sewage from the Kailua Road Pump Station to Kawainui Stream between July 4 and August 7, 2003.  Declaration of James Russo (Docket Document No. 184-9).  Mr. Russo declares that this spill, to his knowledge, did not reach waters of the United States and lasted for only two days.  The Court should disregard this declaration. It is an improper contradiction of CCH's sewage spill report for this incident.  *See* Isaacs Reply Decl., Ex. 5.

storm drains that flow to Oʻahu streams or the ocean on at least 11 additional days.

CCH's self-monitoring reports indicate that it spilled sewage from the Honouliuli collection system on at least 148 separate days.  The Honouliuli NPDES Permit forbids such sewage spills.  The CWA makes NPDES permit holders strictly liable to comply with all terms and conditions of their NPDES permits.

Thus, this Court should grant summary judgment on the Citizens' First Claim declaring CCH liable for 270 violations of CWA section 301(a) by discharging sewage to waters of the United States without NPDES permit authorization.

The Court should grant summary judgment on the Citizens' Second Claim declaring CCH liable for 148 violations of the Honouliuli Permit by spilling sewage from the Honouliuli collection system.

The total number of CCH sewage spill violations under both CWA claims is 418.

The Court should deny CCH's Motion to Dismiss.

DATED:  Honolulu, Hawaiʻi, June 23, 2008.


　　　　　　　　　　　/s/ William M. Tam
　　　　　　　　　　CHRISTOPHER SPROUL
　　　　　　　　　　Environmental Advocates
　　　　　　　　　　PAUL ALSTON
　　　　　　　　　　WILLIAM M. TAM
　　　　　　　　　　BLAKE K. OSHIRO
　　　　　　　　　　Alston Hunt Floyd & Ing
　　　　　　　　　　Attorneys for Plaintiffs