RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department Of Justice
ROBERT D. MULLANEY
Trial Attorney
Environmental Enforcement Section
U.S. Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6491
Fax: (415) 744-6476
E-mail: Robert.Mullaney@usdoj.gov

R. JUSTIN SMITH
AMBER BLAHA
Law and Policy Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 4390
Ben Franklin Station
Washington, DC 20044-4390
Tel: (202) 514-9369
Fax: (202) 514-4231
E-mail: Amber.Blaha@usdoj.gov

Attorneys for the United States of America

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| SIERRA CLUB HAWAI'I CHAPTER, ET AL., | ) ) ) | NO. CV 04-00463-DAE-BMK |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | AMICUS CURIAE BRIEF OF THE UNITED STATES OF AMERICA |
| CITY AND COUNTY OF HONOLULU, | ) ) ) ) | |
| Defendant. | ) ) | |

## TABLE OF CONTENTS

INTERESTS OF THE UNITED STATES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    Statutory Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    The United States' CWA Enforcement Actions
          Against CCH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

          1.    The 1994 Complaint and 1995 Consent Decree . . . . . . 5

          2.    The 2007 Complaint and Stipulated Order . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    I.    This Court Has Subject Matter Jurisdiction over Sierra Club's
        Second Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    II.    CCH May Not Challenge the Terms of its Permits in this
        Proceeding. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    III.    CCH's NPDES Permit Conditions Are Valid and Enforceable. . . . 16

    IV.    The Term "Waters of the United States" Covers those
        Waters that Meet either the Standard Set Forth in the
        Plurality Opinion in *Rapanos* or the Standard Set Forth
        in Justice Kennedy's Concurrence. . . . . . . . . . . . . . . . . . . . . . . 22

# TABLE OF AUTHORITIES

FEDERAL CASES

Alexander v. Sandoval, 532 U.S. 275 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Arbaugh v. Y & H Corp., 546 U.S. 500 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Arkansas v. Oklahoma, 503 U.S. 91 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Bell v. Hood, 327 U.S. 678 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

Chevron, Inc. v. Natural Resources Defense Council, Inc.,

     467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Compassion in Dying v. State of Washington, 79 F.3d 790 (9th Cir. 1996);

     *rev'd on other grounds*, Washington v. Glucksberg,

     521 U.S. 702 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Connecticut Fund for Env't v. Raymark Indus., Inc.,

     631 F. Supp. 1283 (D. Conn. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Franchise Tax Bd. State of Cal. v. Constr. Laborers Vacation

     Trust for S. Cal., 463 U.S. 1 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

General Motors Corp. v. EPA, 168 F.3d 1377 (D.C. Cir. 1999) . . . . . . . . . . . . 14

Gonzales v. Raich, 545 U.S. 1 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Gregg v. Georgia, 428 U.S. 153 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Grutter v. Bollinger, 539 U.S. 306 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Kaiser Aetna v. U.S., 444 U.S. 164 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

League of United Latin Am. Citizens v. Perry, 126 S. Ct. 2594 (2006) . . . . . . . 27

Locust Lane v. Swatara Township Auth., 636 F. Supp. 534 (M.D. Pa.1986) . . . 20

Marks v. United States, 430 U.S. 188 (1977) . . . . . . . . . . . . . . . . . . . . . . 25, 26, 27

Montana-Dakota Utils. Co. v. Nw Pub. Serv. Co., 341 U.S. 246 (1951) . . . . . . . 11

Montgomery Envt'l Coalition v. Costle, 646 F.2d 568 (D.C. Cir. 1980) . . . . . . . 19

Moses H. Cone Memorial Hosp. v. Mercury Construction Corp.,

    460 U.S. 1 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Nichols v. United States, 511 U.S. 738 (1994) . . . . . . . . . . . . . . . . . . . . . . . . 25

Northern Cal. River Watch v. City of Healdsburg,

    457 F.3d 1023 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Northern Cal. River Watch v. City of Healdsburg,

    496 F.3d 993 (9th Cir. 2007), *cert. denied*, 170 L.Ed.2d 61 (2008) . . 28, 29

Nw Envt'l Advocates v. City of Portland, 56 F.3d 979 (9th Cir. 1995) . . . . . 10, 20

Pub. Interest Research Group of N.J. v. Powell Duffryn Terminals, Inc.,

    913 F.2d 64 (3d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Pymatuning Water Shed Citizens for a Hygienic Env't v. Eaton,

    506 F. Supp. 902 (W.D. Pa. 1980), *aff'd*, 644 F.2d 995 (3d Cir. 1981) . . 20

Rapanos v. United States, 547 U.S. 715 (2006) . . . . . . . . . . . . . . 2, 17, 20, passim

San Francisco Baykeeper v. Cargill Salt Division,

    481 F.3d 700 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Sierra Club v. Simkins Indus., Inc., 847 F.2d 1109 (4th Cir. 1988) . . . . . . . . . . 20

Sierra Club v. Union Oil Co., 813 F.2d 1480 (9th Cir. 1987)

    *judgment vacated on other grounds*, 485 U.S. 931 (1988),

    *judgment reinstated*, 853 F.2d 667 (9th Cir. 1988) . . . . . . . . . . . . . . . . 14

Simsbury-Avon Preservation Soc'y L.L.C. v. Metacon Gun Club, Inc.,

    472 F. Supp. 2d 219 (D. Conn. 2007), *appeal pending*,

    No. 07-795CV (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Solid Waste Agency of Northern Cook County v.

    U.S. Army Corps of Engineers, 531 U.S. 159 (2001) . . . . . . . . 2, 17, 20, 21

Steel Co. v. Citizens for a Better Env't, 523 U.S. 83 (1998) . . . . . . . . . . . . 11, 12

Texas Mun. Power Agency v. EPA, 836 F.2d 1482 (5th Cir. 1988) . . . . . . . . . . 14

United States v. Bailey, 516 F. Supp. 2d 998 (D. Minn. 2007) . . . . . . . . . . . . . 28

United States v. City and County of Honolulu,

    No. Cv 94-00765 (D. Haw. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

United States v. City and County of Honolulu,

    No. Cv 07-00235 (D. Haw. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States v. Cundiff, 480 F. Supp. 2d 940 (W.D.Ky. 2007) *appeal pending*,

    No. 07-5630 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

United States v. Gerke Excavating, Inc., 464 F.3d 723 (7th Cir. 2006),

    *cert. denied* 128 S.Ct. 45 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

United States v. Hartsell, 127 F.3d 343 (4th Cir. 1997) . . . . . . . . . . . . . . . . . . . 14

United States v. Johnson, 467 F.3d 56 (1st Cir. 2006),

    *cert. denied*, 128 S. Ct. 375 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

United States v. Krilich, 209 F.3d 968 (7th Cir. 2000) . . . . . . . . . . . . . . 10, 11, 12

United States v. Lopez, 514 U.S. 549 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Moses, 496 F.3d 984 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . 29

United States v. Robison, 505 F.3d 1208 (11th Cir. 2007), *petition for*

  *rehearing en banc denied*, 521 F.3d 1319 (11th Cir. 2008) . . . . . . . . . . . . 28

United States v. Sea Bay Development Corp.,

  2007 WL 1169188 (E.D. Va. April 18, 2007) . . . . . . . . . . . . . . . . . . . . . . 12

Waters v. Churchill, 511 U.S. 661 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Wickard v. Fillburn, 317 U.S. 111 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Wilton v. Seven Falls Co., 515 U.S. 277 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Zipes v. Trans World Airlines, Inc., 455 U.S. 385 (1982) . . . . . . . . . . . . . . . . . 12


FEDERAL STATUTES

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

33 U.S.C. § 1251 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

33 U.S.C. § 1311 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7, 16, 22

33 U.S.C. § 1319 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7

33 U.S.C. § 1342 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 16, 18

33 U.S.C. § 1362 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 22

33 U.S.C. § 1365 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 10, 13

33 U.S.C. § 1369 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 13

FEDERAL REGULATIONS

40 C.F.R. § 122.41 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

65 Fed. Reg. 12818 (Mar. 9, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

FEDERAL RULES

Fed. R. Civ. P. 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## INTERESTS OF THE UNITED STATES

The United States Environmental Protection Agency ("EPA") administers the Clean Water Act ("CWA"), 33 U.S.C. § 1251 et seq., and brings actions under its enforcement provisions. The proper operation and maintenance of publicly-owned treatment works ("POTWs") and their associated municipal sewer systems is an important component of achieving the CWA's objectives. Consequently, EPA has issued regulations governing the issuance of National Pollutant Discharge Elimination System ("NPDES") permits pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, including specific requirements that must be included in permits issued to POTWs like the one at issue in this case related to the operation and maintenance of POTWs and their sewage collection systems.

Sierra Club, Hawaii Chapter, Hawaii's Thousand Friends, and Our Children's Earth Foundation (collectively, "Sierra Club") brought a citizen suit under the CWA against defendant City and County of Honolulu ("CCH"). In its motion to dismiss Sierra Club's Second Claim, CCH argued that spills from its collection system, although they violate conditions of CCH's NPDES permit on its face, are not actionable unless they are spills into waters of the United States. Because NPDES permits routinely contain terms and conditions relating to the operation and maintenance of permitted facilities designed to ensure compliance with the express prohibitions or limitations on discharges to the waters of the United States, defendant's argument implicates the United States' interests in the nationwide operation of the NPDES permitting system.

- 1 -

Defendant's opposition brief on summary judgment also raises issues of the interpretation of the Supreme Court's decision in *Rapanos v. United States*, 547 U.S. 715 (2006), an issue as to which the United States has a significant interest, and other issues regarding the interpretation and application of the CWA.

On June 30, 2008, this Court granted the United States' motion for an extension of time in which to submit a brief as amicus curiae. Pursuant to that Order, the United States submits this brief.

## INTRODUCTION

The United States submits this brief to provide the Court with its views regarding several issues that are raised by CCH's Motion to Dismiss Plaintiffs' Second Claim and CCH's Opposition to Plaintiffs' Motion for Summary Judgment. First, this Court has subject matter jurisdiction over Sierra Club's Second Claim, which alleges violations of CCH's NPDES permit. Subject matter jurisdiction is granted by federal statute, and contrary to CCH's argument, is unaffected by the Supreme Court's decisions in *Rapanos* and *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001) ("*SWANCC*") regarding the scope of federal regulatory jurisdiction under the CWA.

Second, CCH's arguments regarding Sierra Club's Second Claim can only be reasonably read as a challenge to the terms of CCH's NPDES permits. CCH may not challenge or seek to modify its NPDES permits in this proceeding. By statute, permit terms may be reviewed by the U.S. Court of Appeals within 120

days of permit issuance, and are expressly not subject to judicial review in enforcement proceedings. 33 U.S.C. § 1369(b)(1), (b)(2). Thus, CCH's challenge to the permit terms is both untimely and in an improper forum.

Third, the conditions in CCH's NPDES permit are valid, including those that, while not *directly* imposing restrictions on discharges to the waters of the United States, are designed to ensure compliance with limits on such discharges. CCH erroneously suggests that *SWANCC* and *Rapanos* hold otherwise; however, these cases in no way limited the authority of EPA to impose reasonable permit conditions on discharges to waters of the United States, which is the case here.

Finally, the United States disagrees with the statement in CCH's Opposition to Plaintiffs' Motion for Summary Judgment that the Ninth Circuit has "unequivocally determined" that Justice Kennedy's concurrence in *Rapanos* provides the exclusive standard for establishing what waters comprise "waters of the United States" under the CWA. The correct reading of *Rapanos*, and one not foreclosed by the Ninth Circuit, is that "waters of the United States" coverage may be established under either the standard set forth in Justice Kennedy's concurrence or the standard set forth in the plurality opinion.

The United States takes no position on the underlying merits of Sierra Club's claims against CCH.

## BACKGROUND

### A.    Statutory Background

Section 301(a) of the CWA prohibits the discharge of pollutants except in

compliance with specific sections of the Act. 33 U.S.C. § 1311(a). The term "discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters[1] from any point source" or "any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft." 33 U.S.C. § 1362(12). CWA Section 402 creates the NPDES permitting program, which authorizes the Administrator of the EPA to issue a permit allowing effluent discharges in accordance with specified limitations and conditions. 33 U.S.C. § 1342(b), (c).

CWA Section 309(b) authorizes EPA's Administrator to commence a civil action for appropriate relief, including a permanent or temporary injunction, for any violation of CWA Section 301(a) or any violation of a permit condition or limitation. 33 U.S.C. § 1319(b). Section 505(a) permits citizens to bring suit against any person who is alleged to be in violation of an "effluent standard or limitation" or an order issued by the Administrator or a State with respect to such a standard or limitation. 33 U.S.C. § 1365(a).[2]

## B.    The United States' CWA Enforcement Actions Against CCH

As explained below, the United States and the State of Hawaii have filed two separate CWA enforcement actions against CCH, and have negotiated

---

[1] "Navigable waters" are defined as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

[2] "Effluent standard or limitation" is defined to include "a permit or condition thereof issued under section 1342 of this title." 33 U.S.C. § 1365(f).

settlements with CCH that require CCH to implement ongoing compliance measures. This Court has retained jurisdiction in both actions to resolve disputes or enforce compliance with the settlement agreements.

### 1.    The 1994 Complaint and 1995 Consent Decree

In October 1994, the United States and the State of Hawaii filed a complaint against CCH alleging that CCH had violated the CWA, State law, and the conditions of its NPDES permits. *See United States, et al., v. City and County of Honolulu*, No. Cv 94-00765-DAE-KSC (hereafter "*CCH I*"). The complaint alleged, among other things, that CCH had for several years discharged raw or partially treated sewage into waters of the United States.

Concurrently with the filing of the complaint in *CCH I*, the United States and the State of Hawaii lodged a proposed consent decree with the Court to resolve the allegations of the complaint. The consent decree, as modified by stipulation, was entered by the Court on May 15, 1995 (the "1995 Consent Decree"), and provides for a comprehensive set of injunctive measures to address compliance issues associated with CCH's sewage collection system. For example, pursuant to Section VII.E. of the 1995 Consent Decree, CCH is required to undertake a 20-year rehabilitation program to reduce and prevent spills from its collection system. This rehabilitation program commenced in 1999 and is to be completed by December 31, 2019.

For more than a decade, EPA has monitored CCH's compliance with the 1995 Consent Decree. Cola Decl. ¶¶4, 5. The State of Hawaii Department of

Health ("DOH") issued an Administrative Order to CCH in April 2004, requiring CCH to conduct a thorough assessment of its force mains, which are pressurized pipes that carry sewage from residences and commercial and industrial sources to wastewater treatment plants. *Id.* at ¶6. Beginning in 2004, EPA and DOH conducted a comprehensive review of CCH's collection system and two of its wastewater treatment plants. *Id.* at ¶¶7, 8. As a result of this review, EPA and DOH identified a number of compliance issues relating to CCH's collection system and treatment plants and advised CCH of their concerns. *Id.* at ¶9. EPA and DOH, together with Sierra Club, engaged in a series of settlement meetings with CCH beginning in March 2006 to discuss compliance issues relating to CCH's collection system and treatment plants. *Id.*[3]

In March 2007, Sierra Club moved to intervene in *CCH I*, basing its motion on CWA Section 505. 33 U.S.C. § 1365(b)(1)(B).[4] On May 24, 2007, this Court adopted Magistrate Judge Chang's Findings and Recommendations and granted Sierra Club's motion to intervene in *CCH I* subject to certain conditions.

### 2.    The 2007 Complaint and Stipulated Order

In May 2007, the United States and the State of Hawaii brought a second

---

[3] These settlement discussions eventually led to the negotiation of the Stipulated Order in *CCH II* discussed below. Cola Decl. ¶12.

[4] CWA Section 505 provides that no citizen suit may be commenced if the EPA or a State has commenced and is diligently prosecuting a civil action in a federal court. However, "in any such action in a court of the United States any citizen may intervene as a matter of right." 33 U.S.C. § 1365(b)(1)(B).

enforcement action against CCH. *See United States, et al., v. City and County of Honolulu*, No. Cv 07-00235-DAE-KSC ("*CCH II*"). The complaint in *CCH II* alleged that beginning on March 24, 2006, the Beachwalk Force Main suffered a failure, resulting in CCH's discharge of approximately 48.7 million gallons of raw sewage into the Ala Wai Canal, which flows into the Pacific Ocean. Therefore, the Beachwalk Spill involved a discharge of pollutants from a point source into waters of the United States without an NPDES permit or other exception specified in CWA Section 301(a), 33 U.S.C. § 1311(a). The complaint stated a claim against CCH for injunctive relief pursuant to CWA Section 309(b), 33 U.S.C. § 1319(b), for a violation of CWA Section 301(a), 33 U.S.C. § 1311(a).

The parties resolved the allegations of the complaint in *CCH II* by negotiating a Stipulated Order, which provided for critical, high-priority injunctive relief measures to protect water quality and significantly reduce the risk of major sewage spills from six force mains and a pump station in CCH's sewage collection system. The Stipulated Order required CCH to build, at a minimum, three new force mains, and to maintain back-up force mains at four critical places in its collection system. Stipulated Order ¶¶8-11. In addition, CCH is required to implement a condition assessment and repair program for six critical force mains and one pump station to minimize the risk of future failures from these facilities. *Id.* at ¶¶8-13. Finally, CCH is required to implement a Spill Contingency Plan to minimize the adverse consequences of a spill from six of its force mains. *Id.* at ¶15. According to CCH, the work required by this Stipulated Order is valued at

approximately $300 million. Cola Decl. ¶13. The United States and the State expressly reserved their claims for further injunctive relief and civil penalties in the Stipulated Order. Stipulated Order ¶¶54-58. Furthermore, the parties stated their intention to negotiate in good faith a comprehensive remedy addressing all compliance issues associated with CCH's wastewater system. *Id.* at 2.[5]

On May 26, 2007, Sierra Club moved to intervene in *CCH II*. This Court issued an Order on July 25, 2007, adopting the Magistrate's Findings and Recommendation and granting Sierra Club's motion to intervene in *CCH II* subject to specific conditions. On August 24, 2007, Sierra Club filed an opposition to entry of the Stipulated Order. After consideration of the opposition and the United States' response, this Court entered the Stipulated Order on October 10, 2007.

## ARGUMENT

I.    **This Court Has Subject Matter Jurisdiction over Sierra Club's Second Claim.**

CCH erroneously argues that this Court does not have subject matter jurisdiction over Sierra Club's Second Claim, which alleges violations of CCH's NPDES permits. CCH argues that because the permit violations alleged in the Second Claim were not spills that entered a "water of the United States," the CWA

---

[5] In fact, both the United States and the State of Hawaii are currently engaged in settlement negotiations with CCH regarding alleged CWA violations and violations of the 1995 Consent Decree involving CCH's collection system and wastewater treatment plants. Cola Decl. ¶14.

may not be used to regulate or seek redress for these violations. CCH Motion to Dismiss ("MTD") at 8. Thus, CCH argues, this Court lacks subject matter jurisdiction over the Second Claim. MTD at 9.

In presenting its challenge to the Second Claim as a motion under Fed. R. Civ. P. 12(b)(1), CCH has confused the subject matter jurisdiction of the federal courts with federal regulatory "jurisdiction" under the CWA. The former, however, does not depend on the latter. Federal district courts have subject matter jurisdiction to decide cases arising under federal law, including the CWA, whether or not the claims turn out to be meritorious. *E.g., Bell v. Hood*, 327 U.S. 678, 682 (1946) ("Jurisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover."). Here, the questions raised by CCH – *i.e.* whether citizen suit claims may be brought for NPDES permit violations even if those violations did not result in a discharge into the waters of the United States – go to the merits of those claims, and have nothing to do with this Court's subject matter jurisdiction.

Federal statutes unambiguously vest this Court with subject matter jurisdiction over Sierra Club's Second Claim. 28 U.S.C. § 1331 grants federal district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Here, Sierra Club alleged a cause of action under the federal Clean Water Act. Second Am. Compl. ¶¶ 5, 84. If federal law creates the cause of action, then federal question subject matter jurisdiction exists. *Franchise Tax Bd. State of Cal. v. Constr. Laborers Vacation*

*Trust for S. Cal.*, 463 U.S. 1, 27-28 (1983), *superseded by statute on other grounds*, 28 U.S.C. § 1441(e); *see also United States v. Krilich*, 209 F.3d 968, 972 (7th Cir. 2000) (finding that subject matter jurisdiction under 28 U.S.C. § 1331 was present in CWA enforcement action brought by United States).

The Clean Water Act also expressly grants this Court subject matter jurisdiction over this suit. CWA Section 505 authorizes any citizen to commence a civil action on his own behalf against any person who is "alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. § 1365(a)(1). Pursuant to CWA Section 505, "[t]he district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation. . . ." 33 U.S.C. § 1365(a). Moreover, CWA Section 505 specifically defines the term "effluent standard or limitation" to include "a permit or condition thereof issued under section 1342 of this title . . . ." 33 U.S.C. § 1365(f). Thus, the CWA expressly grants this Court jurisdiction to hear citizen allegations of violations of effluent standards, including permit violations. *See Nw Envt'l Advocates v. City of Portland*, 56 F.3d 979, 986 (9th Cir. 1995) ("The plain language of CWA § 505 authorizes citizens to enforce *all* permit conditions.").

The subject matter jurisdiction of the federal district courts is not coextensive with the regulatory "jurisdiction" exercised by EPA and the United States Army Corps of Engineers ("Corps") under the CWA, but rather extends to

all cases arising under the Constitution and laws of the United States. 28 U.S.C.

§ 1331. "[W]here the complaint . . . is so drawn as to seek recovery directly under

the Constitution or laws of the United States, the federal court . . . must entertain

the suit." *Bell*, 327 U.S. at 681-82.

Federal jurisdiction is not affected if a plaintiff fails to state a cause of

action or to prevail on the merits of its claims. To the contrary, "[i]f the complaint

raises a federal question, the mere claim confers power to decide that it has no

merit, as well as to decide that it has." *Montana-Dakota Utils. Co. v. Nw Pub.*

*Serv. Co.*, 341 U.S. 246, 249 (1951); *accord Steel Co. v. Citizens for a Better*

*Env't*, 523 U.S. 83, 89 (1998) ("It is firmly established in our cases that the

absence of a valid . . . cause of action does not implicate subject matter

jurisdiction.").

Here, this Court's subject matter jurisdiction is not dependent on whether

the permit conditions that CCH allegedly violated fall within the scope of EPA's

regulatory jurisdiction. (As discussed in Section III, *infra*, the permit conditions

are a legitimate exercise of EPA's regulatory jurisdiction). In *United States v.*

*Krilich*, the Seventh Circuit addressed a similar issue to the one raised by CCH

here, and rejected the argument that federal court subject matter jurisdiction turns

on whether the federal agency has regulatory jurisdiction under the CWA over the

challenged conduct. 209 F.3d at 971-72. The *Krilich* court explained:

> "[T]he nexus with interstate commerce, which courts
> frequently call the 'jurisdictional element,' is simply one
> of the essential elements of [the offense]. Although

- 11 -

> courts frequently call it the 'jurisdictional element' of the statute, it is 'jurisdictional' only in the shorthand sense that without that nexus, there can be no federal crime. . . . It is not jurisdictional in the sense that it affects a court's subject matter jurisdiction, . . ." *Hugi [v. United States]*, 164 F.3d at 381 (7th Cir. 1999). Thus, while "[a] link to interstate commerce may be essential to Congress's substantive authority, *see United States v. Lopez*, 514 U.S. 549 (1995), . . . the existence of regulatory power differs from the subject-matter jurisdiction of the courts." *Hugi*, 164 F.3d at 380-81.

*Id.* at 972 (alteration in original).

In *United States v. Sea Bay Development Corp.*, 2007 WL 1169188 (E.D. Va. April 18, 2007), the district court also rejected a similar argument. In that case, the defendant argued that the court lacked subject matter jurisdiction over the United States' suit to enforce orders to restore illegally filled wetlands because the wetlands in question allegedly did not fall within the jurisdiction of the CWA. That court noted that the Supreme Court has repeatedly indicated that the determination of whether a cause of action fails to meet statutory criteria is typically a merits determination, not a jurisdictional one. *Id.* at *4-5 (citing *Steel Co.*, 523 U.S. at 86, and *Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006)). Furthermore, "the definition of 'navigable waters' in the CWA 'does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts.'" *Id.* at *5 (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982)). Thus, as the *Sea Bay* court held, the question of whether "waters of the United States" are implicated goes to the merits, and does not implicate subject matter jurisdiction. *Id.*

- 12 -

Similarly here, to the extent there is any question about whether the permit conditions allegedly violated by CCH fall within the regulatory jurisdiction of the CWA, this issue goes to the merits of the claim, not to this Court's jurisdiction. This Court has subject matter jurisdiction to consider Sierra Club's Second Claim.

## II.    CCH May Not Challenge the Terms of its Permits in this Proceeding.

CCH argues that Sierra Club is not entitled to bring suit based on violations of CCH's NPDES permits that did not result in spills to the "waters of the United States." MTD at 6. Because it is not disputed that Sierra Club is entitled to bring suit to enforce permit conditions, *see* 33 U.S.C. § 1365(a)(1), this argument can only be interpreted as a challenge to the validity of the permit conditions themselves. This is not the proper time or forum for CCH to raise these challenges.

Pursuant to Section 509 of the CWA, any federal NPDES permit may be reviewed in the United States Court of Appeals within 120 days from the date of the action taken. 33 U.S.C. § 1369(b)(1). The CWA specifically prohibits collateral attacks on permits outside of these procedures: "Action of the Administrator with respect to which review could have been obtained under paragraph (1) of this subsection shall not be subject to judicial review in any civil or criminal proceeding for enforcement." 33 U.S.C. § 1369(b)(2).

Numerous courts have precluded defendants in CWA enforcement actions from attempting to challenge the terms of their NPDES permits as a defense to the enforcement action. *See, e.g., General Motors Corp. v. EPA*, 168 F.3d 1377,

- 13 -

1381-83 (D.C. Cir. 1999) (rejecting challenge to state permit in federal

enforcement proceeding); *United States v. Hartsell*, 127 F.3d 343, 351 (4th Cir.

1997) (defendants barred from challenging permits in criminal case); *Pub. Interest*

*Research Group of N.J. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 78 (3d

Cir. 1990) ("By failing to challenge a permit in an agency proceeding, [defendant]

has lost forever the right to do so, even though that action might eventually result

in the imposition of severe civil or criminal penalties." (internal citations

omitted)); *Texas Mun. Power Agency v. EPA*, 836 F.2d 1482, 1492 (5th Cir. 1988)

(even if the permittee could show that the permit terms were improper, it is

irrelevant, because "the place for judicial review of findings of fact [justifying the

permit terms] is in a timely challenge after the permit is issued"); *Sierra Club v.*

*Union Oil Co.*, 813 F.2d 1480, 1486-87 (9th Cir. 1987) (rejecting protest of permit

terms in enforcement proceeding), *judgment vacated on other grounds*, 485 U.S.

931 (1988), *judgment reinstated*, 853 F.2d 667 (9th Cir. 1988).

　　　There are good reasons for such a rule.  EPA and the States base NPDES

permitting decisions on the assumption that all of the terms in a permit, including

the standard operation and maintenance conditions at issue here, will be

enforceable.  If one permit term is found invalid, EPA may need to adjust other

permit terms to compensate.  It can do this in a timely manner only if permit

holders are required to utilize the statutory mechanisms for challenging permit

terms.

　　　Furthermore, allowing belated collateral attacks on permit terms in

enforcement proceedings could significantly undermine the orderly administration of the NPDES permitting program and potentially threaten the enforceability of these important health and environmental standards. Permit holders would have less incentive to comply with permit terms if they believed that they could collaterally attack the permit whenever a State, the United States or a citizen commences an enforcement action. This increase in violations could have serious ramifications for public health and the environment.

In an attempt to avoid the plain rule against collateral attacks on permit terms, CCH claims it is not contesting the validity of the underlying permit terms, but "simply whether this Court has jurisdiction over a claim brought solely under the CWA that is based only upon spills that do not impact 'waters of the United States.'" MTD Reply at 6. This is a false distinction. Sierra Club's Second Claim asserts that on numerous occasions, CCH has violated the Standard Provisions and Reporting Requirements of its NPDES permits. Second Am. Compl. ¶¶ 79-83. Sierra Club's right to bring suit to enforce these conditions does not depend on whether the violation of the permit condition resulted in a spill to the ground, a spill to the waters of the United States, or no spill at all.

In effect, CCH is asking this Court to rewrite the NPDES permits to provide that the operation and maintenance conditions address only spills to the waters of the United States. CCH's request is not permissible in the context of this proceeding, and should be rejected.

III.    **CCH's NPDES Permit Conditions Are Valid and Enforceable**.

Even if CCH may challenge the terms of its NPDES permits in this proceeding, its challenge must fail. The permit conditions at issue in this case, including those that arguably may not ***directly*** impose restrictions on discharges to the waters of the United States, are valid exercises of EPA's authority under the CWA.

Section 301(a) of the CWA prohibits discharges of pollutants except in compliance with, *inter alia*, Section 402. 33 U.S.C. § 1311(a). Section 402 states that the Administrator or a State may issue a permit for discharge of any pollutant. 33 U.S.C. § 1342(a)(1), (b). Section 402(a)(2) specifically provides that the Administrator "shall prescribe conditions for such permits to assure compliance with the requirements of paragraph (1) of this subsection, including conditions on data and information collecting, reporting, and such other requirements as he deems appropriate." 33 U.S.C. § 1342(a)(2).

CCH has been issued NPDES permits which, among other things, condition the permit on the prevention of discharges of wastewater from points other than those specifically identified in the permits. For example, the Honouliuli Permit is conditioned on CCH avoiding any "overflow" or bypass of its facilities, including the waste collection system. Honouliuli Permit, Standard Provisions and Reporting Requirements B.7. The permit defines "overflow" as the "intentional or unintentional diversion of flow from the collection and transport systems, including the pumping facilities." *Id.* at A.19. The permit is also conditioned on

- 16 -

CCH "properly operat[ing] and maintain[ing] all facilities and systems of treatment and control (and related appurtenances) which are installed or used by the discharger to achieve compliance with this permit." *Id.* at C.2.

CCH argues that Sierra Club's Second Claim alleges violations of the permit conditions that did not result in spills that entered a "water of the United States," and that these alleged violations exceed federal jurisdiction under the Commerce Clause and the CWA, and are not within the subject matter jurisdiction of this Court. CCH relies on the Supreme Court's decisions in *SWANCC*, 531 U.S. 159, and *Rapanos*, 547 U.S. at 737-38, in support of this argument.

Neither *SWANCC* nor *Rapanos* is relevant to Sierra Club's Second Claim. Both *SWANCC* and *Rapanos* concerned whether a particular wetland or waterbody into which the petitioners wished to discharge dredged or fill material was a "water of the United States," such that a permit from the Corps under CWA Section 404 would be required prior to any discharge. That is not the issue in this case.

There is no dispute that CCH is discharging effluent to a water of the United States -- the Pacific Ocean. Nor is there any dispute that CCH must have a permit governing its discharges. Thus, the conclusions in *SWANCC* and *Rapanos* addressing whether a waterbody is covered by the CWA and thus subject to permitting requirements are simply inapposite. The issue here instead involves what permit conditions EPA may utilize in regulating a large municipal waste treatment facility that indisputably discharges directly into a water of the United

- 17 -

States.

CCH also errs in its assertion that EPA's guidance regarding the application of *Rapanos* "*confirms its lack of jurisdiction* over the alleged violations under plaintiffs' Second Claim." MTD at 23 (emphasis in original); *see* EPA/Corps of Engineers, Clean Water Act Jurisdiction Following the Supreme Court's Decision in *Rapanos v. United States & Carabell v. United States* (June 5, 2007).[6] Contrary to CCH's assertion, nothing in this guidance addresses the authority of EPA to impose and enforce permit conditions on permittees who are discharging into waters that fall within the scope of the CWA, which is the situation here.[7]

In CWA Section 402(a)(2), Congress plainly authorized EPA's Administrator to impose permit conditions that go beyond simple prohibitions or limits on discharges to the waters of the United States. *See* 33 U.S.C. § 1342(a)(2) (the Administrator "shall prescribe conditions for such permits to assure compliance . . ., including conditions on data and information collection, reporting, *and such other requirements as he deems appropriate*") (emphasis added). This provision has been recognized as a broad grant of power to the Administrator to impose such conditions as he deems appropriate to achieve compliance with the Act. *See, e.g., Arkansas v. Oklahoma*, 503 U.S. 91, 105

---

[6] The guidance is available at http://www.epa.gov/owow/ wetlands/pdf/ RapanosGuidance6507.pdf (last visited July 11, 2008).

[7] CCH also fails to point out that the guidance is explicitly non-binding. *See* guidance at 4, n. 16.

(1992) ("Congress has vested in the Administrator broad discretion to establish conditions for NPDES permits."); *Montgomery Envt'l Coalition v. Costle*, 646 F.2d 568, 587 (D.C. Cir. 1980). This includes permit conditions that the Administrator finds are necessary to ensure compliance with limits on discharges to the waters of the United States, not simply the discharge limits themselves.

In reliance on the grant of power in CWA Section 402(a)(2), EPA has promulgated regulations in 40 C.F.R. § 122.41 requiring that all NPDES permits contain certain conditions appropriate to achieve compliance with the CWA. Pursuant to these regulations, all NPDES permits must contain a condition at least as stringent as the following: "[t]he permittee shall at all times properly operate and maintain all facilities and systems of treatment and control (and related appurtenances) which are installed or used by the permittee to achieve compliance with the conditions of this permit." 40 C.F.R. § 122.41(e). CCH has never challenged these regulations or the inclusion of their terms in the CCH permits. Moreover, EPA is entitled to deference in its reasonable interpretation of the CWA's broad grant of authority in this area to allow regulations imposing operation and maintenance requirements as a permit condition. *Chevron, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 865-66 (1984).

Furthermore, there are good reasons for operation and maintenance conditions in NPDES permits. Even if the failure to properly operate and maintain a facility does not result in a direct discharge to the waters of the United States, it may be evidence of defects in the operation and maintenance of the collection or

- 19 -

treatment system that may result in a spill or create a risk of spills to such waters.

The Ninth Circuit has explicitly rejected CCH's argument, holding that "citizens groups may enforce even valid permit conditions that regulate discharges outside the scope of the Clean Water Act, namely discharges that may never reach navigable waters." *Nw Envt'l Advocates*, 56 F.3d at 988 (*citing Connecticut Fund for Env't v. Raymark Indus., Inc.*, 631 F. Supp. 1283, 1285 (D. Conn. 1986)). Numerous other courts have entertained lawsuits seeking to enforce permit conditions other than those dealing directly with discharges to navigable waters. *See, e.g., Sierra Club v. Simkins Indus., Inc.*, 847 F.2d 1109, 1115 (4th Cir. 1988) (allowing citizen enforcement of reporting requirements); *Locust Lane v. Swatara Township Auth.*, 636 F. Supp. 534, 539 (M.D. Pa.1986) (permitting challenge to noncompliance with construction schedules in permit); *Pymatuning Water Shed Citizens for a Hygienic Env't v. Eaton*, 506 F. Supp. 902 (W.D. Pa. 1980), *aff'd*, 644 F.2d 995 (3d Cir. 1981) (allowing citizen enforcement of sewage system maintenance terms). Nothing in *SWANCC* or *Rapanos* imposed any limits on EPA's authority to prescribe the permit terms at issue here.

CCH also errs in suggesting that the Supreme Court decided either *Rapanos* or *SWANCC* on Commerce Clause grounds. The Court decided both cases based on its interpretation of the CWA, and did not address the outer limits of Congress's authority under the Commerce Clause. In both *SWANCC* and *Rapanos*, the Supreme Court specifically chose to "read the statute as written to avoid the significant constitutional and federalism questions" raised by a broader

- 20 -

view of federal jurisdiction. *SWANCC*, 531 U.S. at 174; *see also Rapanos*, 547

U.S. at 738-39 (Scalia, J., plurality opinion) (interpreting the language of the

statute and declining to adopt an interpretation that raises Commerce Clause

questions); 547 U.S. at 782-83 (Kennedy, J., concurring in the judgment) (noting

that no federalism or Commerce Clause concerns support a presumption against

the significant nexus standard).

     No Commerce Clause concerns are raised by the permit terms at issue here.

The operation of CCH's wastewater treatment system, which discharges into

interstate waters, is plainly subject to federal regulation under the Commerce

Clause. *See also Kaiser Aetna v. U.S.*, 444 U.S. 164, 174 (1979) ("[A] wide

spectrum of economic activities 'affect' interstate commerce and thus are

susceptible of congressional regulation under the Commerce Clause irrespective of

whether navigation, or, indeed, water, is involved."). CCH asks this Court to

carve out portions of EPA's NPDES regulatory scheme on the grounds that not

every permit condition directly prohibits discharges to waters of the United States.

However, as the Supreme Court has held:

> That the regulation ensnares some purely intrastate
> activity is of no moment. As we have done many times
> before, we refuse to excise individual components of that
> larger scheme.

*Gonzales v. Raich*, 545 U.S. 1, 22 (2005); *see also Wickard v. Fillburn*, 317 U.S.

111, 124 (1942) ("The commerce power . . . extends to those activities intrastate

which so affect interstate commerce, or the exertion of the power of Congress over

it, as to make regulation of them appropriate means to the attainment of a legitimate end, the effective execution of the granted power to regulate interstate commerce." (citation omitted)).  For the same reasons,  CCH's request to excise certain permit terms should be rejected.

IV.    **The Term "Waters of the United States" Covers those Waters that Meet either the Standard Set Forth in the Plurality Opinion in *Rapanos* or the Standard Set Forth in Justice Kennedy's Concurrence.**

While the United States does not take a position on the ultimate disposition of Sierra Club's summary judgment motion with respect to the First Claim, the United States does take issue with the assertion in defendant's brief (unrebutted by plaintiffs) that the Ninth Circuit has "unequivocally determined" that Justice Kennedy's concurrence provides the exclusive standard for establishing what waters comprise "waters of the United States" under the CWA.  Def's Br. in Opposition to Plaintiffs' Motion for Summary Judgment at 14, n. 4.   An examination of the Supreme Court's decision in *Rapanos*, as well as the Court's precedents interpreting fractured decisions, demonstrates that "waters of the United States" coverage may be established under *either* the standard set forth in Justice Kennedy's concurrence *or* the standard set forth in the plurality opinion. Ninth Circuit precedent is not to the contrary.

The CWA prohibits the "discharge of a pollutant" into "navigable waters," which are defined in turn to mean the "waters of the United States, including the territorial seas." 33 U.S.C. §§ 1311(a); 1362(7).  In a series of decisions culminating in *Rapanos*, the Supreme Court has construed the term "waters of the

- 22 -

United States." *Rapanos* involved two consolidated cases in which the CWA had been applied to wetlands adjacent to nonnavigable tributaries of traditional navigable waters. *See* 547 U.S. at 729 (Scalia, J., plurality opinion). All Members of the Court agreed that the term "waters of the United States" encompasses some waters that are not navigable in the traditional sense. *See id.* at 731 (Scalia, J., plurality opinion); *id.* at 767 (Kennedy, J., concurring in the judgment); *id.* at 792 (Stevens, J., dissenting). Four Justices in *Rapanos* interpreted the term "waters of the United States" as covering "relatively permanent, standing or continuously flowing bodies of water," *id.* at 739 (Scalia, J., plurality opinion), that are connected to traditional navigable waters, *id.* at 741-42, as well as wetlands with a continuous surface connection to such water bodies, *id.* at 742. [8/]

Justice Kennedy interpreted the term to encompass wetlands that "possess a 'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." *Id.* at 759 (Kennedy, J., concurring in the judgment); *see id.* at 780 (wetlands "possess the requisite nexus" if the wetlands "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'"). In addition, Justice Kennedy concluded that the

---

[8/] The *Rapanos* plurality noted that its reference to "relatively permanent" waters "d[id] not necessarily exclude streams, rivers, or lakes that might dry up in extraordinary circumstances, such as drought," or "*seasonal* rivers, which contain continuous flow during some months of the year but no flow during dry months." 547 U.S. at 732 n.5 (emphasis in original).

- 23 -

Corps' assertion of jurisdiction over "wetlands adjacent to navigable-in-fact waters" may be sustained "by showing adjacency alone." *Id.*[9] The four dissenting Justices, who would have affirmed the court of appeals' application of the pertinent regulatory provisions, also concluded that the term "waters of the United States" encompasses, *inter alia*, all tributaries and wetlands that satisfy either the plurality's standard or that of Justice Kennedy. *See id.* at 810 & n.14 (Stevens, J., dissenting).

Under *Rapanos*, EPA and the Corps may continue to exercise regulatory jurisdiction over any water that satisfies either the standard for CWA coverage adopted by the *Rapanos* plurality or the standard set forth in Justice Kennedy's concurrence. That is so because the four dissenting Justices in *Rapanos* stated

---

[9] Inasmuch as the consolidated cases in *Rapanos* involved discharges into *wetlands* adjacent to nonnavigable tributaries, Justice Kennedy's analysis focused on the requisite showing for *wetlands*. His standard does not set forth particular facts that must be established in order to find that a non-navigable tributary has a significant nexus to traditional navigable waters. Justice Kennedy concluded that the breadth of the regulatory standard establishing jurisdiction over non-navigable tributaries precluded use of mere adjacency to such tributaries as the determinative measure of whether *wetlands* adjacent to ephemeral tributaries "are likely to play an important role in the integrity of an aquatic system comprising navigable waters as traditionally understood." 547 U.S. at 781 (Kennedy, J., concurring in the judgment). However, he acknowledged that the Corps' requirement of a perceptible "ordinary high water mark" for ephemeral streams, 65 Fed. Reg. 12818, 12823 (Mar. 9, 2000), "may well provide a reasonable measure of whether specific minor tributaries bear a sufficient nexus with other regulated waters to constitute 'navigable waters' under the Act." 547 U.S. at 781; *see also id.* at 760-61, 770.

explicitly that they would sustain the exercise of federal regulatory jurisdiction under the CWA whenever either of those standards is satisfied. *See* 547 U.S. at 810 & n.14 (Stevens, J., dissenting). Thus, in all such cases, the agencies' exercise of regulatory jurisdiction would be consistent with the views of a majority of the Supreme Court's Members.

In *Marks v. United States*, 430 U.S. 188 (1977), the Supreme Court stated that, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment[] on the narrowest grounds.'" *Id.* at 193 (*quoting Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976). Taken in isolation, the *Marks* Court's reference to "those Members who concurred in the judgment[]" might be read to suggest that lower courts, in determining the precedential effect of a fractured decision of the Supreme Court, should ignore the views of dissenting Justices. The Supreme Court has subsequently recognized, however, that in some cases the *Marks* test is "more easily stated than applied to the various opinions supporting the result," *Grutter v. Bollinger*, 539 U.S. 306, 325 (2003) (*quoting Nichols v. United States*, 511 U.S. 738, 745-46 (1994)). The Court also acknowledged in *Grutter* that "[i]t does not seem 'useful to pursue the *Marks* inquiry to the utmost logical possibility'" in every case. *Id.* (*quoting Nichols*, 511 U.S. at 745-746).

In some fractured decisions, the narrowest rationale adopted by one or more Justices who concur in the judgment may be the only controlling principle on

which a majority of the Court's Members agree. In that situation, application of the rule announced in *Marks* provides a sensible approach to determining the controlling legal principles of the case. But in *Rapanos*, as in some other instances, no opinion for the Court exists and neither the plurality nor the concurring opinion is in any sense a "lesser-included" version of the other.

In *Rapanos*, five Justices agreed that the judgments of the Sixth Circuit in the consolidated cases under review should be vacated and the cases remanded for further proceedings. *See* 547 U.S. at 757 (Scalia, J., plurality opinion); *id.* at 786 (Kennedy, J., concurring in the judgment). The plurality concluded that a remand was necessary because the court of appeals had not determined, and the existing record provided an inadequate basis for deciding, whether the tributaries to which the wetlands were adjacent "contain[ed] a relatively permanent flow" or whether the pertinent wetlands "possess[ed] a continuous surface connection" to those tributaries. *Id.* at 757 (Scalia, J., plurality opinion). Justice Kennedy found a remand to be appropriate because neither the Corps nor the lower courts in the consolidated cases had addressed the question "whether the specific wetlands at issue possess a significant nexus with [traditional] navigable waters." *Id.* at 787 (Kennedy, J., concurring in the judgment).

Because neither of those grounds for decision is inherently narrower than the other, it is logically impossible to identify a consensus "narrowest" position among the views of the Justices who concurred in the judgment. In such circumstances, the Supreme Court has looked to the views of dissenting justices to

- 26 -

discern the controlling principles of law that emerge from a case. *See Waters v. Churchill*, 511 U.S. 661, 685 (1994) (Souter, J., concurring) (analyzing the points of agreement among the plurality, concurring, and dissenting opinions to identify the legal "test . . . that lower courts should apply," under *Marks*, as the holding of the Court); *Wilton v. Seven Falls Co.*, 515 U.S. 277, 285 (1995) (ruling that the controlling legal standard is the one adopted by the concurrence and four dissenting Justices in a prior fractured opinion); *Moses H. Cone Memorial Hosp. v. Mercury Construction Corp.*, 460 U.S. 1, 17 (1983) (same); *cf. League of United Latin Am. Citizens v. Perry*, 126 S. Ct. 2594, 2607 (2006); *Alexander v. Sandoval*, 532 U.S. 275, 281-282 (2001) (same). Consideration of the dissenting Justices' views is consistent with the underlying purpose of the specific rule announced in *Marks*, because it enables lower courts to discern the governing rule of law that emerges from a fractured decision of the Court.

Because neither the plurality opinion nor Justice Kennedy's concurring opinion is a logical subset of the other, the views of the dissenting justices must be considered to determine the principles of law that emerge from *Rapanos*. This examination leads ineluctably to the conclusion that the CWA covers those waters that satisfy either the legal standard of the plurality or that of Justice Kennedy, since a majority of the Court's Members would find regulatory jurisdiction in either of those instances. *See Rapanos*, 547 U.S. at 810 (Stevens, J., dissenting); *United States v. Johnson*, 467 F.3d 56, 66 (1st Cir. 2006) (concluding that the federal government can establish jurisdiction over waters that "meet either the

plurality's or Justice Kennedy's standard as laid out in *Rapanos*"), *cert. denied*,

128 S. Ct. 375 (2007).[10]

Ninth Circuit precedent is not to the contrary. In *Northern Cal. River Watch*

*v. City of Healdsburg*, 496 F.3d 993 (9th Cir. Aug. 6, 2007), *cert. denied,* 170

L.Ed.2d 61(2008), the court stated that Justice Kennedy's concurring opinion in

*Rapanos* constitutes "the narrowest ground to which a majority of the Justices

would assent if forced to choose in *almost all cases*," and that the Rapanos

concurrence "provides the controlling rule of law *for our case*." *Id.* at 999-1000

(emphases added). In response to petitions for rehearing, the Ninth Circuit

---

[10]*See also United States v. Bailey*, 516 F. Supp. 2d 998 (D. Minn.), *appeal filed,*
No. 08-1908 (8th Cir. 2008) (same); *United States v. Cundiff*, 480 F. Supp. 2d 940
(W.D. Ky. 2007), *appeal pending,* No. 07-5630 (6th Cir. 2007) (same); *Simsbury-
Avon Preservation Soc'y L.L.C. v. Metacon Gun Club, Inc.*, 472 F. Supp. 2d 219,
227-28 (D. Conn. 2007), *appeal pending,* No. 07–795CV (2d Cir. 2007) (same);
*cf. United States v. Gerke Excavating, Inc.*, 464 F.3d 723, 725 (7th Cir. 2006),
*cert. denied* 128 S.Ct. 45 (2007) (remanding the case for further proceedings in
light of *Rapanos* and stating that "Justice Kennedy's proposed standard . . . must
govern the further stages of this litigation," but recognizing that cases may
occasionally arise in which Justice Kennedy "would vote against federal authority
only to be outvoted 8-to-1 (the four dissenting Justices plus the members of the
*Rapanos* plurality)," and not specifying what it regarded as the proper disposition
of such a case). *But see United States v. Robison,* 505 F.3d 1208 (11th Cir. 2007)
(holding that Justice Kennedy's standard provides the sole controlling rule of law),
*petition for rehearing en banc denied,* 521 F.3d 1319 (11th Cir. 2008). As the
dissenting opinion from the denial of the petition for rehearing en banc in *Robison*
stated, the panel's decision "cannot be reconciled with Supreme Court and
Eleventh Circuit precedents addressing the proper application of fractured
Supreme Court opinions" and "fails as a matter of common sense." 521 F.3d at
1320 (Wilson, J., dissenting).

withdrew its original opinion in *Healdsburg*, 457 F.3d 1023 (9th Cir. 2006), and substituted the foregoing language for more categorical language that had appeared in the prior decision. 496 F.3d at 999. The Ninth Circuit thus carefully refrained from stating a categorical rule concerning the import of the fractured opinions in *Rapanos*, and it did not specifically discuss the proper resolution of a coverage dispute involving wetlands that satisfy the *Rapanos* plurality's standard but not Justice Kennedy's. Analysis of that question was unnecessary because the Ninth Circuit held that Justice Kennedy's standard was satisfied and that the wetlands at issue therefore were covered by the CWA. *Id.*

Nor do the Ninth Circuit's other decisions foreclose application of the plurality standard. In *San Francisco Baykeeper v. Cargill Salt Division*, 481 F.3d 700 , 707 (9th Cir. 2007), the court referred without explanation to "Justice Kennedy's controlling concurrence." *Id.* at 707. That decision was issued before the Ninth Circuit revised its opinion in *Healdsburg*. Similarly, in *United States v. Moses*, 496 F.3d 984 (9th Cir. 2007), the court referred to Justice Kennedy's opinion as the "controlling rule of law," but cited to the 2006 decision in *Healdsburg* that was subsequently withdrawn. Thus, when examined in context, these decisions do not foreclose the use of the plurality standard to establish coverage under the CWA. Moreover, as the Ninth Circuit has noted, "[t]he Supreme Court has previously recognized that concurring and dissenting justices can constitute a controlling majority on a particular issue, at least where that view does not conflict with the holding of the majority." *Compassion in Dying v. State*

- 29 -

*of Washington*, 79 F.3d 790, 816 n. 68 (9th Cir. 1996); *rev'd on other grounds,*
*Washington v. Glucksberg*, 521 U.S. 702 (1997).

Given that neither the plurality standard nor Justice Kennedy's standard is a
logical subset of the other, and in light of the explicit instructions of the dissenting
Justices in *Rapanos* that they would find CWA regulatory jurisdiction where either
the standard set forth in the plurality opinion or the standard set forth in Justice
Kennedy's opinion is satisfied, it is clear that a majority of the Members of the
Supreme Court would uphold the exercise of CWA regulatory jurisdiction in
either circumstance.  Accordingly, CWA regulatory jurisdiction may be asserted
over waters that satisfy either the plurality standard in *Rapanos* or the standard in
Justice Kennedy's concurring opinion.

Respectfully submitted,

FOR THE UNITED STATES OF AMERICA

Date:  July 14, 2008          /s/ Robert D. Mullaney

ROBERT D. MULLANEY
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources
  Division
U.S. Department of Justice
301 Howard Street, Suite 1050
San Francisco, California  94105
Tel:  (415) 744-6491
Fax:  (415) 744-6476

## CERTIFICATE OF SERVICE

I, Robert D. Mullaney, hereby certify that, on the dates and by the methods of service noted below, a true and correct copy of the documents entitled "Amicus Curiae Brief of the United States of America" and "Declaration of JoAnn Cola in support of United States' Amicus Curiae Brief" was served on the following at their last known addresses:

Served by Electronic Mail:

Carrie Okinaga                                    July 14, 2008
Corporation Counsel
cokinaga@honolulu.gov

James Dragna                                      July 14, 2008
Bingham McCutchen LLP
jim.dragna@bingham.com

Christopher Sproul                                July 14, 2008
Environmental Advocates
csproul@enviroadvocates.com

Bill Tam                                          July 14, 2008
Alston Hunt Floyd & Ing
wtam@ahfi.com

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on July 14, 2008, at San Francisco, California.

/s/ Robert D. Mullaney
Robert D. Mullaney