IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| SIERRA CLUB, HAWAII CHAPTER, HAWAII'S THOUSAND FRIENDS; and OUR CHILDREN'S EARTH FOUNDATION, | ) ) ) ) ) | CV. NO. 04-00463 DAE-BMK |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| CITY AND COUNTY OF HONOLULU, and FRANK DOYLE, DIRECTOR OF THE DEPARTMENT OF ENVIRONMENTAL SERVICES, in his official capacity, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

ORDER GRANTING IN PART AND DENYING IN PART WITHOUT
PREJUDICE  PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT ON PLAINTIFFS' FIRST AND SECOND CLAIMS;
AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS
<u>PLAINTIFFS' SECOND CLAIM</u>

On June 30, 2008, the Court heard Plaintiffs' Motion and Defendant's

Motion.  William Tam, Esq., and Christopher Sproul, Esq., appeared at the hearing

on behalf of Sierra Club, Hawai`i Chapter, Hawai`i's Thousand Friends and Our

Children's Earth Foundation (collectively, "Plaintiffs"); James J. Dragna, Esq.,

Bryan K. Brown, Esq., and Kathleen A. Kelly, Deputy Corporation Counsel,

appeared at the hearing on behalf of Defendant City and County of Honolulu

("CCH"). This Court allowed the parties and the EPA to submit additional exhibits

and briefing after the hearing. After reviewing Plaintiffs' motion, CCH's motion,

and the supporting and opposing memoranda, the Court GRANTS IN PART AND

DENIES IN PART WITHOUT PREJUDICE Plaintiffs' Motion for Partial

Summary Judgment on Plaintiffs' First and Second Claims and DENIES CCH's

Motion to Dismiss Plaintiffs' Second Claim.

Plaintiffs' motion for summary judgment is GRANTED with respect

to their First Claim for the uncontested 112 spills, each of which this Court has

found in turn violates the Clean Water Act, and for 37 other violations from the

contested spills, for a total of 149 violations under the First Claim. Plaintiffs'

motion on their First Claim for all other violations, all of which are contested, is

DENIED WITHOUT PREJUDICE. Plaintiffs' motion for summary judgment with

respect to their Second Claim is GRANTED, and this Court finds 148 violations of

the Permit.

BACKGROUND

Plaintiffs filed the instant lawsuit in July 2004, pursuant to the citizen

suit provision of the Clean Water Act ("CWA") for violations of the CWA due to

sewage spills from the collection system, the wastewater treatment plants

("WWTP"), and alleged violations of the Sand Island and Honouliuli National

Pollution Discharge Elimination System ("NPDES") Permits.  Plaintiffs' first and

second claims are at issue in these motions.  Plaintiffs' first claim for relief alleges

sewage spill discharges of pollutants without a permit in violation of the CWA, 33

U.S.C. §§ 1311(a), 1365 (the "First Claim").  Plaintiffs' second claim for relief

alleges sewage spills in violation of CCH's Honouliuli NPDES permit (the

"Permit"), also in violation of the CWA, 33 U.S.C. §§ 1311(a), 1365 (the "Second

Claim").

        The Honouliuli Permit authorizes CCH to discharge treated

wastewater from the outfall sewer located in Ewa Beach into Mamala Bay of the

Pacific Ocean in accordance with effluent limitations, monitoring requirements,

and other conditions.  (Pls.' Ex. 1.)  Unless certain specific circumstances exist, the

Permit prohibits overflows or bypasses of the treatment facilities, including the

waste collection system.  (Id.)  The term "overflow" is defined as "the intentional

or unintentional diversion of flow from the collection and transport systems,

including the pumping facilities."  (Id.)  The term "bypass" is defined as "the

intentional diversion of waste streams from any portion of a treatment facility

whose operation is necessary to maintain compliance with the terms and conditions

of this permit."  (Id.)  The Permit requires that CCH immediately report any

"noncompliance that may endanger health or the environment," which includes a violation of a discharge prohibition, any overflow or unanticipated bypass that exceeds an effluent limitation, and a violation of a maximum daily discharge limitation for any toxic pollutant or hazardous substance. The Permit also requires CCH to submit monthly Wastestream Diversion Reports, which report sewage spills and bypasses from Honouliuli WWTP. All reports must be signed and certified as accurate under penalty of law. In general, these reports are referred to herein as CCH Spill Reports.

The Consent Decree issued by this Court on May 15, 1995, in a related case, Civ. No. 94-00765 DAE-KSC, requires CCH to submit quarterly reports regarding any noncompliance with the requirements of the Consent Decree. The Quarterly Reports must also include collection system spills and all WWTP emergency bypasses caused by infiltration and inflow in the previous quarter. The Consent Decree requires that the reports be signed and certified as accurate under penalty of law. CCH filed Quarterly Reports through December 31, 2005. However, there is no evidence that CCH filed Quarterly Reports for the period between January 1, 2006, and September 30, 2007.

On May 20, 2008, Plaintiffs filed a motion for partial summary judgment on their First and Second Claims. (Doc. # 177.) With respect to their

4

First Claim, Plaintiffs requested that this Court find there were a total of 332 violations of the CWA. However, in their reply brief, Plaintiffs requested a finding with respect to only 270 violations and withdrew their requests to the extent they were based upon spills from facilities that CCH contended it did not own and those spills that constituted WWTP bypasses. After the hearing, the parties filed joint exhibits wherein they agreed that under the First Claim there are 112 spills that are not contested by CCH and 134 alleged violations that are contested by CCH. (Doc. # 202, Exs. A, B.)

With respect to their Second Claim, Plaintiffs initially sought a finding that there were 207 violations of the CWA for discharging raw or partially treated sewage to ground from the Honouliuli WWTP or collection system in violation of the Permit. However, in their reply brief, Plaintiffs lowered the number of alleged violations to 148 days/incidents of spills, none of which are a part of their First Claim.

CCH filed its opposition on June 12, 2008. (Doc. # 184.) CCH also filed on June 12, 2008, a motion to dismiss Plaintiffs' Second Claim. (Doc. # 182.) By request of the parties, CCH's motion to dismiss was set for hearing on the same day as Plaintiffs' previously scheduled motion and Plaintiffs filed one brief as their opposition to CCH's motion and a reply to their motion on June 23, 2008. (Doc. #

191.)  CCH filed a reply to its motion on June 26, 2008.  (Doc. # 195.)  After the

hearing, the United States Environmental Protection Agency ("EPA") was allowed

to file an Amicus Curiae Brief, which it did on July 14, 2008  (Doc. # 200), and

CCH was allowed to file an opposition to the Amicus Curiae Brief, which it did on

July 21, 2008.  (Doc. # 205.)

<u>STANDARD OF REVIEW</u>

I.    <u>Plaintiffs' Motion for Partial Summary Judgment</u>

Rule 56 requires summary judgment to be granted when "the

pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R.

Civ. P. 56(c); <u>see</u> <u>also</u> <u>Porter v. California Dept. of Corrections</u>, 419 F.3d 885, 891

(9th Cir. 2005); <u>Addisu v. Fred Meyer, Inc.</u>, 198 F.3d 1130, 1134 (9th Cir. 2000).

A main purpose of summary judgment is to dispose of factually unsupported

claims and defenses.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to

demonstrate facts to establish what will be an essential element at trial.  <u>See</u> <u>id.</u> at

323.  A moving party without the ultimate burden of persuasion at trial–usually,

but not always, the defendant–has both the initial burden of production and the

6

ultimate burden of persuasion on a motion for summary judgment.  Nissan Fire &

Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden

initially falls upon the moving party to identify for the court those "portions of the

materials on file that it believes demonstrate the absence of any genuine issue of

material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d

626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).

Once the moving party has carried its burden under Rule 56, the

nonmoving party "must set forth specific facts showing that there is a genuine

issue for trial" and may not rely on the mere allegations in the pleadings.  Porter,

419 F.3d  at 891 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256

(1986)).  In setting forth "specific facts," the nonmoving party may not meet its

burden on a summary judgment motion by making general references to evidence

without page or line numbers.  S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885,

889 (9th Cir. 2003); Local Rule 56.1(f) ("When resolving motions for summary

judgment, the court shall have no independent duty to search and consider any part

of the court record not otherwise referenced in the separate concise statements of

the parties.").  "[A]t least some 'significant probative evidence'" must be

produced.  T.W. Elec. Serv., 809 F.2d at 630  (quoting First Nat'l Bank of Ariz. v.

Cities Serv. Co., 391 U.S. 253, 290 (1968)).  "A scintilla of evidence or evidence

that is merely colorable or not significantly probative does not present a genuine issue of material fact." Addisu, 198 F.3d at 1134.

When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." T.W. Elec. Serv., 809 F.2d at 631. In other words, evidence and inferences must be construed in the light most favorable to the nonmoving party. Porter, 419 F.3d at 891. The court does not make credibility determinations or weigh conflicting evidence at the summary judgment stage. Id. However, inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. T.W. Elec. Serv., 809 F.2d at 631.

II.    CCH's Motion to Dismiss the Second Claim

CCH brought its motion based upon lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim pursuant to Rule 12(b)(6).

In a motion to dismiss for lack of the subject matter jurisdiction the plaintiff bears the initial burden of proving that subject matter jurisdiction exists. Prescott v. United States, 973 F.2d 696, 701 (9th Cir. 1992). Upon a motion to

dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, a party may make a jurisdictional attack that is either facial or factual.  <u>Safe Air for Everyone v. Meyer</u>, 373 F.3d 1035, 1039 (9th Cir. 2004).  CCH has made a facial attack.

A facial attack occurs when the movant "asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction."  <u>Id.</u>  In resolving a facial attack on the allegations of the complaint, the court must accept the allegations of the complaint as true.  <u>Mason v. Arizona</u>, 260 F. Supp. 2d 807, 815 (D. Ariz. 2003).  "Unlike a Rule 12(b)(6) motion, however, the court will not reasonably infer allegations sufficient to support federal subject matter jurisdiction because a plaintiff must affirmatively allege such jurisdiction."  <u>Id.</u>  For a facial attack, the court will grant the motion "only if the plaintiff fails to allege an element necessary for subject matter jurisdiction."  <u>Denney v. Drug Enforcement Admin.</u>, No. CIV.S-06-1711, 2007 WL 2344900, at *3 (E.D. Cal. Aug. 15, 2007).  "A complaint will be dismissed for lack of subject matter jurisdiction (1) if the case does not 'arise under' any federal law or the United States Constitution, (2) if there is no case or controversy within the meaning of that constitutional term, or (3) if the cause is not one described by any jurisdictional statute."  <u>Id.</u> (citing <u>Baker v. Carr</u>, 369 U.S. 186, 198 (1962)).

A Rule 12(b)(6) motion will be granted where the plaintiff fails to state a claim upon which relief can be granted.  Review is limited to the contents of the complaint.  See Clegg v. Cult Awareness Network, 18 F.3d 752, 754 (9th Cir. 1994).  Allegations of fact in the complaint must be taken as true and construed in the light most favorable to the plaintiff.  See Livid Holdings Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940, 946 (9th Cir. 2005).  A complaint need not include detailed facts to survive a Rule 12(b)(6) motion to dismiss.  See Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007).   In providing grounds for relief, however, a plaintiff must do more than recite the formulaic elements of a cause of action. See id. at 1966.  A plaintiff must include enough facts to raise a reasonable expectation that discovery will reveal evidence.  In other words, a plaintiff must allege enough facts to state a claim for relief that is plausible on its face.  See id. at 1974.  "[C]onclusory allegations without more are insufficient to defeat a motion to dismiss for failure to state a claim."  McGlinchy v. Shell Chem. Co., 845 F.2d 802, 810 (9th Cir. 1988).

DISCUSSION

I.    Plaintiffs' Motion for Summary Judgment on Their First Claim

A.    Uncontested Spills

In their motion Plaintiffs requested that this Court find there were a total of 332 violations of the CWA based upon overflows or spills of raw sewage from the CCH collection system or WWTPs.  In their opposition, CCH contested only 216 of the 332 alleged violations.  In their reply brief, Plaintiffs withdrew their request for summary judgment with respect to 332 violations and sought summary judgment for 270 violations.  At the hearing, CCH suggested that the parties be allowed to jointly submit a chart identifying the contested and uncontested spills.  On July 14, 2008, the parties submitted Submissions in Response to June 30, 2008 Hearing on Plaintiff's Motion for Partial Summary Judgment with jointly submitted charts, Exhibits A and B attached, which listed a number of spills by date and location.  (Doc. # 202, Exs. A, B.)  All spills not included on Exhibits A or B have been withdrawn by Plaintiffs.

Exhibit B lists by date and location each spill that CCH does not dispute reached receiving waters of the United States.  (See Doc. #202 at Ex. B.) Those spills total 112 spills.  Upon review of the record, this Court also finds that Plaintiffs have presented evidence that each of those spills in turn violated the

11

CWA, since each element, as set forth below, has been met. Accordingly, this Court enters judgment in favor of Plaintiffs with respect to 112 violations of the CWA, as listed by date and location of each spill on Exhibit B of Document number 202.

B.    Contested CWA Violations

Exhibit A of document number 202 lists by date and location a total of 94 spills for which Plaintiffs are seeking a finding of 134 violations. CCH contests liability, arguing that such spills did not reach receiving waters of the United States because the spills went into a storm drain, a dry stream bed, were contained, or there is no evidence that the spill reached receiving waters of the United States. CCH also asserts that some of the spills were double counted.

In order to establish liability for these 94 spills at issue, Plaintiffs must establish that CCH is a person who discharged a pollutant into the navigable waters of the United States. See 33 U.S.C. § 1311(a) ("the discharge of any pollutant by any person shall be unlawful"); 33 U.S.C. § 1362(12) (defining "discharge of a pollutant" as the addition of a pollutant into navigable waters); see also United States v. Moses, 496 F.3d 984, 988 (9th Cir. 2007) (the CWA "outlaw[s] the unauthorized 'discharge of any pollutant by any person. That, in turn, means that

[a person] could not add 'any pollutant to navigable waters,' which means 'the waters of the United States'") (citations omitted).

It is undisputed that CCH falls within the definition of person under the CWA[1] and that sewage is a pollutant.[2]  The dispute in this case is whether many of the alleged 94 spills went to navigable waters of the United States.

"[A] body of water need not, itself, be navigable in order to be one of the waters of the United States."  Moses, 496 F.3d at 988.  Instead, both the EPA and the Army Corps of Engineers have defined waters of the United States to include "[a]ll other waters such as intrastate lakes, rivers, streams (including intermittent streams) . . . [and] [t]ributaries of [such] waters[.]"  33 C.F.R. § 328.3(a); see also 40 C.F.R. § 122.2 (same); see also Moses, 496 F.3d at 989 n.8 ("There can be little doubt that a tributary of waters of the United States is itself a water of the United States.").

---

[1]  "The term 'person' means an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body."  33 U.S.C. § 1362(5).

[2]  "The term 'pollutant' means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, . . . ." 33 U.S.C. § 1362(6).

13

The Supreme Court has refined this definition as follows:

"[T]he waters of the United States" <u>includes only those relatively permanent</u>, standing <u>or continuously flowing</u> bodies of water forming geographic features that are described in ordinary parlance as streams, oceans, rivers, and lakes. <u>The phrase does not include</u> channels through which water flows intermittently or ephemerally, or <u>channels that periodically provide drainage for rainfall.</u>

<u>Rapanos v. United States</u>, 547 U.S. 715, 739 (2006) (citation, internal quotations, ellipses, and brackets omitted) (emphasis added).

The term "relatively permanent" does not necessarily exclude streams, rivers, or lakes that might dry up in extraordinary circumstance, such as a drought, nor does it exclude seasonal rivers that contain continuous flow during some months of the year but no flow during dry months. <u>Id.</u> at 733 n.5. Thus, even "a seasonally intermittent stream which ultimately empties into a river that is a water of the United States can, itself, be a water of the United States." <u>Moses</u>, 496 F.3d at 989. In addition, the Supreme Court made it clear that "channels containing permanent flow are plainly within the definition[.]" <u>Rapanos</u>, 547 U.S. at 733 n.5. However, normally, ditches, channels, and conduits carrying an intermittent flow of water are, by and large, not "waters of the United States." <u>Id.</u> at 735-36.

In <u>Rapanos</u>, the government brought civil enforcement proceedings based on Rapanos's actions of backfilling wetlands without a permit. 547 U.S. at

719-21.  The wetlands were on his own property and were near ditches or

man-made drains that eventually emptied into traditional navigable waters.  Based

upon the Army Corps of Engineers and the EPA's interpretation of their

jurisdiction, the government urged the Supreme Court to adopt an expansive

interpretation of "the waters of the United States."  That interpretation included

> virtually any parcel of land containing a channel or
> conduit-whether man-made or natural, broad or narrow,
> permanent or ephemeral-through which rainwater or
> drainage may occasionally or intermittently flow. . . .
> [such as] storm drains, roadside ditches, ripples of sand
> in the desert that may contain water once a year, and
> lands that are covered by floodwaters once every 100
> years.

Id. at 722.  The Supreme Court stated that the Army Corps's definition of "the

waters of the United States," which would include "storm sewers and culverts,

'directional sheet flow during storm events,' drain tiles, man-made drainage

ditches, and dry arroyos in the middle of the desert," stretches the definition

"beyond parody[] [and] [t]he plain language of the statute simply does not

authorize this 'Land Is Waters' approach to federal jurisdiction."  Id. at 734.

      In supporting its holding that "waters of the United States" does not

include channels through which water flows intermittently or ephemerally, or

channels that periodically provide drainage for rainfall, the Supreme Court further

explained that

> [i]t is of course true . . . that ditches, channels, conduits
> and the like can all hold water permanently as well as
> intermittently, . . . such a statute that treats "waters"
> separately from ditches, channels, tunnels, and conduits,
> thereby distinguishes between continuously flowing
> "waters" and channels containing only an occasional or
> intermittent flow.  It is also true that highly artificial,
> manufactured, enclosed conveyance systems-such as
> sewage treatment plants, and the mains, pipes, hydrants,
> machinery, buildings, and other appurtenances and
> incidents of the city['s] . . . system of waterworks,-likely
> do not qualify as "waters of the United States," despite
> the fact that they may contain continuous flows of water.
> But this does not contradict our interpretation, which
> asserts that relatively continuous flow is a necessary
> condition for qualification as a "water," not an adequate
> condition. Just as ordinary usage does not treat typically
> dry beds as "waters," so also it does not treat such
> elaborate, man-made, enclosed systems as "waters" on a
> par with "streams," "rivers," and "oceans."

Id. at 736 n.7 (citations, some quotation marks, and brackets omitted).

The holding of Rapanos discussed above is the plurality holding of

four Justices.  The Rapanos decision, however, produced another test for whether a

body of water falls under the reach of the CWA, as set forth by Justice Kennedy in

his concurrence.  Justice Kennedy found that "jurisdiction over wetlands depends

upon the existence of a significant nexus between the wetlands in question and

navigable waters in the traditional sense."  Id. at 779 (Kennedy, J., concurring in

the judgment).  He explained that

> wetlands possess the requisite nexus, and thus come
> within the statutory phrase "navigable waters," if the
> wetlands, either alone or in combination with similarly
> situated lands in the region, significantly affect the
> chemical, physical, and biological integrity of other
> covered waters more readily understood as "navigable."
> When, in contrast, wetlands' effects on water quality are
> speculative or insubstantial, they fall outside the zone
> fairly encompassed by the statutory term "navigable
> waters."

Id. at 780.

Relying on the test espoused by Justice Kennedy, CCH argues that

proof that a spill went into a streambed is insufficient to establish liability because

Plaintiffs have not established that each stream at issue has a "significant nexus"

with a navigable water such that each stream has a hydrological connection with

the ocean that affects the physical, chemical or biological integrity of the ocean.

CCH's reliance on Rapanos for this proposition is misplaced because that test was

applied specifically to an isolated wetland that is not adjacent to a navigable-in-

fact-water.  See Rapanos, 547 U.S. at 759, 783-87  (Kennedy, J., concurring in the

judgment).  As there are no isolated wetlands at issue in this case, the "significant

nexus" test is irrelevant and inapplicable.

17

However, the plurality's definition of waters of the United States discussed above is clearly applicable to CCH's arguments that it cannot be held liable for spills that entered a storm drain, dry stream bed, or otherwise did not enter into receiving waters of the Untied States.  This Court will discuss each of CCH's objections by category in turn.

1.  <u>Storm Drain Spills</u>

Of the 134 contested violations, CCH argues that it is not liable for 74 because the spills at issue reached only a storm drain ("Storm Drain Spills").  (<u>Compare</u> Pls.' Reply Ex. 5A, Joint Ex. A from Doc. #202, and CCH Ex. C from Doc. # 202.)  Plaintiffs state that with respect to each of the Storm Drain Spills at issue, CCH's own discharge monitoring reports specified a water, under the column tilted "Entered Receiving Waters" as the water which the spill could have reached or to which the storm drain led.[3]  For example, the overflow on July 13,

---

[3]The Ninth Circuit has held that Discharge Monitoring Reports, are "conclusive evidence of an exceedance of a permit limitation."  <u>Sierra Club v. Union Oil Co. of Cal.</u>, 813 F.2d 1480, 1492 (9th Cir. 1987) <u>vac'd on other grounds</u>, 485 U.S. 931 (1988), <u>judgment reinstated and amended</u>, 853 F.2d 667 (9th Cir. 1988).  This Court has also previously held that Discharge Monitoring Reports constitute admissions of noncompliance that bind the defendant in an enforcement proceeding because the reports are submitted under penalty of perjury.  <u>Save Our Bays and Beaches</u>, 904 F. Supp. at 1138 ("these self-monitoring reports, known as "Discharge Monitoring Reports" or "DMRs," are public documents and are submitted under penalty of perjury.").

1999, at Lawehana St., was noted by the DOH as having entered a storm drain,

whose outlet was Pearl Harbor.  Similarly, the overflow on July 17, 1999, at

Middle St., was noted as having entered a storm drain which leads to Kahauiki

Stream.  Plaintiffs provided evidence, which is uncontested by CCH, that Pearl

Harbor is a receiving water, and Kahauiki Stream is a tributary that runs to

receiving waters.

CCH asserts that regardless of whether its Spill Reports reported a

receiving water, under the Rapanos decision, spills that enter only a storm drain

cannot result in a CWA violation because a storm drain is not a water of the United

States.  Plaintiffs assert that this Court should follow the Eleventh Circuit case,

United States v. Eidson, 108 F.3d 1336 (11th Cir. 1997), and count spills which

went into a storm drain that leads to a receiving water, because the Ninth Circuit

recently relied on reasoning from that case and found that Rapanos did not

undercut that reasoning.

In Eidson, the court found CWA violations based upon discharges

which entered into storm water ditches that led to a drainage canal, which in turn

flowed into Tampa Bay.  The Eidson court reasoned that

> [t]here is no reason to suspect that Congress intended to
> exclude from "waters of the United States" tributaries
> that flow only intermittently. Pollutants need not reach

> interstate bodies of water immediately or continuously in
> order to inflict serious environmental damage. . . . Rather,
> as long as the tributary would flow into the navigable
> body of water "during significant rainfall," it is capable
> of spreading environmental damage and is thus a "water
> of the United States" under the Act.

Id. at 1342.

The Ninth Circuit in Moses noted that it had previously found that "a seasonally intermittent stream which ultimately empties into a river that is a water of the United States can, itself, be a water of the United States" and in so doing relied upon the language quoted above from the Eidson case.  Moses, 496 F.3d at 989.  The Ninth Circuit discussed the Rapanos decision and found that it did not undercut the prior analysis based on Eidson because the prior analysis was in line with the statements in Rapanos that seasonal rivers with continuous flow for some months of the year were not necessarily excluded from the definition, and that "'intermittent streams, like perennial streams, are still streams.'"  Id. at 989-90 (quoting Rapanos 547 U.S. at 801 (Stevens, J., dissenting)).  Therefore, in Moses, the Ninth Circuit found that

> the man-made severance of Teton Creek at Alta,
> Wyoming, may have made the portion [of the Teton
> Creek] in question here dry during much of the year, but
> when the time of runoff comes, the Creek rises again and
> becomes a rampaging torrent that ultimately joins its
> severed lower limb and then rushes to the Teton River,

20

> the Snake River, and onward to the Columbia River and
> the Pacific Ocean. . . . In short, on this record Teton
> Creek constitutes a water of the United States[.]

Id. at 991.

Unlike the record in Moses, however, this Court does not have

evidence with respect to each Storm Drain Spill that the storm drains at issue ever

had a continuous flow over some months of the year or could be considered a

seasonally intermittent stream or tributary to a receiving water. Although some

storm drains could possibly have a continuous flow of water during some months

of the year or "when the time for run off comes," no such evidence was presented.

At most, the DOH Summary Table or CCH Spill Reports state that at the time of

the spill in question there were intermittent showers or heavy rainfall. This is

insufficient to establish as a matter of law that each storm drain is a water of the

United States or is anything other than a "channel[] that periodically provide[s]

drainage for rainfall." Rapanos, 547 U.S. at 739 (the term waters of the United

States "does not include channels through which water flows intermittently or

ephemerally, or channels that periodically provide drainage for rainfall").[4] As a

---

[4] Indeed, storm drains, also known as storm sewers, are defined as sewers "intended to carry only storm waters, surface runoff, street wash waters, and drainage." 40 C.F.R. § 35.905; see also 40 C.F.R. § 35.2005.

channel that periodically provides drainage for rainfall is not included within the definition of waters of the United States, Plaintiffs, without more evidence, cannot establish CWA violations for spills that entered storm drains only.

Accordingly, Plaintiffs' claim with respect to the 74 violations based upon Storm Drain  Spills is DENIED WITHOUT PREJUDICE as there is no evidence that the storm drains at issue had at least a seasonally intermittent flow of water during some portion of the year.

2. Dry Stream Bed

CCH states that four of the alleged spills entered only a dry stream bed (one of which also went into a storm drain and another of which was also contained) and thus, Plaintiffs are not entitled to summary judgment with respect to CWA violations on those spills.  See Rapanos, 547 U.S. at 732-733 (waters of the United States "connote continuously present, fixed bodies of water, as opposed to ordinarily dry channels through which water occasionally or intermittently flows. . . . [The term does not] encompass[] transitory puddles or ephemeral flows of water.").  Plaintiffs argue that the streams at issue intermittently flow to the Pacific Ocean.

As it is clear that a completely dry stream bed through which water never flows would not be considered a water of the United States, this is a factual

22

dispute of whether the stream beds at issue have no flow, only intermittent or ephemeral flow, or continuous flow during some months of the year.

One of the spills at issue occurred on March 13, 2000, at La-I Road in Palolo, Honolulu. The DOH Summary Table and the CCH Spill Reports state that rocks fell on a line in a dry stream bed, and the spill was removed. Under the receiving Waters column, CCH reported that the spill entered Palolo Stream. Plaintiffs provided the declaration of Matthew McGranaghan, an Associate Professor of Geography at the University of Hawaii, in which he testifies that Palolo Stream is a tributary to the Pacific Ocean. Other than this unsupported and unexplained statement that Palolo Stream is a tributary to the Pacific Ocean, Plaintiffs have not provided evidence regarding the level of flow in the stream at the time of the spill or whether Palolo Stream is ordinarily a dry channel through which water occasionally or intermittently flows, or has a continuous flow. Because CCH's spill reports and DOH's summary table both indicate that the spill occurred in a dry stream bed, there is a question of fact as to whether Palolo Stream qualifies as a water of the United States. Accordingly, summary judgment cannot be found in Plaintiffs' favor regarding this spill.

Similarly, for a spill that occurred on October 17, 2001, the DOH summary table indicated that the spill entered Aiea Stream and that the stream bed

was dry.  Plaintiffs offered only McGranaghan's declaration that Aiea Steam is a water body that drains into the Pacific Ocean.  This is insufficient for this Court to find as a matter of law that Aiea Stream is continuously flowing body of water, rather than a dry stream bed which may never have any flow.

For a spill that occurred on February 13, 2007, the DOH Summary Table stated that the spill entered Moanalua Stream, which was dry. McGranaghan's declaration again states only that Moanalua Stream is a tributary to the Pacific Ocean.

Finally, for a spill that occurred on July 31, 2007, the CCH Spill Reports and DOH Summary Table state that the spill entered Waimalu dry stream bed.  Plaintiffs only evidence regarding Waimalu stream is the declaration that states that it drains into the Pacific Ocean.  This is insufficient to establish that the stream beds at issue had any continuous flow of water.

Thus, Plaintiffs' claim with respect the dry stream bed spills is DENIED WITHOUT PREJUDICE.

3.    <u>No Evidence Spill Reached Receiving Waters/Spill Contained</u>

CCH argues that two spills (which also went into a dry stream bed or a storm drain) should not be counted because the spills were contained.  CCH also

asserts that 16 alleged violations should not be counted because there was no reported volume to a receiving water, and therefore, no violation of the CWA.

To the extent CCH argues that it cannot be found liable for any spills because there is no evidence of the actual volume of spill that reached a receiving water, that argument lacks merit. It is of no importance that CCH's Spill Report only estimated the total volume of the spills and that the spill reached the waters of the United States, but did not expressly identify the volume of sewage that entered the Pacific Ocean. There is no requirement that a specified volume must reach waters of the United States, only that the discharge went into a receiving water. See Sierra Club, 813 F.2d at 1491 (there is no de minimus exception to the CWA); Moses, 496 F.3d at 989 ("Pollutants need not reach interstate bodies of water immediately or continuously in order to inflict serious environmental damage.").

All that matters is whether there is sufficient evidence to determine as a matter of law that a spill entered into a water of the United States as defined above. Although this Court has previously held that discharge monitoring reports constitute admissions of noncompliance that bind the defendant in an enforcement proceeding because the reports are submitted under penalty of perjury, CCH's notation in its Spill Reports under the column "Entered Receiving Water" is only some evidence that a spill entered a receiving water, rather than conclusive

25

evidence.  This is due in part to the fact that whether an identified body of water is in fact a receiving water of the United States is a legal question, in addition to being a factual question.  Therefore, that a CCH employee realized that a body of water may have been involved or impacted by the spill and therefore listed that body of water in the Spill Report under the appropriate column does not conclusively show that the body of water fits within the definition of the term "waters of the United States," as defined in Rapanos.  That is a determination to be made by the court.

Moreover, for spills where there was also a notation that it entered a dry stream bed or a storm drain, the report itself creates a question of fact as to whether the body of "water" identified under the column "Entered Receiving Water" legally qualifies as a receiving water.

In other words, the mere fact that CCH named a body of water under a column entitled Receiving Water in its Spill Report is not conclusive evidence that the spill entered into "waters of the United States" as that term has been defined by case law.  Accordingly, based on the record as its stands, this Court cannot enter summary judgment in favor of Plaintiffs on the 16 violations alleged.  Plaintiffs' motion with respect to these 16 violations is DENIED WITHOUT PREJUDICE.

26

5.  <u>Multiple Violations</u>

The following four spills began on one date and ended on another date: 1) December 6 to December 7, 2000; 2) March 7 to March 8, 2002; 3) July 4 to August 7, 2003; and 4) March 22 to March 23, 2006.  CCH contends each of the four spills should be counted as only one violation, for a total of four violations.  Plaintiffs argue that a violation should be counted for every calendar day on which the spill occurred, which according to Plaintiffs, would be 41 violations.

Plaintiffs cite to this Court's October Order wherein this Court determined that a violation of an annual limit counts as a violation of each day of the year.  (October Order at 16-17.)  This Court so held because the CWA imposes a maximum penalty "per day for each violation."  33 U.S.C. § 1319(d); <u>see</u> <u>also</u> <u>Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd.</u>, 791 F.2d 304, 314 (4th Cir. 1986), <u>vacated on other grounds</u>, 484 U.S. 49 (1987) (holding that 33 U.S.C. § 1319(d) speaks in terms of "penalties per day of violation").

It is clear to this Court therefore, that CCH is liable for each day on which a violation occurred, which in this case would be each day during which a spill occurred or was still occurring.  However, neither party presented legal citations to this Court defining a "day."  For example, should a day be considered solely by calendar date without regard to a 24 hour period, or where a sewage spill

27

lasts for several days, should a day be counted on a rolling 24 hour period? This is an important question for these spills because some of them occurred in the evening or at night and lasted into the early hours of the next morning, but in total lasted far less than 24 hours. Without answering this question, and counting only each 24 hour period in favor of the non-moving party, this Court finds that at a minimum, there were 37 violations. This Court, therefore, GRANTS summary judgment in favor of Plaintiffs with respect to these four spills, finding a total of 37 violations. This Court DENIES the remainder of Plaintiffs' request for further violations with respect to these spills WITHOUT PREJUDICE.

II.    Plaintiffs' Second Claim for Relief

In their motion, Plaintiffs sought a finding that there were 207 violations of the CWA for discharging raw or partially treated sewage to the ground in the form of overflows or bypasses from the Honouliuli WWTP in violation of the Honouliuli Permit (the "Permit"). Plaintiffs, however, withdrew some of these alleged violations and now seek summary judgment on 148 violations of the Permit. Plaintiffs claim that any spill or bypass of the Honouliuli WWTP collection system, even those that did not reach waters of the United States, violate the Permit because the Permit prohibits any overflow or bypass and requires CCH to operate its system in a manner that precludes public contact with

wastewater.  Plaintiffs have presented CCH's reports which indicate that CCH

spilled raw or partially treated sewage from the Honouliuli WWTP or collection

system hundreds of times between May 1999 and December 2007.  CCH seeks

summary judgment with respect to 148 alleged violations.

CCH opposes this motion and has separately filed a motion to dismiss

the Second Claim.  CCH states that this Court must deny Plaintiffs' motion and

grant its motion to dismiss the Second Claim in its entirety because Plaintiffs are

seeking recovery for ground-only spills, which Plaintiffs concede did not enter into

waters of the United States.  CCH's main argument is that the Supreme Court in

Rapanos and Solid Waste Agency of N. Cook County v. U.S. Army Corps of

Engineers, 531 US. 159 (2001) (hereinafter "SWANCC")[5] clarified that the scope

of the CWA is limited to impacts to waters of the United States, and because none

of the spills alleged in the Second Claim impacted the waters of the United States,

this Court has no jurisdiction over the Second Claim.  In other words, although the

spills at issue in the Second Claim may have violated the terms of the Permit, those

---

[5]In SWANCC, the Supreme Court held that the Amy Corps of Engineers'
rule which extended the definition of "navigable waters" under the CWA to
include intrastate waters used as habitat by migratory birds, exceeded the authority
granted to Corps under CWA.  531 U.S. at 171-72.  Therefore, an abandoned sand
and gravel pit containing ponds used by migratory birds was not subject to Corps'
jurisdiction under CWA.  Id.

Permit violations did not involve spills that reached waters of the United States and therefore, this Court does not have jurisdiction because it cannot enforce through a permit what it could not enforce under the CWA.

Plaintiffs argue that they have the right to enforce the Permit through this citizen suit and that CCH is essentially seeking to modify or challenge its Permit terms, something which it cannot do in this enforcement proceeding. CCH argues in its reply brief that it is not at this time challenging the validity of the Permit, or EPA's or DOH's authority to issue permit conditions that do not impact waters of the United States, nor is it seeking to nullify any of the conditions in its Permit. CCH is only raising the issue that Plaintiffs should not be able to use the Permit terms to enforce ground-only spills under the CWA because the CWA only prohibits spills that reach the waters of the United States.

The EPA was allowed to file an Amicus Curiae brief on these issues, which it did on July 14, 2008 (the "Amicus Curiae Brief"). (Doc. # 200.) The EPA agrees with Plaintiffs and asserts that CCH is in fact seeking to challenge the terms of its Permit, something which it cannot do. In addition, EPA avers that this Court has subject matter jurisdiction over Plaintiffs' Second Claim through 28 U.S.C. § 1331 and the CWA and that jurisdiction is unaffected by the Rapanos and SWANCC cases. CCH filed an opposition to the Amicus Curiae Brief on July 21,

30

2008.  (Doc. # 205.)  Because there are cross motions on the Second Claim, this Court will discuss each motion in turn.

      A.     <u>CCH's Motion to Dismiss the Second Claim</u>

      1.     <u>Subject Matter Jurisdiction</u>

      The heart of CCH's argument is that Plaintiffs' claim should be dismissed because they cannot prove a necessary element of their Second Claim -- that the spills entered waters of the United States.[6]  CCH argues that Plaintiffs' claim is therefore not colorable under the CWA, and this Court does not have jurisdiction over the Second Claim.  This Court disagrees.

      Subject matter jurisdiction is established in this case under 28 U.S.C. § 1331, which vests this Court with jurisdiction over actions arising under the laws of the United States.  The Second Claim arises under the CWA, a law of the United States.  In addition, section 505 of the CWA authorizes citizens to bring suit against any governmental entity that is alleged to be in violation of an effluent standard or limitation, which includes a permit condition, and provides that the district courts shall have jurisdiction to enforce the effluent standard or limitation.

_____

   [6]  As stated above, one way to establish a violation of the CWA is to show that CCH is a person who discharged a pollutant into the navigable waters of the United States.  <u>See</u> 33 U.S.C. § 1311(a); 33 U.S.C. § 1362(12); <u>see</u> <u>also</u> <u>Moses</u>, 496 F.3d at 988.

33 U.S.C. §§ 1365(a)(1) and (f).  Plaintiffs have brought such a claim in their

Second Claim.

Whether or not Plaintiffs can prove violations of the CWA based upon

violations of NPDES permit terms that prohibit ground-only spills, goes to the

merits of Plaintiffs' claim, not to the jurisdiction of this Court.  Indeed, "[i]t is

firmly established . . . that the absence of a valid (as opposed to arguable) cause of

action does not implicate subject-matter jurisdiction, i.e., the courts' statutory or

constitutional power to adjudicate the case."  Steel Co. v. Citizens for a Better

Env't, 523 U.S. 83, 89 (1998).

> Jurisdiction, therefore, is not defeated . . . by the
> possibility that the averments might fail to state a cause
> of action on which petitioners could actually recover. For
> it is well settled that the failure to state a proper cause of
> action calls for a judgment on the merits and not for a
> dismissal for want of jurisdiction.

Bell v. Hood, 327 U.S. 678, 682 (1946).

In United States v. Sea Bay Dev. Corp., No. 2:06cv624, 2007 WL

1169188 (E.D. Va. April 18, 2007), the court was presented with the same

argument that CCH makes here.  The defendants argued that pursuant to the

Rapanos decision, the court lacked subject matter jurisdiction because the CWA

could not be construed to cover the property in question.  The court determined

that "the issue of whether the property in question is covered by the CWA depends

upon the Court's construction of the CWA." <u>Id.</u> at *4.  The court held that its

construction of the term

> 'waters of the United States' may determine whether
> [the] [p]laintiff has a valid cause of action, but as in <u>Steel</u>
> <u>Co.</u>, this question of statutory construction does not
> implicate subject matter jurisdiction. Instead, whether the
> property in question falls under the purview of the
> CWA's 'navigable waters' definition as construed by the
> Supreme Court goes to the merits of Plaintiff's case.

<u>Id.</u>

Similarly, here, the issue of whether the spills violated the Permit and

in turn violated the CWA depend upon this Court's construction of the CWA based

on precedent.  As detailed below, there is a colorable argument that CCH is

attempting to challenge its Permit terms through this jurisdictional argument and

because this is an enforcement proceeding and CCH did not exhaust its

administrative remedies, CCH cannot now make such a challenge.  Accordingly,

this Court has jurisdiction to consider the merits of Plaintiffs' Second Claim

because the issue of whether they can enforce permit terms based on ground-spills

goes to the scope of the CWA, its grant of authority to the EPA, and CCH's failure

to follow the statutorily imposed administrative remedies.  <u>See</u> <u>Steel Co.</u>, 523 U.S.

at 92 (the question of the scope of the Emergency Planning and Community Right-To-Know Act of 1986 goes to the merits and not to statutory standing).

2.    Challenge to Permit Terms

Although CCH claims that it is not challenging its Permit terms, that is in fact what CCH has done in its briefs.  Indeed, Plaintiffs' Second Claim is based on violations of the Permit, and CCH is arguing that the Permit cannot be enforced in this Court because the Permit prohibits acts that are not prohibited by the CWA -- ground-only spills.  Time and again CCH asserts that neither the EPA nor Plaintiffs can enforce through a permit what is unenforceable under the CWA. In other words, the Permit violations alleged here are unenforceable.[7]

As acknowledged by CCH, however, permit terms are not subject to judicial review in enforcement proceedings.  33 U.S.C. § 1369(b)(1) provides that review of the Administrator's action

> may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts business which is directly affected by such action upon application by such person. Any such application shall be made within 120 days from the date of such determination, approval, promulgation, issuance or denial, or after such

---

[7] Specifically, in its opposition to the Amicus Curiae Brief, CCH states "permit conditions -- to the extent they seek to regulate non-navigable water spills -- are clearly invalid."  (Doc. # 205 at 3.)

> date only if such application is based solely on grounds
> which arose after such 120th day.

33 U.S.C. § 1369(b)(2) provides "[a]ction of the Administrator with respect to

which review could have been obtained under paragraph (1) of this subsection

shall not be subject to judicial review in any civil or criminal proceeding for

enforcement."  See 33 U.S.C. § 1369(b).

Following this premise and cases based thereon, this Court previously

held in this case that CCH could not challenge the typographical error of the

effluent limitations set forth in its Permit because this Court did not have authority

to change the terms of a permit in an enforcement action, and CCH had not

exhausted its administrative remedies.  (Order Granting in Part and Denying in Part

Pls.' Mot. for Partial SJ on Pls.' Third, Fourth and Eighth Claims filed Oct. 30,

2007 ("October Order") at 24-27.)  In making that determination, this Court relied

upon Sierra Club which, similar to the instant case, was "an enforcement action in

which Sierra Club alleged that Union Oil failed to comply with the terms of a

permit[.]" 813 F.2d at 1486.  In Sierra Club, the Ninth Circuit found that "Union

Oil was essentially asking the district court to modify its permit to include an upset

provision," something which the district court did not have authority to do.  Id. at

1486.  Instead, the court held that Union Oil should have exhausted its

35

administrative remedies to modify the terms of the permit.  Id.  Because Union Oil

had failed to proceed through the proper administrative channels, it was bound by

the terms of the permit.  Id.

       The Ninth Circuit explained that "[t]he purpose of the exhaustion rule

is to allow an administrative agency to perform functions within its special

competence-to make a factual record, to apply its expertise, and to correct its own

errors so as to moot judicial controversies."  Id. (citation and internal quotation

marks omitted).  The Ninth Circuit further noted that there are several

administrative routes that can be taken to protest a permit's terms.  Id. at 1487.  For

example,

> [t]he NPDES program authorizes permittees to seek
> modifications of their permits in response to current
> judicial decisions and new EPA regulations. 40 C.F.R. §
> 122.62. In addition, when a state permit issuer submits a
> proposed permit to the EPA Administrator for review, the
> Administrator is authorized to object to the permit's
> terms. 33 U.S.C. § 1342(d).

Id.  In addition, as noted above, 33 U.S.C. § 1369 allows for review by the

appellate court.

       Here, CCH has not exhausted its administrative remedies with respect

to the Permit.  Although the Rapanos decision was issued well after the 120 days

had passed to challenge the Permit terms, CCH has provided no reason why it did

not challenge its Permit terms based on this argument soon after the <u>Rapanos</u>

decision was issued in 2006. Accordingly, it is too late for CCH to now challenge

the terms of its Permit through a motion to dismiss the Second Claim of this

enforcement action. For these reasons, this Court DENIES CCH's motion to

dismiss Plaintiffs' Second Claim.

      B.    <u>Plaintiffs' Motion for Summary Judgment on Their Second Claim</u>

      If the only pending motion were CCH's motion to dismiss the Second

Claim, this Court would not need to further discuss the Second Claim as the

motion has been denied because it is essentially an untimely challenge to the

Permit terms. However, because Plaintiffs have moved for summary judgment on

their Second Claim, this Court must determine whether Plaintiffs have met their

burden of proof on each element.

      It is undisputed that each of the sewage spills at issue in the Second

Claim are ground-only spills. Plaintiffs' have conceded that they cannot show that

any of the spills entered waters of the United States. CCH argues that because the

spills did not enter receiving waters, Plaintiffs cannot prove violations of the

CWA. Plaintiffs, however, argue that whether or not the spills entered waters is

irrelevant because it is clear that the spills violated the Permit terms, and therefore

37

the CWA, and CCH cannot now attack the terms of its Permit.  This Court agrees

with Plaintiffs.

Plaintiffs framed their Second Claim as a cause of action for sewage

spills in violation of the Permit conditions and the CWA "33 U.S.C. §§ 1311(a),

1365."  (Second Amend. Compl.)  Plaintiffs alleged that CCH's poor system

operation and maintenance allowed ground-only sewage spills in violation the

Standards Provisions and Reporting Requirements of the Permit, which requires

CCH to operate the collection system in a manner that precludes public contact

with wastewater and prohibits overflows and bypasses.  (Id. at 39-42.)  Plaintiffs

were careful to keep their Second Claim to violations of the Permit.  The last

paragraph of the Second Claim states the Permit condition

> constitutes an effluent limitation within the meaning of
> CWA section 505(a) and (f), 33 U.S.C. § 1365(a), (f).
> Accordingly, every separate instance when CCH has
> failed to comply with DOH NPDES Standard Permit
> Condition paragraph 9 on or after May 30, 1999
> constitutes a day of the Defendants' violation of a CWA
> effluent limitation.

(Id. ¶ 84.)

In order to determine if Plaintiffs are entitled to summary judgment,

this Court must review the Permit terms, and the underlying CWA authority that

the Permit is based upon.

> CWA section 505(a) provides in part as follows
>
> > any citizen may commence a civil action on his own behalf-- (1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter . . . .

33 U.S.C. § 1365(a).  The definition of the term "Effluent standard or limitation" includes "a permit or condition thereof issued under section 1342 of this title, which is in effect under this chapter[.]"  33 U.S.C. § 1365(f)(6).  33 U.S.C. § 1342(a)(1) provides that "the Administrator may, after opportunity for public hearing, issue a permit for the discharge of any pollutant."  "The Administrator shall prescribe conditions for such permits to assure compliance with the requirements of paragraph (1) of this subsection, including conditions on data and information collection, reporting, and such other requirements as he deems appropriate."  33 U.S.C. § 1342(a)(2) (emphasis added).

Thus, the statute clearly provides the Administrator with broad authority to place conditions in the permit that he deems appropriate.  See Arkansas v. Oklahoma, 503 U.S. 91, 105 (1992) ("Congress has vested in the Administrator broad discretion to establish conditions for NPDES permits.").  The EPA has promulgated regulations in reliance on this grant of power.  Those

39

regulations provide that permits must contain conditions appropriate to achieve compliance with the CWA, including a condition to properly operate and maintain facilities. 40 C.F.R. § 122.41. Those regulations also provide that "[a]ny permit noncompliance constitutes a violation of the Clean Water Act and is grounds for enforcement action." Id.

On the one hand CCH asserts that it is not challenging the Permit terms or EPA's authority. On the other hand, in its opposition to the Amicus Curiae Brief, relying on Rapanos and SWANCC, CCH asserts that to the extent the Permit regulates ground-only spills, it is invalid. CCH also asserts that the EPA has failed to make the connection or explain how conditions prohibiting ground-only spills are necessary to ensure compliance with the CWA and thus, is actually within EPA's authority to regulate. CCH is essentially arguing that the prohibition of ground-only spills in its Permit is beyond EPA's authority to regulate.

Although CCH's argument that Plaintiffs cannot enforce through a permit what is unenforceable directly under the CWA may be persuasive given the holdings in Rapanos and SWANCC, CCH has not effectively challenged the EPA's authority to regulate ground-only spills or argued that its Permit conditions

were outside of EPA's reasonable exercise of statutory authority.[8]  Indeed, CCH

only raised that argument in its last brief, and prior to filing that brief had stated

that it was not challenging EPA's authority or the Permit terms.  Having failed to

make the argument earlier, and leading Plaintiffs and this Court to believe that

CCH was not challenging its Permit terms or EPA's authority, CCH's argument is

untimely and cannot be considered.  See LR 7.4 ("Any arguments raised for the

first time in the reply shall be disregarded.").  Moreover, even if CCH had

challenged EPA's authority in its motion, such challenge could not be considered

by this Court in an enforcement proceeding where CCH failed to exhaust its

administrative remedies.  See 33 U.S.C. § 1369(b); Sierra Club, 813 F.2d at 146.[9]

_____

[8]  This Court notes, however, that although CCH's argument is persuasive
based upon the definition of waters of the United States provided in Rapanos, the
Supreme Court in Rapanos and SWANCC decided the cases based on
interpretation of the statute and avoided addressing the outer limits of Congress's
authority under the Commerce Clause, such as whether Congress could authorize
the EPA to regulate purely intrastate waters under the CWA.  See SWANCC, 531
U.S. at 174 (" We thus read the statute as written to avoid the significant
constitutional and federalism questions raised by respondents' interpretation, and
therefore reject the request for administrative deference."); Rapanos, 547 U.S. at
738-39 (interpreting the language of the statute and declining to adopt an
interpretation that stretches the outer limits of Congress's commerce power).

[9]  CCH also relies on Exxon Corp. v. Train, 554 F.2d 1310 (5th Cir. 1977),
which found that the EPA did not have the authority to place conditions in permits
controlling the disposal of wastes into deep wells.  The procedural posture of that
case, however, is quite different from the instant case.  In Exxon, Exxon had
already requested a permit modification from the EPA, which was denied, and the

Additionally, the Ninth Circuit has held that permit conditions relating to sewage, and permit conditions regulating discharges that never reach navigable waters are enforceable permit conditions.  See NW Envtl. Advocates v. City of Portland, 56 F.3d 979, 988-89 (9th Cir. 1995)  ("enforceable permit conditions include conditions relating to sewage maintenance, and construction schedules . . . [and] citizens groups may enforce even valid permit conditions that regulate discharges outside the scope of the Clean Water Act, namely discharges that may never reach navigable waters.")  (citations omitted) (emphasis added).[10]  This is exactly the type of conduct prohibited by the Permit that Plaintiffs now seek to enforce and for which they have the right to enforce.  Id. at 986 ("[t]he plain language of CWA § 505 authorizes citizens to enforce all permit conditions.") (emphasis added).

This Court is cognizant of the fact that by granting Plaintiffs' motion and finding 148 violations of the Permit, it is in effect finding 148 violations of the CWA that are not based on adding pollutants to waters of the United States.

_____

case involved a petition for review.  Id. at 1315-16.  Here, however, CCH has not requested a modification of its Permit from the EPA and this is an enforcement proceeding.

[10]Although the NW Envtl. Advocates decision was issued prior to the Rapanos and SWANCC decisions, the Ninth Circuit's holding has not been overturned.

Although this may seem as if it is a flawed result as argued by CCH, courts, including this Court in this case, have consistently found violations of the CWA for permit violations where the violative conduct could not by itself have violated the CWA had a permit not been issued.[11]  Indeed, in the October Order, this Court granted summary judgment in favor of Plaintiffs on their Fourth Claim for relief, which alleged violations of the Sand Island WWTP Permit deadlines to construct and operate a disinfection facility.  (October Order at 2.)  This Court found that CCH committed a total of 1,578 violations of the permit for its continuous failure to construct and operate the disinfection facility as required by the NPDES permit.  (Id. at 30.)  Certainly, had the permit not been issued, a failure to build a disinfection plant would not directly violate the CWA as it does not involve an addition of pollutants to waters of the United States.  CCH has not challenged that holding or argued that those violations should be discounted as they do not involve

_____

[11] See Save Our Bays and Beaches v. City and County of Honolulu, 904 F. Supp. 1098, 1105 (D. Haw. 1994) ("Courts have held that a failure to comply with a permit condition amounts to a violation of the Act itself.") (citing NRDC v. Vygen Corp., 803 F. Supp. 97, 103 (N.D. Ohio 1992) (reporting violations enforceable under the Act); Sierra Club v. Simkins Indus., Inc., 847 F.2d 1109, 1115 (4th Cir. 1988) (same); SPIRG v. P.D. Oil & Chem. Storage, Inc., 627 F. Supp. 1074, 1087-88 (D.N.J. 1986); United States v. Earth Scis., Inc., 599 F.2d 368, 374 (10th Cir. 1979); Pymatuning Water Shed Citizens for a Hygienic Env't v. Eaton, 506 F. Supp. 902 (W.D. Pa. 1980), aff'd, 644 F.2d 995 (3rd Cir. 1981) (holding conditions relating to maintenance to be enforceable)).

direct CWA violations.  See Nw Env't Advocates, 56 F.3d at 988-89 (noting that

several courts had held that citizens groups may seek to enforce many kinds of

permit conditions besides effluent limitations, such as retaining records of

discharge sampling, and filing reports).

       The reason for allowing citizen enforcement of permit terms that do

directly involve adding pollutants into receiving waters is that as long as the permit

is valid, a violation of a permit in turn is a violation of the CWA because the

Administrator has authority to include in a permit conditions to assure compliance

with the CWA as he deems appropriate.  CCH had the opportunity to challenge the

conditions of its Permit, including the condition that any bypass or overflow would

be considered a violation of the Permit despite the fact that it did not reach

receiving waters.  Having failed to challenge the Permit conditions, as set forth

above, CCH may not use an enforcement proceeding to collaterally attack the

terms of its Permit.  In other words, by failing to make this argument earlier in the

correct forum, this Court cannot now entertain such an argument.

       Although it is clear that ground-only spills are not in themselves

violative of the CWA, a permit was issued and each spill in fact violates the

Permit.  As set forth above, the Permit prohibits overflow or bypasses of the

treatment facilities, and prohibits public contact with sewage.  Each of these

44

sewage spills violated those provisions of the Permit.  Therefore, this Court finds

148 violations of the Permit and the CWA.  For these reasons, Plaintiffs' motion

for summary judgment on the Second Claim is GRANTED and this Court finds

148 violations of the Permit.

<u>CONCLUSION</u>

For the reasons stated above, this Court GRANTS IN PART AND

DENIES IN PART WITHOUT PREJUDICE Plaintiffs' Motion for Partial

Summary Judgment on Plaintiffs' First and Second Claims and DENIES CCH's

Motion to Dismiss Plaintiffs' Second Claim.

Plaintiffs' motion for summary judgment is GRANTED with respect

to their First Claim for the uncontested 112 spills, each of which this Court has

found in turn violates the Clean Water Act, and for 37 other violations from the

contested spills, for a total of 149 violations under the First Claim.  Plaintiffs'

motion on their First Claim for all other violations, all of which are contested, is

DENIED WITHOUT PREJUDICE.  Plaintiffs' motion for summary judgment with

45

respect to their Second Claim is GRANTED, and this Court finds 148 violations of the Permit.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, August 18, 2008.



_____
David Alan Ezra
United States District Judge

Sierra Club, Hawaii Chapter, et al. v. City and County of Honolulu et al., CV. NO. 04-00463 DAE-BMK;  ORDER GRANTING IN PART AND DENYING IN PART WITHOUT PREJUDICE  PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' FIRST AND SECOND CLAIMS; AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' SECOND CLAIM